**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SAMUEL WHITE**

Plaintiff

Case No.:

-v-

**COMPLAINT AND JURY DEMAND**

**COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE DEPARTMENT, RONALD TAVARES, MICHAEL MILAU, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, DARRYL LEVY, LAURA NEWCOMBE, THOMAS SPOTA, JOHN DOES 1-10**

Defendants

---

Plaintiff, SAMUEL WHITE, by and through his attorney, Stephanie McClure, upon information and belief, respectfully states as follows:

## PRELIMINARY STATEMENT

1. Plaintiff brings this action against defendants for various violations of his rights pursuant to 42 U.S.C. § 1983, §1985, and under provisions of the United States Constitution, seeking monetary damages and non-monetary relief.
2. Defendants wrongfully detained, charged, arrested, and re-arrested the plaintiff, engaged in the fabrication of evidence, intentionally withheld evidence, and otherwise maliciously prosecuted manslaughter charges against the Plaintiff.
3. Plaintiff spent nearly a year in jail before he was acquitted at trial on July 12, 2019.
4. As a result of the unlawful actions of defendants, Plaintiff was damaged in a variety of ways. In addition to incarceration and all of the suffering that flows from that, plaintiff, a

business owner, lost business, his professional reputation, and his personal reputation. His family relationships suffered, including but not limited to that with his young daughter.

5. Damages continue to accrue daily, as media reporting reflecting the false arrest and malicious prosecution, continue to be available online, alongside photographs of plaintiff, continuing to harm his reputation every day.

6. These defendants have demonstrated a course of behavior, establishing a custom and culture of corruption.

7. Defendant, Thomas Spota, was the head of the Suffolk County District Attorney's Office, (the SCDAO), during the relevant time period. In or about December 2019, Spota was convicted on a federal indictment before this honorable court. He was convicted obstruction of justice, witness tampering, and conspiracy and is presently pending sentence in April 2020.

8. His trial and convictions exposed a history and customs of his administration that included: fabricating evidence and covering-up exculpatory evidence, as needed, to "fit" the District Attorney's version of the "facts" in a criminal case, versions that did not comport with truth or justice. Such is the nature of the misdeeds perpetrated upon this plaintiff.

9. In fact, at least five (5) cases of this nature, involving corruption and the intentional withholding of evidence and/or fabrication of evidence, have been identified in Suffolk County. The cases have either been dismissed or re-litigated. Two similar scenarios are the subject of complaints pending before this honorable court: 1) Shawn Lawrence v. Suffolk County et al; 2:19-cv-02887; and Thomas M. Moroughan v. The County of Suffolk, et al; 2:12-cv-00512.

10. Shawn Lawrence v. Suffolk County, et al. and Thomas M. Moroughan v. The County of Suffolk, et al. further demonstrate the "culture of corruption" of the named defendants.

11. No party is entitled to immunity from this action which seeks non-monetary and monetary relief.

## JURISDICTION AND VENUE

12. These claims are made pursuant to 42 U.S.C. § 1983, 1985, and provisions of the United States Constitution.

13. This court has original jurisdiction by authority of 28 U.S.C. §1331 and 1343.

14. Venue is laid properly in this honorable court pursuant to 28 U.S.C. §1391, as this is the district that encompasses defendants' offices and the district in which the subject matter transpired.

## THE PARTIES

15. Plaintiff, SAMUEL WHITE, is a citizen of the United States.

16. Defendant, COUNTY OF SUFFOLK (NY), ("the county"), is a municipal corporation, organized and existing in the State of New York and is a resident of the Eastern District of New York.

17. Defendant, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, is a law enforcement agency, and agency of the COUNTY. It is also the employer of the attorneys and law enforcement agents named herein and to be named.

18. The SUFFOLK COUNTY POLICE DEPARTMENT is also a law enforcement agency, and agency of the County, as are the named detectives and officers, as well as those to be named.

19. Defendant, RONALD TAVARAS, is and was at all relevant times, a detective employed by the Suffolk County Police Department and agent of the Suffolk County District Attorney's Office, at all times acting under color of law, the statutes, ordinances, customs, and usage of the State of New York and the county of Suffolk. He is sued in his individual and official capacities. He is not entitled to immunity as this complaint seeks non-monetary and monetary relief.

20. Defendant MICHAEL MILAU, is and was at all relevant times, a detective employed by the Suffolk County Police Department and agent of the Suffolk County District Attorney's Office, at all times acting under color of law, the statutes, ordinances, customs, and usage of the State of New York and the county of Suffolk. He is sued in his individual and official capacities. He is not entitled to immunity as this complaint seeks non-monetary and monetary relief.

21. Defendants, JOHN DOE 1-10 are and were at all relevant times, individuals, employees, or agents of the named defendants herein, or others to be determined during discovery, who participated in the course of misconduct that is the subject of this complaint.

22. Defendant DARRYL LEVY is and was an Assistant District Attorney (ADA) and an employee of the SUFFOLK COUNTY DISTRICT ATTORNEYS OFFICE, acting under color of law, the statutes, ordinances, customs, and usage of the State of New York and County of Suffolk at all relevant times herein. He is sued in his individual and official capacities. He is not entitled to immunity as this complaint seeks non-monetary and monetary relief.

23. Defendant LAURA NEWCOMBE is and was an Assistant District Attorney (ADA) and an employee of the SUFFOLK COUNTY DISTRICT ATTORNEYS OFFICE, acting under color of law, the statutes, ordinances, customs, and usage of the State of New York and County of Suffolk at all relevant times herein. She is sued in her individual and official capacities. She is not entitled to immunity as this complaint seeks non-monetary and monetary relief.

24. Defendant THOMAS SPOTA was the head of the SUFFOLK COUNTY DISTRICT ATTORNEYS OFFICE during the investigation and prosecution of this matter. His culture of malfeasance pervaded his office and perverted this prosecution as well as many others. All actions and inactions herein were made under color of law, the statutes, ordinances, customs, and usage of the State of New York and the county of Suffolk. He is sued in his individual and official capacities. He is not entitled to immunity as this complaint seeks non-monetary and monetary relief.

## BACKGROUND

25. It is imperative to note the background and culture of corruption in which the pertinent events took place.

26. Attorney misconduct, falsification of evidence, unfair trial practices, and *Brady* violations have been and were, at all relevant times, a custom and routine of the Suffolk County District Attorneys Office and the Suffolk County Police.

27. During the time period pertinent to plaintiff's case, at least 5 homicide cases have been dismissed or overturned in Suffolk County due to misconduct on the part of law enforcement, of the nature herein discussed.

28. Attached are articles from the New York Times and Newsday, illustrating the widespread corruption, and recent federal convictions of Thomas Spota and his co-conspirators within the District Attorneys Office.

29. This federal conviction of the former head of the Suffolk County District Attorneys Office evidences the culture of corruption he lead; having been convicted in a cover-up scheme along with, ironically, the head of his "anti-corruption unit." The conviction exposed the fabrication of evidence and creation of false facts to fit their "story." This culture, where law enforcement felt free to ignore available exculpatory evidence, create false facts and impressions, fabricate evidence, and engage in this type of "cover-up" of facts, represent the nature of the wrongs perpetrated against this plaintiff.

30. Thomas Spota was the Suffolk County District Attorney from 2002 through November 2017.

31. Spota was the highest-ranking law enforcement official with responsibility for settling and enforcing policy with respect to managing his office's personnel and the functions of the office and had policymaking authority in all such areas.

32. Under principles of municipal liability for federal civil rights violations, the Suffolk County District Attorney and any of its authorized delegates, had and has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in is office regarding their conduct as employees of the District Attorney's Office and the Defendant Suffolk County; including but not limited to their obligations not to coerce witnesses, not to manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence or Brady material to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony and argument. After all,

the duty of a district attorney is to do justice. Thomas Spota set the tone for the policies and procedures, not only those in writing, but those known to his employees, that pervaded the office as "cultural norms."

33. Fabricating evidence and withholding of exculpatory information from the defense are egregious constitutional violations and were part and parcel of ordinary operations in that office. While this may sound outlandish, the recent conviction, prior scandals, and numerous case examples, dismissals, and admonishments from the courts evidence this unfortunate and unjust reality.

34. Thomas Spota and the Suffolk County District Attorneys Office he headed, personally and through his authorized delegates, at all times, had authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline with respect to the performance of these duties by all employees of the Suffolk County District Attorneys Office.

35. The Suffolk County District Attorney is an elected officer of Suffolk County. The District Attorney's Office is funded from the County budget and the Office's personnel management and administrative policies were subject through the budgetary process of Suffolk County, including the County Executive and legislature.

36. The Suffolk County District Attorney personally and /or his authorized delegates, at all relevant times, had final authority and constituted a county policymaker for whom the defendant Suffolk County is liable.

37. Defendant Suffolk County had a duty through its policymakers, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or

defendants and of other members of the public. This duty was breached as is explained further below.

38. In this policymaking role on behalf of his employer, Suffolk County, and the Suffolk County District Attorneys Office, defendant Thomas Spota maintained a policy, custom, and or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Suffolk County. These violations included, (but were not limited to):

a. Knowingly or recklessly using (or failing to correct), false evidence

b. Fabricating evidence

c. Improper manipulation of witnesses

d. The creation of false or unreliable statements and/or testimony

e. Tolerating police creation of false or unreliable statements and/or testimony

f. Withholding from defendants, evidence favorable to them under *Brady v. Maryland*

All of these actions and more were perpetrated upon this plaintiff.

39. The culture created by Thomas Spota tolerated and encouraged these misdeeds and those of its kind and did so from the date he took office until the date he left in 2017, and continued through the conclusion of plaintiff's trial.

40. As exemplified during his federal case and conviction, Thomas Spota's policy of tolerance and misdeeds pervaded the Suffolk County Police as well, not only his District Attorney's Office, working and conspiring with each other to effectuate misdeeds. Spota was the highest-ranking law enforcement official. The Suffolk County Police were part and parcel of his culture of corruption. Spota's subordinates included all defendants specifically named herein, including Ronald Tavaras, Michael Milau, Laura Newcombe, and Daryl

Levy, those individuals who caused injury to plaintiff, through their acts and omissions consistent with Spota's culture of corruption.

41. Importantly, numerous cases handled by Spota's office either at trial, on appeal or collateral attack, courts have found instances of such misconduct by the Suffolk County District Attorneys Office including instances during the relevant time period.

42. By way of example, one such case involved a defendant by the name Thomas Moroughan, mentioned above. In that case, Moroughan, a cab driver, was shot by two off-duty police officers who were intoxicated. Detective Ronald Tavaras, named herein, manufactured a false confession from Moroughan. By virtue of this fabricated evidence, Moroughan was charged with assaulting the officers who shot him, and the officers were cleared of liability. The Suffolk County District Attorneys Office prosecuted the case using the false confession. After an extensive internal affairs investigation, it became known that Detective Tavaras had fabricated this false witness statement. Moroughan was cleared and all criminal charges against him were dismissed on June 6, 2011.

43. Despite knowing that Detective Tavaras had fabricated a statement in a homicide investigation, he was allowed to continue working and the District Attorneys Office continued to use his work in their cases. He was one of the lead detectives in plaintiff's case.

44. A second example is that of Gabriel Hubbard, who was convicted of murder based on yet another false statement, fabricated by Detective Tavaras.

45. Despite knowing Tavaras' history of fabrication of witness statements, the Suffolk County District Attorneys used the statement he fabricated, and, failed to disclose Tavaras' prior misconduct in the Moroughan case to the defense in the Hubbard case.

46. On July 25, 2014, the Supreme Court vacated Gabriel Hubbard's conviction, finding that the Suffolk County District Attorney failed to disclose evidence of Tavaras' prior misconduct in violation of the defendant's rights under *Brady*. See People v. Hubbard, 45 Misc.3d 328 (Efman, J.), aff'd 132 A.D.3d 1013 (2d Dept 2015).

47. Rather than terminating Tavaras, Tavaras was allowed to continue working as a detective. Further, rather than taking action to prevent Tavaras' statements from being used, or requiring disclosure of his history to all defendants who may be affected by his misdeeds, the District Attorneys Office continued to intentionally turn a blind eye to his misdeeds and use his evidence in their cases. Shockingly, the District Attorneys Office even continued to fight for the ability to withhold Tavaras' history from defendants. This is exemplified by their appeal of the Hubbard decision noted above. The defendants collectively now have implemented a procedure by which Tavaras maintains "notes" during his investigations which the District Attorney's Office then uses at trial through other officers, in attempt to evade cross-examination. Such was done in plaintiff's case over objection.

48. Ronald Tavaras, The Suffolk County Police, and the Suffolk County District Attorneys Office and its ADAs have developed this custom to attempt to avoid having to disclose Tavaras' discredited past and history of fabricating witness statements. In plaintiff's case, the SCDAO intentionally withheld Tavaras from testifying at trial, and had his partner read his "notes" to the jury precluding cross examination on his credibility. This is a routine that the office employs for this purpose as demonstrated by their employment of the same tactic in other cases.

49. A third example, is the matter of Aston Martin Barth, charged with murder in 2012. Det. Tavaras obtained a statement from the defendant that the SCDAO used against him in the prosecution. Barth's defense lawyer moved for disclosure of Tavaras' IA records, as the District Attorneys Office did not turn it over under *Brady*. After an initial ruling by Judge Condon (Suffolk County) agreeing to review the IA records of Tavaras, the Suffolk County District Attorney continued to fight against disclosure, agreeing *not* to call Tavaras as a witness at trial (even though he was the detective who obtained their purported confession.). Condon thereafter agreed to reverse his ruling ordering the review of the IA records, since the SCDAO agreed not to call Tavaras to the stand. Effectively, this scenario allowed the SCDAO to use Tavaras' fabricated evidence without subjecting it to cross-examination, just as they did in plaintiff's case. Through this custom, the SCDAO hid Tavaras' internal affairs records from the defense and also from a jury, allowing him to continue his malfeasance unchecked.

50. The Suffolk County Police and the Suffolk County District Attorneys Offices allowed such misconduct to go unaddressed and allowed it to pervade their investigations and prosecutions.

51. A fourth example of misconduct came in 2015 in the matter of Wilfredo Flores 165 A.D.3d 695 (2d Dept 2018). In that case, the Appellate Division found the assistant district attorney from the Suffolk County District Attorneys Office committed misconduct at trial by consistently misstating the evidence, vouching for witness credibility, and commenting on the defendant's exercising his right to remain silent after arrest. This ADA was allowed to continue working in the District Attorneys Office. This is reflective of the culture of corruption that pervaded that office and its employees.

52. A fifth example is the case of Dante Taylor charged with murder in June 2016. Supreme Court Justice John Collins sanctioned the Chief of the Suffolk County Homicide Bureau for withholding critical *Brady* evidence in the case, including a series of Crime Stopper tips pointing to other possible suspects and evidence that Suffolk County Police destroyed a threatening voicemail message to the victim left by her ex-boyfriend from whom she had recently split.

53. Upon information and belief, the Suffolk County Police received crime stopper tips in this plaintiff's case as well, providing information regarding potential suspects that, to date, remain undisclosed, and uninvestigated.

54. The Chief of the homicide unit, ADA Albertson, continued to be the Chief under Spota, and was the Chief during the egregious withholding of evidence in the Shawn Lawrence and Messiah Booker cases noted above. Again, this is reflective of the culture of corruption.

55. A sixth example is that of Messiah Booker. In May 2017, Glenn Kurtzrock, a homicide prosecutor in the Suffolk County District Attorney's Office was caught red-handed concealing dozens of pages of material from Messiah Booker, a young man charged with first-degree murder who maintained he was innocent. Booker was arrested and spent more than 18 months in jail awaiting trial before his defense lawyer discovered that the District Attorney had *altered hundreds* of pages of police records to remove a wealth of exculpatory information. That included evidence pointing to another suspect he knew Mr. Booker's lawyer had been investigating.

56. The prosecutor had also removed the covers of two police notebooks to make it look like his altered versions of the documents were the originals. Upon information and belief,

Lauren Newcombe named herein, participated in multiple cases along with Kurtzrock, but she was allowed to continue employment at the office uninterrupted.

57. A seventh example is that of the matter of Shawn Lawrence. Lawrence was convicted of a 2010 gang-related murder and the shooting of two other men. The gunman was described as about 5-foot-5, while Lawrence is 6-foot-4 with no gang ties, and was at home at the time of the murder. Suffolk County Police, including Detective Ronald Tavares, purported to obtain statements against him and failed to pursue key leads, while withholding 45 pieces of critical evidence from the defense. Lawrence spent over six years in jail before his conviction was overturned.

58. Importantly, ADA Laura Newcombe worked with ADA Kurtzrock on the case, making numerous personal visits to witnesses. She was also the ADA who proferred surveillance video that had been edited and tampered with to lessen quality. While Kurtzrock's admonishment during trial was made public, ADA Laura Newcombe went unscathed to continue this corruption.

59. She is named above having injured this plaintiff. On May 26, 2016, Laura Newcombe gave a false statement to Newsday misstating the contents of surveillance video in this case which, was edited to cut recording before and after the attack on plaintiff. According to Newcombe and Levy, the surveillance video in plaintiff's case was "damaged" and thus was missing information. Again, we see the custom of the destruction of evidence favorable to the defense. Additionally, this ADA went out of her way to fabricate evidence, hide and delay exculpatory evidence, and actually go out of her way to instruct the delay and avoidance of certain critical DNA evidence that would have been exculpatory to this plaintiff. ADA Levy then continued the prosecution of her case through trial, proffering false evidence and withholding exculpatory evidence.

60. An eighth example of the Suffolk County District Attorneys Office withholding evidence was the case of Rudolph Bisnauth, who was convicted of homicide in 2009. In 2015, the Supreme Court found that the Suffolk County District Attorneys Office and its delegates withheld evidence from the defense showing that the main witness against Bisnauth was

an informant on drug cases working with the Suffolk County Police Department. This was important because the informant would have been a suspect in the murder, were he not a Suffolk County Police informant. This critical and exculpatory information was withheld from the defense.

61. Thomas Spota was the head law enforcement officer and District Attorney during the time of all of the above examples, and his culture of misdeeds corrupted all named defendants and their work.

62. Most recently, as referenced above, Thomas Spota and his Chief of Investigations and ironically, the Chief of the Government Corruption Bureau, ADA Christopher McPartland, were indicted in October 2017 and were convicted in 2019 for conspiring and acting to cover-up the Suffolk County Police – for beating an in-custody suspect, among other things. They were convicted of conspiracy, witness tampering and obstruction.

63. These actions of fabricating evidence, withholding evidence, destruction of evidence, and witness tampering all are part and parcel of the "anything goes" culture that was the earmark of the Spota administration. The Suffolk County District Attorneys Office and Suffolk County Police were part of this systemic misconduct, as were all the named defendants.

64. During the Spota trial, evidence was adduced to show that the District Attorney worked with the Suffolk County Police Chief, James Burke, to cover up violent crimes committed by Burke.

65. In investigative papers filed in December 2018 by the United States Attorney's Office, it was recorded that Spota demanded during a meeting at the Suffolk County District Attorneys Office in 2015, that a Suffolk County Police Officer find out which officer in the department was leaking information regarding their cover up.. He warned that anyone giving information to federal investigators was "dead" and that they "would never work in Suffolk County again." This exemplifies the corruption and conspiracies between the District Attorney's Office, the Suffolk County Police, and their respective employees, including the named defendants.

66. The US Attorney's Office papers also memorialized that Spota and McPartland required the Suffolk County Police involved in the cover up, obtain their lawyers from a list of attorneys that had been specifically arranged for the Suffolk County Police Department and union officials, for the purpose of controlling interaction with witnesses and controlling the flow of information.
67. Spota set the example for district attorneys in his office as he worked directly with the Suffolk County Police to cover up truth, withhold and destroy evidence, fabricate statements, tamper with witnesses, and "create" the version of facts that he and the police wanted to put before a judge or jury. For Spota, this was business as usual. This was the modus operandi employed by the named defendants in general, and in the case of this plaintiff.
68. Suffolk County Police Chief James Burke pleaded guilty to the beating and conspiracy to cover it up with Spota and was sentenced in 2016 to serve 46 months in Federal Prison.
69. Thomas Spota and Chief McPartland are scheduled to be sentenced April 30, 2020 for their parts in the criminal cover-up for the Suffolk Police chief, on convictions for conspiracy, witness tampering, obstruction and participating in a civil rights violation.
70. Each face up to 20 years in prison.
71. It was during this reign of corruption that this plaintiff was unlawfully arrested and charged with manslaughter. Thomas Spota was in office and Laura Newcombe his delegate, who worked directly with the Suffolk County Detectives in building the case against the plaintiff; "investigating" the witnesses and evidence they used against the plaintiff. Evidence of plaintiff's innocence was available and intentionally ignored. Physical evidence was ignored. Other suspects were ignored. A witness statement was manipulated and materially changed. Newcombe secured an indictment with false evidence and fabricated statements created by the Suffolk Police. She intentionally withheld self-defense evidence. She worked the case with ADA Levy who knew and/or should have known of the malfeasance in the investigation and continued the misdeeds against the plaintiff, withholding evidence and proferring evidence he should have known was false at trial. He

also directly participated in the acts and conspiracy to cover up defendant Tavaras' history of misconduct and fabrication of evidence. Evidence of plaintiff's innocence was immediately available and ignored by all of the named defendants, who intentionally continued this malicious prosecution, right through plaintiff's trial where defendant Milau also proferred false evidence and participated in the conspiracy to cover up Tavaras' misdeeds. The misdeeds continued by the named defendants through the trial.

72. After a year incarcerated and several years of anguish and loss that continue to accrue to date, a jury finally had an opportunity to see a surveillance video without the defendants' interference and acquitted the plaintiff.

## STATEMENT OF FACTS

1. On May 25, 2016, plaintiff was in Huntington, New York. He was leaving a pub after a business-related dinner and evening with a female acquaintance. They were walking toward his car when he observed a suspicious vehicle driving toward him.
2. The car was driving the wrong way down a one-way street and its headlights were off, despite the darkness of night.
3. The car stopped next to them, in the middle of the road, facing the wrong way, and a man significantly larger than plaintiff, jumped out and charged toward them, seemingly holding something in his pants pocket. He left his driver's side car door open and his car running.
4. The man, later identified as E.R., threatened the plaintiff, telling him he was going to steal his jewelry and watch after he knocked him out (expletives omitted).
5. The female that had been with plaintiff, one Valerie Halloway, a/k/a "Janelle," identified the man as her former fiancée.

6. Earlier that evening, Halloway told the plaintiff of her violent and tumultuous relationship with E.R. who would regularly use violence against her, including using his car as a weapon to "ram" it into hers after an argument, punching holes in the walls of her home, and coming to her work where he would "cause trouble."

7. Unbeknownst to plaintiff, Halloway had been in constant communication through text messages and phone calls with E.R. throughout that evening and she had told him to come to the location.

8. Plaintiff, completely unaware of the communications between Halloway and E.R., attempted to de-escalate the situation by telling E.R. **repeatedly** that he did not want to fight, had no interest in Janelle, and physically retreated from E.R. by putting his hands up and stepping away.

9. Despite plaintiff's attempt to avoid E.R. and de-escalate the situation, and despite saying repeatedly that he did not want to fight, the man attacked the plaintiff with punches.

10. Plaintiff, terrified under the circumstances, had no choice but to defend himself and did so with return punches. After only several seconds of engagement, plaintiff was able to leave the scene and did so. His jewelry however, including a large diamond ring and a gold necklace, were stolen during the incident.

11. At that time, plaintiff had no idea that Janelle had orchestrated this encounter and robbery and offered to drive her back to her car which was parked at his work. Halloway took the ride.

12. It would later be discovered that Janelle not only took the proceeds of the robbery of plaintiff that evening, but also posed for social media posts with the proceeds; specifically plaintiff's large diamond ring.

13. Plaintiff went to his local police department to report the incident, the Suffolk County Police Third Precinct. He met Detectives Tavaras and Milau there, where they placed plaintiff in handcuffs within minutes and took an unrecorded statement from the plaintiff, who had gone there voluntarily to report a crime against him and to assist in the police investigation of it.

14. Plaintiff reported that in the early morning hours, he was approached and attacked by a man unknown to him, who had driven his vehicle up to plaintiff, with headlights off, driving the wrong way down a one-way street, before getting out and aggressively charging and screaming at him. Plaintiff reported that the man, later identified as E.R., charged at him while seeming to conceal something in his pants pocket, and proceeded to rip plaintiff's gold necklace off his neck. Plaintiff told police that in addition to ripping his chain, told him he was going to steal his watch after he "knocked him the f**k out." Plaintiff explained that he was terrified and had no choice but to defend himself. Clearly, these facts are indicative of a robbery.

15. Plaintiff told police that he retreated from this man, walking backward, repeatedly trying to de-escalate the situation and verbalizing to E.R. repeatedly that he did not want to fight.

16. Labs confirm that E.R. had <u>cocaine</u> and nearly <u>double</u> the limit of alcohol in his blood. He was sitting up and breathing when plaintiff retreated from him. However, he passed away later that evening at a hospital, after being left supine for an extended period of time in accordance with trial testimony.

17. Fortunately, the incident was captured on surveillance video by the township of Huntington. The version made available to plaintiff was edited and cut by the defendants.

18. The surveillance video was in police possession prior to plaintiff's initial report at the police station.
19. The video corroborated plaintiff's report to police.
20. Prior to plaintiff's report and the surveillance video corroborating his statements, police also had received information that E.R. had complained that same evening of a problem he was having with "Bloods" street-gang members, specifically that two men had been following him that same night.
21. Prior to plaintiff's report, police also had received information from E.R.'s family, telling them that Halloway, (a/k/a Janelle), was a troublemaker and suggested they look into her.
22. At the Third Precinct Plaintiff repeatedly told police he wanted to help their investigation, and voluntarily gave police unrestricted access to his cell phone and even told them where his car was, suggesting they look inside Halloway's phone, which she had left in his passenger seat area.
23. Police had access to Halloway, her home, her car, and her cell phone all prior to arresting Plaintiff.
24. Halloway's cell phone would later clearly show that she actually set up this robbery/encounter and had called E.R. to the scene. The timestamps in the video coincide with the texts from her phone. It shows that E.R. had come to the place where plaintiff and Halloway were located, stalked the plaintiff by parking next to his vehicle and lying in wait. After communicating with Halloway via text and phone calls, Halloway walked the unknowing plaintiff directly into the Robbery, just as E.R. warned her that he'd be leaving soon. The robbery then ensued.

25. This evidence had been immediately available to police.

26. Despite the evidence immediately available to police reflecting defendant's innocence, and despite the evidence of Halloway's guilt, police arrested plaintiff within several minutes of his statement and held him, without charges, for hours, denying him an attorney, despite his repeated requests.

27. Police contacted the Suffolk County District Attorney's Office, where its attorneys, including but not limited to the above-named district attorneys, advised the police Detectives Milau and Tavaras to charge plaintiff with the crime of manslaughter.

28. Detective Tavaras, who has been the subject of numerous infamous internal investigations for fabricating witness statements, went to Halloway's home and spoke with her to obtain her statement. It was unrecorded. He took handwritten notes, which are substantially different from the subsequent statement that he wrote in his handwriting and had her sign. Both were substantially different from her grand jury testimony – which was also substantially different from her trial testimony.

29. It was clear that the defendants had manipulated and coached her statement, and appallingly, presented her to the grand jury, allowing her to lie and mis-narrate the surveillance video into the record.

30. The result was a defective grand jury indictment that would later be successfully challenged by plaintiff's criminal attorney. Specifically, the trial court Judge Condon ruled in favor of this defendant, dismissing the indictment against him, finding that, the law on self-defense should have been read to the grand jury and was not.

31. The defendants knew that if they re-presented to the grand jury and read the self-defense law, that they may not secure an indictment; especially if any juror asked for playback of the surveillance video, independent of the false narration by Halloway.

32. So, instead of representing in the interest of justice, the District Attorney's Office and the named ADAs appealed that decision. Naturally, on appeal, the only "facts" considered are the four-corners of the transcript, so the Appellate Division did not have the chance to see the video that did not match the lying witness' coached testimony. All the Appellate Division read from the transcript was the testimony. They could not see the self defense on the video and reinstated the faulty indictment. This was a tactic of the defendants named herein, again, to avoid the possibility that their indictment would be dismissed. They wanted "their guy." They pinned the plaintiff, and built the entire case around him, intentionally ignoring all else, and all exculpatory facts, fabricating and manipulating evidence as needed.

33. The clear and immediately available evidence in this case required one person to be charged criminally, and that was Ms. Halloway. The evidence immediately available proved that she had committed a felony murder, with photo evidence of her being in possession of the robbery proceeds. Texts and calls confirm that she called E.R. to the scene enraged, aware of his violent nature, setting up this confrontation. E.R. proceeded to rob and assault the plaintiff, who was left with no choice but to defend himself in a terrifying situation. E.R.'s death was a result of Halloway's actions. Not plaintiff's. The evidence available to police immediately proved this; particularly in the light of the surveillance video and cell phone records. Nevertheless, Halloway remains uncharged, and became Suffolk County's "star

witness" – using the statement as fabricated and coached by Dets. Ronald Tavaras and Michael Milau.

34. Plaintiff went to the police to report the incident in which he was a victim and assist police in the police investigation. To his surprise, rather than recognizing the self-defense that is shown on surveillance video and reading the texts available that proved his innocence, police interrogated him for hours and framed him as a killer.

35. Detectives Tavaras and Milau interrogated plaintiff off camera at the police station and unlawfully detained him, despite the fact that *he* was reporting a robbery and attack in which he was a victim, and despite the corroborating evidence that was then available to them. They also detained plaintiff intentionally ignoring other reports given to them by E.R.'s family, implicating others including Halloway and rival gang members. During this off-camera interrogation during which time plaintiff was in custody, he requested an attorney several times and was denied. Det. Milau would later lie at trial, testifying in summary that police did not have access to the surveillance video prior to plaintiff's arrest. This is untrue.

36. Det. Tavaras purported to memorialize this unrecorded interview at the Third Precinct with plaintiff by taking hand-written notes; notes which contain statements that plaintiff did not make.

37. The detectives later took plaintiff to a different police station where a second interrogation took place on video, where he was continuously detained and interrogated without regard to his requests for an attorney. By that time, he'd requested an attorney at least 5 times since the beginning of their interactions. He continued to attempt to help police by describing what had happened, how he retreated, tried to de-escalate, and was in fear for his life.

38. During the recorded interview, the named detectives clearly tried to frame plaintiff with the death of E.R. despite plaintiff's tearful recollection of the events that necessitated his self-defense which was captured on surveillance video then in police possession. Plaintiff remained steadfast in his self-defense, gave police access to his cell phone, car, and even asked them to pull the phone and text records as they would prove his statements.

39. Plaintiff's statement, corroborated by surveillance video, was so moving that the police officer who'd participated in the booking and photographing of the plaintiff that evening, shook his hand and wished him good luck – as it was clear that he was not guilty of a crime. That interaction was captured on video. No reasonable police officer would have pursued a crime against plaintiff – ignoring exculpatory text and video evidence immediately available.

40. With surveillance video evidence that corroborated plaintiff's statement, and a plethora of text messages in Halloway's phone showing her culpability, police, detectives, and members of the District Attorney's office ignored Halloway's culpability, and instead used her in order to build a false case and malicious prosecution against plaintiff. The named defendants did this in concert, conspiring with each other, and each acting for this purpose.

41. The Suffolk police and the detectives named herein sought a charging determination from the Suffolk County District Attorney's Office, under the direction of defendant Spota and ADA Newcombe, and perhaps yet unknown employees, who told Suffolk Police to charge plaintiff with manslaughter. Suffolk police then charged plaintiff with manslaughter based upon nothing but his own statement of self-defense, a statement which was corroborated by surveillance video and text messages that were available to them at that time – but ignored.

42. The District Attorney's Office and the Suffolk County Police engaged in the fabrication of evidence, in Tavares' notes, in the purported statement and manipulation of Halloway, in the grand jury presentation, and purpose hid and/or ignored exculpatory evidence, in addition to other acts of fabrication.

43. Detectives also aggressively approached plaintiff's business associates in attempt to coerce them into false statements, statements that would "fit" their theory of the case. Specifically, detectives pressured potential witnesses to say that plaintiff and E.R. knew each other, as if to suggest some motive or "rift." No one succumbed to this police pressure. Plaintiff and E.R. were strangers to each other – strangers whose paths were brought together by Valery Halloway, the woman who orchestrated this robbery and encounter.

44. Police had evidence to arrest and convict Halloway for felony murder, robbery, and perjury. Rather than charge her, however, they coerced her into statements that fit their version of events to cast plaintiff as a killer, and molded her statements from the initial investigation up through trial with coaching from the District Attorney's Office, including ADAs Newcombe and Levy, who knew or should have known of the falsity of the statements and nevertheless continued the prosecution and presentation of false evidence each step of the way.

45. Defendants intentionally withheld exculpatory evidence from the defense at all times, a habit of fabricating evidence to frame their theory of the case, withholding exculpatory evidence, and witnesses. Certain cell phone evidence was ignored and critical exculpatory DNA evidence was intentionally withheld at the direction of ADA Newcomb, who manipulated and directed the forensic examination, or lack thereof, of physical evidence.

46. During discovery, the defendants intentionally withheld Brady material from the defense, including the evidence that the detectives involved in this case had long histories of internal affairs investigations and had previously been caught falsifying evidence to fit their own versions of cases, including the coercion of witnesses and procurement of false witness statements and confessions. The prior actions of these detectives and the district attorney's office had resulted in numerous dismissals and exonerations now known to the plaintiff, but never made known to him during the manslaughter prosecution against him.

47. Importantly, multiple cases have been dismissed and parties exonerated, under circumstances in which Det. Tavaras coerced false statements and confessions. This was not made known to the plaintiff during his case, despite the fact that the People proffered Tavaras' testimony during pre-trial motions. This non-disclosure of critical Brady material prevented plaintiff from impeaching Tavaras at pre-trial motions and also prevented him from moving to suppress any notes or statements Tavaras allegedly obtained and made.

48. ADA Newcombe intentionally played an investigative role in this case, requiring certain parts of the forensic investigation to be withheld and/or delayed of key evidence. She intentionally withheld exculpatory forensic evidence. She also acted in conjunction with the named detectives, to manipulate and proffer the false statement of Halloway to the grand jury.

49. ADA Newcombe additionally knowingly made false statements to the grand jury, to the court, and to the press regarding plaintiff.

50. Plaintiff was incarcerated after his arrest and one year into the litigation, plaintiff remained in jail, when a motion to dismiss the indictment was considered by Judge Condon.

51. The flaws in the indictment discussed above were recognized by Judge Condon who was familiar with the nature and circumstances of plaintiff's case.

52. Judge Condon had also presided over, was familiar with, and dismissed other cases involving these defendants in instances of similar misconduct. Judge Condon previously ruled actions of defendants unlawful and egregious and issued prior rulings and dismissals accordingly. Condon ruled that under the circumstances of plaintiff's case, the grand jury should have been instructed on self-defense and therefore rendered the indictment fatally defective. He knew the surveillance video was shown to the grand jury, albeit was narrated falsely by ADA Newcombe and witness Halloway.

53. In order to continue their malicious prosecution based on their fabricated evidence, and to avoid a no-bill, the defendants took up Condon's decision to the Appellate Division; after all, the appellate division would not be able to see or understand the contents of the surveillance video shown to the grand jury, as the grand jury transcript on which the appellate division would rely, would not reveal the self-defense to be considered.

54. The appellate division's review was therefore limited to the false facts presented by defendants at grand jury. None of the self-defense law or facts had been given to the grand jury. Thus, the matter was reinstated based upon the defendants' fabricated evidence and false version of the facts created and presented to the grand jury by ADA Newcomb and members of the Suffolk County Police.

55. Defendants knew the appellate division would not be able to see the self-defense video and continued the malicious prosecution.

56. Plaintiff, who had been released after Judge Condon's dismissal of the case, was re-arrested on November 23, 2018, despite a pleathora of evidence of innocence at that time.

57. The matter went to trial in June 2019 and was tried to conclusion in July 2019, when the plaintiff was fully acquitted on July 12, 2019, after a jury finally was able to see the surveillance video, and where Halloway's lies were exposed by counsel, including the photos she posed for on Instagram with the proceeds of the robbery, shortly after it. Nevertheless, the defendants prosecuted this plaintiff until the very end.

58. During the trial, the defendants intentionally and purposely withheld Ronald Tavaras from the stand. They knew he would be subjected to cross-examination regarding his lengthy history of fabricating evidence and obtaining false statements.

59. The District Attorney's office had already gotten into the habit of hiding misdeeds by these detectives and had conspired to use Tavaras' statements about the case in an indirect way, denying plaintiff his right to confront him, and ensuring his false

statements would be heard by the jury at trial. This method had been used by the defendants in other cases prior to this one.

60. To do this, Det. Tavaras took notes during unrecorded interviews, including the first interview of the plaintiff. These notes were re-written, and produced at trial through his partner, Detective Milau, who then read them to the jury. The notes contained false statements including some that he alleged were made by plaintiff. Using this method of having Detective Milau read Tavaras' notes effectively prevented the defense from confronting Tavaras who had been caught creating false witness statements in the past, causing various dismissals and exonerations.

61. The use of Tavaras' false statements in this way, and purposely not calling him as a trial witness, had become a custom of the District Attorney and Suffolk Police and is proof positive of the conspiracy among them to utilize his misdeeds and misstatements of fact without confrontation due to his long internal affairs history, in particular, having been caught fabricating witness statements in the past to cover up truths and "fit" his version of events.

62. Additionally, at trial, ADA Levy presented evidence to the petit jury, knowing the evidence contained falsehoods and knowingly hiding evidence of his witness' malfeasance from the jury.

63. After years of suffering and anguish, a jury finally had the opportunity to see the surveillance video coupled with the law on self-defense, and was acquitted. Damage was done as a result of defendants' actions, however, and continues to accrue to date.

**FIRST COUNT**
**Pursuant to §1983 FALSE ARREST – May 25, 2016**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants arrested plaintiff on May 25, 2016 without sufficient, lawful evidence to support arguable probable cause.
3. By detaining plaintiff without a fair and reliable determination of arguable probable cause, the defendants abused their power and authority and were acting under the color of state and/or local law.
4. These defendants had a routine, policy, custom, and/or a habit of charging and arresting persons for crimes based upon invalid evidence, insufficient probable cause, and without lawful authority in order to "fit" their theory of the case. These defendants all participated directly or through agency in the May 25, 2016 arrest of the plaintiff.
5. These customs constituted a deliberate violation of the plaintiff's rights and caused him damages.
6. By reason of defendant's acts and omissions, the defendants, acting under color of state law, disregarded plaintiff's constitutional rights and subjected him to an unlawful detention in violation of the Fourth and/or Fourteenth Amendments of the United States Constitution and the laws of the State of New York.
7. By reason of the foregoing, plaintiff suffered physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

**SECOND COUNT**
**Pursuant to §1983 FALSE ARREST – November 23, 2018**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants arrested plaintiff on **November 23, 2018** without sufficient lawful evidence to support arguable probable cause.
3. By detaining plaintiff without a fair and reliable determination of arguable probable cause, the defendants abused their power and authority and were acting under the color of state and/or local law.
4. These defendants had a routine, policy, custom, and/or a habit of charging and arresting persons for crimes based upon invalid evidence, insufficient probable cause, and without lawful authority in order to "fit" their theory of the case. These defendants all participated directly or through agency in the **November 23, 2018** arrest of the plaintiff.
5. These customs constituted a deliberate violation of the plaintiff's rights and caused him damages.
6. By reason of defendant's acts and omissions, the defendants, acting under color of state law, disregarded plaintiff's constitutional rights and subjected him to an unlawful detention in violation of the Fourth and/or Fourteenth Amendments of the United States Constitution and the laws of the State of New York.
7. By reason of the foregoing, plaintiff suffered physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## THIRD COUNT

**Pursuant to §1983 MALICIOUS PROSECUTION**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants, with malicious intent, arrested and/or initiated and/or prosecuted a criminal case against the plaintiff for manslaughter without lawful probable cause.
3. All charges were terminated and dismissed in plaintiff's favor on July 12, 2019.
4. Defendants intentionally ignored available exculpatory evidence that established plaintiff's innocence.
5. By reason of defendants acts and omissions, acting under the color of state law, in disregard of plaintiff's rights, deprived the plaintiff of his rights, liberty and maliciously prosecuted him, subjecting him to unlawful, illegal, and excessive detention and causing damages, in violation of his Fourth and Fourteenth Amendment rights of the United States Constitution.
6. Defendants had a policy and/or a custom of maliciously prosecuting individuals and had a custom of ignoring exculpatory evidence that established innocence and/or fabricating evidence to fit their version of events.
7. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## FOURTH COUNT

### Pursuant to §1983 MALICIOUS PROSECUTION

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants, with malicious intent, arrested and/or initiated and/or prosecuted a criminal case against the plaintiff for manslaughter without lawful probable cause.
3. All charges were terminated and dismissed in plaintiff's favor on July 12, 2019.
4. Defendants intentionally fabricated evidence and/or manipulated and/or unlawfully delayed evidence to fit their theory of the case – in order to frame the plaintiff as a killer.
5. By reason of defendants acts and omissions, acting under the color of state law, in disregard of plaintiff's rights, deprived the plaintiff of his rights, liberty and maliciously prosecuted him, subjecting him to unlawful, illegal, and excessive detention and causing damages, in violation of his Fourth and Fourteenth Amendment rights of the United States Constitution.
6. Defendants had a policy and/or a custom of maliciously prosecuting individuals and had a custom of ignoring exculpatory evidence that established innocence and/or fabricating evidence to fit their version of events.
7. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## FIFTH COUNT

**Pursuant to §1983 MALICIOUS PROSECUTION – Withholding Critical Evidence**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants, with malicious intent, arrested and/or initiated and/or prosecuted a criminal case against the plaintiff for manslaughter without lawful probable cause.
3. All charges were terminated and dismissed in plaintiff's favor on July 12, 2019.
4. Defendants intentionally withheld evidence of the internal affairs history of their witnesses from plaintiff. At a minimum, that internal affairs history includes evidence that Ronald Tavaras had been investigated for fabricating witness statements and/or witness tampering. Ronald Tavares took statements in this case that defendants used against plaintiff at grand jury and at trial.
5. By reason of defendants acts and omissions, acting under the color of state law, in disregard of plaintiff's rights, deprived the plaintiff of his rights, liberty and maliciously prosecuted him, subjecting him to unlawful, illegal, and excessive detention and causing damages, in violation of his Fourth and Fourteenth Amendment rights of the United States Constitution.
6. Defendants had a policy and/or a custom of maliciously prosecuting individuals and had a custom of ignoring exculpatory evidence that established innocence and/or fabricating evidence to fit their version of events.
7. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his

family, including his young daughter. All of these injuries continue to accrue and may be permanent.

**SIXTH COUNT**

**Pursuant to §1983 DENIAL OF A FAIR TRIAL – Fabricating Evidence**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law. Defendants Tavaras and Milau are "officials" in their capacity as detectives, and the named District Attorneys, Levy, Newcombe, and Spota are "officials" in their capacities as law enforcement officers and District Attorneys.

2. Defendants fabricated evidence, likely to influence a jury, and forwarded it to the prosecuting attorney knowing it was false, to be put before a jury. As a result, plaintiff suffered a loss of liberty. In doing so defendants violated the plaintiff's constitutional right to a fair trial, depriving him of his civil Constitutional Rights.

3. Defendants were aware and/or should have been aware of the falsity of the information used to prosecute the plaintiff.

4. By reason of the foregoing, plaintiff suffered additional damages, including physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## SEVENTH COUNT

**Pursuant to §1983 DENIAL OF A FAIR TRIAL – Withholding Evidence**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. At trial, defendants knowingly set forth false evidence before a jury, including false witness testimony and/or other evidence, including fabricated notes, tainted by defendant Ronald Tavares.
3. Knowing that Ronald Tavaras had a negative Internal Affairs history for fabricating evidence, and/or witness tampering, and/or other blemishes on his record that affect his credibility, the defendants knowingly put forth Tavaras' fabricated evidence before a jury in such a way as to prevent the plaintiff from impeaching him. This violated plaintiff's rights to confrontation and to a fair trial.
4. Detective Tavares prepared falsified "notes" purporting to reflect words of witnesses that were submitted to the jury knowingly and purposely to keep Tavares off the stand, and to keep his past record of falsifying evidence away from the jury. Detective Tavaras, an official, forwarded this fabricated evidence to the prosecuting attorney, knowing it was false. The evidence was of the kind likely to influence a jury, and as a result, plaintiff suffered a loss of liberty.
5. Defendants were aware of the falsity of the information used to prosecute the plaintiff.
6. Due to this impermissible conduct, producing false evidence at trial and intentionally withholding internal affairs evidence, defendants caused plaintiff additional suffering and damages.

7. The production of false evidence and withholding of this critical exculpatory evidence against Ronald Tavares and the state's other witnesses, amounted to a constitutional violation, and deprived plaintiff of its protections. All named defendants participated in this violation as officials.

8. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## EIGTH COUNT

### Pursuant to §1983 Failure to Intervene

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. All Defendants had a duty to intervene and had an opportunity to intervene in the violations of plaintiff's constitutional rights during the false arrests, investigation, and/or malicious prosecution of the plaintiff.

3. Defendants failed to intervene when they knew or should have known that plaintiff's constitutional rights were being violated.

4. Defendants had a custom of failing to intervene to protect citizens from such constitutional violations.

5. Defendants Suffolk County, Suffolk County Police Department, and the Suffolk County District Attorneys Office, and Thomas Spota had a custom of overlooking unconstitutional actions of their employees, such as those named herein, including but not limited to, the

fabrication of evidence, intentionally withholding exculpatory evidence, perpetuating unfair trial practices, and otherwise failed in acting to stop it, causing injury to plaintiff.

6. These policies and customs of failing to intervene demonstrate a deliberate indifference on the part of the policymakers within Suffolk County, Suffolk County Police Department, Thomas Spota and the Suffolk County District Attorneys Office to the constitutional rights of citizens, detainees, and defendants and caused the plaintiff damages.

7. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## NINTH COUNT

### Pursuant to §1983 Due Process Violations – 4th Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. Defendants took plaintiff into custody, seizing his person and property on May 25, 2016 without valid probable cause based on lawful evidence.

3. Defendants actions constituted a violation of plaintiff's fourth amendment rights.

4. Defendants had a custom of these constitutional violations.

5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his

family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## TENTH COUNT

### Pursuant to §1983 Due Process Violations – 4th Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants took plaintiff into custody, seizing his person and property on November 23, 2018 without valid probable cause based on lawful evidence.
3. Defendants actions constituted a violation of plaintiff's fourth amendment rights.
4. Defendants had a custom of these constitutional violations.
5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## ELEVENTH COUNT

### Pursuant to §1983 Due Process Violations - 14th Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants took plaintiff into custody on May 25, 2016 without lawful authority.
3. Defendants took plaintiff into custody without valid probable cause based on lawful evidence.
4. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights.
5. Defendants had a custom of these constitutional violations.

6. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## ELEVENTH COUNT

### Pursuant to §1983 Due Process Violations - 14th Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants took plaintiff into custody on November 23, 2018 without lawful authority.
3. Defendants took plaintiff into custody without valid probable cause based on lawful evidence.
4. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights.
5. Defendants had a custom of these constitutional violations.
6. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## TWELVTH COUNT

### Pursuant to §1983 DUE PROCESS VIOLATION- Sixth Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. Defendants took plaintiff into custody on May 25, 2016 and his right to an attorney attached.
3. Defendants denied plaintiff access to an attorney despite repeated requests by the plaintiff. They also held Defendant for an extended period of time, having arrested him, without a charge. Defendants continued his seizure, and continued his uncounseled statement, after denying him an attorney, for an extended period of time, without advising him of the nature of the charge nor any witnesses against him, all in violation of his Sixth Amendment rights.
4. Defendants had a custom of these constitutional violations.
5. Defendants actions constituted a violation of plaintiff's sixth amendment rights causing him injury.
6. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## THIRTEENTH COUNT

### Pursuant to §1983 DUE PROCESS VIOLATION – 14th Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants knowingly presented false evidence to a grand jury.
3. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights causing him injury.
4. Defendants had a custom of these constitutional violations.

5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## FOURTEENTH COUNT

### Pursuant to §1983 DUE PROCESS VIOLATION – Fourteenth Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants knowingly presented false evidence to the Appellate Division.
3. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights causing him injury.
4. Defendants had a custom of these constitutional violations.
5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## FIFTEENTH COUNT

### Pursuant to §1983 DUE PROCESS VIOLATION, Fourteenth Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. Defendants knowingly withheld evidence and legal instruction of self-defense to a grand jury, despite knowing the surveillance video showed evidence of self-defense that required the jury charge.
3. Defendants had a custom of these constitutional violations.
4. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights causing him injury.
5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## <u>SIXTEENTH COUNT</u>

**Pursuant to §1983 DUE PROCESS VIOLATION, Fourteenth Amendment**

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants intentionally withheld exculpatory *Brady* evidence from plaintiff.
3. Defendants actions constituted a violation of plaintiff's constitutional rights causing him injury.
4. Defendants had a custom of these constitutional violations.
5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his

family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## SEVENTEENTH COUNT

### Pursuant to §1983 DUE PROCESS VIOLATION, Fourteenth Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.
2. Defendants intentionally withheld exculpatory evidence from plaintiff and/or intentionally fabricated evidence against plaintiff.
3. Defendants actions constituted a violation of plaintiff's fourteenth amendment rights causing him injury.
4. Defendants had a custom of these constitutional violations.
5. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## EIGHTEENTH COUNT

### Pursuant to §1983 VIOLATION OF EQUAL PROTECTION

### Fourteenth Amendment

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. Defendants, at all times acting under color of law, discriminated against this plaintiff based upon his race and appearance, treating him unfairly and unequally to those similarly situated throughout this matter, without any rational basis to do so.
3. Defendant is black male. Halloway, who should have been charged in this matter with felony murder, robbery, and perjury, is a white female. Further, there exist similarly situated individuals charged in the county and similarly situated, who are not framed for a crime.
4. Defendant's actions constituted a violation of plaintiff's fourteenth amendment rights to Equal Protection of the law causing him injury. There is no rational basis for their actions.
5. Defendants actions were willful, intentional, wanton, reckless, and committed with a conscious disregard of plaintiff's constitutional rights entitling him to punitive damages.
6. Defendants had a custom of these constitutional violations.
7. By reason of the foregoing, plaintiff suffered additional physical injuries, mental injuries, financial damages, loss of work, deprivation of liberty and privacy, terror, humiliation, damages to his personal and professional reputations, as well as loss of relationship with his family, including his young daughter. All of these injuries continue to accrue and may be permanent.

## NINTEENTH COUNT

## CONSPIRACY

## Pursuant to §1985

1. Plaintiff repeats and realleges each paragraph of the within complaint as if set forth at length herein. At all times, all defendants are considered state actors, acting under color of law.

2. Defendants conspired with each other and reached an agreement, express and/or tacit, to achieve an unlawful end against plaintiff, carrying out overt acts and/or intentional omissions in furtherance of that goal, causing plaintiff damages. These overt acts are described herein and incorporated herein by reference. Defendants worked together, committing overt acts in furtherance of the conspiracy to deprive plaintiff of his constitutional rights as further set forth herein.

3. By virtue of the above, defendants caused harm to plaintiff.

## TWENTIETH COUNT

**Failure to Supervise, Investigate and Discipline**
**(Actionable under 42 U.S.C. § 1983)**

1. Plaintiff re-alleges and incorporates by reference each and every paragraph above as if set forth at length herein.

2. The aforementioned violations of plaintiff's federal constitutional rights by the Defendants occurred as a result of the failure of Defendants Suffolk County, Suffolk County District Attorney's Office, and the Suffolk County Police's failures to adequately supervise, investigate and discipline employee conduct. Defendants knew or should have known of the misdeeds of their employees which deprived persons, including the plaintiff, of his Constitutional Rights as stated herein, and had the opportunity to supervise, investigate, and discipline the behavior.

3. Defendants Suffolk County, Suffolk County Police, and Suffolk County District Attorneys Office knew or should have known of the actions and violations being perpetrated upon plaintiff by their employees, and had a duty to prevent it as stated above.

4. Their failures caused injury to plaintiff.

## DEMAND

WHEREFORE Plaintiff demands:

1. Equitable relief and specific performance requiring the termination of all named defendants from their employment with the Suffolk County Police and the Suffolk County District Attorney's Office in the interest of Public Protection.
2. Equitable relief and specific performance requiring notification of all defendants charged and/or tried by the named defendants; notifying them specifically of the internal affairs history and customs of malfeasance discussed herein, and notifying them that they may give rise to claims for post-conviction relief;
3. Equitable relief and specific performance requiring an independent agency of licensed, impartial, and experienced attorneys to review and investigate all files prosecuted during the Spota era, specifically including all files in which the named detectives and prosecutors participated.
4. For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;
5. For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;
6. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law;

7. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper and just.

8. For additional compensatory damages against all defendants jointly and severally as follows:

   a. Compensatory damages in the amount of at least $100 million dollars for pain and suffering, loss of liberty, and loss of relationship with his family

   b. Compensatory damages in the amount of at least $60 million dollars representing loss of work, contracts, future work, loss of personal and professional reputation

10. Pre and post judgment interest as allowed by law;

11. Such other and further relief as this court or a jury may deem proper and just.

Dated: 03/20/20
New York, New York

STEPHANIE MCCLURE (SM8693)
Law Office of Stephanie McClure
101 Avenue of the Americas; 9th Fl
New York New York 10013
Tel: 646-417-8380
*Attorney for Plaintiff*

**JURY DEMAND**

Plaintiff hereby demands trial by jury of all issues triable thereby.

Dated: 03/20/20
New York, New York

STEPHANIE MCCLURE (SM8693)
Law Office of Stephanie McClure
101 Avenue of the Americas; 9th Fl
New York New York 10013
Tel: 646-417-8380
*Attorney for Plaintiff*