1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ------------------------------------------X
    SAMUEL WHITE,

4
                              PLAINTIFF,
5
6          -against-          Case No:
                              2:20-cv-01501
7
8   COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
    DEPARTMENT, RONALD TAVARES, MICHAEL MILAU,
9   SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE,
    DARRYL LEVY, LAURA NEWCOMBE, THOMAS SPOTA,
10  JOHN DOES 1-10, TIMOTHY SINI, OFFICE OF THE
    MEDICAL EXAMINER CRIME LABORATORY (SUFFOLK
11  COUNTY) HELEN WONG, ODETTE R. HALL, M.D.,
    JOHN PETERSON, and JAMES MCGUINNESS,

12
                              DEFENDANTS.
13  ------------------------------------------X
14                  DATE: April 12, 2022
15                  TIME: 10:07 a.m.
16           DEPOSITION of the Defendant,
17  COUNTY OF SUFFOLK, by a witness, ALEXANDER
18  CRAWFORD, taken by the Plaintiff, pursuant
19  to a Subpoena and to the Federal Rules of
20  Civil Procedure, held at the offices of
21  SUFFOLK COUNTY COUNTY, H. LEE DENNISON
22  BUILDING, 100 Veterans Memorial Highway,
23  Hauppauge, New York 11788, before Nancy
24  Weinschreider, a Notary Public of the State
25  of New York.

1
2      A P P E A R A N C E S:
3
4      LAW OFFICES OF STEPHANIE McCLURE, ESQ.
          Attorney for the Plaintiff
5          SAMUEL WHITE
           101 Avenue of the Americas, 9th Floor
6          New York, New York 10013
           BY: STEPHANIE McCLURE, ESQ.
7          Email: stephanie@nycnjlawyer.com
8
9
10     DENNIS M. COHEN, ESQ.
          SUFFOLK COUNTY ATTORNEY'S OFFICE
11         Attorneys for the Defendants
           COUNTY OF SUFFOLK, et. al.
12         H. Lee Dennison Building
           100 Veterans Memorial Highway
13         Hauppauge, New York 11788
           BY: BRIAN MITCHELL, ESQ.
14         Email:bmitchell@suffolkcountyny.gov
15
16
17
18
       ALSO PRESENT: Brian Duval
19
                     Kyle Wood
20
21
22
23            *           *           *
24
25

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20     IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24                 *     *     *     *

25

1                   A. CRAWFORD

2    A L E X A N D E R   C R A W F O R D ,

3    called as a witness, having been first duly

4    sworn by a Notary Public of the State of

5    New York, was examined and testified as

6    follows:

7    EXAMINATION BY

8    MS. McCLURE:

9        Q.    Please state your name for the

10   record.

11       A.    Alexander Crawford.

12       Q.    What is your business address?

13       A.    Suffolk County Police

14   Department, 30 Yaphank Avenue, Yaphank, New

15   York 11980.

16            MS. McCLURE: Can you mark this

17        as Plaintiff's 1, please?

18            (Whereupon, the aforementioned

19        documents were marked as Plaintiff's

20        Exhibit 1 for identification as of

21        this date by the Reporter.)

22            MS. McCLURE: So just to call

23        the case a bit more formally, we have

24        been placed on the record by the

25        Court Reporter in the matter of

1              A. CRAWFORD
2          Samuel White versus Suffolk County,
3          et al.  Today is April 12, 2022.
4          We're beginning at 10:08 a.m.  We
5          have Alexander Crawford here.
6          Q.    Sir, you have been sworn in.
7    You understand that today we will be doing
8    your deposition where you're placed under
9    oath just like you are at trial --
10          A.    Yes.
11          Q.    -- or at a formal hearing?
12          A.    Yes.
13          Q.    And you understand that of
14   course today that oath is the same as it is
15   in those settings where you have to tell
16   the truth, the whole truth and nothing but
17   the truth.  You understand that?
18          A.    Yes, I do.
19          Q.    How many depositions have you
20   testified in up until today approximately?
21          A.    Approximately eight or nine.
22          Q.    So you know the drill?
23          A.    Yes, I am familiar with the
24   process, yes.
25          Q.    So you know that if I ask you

1                    A. CRAWFORD

2    any questions that you don't understand,

3    please let me know and it's perfectly

4    acceptable for you to stop me and say that

5    you don't understand the question or you

6    need me to repeat it.

7         A.    Yes, I understand.

8         Q.    I have a tendency to talk a bit

9    softly and in a room like this, I think

10   it's probably more appreciated than me

11   overwhelming everyone with a loud voice, so

12   if you don't have the ability to hear me at

13   any time, please also let me know because

14   it's important that you fully hear and

15   understand all the questions.  Okay?

16        A.    Yes, I understand.

17        Q.    Okay, very good.  All right.

18             So I am Stephanie McClure.  I'm

19   the attorney for Samuel White and also, by

20   way of introduction, this is my assistant

21   today, Investigator Brian Duval.  He will

22   be assisting me throughout the deposition.

23             MS. McCLURE: I assume that no

24        one has any objection to the ordinary

25        stipulation and preserving, of course

A. CRAWFORD

1
2      not waiving, any objections, Brian, I
3      heard you mention that earlier to
4      Mr. Crawford and that's certainly
5      acceptable to me that stipulation
6      that you're not waiving your rights
7      to object, but rather that you're
8      preserving them.
9          Does anybody else have anything
10      to place on the record before we get
11      started?
12          MR. WOOD: I do not.
13          MR. MITCHELL: And I do not.
14          MS. McCLURE: Okay, very good.
15      Q.    And actually, two more things
16  of recordkeeping.  Of course, although no
17  judge will be present, Mr. Mitchell, as he
18  indicated to you, does have the right
19  although limited to object to certain kinds
20  of questions.  If there is an objection,
21  unless he tells you directly not to answer
22  it, you are directed to answer it.
23          Additionally, before this
24  deposition can be used in a court, you will
25  have the full opportunity to review it for

1                    A. CRAWFORD
2      accuracies before such time, okay, all
3      right.  Mr. Crawford, what is your present
4      title?
5            A.    Inspector.
6            Q.    And by whom are you so
7      employed?
8            A.    The Suffolk County Police
9      Department.
10           Q.    And Suffolk County Police
11     Department is an arm of the county; is that
12     correct?
13           A.    That's an agency of the county,
14     yes.
15           Q.    And what are your present
16     duties in that capacity?
17           A.    I am the executive officer of
18     the Internal Affairs Bureau.
19           Q.    Okay.
20                 And by executive officer, tell
21     me what are your specific duties as an
22     executive officer?
23           A.    I assist the commanding officer
24     in running the operations of Internal
25     Affairs Bureau.

1                A. CRAWFORD

2        Q.    Can you describe for me the

3   operations of running an Internal Affairs

4   Bureau?

5        A.    Well, I obviously, there's the

6   investigative aspect of the

7   responsibilities of the office, conducting

8   investigations regarding civilian

9   complaints and other allegations of

10  misconduct; also the responsibilities of

11  the office include discovery production to

12  the DA's office, the County Attorney's

13  office, the U.S. Attorney's Office.  It

14  also involves formal production to various

15  requestors, so, and then overseeing other

16  aspects of control operations, detective

17  operations as far as conducting audits,

18  doing checks; also Internal Affairs is

19  responsible for drug and alcohol testing

20  for the department.

21       Q.    When you mentioned conducting

22  audits in the context of patrol, can you

23  tell me what you mean by conducting audits?

24       A.    Can vary, will check to make

25  sure that officers respond to their post in

1          A. CRAWFORD
2    a timely fashion and remain on their post
3    for the assigned period of time, will
4    conduct audits to ensure officers or
5    crossing guards assigned to crossing posts
6    are doing their jobs properly, we will
7    conduct audits of property section
8    contained to ensure that they're
9    maintaining and securing invoiced items in
10   a proper fashion, so it's wide ranging.
11        Q.    And are those audits done
12   pursuant to a written policy or procedure?
13             MR. MITCHELL: I object to the
14        form.  You can answer.
15        A.    As far as a written policy, we
16   have a guidebook within Internal Affairs
17   Bureau; and as far as the policy manual for
18   the department, yes, it does require
19   various audits.
20        Q.    So you have a guidebook and
21   also a policy manual, two separate
22   documents, is that right?
23        A.    Yes.
24        Q.    And are those issued and
25   re-issued every year or is there one

```
 1                    A. CRAWFORD
 2     standing manual that is updated whenever it
 3     needs to be?
 4          A.    Yeah, it's updated
 5     continuously.
 6          Q.    Do you know when the last
 7     update to that was published?
 8          A.    For the policy manual?
 9          Q.    Yes.
10          A.    That occurs on a daily basis.
11          Q.    On a daily basis, okay.
12                So on a daily basis, the
13     written policy manual is updated?
14          A.    Yes, as department directors
15     are issued amending the policies, yes.
16     It's amended on a continual basis, yes.
17          Q.    Roger, I understand.
18                So when memoranda are issued
19     with regard to any pertinent material to
20     the policy manual, it becomes part and
21     parcel to the manual, correct?
22          A.    Well, actually it's a
23     department general order.  There are
24     various department orders, but a department
25     general order, yes, does amend the policy
```

1                          A. CRAWFORD

2       manual.

3            Q.    And where are those department

4       general orders stored?

5            A.    They are disseminated

6       electronically on the internet for the

7       department.  As far as the physical copies

8       of the orders, I believe they're maintained

9       at research and development.

10           Q.    And where is that located?

11           A.    That's within the headquarters

12      building.

13           Q.    Which is where?

14           A.    At 30 Yaphank Avenue in

15      Yaphank.

16           Q.    And how about for the guidebook

17      separate from the policy manual, when was

18      that last published?

19           A.    Well, it's, you mean published

20      or amended?

21           Q.    What was the last edition?

22           A.    It was probably about four or

23      five months ago.

24           Q.    And is that updated on a

25      regular schedule or on an as-needed basis?

1                    A. CRAWFORD

2          A.     As-needed basis.

3          Q.     And where can one go in order

4     to find a copy of that guidebook and the

5     various editions of it?

6          A.     That would be maintained within

7     the Internal Affairs Bureau.

8          Q.     Which is located where?

9          A.     Actually, we just moved.  We're

10    now in Hauppauge, right behind the 4th

11    Precinct.  Sorry, I don't know the street

12    address.

13         Q.     That's all right.

14         A.     The Hauppauge North Complex, I

15    believe it's called.

16                MR. MITCHELL: Yeah, this is by

17            counsel, the actual address is North

18            County Complex, Veterans Highway,

19            Hauppauge, New York 11788 and I don't

20            know the building number.  Each

21            building in there has a number, so

22            whatever the building number it is.

23         A.     C928.

24         Q.     Thank you, gentlemen.

25                With regard to the amendments

1                    A. CRAWFORD
2       that are done on an as-needed basis, who
3       makes the determination?
4            A.    The ultimate decision is made
5       by the commanding officer from the Internal
6       Affairs Bureau.
7            Q.    And when you say ultimate
8       decision, is that because someone may
9       present him with an idea or a concern for
10      amendment?
11           A.    Yes.
12           Q.    Okay.
13                 And then it would be up to him
14      to say yes or no, it goes in the manual or
15      no?
16           A.    Yes, it would be up to her.
17           Q.    Her, pardon.  All right.
18                 So going back to some
19      preliminaries.  How long have you been in
20      law enforcement altogether, Mr. Crawford?
21           A.    Little over 30 years.
22           Q.    And can you give me an idea of,
23      clearly you probably started in patrol, is
24      that right?
25           A.    Yes.

1                    A. CRAWFORD

2        Q.     Worked your way to detective?

3        A.     No.

4        Q.     Never a detective, okay.

5               Can you track what you did from

6     the time you were on patrol until you're

7     sitting here now as an investigator?

8        A.     Sure.  As a police officer, I

9     was assigned to the 5th Precinct.

10       Q.     Okay.

11       A.     Then to the Highway Patrol

12    Bureau; then upon promotion to sergeant in

13    2000, I was assigned to 5th Precinct

14    patrol; then I was assigned to research and

15    development; and then to Internal Affairs

16    Bureau; and then upon promotion to

17    lieutenant in 2005, I remained at Internal

18    Affairs Bureau; and then transferred to

19    Special Patrol Bureau; then to the 7th

20    Precinct; then upon promotion to captain in

21    2014, I was assigned to Legal Bureau --

22       Q.     Okay.

23       A.     -- which is within the

24    Commissioner's office.  Sorry.

25       Q.     That's all right, take your

1                    A. CRAWFORD

2    time.

3         A.    2016 I was assigned to 7th

4    Precinct.

5         Q.    In what capacity?

6         A.    As a captain; then, I was

7    assigned then to Highway Patrol Bureau as a

8    captain in also 2017; then 2018, I was

9    promoted to deputy inspector, I was

10   assigned to the 6th Precinct; and then in

11   2019, I was assigned to Internal Affairs

12   Bureau where I'm currently assigned.

13        Q.    Okay.

14              That was pretty good, thank

15   you?

16        A.    Yeah, sorry, the details is a

17   little hazy overtime.

18        Q.    That's all right.  That was a

19   lot of positions.

20              So at what point through that

21   course did you obtain your juris doctorate

22   and your legal degrees?

23        A.    When I was a police officer.

24        Q.    Okay.

25              So while you were on patrol, is

1                    A. CRAWFORD
2    that right?
3         A.    Yes.
4         Q.    So you did law school around
5    your shifts?
6         A.    Yes, I worked a steady midnight
7    shift.
8         Q.    Okay.
9               And when did you pass the bar?
10        A.    In 1997.
11        Q.    That said, in the course of
12   your history, I see that, I have made the
13   presumption originally which you corrected
14   that you would have gone from patrol to an
15   investigatory unit as a detective.
16              Throughout your various
17   promotions and supervisory capacities, were
18   they continually over patrol or did you
19   have direct chain of command over an
20   investigatory officer, a chain of officers
21   at any time?
22        A.    The only supervisory position I
23   had in an investigative capacity is
24   currently in the Internal Affairs Bureau.
25        Q.    So prior to this last position

1                    A. CRAWFORD
2       that you're holding, did you have to
3       undergo any additional special training or
4       instruction with regard to investigation or
5       investigation techniques?
6             A.    I'm sorry, could you repeat
7       that?
8             Q.    That's okay.
9                   Prior to this current position
10      that you hold since you hadn't had previous
11      investigatory experience, did you have to
12      undergo any additional training or whatnot
13      in that regard specifically about
14      investigation techniques?
15            A.    Okay.  I thought your previous
16      question was regarding supervising
17      investigations?
18            Q.    I'm asking if you had training
19      in investigation specifically.
20            A.    Yes.  When I was first assigned
21      as an investigator in the Internal Affairs
22      Bureau --
23            Q.    Okay.
24            A.    And that was in 2004.
25            Q.    Can you tell me a little bit

1                    A. CRAWFORD
2      about that training, if you recall it?
3          A.    Yeah, it was just like a basic
4      course in Internal Affairs Investigations
5      and there were a few training seminars that
6      I attended, but I'm sorry, I don't recall
7      the specific names at this point.
8          Q.    That's okay.  I wouldn't expect
9      you to.
10              So with regard to your
11     investigative training, is it fair to say
12     that it all pertained to the investigation
13     of Internal Affairs issues?
14         A.    Yes, when I was assigned to the
15     Internal Affairs Bureau.
16         Q.    Okay.
17              When you were going through
18     your time in patrol, did you have any
19     training specifically in investigating
20     street crimes, homicides or anything of
21     that nature?
22         A.    You mean like a basic criminal
23     investigation course or anything of that
24     nature?  No, not while I was in patrol. No.
25         Q.    At any time?

1                    A. CRAWFORD

2          A.     No.

3          Q.     You're a member of any union?

4          A.     I am currently a member of the

5     Suffolk Superior Officers Association.

6          Q.     Tell me, what is the purpose of

7     splitting up the police union into superior

8     officers and regular non-superior officers?

9               MR. MITCHELL: I object to the

10              form, but you can answer.

11         A.     I, maybe it was done before I

12     started my employment with the agency.   I

13     would imagine it was --

14              MR. MITCHELL: I know it's a

15              figure of speech, but don't guess or

16              imagine.

17              THE WITNESS: Okay.

18              MR. MITCHELL: If you have some

19              basis for your knowledge, that's

20              fine.

21         A.     I don't know why they were

22     split up as they were, as they were formed.

23         Q.     Does the union have a function

24     or is it more of a social in nature?

25              MR. MITCHELL: I object to the

1                    A. CRAWFORD

2           form.  You can answer.

3           A.    It's, no, each union has a

4     function.  They're the bargaining

5     representative for all of the members.

6           Q.    When you say bargaining

7     representative, can you explain to me what

8     that means?

9                 MR. MITCHELL: I object to the

10               form.  This is beyond the scope of

11               the 30B.  I'm going to direct him not

12               to answer.

13                MS. McCLURE: I had specifically

14               asked about all of his knowledge with

15               regard to the Suffolk County Police

16               Department and it does go into

17               recordkeeping, but part of what we're

18               talking about today, Brian, is

19               Internal Affairs records, some of

20               these records having to do with

21               issues that pertain to union related

22               issues and outcomes that pertain to

23               union related issues, so it's a fair

24               question.

25                MR. MITCHELL: I disagree.  I'm

```
1                    A. CRAWFORD
2         directing him not to answer questions
3         about the make-up of the union --
4              MS. McCLURE: Okay.
5              MR. MITCHELL: -- as far as the
6         union being involved in, if there's
7         an IA investigation, that's
8         different, but you're asking about
9         the structural make-up of the union.
10        He's not here for that, so I'm
11        directing him not to answer.
12             MS. McCLURE: Okay.  That's
13        fine.  Madam Reporter, I would just
14        ask you to note and mark that
15        question for follow-up at a later
16        date.
17        Q.    But you said you are a member
18    of that Superiors Officers Union, is that
19    right?
20        A.    Yes.
21        Q.    How long have you been there?
22        A.    Since my promotion to sergeant
23    in 2000.
24        Q.    And have you ever held an
25    office within that union?
```

1              A. CRAWFORD

2        A.    As a board member?

3        Q.    Yes.

4        A.    Yes.

5        Q.    And do you currently hold an

6    office?

7        A.    No.

8        Q.    Okay.

9              Can you tell me the years when

10   you were a board member of any kind?

11       A.    I served as a trustee for the

12   Superiors Officers Association from 2011 to

13   2014 and then I served as the sergeant at

14   arms in, from 2015 to 2018.

15       Q.    Have you ever been deposed

16   before as a representative of the union in

17   any capacity?

18       A.    No.

19       Q.    No, okay.

20             Have you ever appeared on

21   behalf of a member in a representative

22   capacity on behalf of the union?

23             MR. MITCHELL: I object to the

24        form, but you can answer.

25       A.    I, in what capacity?

1                  A. CRAWFORD

2       Q.    At any hearing.  Have you gone

3  along with an officer for any purpose to

4  assist him on his behalf?

5       A.    Not for a hearing.  I used to

6  provide assistance with disciplinary issues

7  when I was on the board.

8       Q.    Okay.

9             What kind of assistance?

10       A.    Just providing counseling and

11  appearing at Internal Affairs interviews.

12       Q.    So almost as counsel for them,

13  legal counsel?

14       A.    No, as union, union counsel.

15  That would be separate legal union counsel.

16       Q.    And with regard to your prior

17  depositions, have you ever been designated

18  by the county as you have today as a

19  representative under 30B6?

20       A.    No.

21       Q.    And you're familiar with that

22  rule as someone with a legal background?

23       A.    Yes.

24       Q.    So you understand today that

25  that is your role today?

1                    A. CRAWFORD

2          A.     Yes.

3          Q.     And it's your first time?

4          A.     Yes.

5          Q.     And before, especially given

6     that, before today, did you have the

7     opportunity, without telling me what you

8     guys talked about, to speak or get-together

9     with Mr. Mitchell for preparation?

10         A.     Yes.

11         Q.     Did you meet with anyone else?

12         A.     No.

13         Q.     And did you review any

14    documents of any kind in preparation for

15    today?

16         A.     Yes, I, yes, I did.

17         Q.     Okay.

18                Can you tell me what you

19    reviewed, do you recall?

20         A.     Yes, the affidavit that I had

21    submitted regarding the matter.

22         Q.     That's it?

23         A.     Yeah.

24         Q.     Okay.

25                No policies, procedures, guide

1                    A. CRAWFORD
2    books?
3         A.    No.
4         Q.    No, okay.
5               Nothing with regard to the
6    storage of files or software used to
7    maintain them, nothing?
8         A.    No, I'm pretty familiar with.
9         Q.    Is that because you use it all
10   the time?
11        A.    Yes.
12        Q.    So you have mastered the craft
13   of your organizational software and
14   systems?
15              MR. MITCHELL: I object to the
16         form.  You can answer.
17        A.    For the purposes of Internal
18   Affairs Bureau?
19        Q.    Yes.
20        A.    Yes, I'd like to think so.
21        Q.    Okay, very good.
22              So with regard to the subpoena
23   that was issued for you today, it's been
24   marked Exhibit 1.  Fellas, I think you've
25   had a chance to look at it.  Do you

```
1                    A. CRAWFORD
2       recognize that specific form?
3                    MR. MITCHELL: Now, are you
4               referring to the notice, the 30B
5               Notice?
6                    MS. McCLURE: Yes.
7                    MR. MITCHELL: Okay.  I'm
8               splitting hairs here, but it's not a
9               subpoena.  It's a notice, it's what
10              we're talking about, 30B Notice.
11          Q.    It's Exhibit 1?
12          A.    Yes.
13          Q.    And you had the opportunity to
14      review that --
15          A.    Yes.
16          Q.    -- prior to today?
17          A.    Yes.
18          Q.    So you saw the issues that we
19      wanted to talk about today specifically
20      with regard to a number of things that are
21      not enumerated, but set forth within the
22      notice?
23          A.    Yes.
24          Q.    And do you consider yourself
25      qualified to speak on all of those issues
```

1                    A. CRAWFORD
2     as they're written in that, in any
3     tangential related issue that might come
4     up?
5               MR. MITCHELL: I object to the
6          form.  You can answer.
7          A.    Yes.
8          Q.    Can you tell me what makes you
9     so qualified to speak on behalf of the
10    county as to all of those things?
11              MR. MITCHELL: I object to the
12         form, but you can answer.
13         A.    Because of my knowledge and
14    experience, being assigned to Internal
15    Affairs Bureau.
16         Q.    Okay.
17              And of all of the different
18    capacities that you were counted for, and
19    forgive me, I wasn't taking note of all the
20    years that you were dictating, sort of
21    speak, how many years altogether have you
22    served in Internal Affairs in one capacity
23    or another?
24         A.    Approximately six years.
25         Q.    Six years, okay.

1                    A. CRAWFORD
2                    And so through those six years,
3        you have gone through a couple of different
4        administrations if you will, at least?
5              A.    Yes, two.
6              Q.    Okay.
7                    Mr. Crawford, in addition to
8        reviewing your affidavit and just through
9        generalized knowledge as well as meeting
10       with Mr. Mitchell, did you take any time to
11       study anything else, any policy or
12       procedures that are going to be perhaps
13       going into effect or changes that are
14       currently proposed, anything of that
15       nature?
16                   MR. MITCHELL: I object to the
17             form.  You can answer.
18             A.    I'm sorry, did I look into
19       anything that's being proposed?
20             Q.    Right, yes.
21             A.    For preparation for today?
22             Q.    Yep.
23             A.    No.
24             Q.    No, okay.
25                   And how many times did you meet

1                    A. CRAWFORD

2    with Mr. Mitchell to prepare for today?

3         A.    Two times.

4         Q.    Two times, okay.

5               Do you feel as though you've

6    had enough time to go over anything that

7    you might have wanted to go over with him

8    in preparation for today?

9               MR. MITCHELL: I object to the

10         form, but you can answer.

11        A.    Yes, I think I'm prepared for

12   whatever questions you have.

13        Q.    Okay, very good.

14              Do you guys in IA use a

15   specifically designated IT department, so

16   information technology department to

17   maintain your software and data?

18        A.    I'm sorry, are you asking does

19   the department have an IT section?

20        Q.    Yes, its own.

21        A.    Yes.

22        Q.    So it's separate and apart from

23   the counties in general and the police

24   department, you have your own IA IT

25   department, is that right?

1                    A. CRAWFORD
2          A.     No, it's not an IA IT, we do
3      have a department IT section.
4          Q.     And who does that department
5      serve besides IA?
6          A.     The whole department.
7          Q.     The whole department, okay.
8                 And can you tell me which
9      softwares you use to maintain your files
10     on-line?
11         A.     An Internal Affairs Bureau?
12         Q.     Yes.
13         A.     IAPro.
14         Q.     Do you know which version that
15     you use?
16         A.     As far as version number, no,
17     no, I don't.
18         Q.     Do you know someone that would
19     know that?
20         A.     We could have somebody check on
21     the computer.
22         Q.     Okay.
23                Yes, part of the things that
24     we're going to be talking about today are
25     specifics with regard to how you maintain

                        A. CRAWFORD

1
2      your records and I think it is important to
3      know which version you're operating to
4      fully understand the use, and so I'm going
5      to ask that if you don't know the answer to
6      that question, perhaps you could take a
7      minute for you to step out and check the
8      computer or make a phone call to find out
9      which version?
10               MR. MITCHELL: Yes, that's fine.
11          You want to do that now?
12               MS. McCLURE: Sure.  We can go
13          off the record.
14               (Whereupon, a five-minute break
15          was taken.)
16               MS. McCLURE: Back on the
17          record.
18      Q.    So we're back on the record
19      after a short recess.  All the same parties
20      have returned and are present.
21               Mr. Crawford, of course, you
22      realize you're still under oath the same as
23      before and that will be the same for any
24      break and regrouping throughout the day,
25      all right?

```
 1                    A. CRAWFORD
 2        A.    Yes, I understand.
 3        Q.    Okay.
 4              So that said, were you able to
 5   make a phone call and find out which
 6   version of IAPro you guys are using?
 7        A.    Yes.
 8        Q.    And which version is that?
 9        A.    7.5.197.
10        Q.    One more time?
11        A.    7.5.197.
12        Q.    7.5.197, okay.
13              And are you aware of whether or
14   not that's the most current version?
15        A.    No, I'm not aware.
16        Q.    Are you aware of how long you
17   guys have been running that version?
18        A.    No.
19        Q.    Have you ever taken a look at
20   any of the user manuals for any version of
21   IAPro?
22        A.    Yes, I have.
23        Q.    But you did not look at it in
24   preparation for today?
25        A.    No.
```

1                    A. CRAWFORD
2          Q.     Are you aware of whether the
3      user manual that you use corresponds with
4      the same version that you currently
5      operate?
6          A.     That, I am, I'm not aware of.
7      There's a particular user manual for that
8      version that we use currently.
9          Q.     Okay.
10               Is there someone in your office
11     that is more knowledgeable with regard to
12     the IAPro system than you are?
13               MR. MITCHELL: I object to the
14          form.   You can answer.
15         A.     As far as using it or are you
16     talking about like updates and tech
17     support?
18         Q.     I'm talking specifically about
19     the capacity of the software and how you
20     use it, so you could answer in two parts if
21     you want.
22               Is there someone who has a
23     better understanding than of the capacity
24     of the IAPro software meaning the functions
25     that are capable of running?

1                    A. CRAWFORD
2                 MR. MITCHELL: And I object to
3            the form, but you can answer.
4         A.    As far the capabilities of the
5     software, I don't know, possibly someone in
6     our IT section.  As far as the day to day
7     usage and how we use it, no, I'm not
8     familiar.
9         Q.    Do you know whose decision it
10    was to use that software in particular of
11    all the softwares that can be used?
12        A.    It was a decision made under
13    Commissioner Dormer, D-O-R-M-E-R.
14        Q.    And do you recall about what
15    years Commissioner Dormer served in that
16    capacity?
17        A.    Commissioner Dormer served as
18    commissioner from 2004 through 2011.
19        Q.    So since 2011, are you aware of
20    whether or not that software has been
21    updated at all?
22        A.    Yes, we have periodic updates.
23        Q.    And when you run those updates,
24    is the system integrated with the new
25    version and any new capabilities that a new

1                    A. CRAWFORD
2       version may have?
3            A.    I'm sorry, can you ask that one
4       more time?
5            Q.    Sure.
6                  When you run a new system, so a
7       new system is put into your office.  Is all
8       of the information from the former system
9       input into the new system or is it legacy
10      that you have an old system and a new
11      system?
12           A.    The data that's actually stored
13      in the system is legacy and it's just
14      assimilated with whatever updates are added
15      to the system.
16           Q.    So then if the information in
17      the old version is legacy, given that, are
18      you aware of whether or not any old
19      functions, old flags, old monitoring are
20      carried over to the new system
21      automatically?
22                 MR. MITCHELL: I object to the
23            form.  You can answer.
24           A.    I, are they automatically when
25      the update occurs?  No, I don't, I don't

A. CRAWFORD

1
2    believe any of the -- no, no, any of the
3    monitoring that's in the system, you know,
4    not with any of the updates.  It's not as
5    if we're working from a new and have to
6    create everything all over again.
7        Q.    Okay.
8              So are you saying that when you
9    run the update, some information is
10   imported as far as the employees or whatnot
11   or do you work completely anew from a
12   system?
13       A.    No, all the data is maintained
14   in the system.
15       Q.    Okay.
16             But the functions are not
17   transferred, so monitoring, flagging all of
18   that are automatically transferred, someone
19   has to trigger that?
20             MR. MITCHELL: I object to the
21        form of the question.  You can
22        answer.
23       A.    As far as the actual technical
24   set up, that, I'm not sure.
25       Q.    And are you not sure because

1                    A. CRAWFORD
2      that's not something that you consider to
3      be particularly important for your role?
4                    MR. MITCHELL: I object to the
5              form.  You can answer.
6          A.    No, it's very important, but we
7      never had an issue.  I don't recall any
8      updates where we erased any data or any --
9      and, you know, the monitoring in the system
10     is a continual process, so I'm not aware of
11     any resets or anything where we had lost
12     data or flags or anything of that nature.
13         Q.    Have you ever asked?
14         A.    Have I asked what?
15         Q.    If any information would be
16     lost or fallen through the cracks with
17     assimilation into a new version?
18                    MR. MITCHELL: I object to the
19              form.  You can answer.
20         A.    I never had a concern with
21     that.  I'm not aware of any loss of data,
22     I'm not aware of any lapses with any of the
23     monitoring or flagging in the system.
24         Q.    Okay.
25                    And is the administration of a

1                    A. CRAWFORD

2    new update subject to any standards of

3    procedures, protocols?

4              MR. MITCHELL: I object to the

5         form of the question.  You can

6         answer.

7         A.    As per our IT section, no, not

8    aware of the protocols or procedures.

9         Q.    Does IT have protocols or

10   procedures?

11             MR. MITCHELL: I object to the

12        form.  You can answer.

13        A.    I don't know.  I presume that

14   they do, but I never worked in the IT

15   section.  I defer to the experts.

16        Q.    All right, you defer to the

17   experts.

18             So you're not prepared then to

19   speak on the technological side of how IA

20   files are stored and maintained, but

21   someone else should speak on that, as to

22   that, is that fair to say?

23             MR. MITCHELL: I object to the

24        form.  I will allow him to answer it.

25        The portion of your question I'm

                    A. CRAWFORD

1
2          objecting to is someone else should
3          speak to.  He doesn't, regardless of
4          whether he's here as a 30B witness or
5          as a fact witness or anything, the
6          question itself is objectionable
7          because it's not his place to testify
8          as to who should be giving
9          information.  That being said, you
10          can answer if you can.
11     Q.    Well, you have already
12 testified, correct, that you defer to the
13 experts.  What did you mean by that?
14     A.    When it comes to any
15 programming of our computers, I, I know to
16 defer to the IT people and that's our IA
17 requirement and policy of the department.
18     Q.    So it's a policy of the
19 department not to ask any questions per se,
20 but just to leave IT to what they do?
21          MR. MITCHELL: I'm going to
22          object to the form.  You can answer.
23     A.    When it comes to any computer
24 programming, we defer to the expertise of
25 the programmer, so if the ones that are

1                    A. CRAWFORD
2      actually experts that when it comes to
3      computer equipment, my expertise runs to
4      using it and how we maintain the data.  As
5      far as the technical aspects of it, no, I'm
6      not familiar.
7           Q.    Has your department ever done
8      any type of audit of the information from
9      one version to another to make sure that
10     everything is A OK in there?
11               MR. MITCHELL: I object to the
12          form.  You can answer.
13          A.    We use the software on a
14     continual basis throughout the day.  If we
15     have a glitch in the system or if we have
16     any problems, then yes, at that point we
17     then we seek assistance, but as far as
18     audits, I mean this is, you know, never
19     done an audit to check to make sure that we
20     haven't lost files or anything because it
21     would be noticeable.  You know, if we went
22     to run data or input anything and all of a
23     sudden the data was lost, it would be
24     noticeable.
25          Q.    How many files do you think are

1                    A. CRAWFORD

2       in there?

3            A.    In the computer system?

4            Q.    Yes.

5            A.    What kind of files?  Are you

6       talking about altogether?

7            Q.    All of them, yes.

8            A.    In the computer system, you got

9       to remember, it's not limited to

10      investigative files.  It also includes all

11      the alerts, notifications, et cetera, so I

12      would say in the tens of thousands.

13           Q.    But you would feel it would be

14      noticeable if something was missing?

15                 MR. MITCHELL: I object to the

16            form.  You can answer.

17           A.    Yes.

18           Q.    And why do you feel that way?

19                 MR. MITCHELL: I object to the

20            form.  You can answer.

21           A.    Because we have discovery

22      demands made upon the office on an hourly

23      basis in which we have to produce files

24      dating back sometimes 30 or 40 years and if

25      any files were missing, it would be

1              A. CRAWFORD
2    noticeable.
3         Q.    Do you maintain any kind of
4    paper copy or list that mirrors the
5    information in the IAPro system?
6         A.    Yes.
7         Q.    You do, okay.  Tell me about
8    that.
9              MR. MITCHELL: I object to the
10            form.  You can answer.
11        A.    Every file within IAB is kept
12   in paper form and some of them are
13   maintained in digital form on IAPro, but we
14   have all of the paper files maintained
15   within the office.
16        Q.    So some of them are uploaded
17   into the system, but all of them are in
18   paper form in the office; is that correct?
19        A.    Yes.
20        Q.    Who makes the decision as to
21   what gets uploaded into the system?
22        A.    Well, as of about seven or
23   eight years ago, every file is maintained
24   in a digital format, but as far legacy
25   files, some of them are only maintained on

```
 1                    A. CRAWFORD
 2     paper and haven't been digitized.
 3          Q.    Where are the legacy files
 4     kept?
 5          A.    Within the office of IAB.
 6          Q.    And what is the storage system
 7     of those files?
 8          A.    They're paper files, they're
 9     maintained in file cabinets, many file
10     cabinets.
11          Q.    Okay.
12               Are they by number, by last
13     name?
14          A.    By number.
15          Q.    Is there any back-up of that
16     paper filing system such that if anything
17     were ever to happen, say, a fire that that
18     information wouldn't be lost?
19          A.    Like I said, most of the files
20     have been digitized, but there are some
21     from many years ago that have not.  Some of
22     the older files have been copied to
23     microfilm and the paper files for those are
24     stored in file cabinets, so yes, the files
25     are maintained in many forms.
```

1          A. CRAWFORD

2          Q.    Is it fair to say that the

3     files are maintained in some form of

4     electronic back-up or microfiche back-up or

5     are there files that exist that are only on

6     paper?

7          A.    There are some files that only

8     exist on paper.

9          Q.    And when do you think they

10    would be from, ancient files?

11         A.    Yes, most of them, yes, that

12    are old files, but at some point in history

13    we had a need to produce files for

14    discovery or for any other purpose and they

15    weren't stored digitally, they would be

16    digitized, so that if they were maintained

17    in IAPro, but no, there were some files

18    that are just maintained in paper format.

19         Q.    So from, say, the year 2000, so

20    from 2000 until now, is it fair to say that

21    all of those files are some way backed up

22    and digitized somehow?

23         A.    No, not all of them.  There

24    would be some files that are just

25    maintained in paper format.

A. CRAWFORD

1

2      Q.      Not microfiche for those?

3      A.      No, the microfilm only goes to

4   files through, I believe, to '95 -- from

5   the files of the year 1995 and prior to

6   that are, have been placed on microfilm,

7   but we still have the paper versions, but

8   the microfilming, that stopped for the

9   files, like I said, in 1995.

10     Q.      What is your understanding of

11  the reason why those files up through 1995

12  were placed on microfilm?

13          MR. MITCHELL: I object, but you

14       can answer.

15     A.      So the files could be, they

16  would be stored in the microfilm, so they

17  would be available.  We used to have

18  microfilm machines to pull the files.  As

19  far as the decision why and why it ceased

20  at that point, I don't know.

21     Q.      Would you agree that putting

22  them on microfilm did indeed make it

23  easier, quicker to access those files?

24          MR. MITCHELL: I object, but you

25       can answer.

A. CRAWFORD

1
2          A.     Have you ever used a microfilm
3     machine?
4          Q.     I have.
5          A.     It's, in my opinion, much
6     easier to access the paper file than it is
7     to locate a file on thousands of pages on a
8     microfilm reel.
9          Q.     It sounds like a large
10    undertaking to put all of those files on
11    microfilm, right?
12         A.     As far as I understand, yes, a
13    great undertaking, yes.
14         Q.     So there must been some reason
15    for it, correct?
16              MR. MITCHELL: I object.  You
17         can answer it.
18         A.     I'm sure there's a reason why
19    they stopped doing it, but that, I don't
20    know.
21         Q.     So from 1996 until seven or
22    eight years ago when everything started
23    being digitized, that span of files, from
24    '96 to seven or eight years ago is all on
25    backed up, is that right, it's all on paper

1                    A. CRAWFORD
2      or how would you be able to tell?
3           A.    No, most of the files are
4      digitized, but there are some files that
5      are only available for paper form.
6           Q.    What percentage of those files
7      are only available on paper form?
8           A.    I'd say 10 to 15 percent.
9           Q.    And everything is else is
10     digitized at this point?
11          A.    Yes.
12          Q.    So what system are they stored
13     in, are they part of IAPro or something
14     else?
15          A.    IAPro.
16          Q.    Who uses IAPro within your
17     office?
18          A.    All of the members assigned to
19     the office.
20          Q.    Okay.
21                Does everyone have the same
22     access to the files and information on
23     there?
24          A.    No.
25          Q.    Can you describe the different

```
 1                    A. CRAWFORD
 2      levels of access?
 3           A.    There are limitations that can
 4      be imposed on files, so some of, all files
 5      are confidential; however, some are labeled
 6      as confidential on top of confidential and
 7      limiting the access to everybody in the
 8      office.
 9           Q.    That's it?
10           A.    As far as procedures within the
11      office, yes.
12           Q.    Okay.
13                 So you're aware then that IAPro
14      has other capabilities to label files, to
15      restrict files, right?
16           A.    Yes.
17           Q.    Can you tell me what your
18      understanding is of the capability of the
19      system?
20           A.    As far as the other uses that
21      are available, no, I'm familiar with our
22      usage of the system, yes.
23           Q.    But you don't know the other
24      abilities of the software, for example, the
25      other items and the drop down menu for
```

```
 1                  A. CRAWFORD
 2     classification, you're not aware of those
 3     or you are?
 4          A.    As far as the categorization
 5     with each file --
 6          Q.    Yes.
 7          A.    -- no.  As far as the drop down
 8     menus and the limitations imposed, we just
 9     use, it's either confidential or not
10     confidential within the office, but just to
11     make it clear, all our files are
12     confidential, but just within IAPro, we can
13     limit access to just the commanding
14     officer, executive officer and the three
15     captains.
16          Q.    Okay.
17                And what is the reason for
18     limiting information?
19          A.    Depending on the circumstances
20     of a case or the information involved is
21     just to prevent anybody who doesn't have a
22     need to from accessing the file.
23          Q.    Does the IAPro office allow
24     access to any other members of law
25     enforcement who is not specifically in IA?
```

1                    A. CRAWFORD

2         A.    The commissioner and the two

3    deputy police commissioners.

4         Q.    That's it?

5         A.    That's it.

6         Q.    Who makes that decision?

7         A.    That was the commissioner that

8    made that decision.

9         Q.    Which commissioner?

10        A.    Commissioner Harrison.

11        Q.    And when was Commissioner

12   Harrison in that office?

13        A.    When did he become

14   Commissioner?

15        Q.    Yes.

16        A.    January 1st -- or actually

17   December 27th.

18        Q.    So it was his decision to make

19   sure that he had access to IAPro as well as

20   certain folks underneath him in his chain

21   of command as well as the Internal Affairs

22   Department, is that right?

23        A.    The Internal Affairs Bureau

24   already had access, but as far as access

25   outside of Internal Affairs Bureau, yes,

1                    A. CRAWFORD

2       Commissioner Harris, Deputy Police

3       Commissioner Anthony Carter and Deputy

4       Police Commissioner Risco Mention-Lewis,

5       R-I-S-C-O; Mention, M-E-N-T-I-O-N, hyphen,

6       Lewis, L-E-W-I-S.

7            Q.    So before December 27, 2021,

8       the Commissioner did not have access to

9       IAPro; is that correct?

10           A.    No, Acting Commissioner Cameron

11      had access to IAPro and Risco Mention,

12      Deputy Police Commissioner Risco

13      Mention-Lewis also had access.

14           Q.    As far as you can remember back

15      in your current capacity, has the

16      Commissioner and whoever they made

17      designated in their chain of command, had

18      they always also had access to IAPro

19      besides the IA Department?

20           A.    Commissioner Hart did not have

21      access, but First Deputy Police

22      Commissioner James Skopek had access.

23           Q.    And when was that person in

24      office?

25           A.    Commissioner Hart was

```
 1                    A. CRAWFORD
 2    commissioner between 2018 and 2021.
 3         Q.    And are you aware if whether or
 4    not they use any of the classifications in
 5    addition to the confidential
 6    classifications for files?
 7         A.    Are you talking, who's they,
 8    the Commissioner?
 9         Q.    The Commissioner and anyone
10    under, in their direct chain of command who
11    has access?
12         A.    I don't know. I, could you ask
13    the question one more time, please?
14         Q.    Sure.
15              Are you aware if whether or not
16    they have the ability to classify any
17    information in IAPro using either the
18    confidential designation or the others
19    which are top secret and unclassified?
20         A.    They do.  As to whether or not
21    they use that, I don't know.
22         Q.    Who has the ability to input
23    information in the IAPro system?
24         A.    Everybody assigned to the
25    office.
```

```
1                    A. CRAWFORD
2          Q.     Is everyone's imputability
3     unrestricted?
4          A.     What do you mean by
5     unrestricted?
6          Q.     Does everybody have full access
7     to input information into the system as
8     much as or as little as they would like?
9          A.     As far as reporting?
10         Q.     As far as any input that may go
11    in.
12         A.     Administrative access, no, they
13    don't have, but as far as reporting, yes,
14    they have access.
15         Q.     Tell me about administrative
16    reporting, what is that?
17         A.     As far as creating files or
18    eliminating files from IAPro, the
19    investigators don't have that access.
20         Q.     So the investigators don't have
21    access, it's administrators that have
22    access for those purposes, is that right?
23         A.     Yes.
24         Q.     And who is it that makes up
25    those administrators currently, what are
```

A. CRAWFORD

1
2     the titles of those folks who have that
3     access?
4          A.     The commanding officer, the
5     executive officer, the three captains and
6     also the Administrative One in the office.
7          Q.     What is an Administrative One?
8          A.     She's the head clerical within
9     the office.
10         Q.     Perhaps it's a good time for me
11    to understand the structure of the offices
12    a little bit.
13              Could you start just very
14    generally explain to me the chain of
15    command within Internal Affairs and how
16    they may work with any administrative folks
17    that you were just saying?
18         A.     Okay.  There's a commanding
19    officer, an executive officer; right now we
20    have three captains and each captain is in
21    charge of an investigative team and
22    ordinarily, we have 18 investigators
23    assigned to the office.  We just lost two
24    transfers in promotions on Friday, so right
25    now we have 16 investigators, but

```
 1                    A. CRAWFORD
 2      ordinarily there would be three
 3      investigative teams with six investigators
 4      on each team, and then we have a field
 5      auditing unit which is three lieutenants, a
 6      sergeant; and then as far as an admin
 7      staff, we have four members of the admin
 8      staff, they have clerical responsibilities
 9      and the head clerical, her position is per
10      Civil Service Administrative One.
11           Q.    You mentioned 18 investigators
12      ordinarily was the term that you had used.
13      How long have you had that many
14      investigators in that unit?
15           A.    What do you mean, how long has
16      the staffing been 18 investigators?
17           Q.    Yes.
18           A.    That staffing level has been in
19      effect for many years dating back to when I
20      worked as an investigator, but the actual
21      staffing levels of Internal Affairs Bureau
22      will fluctuate, depending on promotions,
23      transfers, things of that nature, but
24      ideally, we have 18 investigators and we're
25      hoping to have a full compliment at the end
```

1                    A. CRAWFORD
2      of this week again.
3          Q.    And you said you've had it for
4      many years since you have been an
5      investigator, but forgive me, again, I
6      wasn't keeping track of the years that you
7      served in your position, so I can't
8      extrapolate that information, so for how
9      long has the staffing been at 18 for that
10     position?
11         A.    Well, it's, again, it
12     fluctuates.  When I was an investigator
13     assigned to Internal Affairs Bureau between
14     2004 and 2007, the staffing level was 18
15     investigators, but like I said, it would
16     fluctuate occasionally based on transfers
17     and promotions.
18                After I left the office, the
19     staffing apparently went down and then when
20     I got back into the office in 2018, it was
21     at 18.
22         Q.    Who is responsible for
23     determining how many investigators are
24     needed in that position?
25         A.    For staffing, that's the

```
 1                    A. CRAWFORD
 2     Commissioner's purview.
 3          Q.    And for each of those roles
 4     that you just went down, does each staffing
 5     position have its own procedures and
 6     policies that they have to follow in the
 7     form of a written manual?
 8               MR. MITCHELL: I object, but you
 9          can answer.
10          A.    Could you repeat that question,
11     please?
12          Q.    Is there a procedure manual for
13     each staffing position?
14               MR. MITCHELL: I object, but you
15          can answer.
16          A.    Procedure manual for a staffing
17     position, I don't understand what you're
18     asking.
19          Q.    For each job within your
20     office, does each job have a standard
21     operating procedure or a manual with
22     procedures they have to follow?
23          A.    Yes, for Internal Affairs
24     Bureau, yes, there is a guidebook for the
25     investigators.
```

1                    A. CRAWFORD

2          Q.     Okay.

3                 And for, just for the

4     investigators or everyone?  Is everyone --

5          A.     No, it applies to all personnel

6     within the office.

7          Q.     One guidebook for all?

8          A.     Yes.

9          Q.     And who is it that makes that

10    --

11         A.     We maintain it within the

12    office.

13         Q.     Who's responsibile for the

14    policies and procedures then?

15         A.     The commanding officer.

16         Q.     The commanding officer, okay.

17                And how long have those, has

18    that manual currently been in place in its

19    current form?

20         A.     What do you mean by its current

21    form?

22         Q.     In the current form that it's

23    in right now, I believe you testified about

24    a guidebook and policy manual.  How long

25    has the current guidebook been in its

```
 1                    A. CRAWFORD
 2      current form?
 3           A.    What do you mean by current
 4      form?  You mean the last time an amendment
 5      was made to it?
 6           Q.    Yes.
 7           A.    About four, five months ago.
 8           Q.    And when does someone receive
 9      that guidebook?
10           A.    Upon assignment.  It's
11      available as a reference with any [sic]
12      office and it's provided to new
13      investigators when they get to the office
14      when they get transferred and new captains.
15           Q.    And after they receive a copy
16      of the guidebook, how do they receive
17      amendment?
18           A.    The amendments are usually
19      disseminated either electronically or by
20      Email or through paper version.
21           Q.    Going back to IAPro, I know you
22      testified earlier that you currently run
23      7.5.197, that's correct?
24           A.    Yes.
25           Q.    And am I correct in also saying
```

1                    A. CRAWFORD

2       that everyone within the Internal Affairs

3       Department has access to it?

4            A.     Has access to IAPro, yes.

5            Q.     Yes?

6            A.     Yes.

7            Q.     What training do they receive

8       in IAPro specifically?

9            A.     Generally it's more experienced

10      officer within the command will provide

11      instruction to anybody who is recently

12      transferred into the office.

13           Q.     There's no formalized training

14      of any kind?

15                  MR. MITCHELL: I object to the

16            form.  You can answer.

17           A.     As far as formal, no.

18           Q.     No class?

19           A.     No class, no.

20           Q.     Guidebook?

21           A.     The guide, there's a guidebook

22      available in the office as a reference, but

23      usually somebody who is proficient in the

24      system will provide instruction to whoever

25      is new to the office.

1                    A. CRAWFORD

2          Q.      You testified earlier that you

3     were not sure how often it's updated.

4     Since you have been using it, have you seen

5     any changes to the format or to the way

6     that you use the software?

7          A.      Since I've been in the office,

8     any noticeable changes, no.

9          Q.      Do you know which version was

10    used back in 2006?

11         A.      No, I don't.

12         Q.      Do you have any idea how many

13    updates may have been made?

14         A.      To the software, no.

15         Q.      Do you get any kind of notice

16    before an update is made?

17         A.      Usually the company will send a

18    notification that an update is available.

19         Q.      And whose decision is it to run

20    that update?

21         A.      Decision to run the update, I

22    mean that's, you know, if it's just

23    software update, we have our Admin One --

24         Q.      Okay.

25         A.      -- managing the update.

1                    A. CRAWFORD

2          Q.     So who is responsible for

3     finding out what the update entails?

4          A.     The Admin One.

5          Q.     So the Admin One is responsible

6     for receiving notice of the update and

7     determining whether or not it's in the

8     County's best interest to run it?

9               MR. MITCHELL: I object to the

10             form.  You can answer.

11         A.     No, if we get an update, then

12    we incorporate it into the system or if we

13    get word of an update, then we incorporate

14    it into the system.

15         Q.     You said no, but your answer

16    sounded like a yes answer.

17              So when you guys get, do you

18    get an Email, is that how you get notice?

19         A.     Generally it's a Email.

20         Q.     So when you get notice by Email

21    or otherwise that an update needs to be run

22    to the IAPro system, it's the Admin One's

23    job to run that update, correct?

24         A.     To coordinate with our IT

25    section and also with IAPro.

1                     A. CRAWFORD
2          Q.    So take me step by step.  She
3     receives notice that an update needs to be
4     run and then what is her duties next?
5          A.    To coordinate with our IT
6     section and then with IAPro.
7          Q.    So whose job is it to find out
8     what the update is?
9               MR. MITCHELL: And I object, you
10          can answer.
11         A.    Who job is it, IAPro.
12         Q.    So you automatically run it
13    without any investigation as to what it's
14    going to be changing in your system?
15              MR. MITCHELL: I object to the
16          form, but you can answer.
17         A.    I mean we get notice of the
18    recommended software amendment, but I'm not
19    aware of any time where we decided not to
20    run an update.  I mean we have to reply on
21    our [sic] vendor.
22         Q.    Okay.
23              So you rely on the vendor and
24    don't make any inquiry as to what the
25    update is going to be doing to your data or

```
 1                    A. CRAWFORD
 2      this system, is that right?
 3               MR. MITCHELL: I object, but you
 4          can answer.
 5          A.    Yes, we get a description as to
 6      what the update, you know, as with any
 7      software update, the general purpose of the
 8      update and then we coordinate the measure
 9      to make sure the update is conducted.
10          Q.    So when you get the general
11      notice of the update, it comes now with a
12      description of what the update does?
13          A.    Generally, yes.
14          Q.    Okay.
15               Is there any policy or
16      procedure in place that when an update
17      comes in measures have to be taken
18      specifically to find out what it's going to
19      be doing to IAPro beyond just the Email
20      from the vendor before it's run?
21               MR. MITCHELL: I object.  You
22          can answer.
23          A.    I'm sorry, could you ask the
24      question again, please?
25          Q.    Is there any policy or
```

1                    A. CRAWFORD

2      procedure that needs to be done when the

3      County receives notice of an update to

4      investigate the purpose of the update

5      beyond what it just says in the Email from

6      the vendor before it makes the decision to

7      run the update?

8                    MR. MITCHELL: And I object, but

9           you can answer.

10          A.    It's coordinated for the IT

11     section.  As far as a decision not to run,

12     a recommended software update, I'm not

13     aware of any discussion where we decided

14     not to incorporate a recommended update.

15          Q.    Is there any action that's

16     required to be taken before an update is

17     run?

18          A.    We have to coordinate with our

19     IT section.

20          Q.    What does that mean, though,

21     what do they do?

22          A.    We have our technical experts

23     coordinate to make sure it's one that our

24     system can incorporate whatever software

25     amendment is going to take place and ensure

1                    A. CRAWFORD
2     that it's done properly.
3          Q.    Okay.
4                How about a back-up?
5          A.    Our entire computer system is
6     backed up on a daily basis by our IT
7     section.
8          Q.    Tell me about the daily
9     back-ups. Are they maintained on hard copy,
10    meaning on an external thumb drive, CD, a
11    network or are they uploaded to a Cloud
12    base system?  I'm giving you options.
13         A.    Yeah, a microsystem -- this is
14    under [sic] the purview of the IT section.
15         Q.    So you're unaware of how your
16    back-ups are maintained of all of the
17    information in the IAPro?
18         A.    Yes, I am not familiar with the
19    form of how it's backed up or the
20    procedures are involved.
21         Q.    Are you aware that one of the
22    reasons or one of the issues to be explored
23    today was to find out about how information
24    is stored within IA files which would
25    include electronic storage?

```
 1                    A. CRAWFORD
 2              MR. MITCHELL: And I object to
 3         the form.  You could answer.  Are you
 4         asking him is he aware of what your
 5         notice said, is that what you're
 6         asking?
 7              MS. McCLURE: Was he aware that
 8         that was going to be a question that
 9         we were going to be asking him?
10              MR. MITCHELL: You could ask him
11         that question.  I object to it, and
12         you can answer, but that's not what
13         your notice says, but go ahead,
14         answer the question.
15         A.    I mean my understanding of your
16    notice was that am I familiar with how our
17    files are maintained in IAPro, yes.
18         Q.    And how are your files are
19    stored, right, so if they're stored in a
20    back-up, that's something we need to know
21    today.
22              MR. MITCHELL: And he's answered
23         they are stored in the back-up.
24         You're now asking how the back-up
25         works and we've already had that
```

1              A. CRAWFORD

2         discussion and he's not here as an IT

3         person and, I'm allowing him to

4         answer I don't know, but I could

5         direct him not to answer because it's

6         beyond the scope of the 30B Notice;

7         that being said, I will allow him to

8         answer I don't know if that's what

9         you prefer, but with that in mind, if

10        you want to read back the question,

11        read it back, I will object, but I

12        will allow him to answer and his

13        answer is his answer.

14             MS. McCLURE: Before you answer,

15        for the record, it is fully within

16        the scope of this notice and the

17        entire purpose that this witness was

18        ordered by The Court to explore how

19        the files are maintained in the

20        office.

21             MR. MITCHELL: And we disagree,

22        that's fine, we have a disagreement.

23             MS. McCLURE: Mr. Mitchell, I

24        let you put your full objection on

25        the record and I would ask for the

1                    A. CRAWFORD
2          same courtesy.
3               MR. MITCHELL: Sure, go ahead.
4               MS. McCLURE: Judge Wicks
5          specifically ordered this witness in
6          the context or a discovery dispute
7          that pertains to paper files and the
8          availability of electronic discovery,
9          part and parcel of our discussions
10         during the court proceedings were the
11         availability of electronic discovery;
12         that necessarily goes to back-ups of
13         information and the format and
14         accessibility of those records.
15              In fact, I believe in the
16         deposition notice specifically, and
17         I'm referring to Exhibit 1, I was
18         sure to include knowledge pertaining
19         to recordkeeping, the availability
20         and maintenance of all Internal
21         Affairs files among other things in
22         the Notice, but what that means is
23         availability and maintenance could in
24         fact include electronically stored
25         information.

1                    A. CRAWFORD
2          Q.    So going back, my question was,
3      in sum and substance, are you aware of how
4      those back-ups are maintained in your
5      office?
6                    MR. MITCHELL: And I object.
7            You can answer.
8          A.    I, I can, are you talking about
9      our IT section backing up all of the
10     computers, all the computer storage within
11     the department or are we talking about how
12     we maintain within IAPro?
13         Q.    I'm glad you are aware of that
14     distinction, so let's answer both with
15     regard to IAPro.  How is the information
16     backed up?
17         A.    It's stored in our computers.
18     As far as our IT section, they back up all
19     the computers, all the computer storage
20     within the department.  As far as our
21     files, we maintain them in paperwork, we
22     also have them in microfilm.
23         Q.    Okay.
24                 So if anything were to happen
25     to your computers, you'd be able to

1                    A. CRAWFORD

2      essentially duplicate it the next day

3      because the back-ups would be available; is

4      that right?

5           A.    Not only that, we would have

6      the paper files.

7           Q.    Of course, understood.

8           A.    So, yeah, if anything happened

9      to our computers, we would still have our

10     paper files to use as a reference.

11          Q.    Of course many of those paper

12     files that you testified to are uploaded to

13     IAPro directly, is that right?

14          A.    Yes, but we still maintain the

15     paper files even if they're digitally

16     stored.

17          Q.    And body camera footages is

18     also available to be linked to IAPro, is

19     that right?

20               MR. MITCHELL: I object, but you

21          can answer.

22          A.    If the video or audio record

23     has been downloaded to IAPro, yes, it would

24     be stored in IAPro.

25          Q.    Tell me about the mechanism

1                    A. CRAWFORD

2       that you guys use to download the body cam

3       footage?

4            A.    Generally we have our

5       electronic investigation section, we will

6       obtain a copy of the video or audio files

7       and then we will have it on CD-Rom and then

8       the CD-Rom will either be downloaded to

9       IAPro or it will be stored within the case

10      file.

11           Q.    Is there a policy and procedure

12      with regard to how often body cam footage

13      is downloaded do IAPro?

14                 MR. MITCHELL: Objection.  You

15           can answer.

16           A.    No, that's based on an

17      investigative need.

18           Q.    So it's not done automatically,

19      it's done on an as-needed individual basis?

20           A.    Yeah, the body cam program at

21      this point is limited to our, it's called

22      our safety section from Highway Patrol

23      Bureau and it's eight officers assigned to

24      essentially stop DWI and they maintain the

25      body cam video within their command.

1                    A. CRAWFORD
2          Q.    So only eight officers, I might
3     have misunderstood, only eight officers in
4     the Suffolk County Police Department have
5     body cam?
6          A.    At this point, eight officers
7     and a sergeant, yes.
8          Q.    All right.
9                How many officers are there in
10    the Suffolk County Police Department
11    active?
12         A.    There are approximately 2,500
13    sworn members.
14         Q.    And how about detectives, how
15    many detectives are in the Suffolk County
16    Police Department?
17         A.    No, that's sworn members.
18         Q.    Sworn members altogether,
19    2,500, and only eight have body cam
20    footage, is that right?
21              MR. MITCHELL: Objection to the
22          form. You can answer.
23         A.    At this point, yes, eight
24    officers and a sergeant.
25         Q.    And who is in charge of that

1                    A. CRAWFORD

2    decision?

3          A.     What decision?

4          Q.     Who decides which officers get

5    body cam footage capabilities?

6          A.     That was a decision made on the

7    highest level of the police commissioner.

8          Q.     Police commissioner, all right.

9                 Is there any reason why every

10   officer can't have body cam footage?

11                 MR. MITCHELL: I object to the

12         form.  You can answer.

13         A.     We're in the process of, yes,

14   adopting a body cam program for all patrol

15   officers and hopefully that's being rolled

16   out very shortly.

17         Q.     Is that for all patrol officers

18   you said or all officers?

19         A.     I, as far as the end result, as

20   far as the assignment, that, I don't know

21   at this point, but yes, the program, at

22   this point, is going to involve all patrol

23   officers having body cam cameras.

24         Q.     And when is that expected to go

25   into effect?

1                    A. CRAWFORD
2        A.    Right now the department is in
3     the procurement process with the vendor and
4     hope to have the program rolled out by the
5     end of this year.
6        Q.    And how long has that
7     initiative been in the works, do you know?
8              MR. MITCHELL: I object to the
9          form.  You can answer.
10        A.    As far as this procurement
11     plan?
12        Q.    Yes.
13        A.    This has been in effect since
14     the fall of last year.
15        Q.    So from the fall of last year
16     until the anticipated start date that you
17     just placed on the record, that's how long
18     it took to create the initiative for the
19     procurement plan and then to deal with
20     vendors in an expected fulfillment, say,
21     within the year, is that right?
22        A.    Yes.
23        Q.    And is that because the county
24     felt it was important to have video
25     capability available for the integrity of

```
1                    A. CRAWFORD
2      its investigation at all times from all of
3      its officers?
4               MR. MITCHELL: I object to the
5          form.  You can answer.
6          A.    Yes, it was a decision made by
7      the commissioner, yes, to, for many
8      positive reasons to have the body cam
9      program adopted by the department, on a
10     widespread basis.
11         Q.    And was that this current
12     commissioner or the one immediately before
13     it?
14         A.    It actually started with Acting
15     Commissioner Stuart Cameron and then
16     Commissioner Harrison has continued with
17     the process.
18         Q.    Is there plans within that
19     initiative to have daily download of body
20     cam footage to IAPro?
21              MR. MITCHELL: You can answer.
22         A.    No, it's not going to be stored
23     on IAPro.
24         Q.    Are you aware that IAPro has
25     the capability to store body cam footage?
```

1                    A. CRAWFORD

2        A.    Yes, but it's going to be

3    stored on, the plan right now is Axon is

4    the vendor and Axon is going to maintain

5    the platform on which the storage is to

6    take place.

7                MS. McCLURE: Off the record.

8                (Whereupon, a five-minute break

9        was taken.)

10               MS. McCLURE: All right.  We're

11           back on the record.  Again, this

12           represents our second break for the

13           day.  We're all back in attendance.

14           The witness is back.  He is aware

15           that he is still sworn as discussed

16           last time. We will pick back up with

17           questioning.

18        Q.    So one thing that I thought of

19    during the break was that I forgot to ask

20    you this with regard to the general

21    directives that are pushed out that amend

22    the guidebook.

23               What is the specific format

24    that they're pushed out in, is it Email?

25        A.    Generally any procedures to be

1                    A. CRAWFORD
2      amended in the office, yeah, we send them
3      out by Email.
4           Q.    And whose responsibilities is
5      it to send them out?
6           A.    Generally I send them out.
7      Sometimes our training officer within the
8      office will update people with directives
9      as well.
10          Q.    Okay.
11                And what, if any, system of
12     follow-up do you have to make sure that
13     they are received, acknowledged and
14     understood?
15          A.    Well, generally it's the Email
16     is to send to everybody as a reference, but
17     we usually have a meeting within the
18     office, so everybody was working as
19     apprised to whatever policies and
20     procedures are being amended and then, you
21     know, just follow-up with whoever is not
22     working, you know, at a later time.
23          Q.    Okay.
24                Is there any formalized
25     procedure whereby almost like attendance or

```
 1                    A. CRAWFORD
 2     acknowledgement is tracked or specifically
 3     received and maintained?
 4          A.    I mean it depends on the nature
 5     of the procedural amendment or the policy
 6     amendment.  We do track.  If there's a
 7     formal measure taken, but I have to remind
 8     people of anything, I will just speak to
 9     everybody in the office and then follow-up
10     with an Email to everybody.
11          Q.    So is it fair to say it's at
12     your discretion as to how follow-up is
13     taken on a directive by directive basis?
14          A.    It depends on the nature of the
15     matter.
16          Q.    Okay.
17                So tell me about the nature of
18     matter that require more formalized
19     follow-up?
20          A.    If we're changing any procedure
21     within the office, then we're going to have
22     our training officer administrate the
23     training.  As far as like if I have to
24     remind people of, hey, this has been coming
25     up as an issue and you guys need to
```

1                    A. CRAWFORD
2       remember to do something, just like a
3       reminder, I will do it in an informal
4       matter in the office and then follow it up
5       an Email.
6            Q.    All right.
7                  Is there any system kept within
8       each person's personnel file to prove that
9       they received and acknowledged these
10      additional amendments?
11           A.    In the personnel file, no, we
12      have training records maintained by the
13      academy.
14           Q.    So your training records for
15      your employees are maintained separately by
16      a third party, is that right?
17           A.    Yes.
18                 MR. MITCHELL: I object to the
19            form.  You can answer.
20           A.    Yes, by the police academy,
21      yes.
22           Q.    So you do not then use the
23      system available through IAPro that
24      maintains training records, is that right?
25           A.    No, we don't use that system.

1                    A. CRAWFORD
2         Q.    But you're aware that it's part
3     of the IAPro software?
4         A.    I have heard of the feature
5     that's available, but no, we don't use
6     that.
7         Q.    Whose decision is it to use
8     certain features and not use others in
9     IAPro?
10              MR. MITCHELL: I object, but you
11         can answer.
12        A.    It's ultimately the commanding
13    officer.
14        Q.    So the commanding officer is
15    the one who, would be fully familiar with
16    the capabilities of IAPro and would decide
17    we're going to use this, we're not going to
18    use that, is that right?
19        A.    As far as features that are
20    being used with IAPro?
21        Q.    Correct.
22        A.    I mean this has been a
23    continual process since the platform was
24    adopted by the office, but as far as the
25    various features on it, no, not all of the

1            A. CRAWFORD
2    capabilities are used by our office.
3        Q.    Okay.
4              A moment ago you mentioned
5    personnel files.  Are they separate than
6    the files that are maintained in your
7    office?
8        A.    I'm sorry, could you repeat
9    that question?
10       Q.    Sure.
11             Does each employee have a
12   personnel file that is separate and apart
13   from an IA file?
14       A.    Yes.
15       Q.    Are you familiar with what goes
16   in the personnel file?
17       A.    Yes.
18       Q.    And who's responsible for
19   maintaining those files?
20       A.    The personnel office.
21       Q.    Okay.
22             Which consists of what?
23       A.    Consists of, her title is
24   Administrator Four and there's also an
25   Administrative Three assigned to the office

1                    A. CRAWFORD
2      as well as other staff clerical members.
3           Q.    And does the Suffolk County
4      Police Department maintain a personnel file
5      for each and every hire?
6           A.    For every employee, yes.
7           Q.    Where is the personnel office
8      specifically located?
9           A.    Within police headquarters.
10           Q.    Which is where?
11           A.    30 Yaphank Avenue in Yaphank.
12           Q.    And who has access to those
13      files?
14           A.    The personnel assigned to the
15      personnel section.
16           Q.    Do supervisory employees have
17      access to their subordinates personnel
18      files?
19           A.    No.
20           Q.    For example, if a supervisor
21      wanted to make a note with regard to an
22      issue, problem or some corrective action,
23      would it go in the personnel file?
24                MR. MITCHELL: I object to the
25           form.  You can answer.

1                    A. CRAWFORD

2          A.     Depending on the nature, yes,

3     it would be filed with the personnel file

4     and also with the associated disciplinary

5     file.

6          Q.     Okay.

7                 Let's say a disciplinary

8     investigation was not triggered for

9     whatever would be the reason, just some

10    kind of corrective action noted by a

11    supervisor of some kind, where would that

12    go?

13         A.     Generally that would be

14    documented on the internal correspondence

15    and then it would be filed in the, involved

16    of the employees personnel file.

17         Q.     Who is in charge of the

18    policies and procedures with regard to the

19    personnel files?

20                MR. MITCHELL: I object to the

21         form.  You can answer.

22         A.     Policies and procedures

23    regarding personnel files?

24         Q.     Yes.

25         A.     Well, we have department

1                    A. CRAWFORD
2       policies that impact upon the maintenance
3       of personnel files and what should be
4       filed, so that's ultimately under the
5       purview of the police commissioner or the
6       chief of department.  As far as, are you
7       referring to the day-to-day operation of
8       personnel section?
9            Q.    I wasn't, but you could tell me
10      about that now.
11               MR. MITCHELL: No, I'm going to
12               object.  He's not here to tell you
13               about personnel section.  He's here
14               to tell you about Internal Affairs,
15               and, wait, he hasn't clarified it.
16               Personnel section is separate and
17               apart from the Internal Affairs, it's
18               not part of Internal Affairs, so with
19               that in mind, you know, if you want
20               to ask him another question, ask him
21               another question.
22               MS. McCLURE: Well, referring to
23               Exhibit 1, Brian, the Notice --
24               MR. MITCHELL: If you want to
25               the ask him a question, ask him a

1                    A. CRAWFORD

2          question.  I will either direct him

3          to answer or not.

4              MS. McCLURE: Well, the Notice

5          --

6              MR. MITCHELL: You don't have to

7          tell me about the Notice, I read it

8          five times.

9              MS. McCLURE: -- okay, well,

10         then clearly all of the Suffolk

11         County Police Department files are

12         subject to inquiry today.

13             MR. MITCHELL: No, they're not,

14         but you can go ahead.  You know, the

15         Notice is not asking for all police

16         department files.  You're asking, if

17         you note at the beginning of your

18         Notice, it says, it says "Alexander

19         Crawford must be produced for a

20         deposition herein.  He should be

21         prepared to testify about his role

22         and knowledge" and then after that is

23         a paragraph.

24             So he's here to testify about

25         his role and knowledge and quite

1              A. CRAWFORD

2         frankly, I didn't hold him to that

3         way it was written. I'm allowing him

4         to testify to things beyond his role

5         and knowledge, but he's not here to

6         testify about the personnel

7         department.  He's here to testify

8         about the Internal Affairs

9         Department, which he's doing and you

10        can take your seven hours and talk to

11        him about it, but as far as, you're

12        now asking him to go into specifics

13        about personnel department, he's not

14        here for that.

15             MS. McCLURE: He's here to be

16        prepared and to testify about his

17        role and knowledge and it's no secret

18        why you stopped at that part in the

19        sentence because it says his role and

20        knowledge of the Suffolk County

21        Police Department and the

22        recordkeeping.

23             MR. MITCHELL: Right.  He's not

24        here to testify about, well, first

25        place, I'm going to make a record and

```
 1                    A. CRAWFORD
 2          then we will just move on because
 3          we're just going to wind up making
 4          this record again and again.
 5                You create, you submitted a 30B
 6          Notice that is deficient.  I didn't
 7          want to make a big deal out of it, I
 8          didn't want to go to Judge Wicks and
 9          say that your 30B Notice doesn't
10          comply with the statute because the
11          understanding was that we have
12          someone produced for the purpose of
13          investigating and talking about
14          Internal Affairs, how the files are
15          kept, IAPro, all that stuff.  We're
16          on the same page as that.
17                Your general phrase at the
18          very, very beginning that you're now
19          relying on that he be familiar with
20          the Suffolk County Police Department
21          and their recordkeeping is, if you're
22          now arguing that that general phrase
23          means that he's to be here to testify
24          about the entire Suffolk County
25          Police Department recordkeeping, that
```

1           A. CRAWFORD

2     is unreasonable.  That is not

3     something that your Notice says.

4     Your Notice talks all about IA.  He's

5     here to talk about IA, he's here to

6     talk about the way it works, the

7     maintenance of the files, he'll tell

8     you all about that.

9          He's not here to talk about

10    other departments of the police

11    department and he's not here to talk

12    about the entire recordkeeping

13    process of the entire Suffolk County

14    Police Department.  That being said,

15    continue with your examination,

16    anything beyond what I just, what

17    your Notice indicates having to do

18    with IA, anything beyond that, I'm

19    going to advise him not to answer.

20         I don't mind him to talk about

21    the personnel department because your

22    questions weren't really, they seem

23    to be reasonable and weren't in

24    depth, but now that you've gotten to

25    this point of asking him let's now

1                    A. CRAWFORD
2          talk about the personnel department,
3          I'm going to direct him not to
4          answer.
5               I know we have a disagreement
6          on that.  I'm not trying to convince
7          you.  I'm simply putting on the
8          record that that's my position.  If
9          you want to put your position on the
10         record, please do.  I'm just saying
11         we have a disagreement on it, that's
12         it.
13              MS. McCLURE: So we can mark
14         that for inquiry or follow-up if we
15         have to.
16              I'm going to go ahead and
17         continue to ask him these questions
18         that I want to ask and if you're
19         going to direct him not to answer as
20         to each one, then Madam Reporter, I
21         would just respectfully mark each
22         question to which there is a response
23         of a direction not to answer.
24         Q.    Now, knowing that there are
25     procedures in place whereby a certain

1                    A. CRAWFORD

2     discipline memoranda are filed in the

3     personnel files as opposed to those that

4     rise to the level of being placed in the

5     Internal Affairs files, I do some

6     additional questions.

7                    So with regard to the personnel

8     department, does that department conduct

9     reviews of employees or do supervisors

10    conduct reviews of employees?

11                   MR. MITCHELL: I object to the

12               form, but you can answer.

13         A.    A review in what manner?

14         Q.    A review in performance.

15         A.    In personnel section?

16         Q.    Does any supervisor in the

17    Suffolk County Police Department take

18    reviews regularly of the performance of

19    their subordinates?

20         A.    Yes.

21         Q.    All of them?

22         A.    As long as they have

23    subordinates to supervise, yes, that's part

24    of being a supervisor.

25         Q.    Okay.

```
1                    A. CRAWFORD
2              And the results of that
3     performance review, are they memorialized
4     in writing somewhere?
5         A.    It depends on the nature of the
6     review.
7         Q.    So there's no requirement that
8     it be written down?
9         A.    It depends what type of
10    employee you're, that's at issue.
11        Q.    Let's talk about detectives.
12    Do their performance reviews get
13    memorialized in writing?
14             MR. MITCHELL: I object to the
15          form.  You can answer.
16        A.    Probationary detectives, yes,
17    have reviews by their supervisor.  As far
18    as further reviews, yes, the detective
19    supervisor is required to review the
20    performance of each of their subordinate
21    investigators and takes action as
22    warranted.
23        Q.    Among those actions that may be
24    warranted, can you explain them for me?
25             MR. MITCHELL: I object to the
```

1              A. CRAWFORD

2          form.  You can answer.

3          A.    If there's any kind of remedial

4     need, the supervisor should document the

5     observed deficiency and document whatever

6     remedial action was taken.  If it's of a

7     disciplinary nature, then the supervisor

8     should be taking appropriate disciplinary

9     action.

10         Q.    And are those written results

11    stored then in the personnel file?

12         A.    It depends if it's a counseling

13    or a training, that would just be

14    documented and placed into the personnel

15    folder; if a disciplinary action was taken,

16    then a copy will be put in the personnel

17    folder, but it then will be a disciplinary

18    file regarding a disciplinary action and

19    that would be filed in Internal Affairs

20    Bureau.

21         Q.    Okay.

22               Are disciplinary files

23    different than Internal Affairs files in

24    general, is that a special kind of file?

25               MR. MITCHELL: I object.  You

1                          A. CRAWFORD

2              can answer.

3          A.     Disciplinary files, I'm

4      referring to some kind of investigation or

5      some kind of observed infraction and

6      documentation regarding resulting

7      disciplinary action, yes, that would be

8      filed within IAB.

9          Q.     Are all corrective actions that

10     end up in personnel files forwarded in some

11     way to Internal Affairs to determine if

12     further action is needed?

13              MR. MITCHELL: I object to the

14         form.  You can answer.

15         A.     If a matter was simply a matter

16     of counseling, in other words a supervisor

17     provided training or what we call

18     counseling to a subordinate member, then

19     that would be documented on internal

20     correspondence and, no, ordinarily that

21     would not be filed in IAB unless it

22     resulted from some type of disciplinary

23     type of investigation.

24         Q.     And is there protocol with

25     regard to these disciplinary measures that

1                    A. CRAWFORD
2       supervisors may take of their direct
3       subordinates and protocol about how to
4       memorialize it and file it, et cetera?
5            A.    Yes.
6            Q.    Within that protocol, is there
7       any internal trigger for your office to
8       audit personnel files at all?
9            A.    To audit personnel files, no.
10      We don't have any procedures with Internal
11      Affairs Bureau to audit personnel files.
12           Q.    Okay.
13                 Is there any type of reporting
14      or copy of any type of corrective action
15      memo that goes in a personnel file sent
16      anywhere else except for personnel?
17                 MR. MITCHELL: I'm going to
18            object.  You can answer.
19           A.    It depends on the nature of the
20      issue.  It could be filed within the
21      command, it could be filed in addition to
22      just being in the personnel folder, it
23      could be, I mean for, for example, if you
24      had an employee who was involved in a
25      police vehicle motor vehicle accident and

1                    A. CRAWFORD
2        there was some kind of remedial training
3        offered or conducted with the involved
4        member, that would just ordinarily be
5        documented as counseling.
6                    However, given another example,
7        if Internal Affairs Bureau conducted a
8        disciplinary action based on a complaint or
9        referral and there was some kind of
10       training need detected pursuant to the
11       investigation, then a referral would be
12       made to the command to effective
13       recommended training and then the, in that
14       case, then the counseling would be
15       documented in the Internal Affairs Bureau
16       file as well.
17            Q.    Okay.
18                    So absent that referral, is
19       there any other internal trigger for IA to
20       take a look at personnel files, absent or
21       referral?
22            A.    If you could clarify what you
23       bean by taking a look at personnel files?
24            Q.    Is there any reason for, under
25       the current policies, for anyone in IA to

1                    A. CRAWFORD
2      keep abreast of what is in the internal,
3      pardon me, of what is in the personnel
4      files?
5               MR. MITCHELL: I object.  You
6           can answer.
7          A.    What do you mean by what's in
8      the personnel file?  Like, did, I, do you
9      mean by that that Internal Affairs Bureau
10     will go down to personnel section and
11     review what's indicated in somebody's
12     personnel file?
13         Q.    Yes.
14         A.    Yes, that could occur if, as
15     part of an IAB investigation, if there was
16     a need to delve into any records that are
17     maintained within somebody's personnel
18     file, yes.
19         Q.    Does it happen as a part of any
20     procedural audit that you do of performance
21     reviews or any other memoranda that may be
22     in personnel files?
23               MR. MITCHELL: I object, but you
24           can answer.
25         A.    I need clarification.  You're

```
 1                    A. CRAWFORD
 2      talking about personnel files and I'm --
 3           Q.    Does Internal Affairs Bureau
 4      maintain any policy whereby it occasionally
 5      reviews the notes and more memoranda in
 6      personnel files to see whether there was or
 7      any issues noted by any supervisors?
 8           A.    Yes.
 9                 MR. MITCHELL: I object.  You
10            can answer.
11           A.    Yes, depending on the
12      circumstances, yes, there might be
13      pertinent information to an IAB
14      investigation.
15           Q.    Respectfully what I'm asking
16      you is not whether it could happen or
17      perhaps it does, I'm asking you is there
18      any policy or procedure whereby IAB is
19      required to stay abreast of the information
20      placed in personnel files?
21                 MR. MITCHELL: And I object, but
22            you can answer.
23           A.    No, as far as what's documented
24      within somebody's personnel file?
25           Q.    Yes.
```

1                    A. CRAWFORD
2         A.    Unless it pertains to some
3    disciplinary issue, no, IAB would not get a
4    notification.
5         Q.    When you say disciplinary
6    issues, do you mean a specific referral to
7    IAB that an investigation is needed?
8         A.    No, it could be a disciplinary
9    issue that was investigated on the command
10    level by an involved supervisor.
11        Q.    Okay.
12              So let's say an involved
13    supervisor has had to make some kind of
14    counseling, perhaps on more than one
15    occasion, is there any requirement that IAB
16    be notified of that or is that
17    discretionary upon the supervisor?
18              MR. MITCHELL: I object.  You
19         can answer.
20        A.    If it's a disciplinary issue,
21    then yes, the IAB has to be notified a copy
22    of the correspondence would be forwarded to
23    IAB.
24        Q.    Are there clearly defined
25    issues that are considered disciplinary

1                    A. CRAWFORD

2    issues?

3          A.    It depends on the

4    circumstances, if --

5          Q.    Well, what I'm asking is, is

6    there a list clearly defining circumstances

7    as disciplinary issues that require a

8    referral?

9          A.    Within the policy manual that

10   there's policy regarding standards of

11   conduct, but generally with counseling,

12   that's considered essentially a training

13   issue, so that if supervisor detects that

14   somebody is not performing their job

15   functions properly, but it's not a matter

16   of misconduct, it's just a matter of

17   training or advising the subordinate, then

18   it would just be documented as counseling

19   and documented as a training.

20         Q.    So there are no clearly defined

21   triggers for supervisors in those

22   circumstances, they have the right to

23   exercise discretion as to whether it's a

24   training issue or whatnot?

25              MR. MITCHELL: And I object, but

1                    A. CRAWFORD
2            you can answer.
3            A.    No, there are -- I mean if it's
4       misconduct, then it has to be reported.
5            Q.    What I'm asking you is, how
6       does a supervisor know whether or not it's
7       reportable misconduct?  Is there a specific
8       list that clearly defines instances that
9       are to be reported to IAB or are they
10      trusted with discretion to some extent?
11           A.    All misconduct has to be
12      reported to IAB.  Again, as I'm sure you
13      supervise subordinates, I mean just because
14      an employee makes a mistake in job
15      performance you don't automatically take
16      disciplinary action, you train the
17      employee.
18                 So it's a training issue, it's
19      a supervisory responsibility to train
20      subordinates and make sure they're doing
21      their jobs properly.  If it's misconduct,
22      it has to be reported to IAB.
23           Q.    I guess I'm having a hard time
24      understanding the vernacular.  So what
25      defines misconduct that needs to be

1                    A. CRAWFORD

2        reported to IAB, is that defined in the

3        manual or no?

4            A.    Yes, there are standards of

5        conduct, with respect to conduct of

6        members, but there's always a catchall

7        category conduct on becoming, so again,

8        it's a matter of, if somebody is making a

9        mistake while doing their job

10       responsibilities and a mistake was made in

11       good faith and a supervisor recognizes the

12       mistake and takes appropriate remedial

13       action, it's just a matter of training or

14       providing instruction, then it's not

15       considered a misconduct issue.

16           Q.    Okay.

17           A.    Where if somebody doesn't

18       intentionally do their job or has a pattern

19       of not doing their job properly, then it

20       would be misconduct.

21           Q.    How would a supervisor know

22       whether or not a particular employee has

23       reached a pattern of misconduct, is that

24       clearly defined in policy?

25                 MR. MITCHELL: I object.  You

```
1                    A. CRAWFORD
2          can answer.
3          A.     To recognize a pattern of
4     misconduct?
5          Q.     Sure.
6               How does a supervisor know when
7     it's going beyond the need of training to
8     the point where it should be reported to
9     you, what defines that in the policies and
10    procedures?
11              MR. MITCHELL: I object, but you
12         can answer.
13         A.     Again, if somebody has a
14    pattern of not doing their job properly,
15    it's an issue of either incompetence or
16    misconduct and if remedial action such as
17    instruction is not working, then the
18    supervisor should report the issue and it
19    should be an issue of discipline,
20    misconduct or incompetence.
21         Q.     So that decision to refer to
22    IAB is trusted to the supervisor whose job
23    it is to train and supervise their
24    employees, is that right?
25         A.     If it's an issue of job
```

```
 1                    A. CRAWFORD
 2      performance, yes.  I just want to make it
 3      manifestly clear when it's an issue of
 4      misconduct, it has to be reported to IAB --
 5          Q.    Sure.
 6          A.    -- it's not a discretionary
 7      issue.
 8          Q.    Right, because of course,
 9      that's very important to distinguish
10      between misconduct and just regular old
11      failure to perform proper duties, right?
12          A.    Yes.
13          Q.    So then being in agreement with
14      you, I would expect that IA would have
15      clearly defined circumstances if then
16      statements, if your supervisee does X and
17      must reported, if your supervisee does Y,
18      it must be reported.  Is there any such
19      lists?
20          A.    There is --
21          Q.    Okay.
22                THE WITNESS: I'm sorry.
23                MR. MITCHELL: No, I'm sorry, go
24           ahead.  I was just going to direct
25             you you can answer.
```

```
1                    A. CRAWFORD
2        A.     If there's a mandatory
3    reporting requirement like misconduct.
4        Q.     All right.
5               Where is that found?
6        A.     In the policy manual.
7        Q.     Okay.
8               When was the last time that was
9    updated?
10       A.     That's policy 10-10.  That was
11   updated within the last month or two and it
12   gets continually updated.
13       Q.     Would you consider those
14   updates to be of the utmost importance --
15              MR. MITCHELL: I object, but you
16        can answer.
17       A.     Yes.
18       Q.     Likely to the integrity of the
19   whole department I would think.
20       A.     Yes.
21       Q.     So what extra measures do you
22   guys do to make sure those specific
23   procedural updates are received,
24   acknowledged and understood by the parties
25   who receive them?
```

1              A. CRAWFORD
2              MR. MITCHELL: I object, but you
3         can answer.
4         A.    That's administered through the
5    Lexipol, L-E-X-I-P-O-L, platform.
6         Q.    Tell me about that.  What is
7    that software, what is it?
8         A.    It's the department policy
9    manual.
10        Q.    So the policy manual is
11   maintained through software?
12        A.    Through the department's
13   internet, yes.
14        Q.    Through the department's
15   internet, okay.
16             Is Lexipol the name of the
17   software or your internet system?
18        A.    It's the name of the software
19   company.
20        Q.    Name of the software company,
21   okay.
22             Is there a version that you're
23   currently administering?
24        A.    As far as the actual version
25   number, that I'm not aware of.

1          A. CRAWFORD

2          Q.    And who is responsible for

3    administering the Lexipol system?

4          A.    Our research and development

5    section.

6          Q.    Where does research and

7    development fall in the chain of command?

8          A.    It's under the commissioner's

9    office.

10          Q.    Who is the head of the research

11    and development section?

12          A.    At this point, it's Lieutenant

13    Colleen Cooney, C-O-O-N-E-Y.

14          Q.    Is that department always lead

15    by a person in a lieutenant capacity?

16          A.    No.

17          Q.    What else has it been?

18          A.    I served as commanding officer

19    many years ago, I was a sergeant at the

20    time.

21          Q.    Okay.

22               And why is it that the policy

23    manual is maintained separately through

24    that system?

25               MR. MITCHELL: I object, you can

1          A. CRAWFORD

2          answer.

3          A.    Through Lexipol?

4          Q.    Yes.

5              What is it about Lexipol that

6     makes it useful for that purpose?

7              MR. MITCHELL: I object, but you

8          can answer.

9          A.    Actually, I was part of the

10    process with assimilating it into the

11    department.  Just ease of use as compared

12    to our prior rules and procedures that we

13    had, our former rules and procedures that

14    we had over 1,600 pages and unfortunately

15    overtime there were amendments where

16    references would be in separate chapters,

17    so it wasn't easy to use, it was a bit

18    unwheely [sic] and the Lexipol product is

19    maintained and updated and for that

20    training aspects to it, that's why the move

21    went from our in-house rules and procedures

22    to the Lexipol version.

23    Q.    And when was that system first

24    rolled out in your office?

25    A.    Well, it was rolled out for the

1                    A. CRAWFORD

2     department.  That went into effect January

3     11th of 2021.

4          Q.    Okay.

5                 And how about, when you say the

6     department, you're referring to the IA

7     Department, right?

8          A.    No, I'm talking about the

9     police department.

10         Q.    The police department, okay.

11                So January of 2021, you began

12    using Lexipol, right?

13         A.    Yes.

14         Q.    So before January of '21, how

15    was the policy manual updated?

16         A.    Before January 2021?

17         Q.    Yes, before January 2021.

18         A.    The rules and procedures would

19    be amended through the issuance of

20    department general orders.

21         Q.    And how did the personnel

22    receive those department general orders?

23         A.    They would be published on the

24    internet and the individual members of the

25    department would be tasked with clicking on

1                    A. CRAWFORD
2     to confirm receipt of the directive.
3          Q.     Okay.
4                 Was there a signature required?
5          A.     A signature, no.
6          Q.     Was there any follow-up done to
7     ensure that any kind of training required
8     by that general directive, was there any
9     follow-up that it was had by an individual
10    person?
11         A.     Can you repeat that?
12         Q.     Sure.
13                So if a general order required
14    any additional training, was there any
15    system of follow-up to ensure that the
16    employees received it?
17                MR. MITCHELL: And I object, you
18           can answer.
19         A.     The information, that would be
20    disseminated and the department general
21    order would be received by the employee;
22    the confirmation would be through
23    electronic delivery through the internet
24    and which would be tracked and supervisors
25    of this subordinates are required to ensure

1                    A. CRAWFORD
2        that the subordinate employees have access
3        the directives and review them.
4            Q.    But it was not done through
5        Email, right, it was just done through this
6        internet base acknowledgement?
7            A.    Yes.
8            Q.    Similar to when you're on a
9        website and it asks you to agree to the
10       terms, something like that?
11           A.    Yes.
12           Q.    So with a click, they
13       acknowledged receipt and that was it?
14           A.    Yes.
15           Q.    Was there any requirement that
16       a copy be printed and maintained anywhere
17       and hard copy by each employee?
18                 MR. MITCHELL: I object.  You
19            can answer.
20           A.    For most circumstances, no.
21           Q.    Was there any inventory taken
22       to ensure that the certain number of clicks
23       matched up with the certain number of
24       persons who are supposed to do it?
25           A.    Yes, there is an auditing

```
 1                    A. CRAWFORD
 2      capability within the system to confirm
 3      receipt of the directives, yes, supervisors
 4      were tasked to ensure that there were
 5      subordinates have access and received the
 6      directives.
 7           Q.    Okay.
 8                 And who was tasked with the
 9      auditing of each general directive as far
10      as the computer goes, not the supervisor's
11      responsibilities that were stated, but who
12      maintains the computer tracking that you're
13      talking about?
14                 MR. MITCHELL: I object, but you
15            can answer.
16           A.    It's maintained through the IT
17      system.
18           Q.    Through the IT system, okay.
19                 And who is in charge of looking
20      into that IT system to make sure that the
21      number of acknowledgements and clicks match
22      the number of employees who needed to
23      receive that general directive?
24                 MR. MITCHELL: I object, but you
25            can answer.
```

1                    A. CRAWFORD

2          A.     It would be the responsibility

3      of the immediate supervisor to check to

4      ensure that the subordinates have received

5      the directive and then there would be a

6      command audit depending on the command; if

7      it was a precinct, then it would be the CO

8      or the XO confirming that all the required

9      directive dissemination occurred and that's

10     actually part of the department's

11     accreditation process.

12          Q.     I guess what I'm talking about

13     is on the electronic tracking that you were

14     talking about before.  I realize there's an

15     in-person protocol and we will get back to

16     that in a moment, but as far as the

17     computer tracking goes, whose job is it to

18     look at the computer records and say, okay,

19     general directive number ABC was

20     disseminated to 2,500 folks and 2,500 folks

21     clicked the form to acknowledge receiving

22     it.  Whose job is it to do the individual

23     audit?

24              MR. MITCHELL: I object, but you

25          can answer.

```
 1                  A. CRAWFORD
 2        A.    As I explained, the
 3    responsibilities of the immediate
 4    supervisor would be to ensure that all of
 5    the subordinate employees assigned to that
 6    supervisor have received a directive and
 7    then there would be a command review.
 8        Q.    We're not seeing eye to eye on
 9    this.  I know that you are saying that an
10    immediate supervisor --
11        A.    I'm unaware of any audit on a
12    higher level other than the command.
13        Q.    Are you aware of any audit done
14    on a computer acknowledgement system?
15              MR. MITCHELL: I object.  You
16         can answer.
17        A.    Other than what I have already
18    explained.
19        Q.    Yes.
20        A.    No, I'm not aware.
21        Q.    Is there anybody else that
22    would be aware of any procedures for
23    Internal Affairs to make sure that the
24    number of electronic clicks send out to the
25    department to all the folks who needed to
```

```
 1                    A. CRAWFORD
 2      receive this general directive matched the
 3      number of folks that it was supposed to
 4      reach?  Are you aware if it's anybody's job
 5      in your department?
 6                MR. MITCHELL: I object.  You
 7           can answer.  You're asking
 8           specifically about Internal Affairs
 9           now, am I correct?
10                MS. McCLURE: Yes.
11                MR. MITCHELL: Because I think
12           your answer before was department
13           wise, am I right?
14                THE WITNESS: Yes.
15      A.     But the review is done on a
16      command level and I'm not aware of anybody
17      else doing any further review.
18      Q.     Okay.
19      A.     It's up to the commanding
20      officer to ensure all the subordinate
21      personnel have reviewed all the directives.
22      Q.     Okay.
23                So if no one is taking an audit
24      of the computer tracking and, tell me then
25      what follow-up was done with the
```

```
1                    A. CRAWFORD
2      supervising officers of the command level
3      folks to ensure that all of their people
4      underneath them received and also
5      understood what was in that general
6      directive update?
7                    MR. MITCHELL:  I object.  You
8              can answer.
9          A.     Without having you ask the
10     question again, are you asking is there any
11     further review in addition to the command
12     level review?
13         Q.     Right.
14                 Does anybody say to the command
15     level, folks, did all your people receive
16     general notice one, two, three; did anyone
17     understand it, is there any follow-up done,
18     that's my question?
19         A.     Yes, there is follow-up done.
20         Q.     Okay.
21         A.     If the review by all
22     subordinate personnel is not completed, so
23     there would have to be documentation as to
24     why the, any particular employees didn't
25     access or received the record.
```

1                   A. CRAWFORD

2          Q.     Okay.

3          A.     I guess somebody out on a long

4    term absence or something of that nature,

5    military deployment, then it would be

6    documented.

7          Q.     I guess what I'm asking is,

8    does anyone take any action to ensure the

9    command level audit come out appropriately,

10   that everybody has in fact received each

11   general department order?

12         A.     Yes, the research and

13   development process with accreditation

14   would ensure that all of the commands that

15   were reviewed, that they received [sic] of

16   all the subordinate personnel.

17         Q.     So then it's up to someone in

18   research and development to make sure that

19   every department general order issued by

20   the Lexipol system was received,

21   acknowledged and understood by all of the

22   recipients that it was intended for?

23         A.     Yes.

24         Q.     And that was with regard to

25   each and every update of the policies that

1                    A. CRAWFORD
2       we're talking about?
3              A.    Yes.
4              Q.    So does R & D keep some type of
5       record of those audits?
6              A.    Yes.
7                    MR. MITCHELL: I object.  You
8              can answer.
9              A.    Yes.
10             Q.    And what kind of records do
11      they keep?
12                   MR. MITCHELL: I object, you can
13             answer.
14             A.    I, are you asking for the scope
15      of records that they maintain in that
16      office?
17             Q.    Well, yes, is there a checklist
18      to show or an acknowledgement form?
19             A.    It's a computer-generated
20      report from each command showing,
21      confirming receipt of directives and
22      indicating any subordinate personnel that
23      haven't received the directives and there
24      be documentation from the command as to why
25      any particular employee didn't access any

1                    A. CRAWFORD
2      particular directives.
3           Q.    Understood.
4                 So if someone wanted to find
5      out if a particular employee failed to
6      receive or knowledge a certain directive at
7      any point, they could look back into R &
8      D's records and see whether or not that
9      person properly acknowledged it in a timely
10     fashion?
11          A.    Yes.
12          Q.    Do supervisors receive any
13     particularized training when department
14     general orders come out as supervisors to
15     make sure they're equipped to answer
16     questions that may come about from?
17          A.    That depends on the nature of
18     the information.
19          Q.    So not on a, not on a matter of
20     protocol with regard to every general
21     order, it's a matter of the nature of the
22     scope of it?
23          A.    Yeah, if there's some kind of
24     significant policy or procedure change,
25     yes, then usually some type of training

1                    A. CRAWFORD
2    would be indicated. Most times if it's just
3    what we consider housekeeping amendment,
4    no, it wouldn't warrant any additional
5    training.
6         Q.    Is there any system for
7    communication between the District
8    Attorney's office and your office with
9    regard to general orders that update the
10   policy manual, are they put on notice as
11   well or is it just the police department?
12             MR. MITCHELL: I object, but you
13          can answer.
14        A.    The policies and procedures are
15   maintained within the department and unless
16   the DA's office submits a specific request,
17   no, we don't disseminate our directives to
18   the DA's office.
19        Q.    Okay.
20             Is there any standardized
21   communication for any of your records in
22   Internalized Affairs with the DA's office,
23   is there anything that automatically
24   triggers communication or is it no, it's a
25   case by case?

1              A. CRAWFORD
2         A.    As far as an automatic, we
3    automatically send copies of all of our
4    investigations, all the investigative
5    reports, they get transmitted to the DA's
6    office.  If we discern any information
7    indicating criminal conduct by any of our
8    members, then we notify the DA's office.
9         Q.    Who do you send them to within
10   the DA's office?
11        A.    You're talking about the IA
12   files that we sent over?
13        Q.    Yes.
14        A.    They go to the Public Integrity
15   Bureau and right now the Bureau Chief is
16   Kevin Ward.
17        Q.    Has that bureau been, how long
18   has that bureau been in existence?
19        A.    I think it was in existence
20   when I was assigned an investigator in IAB
21   in 2004.  I don't know when the bureau was
22   created.
23        Q.    When your office conducts its
24   investigations and issues reports, does it
25   take care to include a review of the

1                    A. CRAWFORD

2      personnel file as well?

3           A.    If there's reason to delve into

4      somebody's personnel file, yes.

5           Q.    If there's not a specific

6      reason, is it not checked?

7           A.    It's not checked as a matter of

8      course if that's you're asking.

9           Q.    Yes.

10               So when you send information to

11     the DA's office, you only send what's in

12     the four corners of your IA file, is that

13     right?

14          A.    Yes.

15          Q.    Does Internal Affairs have any

16     access to any computerized system where

17     personnel files are maintained or are they

18     only on paper?

19          A.    The files maintained within the

20     personnel section?

21          Q.    Yes.

22          A.    No, we don't have access

23     through IA, through our office.

24          Q.    Does one need to have special

25     access or clearance, if you will, in order

1                    A. CRAWFORD

2       to access personnel files or no?  Does

3       everybody from IA have the right to access

4       those files?

5                    MR. MITCHELL: I object to the

6              form.  You can answer.

7            A.    It's not a matter of right,

8       it's a based on need.

9            Q.    Okay.

10           A.    Our IA investigators can't just

11      walk down the hallway and access a

12      personnel file without justification.

13           Q.    How long are IA files

14      maintained in general?

15           A.    Indefinitely.

16           Q.    Is there any procedure or

17      protocol about when and if files are purged

18      or discarded?

19           A.    We don't purge any files.

20           Q.    So they're kept forever?

21           A.    Yes.

22           Q.    With regard to your IAPro

23      system and the documents that are scanned

24      into it, who determines which documents,

25      are, if any, are scanned into each file?

                    A. CRAWFORD

         A.    It's going to be what's in the
    file.

         Q.    Okay.

         A.    They're going to be scanned
    into, it's not a matter of discretion, oh,
    this one goes in, this one doesn't.  The
    IAB file gets scanned into an IAPro.

         Q.    As a matter of course, am I
    understanding correctly that all documents
    within IA's paper file gets scanned and
    uploaded to the corresponding IAPro file?

         A.    Yes.

         Q.    So there's no discretion about
    this handwritten note doesn't go in or that
    handwritten note doesn't go in, every
    paper should go into IAPro, is that right?

         A.    Any document that's within the
    IAPro investigative file is going to be
    scanned into IAPro.

         Q.    Okay.

               Does that include any
    handwritten notes that may be taken?

         A.    If the handwritten notes are
    added as an attachment to the file, yes.

```
1                    A. CRAWFORD
2          Q.    I guess what I'm trying to
3     figure out is, is there any procedure or
4     protocol whereby it's required that any
5     writing be scanned and uploaded to IAPro?
6               MR. MITCHELL: I object, you can
7          answer.
8          A.    Well, what kind of document are
9     you referring to?
10         Q.    If a person is making notes on
11    a draft or a report, does that version get
12    scanned in if someone sees fit that draft
13    in the paper folder?
14         A.    If it's just a draft and it's
15    been amended, no, that's not scanned in,
16    that's not a final report.
17         Q.    So is there a system whereby
18    someone we doubt them or doesn't go in and
19    what does go in to their electronic file?
20               MR. MITCHELL: I'm going to
21          object, but you can answer.
22         A.    No, whatever is incorporated in
23    the file, the IAB file, it's scanned and
24    incorporated into the IAPro.
25         Q.    Are people permitted to keep
```

1                    A. CRAWFORD
2       notes that don't go into the file on the
3       desk or elsewhere?
4            A.    What kind of notes are you
5       talking about?
6            Q.    Notes from any of their
7       thoughts or instructions with regard to any
8       particular report or discipline or any part
9       of the investigation?
10                 So if you jot anything down on
11      a piece of paper before you write it in the
12      computer, does that get considered part of
13      the file, too, or no?
14           A.    Only if it's submitted by the
15      investigator as a reference or attachment
16      with the file, so if somebody takes a phone
17      message and jots something down, unless it
18      has some pertinence to the case, I wouldn't
19      expect that to be made part of the IAB
20      file.
21           Q.    Is that then a matter of
22      discretion as to what someone sees fit to
23      be include in the official file or is it a
24      matter of written of policy that they have
25      the discretion to consider something part

1                    A. CRAWFORD
2    or the file or not?
3                    MR. MITCHELL: I object, but you
4          can answer.
5          A.      They don't have discretion, but
6    I mean if it's part of the investigation
7    and there's a need to refer to it, it's
8    going to be included as an attachment, so
9    for that example, I have seen phone
10   messages and added as attachments.  If it's
11   just, you know, doesn't have pertinence to
12   the case, then okay, the complainant call
13   back the fifth time today, no, we don't
14   save every scrap of paper.
15                   If it's a criminal case, then I
16   obviously implications, but as far as the
17   IAB file, it depends on the nature of the
18   notation.
19        Q.      Is there any requirement that
20   within IAPro, an investigator keep track of
21   work performed on the investigations?
22        A.      Case?
23        Q.      Yes.
24        A.      Yes.
25        Q.      Can you tell me about

```
 1                    A. CRAWFORD
 2      requirements of data?
 3           A.    We instruct our investigators
 4      to make prompt and diligent case note
 5      entries regarding the actions that they
 6      have taken regarding their investigations.
 7           Q.    What is the purpose of that?
 8           A.    It's to memorialize whatever
 9      action are taken by the investigator.
10           Q.    And how about when it comes to
11      intake, is there a requirement that someone
12      sufficiently summarized the nature of the
13      claim within the IAPro in a summary section
14      or note section?
15           A.    When doing complaint intake?
16           Q.    Yes.
17           A.    Yes, they're supposed to input
18      a summary of the complaint.
19           Q.    And what is the purpose of
20      that?
21           A.    It's to obtain sufficient
22      information to commence an investigation.
23           Q.    Okay.
24                 So would you agree that all
25      material facts about the allegation should
```

```
 1                    A. CRAWFORD
 2     go in there?
 3          A.    Yes.
 4          Q.    Because that's going to be what
 5     commences your investigation, is that
 6     right?
 7          A.    Well, the investigation is
 8     going to go be commenced no matter whatever
 9     information is indicated, but yes, the more
10     material information you can obtain, the
11     better, but we've had investigations
12     commenced based on the vagueness of
13     details, like, for example, a cop harassed
14     me and it was four years ago and, you know,
15     obviously that's the barest of information,
16     but we commenced investigations based on
17     that.
18          Q.    As far as the summary goes
19     where you indicated that all material facts
20     should go in there, is that updated as the
21     case goes on to include a more robust
22     summary of what the heck is going on in
23     this case?
24               MR. MITCHELL: I object, but you
25          can answer.
```

1              A. CRAWFORD
2          A.    No.  Once the complaint intake
3      is completed, generally, no, there's no
4      amendments to that document.
5          Q.    So let's say a complaint came
6      in with ten allegations, would all ten be
7      summarized as it was received in that
8      summary portion of the IAPro?
9          A.    Yes.
10         Q.    And that's a matter of standard
11     operating procedure?
12         A.    Yes.
13         Q.    And everybody is trained in
14     that procedure?
15         A.    Yes.
16         Q.    Is there any auditing system to
17     ensure that the way cases are opened in
18     IAPro are done fully and appropriately per
19     procedure?
20         A.    I'm sorry, auditing or you mean
21     a review process?
22         Q.    A review process.
23         A.    Yes.
24         Q.    Can you tell me about that?
25         A.    When IAB investigations

1                    A. CRAWFORD

2       completed by the investigator, it gets

3       submitted to the captain by that particular

4       team, it gets conveyed to me for my review

5       and commanding officer for her review and

6       then we will then be reviewed by the deputy

7       commissioner.

8            Q.    And going all the way back to

9       the intake procedure, is there any review

10      process done to make sure new cases are

11      properly opened within the system?

12           A.    Yes.

13           Q.    Okay.

14                 Can you tell me about that

15      review procedure, is that part of an SOP

16      for Internal Affairs?

17                 MR. MITCHELL: I object, but you

18            can answer.

19           A.    Yes.

20           Q.    And who is in charge of making

21      sure the files are opened up fully and

22      appropriately?

23           A.    The commanding officer and also

24      myself.

25           Q.    Okay.

```
 1                    A. CRAWFORD
 2              And that's part of routine
 3    duties would you say?
 4         A.    Yes.
 5         Q.    Would you say that it's
 6    required that every file newly opened in
 7    IAPro is required to undergo a review to
 8    make sure that all of the data entries and
 9    summary is full and accurate and complete?
10         A.    Yes.
11         Q.    When a file is opened in IAPro,
12    what content goes in meaning specifically
13    in addition to the allegations, is it
14    linked to employees, suspects, can you tell
15    me what else goes into the opening of a
16    file?
17         A.    If a specific employee can be
18    identified as being involved in the matter,
19    then yes, the employee would be named.  If
20    that information gets developed pursuant to
21    an investigation, then it will be done at a
22    later time, but as far as the complaint
23    intake, I mean like I said, sometimes we
24    get written complaints that are so vague
25    that you can't even really formulate, you
```

1                   A. CRAWFORD

2     know, an allegation misconduct or a time,

3     date, location or an involved officer, but

4     we commence an investigation and we try to

5     get as much information as we can.

6          Q.    So in cases like that, you say

7     you do your best to summarize what you

8     believe the case is about to justify the

9     facts that you then take to investigating

10    it?

11         A.    When we get the complaint, we

12    work with whatever information we can get.

13    I mean if we can get a written complaint

14    report and it just has the barest of

15    information, we will commence an

16    investigation and then work from there.

17              I mean we will try to get

18    additional information from the

19    complainant.  Sometimes the complainant

20    don't cooperate.

21         Q.    Right.

22              If it comes to be that initial

23    persons are identified through the

24    investigatory process, are they added to

25    the IA profile subsequently?

1                    A. CRAWFORD
2           A.    Yes.
3           Q.    Is there any effort during an
4      investigation process to search for
5      commonalities in light kind situations,
6      common personnel, common incidents?
7           A.    Yes.
8           Q.    And is it the case that
9      sometimes folks are employees are seen to
10     have been acting in concert with other
11     employees regularly, perhaps a partner?
12               MR. MITCHELL: I object, but you
13            can answer.
14          A.    You mean working with somebody?
15          Q.    Yes, right.
16          A.    Yes.
17          Q.    Is that person as a matter of
18     routine added to the investigation to see
19     whether they're a witness or whether
20     they're also involved in wrongdoing?
21          A.    Yes.  All members that were
22     working at the time of occurrence, anybody
23     who was present could be at the very least
24     an involved party or a witness, so yes,
25     they're going to be what we call linked

```
 1                    A. CRAWFORD
 2     into the investigation.
 3          Q.    Is that a matter of standard
 4     procedure linking all parties that have may
 5     have been involved in one way or the other?
 6          A.    Yes.
 7          Q.    As far as how IA files are
 8     developed, who is in charge of the
 9     procedures that are taken?
10          A.    Could you repeat that, please?
11          Q.    Sure.
12               As far as the procedure and the
13     investigative measures that are taken, who
14     is in charge of those standard operations
15     in your office?
16               MR. MITCHELL: I object, but you
17          can answer.
18          A.    Commanding officer.
19          Q.    And is there any type of system
20     of standardized measures that are taken in
21     every case and then developed further on an
22     as-needed basis as investigators fit?  Is
23     there any common system, checklist of
24     things?
25          A.    An investigative checklist?
```

1                    A. CRAWFORD
2          Q.    Yes.
3          A.    Yes.
4          Q.    Can you tell me what is on that
5     investigative checklist?
6          A.    Just a list of usual
7     investigative measures to be considered by
8     the investigator.
9          Q.    Where is that checklist found?
10         A.    That's in the guidebook.
11         Q.    When was the last time that
12    checklist was investigated?
13         A.    Not recently.  I couldn't tell
14    you exactly when it was last amended.
15         Q.    Can you estimate for me perhaps
16    whether in your career since --
17         A.    Probably about two or three
18    years ago.
19         Q.    Two or three years ago, okay.
20               When an IA file is created and
21    the summary is written, is there any
22    attempt at that point to categorize the
23    complaint into any system of
24    categorization?
25         A.    Yes.

1          A. CRAWFORD

2     Q.     Can you tell me about that

3     system?

4     A.     It's a drop down menu and any

5     IAPro that's available through the blue

6     team entry and the allegations of

7     misconduct are to be categorized and

8     entered, you know, just using that drop

9     down menu and linked to the particular

10    officer.

11    Q.     That's down in addition to

12    linking the employees and then narrative

13    summary we talked about before?

14    A.     Well, it would be all part of

15    the same report, but yes.

16    Q.     Okay.

17    A.     Summary would be a narrative of

18    the allegation, material information and

19    then the involved officer would be added or

20    what we call linked and then any

21    allegations of misconduct attributed to

22    that particular officer would be

23    categorized and linked as well.

24    Q.     And as far as those categories

25    are as it stands right now today, how many

```
 1                  A. CRAWFORD
 2      categories are on that drop down menu?
 3           A.    Thirty-seven.
 4           Q.    And how long have there been 37
 5      categories?
 6           A.    There have been -- let's see,
 7      it was probably last amended seven years
 8      ago.
 9           Q.    And as of that point seven
10      years ago, do you mean, do you know how
11      many categories existed at that time?
12           A.    No, I don't.
13           Q.    Okay.  Let's see.
14                 So prior to seven years ago,
15      how would one find out how many categories
16      there were at that time?
17           A.    We would have a, would have
18      documentation maintained in the office.
19           Q.    Okay.
20                 Where?
21           A.    It would be maintained within
22      IAB.
23           Q.    Well, I mean in a file with
24      regard to legacied --
25           A.    Yeah.
```

1              A. CRAWFORD

2        Q.    -- procedures?  Okay.

3              And if someone wanted to

4     request that file, what would they call it?

5        A.    They would call it a list of

6     categorized allegations and misconduct.

7        Q.    And do you know how many times

8     that list has changed since, say, the year

9     2000?

10       A.    Well, the system was put into

11    effect around 2005.  Prior to that, no, I

12    wouldn't, I mean that's, that list has been

13    essentially standard.  I'm only aware of

14    recent change, like I said, within the last

15    seven years where we had advised policing

16    and that was pursuant to a DOJ agreement.

17       Q.    And this list of 37, you're

18    aware that it's customized, correct?

19       A.    Yes.

20       Q.    And who is it that customized

21    these 37 categories?

22       A.    It was done by Deputy Chief

23    Nicholas Mango back when this system, when

24    IAPro was incorporated into the office.

25       Q.    And what is the general purpose

1                    A. CRAWFORD
2       of this generalization?
3           A.    That was the feature that was
4       available through IAPro to categorize
5       allegations and misconduct and have them
6       attributed to the involved members.
7           Q.    Do you know whether or not any
8       of the suggested categories that come with
9       the software were not used or deleted?
10          A.    When the system was first put
11      into effect, not that I'm aware.
12          Q.    Or, currently, because current
13      versions have current suggestions.  Are you
14      aware of whether or not anyone has been
15      looking at them to see if they should be
16      adopted or not?
17          A.    So, well, the system has worked
18      for us, so we've maintained it as it is.
19          Q.    Have you found that this system
20      of 37 incorporates all possible categories
21      that patrol and investigatory personnel
22      might encounter?
23              MR. MITCHELL: And I note my
24          objection.  You can answer.
25          A.    In my experience, we didn't

1                    A. CRAWFORD

2      feel the need to add any additional one.

3          Q.    Looking at this list of 37, I

4      don't see any categories specific to those,

5      to the investigator.  This looks like it

6      mainly pertains to patrol issues.  Is that

7      because it's often parole folks that are

8      patrol folks that are dealing with the

9      public and perhaps may fall into these

10     categories more readily than investigatory

11     personnel?

12              MR. MITCHELL: And I object, but

13          you can answer.

14         A.    No, investigations are part of

15     everyone's job including patrol members.

16         Q.    So patrol members, detectives

17     don't receive any specialized training or

18     they don't have any specialized rules that

19     they're supposed to follow when

20     investigating crimes that wouldn't

21     necessarily be reflected on here?

22              MR. MITCHELL: And I object.

23          You can answer.

24         A.    I'm sorry, can you repeat the

25     question?

```
 1              A. CRAWFORD
 2        Q.    Sure.
 3              It seems to me that these
 4    categories apply mainly to patrol officers.
 5    Are you able to account for all detectives
 6    specialized trained and rules within these
 7    37 categories?
 8              MR. MITCHELL: And I object, but
 9         you can answer.
10        A.    Yes, we have been using these
11    categories of allegations and we haven't
12    determined the need to add any or amend
13    them.
14        Q.    Okay.
15              So, for example, in the
16    instance of someone who's accused of
17    fabricating evidence, what category would
18    that go into?
19        A.    Well, fabricating evidence
20    would generally be considered conduct
21    unbecoming.
22        Q.    Unbecoming you said?
23        A.    Yes, or it could be considered
24    improper performance as well.
25        Q.    So I don't see improper
```

```
1                    A. CRAWFORD
2      performance on here.  Is there another one
3      that it would be --
4            A.    I'm sorry.
5            Q.    That's okay.
6            A.    There's improper police act,
7      action and for something like that, that
8      would be, if we got a referral from the
9      DA's office, it would be most likely
10     categorized as conduct unbecoming.
11           Q.    Conduct unbecoming, okay.
12                 So falsifying evidence would
13     fall under conduct unbecoming, is that
14     right, is that your testimony?
15           A.    It can.
16           Q.    It can?
17           A.    Yes.
18           Q.    Can we agree that perhaps it's
19     not clearly defined?
20           A.    Yes.
21           Q.    Okay.
22                 How about, I mean is this the
23     first time that you have considered that
24     issue as it's never come up before in
25     categorizing?
```

1              A. CRAWFORD

2        A.    Allegations of fabricated

3    evidence, it comes up, yeah, it does come

4    up.

5        Q.    Okay.

6              So you just wing it when trying

7    to figure out what category to put it into?

8              MR. MITCHELL: I object, but you

9         can answer it.

10       A.    We put it in --

11       Q.    Something?

12       A.    Yes.

13       Q.    And something that perhaps

14   makes sense, you know, within, we can agree

15   that it could fall into a couple of these?

16       A.    Yes.

17       Q.    So if one wanted to find

18   specific files about falsifying evidence,

19   it really wouldn't be a clear category to

20   look in, you really have to look in one of

21   them?

22       A.    One, yes.

23       Q.    And this is an issue that's

24   come up before and you have worked within

25   these 37?

1                    A. CRAWFORD

2                    MR. MITCHELL: I object to the

3              form, but you can answer.

4         A.    What issue has come up before?

5         Q.    I mean complaints regarding

6    fabrications of evidence that have come up

7    before, right?

8         A.    Yes.

9         Q.    One time or more than one time?

10        A.    More than one.

11        Q.    Okay.

12              And in the contention of

13   categorizing them, the SOP is just defined,

14   put it somewhere?

15        A.    Yes.

16        Q.    Who is in charge of making

17   perhaps referrals to update and amend these

18   categories?

19        A.    Anybody can make a referral or

20   a recommendation.

21        Q.    Are you aware of whether or not

22   anyone has made a referral or

23   recommendation?

24        A.    I'm not aware of any, no.

25        Q.    Who would be aware of that?

```
1                    A. CRAWFORD
2              MR. MITCHELL: I object, but you
3          can answer.
4          A.    If there were any
5     recommendations, I would be aware of it.
6          Q.    Why haven't you ever made that
7     recommendation?
8              MR. MITCHELL: And I object, but
9          you can answer.
10         A.    Because we haven't had a need
11    for it.
12         Q.    Meaning you're satisfied to
13    just categorize it in any of these that are
14    close enough?
15         A.    Yes, as long as it's thoroughly
16    investigated.  It's difficult to categorize
17    every allegation of police misconduct.
18    It's such a wide ranging spectrum that we
19    use the categorizations that are available
20    and then we specifically address the
21    allegations in the summary.
22         Q.    In the summary, okay.
23              And is that because through the
24    summary, you're aware that if you need to
25    find the files for a specific type of thing
```

```
1                    A. CRAWFORD
2      that's not in a category of its own, that
3      you could do a quierum and pull up all the
4      information and with all of the information
5      that have certain key words within the
6      summary?
7                MR. MITCHELL: And I object, but
8           you can answer.
9           A.    That search can't be limited to
10     the summary and the blue team entry because
11     there may have been information that was
12     developed pursuant to the investigation.
13          Q.    Sure.
14                But you're aware that you can
15     do a key word query that would pick up
16     words in the summary?
17          A.    In the summary, yes.
18          Q.    So, for example, you had a case
19     that clearly alleged falsification of
20     evidence.  Your staff is trained to
21     specifically include the allegation in the
22     summary that way you could pull it up later
23     if you wanted to using a key word search;
24     is that correct?
25                MR. MITCHELL: I object to form.
```

1                    A. CRAWFORD

2              You can answer.

3         A.    You could.  You wouldn't be

4     able to limit your key word search to just

5     falsified.  You'd have to use fabricated,

6     you'd have to use the word planted.

7     Unfortunately there are many words in the

8     English language that could be used to

9     describe the misconduct under those

10    circumstances.

11        Q.    Sure.

12              And you'd have to do that

13    because there's not a specific category

14    that's made for it?

15        A.    Yes.

16        Q.    How about perjury in court, for

17    example, where does that go in here?

18        A.    Perjury would usually result

19    from referral from the DA's office and

20    again that would most likely be categorized

21    as unbecoming.

22        Q.    Anything else, any other

23    category?

24        A.    It couldn't fit under improper

25    police act, it could -- I guess it's

1                    A. CRAWFORD
2       possible it could be failed to perform, but
3       most likely would be categorized as conduct
4       unbecoming.
5              Q.    Does the public and complaints,
6       do they often come in accusing police
7       officers and employees of lying in one form
8       or another?
9              A.    Yes.
10             Q.    And you would say multiple
11      complaints probably make that allegation I
12      would imagine, right?
13             A.    Yes.
14             Q.    But I don't, I mean I see a
15      false statement, but I don't see anything
16      in particular about court.  Is that because
17      people never claim cops lie in court?
18                   MR. MITCHELL: I object to the
19              form.  You can answer.
20             A.    As you know, perjury would be
21      limited to a written submission or
22      testimony under oath.  Some people assert
23      that officers lie when they, when talking
24      to somebody or, you know, when conveying
25      information in other circumstances, so it

```
1                    A. CRAWFORD
2        would be difficult to use perjury as a
3        classification.  False statement, that's
4        generally used when somebody conveys a
5        false statement either to SPEAR [sic] an
6        officer to Internal Affairs, so yes,
7        unfortunately we don't have, you know, 100
8        specific allegations to categorize many
9        more aspects of allegations and misconduct.
10            Q.    Is that because the software
11       doesn't accommodate 100 categorizations or
12       just no one has taken the initiative to
13       expand?
14            A.    We haven't --
15            MR. MITCHELL: Sorry, I object
16         to form.  You can answer.
17            A.    -- no, we have all the
18       information captured in the system.
19       Generally when not using it for research
20       or, you know, to check files.  Yes, it
21       would be easier, I just search his IPad to
22       do.  I mean you have to go through each
23       case, definitely would make things easier
24       if we had another tool available, but no
25       matter what, you'd have to, I couldn't
```

```
 1                    A. CRAWFORD
 2      certify that a review of our records was
 3      exhaustive unless I could check every
 4      possible permutation or category.
 5           Q.    Is that because you wouldn't
 6      trust the query that captures --
 7           A.    Yes.
 8           Q.    -- your staff those in the
 9      summary?
10           A.    I couldn't just say I'm just
11      going to search this particular allegation
12      and misconduct and say with any certainty
13      that that could be the only way that it was
14      categorized.
15           Q.    Sure.
16                 But if you did want to find
17      files that contain perjured statements or
18      fabricated allegations, you could easily
19      start with a query and it would see what's
20      in there as far as what complaints or files
21      are linked to that keyboard?
22           A.    Yes.
23                 MS. McCLURE: Off the record.
24                 (Whereupon, a 15-minute break
25            was taken.)
```

1                    A. CRAWFORD

2              MS. McCLURE: We're back on the

3          record.  The witness is still sworn.

4          Everyone is back present from our

5          break.  All right.

6         Q.    Going back to the Internal

7    Affairs Department, do you guys do annual

8    reporting of any kind?

9         A.    We do annual reporting and we

10   do quarterly reporting.

11        Q.    And who do those reports go to?

12        A.    The quarterly reports go to the

13   Suffolk County Legislature and the annual

14   reporting goes to the Department of

15   Justice.

16        Q.    Okay.

17              And what information is a

18   general overview goes into each of those

19   reports respectively?

20        A.    The legislative report will on

21   a quarterly basis report the number of

22   cases or complaints that have been

23   received, how many cases have been

24   completed.  We will also indicate a summary

25   of the length of each investigation that

```
 1                    A. CRAWFORD
 2    are still pending.  It will also summarize
 3    disciplinary action that have been taken by
 4    the department and we will provide
 5    statistics regarding the complaints and the
 6    categorization of allegation.
 7         Q.    Okay.
 8               Is that categorization done
 9    based on these 37 categories?
10         A.    Yes.
11         Q.    So if there were multiple
12    incidents of, say, fabrication of evidence
13    per se, that would not be reflected in your
14    category analysis of your report, right?
15         A.    Not specifically, no.
16         Q.    And is it fair to say that
17    anymore specific type of incident whether
18    or not it's repeatedly investigated by your
19    office, if it's not part of those 37
20    categories, it's not going to be included
21    in that categorical breakdown?
22         A.    I'm sorry, could you ask that
23    question again?
24         Q.    Sure.
25               So let's say you have a
```

```
1                    A. CRAWFORD
2       particular type of incident like perjury
3       that is seen with some regularity, but
4       there's not a particular category for it,
5       is it correct that that will not reflect as
6       something investigated in the categories
7       that are put in your annual reporting?
8                    MR. MITCHELL: I object, but you
9            can answer.
10           A.    As indicated in the specific
11      category, no.
12           Q.    So it's limited then to these
13      specific 37 and nothing more?
14           A.    Yes.
15           Q.    Okay.
16                 With regard to these annual
17      reports that go to, is it that for the
18      quarterly reporting and annually reporting?
19      Are they broken down by category of these
20      37 as far as reporting categorically that
21      goes into them?
22           A.    Yes.
23           Q.    Is there any narrative
24      recitation of important matters or major
25      discipline that goes further into material
```

```
1                    A. CRAWFORD
2      facts than just the categories in those
3      reports?
4           A.    As far as a disciplinary action
5      that was taken?
6           Q.    Yes.
7           A.    No, it would be just a brief
8      description of the actual disciplinary
9      action that was taken, so say a suspension
10     without pay, loss of accruals, termination,
11     et cetera.
12          Q.    Okay.
13                After cases are closed in your
14     office, if additional parties or
15     information is made known to your office,
16     what is the procedure for re-opening a
17     file, do you re-open a file --
18          A.    Yes.
19          Q.    -- or is there a determination
20     to be made?  Can you explain the procedure
21     to me?
22          A.    If information it receives of a
23     referral or an additional complaint and
24     it's regarding an incident that was already
25     investigated, then that file would be
```

1                          A. CRAWFORD

2          reopened and whatever investigative action

3          that were taken at that point would be

4          documented.

5                  Q.    Let me ask you this.

6                        What, if any, internal triggers

7          are there to perform an IA investigation?

8                        MR. MITCHELL: I object, but you

9              can answer.

10                 A.    You just want me to limit it to

11         internal triggers?

12                 Q.    Yes, so absent a complaint or a

13         referral, are there any internal triggers

14         to start an investigation?

15                 A.    For it to be internal, it would

16         be an internal referral from the, whether

17         it be direction from a police commissioner

18         or it would be a report from an employee,

19         is that what you're referring to?

20                 Q.    That's what I'm getting at.

21                 A.    Okay.

22                 Q.    Are there any other internal

23         triggers or just those referrals from

24         employees?

25                 A.    To commence an investigation?

1              A. CRAWFORD

2         Q.     Yes.

3         A.     It either would have to be, we

4    would have to have some kind of referral of

5    information where it would be something

6    that be discerned internally somehow that

7    would warrant commencing an investigation.

8         Q.     When you say discerned

9    internally somehow, I'm taking that to mean

10   there's no particular policy regarding

11   conditions that would warrant an internal

12   audit automatically, is that fair to say?

13             MR. MITCHELL: I object, but you

14        can answer.

15        A.     Well, you're referring to

16   investigations?

17        Q.     Right.

18        A.     Okay.

19             For there to be an

20   investigation commenced, we would have to

21   have some information indicating that there

22   was a misconduct by a member of the

23   department.  So if you're limiting it to an

24   internal referral, it would be either from

25   you know, supervisor, another employee,

1                    A. CRAWFORD
2      something that was, let's just say, as a
3      hypothetical, a supervisor checks the
4      Facebook page of another employee and
5      discovers something inappropriate policy,
6      you know, there would be referral to IAB.
7          Q.    Is there any procedure or staff
8      member whose job it is to continuously
9      monitor employees and conditions to
10     determine whether an investigation should
11     be opened?
12              MR. MITCHELL: I object, but you
13         can answer.
14         A.    I'm sorry, can you ask the
15     question one more time, please?
16         Q.    Sure.
17              Is there any procedure or
18     employee whose job it is to continuously
19     monitor any certain conditions or employees
20     in general for conditions that would
21     trigger an Internal Affairs investigation?
22         A.    Well, as far as monitoring,
23     yes.  Does it automatically trigger an
24     Internal Affairs investigation, no.  Does
25     continually monitoring --

1                    A. CRAWFORD
2          Q.     Okay.
3          A.     -- of conditions or information
4     or patterns regarding conduct of our
5     members --
6          Q.     Okay.
7          A.     -- but it doesn't automatically
8     warrant the commencement of an Internal
9     Affairs investigation.
10         Q.     And is that a matter of
11    protocol or is that a matter of generalized
12    orders of your department to be cognizant
13    of what its employees are doing?
14         A.     Both.
15         Q.     Can you tell me what the policy
16    is regarding any proactive investigation
17    that you guys take that is not reactive to
18    a referral or a complaint?
19              MR. MITCHELL: I object, but you
20           can answer.
21         A.     Okay.  We have departmental
22    monitoring of the employees regarding
23    various aspects of their performance and
24    supervisors are tasked with continually
25    monitoring this information, but again, it

1                    A. CRAWFORD
2      doesn't automatically trigger an Internal
3      Affairs investigation.
4              I mean if the monitoring picks
5      up on some kind of apparent misconduct or
6      suspicion of misconduct, then yes, at that
7      point an investigation will be commenced.
8         Q.    Does monitoring occur of all
9      employees?
10        A.    Of all sworn members, yes.
11        Q.    And does that monitoring
12     pertain to job performance, Email, internet
13     presence, what does that monitoring entail?
14        A.    We have an early intervention
15     dashboard that's available to all our
16     supervisors that's pursuant to the IAPro
17     platform.  Supervisors are tasked with
18     checking the system to see if there are any
19     indications of possible problems involving
20     those employees regarding complaints,
21     domestic incidents, you know, PD, police
22     involved vehicle accidents, pursuits, use
23     of force, et cetera.  Is that what you're
24     referring to with monitoring?
25        Q.    I'm getting there.

1                    A. CRAWFORD

2                    So is monitoring something that

3          is tasked up, you said supervisors.  Are

4          you talking about the direct reports of,

5          you know, people who are supervising

6          employees or are you saying supervisors

7          within the IA Department are tasked with

8          monitoring?

9               A.    Both.

10              Q.    Both, okay.

11                    So supervisors of all kinds

12         have access to IAPro and its early

13         intervention system?

14              A.    Yes.

15              Q.    And all IA records that are not

16         classified as, I guess, top secret or

17         confidential?

18              A.    They're not going to have IAB

19         files.

20              Q.    Oh, okay.

21              A.    They'll have access to an early

22         intervention dashboards.

23              Q.    And what information is

24         available on the early intervention

25         dashboard?

1                    A. CRAWFORD

2          A.      They would indicate the number

3     of particular incidents involving each

4     member.

5          Q.      The number of incidents

6     pertaining to each member, is that right?

7          A.      Yes, yes.

8          Q.      Does it describe or in what

9     detail does it describe the incidents

10    themselves?

11         A.      Generally the dashboard itself

12    is not going to provide comprehensive

13    information regarding any of the involved

14    incidents.

15         Q.      Does it give any information?

16         A.      Yes, it will give a description

17    of the involved incidents associated with

18    that officer.

19         Q.      And who creates that

20    description?

21         A.      That's created through the

22    IAPro platform.

23         Q.      Is it limited to the category

24    one of 37?

25         A.      No, it's, it's delineated by

1                    A. CRAWFORD
2     the type of incidents.  So, for instance, a
3     complaint, use of force incident, any
4     officers involved in a domestic incident
5     and officers involved with pursuits,
6     vehicle pursuits, police vehicle accidents,
7     so it would have that information available
8     on this dashboard.
9          Q.    Would it necessarily be the
10    case that information on that system be
11    associated with one of those types of
12    incidents that you just described?
13         A.    Yes.
14         Q.    Okay.
15               So in order for, I guess we
16    will call it a notice or an entry to be
17    made on this early intervention system, it
18    would be have to be from a motor vehicle
19    incident, a domestic violence incident or a
20    complaint or there was one other, refresh
21    my memory?
22         A.    Okay.  That would be, this is
23    information that's maintained in IAPro and
24    it would be associated with each member, so
25    each supervisor is responsible on a monthly

1                    A. CRAWFORD

2       basis to check this early intervention

3       dashboard and check to see if there are any

4       issues with the performance of their

5       subordinates.

6            Q.    I'm not understanding how

7       issues with the performance of subordinates

8       is shown on that system.

9                 So if it's limited to

10      instances, tell me again those four

11      categories; complaints, pursuits, car

12      accidents and domestic violence, is that

13      right?

14           A.    Yes, and police vehicle

15      accidents.

16           Q.    And police vehicle accidents,

17      pardon me.

18                 So if it's not one of those

19      incidents, is it in that system or no?

20           A.    Is what in the system?

21           Q.    Well --

22           A.    I mean this is the information

23      that's available on --

24           Q.    That's available.

25           A.    -- early intervention

```
1                    A. CRAWFORD
2    dashboard.
3         Q.    So let's say there was a
4    performance issue that wasn't a complaint,
5    DV incident, a vehicle pursuit or a police
6    vehicle related accident, is it reflected
7    in there?
8              MR. MITCHELL: And forgive me,
9         only because I don't want to like
10        come back later and ask this
11        question, but he also said use of
12        force is one of the categories.
13             MS. McCLURE: Oh, okay.  I
14        appreciate that.
15        Q.    So out of those five, if
16   there's a performance related issue that's
17   not from one of those five, is it in that
18   system?
19        A.    In a dashboard, no.
20        Q.    Okay.
21             How about the monitoring that's
22   associated with IAPro, is that part and
23   parcel of the monitoring that's associated
24   with the monitoring tab on IAPro or is that
25   a separate function of monitoring or
```

```
 1                    A. CRAWFORD
 2      separate software?
 3           A.    These would be alerts generated
 4      through the IAPro system.
 5           Q.    So the IAPro system monitoring
 6      the way that you guys use it, takes
 7      information and creates alerts that then
 8      appears in these early intervention
 9      dashboards --
10           A.    No.
11           Q.    -- is that correct?
12           A.    No.
13           Q.    Tell me about the feed of
14      information, what ends up in the early
15      intervention information, where is that
16      information inputted?
17           A.    The input is part of the IA
18      Bureau process.
19           Q.    So it goes into IAPro, it's
20      associated with an officer when it's made,
21      we established that before?
22           A.    Yes.
23           Q.    Okay.
24                 So then it's issued one of 37
25      categories, we went through that before as
```

1                    A. CRAWFORD

2     well?

3          A.    If it's pertaining to a

4     complaint.

5          Q.    Okay.

6                And then at some point is given

7     one of those five categories that we just

8     discussed?

9          A.    No, you're confusing --

10         Q.    Okay, that's what I need to

11    understand.

12               So at what point is an incident

13    given one of those five categories that

14    show up in the dashboard?

15         A.    When it's reported, okay, the

16    use of force reports or are administered

17    throughout the IAPro software, police

18    vehicle accidents.  So these reports are

19    generated on the command level when the

20    incident occurs and then when it's inputted

21    into the system, it will be associated with

22    the involved officers and then IAPro will

23    track, you know, each particular incident.

24         Q.    So when a new supervisor comes

25    into his duties over a particular team or

1                    A. CRAWFORD

2       set of folks, he is made aware of the fact

3       that he has to check you said monthly

4       before, correct --

5            A.    Yes.

6            Q.    -- the system for, pardon me,

7       the dashboard let's call it, the monitoring

8       dashboard, okay.

9                 And is there any summary that's

10      given to a new supervisor regarding his

11      employees and any history that they may

12      have had that will be reflected in IAPro or

13      is it incumbent upon that person to do the

14      research on who they're supervising and if

15      there any problems?

16           A.    It gives them notice regarding

17      potential problems.  If he needs any

18      particular information, he is going to have

19      to get that through his or her supervisors.

20           Q.    And that notice comes from this

21      early intervention dashboard, correct?

22           A.    Yes.

23           Q.    Is there any other system of

24      notice that you would be given?

25           A.    If the officers involved

                         A. CRAWFORD
1
2      incidents made a threshold, then it would
3      be an alert sent to the command, then it
4      would go to the commanding officer who
5      would then refer to the lieutenant in the
6      squad.
7           Q.    All right.
8                 But it would never be the case
9      that they would go, say, review personnel
10     records to see what prior training or
11     interventions were held by old supervisors?
12                MR. MITCHELL: I object to the
13            form, but you can answer.
14          A.    They may.  I mean if you have a
15     new supervisor and he wants to learn about
16     his subordinates or if she wants to learn
17     about the subordinates, then they may seek
18     access.
19          Q.    But they don't have to?
20          A.    No, they don't have to.
21          Q.    These alerts that you generated
22     from IAPro, who programs the trigger points
23     for these alerts in IAPro?
24          A.    The commanding officer of
25     Internal Affairs Bureau establishes the

```
 1                    A. CRAWFORD
 2    thresholds.
 3         Q.    And is that threshold policy
 4    subject to a review or vote or --
 5         A.    Yes.
 6         Q.    It is, okay.
 7               Can you tell me about that
 8    process for agreeing upon the trigger
 9    points for an alert?
10         A.    If there was a need for a
11    review of the threshold, then at that point
12    it would be discussed.  Most recently, one
13    that I can think of, we had to create an
14    alert for the reporting requirements
15    pursuant to Executive Law Section 75.
16               So if any member of the
17    department has five or more complaints
18    within any 24 months, we have to convey a
19    report to the State Attorney General's
20    office.
21         Q.    Okay.
22         A.    So that was the most recent
23    amendment we made to the system.
24         Q.    And who was it that brought
25    that to the attention of the decision maker
```

```
1                     A. CRAWFORD
2      with regard to that?  Who decided that an
3      intervention needed to be had with regard
4      to that trigger evaluation?
5             A.    I did.
6             Q.    Okay.
7                   And did you do that as part of
8      your duties or did you just surmise that
9      that would be necessary?
10            A.    It's part of my duty --
11                  MR. MITCHELL: I object, but you
12             could answer.
13            A.    -- part of my duties and I was
14      aware of the legislative amendment that
15      went into effect.
16            Q.    And what are the trigger points
17      now, are they different for the 37
18      categories or is it one uniform trigger
19      point for an alert?
20                  MR. MITCHELL: I object to the
21             form.  You can answer.
22            A.    Well, the alerts are not
23      limited to complaints, so as far as the
24      thresholds or complaints, it would be three
25      complaints within a year or two complaints
```

```
 1                      A. CRAWFORD
 2       of unprofessional language or attitude.
 3            Q.     Within what span of time?
 4            A.     For two, it would be six months
 5       and that's -- and other than that, five
 6       complaints over any 24-month period, that
 7       would trigger a reporting requirement.
 8            Q.     Is there any manual review such
 9       that, let's say, someone has five
10       complaints within 25 months, is that person
11       evaluated or no?
12            A.     Depending on the circumstances,
13       yes.
14            Q.     Okay.
15                   When you say depending on the
16       circumstances, does that mean that there's
17       no rule that requires human oversight of
18       those kinds of the, of the need for an
19       alert of any kind?
20                   MR. MITCHELL: I object, but you
21             can answer.
22            A.     I'm sorry, could you ask that
23       question again?
24            Q.     Sure.
25                   The fact that you say depends
```

1            A. CRAWFORD
2      on the circumstances, right, whether
3      someone is made the subject of an alert, if
4      he's had, say, five complaints within a
5      24-month period, I'm saying your testimony
6      correctly, right?
7           A.    Well, as far as the alerts?
8           Q.    Right.
9           A.    No, they're limited to the
10     threshold that was established in the
11     IAPro.  I think you were talking about a
12     general review.
13          Q.    That's my follow-up question.
14          A.    Okay.
15          Q.    Is there some sort of human
16     review of the alert system to say, well,
17     this person has had 25 complaints in 25
18     months, perhaps there should be an alert
19     about this guy that perhaps the computer
20     didn't catch?
21          A.    Well, I would expect that if he
22     had five in 25 months, then he or she most
23     likely would have triggered one of the
24     other thresholds.
25          Q.    Which are what again, tell me?

A. CRAWFORD

1                    A. CRAWFORD

2         A.    Three complaints over a

3     12-month period or two unprofessional

4     language/attitude complaints over a

5     six-month period.

6         Q.    Okay.

7               And there are no other triggers

8     that relate to any other, we will call it

9     conduct unbecoming or any other problem,

10    it's just limited to those five and three,

11    is that right, as you just testified?

12    There's no other trigger programmed in the

13    system?

14              MR. MITCHELL: I object to the

15          form. You can answer.

16        A.    Regarding complaints or

17    regarding other thresholds?

18        Q.    Is there any other trigger

19    threshold with regard to complaints, let's

20    get that out of the way?

21        A.    Regarding complaints at this

22    point, no, it's just those three.

23        Q.    Okay.

24              And what human system would

25    exist to cause a trigger or an alert

1                    A. CRAWFORD
2       outside of the computer system for
3       complaints, is there any?
4              A.     There would be a review on the
5       command level regarding an officer's
6       performance as far as, you know, looking
7       for patterns, I mean this is what we do
8       when we do complaint intake.  I mean we
9       review an officer's history, if there's any
10      type of pattern, then obviously that's a
11      factor that needs to be investigated.
12             Q.     So who is responsible again for
13      reviewing the officer's history at
14      complaint intake to determine whether there
15      needs to be a notice or alert sent out?
16             A.     Well, the alerts are
17      automatically generated from IAPro, but as
18      far as any other perceived need outside of
19      the threshold triggers, that will be on the
20      case-by-case basis.
21             Q.     So am I correct in saying that
22      there are not alerts generated from any
23      other source, but the threshold system
24      programs into that computer?
25             A.     Yes.

```
 1                  A. CRAWFORD
 2        Q.    And what we have just discussed
 3    was alerts with regard to complaints only;
 4    is that correct?
 5        A.    Yes.
 6        Q.    What other alerts are there?
 7        A.    There are alerts regarding
 8    domestics, if an officer is involved in a
 9    domestic incident; there are alerts
10    regarding pursuits, officers involved in
11    pursuits; there are alerts regarding
12    officers involved in police vehicle
13    accidents; there are alerts regarding use
14    of force incidents.
15        Q.    That seems to correspond
16    exactly to those five categories that would
17    then show up on the dashboard, correct,
18    that's monitored by supervisors?
19        A.    Yes.
20        Q.    So using those five categories,
21    are the same five categories on which the
22    computer trigger alerts are based, is that
23    right?
24        A.    Yes.
25        Q.    So is it fair to say then that
```

1                     A. CRAWFORD
2       if a situation does not fit into one of
3       those five categories, it is not subject to
4       those automatic computerized alerts?
5            A.    Yes.
6            Q.    If an incident doesn't fit into
7       one of those five categories, is there any
8       system computerized or otherwise designed
9       to automatically trigger an alert if it
10      does not fit into one of those five
11      categories?
12           A.    We used to have an overall, any
13      six combination of, six incidents; however,
14      due to the limitations with the system, we
15      had to amend that to address the reporting
16      notification to State Attorney General's
17      office.
18           Q.    And how long have you been
19      using this system where you feel the
20      notification system is limited by the
21      fields, by the software?
22                 MR. MITCHELL: I object to the
23            form.  You can answer.
24           A.    Can you ask that question
25      again?

1                    A. CRAWFORD
2          Q.    Yes, sure.
3                You just testified that you
4     feel that these five categories are
5     limited, you're use to using something a
6     little different, but that had six, right,
7     am I saying that correctly?
8          A.    No.  There was another alert
9     that was available on the system where if
10    any combination of the tracked incidents
11    amounted to six occurrences, there would be
12    an alert generated.
13         Q.    Okay.
14         A.    That we had to amend that and
15    to use that alert for the reporting
16    requirement to the State Attorney General.
17         Q.    Okay.
18                So as it stands right now,
19    there are no other provisions for --
20         A.    No.
21         Q.    -- that would cause an alert?
22         A.    No.
23         Q.    So when a supervisor takes a
24    supervisory role and is given access to the
25    dashboard that would have all of the

```
1                    A. CRAWFORD
2      alerts, if the alert is not there, is he
3      under any requirement to do anything
4      further to understand if there's a history
5      or anything he should be looking out for or
6      is that the extent of his requirements?
7                    MR. MITCHELL: I object, but you
8            can answer.
9            A.    The supervisors are required to
10     do an inquiry into the early intervention
11     system on a monthly basis.  As far as any
12     other inquiries, that would be done often
13     on a case-by-case basis with a particular
14     supervisor.
15           Q.    And that's discretionary?
16           A.    Yes.
17           Q.    I'd like to talk about the
18     concise officer history provision of the
19     IAPro.  You're familiar with that as well?
20           A.    Yes.
21           Q.    And how in the course of the
22     administration of your duties do you use
23     that concise officer history?
24           A.    That will be used any time
25     we're doing an inquiry regarding an
```

```
 1                    A. CRAWFORD
 2    officer.
 3         Q.    And what information is
 4    available to you when you pull up an
 5    officer by name?
 6         A.    With the concise history?
 7         Q.    Yes.
 8         A.    Essentially all information
 9    that's available on IAPro.
10         Q.    So that would include any
11    information that was inputted as to the
12    summary of the IA profile?
13         A.    Whatever summary was entered,
14    it would have, as far as complaints, it
15    would indicate each complaint of the
16    categorization of the allegations of
17    misconduct and the dispositions for each
18    disciplinary action.  It would indicate if
19    there was any disciplinary action that was
20    taken against the involved officer, you
21    could also obtain any incidents involving
22    use of force, police vehicle accidents,
23    pursuits, use of force; it would also
24    indicate any alerts that were generated in
25    the course of that officer's career.  So
```

1                    A. CRAWFORD
2       yes, there's a lot of information available
3       in the concise history report.
4            Q.    Okay.
5                  And all of this information is
6       subject to the back-up that we talked about
7       earlier where, God forbid, something
8       happened to the computer, it would be able
9       to be backed up from some external source?
10           A.    Yes, but if, for whatever
11      reason, we lost our computer system and the
12      back-up was in effectual, we would have the
13      paper files as a reference within the
14      office.
15           Q.    Understood, okay.
16                 So in the concise officer
17      history database then, it transfers
18      information from the narrative summary and
19      inputs it into the concise officer history
20      screen, is that fair to say?
21           A.    Yes.
22           Q.    So if a user is using the
23      system correctly, someone should be able to
24      look up the concise officer history and
25      have a complete narrative of the materials

```
 1                    A. CRAWFORD
 2      in this case, is that right?
 3           A.    Ideally, yes.
 4           Q.    Well, ideally in the sense that
 5      that is the procedure and protocol that you
 6      require, right, that's what it is for, the
 7      narrative section, to put the material
 8      facts that you testified to before?
 9           A.    Yes.
10           Q.    And those material facts would
11      necessarily then have additional
12      information beyond those 37 categories,
13      correct?
14           A.    Ideally, yes.
15           Q.    And that's because, I think we
16      have acknowledged here today that there's
17      additional information that doesn't
18      necessarily fit into one of these 37
19      categories that's material to your
20      investigation and the nature of that claim,
21      correct?
22           A.    Yes, and also as the
23      investigation progresses, further
24      information will be developed.
25           Q.    And when further information is
```

1                    A. CRAWFORD
2       developed, is it supposed to be further put
3       into that narrative summary?
4            A.    Generally it's not, whatever
5       was inputted as the original complaint will
6       remain as the summary and then any
7       information regarding the investigation
8       will be depicted in the investigative
9       reports and attachments.
10            Q.    Okay, understood.
11                 So in the event someone needs
12       to run a concise officer history, are they
13       able to be run on query [sic] of a
14       department or is it done on a per officer
15       basis?
16            A.    Generally the concise history
17       is run on a, based on the officer.
18            Q.    Based on the officer, okay.
19                 And if you want to run a query
20       based upon a key word, you're aware that
21       you can pull up a key summary of all of the
22       cases that have that key word in it?
23            A.    Yep.
24            Q.    And is fair to say that you can
25       then with a click, click into those cases

```
 1                    A. CRAWFORD
 2      and see the officers that were involved in
 3      a particular case and then run their
 4      concise history; is that all correct?
 5           A.    Yes.
 6           Q.    I don't recall if I asked this
 7      before and forgive me if I did, I'm sure
 8      counsel will advise me.  Are there audit
 9      procedures in place to ensure that the
10      category selected and that the narrative at
11      the time of intake is done properly?  I
12      don't recall if I asked you that question.
13           A.    No.
14                 MR. MITCHELL: And I will
15              forgive you if you did, and forgive
16              me because I don't recall if you did,
17              but with that in mind, I object, but
18              you can answer.
19           Q.    So is anybody over --
20           A.    Yes, as part of the intake
21      process, the commanding officer or the
22      executive officer will review the incoming
23      complaint and then based on the available
24      information ensure that the allegations are
25      categorized as properly as we can properly
```

```
 1                    A. CRAWFORD
 2      categorize them at that point.
 3           Q.    Okay.
 4                 And files are uploaded to the
 5      individual IAPro system from your files; is
 6      that correct?  Documents are uploaded to
 7      the IA profiles from your IA hard files?
 8           A.    Yes.
 9           Q.    And then they become part and
10      parcel from the computerized file?
11           A.    Yes.
12           Q.    When files are discovered or
13      subject to some disclosure of any kind, do
14      you use the hard file or the computer file
15      for disclosure?
16           A.    Unfortunately, the IAPro
17      records are not comprehensive.  That's
18      especially when it pertains to any of the
19      files that pre-existed the implementation
20      of the use of the platform.
21                 So as a fail [sic] safe, we
22      also have a card catalog filing system to
23      track investigations involved with
24      officers.  So for officers with, you know,
25      30 or 40 years of service, we're not going
```

```
 1                  A. CRAWFORD
 2      to rely on the concise history within IAPro
 3      and we, unless the officer was hired within
 4      the last seven or eight years, we're going
 5      to check the card catalog to ensure that
 6      all the information is correct.
 7           Q.    But that's not a procedure
 8      required of a supervisor?
 9           A.    No, that's a procedure limited
10      to production of files in IAB.
11           Q.    I'm trying to understand how in
12      the course of discovery when any particular
13      IA file is discovered, how it could have
14      different contents from one person to the
15      next if it's being discovered from your
16      office.
17                 So is there some way that you
18      could think of that one person would get
19      different copies of files than another
20      person might receive?
21                 MR. MITCHELL: I'm going to
22            object, but you can answer.
23           A.    I'm sorry, for a discovery
24      request --
25           Q.    Yep.
```

1              A. CRAWFORD

2        A.    -- are you asking if it's

3    possible that to requests to a particular

4    officer would result in two different

5    productions?

6        Q.    Yep.

7        A.    I obviously can't say that it

8    can happen, but no, we do a comprehensive

9    check of the available files and ensure

10   that all pertinent files are disclosed.

11       Q.    Okay.

12             I'm trying to understand how in

13   this case I had received a copy of the

14   Thomas Moroughan --

15             MR. MITCHELL: Moroughan.

16       Q.    -- Moroughan file.

17             I received a copy of the IA

18   file and the documents and my files didn't

19   have the same handwritten notes on them

20   that were published on the internet, so I'm

21   just trying to figure out how my files are

22   different from the files of the Nassau

23   County attorneys put up on-line.

24             MR. MITCHELL: And I object to

25        the form, if you know.

```
 1                    A. CRAWFORD
 2          A.    I'm sorry --
 3                MR. MITCHELL: I don't know, I'm
 4           sorry, how would he know?
 5          Q.    Let me rephrase my question.
 6                My question is, it's my
 7     understanding that a set of files exist in
 8     that particular case that were received by
 9     folks in Nassau County.
10                MR. MITCHELL: Forgive me, I
11           don't mean, if you could just clarify
12           folks in Nassau County.  Just be more
13           specific, that's all.
14          Q.    As part of their investigation
15     into the matter, I'm sure you were aware
16     that there was a dual investigation into
17     that matter?
18          A.    Yes.
19          Q.    And then those files that were
20     produced to Nassau County as opposed [sic]
21     to the Internal Affairs Department or
22     inspectors out there --
23          A.    I'm sorry to interrupt, what
24     files?
25          Q.    A copy of the IA.
```

1                    A. CRAWFORD

2          A.    So the Suffolk County Police

3    Department Internal Affairs Bureau file.

4          Q.    Was disclosed, and apparently

5    it was published because I got it.  It was

6    available publicly and I received it.  That

7    copy that I received publicly purported to

8    have a whole lot of handwritten information

9    on it from those that were involved in the

10   process of reviewing the reports and I know

11   that you were involved in that, so I know

12   perhaps, do you know what I'm talking about

13   so far?

14              MR. MITCHELL: I object to your

15         form, but you could answer her

16         question.

17         A.    You're talking about the IA

18   investigative report regarding that

19   investigation --

20         Q.    Right.

21         A.    -- from Suffolk County Police

22   Department?

23         Q.    Right.

24         A.    And it had handwritten

25   provisions on it?

```
1                    A. CRAWFORD
2        Q.    Right.
3              Are you aware of the
4   handwritten notes that were published in
5   the media pertaining to that investigation
6   report?
7        A.    That was published in Newsday.
8        Q.    That's right.
9        A.    Yes.
10       Q.    Okay.
11             So I'm just trying to figure
12  out how those copies that had clearly
13  internal handwriting on them didn't make it
14  to me and my discovery requests in this
15  case.  I got clean sheets without any
16  handwritten notes on them.
17             I'm trying to understand from
18  you as far as recordkeeping goes, are those
19  handwritten notes kept separately or why
20  weren't they included in my discovery?
21             MR. MITCHELL: I object to the
22        form.  He can answer the first part
23        of your question.
24       Q.    Yes, as far as recordkeeping,
25  are they --
```

```
1                    A. CRAWFORD
2               MR. MITCHELL: But as far as why
3           you didn't get it, he's not competent
4           to answer that, unless he knows it.
5           Do you know why she didn't get some
6           paperwork?
7         A.    When did you get this
8     paperwork?
9         Q.    During the course of my case.
10              So I'm trying to understand --
11        A.    Okay.
12        Q.    -- why some IA records are,
13    seem to be sanitized and others aren't.
14              MR. MITCHELL: I object to the
15           form.  You can answer.
16        A.    I can only speculate.
17              MR. MITCHELL: Don't speculate.
18        A.    Okay, I don't know.  I'm sorry,
19    unless you could show me.
20              MR. MITCHELL: No, I don't know
21           is an acceptable answer.
22        Q.    Sure.
23              I would not want you to answer
24    things that you don't know that is for
25    sure.
```

                        A. CRAWFORD

1

2          A.     Okay.

3          Q.     So do you know whether or not

4     your IA file in paper or on the computer

5     contains any copies of any handwritten

6     notes from any party from any of the

7     documents?

8          A.     I don't know for certain.  I

9     wasn't involved in that investigation.  At

10    one point, I was asked to review a document

11    that was created by Inspector Calderelli.

12    I'd have to check the actual file.

13         Q.     That document from Inspector

14    Calderelli is the one I'm talking about

15    that was published on Newsday that had

16    handwritten notes in it.

17              I'm trying to figure out if

18    that's a copy saved in your file or if that

19    came from somewhere else.  Do you know if

20    that copy with handwritten notes is in your

21    file?

22         A.     That, I don't know, and I don't

23    know if Inspector Calderelli kept a

24    personal copy of a document and then

25    produced it to Newsday, I don't know.

1                    A. CRAWFORD
2        Q.     Should it be kept as a routine
3    matter?
4        A.     Should it be maintained by IAB?
5        Q.     Yes.
6        A.     Yes, and no file should have
7    been removed from the office.
8        Q.     Oh, okay.
9               So what were you shaking your
10   head no about just now, what part of my
11   question?
12              MR. MITCHELL: I object, but you
13          can answer.
14       A.     No, you said should have been
15   removed, I said no, that's clear-cut that
16   you do not remove any documents and no,
17   nobody should be removing any document.
18       Q.     Okay.
19       A.     Keeping it in as personnel
20   effects.
21       Q.     Okay.
22              Should that document have been
23   retained in the IA file with handwritten
24   notes regarding information or thoughts or
25   anything at all, should that copy have been

1          A. CRAWFORD

2     kept within procedures and rules?

3          A.    If it pertained to that

4     procedure, yes, it should be kept.

5          Q.    So as your file sits right

6     there, is there a copy of it in there?

7          A.    I'd have to check that

8     particular file.  I would expect it, yes.

9     Any document that was created pursuant to

10    that investigation is contained within the

11    file maintained within IAB.

12         Q.    Okay, that's fair, I wouldn't

13    expect you to know per se if it's in there,

14    but knowing it's supposed to be in there is

15    what I'm getting at.

16         A.    Okay.

17         Q.    So is it also fair to say that

18    any reports reviewed by anyone in the chain

19    of command or anyone who was asked for

20    thoughts that their handwritten notes on

21    them should per procedure be maintained in

22    your IA file?

23         A.    Yes.  Any records maintained

24    pursuant to that investigation which all of

25    them maintained or depict handwritten

1                    A. CRAWFORD

2      notations regarding the review process,

3      yes, they should be maintained with IAB.

4          Q.    So no one should be throwing

5      out any handwritten notes of anything at

6      any time, is that fair, unless there are --

7          A.    If it's not related, then it's

8      not material, it's just like an

9      investigation, not criminal, just like a,

10     like I described before, you got a phone

11     message from this complainant, I wouldn't

12     expect that to be saved in the file, but

13     any materials to the investigation, yes,

14     should be maintained in the file.

15         Q.    So someone's draft mark-ups

16     containing edits to any kind of official

17     report should be kept for any policy and

18     procedure?

19         A.    No, if it's not a final report

20     because we have an extensive review process

21     and that entails sometimes numerous

22     amendments.

23         Q.    Okay.

24                Let me see if I could better

25     understand this.

1                    A. CRAWFORD
2              I'm going to mark this for ID.
3      I made a copy of a Newsday report that way
4      you and I are talking about the same thing.
5                 MS. McCLURE: Can you mark this
6          as Plaintiff's Exhibit 2, please.
7                 (Whereupon, the aforementioned
8              document was marked as Plaintiff's
9              Exhibit 2 for identification as of
10             this date by the Reporter.)
11         Q.    So I'm going to ask you just to
12     take a look at this.  This is the article
13     that we were just referring to in Newsday.
14     You're familiar with that article?
15         A.    Yes.
16         Q.    Okay.
17                And the photo insert there
18     purports to be a draft copy of that
19     Calderelli report, correct?
20         A.    Yes.
21         Q.    And there's some handwriting on
22     that report that clearly is indicative of
23     being some kind of draft or someone's
24     thoughts on what should go in and what
25     should be taken out on a final draft.

1                    A. CRAWFORD
2        Would you agree with that?
3            A.    Yes.
4            Q.    So what I want to understand is
5        that, is it Suffolk County's policy to
6        purge these reports with handwritten notes
7        on them when eventually a final report is
8        written?
9                    MR. MITCHELL: And I will object
10            to form.  You can answer.
11           A.    If it's just a draft of a
12       report and it gets amended and it's not a
13       final report, it depends on whether there's
14       a need to save the original draft.
15           Q.    Okay.
16                   So then the county does not
17       have a policy per se or a written policy
18       that has requirements about saving drafts
19       or supervisor directives --
20           A.    No.
21           Q.    -- with regard to IA reports?
22           A.    When it comes --
23                   MR. MITCHELL: I object, but you
24            can answer.
25           A.    -- when it comes to our

                    A. CRAWFORD

1

2    reports, for instance, if I get a report, I

3    review it and there are a couple of issues

4    that need further investigative efforts or

5    if it's not drafted properly in my opinion,

6    I send it back for some kind of revision,

7    no.  Generally, we just save the final

8    version of the report and that's what gets

9    submitted up the chain for review.

10        Q.    Okay.

11             So a copy with handwritten

12   notes as the one we're using in Exhibit

13   Number 2 according to the county's policies

14   and procedures are then properly destroyed?

15             MR. MITCHELL: Objection to the

16        form.  That's not his testimony.  I

17        object to the form, but you can

18        answer.

19        A.    No.

20        Q.    What should happen to it?

21        A.    I don't know what happened with

22   this report.  I remember being assigned to

23   a meeting with Inspector Calderelli because

24   there was some glaring issues with a report

25   that he drafted.

1                    A. CRAWFORD
2        Q.    And you were called to that
3     meeting at that time?
4        A.    Yes.
5        Q.    And in what capacity were you
6     called to that meeting?
7              MR. MITCHELL: I object to form.
8         You can answer.
9        A.    I was assigned to legal bureau.
10    I was working in the commissioner's office.
11       Q.    So you were not a member of
12    Internal Affairs at that time?
13       A.    No.
14       Q.    And you were, legal affairs of
15    the commissioner's office at that time?
16       A.    Legal bureau.
17       Q.    Legal bureau, okay.
18             That corresponded with the time
19    that you were held an officer position with
20    the Superior Officers Union as well; is
21    that correct?
22       A.    No.
23       Q.    No, it was a different in time?
24       A.    It was in 2014 and no, I was
25    not on a union board at that point.

```
 1                    A. CRAWFORD
 2         Q.     Okay.
 3                So you were in this capacity as
 4     a legal affairs capacity, as one would
 5     attend that meeting?
 6         A.     Yes.
 7         Q.     So in your estimation then
 8     having been so involved with this specific
 9     report, should per the policy of Suffolk
10     County, should that have been destroyed or
11     should that have been kept?
12                MR. MITCHELL: I object to the
13          form.  You can answer.
14         A.     I never really possessed the
15     report, so I don't know what happened to
16     it.
17         Q.     Looking at it now and
18     understanding the recordkeeping policies as
19     you do, should that report have been kept
20     or should it have not been kept?
21                MR. MITCHELL: I object to the
22          form.  You can answer.
23         Q.     Or something else?
24         A.     I can't tell just based on
25     this, I don't know if this was signed by
```

A. CRAWFORD

1
2    the commissioner or signed by anybody along
3    the review process.  So I don't know what
4    version of this report is indicated in this
5    Newsday publication and also, I don't know
6    what we actually have in our file.  We
7    might have this in our file.
8         Q.    So it was a report that was
9    important enough to call several persons in
10   to discuss it, is that fair to say?  How
11   many people were involved in that meeting
12   to discuss this report?
13        A.    It was chief of detectives, me
14   and Chief Calderelli.
15        Q.    And who was the chief at that
16   time, who was the chief of detectives that
17   you just mentioned?
18        A.    Chief Madigan.
19        Q.    So who called that meeting?
20        A.    Commissioner Webber.
21        Q.    So Commissioner Webber was
22   interested enough in this report that he
23   got the three of you guys to get-together
24   to discuss it and at that time, you, this,
25   well, and you would say then that any

```
 1                    A. CRAWFORD
 2     drafts about that report wouldn't
 3     necessarily be saved?  So it's important
 4     enough to have a meeting about it, but not
 5     important enough to save those handwritten
 6     notes?
 7                MR. MITCHELL: I object to the
 8           form.  You can answer.
 9        Q.    I'm just asking, for the
10     recordkeeping policies, should it be saved
11     or should it not, given these
12     circumstances?
13                MR. MITCHELL: And I object to
14           form.  You can answer.
15        A.    If it was reviewed by the
16     commissioner and there were notations to
17     that effect, it should be saved in my
18     opinion.
19        Q.    I want to go back to IAPro
20     little bit on these categories.
21                At some point, these categories
22     changed, we would agree on that.  At some
23     point these 37 were updated, they weren't
24     always 37, at some point they were 19 or
25     something to that effect; is that correct?
```

1           A. CRAWFORD
2               MR. MITCHELL: I object to the
3            form.  You can answer.
4        A.    I don't know the exact number
5     when it was originally put into the system,
6     but yes, they have been amended overtime.
7        Q.    Okay.
8               So at the time that each
9     amendment happened, how were the legacy
10     categories incorporated into the new
11     categories?
12        A.    They weren't.
13        Q.    What happened to them?
14        A.    Whatever categorization
15     occurred when it was entered into IAPro
16     still remains.
17        Q.    Okay.
18               So is it possible that there
19     are categories that are not reflected on
20     this list of 37 that are still in the
21     system?
22        A.    Yes.
23        Q.    What are those categories that
24     are still in appearance somewhere in the
25     IAPro system, but are not in the

                    A. CRAWFORD

1
2      categorization system?
3           A.    Example such as now it's
4      categorized as excessive force, at one
5      point for whatever reason they categorized
6      it as undue force.
7           Q.    Okay.
8           A.    That's one example.  Also, we
9      added bias policing as an allegation,
10     probably about seven years ago; prior to
11     that, I mean it would be entered as civil
12     rights violation, but that, as you know,
13     could incorporate false arrest, excessive
14     force, et cetera.
15               So unfortunately, the
16     categorization is not sufficiently specific
17     where you could just say, oh, whatever
18     you're looking for has to be under just
19     this categorization and that one only.
20          Q.    Okay.
21               What would occur if a
22     particular officer had a common issue
23     violating a particular duty, but his
24     violation did not occur within the trigger
25     points, so not five within a 24-month

1                    A. CRAWFORD
2    period or not three of the other certain
3    kind.  They had to do with something else.
4              Would there be any flag that
5    was put into the system because of the
6    commonality and the problems of his
7    behavior?
8              MR. MITCHELL: And I'm going to
9         object to the form.  You say it has
10        to do something else, you're talking
11        about a complaint?
12             MS. McCLURE: I'm talking about
13        whether it's in a complaint or
14        whether it's some supervisor notice
15        that he was having a problem --
16             MR. MITCHELL: And I object to
17        the form.  You can answer.
18        A.    As part of IAB intake process,
19   when we get a complaint on an officer, we
20   check the history on the officer to see if
21   any parent patterns.
22        Q.    In IAPro, is that where you
23   checked?
24        A.    We start with IAPro, yes, but
25   depending on how long the officer was with

```
 1                    A. CRAWFORD
 2       the department, we may have to check our
 3       antiquated card catalog system.
 4            Q.    If an officer had a repeated
 5       history of having some trouble with
 6       withholding exculpatory of reading
 7       material, how would that person be
 8       triggered in the computer system?
 9                 MR. MITCHELL: I object to the
10            form.  You can answer.
11            A.    I, very rarely do we see an
12       actual allegation that withheld Brady [sic]
13       material.  It would be, that's very rarely
14       encountered.  If we got an allegation of
15       false arrest or some improper action
16       regarding statement taken something of that
17       nature, but these don't happen frequently.
18            Q.    So if they did occur with a
19       particular officer with any frequency, say,
20       four or five times in a ten-year span,
21       would that trigger any flags to say, hey,
22       this guy is having trouble with this Brady
23       thing, he should be monitored?
24                 MR. MITCHELL: I object to the
25            form.  You can answer.
```

1                    A. CRAWFORD
2          A.    If there's any commonality or
3    any apparent pattern, yeah, that definitely
4    should be noted.  It's part of the intake
5    process.
6          Q.    Part of the intake of what?
7          A.    Of a complaint investigation --
8          Q.    Okay.
9          A.    -- or an administrative
10   investigation.
11         Q.    What would trigger such an
12   administrative investigation?
13         A.    Could be referral from the DA's
14   office, could be direction from the police
15   commissioner, could be any source.
16         Q.    Okay.
17         A.    So we don't need an actual
18   civilian coming forward and making a
19   complaint to commence an investigation.  So
20   if there's any other referral, any other
21   essentially a referral or any kind of need
22   to do an investigation, then that would
23   trigger what we call an administrative
24   investigation.
25         Q.    And that would be all

                    A. CRAWFORD

1
2    reactionary to some information coming to
3    the IAB?
4         A.    Yes, it would be some
5    information that would trigger that need.
6         Q.    Is there any system of
7    follow-up when it comes to officers'
8    testimony in grand jury or at trial if
9    there are allegations of false swearing of
10   any kind?  Is there any kind of automatic
11   system of follow-up to make sure if there
12   should be some kind of internal trigger or
13   flag on a person saying I don't know that
14   he was being truthful, maybe you should
15   watch him?  Is there any human trigger that
16   would go into that?
17              MR. MITCHELL: I object to the
18          form, but you can answer
19        Q.    Do you understand what my
20   question is?
21        A.    I understand that the
22   limitation is going to be especially with
23   grand jury testimony.  We're not going to
24   be able to monitor that.  So generally if
25   there's an issue regarding an officer's

```
1                    A. CRAWFORD
2       testimony pursuant to a criminal
3       prosecution, we're going to get a
4       notification from the DA's office and that
5       will be our notice.
6            Q.    So it will be up to the DA to
7       say to themselves something isn't right
8       about this officer and then it would be
9       incumbent on the DA to bring that to your
10      attention?
11           A.    Yes, that does happen on a
12      regular basis.
13           Q.    So there's no internal
14      monitoring of testimony, say, in a grand
15      jury or at trial?
16               MR. MITCHELL: I object.  You
17          can answer.
18           A.    In practicality, I don't know
19      how we would be able monitor testimony in a
20      grand jury other than seeking the DA's
21      office or the ADA.
22           Q.    I guess that's my question.
23               Do you guys seek information or
24      do you only receive it?
25               MR. MITCHELL: I object, but you
```

1                       A. CRAWFORD
2            can answer.
3            A.      We seek it, but generally any
4       time there's an issue, we get a referral
5       from the DA's office, that's an automatic.
6            Q.      Is it generally or is it always
7       the case that when you guys do these
8       investigations into testimony and false
9       swearing that it's reactionary from some
10      information coming into your office?
11                   MR. MITCHELL: I object, but you
12            can answer.
13           A.      We would get notice from the
14      DA's office and it would be a formal
15      referral from the DA, him or herself, to a
16      commissioner and then it would trigger an
17      IAB investigation into underlying matter.
18           Q.      Okay.
19                   How about complaints against
20      the Suffolk County Laboratory or the
21      Medical Examiner's Office, do they come
22      through your office as well?
23           A.      No, because they're not under
24      the purview of the police department.
25           Q.      Okay.

1                    A. CRAWFORD

2                Help me to understand what, if

3        any, Internal Affairs are monitored of

4        those two departments?

5                MR. MITCHELL: I object to the

6            form.  If you're asking -- I object,

7            but you can answer.  You can answer

8            the question.

9        A.    Okay.  We don't have authority

10       over are those offices and any allegations

11       of misconduct pertaining to their office

12       would be referred to their offices.

13       Q.    Understood.

14                Explain to me if you would the

15       four categories of findings from your

16       office.

17       A.    We have exonerated which means

18       that the alleged actions of the officer

19       have been established by evidence to have

20       occurred, but upon review, they're

21       justified or proper; we have unfounded in

22       which case due to the investigation

23       reliable information has been discerned

24       that would have disproved the allegations

25       and refute the allegations; and there's

1                    A. CRAWFORD

2      unsubstantiated which means the

3      investigation didn't resolve the differing

4      accounts between the complainant and the

5      involved officers and then there's

6      substantiated which means that there's

7      credible information to support the

8      allegations and the allegations are in fact

9      constitute police misconduct.

10          Q.    In instances where cases are

11     exonerated and facts and allegations have

12     been deemed to have in fact occurred, but

13     were deemed not to be misconduct, what, if

14     any follow-up occurs with regard to

15     monitoring of those cases after your file

16     is closed?

17               MR. MITCHELL: I object, but you

18          can answer.

19          A.    Monitoring of the case that's

20     closed?

21          Q.    Of the case or personnel that's

22     involved.

23          A.    Well, as far as the case

24     itself, I mean once it's closed, there's

25     not going to be any further investigation

                    A. CRAWFORD

1    unless there's new information that comes

2    forward or comes to light or there's some

3    additional allegations that are made.  As

4    far as monitoring of the involved officer,

5    I think we discussed comprehensively of the

6    amount that's done.

7        Q.    Okay.

8            Is there any mechanism or by

9    exonerated cases that were again, factually

10   substantiated, are disclosed as part of

11   your regular disclosure process or lawsuits

12   and foil requests or are exonerated cases

13   kept classified?

14           MR. MITCHELL: I object to the

15       form.  You can answer.

16       A.    We abide by the directions

17   provided to us either by the U.S.

18   Attorney's Office, the DA's office, State

19   Attorney General's office or the County

20   Attorney's office or outside legal counsel

21   as to what files they need to produce.

22       Q.    Okay.

23       A.    So we don't make those

24   decisions for such offices.

                    A. CRAWFORD

1

2        Q.    Are your files in IA organized

3    by incident or office?

4        A.    They're organized by case

5    number.

6        Q.    Case number, okay.

7              And does a case number get

8    assigned to each and every incident?

9        A.    Each and every investigation.

10       Q.    So one file has one

11   investigation in it?

12       A.    Yes.

13       Q.    Is there ever a time when your

14   office sees it fit to have a third party or

15   outside source perform an investigation?

16             MR. MITCHELL: I object to the

17        form.  You can answer.

18       A.    As far as referring a matter?

19       Q.    When a matter is referred, is

20   there ever a time where you feel something

21   would be best investigated by an outside

22   entity?

23       A.    Yes.

24       Q.    Can you tell me about those

25   times?

1              A. CRAWFORD

2          A.    If we have a matter that

3     appears to be of a criminal nature

4     involving one of our officers, we will

5     refer to the DA's office, sometimes the

6     U.S. Attorney's Office and sometimes the

7     State Attorney General's office.

8                   Other than that, no.  We have

9     procedures if a complaint is made against

10    the commissioner or the deputy police

11    commissioner or chief of department by one

12    of our employees and it involves, you know,

13    sexual harassment or hostile work

14    environment, such matters have to be

15    referred to the chief deputy, county

16    executive for investigation.

17         Q.    And when that occurs, do you

18    get copies of the records that were

19    generated that to be maintained in your

20    Internal Affairs bracket?

21         A.    No, such investigations we

22    don't get copies in IAB.

23         Q.    Do you get communications or

24    correspondence about the outcome of those

25    investigations?

```
1                    A. CRAWFORD
2         A.    We don't get a formal
3    investigation, no.
4         Q.    What kind of notification do
5    you get?
6         A.    The copy of the report, I guess
7    maintained in labor relations.
8         Q.    I'm sorry, copy of what report,
9    copy --
10        A.    Whatever investigative report
11   that's created pursuant to matter.  It's
12   not going to be maintained within IAB.
13        Q.    Okay.
14              It's going to be maintained
15   where, pardon me?
16        A.    Labor relations.
17        Q.    Labor relations?
18              MR. MITCHELL: The Dennison
19         Building.
20        Q.    The Dennison Building, okay.
21              And where is labor relations?
22        A.    In the Dennison Building.
23        Q.    Is that considered part of the
24   police department, part of your office,
25   what is there?  Are they a separate arm of
```

1              A. CRAWFORD

2    the government, what are they?

3         A.    It's a county agency that's

4    outside the police department.

5         Q.    And how were you notified about

6    the outcome then?  You said you don't get a

7    formal notification, so what, do you get a

8    phone call?

9         A.    We don't get any kind of

10   notification unless there's some action

11   that needs to be taken.

12        Q.    Okay.

13              So after a third party takes

14   over an investigation, your office has no

15   involvement or understanding of the case or

16   its outcome at all whatsoever?

17              MR. MITCHELL: I object to the

18          form.  You can answer.

19        A.    Only pertaining to the

20   investigations that are done under the

21   investigations of labor relations.

22        Q.    Okay.

23        A.    Any cases that we refer to for

24   possible criminal investigations, well,

25   prosecution say to the DA's office or, we

1                    A. CRAWFORD

2       would retain disciplinary investigation

3       within the agency.

4            Q.    Okay.

5                  And what records would you

6       maintain in those files?

7            A.    It would be the usual

8       investigative report and associated

9       documents.

10           Q.    Would you receive copies of

11      anything generated by the third parties

12      who's investigating it?

13           A.    It would incorporate any

14      documentation that was provided by the

15      prosecuting agency, yes.

16           Q.    So there is a system in place

17      for sharing information between your office

18      and the investigating agency?

19           A.    I wouldn't say a system, it

20      would be a request that upon completion of

21      its criminal investigation and or

22      prosecution that we would be provided with

23      whatever documents that they could share.

24           Q.    And do you do that as a matter

25      of policy in all cases where something

```
1                     A. CRAWFORD
2      criminal is investigated by a third party?
3           A.    Yes.
4           Q.    Did you do that for the Spota
5      investigation, request those files?
6                 MR. MITCHELL: And I object to
7              the form, you can answer.
8           A.    I'm sorry, to the Spota
9      investigation?
10          Q.    Yes, I'm sorry, perhaps you're
11     familiar with it.
12                Did you request the
13     investigating agency to disclose any of
14     their files to you?
15                MR. MITCHELL: You're referring
16             to the investigation, the District
17             Attorney Tom Spota?
18                MS. McCLURE: Yes, the one he's
19             currently in prison --
20                MR. MITCHELL: I just want to
21             clarify, you're talking about an
22             investigation of Tom Spota?
23                MS. McCLURE: Yes.
24                MR. MITCHELL: Okay, that's all.
25             With that in mind, I'm objecting to
```

1                    A. CRAWFORD
2           the form.  You can answer.
3           Q.    Do you remember the question?
4           A.    Yes.  Did we request -- there
5     was a request from Commissioner Hart that
6     was made to the FBI for whatever
7     documentation they could share and, yes,
8     there was some documentation that was
9     provided to the police department.
10          Q.    About when was that received?
11          A.    I believe that was probably
12    January of 2020.
13          Q.    Tell me about the background
14    usage log of IAPro.  Are you familiar with
15    that system and the capability of it?
16          A.    You mean as far as access when
17    people access the program?
18          Q.    Right.
19          A.    Yes, I am familiar.
20          Q.    Okay.
21                Is there a system in place for
22    you to monitor who accesses the system and
23    what's done on it?
24          A.    Yes, we can monitor who has
25    access to particular files and then delve

1                    A. CRAWFORD
2        into the issue as to why a particular
3        investigator accessed the file.
4            Q.    Is it automatically reviewed
5        per some standing operating procedure or do
6        you just simply know that you have the
7        capability to do it and have occasionally
8        review it?
9            A.    I know we have the capability
10       and know how to use it and when the need
11       arises, if there's an investigative need we
12       will check it.
13           Q.    Okay.
14                 I know that in IAPro you have
15       the ability to purge files and purge
16       employees; is that correct?
17           A.    It has, the system has the
18       capability all data that's entered into it.
19           Q.    And is a back-up system kept of
20       purged information, do you know?
21           A.    The only information that's
22       allowed to be purged is if somebody
23       erroneously enters a file with no
24       information and then it's not essentially
25       purged, it's just used for a report of that

A. CRAWFORD

nature.

Q.     And when you say allowed, does
that mean there's some policy specific with
regard to purging information?

A.     All request to purge any
entries and what will happen is the only
time it's allowed to occur is if the CO or
I review report that's created by somebody
in Internal Affairs Bureau, a notification
or some other report and for whatever
reason they left it blank.

Q.     Okay.

A.     And then at that point, we
don't actually purge it, we just -- I have
our Admin One just open up the file so it
can be used for such a report.

Q.     All right.

A.     And even just to make it
perfectly clear, if any data for whatever
reason was accidentally purged, again we
have the documents for all of the files.

Q.     Are you aware of whether or not
your IT department has what's called a
purge hold on the files in IAPro?

1                    A. CRAWFORD
2          A.    I'm not aware if they had a
3     purge hold on them.
4          Q.    Is there somebody within the IT
5     department who is in charge of IAPro and
6     its administration?
7                 MR. MITCHELL: I object.  You
8             can answer.
9          A.    There's nobody in charge of it.
10    Generally we use whichever computer tech is
11    available to help us with whatever we need.
12         Q.    Okay.
13                Are you familiar with the
14    storage and your office's policy on the
15    keeping of Metadata in records?  Do you
16    know what that is?
17         A.    I'm sorry, am I familiar with
18    the policy?
19         Q.    Are you familiar first with
20    what Metadata is as a record, and secondly
21    do you have a policy on the storage of it?
22                MR. MITCHELL: I'm going to
23            object, but you can answer it.
24         A.    No, I'm not aware of any
25    particular policy regarding Metadata.

1                    A. CRAWFORD

2          Q.      But you are aware of the

3     information stored in Metadata?

4          A.      As far as how it's stored, no,

5     I'm not.   I'm not an IT or a tech person,

6     no.

7          Q.      But you are aware that it

8     stores information about a user's

9     interphase [sic] with a computer

10    information that is stored on a computer

11    and when it was generated and when it's

12    deleted, you can tell all of that from

13    Metadata.   Is that something that you have

14    in your understanding of what Metadata is?

15         A.      Okay, no, I didn't understand

16    what you meant by Metadata, but yes, we do

17    have the capability to check any data was

18    altered within the system.

19         Q.      And is that system that you

20    have pursuant to standardized policies and

21    procedures checking that data with any

22    given regularity?

23         A.      No, we don't have any

24    requirement to check such data.

25         Q.      Okay.

```
 1                    A. CRAWFORD
 2              MS. McCLURE: Off the record.
 3              (Whereupon, a five-minute break
 4         was taken.)
 5              MS. McCLURE: Back on the
 6         record. All parties are present.  The
 7         witness knows he's sworn.  We're in
 8         the home stretch.  All right.
 9      Q.    I'm going to hand you now, I'm
10   going to mark just this first page of the
11   IAPro manual exhibit as three, Plaintiff's
12   3.
13              (Whereupon, the aforementioned
14         document was marked as Plaintiff's
15         Exhibit 3 for identification as of
16         this date by the Reporter.)
17              MS. McCLURE: If you guys want
18         to check this out.  It's just page
19         one.  The software brand.
20              MR. MITCHELL: Thank you.
21              MS. McCLURE: Exhibit 3, I will
22         pass this to the witness to take a
23         look at that first page.
24      Q.    Mr. Crawford, take a look at
25   the provider, IAPro, the information at the
```

```
 1                    A. CRAWFORD
 2      bottom pertaining to the vendor.
 3                 Is that in fact the software
 4      that you guys use reflected in that page
 5      one of the manual?
 6           A.    IAPro software, yes.
 7           Q.    So that March 2019 handbook
 8      sort of speak is several hundred pages.  Do
 9      you have a copy of that full handbook in
10      your office?
11           A.    I know we have a handbook as a
12      reference within the office.  I don't know
13      if it's the March 2019 version.
14           Q.    Okay.
15                 Do you have every handbook for
16      every version that's been published?
17           A.    That, I'm not aware of.
18           Q.    All right.
19                 I want to talk about the
20      monitor tab a little bit more.  The monitor
21      tab, my understanding, is that it's linked
22      to that early intervention system and the
23      threshold notifications that we have
24      already discussed.
25                 Is my understanding correct?
```

1                    A. CRAWFORD

2          A.    Yes.

3          Q.    Does that monitor tab serve any

4    other function in your office?

5          A.    Yes, we also use the monitoring

6    for officers that are subject to

7    stipulation and agreements.

8          Q.    Okay.

9          A.    Also for officers that are

10   subject to the terms of an Order of

11   Protection.

12         Q.    So for Orders of Protection,

13   that pertain to domestic violence incidents

14   or any other criminal or family related

15   matter?

16         A.    Yes.

17         Q.    And when the monitor tab gives

18   you an employee snapshot, the screen talks

19   about threshold limits.  Are those

20   threshold limits limited to the two

21   threshold limits we talked about earlier

22   that trigger notifications?

23         A.    Thresholds regarding complaint?

24         Q.    Any other threshold limit.  I

25   see administrative threshold, citizen

```
 1              A. CRAWFORD
 2      complaint limit, overall threshold limit,
 3      probationary police officer or use of force
 4      limit.  If you want to take a look at that.
 5           A.    I mean we also have bias
 6      policing, by allegation of bias policing,
 7      it's not really a threshold, but upon every
 8      incident generated for that.
 9           Q.    So bias policing is defined as
10      what?
11           A.    As any act or, by a police
12      officer that is based on either an actual
13      bias or perceived bias.
14           Q.    And a flag or an alert goes out
15      immediately upon the accusation of the bias
16      policing?
17           A.    Yes, there's no, the threshold
18      is essentially one.
19           Q.    And how long does that flag
20      stay active?  How long is that alert
21      carried with that officer?
22           A.    Well, the alert is generated
23      upon one complaint.
24           Q.    And how long does it stay
25      there?
```

1              A. CRAWFORD
2        A.    It stays in his or her history
3    for the remainder of the officer's carrier.
4        Q.    Is that the case for all
5    alerts?  Do they stay with the officer for
6    the remainder of their career?
7        A.    There's a record of the alerts,
8    yes.
9        Q.    Okay.
10             Do those alerts at any point
11   drop off of the early intervention screen?
12       A.    Well, I, as far as the
13   dashboard, as far --
14       Q.    As far as the dashboard.
15       A.    No.  It may drop off for a
16   certain period of time elapses and that
17   officer is no longer within a threshold
18   criteria, but the alert itself is going to
19   remain as a permanent part of that
20   officer's history.
21       Q.    So what alerts remain as a
22   permanent part of the officer's history
23   until retirement?
24       A.    All of them.
25       Q.    Okay.

1                    A. CRAWFORD
2              So you just testified that some
3       of them, if they fall out of a threshold
4       time limit would fall off.  So are there
5       categories of notifications or flags,
6       pardon me, what's the proper term, alert?
7         A.    Well, we need to make a
8       distinction between an alert and an
9       indication on the dashboard.
10        Q.    Okay.
11        A.    The alert is generated upon an
12      officer meeting one of the established
13      thresholds.  The alert goes to the command
14      of the officer and that's going to be a
15      record of, that alert is going to be a
16      permanent alert of that officer's
17      disciplinary history.
18        Q.    And what, if anything, remains
19      a permanent part on the dashboard?
20        A.    Ideally, nothing. I mean it's
21      going to fluctuate on the information
22      available at any particular time.  So if an
23      officer had, for argument sake, three
24      complaints last year, but two years go by
25      and the officer doesn't have any additional

1                    A. CRAWFORD

2       complaints and there are no other incidents

3       that would trigger a threshold, then at

4       that point you should have a green light.

5            Q.    And what determines that time

6       period that you, you know, determine

7       whether or not if there's been a clean

8       history, something should be removed?  Is

9       that policy or discretion?

10                 MR. MITCHELL: I object to the

11             form. You can answer.

12           A.    It's pursuant to the

13      established threshold and whatever time we

14      entered into the system for that particular

15      threshold.

16           Q.    And is it one person that

17      determined the threshold for each category?

18           A.    Ultimately, yes.  It's a

19      commanding officer of Internal Affairs

20      Bureau.

21           Q.    And are those changed or

22      updated ever?

23           A.    They are updated.  As far as

24      the last time it's been updated, that was

25      probably 2015 or so, I don't know. I'm

1                     A. CRAWFORD
2        sorry, that's when we added bias policing
3        and an automatic alert on that, but we had
4        to change the threshold, we had an overall
5        six incident alert, but because of
6        limitations in the system, we had to
7        convert that to the category regarding five
8        complaints within any 24-month period so we
9        can ensure that we adhere to our reporting
10       requirements.
11            Q.    So are all of the alerts then
12       subject to fall off of the dashboard at
13       sometime or another?
14                 MR. MITCHELL: I'm going to
15            object to the form.  You can answer.
16            A.    As far as the information
17       that's available on the dashboard when the
18       supervisor is supposed to make the monthly
19       checks?
20            Q.    Yep.
21            A.    Yes, that's going to
22       continually fluctuate based on the data
23       present at the time.
24            Q.    So if a person has had, for
25       example, ten complaints of lying, that's a

1                    A. CRAWFORD
2       category, right, lying; ten problems that,
3       but he hasn't had any problem with that in
4       the last, say, two years or whatever the
5       threshold might be at by the commander and
6       the supervisor pulled up the dashboard
7       after that time had happened, would there
8       be any indication on the dashboard of that
9       prior problem?
10             A.    No, not to the supervisor.
11             Q.    All right.  I want to talk
12      about reports that are run from IAPro.
13                   In the course of the
14      administration of your office, do you
15      regularly run any type of reports; monthly,
16      quarterly showing officers who have had
17      problems or any type of compilation of data
18      that you feel is important to review?
19             A.    Yes, what we do is check for
20      specific types of categorization of
21      complaints, allegations of excessive force,
22      false arrest, et cetera, and we will help
23      put together a list of the officer's most
24      complaints so it can be analyzed further.
25             Q.    Is that list automatically

1                    A. CRAWFORD
2       generated by IAPro, the top percentage
3       list, what is it called, or is that a list
4       that you guys generate yourself?
5            A.    Generally the data runs that we
6       do would generate ourselves.  We don't use
7       any standardized report.
8            Q.    Okay.
9                  So within your offices, is it
10      correct to say that there are compilations
11      of data on your computer that track
12      information about officers and problems
13      that are seen as commonalities throughout
14      the data that you create and maintain on
15      your computer system outside of IAPro?
16                 MR. MITCHELL: I object to the
17            form.  You can answer.
18           A.    We will put together the
19      reports, we will use it for our arm
20      analysis and with our meetings with the
21      commissioner and actually the department
22      just instituted a new bureau, a risk
23      management bureau that's going to be
24      actually assisting us with analyzing this
25      data, but there's something we do

                        A. CRAWFORD

1

2      internally with IAPro and we present the

3      information to the commissioner.

4           Q.     When you guys go to those

5      meetings, how would you go with your

6      laptops and computers or do you go with

7      those reports printed on paper?

8           A.     Generally we have the data

9      compiled and printed out.

10          Q.     So are those data compilations

11     maintained on paper and also scanned

12     somewhere in your computer?

13          A.     Ordinarily I will keep my

14     copies in a folder that I use for our

15     meetings with the commissioner as a

16     reference.

17          Q.     Okay.

18               And because they were made in

19     the computer, is it safe to say that your

20     reports would also be stored in the

21     computer?

22          A.     Well, the data is, I would say,

23     from a system, so we don't scan, you know,

24     these data runs and enter them as any

25     particular report.  We just have this

1                    A. CRAWFORD

2        available as a reference when we meet the

3        commissioner.

4             Q.    So you do data runs, so queries

5        from IAPro and then print it out?

6             A.    Yes.

7             Q.    Okay.

8                   So you don't transfer that data

9        into, say, an Excel sheet or data into your

10       own report, is that right?

11            A.    We, it may be converted in an

12       Excel spread sheet or print it out as a

13       word document depending on what data we're

14       trying to assemble.

15            Q.    Okay.

16                  Do those types of reports or

17       charts in Excel have a particular name?

18            A.    No, I mean we just use them for

19       personal reference within the office and

20       have it available for our meeting with the

21       commissioner.

22            Q.    How often do you guys meet with

23       the commissioner?

24            A.    Once a week.

25            Q.    Do you always have reports with

1                   A. CRAWFORD

2       you to go over with the commissioner in

3       substance?

4            A.    Usually, yeah, you better be

5       prepared when you meet with the

6       commissioner.  Yes, we have references

7       available.

8            Q.    So there are weekly reports

9       about Internal Affairs that you share with

10      the commissioner on a weekly basis with new

11      reports generated every week?

12           A.    We actually don't transmit a

13      report with the commissioner.  We meet in

14      person with the commissioner at minimum

15      once a week and also additionally if the

16      need arises, but we will have information

17      available when the commanding officer and I

18      go to these meetings.

19           Q.    Do you guys also discuss any

20      significant cases that you may be

21      investigating?

22           A.    Yes, of course.

23           Q.    And to be able to share with

24      him that information, do you ever prepare

25      any summary reports or memoranda about

1          A. CRAWFORD
2     those significant cases to give to him?
3          A.    Generally our presentations to
4     the commissioner are verbal and we will
5     have whatever reports as a reference for
6     these meetings.
7          Q.    Okay.
8               So I want to go back for a
9     moment.  After your office became aware of
10    the results of the outside investigation of
11    Thomas Spota that we talked about earlier,
12    did your office do any further
13    investigating or generate any reports of
14    your own with regard to your, anything,
15    anything that you would have learned from
16    that case?
17               MR. MITCHELL: I object.  You
18          can answer.
19          A.    Yes, the department conducted
20    an investigation regarding our members'
21    involvement with that particular case as
22    well as other associated matters.
23          Q.    And how did you determine which
24    associated matters would be investigated?
25          A.    Well, this was at the direction

1                    A. CRAWFORD
2       of the police commissioner at the time, but
3       it was essentially Chief Burke and
4       associated incidents.
5            Q.    So using the reports then from
6       a third party agency, you received
7       information and launched an investigation
8       on your own that generated additional
9       reports regarding that subject matter
10      affiliated things; is that correct?
11           A.    Yes.
12           Q.    Does your office have any
13      involvement over the investigation of the
14      district attorneys as well or just police
15      officers?
16           A.    Just members of the police
17      department.
18           Q.    Do you have any records
19      regarding members of the police department
20      and their interaction with any DA's as part
21      of your investigations, like do you ever
22      investigate DA's or their directives given
23      to police officers?
24                 MR. MITCHELL: I object.  You
25            can answer.

1          A. CRAWFORD
2          A.   We have no authority to
3     investigate allegations of misconduct or
4     anything else involving members of the DA's
5     office; however, if our investigation is
6     necessarily need to include information
7     from the DA's office, yes, we will try to
8     get information from the DA's office.
9          Q.   If it comes to your attention
10    that a member of the DA's office working in
11    conjunction with a member of your
12    department are committing some kind of
13    misconduct or a conduct that you know as an
14    attorney is unethical, what is the policy
15    and procedure of your office to report that
16    to the agency that does have jurisdiction
17    over the DA's office?
18              MR. MITCHELL: I object to the
19         form.  You can answer.
20         A.   If we received any information,
21    any allegations of misconduct from members
22    of the DA's office, it will be referred to
23    the DA himself and also to the Public
24    Integrity Bureau and depending on the
25    nature of the allegations, referral to the

1                  A. CRAWFORD

2       U.S. Attorney's Office may also be

3       indicated, depending on the information.

4            Q.    Okay.

5                  And is that procedure

6       memorialized in any kind of SOP or

7       guidebook or is it discretionary?

8            A.    As far as discretionary, if we

9       get allegations in misconduct involving

10      another agency, no, it's not discretionary,

11      we have to refer to them.

12                 As far as which agencies get

13      the referral, that would be pursuant to a

14      discussion on the highest level with the

15      police commissioner.

16           Q.    With regard to criminal matters

17      that come through and are prosecuted here

18      through Suffolk County, if any of those

19      investigations result in either a

20      conviction that's overturned or an

21      acquittal, does that trigger an automatic

22      investigation by your office?

23                 MR. MITCHELL: I object, but you

24           can answer.

25           A.    The acquittal itself or the

1           A. CRAWFORD

2     reversal pursuant to an appeal would not

3     automatically trigger an investigation.  We

4     would have to receive notice regarding the

5     matter, so we don't keep track of criminal

6     prosecution and the results and any appeals

7     that may result, but ordinarily our

8     investigation will be triggered by the

9     expected resulting in litigation.

10          Q.    Okay.

11          A.    So generally if a verdict is

12    set aside or there's an acquittal and

13    invariably the department and the County of

14    contracting would be served with the very

15    least a Notice of Claim, if not Summons &

16    Complaint and upon receipt of either of

17    those documents articulating any allegation

18    of misconduct would trigger an

19    investigation.

20          Q.    Sure.

21                On referral?

22          A.    Yes.

23          Q.    Within your department, does

24    anyone communicate with the District

25    Attorney's office any kind of

```
 1                      A. CRAWFORD
 2    recordkeeping, any kind of list of officers
 3    who are presently flagged or under alert
 4    for any issue?
 5             MR. MITCHELL: I'm going to
 6          object.  You can answer.
 7       A.    I'm sorry, could you repeat
 8    that again?
 9       Q.    Do you share any records with
10    the Suffolk County District Attorney's
11    office when it comes to your attention or
12    when an officer is flagged or an alert is
13    put out to watch a specific officer?
14             MR. MITCHELL: I'm going to
15          object.  You can answer.
16       A.    Are you asking me if any of the
17    alerts that are generated pursuant to the
18    IAPro platform or shared with the DA's
19    office?
20       Q.    Either the alerts themselves or
21    any communication to notify the DA's office
22    of an alert.
23             MR. MITCHELL: I object.  You
24          can answer.
25       A.    Any communications to the DA's
```

```
 1                    A. CRAWFORD
 2      office regarding an alert?
 3           Q.    Yes.
 4           A.    Who would make that
 5      communication?
 6           Q.    I'm asking you.
 7           A.    No --
 8           Q.    Does any communication happen
 9      at all?
10           A.    -- when it comes through the
11      alerts generally the IAPro system, no.  At
12      this time there's an internal alert.
13                 MS. McCLURE: Folks, I think,
14             I'm just about ready to wrap up.  I'm
15             going to take a moment.  We will go
16             off the record and then I suspect we
17             will wrap it up.
18                 MR. MITCHELL: Okay, sounds
19             good.
20                 (Whereupon, a five-minute break
21             was taken.)
22                 MS. McCLURE: Guys, we're going
23             back on the record.  All parties are
24             present and we're back on the record.
25           Q.    Officer, we have covered quite
```

1                    A. CRAWFORD
2        a bit today, but I need to understand a bit
3        more about these back-ups that you weren't
4        able to talk about before, how they're
5        maintained.
6                    Is there someone specifically
7        that is in charge of maintaining these
8        back-ups that could answer questions about
9        extracting information from them?
10            A.    As far as the IT staff, it
11       would either be William Dougherty,
12       Inspector William Dougherty is the
13       inspector of our section or Captain
14       Frederick Webber is the executive officer.
15            Q.    All right, very good.
16                    And with regard to the reports
17       that we have discussed today about doing
18       the queries that generate substantial
19       information and the concise history that
20       should have information pulled from the
21       IAPro system including the narratives,
22       those are indeed queries that could be run
23       and either saved electronically or printed
24       out; is that correct?
25            A.    Yes.

1          A. CRAWFORD

2          Q.    Do you save electronic copies

3     of your weekly reports to the commissioner?

4          A.    No.

5          Q.    So those are queries that you

6     make weekly that you printout that, what

7     happens to them afterwards, do you keep a

8     copy, throw them out, what happens to

9     those?

10          A.    It's just, I may keep it in my,

11     I have a file that I keep as a personal

12     reference for the means with the

13     commissioner, if I replace it at any point

14     it's not as if these are standing reports

15     or any reports that are used external or

16     generally just shred the reports and update

17     it with new information.

18          Q.    All right.

19               And how about those problem

20     officer reports that you were talking about

21     before, the top few that have been having

22     issues, I referred to it as something else,

23     from the IAPro manual, but what do you call

24     those reports?

25               MR. MITCHELL: I object to the

```
1                      A. CRAWFORD
2            form. You can answer.
3            A.    I'm sorry, the report of
4     problem officers?
5            Q.    Yes.
6                  You testified that there's a
7     report that you run where it shows officers
8     that have had perhaps the top percentile of
9     problems in one report; is that correct?
10           A.    Yes, we will run reports with,
11    you know, the officers with the most
12    allegation of excessive force.
13           Q.    And does that result from a
14    query that you do in IAPro that brings up a
15    list of officers?
16           A.    Yes.
17           Q.    And that list could either be
18    printed or saved of course in Adobe format,
19    am I right?
20           A.    Yes.
21           Q.    As far as the concise officers
22    history reports, it's my understanding that
23    those reports are generated by individual
24    officers; is that correct?
25           A.    They're generated by individual
```

1                    A. CRAWFORD

2       officers?

3            Q.    Right.

4                    In other words, can I pull up a

5       concise officer history of a particular

6       command or investigation unit that has

7       multiple officers?

8            A.    Okay, no, I'm sorry, I thought

9       you meant that the individual officers were

10      the ones generating.  Yes, the concise

11      history would be limited to a particular

12      officer.

13           Q.    And does your unit ever see fit

14      to group those concise officer histories by

15      departments, so, say make a compilation of

16      the histories for, of a certain precinct or

17      a certain command unit?

18           A.    Generally, in my experience

19      that without getting particular data on

20      individual officers compiling it for a

21      command really isn't useful data, in my

22      opinion.

23           Q.    So if someone wanted to receive

24      concise officer histories of a particular

25      group of folks, that would be run either

1                    A. CRAWFORD
2        one of two ways in my estimation, either by
3        officer individuals or extracted from the
4        back-up which would have all the
5        information available, is that right?
6            A.    Yes.
7            Q.    And in order to inquire about
8        extracting that information via back-up, I
9        have to contact one of those two officers
10       because it's outside of your scope, right?
11              MR. MITCHELL: I object to form,
12          but you can answer.
13           A.    Extracting from the back-up,
14       I'm not aware of that ever occurring, but
15       yes, if we had all of our computer
16       equipment destroyed in a fire and we had to
17       replicate all of the data, then yes, we
18       have to have IT session at that point to
19       replicate the data for us.
20           Q.    I suppose that's good enough.
21       That answers my question.  I have no
22       further questions at this time.
23              MS. McCLURE: Is there anything
24          else you wanted to bring to my
25          attention, folks?  Is there anything

```
 1                A. CRAWFORD
 2        you want to put on the record or
 3        should we go ahead and wrap up?
 4             MR. MITCHELL: The only thing I
 5        would put on the record is request a
 6        copy of the transcript for him to
 7        make corrections and errors.
 8             MS. McCLURE: Of course.
 9             MR. MITCHELL: That's it.
10        Nothing else from me.
11             MR. WOOD: I have no questions.
12             MS. McCLURE: Thank you.  That
13        will conclude the record.
14             (Whereupon, at 3:09 p.m., the
15        Examination of this witness was
16        concluded.)
17
18             °        °        °        °
19
20
21
22
23
24
25
```

1    Brian Mitchell, Esq.

2    bmitchell@suffolkcountyny.gov

3                          April 19, 2021.

4    RE: White v. County Of Suffolk, et al.

5         4/12/2022, Alexander Crawford (#5183058)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

1    White v. County Of Suffolk, et al.

2    Alexander Crawford (#5183058)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Alexander Crawford                          Date

25

1                   A. CRAWFORD

2              D E C L A R A T I O N

3

4       I hereby certify that having been

5 first duly sworn to testify to the truth, I

6 gave the above testimony.

7

8       I FURTHER CERTIFY that the foregoing

9 transcript is a true and correct transcript

10 of the testimony given by me at the time

11 and place specified hereinbefore.

12

13

14

            _____

15                 ALEXANDER CRAWFORD

16

17

18 Subscribed and sworn to before me

19 this _____ day of _____ 20___.

20

21

       _____

22            NOTARY PUBLIC

23

24

25

1                    A. CRAWFORD
2                  E X H I B I T S
3     PLAINTIFF'S EXHIBITS
4     EXHIBIT   EXHIBIT                        PAGE
5     NUMBER    DESCRIPTION
6     EX 1      Document: Subpoena of
7               Alexander Crawford            4
8
      EX 2      Documents: Newsday
9
                Article #1                    197
10
11    EX 3      Document: IAPro
12              Instruction Manual Page    226
13
14          (Exhibits retained by Counsel.)
15
16
17                  I N D E X
18    EXAMINATION BY                          PAGE
19    MS. McCLURE                          4-250
20
21
22
23
24
25

1          A. CRAWFORD

2    INFORMATION AND/OR DOCUMENTS REQUESTED

3    INFORMATION AND/OR DOCUMENTS          PAGE

4    (None)

5

6

7

8        QUESTIONS MARKED FOR RULINGS

9    PAGE LINE QUESTION

10    21    6  When you say bargaining

11             representative, can you explain

12             to me what that means?

13

14    86    10 I wasn't, but you could tell me

15             about that now.

16

17

18

19

20

21

22

23

24

25

A. CRAWFORD

C E R T I F I C A T E

STATE OF NEW YORK          )

                          :  SS.:

COUNTY OF SUFFOLK          )

I, NANCY WEINSCHREIDER, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of April 2022.

*Nancy Weinschreider*

NANCY WEINSCHREIDER

| & |
| --- |
| **&** 3:17 119:4 120:7 243:15 |

| 0 |
| --- |
| **01501** 1:6 |

| 1 |
| --- |
| **1** 3:17 4:17,20 26:24 27:11 70:17 86:23 255:6,9 |
| **1,600** 109:14 |
| **1-10** 1:10 |
| **10** 48:8 256:14 |
| **10-10** 106:10 |
| **100** 1:22 2:12 151:7,11 |
| **10013** 2:6 |
| **101** 2:5 |
| **10:07** 1:15 |
| **10:08** 5:4 |
| **11788** 1:23 2:13 13:19 |
| **11980** 4:15 |
| **11th** 110:3 |
| **12** 1:14 5:3 175:3 |
| **15** 48:8 152:24 |
| **16** 55:25 |
| **18** 55:22 56:11,16 56:24 57:9,14,21 |
| **19** 203:24 252:3 |
| **197** 255:9 |
| **1995** 46:5,9,11 |
| **1996** 47:21 |
| **1997** 17:10 |
| **19th** 257:20 |
| **1st** 51:16 |

| 2 |
| --- |
| **2** 197:6,9 199:13 255:8 |
| **2,500** 74:12,19 114:20,20 |

| 20 254:19 |
| --- |
| **2000** 15:13 22:23 45:19,20 140:9 |
| **2004** 18:24 35:18 57:14 122:21 |
| **2005** 15:17 140:11 |
| **2006** 62:10 |
| **2007** 57:14 |
| **2011** 23:12 35:18 35:19 |
| **2014** 15:21 23:13 200:24 |
| **2015** 23:14 232:25 |
| **2016** 16:3 |
| **2017** 16:8 |
| **2018** 16:8 23:14 53:2 57:20 |
| **2019** 16:11 227:7 227:13 |
| **2020** 221:12 |
| **2021** 52:7 53:2 110:3,11,16,17 252:3 |
| **2022** 1:14 5:3 257:20 |
| **21** 110:14 256:10 |
| **226** 255:12 |
| **24** 171:18 173:6 174:5 205:25 233:8 |
| **24591** 257:23 |
| **25** 173:10 174:17 174:17,22 |
| **27** 52:7 |
| **27th** 51:17 |
| **2:20** 1:6 |

| 3 |
| --- |
| **3** 226:12,15,21 255:11 |
| **30** 3:16 4:14 12:14 14:21 42:24 84:11 |

| 186:25 252:17 |
| --- |
| **30b** 21:11 27:4,10 40:4 69:6 89:5,9 |
| **30b6** 24:19 |
| **37** 139:4 140:17,21 141:20 142:3 143:7 145:25 154:9,19 155:13 155:20 163:24 167:24 172:17 183:12,18 203:23 203:24 204:20 |
| **3:09** 251:14 |

| 4 |
| --- |
| **4** 255:7 |
| **4-250** 255:19 |
| **4/12/2022** 252:5 |
| **40** 42:24 186:25 |
| **4th** 13:10 |

| 5 |
| --- |
| **5183058** 252:5 253:2 |
| **5th** 15:9,13 |

| 6 |
| --- |
| **6** 256:10 |
| **6th** 16:10 |

| 7 |
| --- |
| **7.5.197** 33:12 60:23 |
| **7.5.197.** 33:9,11 |
| **75** 171:15 |
| **7th** 15:19 16:3 |

| 8 |
| --- |
| **86** 256:14 |

| 9 |
| --- |
| **95** 46:4 |
| **96** 47:24 |
| **9th** 2:5 |

| a |
| --- |
| **a.m.** 1:15 5:4 |
| **abc** 114:19 |
| **abide** 214:17 |
| **abilities** 49:24 |
| **ability** 6:12 53:16 53:22 222:15 |
| **able** 33:4 48:2 71:25 143:5 149:4 182:8,23 184:13 209:24 210:19 238:23 246:4 |
| **abreast** 98:2 99:19 |
| **absence** 118:4 |
| **absent** 97:18,20 157:12 |
| **academy** 81:13,20 |
| **acceptable** 6:4 7:5 192:21 |
| **access** 46:23 47:6 48:22 49:2,7 50:13,24 51:19,24 51:24 52:8,11,13 52:18,21,22 53:11 54:6,12,14,19,21 54:22 55:3 61:3,4 84:12,17 112:2 113:5 117:25 119:25 123:16,22 123:25 124:2,3,11 162:12,21 170:18 179:24 221:16,17 221:25 |
| **accessed** 222:3 |
| **accesses** 221:22 |
| **accessibility** 70:14 |
| **accessing** 50:22 |
| **accident** 96:25 166:6 |
| **accidentally** 223:21 |

accidents 161:22
164:6 165:12,15
165:16 168:18
177:13 181:22
accommodate
151:11
account 143:5
accounts 213:4
accreditation
114:11 118:13
accruals 156:10
accuracies 8:2
accuracy 252:9
accurate 133:9
accusation 229:15
accused 143:16
accusing 150:6
acknowledge
114:21
acknowledged
79:13 81:9 106:24
112:13 118:21
120:9 183:16
acknowledgement
80:2 112:6 115:14
119:18
acknowledgeme...
113:21
acknowledgment
252:12
acquittal 242:21
242:25 243:12
act 144:6 149:25
229:11
acting 52:10 77:14
135:10
action 66:15 84:22
85:10 93:21 94:6
94:9,15,18 95:7,12
96:14 97:8 102:16
103:13 104:16

118:8 129:9 144:7
154:3 156:4,9
157:2 181:18,19
207:15 218:10
257:16
actions 93:23 95:9
129:5 212:18
active 74:11
229:20
actual 13:17 37:23
56:20 107:24
156:8 193:12
207:12 208:17
229:12
ada 210:21
add 142:2 143:12
added 36:14
125:25 128:10
134:24 135:18
138:19 205:9
233:2
addition 29:7 53:5
96:21 117:11
133:13 138:11
additional 18:3,12
81:10 92:6 111:14
121:4 134:18
142:2 156:14,23
183:11,17 214:4
231:25 240:8
additionally 7:23
238:15
address 4:12
13:12,17 147:20
178:15
adhere 233:9
admin 56:6,7
62:23 63:4,5,22
223:16
administer 3:11

administered
107:4 168:16
administering
107:23 108:3
administrate
80:22
administration
38:25 180:22
224:6 234:14
administrations
29:4
administrative
54:12,15 55:6,7,16
56:10 83:25 208:9
208:12,23 228:25
administrator
83:24
administrators
54:21,25
adobe 248:18
adopted 77:9
82:24 141:16
adopting 75:14
advise 90:19 185:8
advised 140:15
advising 101:17
affairs 8:18,25 9:3
9:18 10:16 13:7
14:6 15:15,18
16:11 17:24 18:21
19:4,13,15 21:19
24:11 26:18 28:15
28:22 31:11 51:21
51:23,25 55:15
56:21 57:13 58:23
61:2 70:21 86:14
86:17,18 88:8
89:14 92:5 94:19
94:23 95:11 96:11
97:7,15 98:9 99:3
115:23 116:8

121:22 123:15
132:16 151:6
153:7 159:21,24
160:9 161:3
170:25 189:21
190:3 200:12,14
201:4 212:3
216:20 223:10
232:19 238:9
affidavit 25:20
29:8
affiliated 240:10
aforementioned
4:18 197:7 226:13
agencies 242:12
agency 8:13 20:12
218:3 219:3,15,18
220:13 240:6
241:16 242:10
ago 12:23 43:23
44:21 47:22,24
60:7 83:4 108:19
130:14 137:18,19
139:8,10,14
205:10
agree 46:21 112:9
129:24 144:18
145:14 198:2
203:22
agreed 3:5,20
agreeing 171:8
agreement 105:13
140:16
agreements 228:7
ahead 68:13 70:3
87:14 91:16
105:24 251:3
al 2:11 5:3 252:4
253:1
alcohol 9:19

**alert** 170:3 171:9
  171:14 172:19
  173:19 174:3,16
  174:18 175:25
  176:15 178:9
  179:8,12,15,21
  180:2 229:14,20
  229:22 230:18
  231:6,8,11,13,15
  231:16 233:3,5
  244:3,12,22 245:2
  245:12
**alerts** 42:11 167:3
  167:7 170:21,23
  172:22 174:7
  176:16,22 177:3,6
  177:7,9,11,13,22
  178:4 180:2
  181:24 230:5,7,10
  230:21 233:11
  244:17,20 245:11
**alexander** 1:17
  4:11 5:5 87:18
  252:5 253:2,24
  254:15 255:7
**allegation** 129:25
  134:2 138:18
  147:17 148:21
  150:11 152:11
  154:6 205:9
  207:12,14 229:6
  243:17 248:12
**allegations** 9:9
  131:6 133:13
  138:6,21 140:6
  141:5 143:11
  145:2 147:21
  151:8,9 152:18
  181:16 185:24
  209:9 212:10,24
  212:25 213:8,8,11

  214:4 234:21
  241:3,21,25 242:9
**alleged** 148:19
  212:18
**allotted** 252:20
**allow** 39:24 50:23
  69:7,12
**allowed** 222:22
  223:3,8
**allowing** 69:3 88:3
**altered** 225:18
**altogether** 14:20
  28:21 42:6 74:18
**amend** 11:25
  78:21 143:12
  146:17 178:15
  179:14
**amended** 11:16
  12:20 79:2,20
  110:19 126:15
  137:14 139:7
  198:12 204:6
**amending** 11:15
**amendment** 14:10
  60:4,17 64:18
  66:25 80:5,6
  121:3 171:23
  172:14 204:9
**amendments**
  13:25 60:18 81:10
  109:15 131:4
  196:22
**americas** 2:5
**amount** 214:7
**amounted** 179:11
**analysis** 154:14
  235:20
**analyzed** 234:24
**analyzing** 235:24
**ancient** 45:10

**anew** 37:11
**annual** 153:7,9,13
  155:7,16
**annually** 155:18
**answer** 7:21,22
  10:14 20:10 21:2
  21:12 22:2,11
  23:24 26:16 28:6
  28:12 29:17 30:10
  32:5 34:14,20
  35:3 36:23 37:22
  38:5,19 39:6,12,24
  40:10,22 41:12
  42:16,20 43:10
  46:14,25 47:17
  58:9,15 61:16
  63:10,15,16 64:10
  64:16 65:4,22
  66:9 68:3,12,14
  69:4,5,8,12,13,13
  69:14 71:7,14
  72:21 73:15 74:22
  75:12 76:9 77:5
  77:21 81:19 82:11
  84:25 85:21 87:3
  90:19 91:4,19,23
  92:12 93:15 94:2
  95:2,14 96:18
  98:6,24 99:10,22
  100:19 102:2
  104:2,12 105:25
  106:16 107:3
  109:2,8 111:18
  112:19 113:15,25
  114:25 115:16
  116:7,12 117:8
  119:8,13 120:15
  121:13 124:6
  126:7,21 128:4
  130:25 132:18
  135:13 136:17

  141:24 142:13,23
  143:9 145:9 146:3
  147:3,9 148:8
  149:2 150:19
  151:16 155:9
  157:9 158:14
  159:13 160:20
  170:13 172:12,21
  173:21 175:15
  178:23 180:8
  185:18 187:22
  190:15 191:22
  192:4,15,21,23
  194:13 198:10,24
  199:18 200:8
  201:13,22 203:8
  203:14 204:3
  206:17 207:10,25
  209:18 210:17
  211:2,12 212:7,7
  213:18 214:16
  215:17 218:18
  220:7 221:2 224:8
  224:23 232:11
  233:15 235:17
  239:18 240:25
  241:19 242:24
  244:6,15,24 246:8
  248:2 250:12
**answered** 68:22
**answers** 250:21
**anthony** 52:3
**anticipated** 76:16
**antiquated** 207:3
**anybody** 7:9 50:21
  61:11 115:21
  116:16 117:14
  135:22 146:19
  185:19 202:2
**anybody's** 116:4

anymore 154:17
apart 30:22 83:12
 86:17
apparent 161:5
 208:3
apparently 57:19
 190:4
appeal 243:2
appeals 243:6
appearance
 204:24
appeared 23:20
appearing 24:11
appears 167:8
 216:3
applicable 252:8
applies 59:5
apply 143:4
appreciate 166:14
appreciated 6:10
apprised 79:19
appropriate 94:8
 103:12
appropriately
 118:9 131:18
 132:22
approximately
 5:20,21 28:24
 74:12
april 1:14 5:3
 252:3 257:20
arguing 89:22
argument 231:23
arises 222:11
 238:16
arm 8:11 217:25
 235:19
arms 23:14
arrest 205:13
 207:15 234:22

article 197:12,14
 255:9
articulating
 243:17
aside 243:12
asked 21:14 38:13
 38:14 185:6,12
 193:10 195:19
asking 18:18 22:8
 30:18 58:18 68:4
 68:6,9,24 87:15,16
 88:12 90:25 99:15
 99:17 101:5 102:5
 116:7 117:10
 118:7 119:14
 123:8 188:2 203:9
 212:6 244:16
 245:6
asks 112:9
aspect 9:6
aspects 9:16 41:5
 109:20 151:9
 160:23
assemble 237:14
assert 150:22
assigned 10:3,5
 15:9,13,14,21 16:3
 16:7,10,11,12
 18:20 19:14 28:14
 48:18 53:24 55:23
 57:13 73:23 83:25
 84:14 115:5
 122:20 199:22
 200:9 215:8
assignment 60:10
 75:20
assimilated 36:14
assimilating
 109:10
assimilation 38:17

assist 8:23 24:4
assistance 24:6,9
 41:17
assistant 6:20
assisting 6:22
 235:24
associated 85:4
 163:17 164:11,24
 166:22,23 167:20
 168:21 219:8
 239:22,24 240:4
association 20:5
 23:12
assume 6:23
attached 252:11
attachment
 125:25 127:15
 128:8
attachments
 128:10 184:9
attempt 137:22
attend 201:5
attendance 78:13
 79:25
attended 19:6
attention 171:25
 210:10 241:9
 244:11 250:25
attitude 173:2
 175:4
attorney 2:4 6:19
 171:19 178:16
 179:16 214:20
 216:7 220:17
 241:14 252:13
attorney's 1:9
 2:10 9:12,13
 121:8 214:19,21
 216:6 242:2
 243:25 244:10

attorneys 2:11
 188:23 240:14
attributed 138:21
 141:6
audio 72:22 73:6
audit 41:8,19 96:8
 96:9,11 98:20
 114:6,23 115:11
 115:13 116:23
 118:9 158:12
 185:8
auditing 56:5
 112:25 113:9
 131:16,20
audits 9:17,22,23
 10:4,7,11,19 41:18
 119:5
authority 212:9
 241:2
authorized 3:11
automatic 122:2
 178:4 209:10
 211:5 233:3
 242:21
automatically
 36:21,24 37:18
 64:12 73:18
 102:15 121:23
 122:3 158:12
 159:23 160:7
 161:2 176:17
 178:9 222:4
 234:25 243:3
availability 70:8
 70:11,19,23
available 46:17
 48:5,7 49:21
 60:11 61:22 62:18
 72:3,18 76:25
 81:23 82:5 138:5
 141:4 147:19

151:24 161:15
162:24 164:7
165:23,24 179:9
181:4,9 182:2
185:23 188:9
190:6 224:11
231:22 233:17
237:2,20 238:7,17
250:5 252:6
**avenue** 2:5 4:14
12:14 84:11
**aware** 33:13,15,16
34:2,6 35:19
36:18 38:10,21,22
39:8 49:13 50:2
53:3,15 64:19
66:13 67:21 68:4
68:7 71:3,13
77:24 78:14 82:2
107:25 115:13,20
115:22 116:4,16
140:13,18 141:11
141:14 146:21,24
146:25 147:5,24
148:14 169:2
172:14 184:20
189:15 191:3
223:23 224:2,24
225:2,7 227:17
239:9 250:14
**axon** 78:3,4

**b**

**b** 255:2
**back** 14:18 32:16
32:18 42:24 44:15
45:4,4 52:14
56:19 57:20 60:21
62:10 67:4,9,16
68:20,23,24 69:10
69:11 70:12 71:2
71:4,18 72:3

78:11,13,14,16
114:15 120:7
128:13 132:8
140:23 153:2,4,6
166:10 182:6,12
199:6 203:19
222:19 226:5
239:8 245:23,24
246:3,8 250:4,8,13
**backed** 45:21
47:25 67:6,19
71:16 182:9
**background** 24:22
221:13
**backing** 71:9
**bar** 17:9
**barest** 130:15
134:14
**bargaining** 21:4,6
256:10
**base** 67:12 112:6
**based** 57:16 73:16
97:8 124:8 130:12
130:16 154:9
177:22 184:17,18
184:20 185:23
201:24 229:12
233:22
**basic** 19:3,22
**basis** 11:10,11,12
11:16 12:25 13:2
14:2 20:19 41:14
42:23 67:6 73:19
77:10 80:13
136:22 153:21
165:2 176:20
180:11,13 184:15
210:12 238:10
**bean** 97:23
**becoming** 103:7

**began** 110:11
**beginning** 5:4
87:17 89:18
**behalf** 23:21,22
24:4 28:9
**behavior** 206:7
**believe** 12:8 13:15
37:2 46:4 59:23
70:15 134:8
221:11
**best** 63:8 134:7
215:21
**better** 34:23
130:11 196:24
238:4
**beyond** 21:10
65:19 66:5 69:6
88:4 90:16,18
104:7 183:12
**bias** 205:9 229:5,6
229:9,13,13,15
233:2
**big** 89:7
**bit** 4:23 6:8 18:25
55:12 109:17
203:20 227:20
246:2,2
**blank** 223:12
**blood** 257:16
**blue** 138:5 148:10
**bmitchell** 2:14
252:2
**board** 23:2,10
24:7 200:25
**body** 72:17 73:2
73:12,20,25 74:5
74:19 75:5,10,14
75:23 77:8,19,25
**books** 26:2
**bottom** 227:2

**bracket** 216:20
**brady** 207:12,22
**brand** 226:19
**break** 32:14,24
78:8,12,19 152:24
153:5 226:3
245:20
**breakdown**
154:21
**brian** 2:13,18 6:21
7:2 21:18 86:23
252:1
**brief** 156:7
**bring** 210:9
250:24
**brings** 248:14
**broken** 155:19
**brought** 171:24
**building** 1:22 2:12
12:12 13:20,21,22
217:19,20,22
**bureau** 8:18,25
9:4 10:17 13:7
14:6 15:12,16,18
15:19,21 16:7,12
17:24 18:22 19:15
26:18 28:15 31:11
51:23,25 56:21
57:13 58:24 73:23
94:20 96:11 97:7
97:15 98:9 99:3
122:15,15,17,18
122:21 167:18
170:25 190:3
200:9,16,17
223:10 232:20
235:22,23 241:24
**burke** 240:3
**business** 4:12

**c**

**c** 2:2 4:2 52:5
108:13 254:2
257:2,2
**c928** 13:23
**cabinets** 44:9,10
44:24
**calderelli** 193:11
193:14,23 197:19
199:23 202:14
**call** 4:22 32:8 33:5
95:17 128:12
135:25 138:20
140:4,5 164:16
169:7 175:8 202:9
208:23 218:8
247:23
**called** 4:3 13:15
73:21 200:2,6
202:19 223:24
235:3
**cam** 73:2,12,20,25
74:5,19 75:5,10,14
75:23 77:8,20,25
**camera** 72:17
**cameras** 75:23
**cameron** 52:10
77:15
**capabilities** 35:4
35:25 49:14 75:5
82:16 83:2
**capability** 49:18
76:25 77:25 113:2
221:15 222:7,9,18
225:17
**capable** 34:25
**capacities** 17:17
28:18
**capacity** 8:16 16:5
17:23 23:17,22,25
28:22 34:19,23

35:16 52:15
108:15 200:5
201:3,4
**captain** 15:20 16:6
16:8 55:20 132:3
246:13
**captains** 50:15
55:5,20 60:14
**captured** 151:18
**captures** 152:6
**car** 165:11
**card** 186:22 187:5
207:3
**care** 122:25
**career** 137:16
181:25 230:6
**carried** 36:20
229:21
**carrier** 230:3
**carter** 52:3
**case** 1:6 4:23
50:20 73:9 97:14
121:25,25 127:18
128:12,15,22
129:4 130:21,23
134:8 135:8
136:21 148:18
151:23 164:10
170:8 176:20,20
180:13,13 183:2
185:3 188:13
189:8 191:15
192:9 211:7
212:22 213:19,21
213:23 215:4,6,7
218:15 230:4
239:16,21
**cases** 131:17
132:10 134:6
153:22,23 156:13
184:22,25 213:10

213:15 214:10,13
218:23 219:25
238:20 239:2
**catalog** 186:22
187:5 207:3
**catch** 174:20
**catchall** 103:6
**categorical** 154:21
**categorically**
155:20
**categories** 138:24
139:2,5,11,15
140:21 141:8,20
142:4,10 143:4,7
143:11 146:18
154:9,20 155:6
156:2 165:11
166:12 167:25
168:7,13 172:18
177:16,20,21
178:3,7,11 179:4
183:12,19 203:20
203:21 204:10,11
204:19,23 212:15
231:5
**categorization**
50:4 137:24 154:6
154:8 181:16
204:14 205:2,16
205:19 234:20
**categorizations**
147:19 151:11
**categorize** 137:22
141:4 147:13,16
151:8 186:2
**categorized** 138:7
138:23 140:6
144:10 149:20
150:3 152:14
185:25 205:4,5

**categorizing**
144:25 146:13
**category** 103:7
143:17 145:7,19
148:2 149:13,23
152:4 154:14
155:4,11,19
163:23 185:10
232:17 233:7
234:2
**cause** 175:25
179:21
**cd** 67:10 73:7,8
**ceased** 46:19
**certain** 7:19 51:20
82:8 91:25 112:22
112:23 120:6
148:5 159:19
193:8 206:2
230:16 249:16,17
**certainly** 7:4
**certainty** 152:12
**certification** 3:8
**certify** 152:2
254:4,8 257:9,14
**cetera** 42:11 96:4
156:11 161:23
205:14 234:22
**chain** 17:19,20
51:20 52:17 53:10
55:14 108:7
195:18 199:9
**chance** 26:25
**change** 120:24
140:14 233:4
253:4,7,10,13,16
253:19
**changed** 140:8
203:22 232:21
**changes** 29:13
62:5,8 252:10

changing 64:14
80:20
chapters 109:16
charge 55:21
74:25 85:17
113:19 132:20
136:8,14 146:16
224:5,9 246:7
charts 237:17
check 9:24 31:20
32:7 41:19 114:3
151:20 152:3
165:2,3 169:3
187:5 188:9
193:12 195:7
206:20 207:2
222:12 225:17,24
226:18 234:19
checked 123:6,7
206:23
checking 161:18
225:21
checklist 119:17
136:23,25 137:5,9
137:12
checks 9:18 159:3
233:19
chief 86:6 122:15
140:22 202:13,14
202:15,16,18
216:11,15 240:3
circumstances
50:19 99:12 101:4
101:6,22 105:15
112:20 149:10
150:25 173:12,16
174:2 203:12
citizen 228:25
civil 1:20 56:10
205:11

civilian 9:8 208:18
claim 129:13
150:17 183:20
243:15
clarification 98:25
clarified 86:15
clarify 97:22
189:11 220:21
class 61:18,19
classification 50:2
151:3
classifications
53:4,6
classified 162:16
214:14
classify 53:16
clean 191:15 232:7
clear 50:11 105:3
145:19 194:15
223:20
clearance 123:25
clearly 14:23
87:10 100:24
101:6,20 102:8
103:24 105:15
144:19 148:19
191:12 197:22
clerical 55:8 56:8
56:9 84:2
click 112:12
184:25,25
clicked 114:21
clicking 110:25
clicks 112:22
113:21 115:24
close 147:14
closed 156:13
213:16,20,24
cloud 67:11
cognizant 160:12

cohen 2:10
colleen 108:13
combination
178:13 179:10
come 28:3 118:9
120:14,16 141:8
144:24 145:3,24
146:4,6 150:6
166:10 211:21
242:17
comes 40:14,23
41:2 65:11,17
129:10 134:22
145:3 168:24
169:20 198:22,25
209:7 214:2,3
241:9 244:11
245:10
coming 80:24
208:18 209:2
211:10
command 17:19
51:21 52:17 53:10
55:15 61:10 73:25
96:21 97:12 100:9
108:7 114:6,6
115:7,12 116:16
117:2,11,14 118:9
119:20,24 168:19
170:3 176:5
195:19 231:13
249:6,17,21
commander 234:5
commanding 8:23
14:5 50:13 55:4
55:18 59:15,16
82:12,14 108:18
116:19 132:5,23
136:18 170:4,24
185:21 232:19
238:17

commands 118:14
commence 129:22
134:4,15 157:25
208:19
commenced 130:8
130:12,16 158:20
161:7
commencement
160:8
commences 130:5
commencing
158:7
commissioner
35:13,15,17,18
51:2,7,9,10,11,14
52:2,3,4,8,10,12
52:16,20,22,25
53:2,8,9 75:7,8
77:7,12,15,16 86:5
132:7 157:17
202:2,20,21
203:16 208:15
211:16 216:10,11
221:5 235:21
236:3,15 237:3,21
237:23 238:2,6,10
238:13,14 239:4
240:2 242:15
247:3,13
commissioner's
15:24 58:2 108:8
200:10,15
commissioners
51:3
committing
241:12
common 135:6,6
136:23 205:22
commonalities
135:5 235:13

commonality
206:6 208:2
communicate
243:24
communication
121:7,21,24
244:21 245:5,8
communications
216:23 244:25
company 62:17
107:19,20
compared 109:11
competent 192:3
compilation
234:17 249:15
compilations
235:10 236:10
compiled 236:9
compiling 249:20
complainant
128:12 134:19,19
196:11 213:4
complaint 97:8
129:15,18 131:2,5
133:22 134:11,13
137:23 156:23
157:12 160:18
164:3,20 166:4
168:4 176:8,14
181:15 184:5
185:23 206:11,13
206:19 208:7,19
216:9 228:23
229:2,23 243:16
complaints 9:9
133:24 146:5
150:5,11 152:20
153:22 154:5
161:20 165:11
171:17 172:23,24
172:25,25 173:6

173:10 174:4,17
175:2,4,16,19,21
176:3 177:3
181:14 211:19
231:24 232:2
233:8,25 234:21
234:24
complete 133:9
182:25
completed 117:22
131:3 132:2
153:24 252:17
completely 37:11
completion 219:20
complex 13:14,18
compliment 56:25
comply 89:10
comprehensive
163:12 186:17
188:8
comprehensively
214:6
computer 31:21
32:8 40:23 41:3
42:3,8 67:5 71:10
71:19 113:10,12
114:17,18 115:14
116:24 119:19
127:12 174:19
176:2,24 177:22
182:8,11 186:14
193:4 207:8
224:10 225:9,10
235:11,15 236:12
236:19,21 250:15
computerized
123:16 178:4,8
186:10
computers 40:15
71:10,17,19,25
72:9 236:6

concern 14:9
38:20
concert 135:10
concise 180:18,23
181:6 182:3,16,19
182:24 184:12,16
185:4 187:2
246:19 248:21
249:5,10,14,24
conclude 251:13
concluded 251:16
conditions 158:11
159:9,19,20 160:3
conduct 10:4,7
92:8,10 101:11
103:5,5,7 122:7
143:20 144:10,11
144:13 150:3
160:4 175:9
241:13
conducted 65:9
97:3,7 239:19
conducting 9:7,17
9:21,23
conducts 122:23
confidential 49:5
49:6,6 50:9,10,12
53:5,18 162:17
confirm 111:2
113:2
confirmation
111:22
confirming 114:8
119:21
confusing 168:9
conjunction
241:11
consider 27:24
38:2 106:13 121:3
127:25

considered 100:25
101:12 103:15
127:12 137:7
143:20,23 144:23
217:23
consists 83:22,23
constitute 213:9
contact 250:9
contain 152:17
contained 10:8
195:10
containing 196:16
contains 193:5
content 133:12
contention 146:12
contents 187:14
context 9:22 70:6
continual 11:16
38:10 41:14 82:23
continually 17:18
106:12 159:25
160:24 233:22
continue 90:15
91:17
continued 77:16
continuously 11:5
159:8,18
contracting
243:14
control 9:16
convert 233:7
converted 237:11
convey 171:18
conveyed 132:4
conveying 150:24
conveys 151:4
conviction 242:20
convince 91:6
cooney 108:13
cooperate 134:20

**coordinate** 63:24
64:5 65:8 66:18
66:23
**coordinated** 66:10
**cop** 130:13
**copied** 44:22
**copies** 12:7 122:3
187:19 191:12
193:5 216:18,22
219:10 236:14
247:2 252:14
**cops** 150:17
**copy** 3:14,17 13:4
43:4 60:15 67:9
73:6 94:16 96:14
100:21 112:16,17
188:13,17 189:25
190:7 193:18,20
193:24 194:25
195:6 197:3,18
199:11 217:6,8,9
227:9 247:8 251:6
**corners** 123:12
**correct** 8:12 11:21
40:12 43:18 47:15
52:9 60:23,25
63:23 82:21 116:9
140:18 148:24
155:5 167:11
169:4,21 176:21
177:4,17 183:13
183:21 185:4
186:6 187:6
197:19 200:21
203:25 222:16
227:25 235:10
240:10 246:24
248:9,24 254:9
**corrected** 17:13
**corrections** 251:7

**corrective** 84:22
85:10 95:9 96:14
**correctly** 125:10
174:6 179:7
182:23
**correspond**
177:15
**corresponded**
200:18
**correspondence**
85:14 95:20
100:22 216:24
**corresponding**
125:12
**corresponds** 34:3
**counsel** 3:6,17
13:17 24:12,13,14
24:15 185:8
214:21 252:14
255:14
**counseling** 24:10
94:12 95:16,18
97:5,14 100:14
101:11,18
**counted** 28:18
**counties** 30:23
**county** 1:8,8,9,11
1:17,21,21 2:10,11
4:13 5:2 8:8,10,11
8:13 9:12 13:18
21:15 24:18 28:10
66:3 74:4,10,15
76:23 84:3 87:11
88:20 89:20,24
90:13 92:17
153:13 188:23
189:9,12,20 190:2
190:21 198:16
201:10 211:20
214:20 216:15
218:3 242:18

243:13 244:10
252:4 253:1 257:5
**county's** 63:8
198:5 199:13
**couple** 29:3
145:15 199:3
**course** 5:14 6:25
7:16 16:21 17:11
19:4,23 32:21
72:7,11 105:8
123:8 125:9
180:21 181:25
187:12 192:9
234:13 238:22
248:18 251:8
**court** 1:2 3:13
4:25 7:24 69:18
70:10 149:16
150:16,17
**courtesy** 70:2
**covered** 245:25
**cracks** 38:16
**craft** 26:12
**crawford** 1:18 4:1
4:11 5:1,5 6:1 7:1
7:4 8:1,3 9:1 10:1
11:1 12:1 13:1
14:1,20 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1,7 30:1 31:1
32:1,21 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1

56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1,19 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1

179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
226:24 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:5 253:2,24
254:1,15 255:1,7
256:1 257:1
create 37:6 76:18
  89:5 171:13
  235:14
created 122:22
  137:20 163:21
  193:11 195:9
  217:11 223:9
creates 163:19
  167:7
creating 54:17
credible 213:7
crime 1:10

crimes 19:20
  142:20
criminal 19:22
  122:7 128:15
  196:9 210:2 216:3
  218:24 219:21
  220:2 228:14
  242:16 243:5
criteria 230:18
crossing 10:5,5
cs 252:15
current 18:9 33:14
  52:15 59:19,20,22
  59:25 60:2,3
  77:11 97:25
  141:12,13
currently 16:12
  17:24 20:4 23:5
  29:14 34:4,8
  54:25 59:18 60:22
  107:23 141:12
  220:19
customized 140:18
  140:20
cut 194:15
cv 1:6

**d**

d 3:2 4:2,2 35:13
  119:4 254:2
  255:17
d's 120:8
da 210:6,9 211:15
  241:23
da's 9:12 121:16
  121:18,22 122:5,8
  122:10 123:11
  144:9 149:19
  208:13 210:4,20
  211:5,14 214:19
  216:5 218:25
  240:20,22 241:4,7

241:8,10,17,22
  244:18,21,25
daily 11:10,11,12
  67:6,8 77:19
darryl 1:9
dashboard 161:15
  162:25 163:11
  164:8 165:3 166:2
  166:19 168:14
  169:7,8,21 177:17
  179:25 230:13,14
  231:9,19 233:12
  233:17 234:6,8
dashboards
  162:22 167:9
data 30:17 36:12
  37:13 38:8,12,21
  41:4,22,23 64:25
  129:2 133:8
  222:18 223:20
  225:17,21,24
  233:22 234:17
  235:5,11,14,25
  236:8,10,22,24
  237:4,8,9,13
  249:19,21 250:17
  250:19
database 182:17
date 1:14 4:21
  22:16 76:16 134:3
  197:10 226:16
  253:24
dating 42:24 56:19
day 32:24 35:6,6
  41:14 72:2 78:13
  86:7,7 254:19
  257:20
days 3:16 252:17
deal 76:19 89:7
dealing 142:8

december 51:17
  52:7
decide 82:16
decided 64:19
  66:13 172:2
decides 75:4
decision 14:4,8
  35:9,12 43:20
  46:19 51:6,8,18
  62:19,21 66:6,11
  75:2,3,6 77:6 82:7
  104:21 171:25
decisions 214:25
deemed 213:12,13
defendant 1:16
defendants 1:12
  2:11
defer 39:15,16
  40:12,16,24
deficiency 94:5
deficient 89:6
defined 100:24
  101:20 103:2,24
  105:15 144:19
  146:13 229:9
defines 102:8,25
  104:9
defining 101:6
definitely 151:23
  208:3
degrees 16:22
deleted 141:9
  225:12
delineated 163:25
delivery 111:23
delve 98:16 123:3
  221:25
demands 42:22
dennis 2:10
dennison 1:21
  2:12 217:18,20,22

**department** 1:8
4:14 8:9,11 9:20
10:18 11:14,23,24
11:24 12:3,7
21:16 30:15,16,19
30:24,25 31:3,4,6
31:7 40:17,19
41:7 51:22 52:19
61:3 71:11,20
74:4,10,16 76:2
77:9 84:4 85:25
86:6 87:11,16
88:7,9,13,21 89:20
89:25 90:11,14,21
91:2 92:8,8,17
106:19 107:8
108:14 109:11
110:2,6,7,9,10,20
110:22,25 111:20
115:25 116:5,12
118:11,19 120:13
121:11,15 153:7
153:14 154:4
158:23 160:12
162:7 171:17
184:14 189:21
190:3,22 207:2
211:24 216:11
217:24 218:4
221:9 223:24
224:5 235:21
239:19 240:17,19
241:12 243:13,23
**department's**
107:12,14 114:10
**departmental**
160:21
**departments**
90:10 212:4
249:15

**depending** 50:19
56:22 85:2 99:11
114:6 173:12,15
206:25 237:13
241:24 242:3
**depends** 80:4,14
93:5,9 94:12
96:19 101:3
120:17 128:17
173:25 198:13
**depict** 195:25
**depicted** 184:8
**deployment** 118:5
**deponent** 252:13
**deposed** 23:15
**deposing** 252:13
**deposition** 1:16
3:8,9,14 5:8 6:22
7:24 70:16 87:20
**depositions** 5:19
24:17
**depth** 90:24
**deputy** 16:9 51:3
52:2,3,12,21 132:6
140:22 216:10,15
**describe** 9:2 48:25
149:9 163:8,9
**described** 164:12
196:10
**description** 65:5
65:12 156:8
163:16,20 255:5
**designated** 24:17
30:15 52:17
**designation** 53:18
**designed** 178:8
**desk** 127:3
**destroyed** 199:14
201:10 250:16
**detail** 163:9

**details** 16:16
130:13
**detected** 97:10
**detective** 9:16
15:2,4 17:15
93:18
**detectives** 74:14
74:15 93:11,16
142:16 143:5
202:13,16
**detects** 101:13
**determination**
14:3 156:19
**determine** 95:11
159:10 176:14
232:6 239:23
**determined**
143:12 232:17
**determines** 124:24
232:5
**determining** 57:23
63:7
**developed** 133:20
136:8,21 148:12
183:24 184:2
**development** 12:9
15:15 108:4,7,11
118:13,18
**dictating** 28:20
**different** 22:8
28:17 29:3 48:25
94:23 172:17
179:6 187:14,19
188:4,22 200:23
**differing** 213:3
**difficult** 147:16
151:2
**digital** 43:13,24
**digitally** 45:15
72:15

**digitized** 44:2,20
45:16,22 47:23
48:4,10
**diligent** 129:4
**direct** 17:19 21:11
53:10 69:5 87:2
91:3,19 96:2
105:24 162:4
**directed** 7:22
**directing** 22:2,11
**direction** 91:23
157:17 208:14
239:25
**directions** 214:17
**directive** 80:13,13
111:2,8 113:9,23
114:5,9,19 115:6
116:2 117:6 120:6
**directives** 78:21
79:8 112:3 113:3
113:6 116:21
119:21,23 120:2
121:17 198:19
240:22
**directly** 7:21
72:13
**directors** 11:14
**disagree** 21:25
69:21
**disagreement**
69:22 91:5,11
**discarded** 124:18
**discern** 122:6
**discerned** 158:6,8
212:23
**disciplinary** 24:6
85:4,7 94:7,8,15
94:17,18,22 95:3,7
95:22,25 97:8
100:3,5,8,20,25
101:7 102:16

154:3 156:4,8
181:18,19 219:2
231:17
**discipline** 92:2
104:19 127:8
155:25
**disclose** 220:13
**disclosed** 188:10
190:4 214:11
**disclosure** 186:13
186:15 214:12
**discovered** 186:12
187:13,15
**discovers** 159:5
**discovery** 9:11
42:21 45:14 70:6
70:8,11 187:12,23
191:14,20
**discretion** 80:12
101:23 102:10
125:6,14 127:22
127:25 128:5
232:9
**discretionary**
100:17 105:6
180:15 242:7,8,10
**discuss** 202:10,12
202:24 238:19
**discussed** 78:15
168:8 171:12
177:2 214:6
227:24 246:17
**discussion** 66:13
69:2 242:14
**discussions** 70:9
**dispositions**
181:17
**disproved** 212:24
**dispute** 70:6
**disseminate**
121:17

**disseminated** 12:5
60:19 111:20
114:20
**dissemination**
114:9
**distinction** 71:14
231:8
**distinguish** 105:9
**district** 1:2,2,9
121:7 220:16
240:14 243:24
244:10
**doctorate** 16:21
**document** 94:4,5
125:18 126:8
131:4 193:10,13
193:24 194:17,22
195:9 197:8
226:14 237:13
255:6,11
**documentation**
95:6 117:23
119:24 139:18
219:14 221:7,8
**documented** 85:14
94:14 95:19 97:5
97:15 99:23
101:18,19 118:6
157:4
**documents** 4:19
10:22 25:14
124:23,24 125:10
186:6 188:18
193:7 194:16
219:9,23 223:22
243:17 255:8
256:2,3
**doing** 5:7 9:18
10:6 47:19 64:25
65:19 88:9 102:20
103:9,19 104:14

116:17 129:15
160:13 180:25
246:17
**doj** 140:16
**domestic** 161:21
164:4,19 165:12
177:9 228:13
**domestics** 177:8
**dormer** 35:13,15
35:17
**doubt** 126:18
**dougherty** 246:11
246:12
**download** 73:2
77:19
**downloaded** 72:23
73:8,13
**draft** 126:11,12,14
196:15 197:18,23
197:25 198:11,14
**drafted** 199:5,25
**drafts** 198:18
203:2
**drill** 5:22
**drive** 67:10
**drop** 49:25 50:7
138:4,8 139:2
230:11,15
**drug** 9:19
**dual** 189:16
**due** 178:14 212:22
**duly** 4:3 254:5
257:11
**duplicate** 72:2
**duties** 8:16,21
64:4 105:11 133:3
168:25 172:8,13
180:22
**duty** 172:10
205:23

**duval** 2:18 6:21
**dv** 166:5
**dwi** 73:24

---
**e**
---

**e** 2:2,2 3:2,2 4:2,2
35:13 52:5,6
107:5 108:13
253:3,3,3 254:2
255:2,17 257:2,2
**earlier** 7:3 60:22
62:2 182:7 228:21
239:11
**early** 161:14
162:12,21,24
164:17 165:2,25
167:8,14 169:21
180:10 227:22
230:11
**ease** 109:11
**easier** 46:23 47:6
151:21,23
**easily** 152:18
**eastern** 1:2
**easy** 109:17
**edition** 12:21
**editions** 13:5
**edits** 196:16
**effect** 3:12,15
29:13 56:19 75:25
76:13 110:2
140:11 141:11
172:15 203:17,25
**effective** 97:12
**effects** 194:20
**effectual** 182:12
**effort** 135:3
**efforts** 199:4
**eight** 5:21 43:23
47:22,24 73:23
74:2,3,6,19,23
187:4

either 50:9 53:17
60:19 73:8 87:2
104:15 151:5
158:3,24 214:18
229:12 242:19
243:16 244:20
246:11,23 248:17
249:25 250:2
elapses 230:16
electronic 45:4
67:25 70:8,11
73:5 111:23
114:13 115:24
126:19 247:2
electronically 12:6
60:19 70:24
246:23
eliminating 54:18
email 2:7,14 60:20
63:18,19,20 65:19
66:5 78:24 79:3
79:15 80:10 81:5
112:5 161:12
employed 8:7
employee 83:11
84:6 93:10 96:24
102:14,17 103:22
111:21 112:17
119:25 120:5
133:17,19 157:18
158:25 159:4,18
228:18
employees 37:10
81:15 84:16 85:16
92:9,10 104:24
111:16 112:2
113:22 115:5
117:24 133:14
135:9,11 138:12
150:7 157:24
159:9,19 160:13

160:22 161:9,20
162:6 169:11
216:12 222:16
employment 20:12
encounter 141:22
encountered
207:14
ends 167:14
enforcement
14:20 50:25
english 149:8
ensure 10:4,8
66:25 111:7,15,25
112:22 113:4
114:4 115:4
116:20 117:3
118:8,14 131:17
185:9,24 187:5
188:9 233:9
entail 161:13
entails 63:3
196:21
enter 236:24
entered 138:8
181:13 204:15
205:11 222:18
232:14
enters 222:23
entire 67:5 69:17
89:24 90:12,13
entity 215:22
entries 129:5
133:8 223:7
entry 138:6
148:10 164:16
enumerated 27:21
environment
216:14
equipment 41:3
250:16

equipped 120:15
erased 38:8
errata 252:11,13
252:17
erroneously
222:23
errors 251:7
especially 25:5
186:18 209:22
esq 2:4,6,10,13
252:1
essentially 72:2
73:24 101:12
140:13 181:8
208:21 222:24
229:18 240:3
established 167:21
174:10 212:19
231:12 232:13
establishes 170:25
estimate 137:15
estimation 201:7
250:2
et 2:11 5:3 42:11
96:4 156:11
161:23 205:14
234:22 252:4
253:1
evaluated 173:11
evaluation 172:4
event 184:11
eventually 198:7
everybody 49:7
53:24 54:6 79:16
79:18 80:9,10
118:10 124:3
131:13
everyone's 54:2
142:15
evidence 143:17
143:19 144:12

145:3,18 146:6
148:20 154:12
212:19
ex 255:6,8,11
exact 204:4
exactly 137:14
177:16
examination 4:7
90:15 251:15
255:18 257:10,12
examined 4:5
examiner 1:10
examiner's 211:21
example 49:24
84:20 96:23 97:6
128:9 130:13
143:15 148:18
149:17 205:3,8
233:25
excel 237:9,12,17
excessive 205:4,13
234:21 248:12
exculpatory 207:6
executive 8:17,20
8:22 50:14 55:5
55:19 171:15
185:22 216:16
246:14
exercise 101:23
exhaustive 152:3
exhibit 4:20 26:24
27:11 70:17 86:23
197:6,9 199:12
226:11,15,21
255:4,4
exhibits 255:3,14
exist 45:5,8 175:25
189:7
existed 139:11
186:19

**existence** 122:18
122:19
**exonerated** 212:17
213:11 214:10,13
**expand** 151:13
**expect** 19:8 105:14
127:19 174:21
195:8,13 196:12
**expected** 75:24
76:20 243:9
**experience** 18:11
28:14 141:25
249:18
**experienced** 61:9
**expertise** 40:24
41:3
**experts** 39:15,17
40:13 41:2 66:22
**explain** 21:7 55:14
93:24 156:20
212:14 256:11
**explained** 115:2
115:18
**explore** 69:18
**explored** 67:22
**extensive** 196:20
**extent** 102:10
180:6
**external** 67:10
182:9 247:15
**extra** 106:21
**extracted** 250:3
**extracting** 246:9
250:8,13
**extrapolate** 57:8
**eye** 115:8,8

**f**

**f** 3:2 4:2 257:2
**fabricated** 145:2
149:5 152:18

**fabricating** 143:17
143:19
**fabrication** 154:12
**fabrications** 146:6
**facebook** 159:4
**fact** 40:5 70:15,24
118:10 169:2
173:25 213:8,12
227:3
**factor** 176:11
**facts** 129:25
130:19 134:9
156:2 183:8,10
213:11
**factually** 214:10
**fail** 186:21
**failed** 120:5 150:2
**fails** 252:19
**failure** 105:11
**fair** 19:11 21:23
39:22 45:2,20
80:11 154:16
158:12 177:25
182:20 184:24
195:12,17 196:6
202:10
**faith** 103:11
**fall** 76:14,15 108:7
142:9 144:13
145:15 231:3,4
233:12
**fallen** 38:16
**false** 150:15 151:3
151:5 205:13
207:15 209:9
211:8 234:22
**falsification**
148:19
**falsified** 149:5
**falsifying** 144:12
145:18

**familiar** 5:23
24:21 26:8 35:8
41:6 49:21 67:18
68:16 82:15 83:15
89:19 180:19
197:14 220:11
221:14,19 224:13
224:17,19
**family** 228:14
**far** 9:17 10:15,17
12:7 22:5 31:16
34:15 35:4,6
37:10,23 41:5,17
43:24 46:19 47:12
49:10,20 50:4,7
51:24 52:14 54:9
54:10,13,17 56:6
61:17 66:11 71:18
71:20 75:19,20
76:10 80:23 82:19
82:24 86:6 88:11
93:17 99:23
107:24 113:9
114:16 122:2
128:16 130:18
133:22 136:7,12
138:24 152:20
155:20 156:4
159:22 172:23
174:7 176:6,18
180:11 181:14
190:13 191:18,24
192:2 213:23
214:5 215:18
221:16 225:4
230:12,13,14
232:23 233:16
242:8,12 246:10
248:21
**fashion** 10:2,10
120:10

**fbi** 221:6
**feature** 82:4 141:3
**features** 82:8,19
82:25
**federal** 1:19
**feed** 167:13
**feel** 30:5 42:13,18
142:2 178:19
179:4 215:20
234:18
**fellas** 26:24
**felt** 76:24
**field** 56:4
**fields** 178:21
**fifth** 128:13
**figure** 20:15 126:3
145:7 188:21
191:11 193:17
**file** 43:11,23 44:9
44:9,24 47:6,7
50:5,22 73:10
81:8,11 83:12,13
83:16 84:4,23
85:3,5,16 94:11,18
94:24 96:4,15
97:16 98:8,12,18
99:24 123:2,4,12
124:12,25 125:3,8
125:11,12,19,25
126:19,23,23
127:2,13,16,20,23
128:2,17 133:6,11
133:16 137:20
139:23 140:4
156:17,17,25
186:10,14,14
187:13 188:16,18
190:3 193:4,12,18
193:21 194:6,23
195:5,8,11,22
196:12,14 202:6,7

213:15 215:10
222:3,23 223:16
247:11
**filed** 85:3,15 86:4
92:2 94:19 95:8
95:21 96:20,21
**files** 26:6 31:9
39:20 41:20,25
42:5,10,23,25
43:14,25 44:3,7,8
44:19,22,23,24
45:3,5,7,10,12,13
45:17,21,24 46:4,5
46:9,11,15,18,23
47:10,23 48:3,4,6
48:22 49:4,4,14,15
50:11 53:6 54:17
54:18 67:24 68:17
68:18 69:19 70:7
70:21 71:21 72:6
72:10,12,15 73:6
83:5,6,19 84:13,18
85:19,23 86:3
87:11,16 89:14
90:7 92:3,5 94:22
94:23 95:3,10
96:8,9,11 97:20,23
98:4,22 99:2,6,20
122:12 123:17,19
124:2,4,13,17,19
132:21 136:7
145:18 147:25
151:20 152:17,20
162:19 182:13
186:4,5,7,12,19
187:10,19 188:9
188:10,18,21,22
189:7,19,24
214:22 215:2
219:6 220:5,14
221:25 222:15

223:22,25
**filing** 3:7 44:16
186:22
**final** 126:16
196:19 197:25
198:7,13 199:7
**find** 13:4 32:8 33:5
64:7 65:18 67:23
120:4 139:15
145:17 147:25
152:16
**finding** 63:3
**findings** 212:15
**fine** 20:20 22:13
32:10 69:22
**fire** 44:17 250:16
**first** 4:3 18:20
25:3 52:21 88:24
109:23 141:10
144:23 191:22
224:19 226:10,23
254:5
**fit** 126:12 127:22
136:22 149:24
178:2,6,10 183:18
215:14 249:13
**five** 12:23 32:14
60:7 78:8 87:8
166:15,17 168:7
168:13 171:17
173:5,9 174:4,22
175:10 177:16,20
177:21 178:3,7,10
179:4 205:25
207:20 226:3
233:7 245:20
**flag** 206:4 209:13
229:14,19
**flagged** 244:3,12
**flagging** 37:17
38:23

**flags** 36:19 38:12
207:21 231:5
**floor** 2:5
**fluctuate** 56:22
57:16 231:21
233:22
**fluctuates** 57:12
**foil** 214:13
**folder** 94:15,17
96:22 126:13
236:14
**folks** 51:20 55:2
55:16 114:20,20
115:25 116:3
117:3,15 135:9
142:7,8 169:2
189:9,12 245:13
249:25 250:25
**follow** 22:15 58:6
58:22 79:12,21
80:9,12,19 81:4
91:14 111:6,9,15
116:25 117:17,19
142:19 174:13
209:7,11 213:14
**follows** 4:6
**footage** 73:3,12
74:20 75:5,10
77:20,25
**footages** 72:17
**forbid** 182:7
**force** 3:15 161:23
164:3 166:12
168:16 177:14
181:22,23 205:4,6
205:14 229:3
234:21 248:12
**foregoing** 254:8
**forever** 124:20
**forgive** 28:19 57:5
166:8 185:7,15,15

189:10
**forgot** 78:19
**form** 3:21 10:14
20:10 21:2,10
23:24 26:16 27:2
28:6,12 29:17
30:10 34:14 35:3
36:23 37:21 38:5
38:19 39:5,12,24
40:22 41:12 42:16
42:20 43:10,12,13
43:18 45:3 48:5,7
58:7 59:19,21,22
60:2,4 61:16
63:10 64:16 67:19
68:3 74:22 75:12
76:9 77:5 81:19
84:25 85:21 92:12
93:15 94:2 95:14
114:21 119:18
124:6 146:3
148:25 150:7,19
151:16 170:13
172:21 175:15
178:23 188:25
190:15 191:22
192:15 198:10
199:16,17 200:7
201:13,22 203:8
203:14 204:3
206:9,17 207:10
207:25 209:18
212:6 214:16
215:17 218:18
220:7 221:2
232:11 233:15
235:17 241:19
248:2 250:11
**formal** 5:11 9:14
61:17 80:7 211:14
217:2 218:7

**formalized** 61:13
79:24 80:18
**formally** 4:23
**format** 43:24
45:18,25 62:5
70:13 78:23
248:18
**formed** 20:22
**former** 36:8
109:13
**forms** 44:25
**formulate** 133:25
**forth** 27:21 257:11
**forward** 208:18
214:3
**forwarded** 95:10
100:22
**found** 106:5 137:9
141:19
**four** 12:22 56:7
60:7 83:24 123:12
130:14 165:10
207:20 212:15
**frankly** 88:2
**frederick** 246:14
**frequency** 207:19
**frequently** 207:17
**friday** 55:24
**fulfillment** 76:20
**full** 7:25 54:6
56:25 69:24 133:9
227:9
**fully** 6:14 32:4
69:15 82:15
131:18 132:21
**function** 20:23
21:4 166:25 228:4
**functions** 34:24
36:19 37:16
101:15

**further** 3:20 93:18
95:12 116:17
117:11 136:21
155:25 180:4
183:23,25 184:2
199:4 213:25
234:24 239:12
250:22 254:8
257:14

**g**

**general** 11:23,25
12:4 30:23 65:7
65:10 78:20 89:17
89:22 94:24
110:20,22 111:8
111:13,20 113:9
113:23 114:19
116:2 117:5,16
118:11,19 120:14
120:20 121:9
124:14 140:25
153:18 159:20
174:12 179:16
**general's** 171:19
178:16 214:20
216:7
**generalization**
141:2
**generalized** 29:9
160:11
**generally** 55:14
61:9 63:19 65:13
73:4 78:25 79:6
79:15 85:13
101:11 131:3
143:20 151:4,19
163:11 184:4,16
199:7 209:24
211:3,6 224:10
235:5 236:8 239:3
243:11 245:11

247:16 249:18
**generate** 235:4,6
239:13 246:18
**generated** 119:19
167:3 168:19
170:21 176:17,22
179:12 181:24
216:19 219:11
225:11 229:8,22
231:11 235:2
238:11 240:8
244:17 248:23,25
**generating** 249:10
**gentlemen** 13:24
**getting** 157:20
161:25 195:15
249:19
**give** 14:22 163:15
163:16 239:2
**given** 25:5 36:17
97:6 168:6,13
169:10,24 179:24
203:11 225:22
240:22 254:10
257:13
**gives** 169:16
228:17
**giving** 40:8 67:12
**glad** 71:13
**glaring** 199:24
**glitch** 41:15
**go** 13:3 21:16 30:6
30:7 32:12 54:10
68:13 70:3 75:24
84:23 85:12 87:14
88:12 89:8 91:16
98:10 105:23
122:14 125:15,16
125:17 126:18,19
127:2 130:2,8,20
143:18 149:17

151:22 153:11,12
155:17 170:4,9
197:24 203:19
209:16 231:24
236:4,5,6 238:2,18
239:8 245:15
251:3
**god** 182:7
**goes** 14:14 46:3
70:12 83:15 96:15
113:10 114:17
125:7 130:18,21
133:12,15 153:14
153:18 155:21,25
167:19 191:18
229:14 231:13
**going** 14:18 19:17
21:11 29:12,13
31:24 32:4 40:21
60:21 64:14,25
65:18 66:25 68:8
68:9 71:2 75:22
77:22 78:2,4
80:21 82:17,17
86:11 88:25 89:3
90:19 91:3,16,19
96:17 104:7
105:24 125:2,5,19
126:20 128:8
130:4,8,22 132:8
135:25 152:11
153:6 154:20
162:18 163:12
169:18 186:25
187:4,21 197:2,11
206:8 209:22,23
210:3 213:25
217:12,14 224:22
226:9,10 230:18
231:14,15,21
233:14,21 235:23

244:5,14 245:15
245:22
**good** 6:17 7:14
16:14 26:21 30:13
55:10 103:11
245:19 246:15
250:20
**gotten** 90:24
**government** 218:2
**grand** 209:8,23
210:14,20
**great** 47:13
**green** 232:4
**group** 249:14,25
**guards** 10:5
**guess** 20:15
102:23 114:12
118:3,7 126:2
149:25 162:16
164:15 210:22
217:6
**guide** 25:25 61:21
**guidebook** 10:16
10:20 12:16 13:4
58:24 59:7,24,25
60:9,16 61:20,21
78:22 137:10
242:7
**guy** 174:19 207:22
**guys** 25:8 30:14
33:6,17 63:17
73:2 80:25 106:22
153:7 160:17
167:6 202:23
210:23 211:7
226:17 227:4
235:4 236:4
237:22 238:19
245:22

**h**

**h** 1:21 2:12 253:3
255:2
**hairs** 27:8
**hall** 1:11
**hallway** 124:11
**hand** 226:9 257:20
**handbook** 227:7,9
227:11,15
**handwriting**
191:13 197:21
**handwritten**
125:15,16,23,24
188:19 190:8,24
191:4,16,19 193:5
193:16,20 194:23
195:20,25 196:5
198:6 199:11
203:5
**happen** 44:17
71:24 98:19 99:16
188:8 199:20
207:17 210:11
223:7 245:8
**happened** 72:8
182:8 199:21
201:15 204:9,13
234:7
**happens** 247:7,8
**harassed** 130:13
**harassment**
216:13
**hard** 67:9 102:23
112:17 186:7,14
**harris** 52:2
**harrison** 51:10,12
77:16
**hart** 52:20,25
221:5
**hauppauge** 1:23
2:13 13:10,14,19

**hazy** 16:17
**he'll** 90:7
**head** 55:8 56:9
108:10 194:10
**headquarters**
12:11 84:9
**hear** 6:12,14
**heard** 7:3 82:4
**hearing** 5:11 24:2
24:5
**heck** 130:22
**held** 1:20 22:24
170:11 200:19
**helen** 1:11
**help** 212:2 224:11
234:22
**hereinbefore**
254:11 257:11
**hereunto** 257:19
**hey** 80:24 207:21
**higher** 115:12
**highest** 75:7
242:14
**highway** 1:22 2:12
13:18 15:11 16:7
73:22
**hire** 84:5
**hired** 187:3
**histories** 249:14
249:16,24
**history** 17:12
45:12 169:11
176:9,13 180:4,18
180:23 181:6
182:3,17,19,24
184:12,16 185:4
187:2 206:20
207:5 230:2,20,22
231:17 232:8
246:19 248:22
249:5,11

**hold** 18:10 23:5
88:2 223:25 224:3
**holding** 18:2
**home** 226:8
**homicides** 19:20
**hope** 76:4
**hopefully** 75:15
**hoping** 56:25
**hostile** 216:13
**hourly** 42:22
**hours** 88:10
**house** 109:21
**housekeeping**
121:3
**human** 173:17
174:15 175:24
209:15
**hundred** 227:8
**hyphen** 52:5
**hypothetical**
159:3

**i**

**ia** 22:7 30:14,24
31:2,5 39:19
40:16 50:25 52:19
67:24 83:13 90:4
90:5,18 97:19,25
105:14 110:6
122:11 123:12,23
124:3,10,13
134:25 136:7
137:20 157:7
162:7,15 167:17
181:12 186:7,7
187:13 188:17
189:25 190:17
192:12 193:4
194:23 195:22
198:21 215:2
**ia's** 125:11

**iab** 43:11 44:5
95:8,21 98:15
99:13,18 100:3,7
100:15,21,23
102:9,12,22 103:2
104:22 105:4
122:20 125:8
126:23 127:19
128:17 131:25
139:22 159:6
162:18 187:10
194:4 195:11
196:3 206:18
209:3 211:17
216:22 217:12
**iapro** 31:13 33:6
33:21 34:12,24
43:5,13 45:17
48:13,15,16 49:13
50:12,23 51:19
52:9,11,18 53:17
53:23 54:18 60:21
61:4,8 63:22,25
64:6,11 65:19
67:17 68:17 71:12
71:15 72:13,18,23
72:24 73:9,13
77:20,23,24 81:23
82:3,9,16,20 89:15
124:22 125:8,12
125:17,19,20
126:5,24 128:20
129:13 131:8,18
133:7,11 138:5
140:24 141:4
161:16 162:12
163:22 164:23
166:22,24 167:4,5
167:19 168:17,22
169:12 170:22,23
174:11 176:17

180:19 181:9
186:5,16 187:2
203:19 204:15,25
206:22,24 221:14
222:14 223:25
224:5 226:11,25
227:6 234:12
235:2,15 236:2
237:5 244:18
245:11 246:21
247:23 248:14
255:11
**idea** 14:9,22 62:12
**ideally** 56:24
183:3,4,14 231:20
**identification** 4:20
197:9 226:15
**identified** 133:18
134:23
**imagine** 20:13,16
150:12
**immediate** 114:3
115:3,10
**immediately** 77:12
229:15
**impact** 86:2
**implementation**
186:19
**implications**
128:16
**importance**
106:14
**important** 6:14
32:2 38:3,6 76:24
105:9 155:24
202:9 203:3,5
234:18
**imported** 37:10
**imposed** 49:4 50:8
**improper** 143:24
143:25 144:6

149:24 207:15
**imputability** 54:2
**inappropriate**
159:5
**incident** 154:17
155:2 156:24
164:3,4,19,19
166:5 168:12,20
168:23 177:9
178:6 215:3,8
229:8 233:5
**incidents** 135:6
154:12 161:21
163:3,5,9,14,17
164:2,12 165:19
170:2 177:14
178:13 179:10
181:21 228:13
232:2 240:4
**include** 9:11 67:25
70:18,24 122:25
125:22 127:23
130:21 148:21
181:10 241:6
**included** 128:8
154:20 191:20
**includes** 42:10
**including** 142:15
246:21
**incoming** 185:22
**incompetence**
104:15,20
**incorporate** 63:12
63:13 66:14,24
205:13 219:13
**incorporated**
126:22,24 140:24
204:10
**incorporates**
141:20

**incumbent** 169:13
210:9
**indefinitely**
124:15
**indicate** 153:24
163:2 181:15,18
181:24
**indicated** 7:18
98:11 121:2 130:9
130:19 155:10
202:4 242:3
**indicates** 90:17
**indicating** 119:22
122:7 158:21
**indication** 231:9
234:8
**indications** 161:19
**indicative** 197:22
**individual** 73:19
110:24 111:9
114:22 186:5
248:23,25 249:9
249:20
**individuals** 250:3
**informal** 81:3
**information** 30:16
36:8,16 37:9
38:15 40:9 41:8
43:5 44:18 48:22
50:18,20 53:17,23
54:7 57:8 67:17
67:23 70:13,25
71:15 99:13,19
111:19 120:18
122:6 123:10
129:22 130:9,10
130:15 133:20
134:5,12,15,18
138:18 148:4,4,11
150:25 151:18
153:17 156:15,22

158:5,21 160:3,25
162:23 163:13,15
164:7,10,23
165:22 167:7,14
167:15,16 169:18
181:3,8,11 182:2,5
182:18 183:12,17
183:24,25 184:7
185:24 187:6
190:8 194:24
209:2,5 210:23
211:10 212:23
213:7 214:2
219:17 222:20,21
222:24 223:5
225:3,8,10 226:25
231:21 233:16
235:12 236:3
238:16,24 240:7
241:6,8,20 242:3
246:9,19,20
247:17 250:5,8
256:2,3
**infraction** 95:5
**initial** 134:22
**initiative** 76:7,18
77:19 151:12
**input** 36:9 41:22
53:22 54:7,10
129:17 167:17
**inputs** 182:19
**inputted** 167:16
168:20 181:11
184:5
**inquire** 250:7
**inquiries** 180:12
**inquiry** 64:24
87:12 91:14
180:10,25
**insert** 197:17

**inspector** 8:5 16:9
193:11,13,23
199:23 246:12,13
**inspectors** 189:22
**instance** 143:16
164:2 199:2
**instances** 102:8
165:10 213:10
**instituted** 235:22
**instruct** 129:3
**instruction** 18:4
61:11,24 103:14
104:17 255:12
**instructions** 127:7
**intake** 129:11,15
131:2 132:9
133:23 176:8,14
185:11,20 206:18
208:4,6
**integrated** 35:24
**integrity** 76:25
106:18 122:14
241:24
**intended** 118:22
**intentionally**
103:18
**interaction** 240:20
**interest** 63:8
**interested** 202:22
257:17
**internal** 8:18,24
9:3,18 10:16 13:7
14:5 15:15,17
16:11 17:24 18:21
19:4,13,15 21:19
24:11 26:17 28:14
28:22 31:11 51:21
51:23,25 55:15
56:21 57:13 58:23
61:2 70:20 85:14
86:14,17,18 88:8

89:14 92:5 94:19
94:23 95:11,19
96:7,10 97:7,15,19
98:2,9 99:3
115:23 116:8
123:15 132:16
151:6 153:6 157:6
157:11,13,15,16
157:22 158:11,24
159:21,24 160:8
161:2 170:25
189:21 190:3
191:13 200:12
209:12 210:13
212:3 216:20
223:10 232:19
238:9 245:12
**internalized**
121:22
**internally** 158:6,9
236:2
**internet** 12:6
107:13,15,17
110:24 111:23
112:6 161:12
188:20
**interphase** 225:9
**interrupt** 189:23
**intervention**
161:14 162:13,22
162:24 164:17
165:2,25 167:8,15
169:21 172:3
180:10 227:22
230:11
**interventions**
170:11
**interviews** 24:11
**introduction** 6:20
**invariably** 243:13

**inventory** 112:21
**investigate** 66:4
240:22 241:3
**investigated** 100:9
137:12 147:16
154:18 155:6
156:25 176:11
215:21 220:2
239:24
**investigating**
19:19 89:13 134:9
142:20 219:12,18
220:13 238:21
239:13
**investigation** 18:4
18:5,14,19 19:12
19:23 22:7 64:13
73:5 77:2 85:8
95:4,23 97:11
98:15 99:14 100:7
127:9 128:6
129:22 130:5,7
133:21 134:4,16
135:4,18 136:2
148:12 153:25
157:7,14,25 158:7
158:20 159:10,21
159:24 160:9,16
161:3,7 183:20,23
184:7 189:14,16
190:19 191:5
193:9 195:10,24
196:9,13 208:7,10
208:12,19,22,24
211:17 212:22
213:3,25 215:9,11
215:15 216:16
217:3 218:14
219:2,21 220:5,9
220:16,22 239:10
239:20 240:7,13

241:5 242:22
243:3,8,19 249:6
**investigations** 9:8
18:17 19:4 122:4
122:24 128:21
129:6 130:11,16
131:25 142:14
158:16 186:23
211:8 216:21,25
218:20,21,24
240:21 242:19
**investigative** 9:6
17:23 19:11 42:10
55:21 56:3 73:17
122:4 125:19
136:13,25 137:5,7
157:2 184:8
190:18 199:4
217:10 219:8
222:11
**investigator** 6:21
15:7 18:21 56:20
57:5,12 122:20
127:15 128:20
129:9 132:2 137:8
142:5 222:3
**investigators**
54:19,20 55:22,25
56:3,11,14,16,24
57:15,23 58:25
59:4 60:13 93:21
124:10 129:3
136:22
**investigatory**
17:15,20 18:11
134:24 141:21
142:10
**invoiced** 10:9
**involve** 75:22
**involved** 22:6
50:20 67:20 85:15

96:24 97:3 100:10
100:12 133:18
134:3 135:20,24
136:5 138:19
141:6 161:22
163:13,17 164:4,5
168:22 169:25
177:8,10,12
181:20 185:2
186:23 190:9,11
193:9 201:8
202:11 213:5,22
214:5
**involvement**
218:15 239:21
240:13
**involves** 9:14
216:12
**involving** 161:19
163:3 181:21
216:4 241:4 242:9
**ipad** 151:21
**issuance** 110:19
**issue** 28:3 38:7
80:25 84:22 93:10
96:20 100:3,9,20
101:13,24 102:18
103:15 104:15,18
104:19,25 105:3,7
144:24 145:23
146:4 166:4,16
205:22 209:25
211:4 222:2 244:4
**issued** 10:24,25
11:15,18 26:23
118:19 167:24
**issues** 19:13 21:21
21:22,23 24:6
27:18,25 67:22
99:7 100:6,25
101:2,7 122:24

142:6 165:4,7
199:3,24 247:22
**items** 10:9 49:25

**j**

**james** 1:11 52:22
**january** 51:16
110:2,11,14,16,17
221:12
**job** 58:19,20 63:23
64:7,11 101:14
102:14 103:9,18
103:19 104:14,22
104:25 114:17,22
116:4 142:15
159:8,18 161:12
**jobs** 10:6 102:21
**john** 1:10,11
**jot** 127:10
**jots** 127:17
**judge** 3:13 7:17
70:4 89:8
**juris** 16:21
**jurisdiction**
241:16
**jury** 209:8,23
210:15,20
**justice** 153:15
**justification**
124:12
**justified** 212:21
**justify** 134:8

**k**

**keep** 98:2 119:4,11
126:25 128:20
236:13 243:5
247:7,10,11
**keeping** 57:6
194:19 224:15
**kept** 43:11 44:4
81:7 89:15 124:20

191:19 193:23
194:2 195:2,4
196:17 201:11,19
201:20 214:14
222:19
**kevin** 122:16
**key** 148:5,15,23
149:4 184:20,21
184:22
**keyboard** 152:21
**kind** 23:10 24:9
25:14 42:5 43:3
61:14 62:15 85:10
85:11 94:3,24
95:4,5 97:2,9
100:13 111:7
119:10 120:23
126:8 127:4 135:5
153:8 158:4 161:5
173:19 186:13
196:16 197:23
199:6 206:3
208:21 209:10,10
209:12 217:4
218:9 241:12
242:6 243:25
244:2
**kinds** 7:19 162:11
173:18
**know** 5:22,25 6:3
6:13 11:6 13:11
13:20 20:14,21
31:14,18,19 32:3,5
35:5,9 37:3 38:9
39:13 40:15 41:18
41:21 46:20 47:20
49:23 53:12,21
60:21 62:9,22
65:6 68:20 69:4,8
75:20 76:7 79:21
79:22 86:19 87:14

91:5 102:6 103:21
104:6 115:9
122:21 128:11
130:14 134:2
138:8 139:10
140:7 141:7
145:14 150:20,24
151:7,20 158:25
159:6 161:21
162:5 168:23
176:6 186:24
188:25 189:3,4
190:10,11,12
192:5,18,20,24
193:3,8,19,22,23
193:25 195:13
199:21 201:15,25
202:3,5 204:4
205:12 209:13
210:18 216:12
222:6,9,10,14,20
224:16 227:11,12
232:6,25 236:23
241:13 248:11
**knowing** 91:24
195:14
**knowledge** 20:19
21:14 28:13 29:9
70:18 87:22,25
88:5,17,20 120:6
**knowledgeable**
34:11
**known** 156:15
**knows** 192:4 226:7
**kyle** 2:19

**l**

**l** 3:2,2 4:2 52:6
107:5,5 254:2
**label** 49:14
**labeled** 49:5

**labor** 217:7,16,17
217:21 218:21
**laboratory** 1:10
211:20
**language** 149:8
173:2 175:4
**lapses** 38:22
**laptops** 236:6
**large** 47:9
**launched** 240:7
**laura** 1:9
**law** 2:4 14:20 17:4
50:24 171:15
**lawsuits** 214:12
**lead** 108:14
**learn** 170:15,16
**learned** 239:15
**leave** 40:20
**lee** 1:21 2:12
**left** 57:18 223:12
**legacied** 139:24
**legacy** 36:9,13,17
43:24 44:3 204:9
**legal** 15:21 16:22
24:13,15,22 200:9
200:14,16,17
201:4 214:21
252:23
**legislative** 153:20
172:14
**legislature** 153:13
**length** 153:25
**level** 56:18 57:14
75:7 92:4 100:10
115:12 116:16
117:2,12,15 118:9
168:19 176:5
242:14
**levels** 49:2 56:21
**levy** 1:9

**lewis** 52:4,6,13
**lexipol** 107:5,16
108:3 109:3,5,18
109:22 110:12
118:20
**lie** 150:17,23
**lieutenant** 15:17
108:12,15 170:5
**lieutenants** 56:5
**light** 135:5 214:3
232:4
**limit** 50:13 149:4
157:10 228:24
229:2,2,4 231:4
**limitation** 209:22
**limitations** 49:3
50:8 178:14 233:6
**limited** 7:19 42:9
73:21 148:9
150:21 155:12
163:23 165:9
172:23 174:9
175:10 178:20
179:5 187:9
228:20 249:11
**limiting** 49:7
50:18 158:23
**limits** 228:19,20
228:21
**line** 31:10 188:23
253:4,7,10,13,16
253:19 256:9
**linked** 72:18
133:14 135:25
138:9,20,23
152:21 227:21
**linking** 136:4
138:12
**list** 43:4 101:6
102:8 137:6 140:5
140:8,12,17 142:3

**lewis** ... 204:20 234:23,25
235:3,3 244:2
248:15,17
**lists** 105:19
**litigation** 243:9
**little** 14:21 16:17
18:25 54:8 55:12
179:6 203:20
227:20
**locate** 47:7
**located** 12:10 13:8
84:8
**location** 134:3
**log** 221:14
**long** 14:19 22:21
33:16 56:13,15
57:9 59:17,24
76:6,17 92:22
118:3 122:17
124:13 139:4
147:15 178:18
206:25 229:19,20
229:24
**longer** 230:17
**look** 26:25 29:18
33:19,23 97:20,23
114:18 120:7
145:20,20 182:24
197:12 226:23,24
229:4
**looking** 113:19
141:15 142:3
176:6 180:5
201:17 205:18
**looks** 142:5
**loss** 38:21 156:10
**lost** 38:11,16 41:20
41:23 44:18 55:23
182:11
**lot** 16:19 182:2
190:8

**loud** 6:11
**lying** 150:7 233:25
   234:2

---

**m**

**m** 2:10 35:13 52:5
**m.d.** 1:11
**machine** 47:3
**machines** 46:18
**madam** 22:13
   91:20
**madigan** 202:18
**maintain** 26:7
   30:17 31:9,25
   41:4 43:3 59:11
   71:12,21 72:14
   73:24 78:4 84:4
   99:4 119:15 219:6
   235:14
**maintained** 12:8
   13:6 37:13 39:20
   43:13,14,23,25
   44:9,25 45:3,16,18
   45:25 67:9,16
   68:17 69:19 71:4
   80:3 81:12,15
   83:6 98:17 107:11
   108:23 109:19
   112:16 113:16
   121:15 123:17,19
   124:14 139:18,21
   141:18 164:23
   194:4 195:11,21
   195:23,25 196:3
   196:14 216:19
   217:7,12,14
   236:11 246:5
**maintaining** 10:9
   83:19 246:7
**maintains** 81:24
   113:12

**maintenance**
   70:20,23 86:2
   90:7
**major** 155:24
**maker** 171:25
**making** 89:3 103:8
   126:10 132:20
   146:16 208:18
**management**
   235:23
**managing** 62:25
**mandatory** 106:2
**mango** 140:23
**manifestly** 105:3
**manner** 92:13
**manual** 10:17,21
   11:2,8,13,20,21
   12:2,17 14:14
   34:3,7 58:7,12,16
   58:21 59:18,24
   101:9 103:3 106:6
   107:9,10 108:23
   110:15 121:10
   173:8 226:11
   227:5 247:23
   255:12
**manuals** 33:20
**march** 227:7,13
**mark** 4:16 22:14
   91:13,21 196:15
   197:2,5 226:10
**marked** 4:19
   26:24 197:8
   226:14 256:8
**marriage** 257:16
**mastered** 26:12
**match** 113:21
**matched** 112:23
   116:2
**material** 11:19
   129:25 130:10,19

138:18 155:25
   183:7,10,19 196:8
   207:7,13
**materials** 182:25
   196:13
**matter** 4:25 25:21
   80:15,18 81:4
   95:15,15 101:15
   101:16 103:8,13
   120:19,21 123:7
   124:7 125:6,9
   127:21,24 130:8
   131:10 133:18
   135:17 136:3
   151:25 160:10,11
   189:15,17 194:3
   211:17 215:18,19
   216:2 217:11
   219:24 228:15
   240:9 243:5
   257:18
**matters** 155:24
   216:14 239:22,24
   242:16
**mcclure** 2:4,6 4:8
   4:16,22 6:18,23
   7:14 21:13 22:4
   22:12 27:6 32:12
   32:16 68:7 69:14
   69:23 70:4 78:7
   78:10 86:22 87:4
   87:9 88:15 91:13
   116:10 152:23
   153:2 166:13
   197:5 206:12
   220:18,23 226:2,5
   226:17,21 245:13
   245:22 250:23
   251:8,12 255:19
**mcguinness** 1:11

**mean** 9:23 12:19
   19:22 40:13 41:18
   54:4 56:15 59:20
   60:3,4 62:22
   64:17,20 66:20
   68:15 80:4 82:22
   96:23 98:7,9
   100:6 102:3,13
   128:6 131:20
   133:23 134:13,17
   135:14 139:10,23
   140:12 144:22
   146:5 150:14
   151:22 158:9
   161:4 165:22
   170:14 173:16
   176:7,8 189:11
   205:11 213:24
   221:16 223:4
   229:5 231:20
   237:18
**meaning** 34:24
   67:10 133:12
   147:12
**means** 21:8 70:22
   89:23 212:17
   213:2,6 247:12
   256:12
**meant** 225:16
   249:9
**measure** 65:8 80:7
**measures** 65:17
   95:25 106:21
   136:13,20 137:7
**mechanism** 72:25
   214:9
**media** 191:5
**medical** 1:10
   211:21
**meet** 25:11 29:25
   237:2,22 238:5,13

**meeting** 29:9
79:17 199:23
200:3,6 201:5
202:11,19 203:4
231:12 237:20
**meetings** 235:20
236:5,15 238:18
239:6
**member** 20:3,4
22:17 23:2,10,21
95:18 97:4 158:22
159:8 163:4,6
164:24 171:16
200:11 241:10,11
**members** 21:5
48:18 50:24 56:7
74:13,17,18 84:2
103:6 110:24
122:8 135:21
141:6 142:15,16
160:5 161:10
239:20 240:16,19
241:4,21
**memo** 96:15
**memoranda** 11:18
92:2 98:21 99:5
238:25
**memorial** 1:22
2:12
**memorialize** 96:4
129:8
**memorialized**
93:3,13 242:6
**memory** 164:21
**mention** 7:3 52:4,5
52:11,13
**mentioned** 9:21
56:11 83:4 202:17
**menu** 49:25 138:4
138:9 139:2

**menus** 50:8
**message** 127:17
196:11
**messages** 128:10
**metadata** 224:15
224:20,25 225:3
225:13,14,16
**michael** 1:8
**microfiche** 45:4
46:2
**microfilm** 44:23
46:3,6,12,16,18,22
47:2,8,11 71:22
**microfilming** 46:8
**microsystem**
67:13
**midnight** 17:6
**milau** 1:8
**military** 118:5
**mind** 69:9 86:19
90:20 185:17
220:25
**minimum** 238:14
**minute** 32:7,14
78:8 152:24 226:3
245:20
**mirrors** 43:4
**misconduct** 9:10
101:16 102:4,7,11
102:21,25 103:15
103:20,23 104:4
104:16,20 105:4
105:10 106:3
134:2 138:7,21
140:6 141:5
147:17 149:9
151:9 152:12
158:22 161:5,6
181:17 212:11
213:9,13 241:3,13
241:21 242:9

243:18
**missing** 42:14,25
**mistake** 102:14
103:9,10,12
**misunderstood**
74:3
**mitchell** 2:13 7:13
7:17 10:13 13:16
20:9,14,18,25 21:9
21:25 22:5 23:23
25:9 26:15 27:3,7
28:5,11 29:10,16
30:2,9 32:10
34:13 35:2 36:22
37:20 38:4,18
39:4,11,23 40:21
41:11 42:15,19
43:9 46:13,24
47:16 58:8,14
61:15 63:9 64:9
64:15 65:3,21
66:8 68:2,10,22
69:21,23 70:3
71:6 72:20 73:14
74:21 75:11 76:8
77:4,21 81:18
82:10 84:24 85:20
86:11,24 87:6,13
88:23 92:11 93:14
93:25 94:25 95:13
96:17 98:5,23
99:9,21 100:18
101:25 103:25
104:11 105:23
106:15 107:2
108:25 109:7
111:17 112:18
113:14,24 114:24
115:15 116:6,11
117:7 119:7,12
121:12 124:5

126:6,20 128:3
130:24 132:17
135:12 136:16
141:23 142:12,22
143:8 145:8 146:2
147:2,8 148:7,25
150:18 151:15
155:8 157:8
158:13 159:12
160:19 166:8
170:12 172:11,20
173:20 175:14
178:22 180:7
185:14 187:21
188:15,24 189:3
189:10 190:14
191:21 192:2,14
192:17,20 194:12
198:9,23 199:15
200:7 201:12,21
203:7,13 204:2
206:8,16 207:9,24
209:17 210:16,25
211:11 212:5
213:17 214:15
215:16 217:18
218:17 220:6,15
220:20,24 224:7
224:22 226:20
232:10 233:14
235:16 239:17
240:24 241:18
242:23 244:5,14
244:23 245:18
247:25 250:11
251:4,9 252:1
**moment** 83:4
114:16 239:9
245:15
**monitor** 159:9,19
209:24 210:19

221:22,24 227:20
227:20 228:3,17
**monitored** 177:18
207:23 212:3
**monitoring** 36:19
37:3,17 38:9,23
159:22,25 160:22
160:25 161:4,8,11
161:13,24 162:2,8
166:21,23,24,25
167:5 169:7
210:14 213:15,19
214:5 228:5
**month** 106:11
173:6 174:5 175:3
175:5 205:25
233:8
**monthly** 164:25
169:3 180:11
233:18 234:15
**months** 12:23 60:7
171:18 173:4,10
174:18,22
**moroughan**
188:14,15,16
**motor** 96:25
164:18
**move** 89:2 109:20
**moved** 13:9
**multiple** 150:10
154:11 249:7

**n**

**n** 2:2 3:2 4:2 52:5
52:5 108:13 254:2
255:17
**name** 4:9 44:13
107:16,18,20
181:5 237:17
**named** 133:19
**names** 19:7

**nancy** 1:23 257:7
257:23
**narrative** 138:12
138:17 155:23
182:18,25 183:7
184:3 185:10
**narratives** 246:21
**nassau** 188:22
189:9,12,20
**nature** 19:21,24
20:24 29:15 38:12
56:23 80:4,14,17
85:2 93:5 94:7
96:19 118:4
120:17,21 128:17
129:12 183:20
207:17 216:3
223:2 241:25
**necessarily** 70:12
142:21 164:9
183:11,18 203:3
241:6
**necessary** 172:9
**need** 6:6 45:13
50:22 68:20 73:17
80:25 94:4 97:10
98:16,25 104:7
123:24 124:8
128:7 142:2
143:12 147:10,24
168:10 171:10
173:18 176:18
198:14 199:4
208:17,21 209:5
214:22 222:10,11
224:11 231:7
238:16 241:6
246:2
**needed** 12:25 13:2
14:2 57:24 73:19
95:12 100:7

113:22 115:25
136:22 172:3
**needs** 11:3 63:21
64:3 66:2 102:25
169:17 176:11,15
184:11 218:11
**network** 67:11
**never** 15:4 38:7,20
39:14 41:18
144:24 150:17
170:8 201:14
**new** 1:2,23,25 2:6
2:6,13 4:5,14
13:19 35:24,25,25
36:6,7,9,10,20
37:5 38:17 39:2
60:12,14 61:25
132:10 168:24
169:10 170:15
204:10 214:2
235:22 238:10
247:17 257:4,8
**newcombe** 1:9
**newly** 133:6
**newsday** 191:7
193:15,25 197:3
197:13 202:5
255:8
**nicholas** 140:23
**nine** 5:21
**non** 20:8
**north** 13:14,17
**notary** 1:24 4:4
254:22 257:7
**notation** 128:18
**notations** 196:2
203:16
**note** 22:14 28:19
84:21 87:17
125:15,16 129:4
129:14 141:23

252:10
**noted** 85:10 99:7
208:4
**notes** 99:5 125:23
125:24 126:10
127:2,4,6 188:19
191:4,16,19 193:6
193:16,20 194:24
195:20 196:5
198:6 199:12
203:6
**notice** 27:4,5,9,10
27:22 62:15 63:6
63:18,20 64:3,17
65:11 66:3 68:5
68:13,16 69:6,16
70:16,22 86:23
87:4,7,15,18 89:6
89:9 90:3,4,17
117:16 121:10
164:16 169:16,20
169:24 176:15
206:14 210:5
211:13 243:4,15
**noticeable** 41:21
41:24 42:14 43:2
62:8
**notification** 62:18
100:4 178:16,20
210:4 217:4 218:7
218:10 223:10
**notifications** 42:11
227:23 228:22
231:5
**notified** 100:16,21
218:5
**notify** 122:8
244:21
**number** 13:20,21
13:22 27:20 31:16
44:12,14 107:25

112:22,23 113:21
113:22 114:19
115:24 116:3
153:21 163:2,5
199:13 204:4
215:5,6,7 255:5
**numerous** 196:21
**ny** 252:15
**nycnjlawyer.com**
2:7

**o**

**o** 3:2 4:2 35:13
52:5,5 107:5
108:13,13 254:2
**oath** 3:12 5:9,14
32:22 150:22
**object** 7:7,19
10:13 20:9,25
21:9 23:23 26:15
28:5,11 29:16
30:9 34:13 35:2
36:22 37:20 38:4
38:18 39:4,11,23
40:22 41:11 42:15
42:19 43:9 46:13
46:24 47:16 58:8
58:14 61:15 63:9
64:9,15 65:3,21
66:8 68:2,11
69:11 71:6 72:20
75:11 76:8 77:4
81:18 82:10 84:24
85:20 86:12 92:11
93:14,25 94:25
95:13 96:18 98:5
98:23 99:9,21
100:18 101:25
103:25 104:11
106:15 107:2
108:25 109:7
111:17 112:18

113:14,24 114:24
115:15 116:6
117:7 119:7,12
121:12 124:5
126:6,21 128:3
130:24 132:17
135:12 136:16
142:12,22 143:8
145:8 146:2 147:2
147:8 148:7,25
150:18 151:15
155:8 157:8
158:13 159:12
160:19 170:12
172:11,20 173:20
175:14 178:22
180:7 185:17
187:22 188:24
190:14 191:21
192:14 194:12
198:9,23 199:17
200:7 201:12,21
203:7,13 204:2
206:9,16 207:9,24
209:17 210:16,25
211:11 212:5,6
213:17 214:15
215:16 218:17
220:6 224:7,23
232:10 233:15
235:16 239:17
240:24 241:18
242:23 244:6,15
244:23 247:25
250:11
**objecting** 40:2
220:25
**objection** 6:24
7:20 69:24 73:14
74:21 141:24
199:15

**objectionable** 40:6
**objections** 3:21
7:2
**observed** 94:5
95:5
**obtain** 16:21 73:6
129:21 130:10
181:21
**obviously** 9:5
128:16 130:15
176:10 188:7
**occasion** 100:15
**occasionally** 57:16
99:4 222:7
**occur** 98:14 161:8
205:21,24 207:18
223:8
**occurred** 114:9
204:15 212:20
213:12
**occurrence** 135:22
**occurrences**
179:11
**occurring** 250:14
**occurs** 11:10
36:25 168:20
213:14 216:17
**odette** 1:11
**offered** 97:3
**office** 1:9,10 2:10
9:7,11,12,13,13
15:24 22:25 23:6
34:10 36:7 42:22
43:15,18 44:5
48:17,19 49:8,11
50:10,23 51:12
52:24 53:25 55:6
55:9,23 57:18,20
58:20 59:6,12
60:12,13 61:12,22
61:25 62:7 69:20

71:5 79:2,8,18
80:9,21 81:4
82:24 83:2,7,20,25
84:7 96:7 108:9
109:24 119:16
121:8,8,16,18,22
122:6,8,10,23
123:11,23 136:15
139:18 140:24
144:9 149:19
154:19 156:14,15
171:20 178:17
182:14 187:16
194:7 200:10,15
208:14 210:4,21
211:5,10,14,21,22
212:11,16 214:19
214:19,20,21
215:3,14 216:5,6,7
217:24 218:14,25
219:17 227:10,12
228:4 234:14
237:19 239:9,12
240:12 241:5,7,8
241:10,15,17,22
242:2,22 243:25
244:11,19,21
245:2
**office's** 224:14
**officer** 8:17,20,22
8:23 14:5 15:8
16:23 17:20 24:3
50:14,14 55:4,5,19
55:19 59:15,16
61:10 75:10 79:7
80:22 82:13,14
108:18 116:20
132:5,23 134:3
136:18 138:10,19
138:22 151:6
163:18 167:20

170:4,24 177:8
180:18,23 181:2,5
181:20 182:16,19
182:24 184:12,14
184:17,18 185:21
185:22 187:3
188:4 200:19
205:22 206:19,20
206:25 207:4,19
210:8 212:18
214:5 229:3,12,21
230:5,17 231:12
231:14,23,25
232:19 238:17
244:12,13 245:25
246:14 247:20
249:5,12,14,24
250:3
**officer's** 176:5,9
176:13 181:25
209:25 230:3,20
230:22 231:16
234:23
**officers** 9:25 10:4
17:20 20:5,8,8
22:18 23:12 73:23
74:2,3,6,9,24 75:4
75:15,17,18,23
77:3 117:2 143:4
150:7,23 164:4,5
168:22 169:25
177:10,12 185:2
186:24,24 200:20
209:7 213:5 216:4
228:6,9 234:16
235:12 240:15,23
244:2 248:4,7,11
248:15,21,24
249:2,7,9,20 250:9
**offices** 1:20 2:4
55:11 212:10,12

214:25 235:9
**official** 127:23
196:16
**oh** 125:6 162:20
166:13 194:8
205:17
**ok** 41:10
**okay** 6:15,17 7:14
8:2,19 11:11
14:12 15:4,10,22
16:13,24 17:8
18:8,15,23 19:8,16
20:17 22:4,12
23:8,19 24:8
25:17,24 26:4,21
27:7 28:16,25
29:6,24 30:4,13
31:7,22 33:3,12
34:9 37:7,15
38:24 43:7 44:11
48:20 49:12 50:16
55:18 59:2,16
62:24 64:22 65:14
67:3 71:23 79:10
79:23 80:16 83:3
83:21 85:6 87:9
92:25 94:21 96:12
97:17 100:11
103:16 105:21
106:7 107:15,21
108:21 110:4,10
111:3 113:7,18
114:18 116:18,22
117:20 118:2
121:19 124:9
125:4,21 128:12
129:23 132:13,25
137:19 138:16
139:13,19 140:2
143:14 144:5,11
144:21 145:5

146:11 147:22
153:16 154:7
155:15 156:12
157:21 158:18
160:2,6,21 162:10
162:20 164:14,22
166:13,20 167:23
168:5,10,15 169:8
171:6,21 172:6
173:14 174:14
175:6,23 179:13
179:17 182:4,15
184:10,18 186:3
188:11 191:10
192:11,18 193:2
194:8,18,21
195:12,16 196:23
197:16 198:15
199:10 200:17
201:2 204:7,17
205:7,20 208:8,16
211:18,25 212:9
214:8,23 215:6
217:13,20 218:12
218:22 219:4
220:24 221:20
222:13 223:13
224:12 225:15,25
227:14 228:8
230:9,25 231:10
235:8 236:17
237:7,15 239:7
242:4 243:10
245:18 249:8
**old** 36:10,17,18,19
36:19 45:12
105:10 170:11
**older** 44:22
**once** 131:2 213:24
237:24 238:15

**one's** 63:22
**ones** 40:25 249:10
**open** 156:17
223:16
**opened** 131:17
132:11,21 133:6
133:11 159:11
**opening** 133:15
156:16
**operate** 34:5
**operating** 32:3
58:21 131:11
222:5
**operation** 86:7
**operations** 8:24
9:3,16,17 136:14
**opinion** 47:5 199:5
203:18 249:22
**opportunity** 7:25
25:7 27:13
**opposed** 92:3
189:20
**options** 67:12
**order** 11:23,25
13:3 111:13,21
118:11,19 120:21
123:25 164:15
228:10 250:7
**ordered** 69:18
70:5
**orders** 11:24 12:4
12:8 110:20,22
120:14 121:9
160:12 228:12
**ordinarily** 55:22
56:2,12 95:20
97:4 236:13 243:7
**ordinary** 6:24
**organizational**
26:13

organized 215:2,4
original 3:9,17
 184:5 198:14
originally 17:13
 204:5
outcome 216:24
 218:6,16 257:17
outcomes 21:22
outside 51:25
 176:2,18 214:21
 215:15,21 218:4
 235:15 239:10
 250:10
overall 178:12
 229:2 233:4
overseeing 9:15
oversight 173:17
overtime 16:17
 109:15 204:6
overturned 242:20
overview 153:18
overwhelming
 6:11

**p**

p 2:2,2 3:2 107:5
p.m. 251:14
page 89:16 159:4
 226:10,18,23
 227:4 253:4,7,10
 253:13,16,19
 255:4,12,18 256:3
 256:9
pages 47:7 109:14
 227:8
paper 43:4,12,14
 43:18 44:2,8,16,23
 45:6,8,18,25 46:7
 47:6,25 48:5,7
 60:20 70:7 72:6
 72:10,11,15
 123:18 125:11,17

126:13 127:11
128:14 182:13
193:4 236:7,11
paperwork 71:21
 192:6,8
paragraph 87:23
parcel 11:21 70:9
 166:23 186:10
pardon 14:17 98:3
 165:17 169:6
 217:15 231:6
parent 206:21
parole 142:7
part 11:20 21:17
 31:23 48:13 70:9
 82:2 86:18 88:18
 92:23 98:15,19
 109:9 114:10
 127:8,12,19,25
 128:6 132:15
 133:2 138:14
 142:14 154:19
 166:22 167:17
 172:7,10,13
 185:20 186:9
 189:14 191:22
 194:10 206:18
 208:4,6 214:11
 217:23,24 230:19
 230:22 231:19
 240:20
particular 34:7
 35:10 103:22
 117:24 119:25
 120:2,5 127:8
 132:3 138:9,22
 150:16 152:11
 155:2,4 158:10
 163:3 168:23,25
 169:18 180:13
 185:3 187:12

188:3 189:8 195:8
205:22,23 207:19
221:25 222:2
224:25 231:22
232:14 236:25
237:17 239:21
249:5,11,19,24
particularized
 120:13
particularly 38:3
parties 3:7 32:19
 106:24 136:4
 156:14 219:11
 226:6 245:23
 257:15
partner 135:11
parts 34:20
party 81:16
 135:24 193:6
 215:14 218:13
 220:2 240:6
pass 17:9 226:22
patrol 9:22 14:23
 15:6,11,14,19 16:7
 16:25 17:14,18
 19:18,24 73:22
 75:14,17,22
 141:21 142:6,8,15
 142:16 143:4
pattern 103:18,23
 104:3,14 176:10
 208:3
patterns 160:4
 176:7 206:21
pay 156:10
pd 161:21
pending 154:2
people 40:16 79:8
 80:8,24 117:3,15
 126:25 150:17,22
 162:5 202:11

221:17
perceived 176:18
 229:13
percent 48:8
percentage 48:6
 235:2
percentile 248:8
perfectly 6:3
 223:20
perform 105:11
 150:2 157:7
 215:15
performance
 92:14,18 93:3,12
 93:20 98:20
 102:15 105:2
 143:24 144:2
 160:23 161:12
 165:4,7 166:4,16
 176:6
performed 128:21
performing
 101:14
period 10:3 173:6
 174:5 175:3,5
 206:2 230:16
 232:6 233:8
periodic 35:22
perjured 152:17
perjury 149:16,18
 150:20 151:2
 155:2
permanent 230:19
 230:22 231:16,19
permitted 126:25
permutation
 152:4
person 52:23 69:3
 108:15 111:10
 114:15 120:9
 126:10 135:17

169:13 173:10
174:17 187:14,18
187:20 207:7
209:13 225:5
232:16 233:24
238:14
**person's** 81:8
**personal** 193:24
237:19 247:11
**personnel** 59:5
81:8,11 83:5,12,16
83:20 84:4,7,14,15
84:17,23 85:3,16
85:19,23 86:3,8,13
86:16 88:6,13
90:21 91:2 92:3,7
92:15 94:11,14,16
95:10 96:8,9,11,15
96:16,22 97:20,23
98:3,8,10,12,17,22
99:2,6,20,24
110:21 116:21
117:22 118:16
119:22 123:2,4,17
123:20 124:2,12
135:6 141:21
142:11 170:9
194:19 213:21
**persons** 112:24
134:23 202:9
**pertain** 21:21,22
161:12 228:13
**pertained** 19:12
195:3
**pertaining** 70:18
163:6 168:3 191:5
212:11 218:19
227:2
**pertains** 70:7
100:2 142:6
186:18

**pertinence** 127:18
128:11
**pertinent** 11:19
99:13 188:10
**peterson** 1:11
**phone** 32:8 33:5
127:16 128:9
196:10 218:8
**photo** 197:17
**phrase** 89:17,22
**physical** 12:7
**pick** 78:16 148:15
**picks** 161:4
**piece** 127:11
**place** 7:10 40:7
59:18 65:16 66:25
78:6 88:25 91:25
185:9 219:16
221:21 254:11
**placed** 4:24 5:8
46:6,12 76:17
92:4 94:14 99:20
**plaintiff** 1:4,18 2:4
**plaintiff's** 4:17,19
197:6,8 226:11,14
255:3
**plan** 76:11,19 78:3
**plans** 77:18
**planted** 149:6
**platform** 78:5
82:23 107:5
161:17 163:22
186:20 244:18
**please** 4:9,17 6:3
6:13 53:13 58:11
65:24 91:10
136:10 159:15
197:6
**point** 16:20 19:7
41:16 45:12 46:20
48:10 73:21 74:6

74:23 75:21,22
90:25 104:8
108:12 120:7
137:22 139:9
157:3 161:7 168:6
168:12 171:11
172:19 175:22
186:2 193:10
200:25 203:21,23
203:24 205:5
223:14 230:10
232:4 247:13
250:18
**points** 170:22
171:9 172:16
205:25
**police** 1:8 4:13 8:8
8:10 15:8 16:23
20:7 21:15 30:23
51:3 52:2,4,12,21
74:4,10,16 75:7,8
81:20 84:4,9 86:5
87:11,15 88:21
89:20,25 90:10,14
92:17 96:25 110:9
110:10 121:11
144:6 147:17
149:25 150:6
157:17 161:21
164:6 165:14,16
166:5 168:17
177:12 181:22
190:2,21 208:14
211:24 213:9
216:10 217:24
218:4 221:9 229:3
229:11 240:2,14
240:16,19,23
242:15
**policies** 11:15
25:25 58:6 59:14

79:19 85:18,22
86:2 97:25 104:9
118:25 121:14
199:13 201:18
203:10 225:20
**policing** 140:15
205:9 229:6,6,9,16
233:2
**policy** 10:12,15,17
10:21 11:8,13,20
11:25 12:17 29:11
40:17,18 59:24
65:15,25 73:11
80:5 99:4,18
101:9,10 103:24
106:6,10 107:8,10
108:22 110:15
120:24 121:10
127:24 158:10
159:5 160:15
171:3 196:17
198:5,17,17 201:9
219:25 223:4
224:14,18,21,25
232:9 241:14
**portion** 39:25
131:8
**position** 17:22,25
18:9 56:9 57:7,10
57:24 58:5,13,17
91:8,9 200:19
**positions** 16:19
**positive** 77:8
**possessed** 201:14
**possible** 141:20
150:2 152:4
161:19 188:3
204:18 218:24
**possibly** 35:5
**post** 9:25 10:2

posts 10:5
potential 169:17
practicality
  210:18
pre 186:19
precinct 13:11
  15:9,13,20 16:4,10
  114:7 249:16
prefer 69:9
preliminaries
  14:19
preparation 25:9
  25:14 29:21 30:8
  33:24
prepare 30:2
  238:24
prepared 30:11
  39:18 87:21 88:16
  238:5
presence 161:13
present 2:18 7:17
  8:3,15 14:9 32:20
  135:23 153:4
  226:6 233:23
  236:2 245:24
presentations
  239:3
presently 244:3
preserving 6:25
  7:8
presume 39:13
presumption
  17:13
pretty 16:14 26:8
prevent 50:21
previous 18:10,15
print 237:5,12
printed 112:16
  236:7,9 246:23
  248:18

printout 247:6
prior 17:25 18:9
  24:16 27:16 46:5
  109:12 139:14
  140:11 170:10
  205:10 234:9
prison 220:19
proactive 160:16
probably 6:10
  12:22 14:23
  137:17 139:7
  150:11 205:10
  221:11 232:25
probationary
  93:16 229:3
problem 84:22
  175:9 206:15
  234:3,9 247:19
  248:4
problems 41:16
  161:19 169:15,17
  206:6 234:2,17
  235:12 248:9
procedural 80:5
  98:20 106:23
procedure 1:20
  10:12 58:12,16,21
  65:16 66:2 73:11
  79:25 80:20 99:18
  120:24 124:16
  126:3 131:11,14
  131:19 132:9,15
  136:4,12 156:16
  156:20 159:7,17
  183:5 187:7,9
  195:4,21 196:18
  222:5 241:15
  242:5
procedures 25:25
  29:12 39:3,8,10
  49:10 58:5,22

59:14 67:20 78:25
  79:20 85:18,22
  91:25 96:10
  104:10 109:12,13
  109:21 110:18
  115:22 121:14
  136:9 140:2 185:9
  195:2 199:14
  216:9 225:21
proceedings 70:10
process 5:24 38:10
  75:13 76:3 77:17
  82:23 90:13
  109:10 114:11
  118:13 131:21,22
  132:10 134:24
  135:4 167:18
  171:8 185:21
  190:10 196:2,20
  202:3 206:18
  208:5 214:12
procurement 76:3
  76:10,19
produce 42:23
  45:13 214:22
produced 87:19
  89:12 189:20
  193:25
product 109:18
production 9:11
  9:14 187:10
productions 188:5
proficient 61:23
profile 134:25
  181:12
profiles 186:7
program 73:20
  75:14,21 76:4
  77:9 221:17
programmed
  175:12

programmer
  40:25
programming
  40:15,24
programs 170:22
  176:24
progresses 183:23
promoted 16:9
promotion 15:12
  15:16,20 22:22
promotions 17:17
  55:24 56:22 57:17
prompt 129:4
proper 10:10
  105:11 212:21
  231:6
properly 10:6 67:2
  101:15 102:21
  103:19 104:14
  120:9 132:11
  185:11,25,25
  199:5,14
property 10:7
proposed 29:14,19
prosecuted 242:17
prosecuting
  219:15
prosecution 210:3
  218:25 219:22
  243:6
protection 228:11
  228:12
protocol 95:24
  96:3,6 114:15
  120:20 124:17
  126:4 160:11
  183:5
protocols 39:3,8,9
prove 81:8
provide 24:6
  61:10,24 154:4

163:12
**provided** 60:12
95:17 214:18
219:14,22 221:9
**provider** 226:25
**providing** 24:10
103:14
**provision** 180:18
**provisions** 179:19
190:25
**public** 1:24 4:4
122:14 142:9
150:5 241:23
254:22 257:8
**publication** 202:5
**publicly** 190:6,7
**published** 11:7
12:18,19 110:23
188:20 190:5
191:4,7 193:15
227:16
**pull** 46:18 148:3
148:22 181:4
184:21 249:4
**pulled** 234:6
246:20
**purge** 124:19
198:6 222:15,15
223:6,15,25 224:3
**purged** 124:17
222:20,22,25
223:21
**purging** 223:5
**purported** 190:7
**purports** 197:18
**purpose** 20:6 24:3
45:14 65:7 66:4
69:17 89:12 109:6
129:7,19 140:25
**purposes** 26:17
54:22

**pursuant** 1:18
10:12 97:10
133:20 140:16
148:12 161:16
171:15 195:9,24
210:2 217:11
225:20 232:12
242:13 243:2
244:17
**pursuit** 166:5
**pursuits** 161:22
164:5,6 165:11
177:10,11 181:23
**purview** 58:2
67:14 86:5 211:24
**pushed** 78:21,24
**put** 36:7 47:10
69:24 91:9 94:16
121:10 140:10
141:10 145:7,10
146:14 155:7
183:7 184:2
188:23 204:5
206:5 234:23
235:18 244:13
251:2,5
**putting** 46:21 91:7

**q**

**qualified** 27:25
28:9
**quarterly** 153:10
153:12,21 155:18
234:16
**queries** 237:4
246:18,22 247:5
**query** 148:15
152:6,19 184:13
184:19 248:14
**question** 6:5 18:16
21:24 22:15 32:6
37:21 39:5,25

40:6 53:13 58:10
65:24 68:8,11,14
69:10 71:2 83:9
86:20,21,25 87:2
91:22 117:10,18
142:25 154:23
159:15 166:11
173:23 174:13
178:24 185:12
189:5,6 190:16
191:23 194:11
209:20 210:22
212:8 221:3
250:21 256:9
**questioning** 78:17
**questions** 6:2,15
7:20 22:2 30:12
40:19 90:22 91:17
92:6 120:16 246:8
250:22 251:11
256:8
**quicker** 46:23
**quierum** 148:3
**quite** 87:25 245:25

**r**

**r** 1:11 2:2 3:2 4:2,2
4:2 35:13,13 52:5
119:4 120:7 253:3
253:3 254:2 257:2
**ranging** 10:10
147:18
**rarely** 207:11,13
**reach** 116:4
**reached** 103:23
**reactionary** 209:2
211:9
**reactive** 160:17
**read** 69:10,11 87:7
252:9
**readily** 142:10

**reading** 207:6
**ready** 245:14
**realize** 32:22
114:14
**really** 90:22
133:25 145:19,20
201:14 229:7
249:21
**reason** 46:11
47:14,18 50:17
75:9 85:9 97:24
123:3,6 182:11
205:5 223:12,21
252:11 253:6,9,12
253:15,18,21
**reasonable** 90:23
**reasons** 67:22 77:8
**recall** 19:2,6 25:19
35:14 38:7 185:6
185:12,16
**receipt** 111:2
112:13 113:3
119:21 243:16
252:18
**receive** 60:8,15,16
61:7 106:25
110:22 113:23
116:2 117:15
120:6,12 142:17
187:20 210:24
219:10 243:4
249:23
**received** 79:13
80:3 81:9 106:23
111:16,21 113:5
114:4 115:6 117:4
117:25 118:10,15
118:20 119:23
131:7 153:23
188:13,17 189:8
190:6,7 221:10

240:6 241:20
**receives** 64:3 66:3
  156:22
**receiving** 63:6
  114:21
**recess** 32:19
**recipients** 118:22
**recitation** 155:24
**recognize** 27:2
  104:3
**recognizes** 103:11
**recommendation**
  146:20,23 147:7
**recommendations**
  147:5
**recommended**
  64:18 66:12,14
  97:13
**record** 4:10,24
  7:10 32:13,17,18
  69:15,25 72:22
  76:17 78:7,11
  88:25 89:4 91:8
  91:10 117:25
  119:5 152:23
  153:3 224:20
  226:2,6 230:7
  231:15 245:16,23
  245:24 251:2,5,13
  257:12
**recordkeeping**
  7:16 21:17 70:19
  88:22 89:21,25
  90:12 191:18,24
  201:18 203:10
  244:2
**records** 21:19,20
  32:2 70:14 81:12
  81:14,24 98:16
  114:18 119:10,15
  120:8 121:21

152:2 162:15
  170:10 186:17
  192:12 195:23
  216:18 219:5
  224:15 240:18
  244:9
**reel** 47:8
**refer** 104:21 128:7
  170:5 216:5
  218:23 242:11
**reference** 60:11
  61:22 72:10 79:16
  127:15 182:13
  227:12 236:16
  237:2,19 239:5
  247:12
**referenced** 252:6
**references** 109:16
  238:6
**referral** 97:9,11
  97:18,21 100:6
  101:8 144:8
  146:19,22 149:19
  156:23 157:13,16
  158:4,24 159:6
  160:18 208:13,20
  208:21 211:4,15
  241:25 242:13
  243:21
**referrals** 146:17
  157:23
**referred** 212:12
  215:19 216:15
  241:22 247:22
**referring** 27:4
  70:17 86:7,22
  95:4 110:6 126:9
  157:19 158:15
  161:24 197:13
  215:18 220:15

**reflect** 155:5
**reflected** 142:21
  154:13 166:6
  169:12 204:19
  227:4
**refresh** 164:20
**refute** 212:25
**regard** 11:19
  13:25 18:4,13
  19:10 21:15 24:16
  26:5,22 27:20
  31:25 34:11 71:15
  73:12 78:20 84:21
  85:18 92:7 95:25
  118:24 120:20
  121:9 124:22
  127:7 139:24
  155:16 172:2,3
  175:19 177:3
  198:21 213:14
  223:5 239:14
  242:16 246:16
**regarding** 9:8
  18:16 25:21 85:23
  94:18 95:6 101:10
  129:5,6 146:5
  154:5 156:24
  158:10 160:4,16
  160:22 161:20
  163:13 169:10,16
  175:16,17,21
  176:5 177:7,10,11
  177:13 180:25
  184:7 190:18
  194:24 196:2
  207:16 209:25
  224:25 228:23
  233:7 239:20
  240:9,19 243:4
  245:2

**regardless** 40:3
**regrouping** 32:24
**regular** 12:25 20:8
  105:10 210:12
  214:12
**regularity** 155:3
  225:22
**regularly** 92:18
  135:11 234:15
**relate** 175:8
**related** 21:21,23
  28:3 166:6,16
  196:7 228:14
  257:15
**relations** 217:7,16
  217:17,21 218:21
**reliable** 212:23
**rely** 64:23 187:2
**relying** 89:19
**remain** 10:2 184:6
  230:19,21
**remainder** 230:3,6
**remained** 15:17
**remains** 204:16
  231:18
**remedial** 94:3,6
  97:2 103:12
  104:16
**remember** 42:9
  52:14 81:2 199:22
  221:3
**remind** 80:7,24
**reminder** 81:3
**remove** 194:16
**removed** 194:7,15
  232:8
**removing** 194:17
**reopened** 157:2
**repeat** 6:6 18:6
  58:10 83:8 111:11
  136:10 142:24

244:7
**repeated** 207:4
**repeatedly** 154:18
**rephrase** 189:5
**replace** 247:13
**replicate** 250:17
250:19
**reply** 64:20
**report** 104:18
119:20 126:11,16
127:8 134:14
138:15 153:20,21
154:14 157:18
171:19 182:3
190:18 191:6
196:17,19 197:3
197:19,22 198:7
198:12,13 199:2,8
199:22,24 201:9
201:15,19 202:4,8
202:12,22 203:2
217:6,8,10 219:8
222:25 223:9,11
223:17 235:7
236:25 237:10
238:13 241:15
248:3,7,9
**reportable** 102:7
**reported** 102:4,9
102:12,22 103:2
104:8 105:4,17,18
168:15
**reporter** 4:21,25
22:13 91:20
197:10 226:16
**reporting** 54:9,13
54:16 96:13 106:3
153:8,9,10,14
155:7,18,18,20
171:14 173:7
178:15 179:15

233:9
**reports** 122:5,24
153:11,12,19
155:17 156:3
162:4 168:16,18
184:9 190:10
195:18 198:6,21
199:2 234:12,15
235:19 236:7,20
237:16,25 238:8
238:11,25 239:5
239:13 240:5,9
246:16 247:3,14
247:15,16,20,24
248:10,22,23
**representative**
21:5,7 23:16,21
24:19 256:11
**represents** 78:12
**request** 121:16
140:4 187:24
219:20 220:5,12
221:4,5 223:6
251:5
**requested** 256:2
**requestors** 9:15
**requests** 188:3
191:14 214:13
**require** 10:18
80:18 101:7 183:6
**required** 66:16
93:19 99:19 111:4
111:7,13,25 114:8
126:4 133:6,7
180:9 187:8
**requirement**
40:17 93:7 100:15
106:3 112:15
128:19 129:11
173:7 179:16
180:3 225:24

**requirements**
129:2 171:14
180:6 198:18
233:10
**requires** 173:17
**research** 12:9
15:14 108:4,6,10
118:12,18 151:19
169:14
**reserved** 3:22
**resets** 38:11
**resolve** 213:3
**respect** 103:5
**respectfully** 91:21
99:15
**respective** 3:6
**respectively**
153:19
**respond** 9:25
**response** 91:22
**responsibile** 59:13
**responsibilities**
9:7,10 56:8 79:4
103:10 113:11
115:3
**responsibility**
102:19 114:2
**responsible** 9:19
57:22 63:2,5
83:18 108:2
164:25 176:12
**restrict** 49:15
**result** 75:19
149:18 188:4
242:19 243:7
248:13
**resulted** 95:22
**resulting** 95:6
243:9
**results** 93:2 94:10
239:10 243:6

**retain** 219:2
**retained** 194:23
255:14
**retirement** 230:23
**return** 252:13,17
**returned** 32:20
**reversal** 243:2
**review** 7:25 25:13
27:14 92:13,14
93:3,6,19 98:11
112:3 115:7
116:15,17 117:11
117:12,21 122:25
131:21,22 132:4,5
132:9,15 133:7
152:2 170:9 171:4
171:11 173:8
174:12,16 176:4,9
185:22 193:10
196:2,20 199:3,9
202:3 212:20
222:8 223:9
234:18 252:7
**reviewed** 25:19
116:21 118:15
132:6 195:18
203:15 222:4
**reviewing** 29:8
176:13 190:10
**reviews** 92:9,10,18
93:12,17,18 98:21
99:5
**revision** 199:6
**right** 6:17 7:18 8:3
10:22 13:10,13
14:17,24 15:25
16:18 17:2 22:19
29:20 30:25 32:25
39:16 47:11,25
49:15 51:22 54:22
55:19,24 59:23

65:2 68:19 72:4
72:13,19 74:8,20
75:8 76:2,21 78:3
78:10 81:6,16,24
82:18 88:23
101:22 104:24
105:8,11 106:4
110:7,12 112:5
116:13 117:13
122:15 123:13
124:3,7 125:17
130:6 134:21
135:15 138:25
144:14 146:7
150:12 153:5
154:14 158:17
163:6 165:13
170:7 174:2,6,8
175:11 177:23
179:6,18 183:2,6
190:20,23 191:2,8
195:5 210:7
221:18 223:18
226:8 227:18
234:2,11 237:10
246:15 247:18
248:19 249:3
250:5,10
**rights** 7:6 205:12
**risco** 52:4,11,12
**rise** 92:4
**risk** 235:22
**robust** 130:21
**roger** 11:17
**role** 24:25 38:3
87:21,25 88:4,17
88:19 179:24
**roles** 58:3
**rolled** 75:15 76:4
109:24,25

**rom** 73:7,8
**ronald** 1:8
**room** 6:9
**routine** 133:2
135:18 194:2
**rule** 24:22 173:17
**rules** 1:19 109:12
109:13,21 110:18
142:18 143:6
195:2
**rulings** 256:8
**run** 35:23 36:6
37:9 41:22 60:22
62:19,21 63:8,21
63:23 64:4,12,20
65:20 66:7,11,17
184:12,13,17,19
185:3 234:12,15
246:22 248:7,10
249:25
**running** 8:24 9:3
33:17 34:25
**runs** 41:3 235:5
236:24 237:4

**s**

**s** 2:2 3:2,2 52:5,6
253:3 255:2
**safe** 186:21 236:19
**safety** 73:22
**sake** 231:23
**samuel** 1:3 2:5 5:2
6:19
**sanitized** 192:13
**satisfied** 147:12
**save** 128:14
198:14 199:7
203:5 247:2
**saved** 193:18
196:12 203:3,10
203:17 246:23
248:18

**saving** 198:18
**saw** 27:18
**saying** 37:8 55:17
60:25 91:10 115:9
162:6 174:5
176:21 179:7
209:13
**says** 66:5 68:13
87:18,18 88:19
90:3
**scan** 236:23
**scanned** 124:23,25
125:5,8,11,20
126:5,12,15,23
236:11
**schedule** 12:25
**school** 17:4
**scope** 21:10 69:6
69:16 119:14
120:22 250:10
**scrap** 128:14
**screen** 182:20
228:18 230:11
**se** 40:19 154:13
195:13 198:17
**sealing** 3:7
**search** 135:4
148:9,23 149:4
151:21 152:11
**second** 78:12
**secondly** 224:20
**secret** 53:19 88:17
162:16
**section** 10:7 30:19
31:3 35:6 39:7,15
63:25 64:6 66:11
66:19 67:7,14
71:9,18 73:5,22
84:15 86:8,13,16
92:15 98:10 108:5
108:11 123:20

129:13,14 171:15
183:7 246:13
**securing** 10:9
**see** 17:12 99:6
120:8 135:18
139:6,13 141:15
142:4 143:25
150:14,15 152:19
161:18 165:3
170:10 185:2
196:24 206:20
207:11 228:25
249:13
**seeing** 115:8
**seek** 41:17 170:17
210:23 211:3
**seeking** 210:20
**seen** 62:4 128:9
135:9 155:3
235:13
**sees** 126:12 127:22
215:14
**selected** 185:10
**seminars** 19:5
**send** 62:17 79:2,5
79:6,16 115:24
122:3,9 123:10,11
199:6
**sense** 145:14 183:4
**sent** 96:15 122:12
170:3 176:15
252:14
**sentence** 88:19
**separate** 10:21
12:17 24:15 30:22
83:5,12 86:16
109:16 166:25
167:2 217:25
**separately** 81:15
108:23 191:19

sergeant 15:12
22:22 23:13 56:6
74:7,24 108:19
serve 31:5 228:3
served 23:11,13
28:22 35:15,17
57:7 108:18
243:14
service 3:16 56:10
186:25
session 250:18
set 27:21 37:24
169:2 189:7
243:12 257:11,20
settings 5:15
seven 43:22 47:21
47:24 88:10 139:3
139:7,9,14 140:15
187:4 205:10
sexual 216:13
shaking 194:9
share 219:23
221:7 238:9,23
244:9
shared 244:18
sharing 219:17
sheet 237:9,12
252:11
sheets 191:15
shift 17:7
shifts 17:5
short 32:19
shortly 75:16
show 119:18
168:14 177:17
192:19
showing 119:20
234:16
shown 165:8
shows 248:7

shred 247:16
sic 60:11 64:21
67:14 109:18
118:15 151:5
184:13 186:21
189:20 207:12
225:9
side 39:19
sign 252:12
signature 111:4,5
257:23
signed 3:10,12,15
201:25 202:2
252:20
significant 120:24
238:20 239:2
similar 112:8
simply 91:7 95:15
222:6
sini 1:10
sir 5:6
sits 195:5
sitting 15:7
situation 178:2
situations 135:5
six 28:24,25 29:2
56:3 173:4 175:5
178:13,13 179:6
179:11 233:5
skopek 52:22
snapshot 228:18
social 20:24
softly 6:9
software 26:6,13
30:17 34:19,24
35:5,10,20 41:13
49:24 62:6,14,23
64:18 65:7 66:12
66:24 82:3 107:7
107:11,17,18,20
141:9 151:10

167:2 168:17
178:21 226:19
227:3,6
softwares 31:9
35:11
solutions 252:23
somebody 31:20
61:23 101:14
103:8,17 104:13
118:3 127:16
135:14 150:24
151:4 222:22
223:9 224:4
somebody's 98:11
98:17 99:24 123:4
someone's 196:15
197:23
sop 132:15 146:13
242:6
sorry 13:11 15:24
16:16 18:6 19:6
29:18 30:18 36:3
65:23 83:8 105:22
105:23 131:20
142:24 144:4
151:15 154:22
159:14 173:22
187:23 189:2,4,23
192:18 217:8
220:8,10 224:17
233:2 244:7 248:3
249:8
sort 28:20 174:15
227:8
sounded 63:16
sounds 47:9
245:18
source 176:23
182:9 208:15
215:15

span 47:23 173:3
207:20
speak 25:8 27:25
28:9,21 39:19,21
40:3 80:8 227:8
spear 151:5
special 15:19 18:3
94:24 123:24
specialized 142:17
142:18 143:6
specific 8:21 19:7
27:2 78:23 100:6
102:7 106:22
121:16 123:5
133:17 142:4
145:18 147:25
149:13 151:8
154:17 155:10,13
189:13 201:8
205:16 223:4
234:20 244:13
specifically 18:13
18:19 19:19 21:13
27:19 30:15 34:18
50:25 61:8 65:18
70:5,16 80:2 84:8
116:8 133:12
147:20 148:21
154:15 246:6
specifics 31:25
88:12
specified 254:11
spectrum 147:18
speculate 192:16
192:17
speech 20:15
split 20:22
splitting 20:7 27:8
spota 1:9 220:4,8
220:17,22 239:11

| | | | |
|---|---|---|---|
| **spread** 237:12 | **stays** 230:2 | **subordinate** 93:20 | **suggestions** |
| **squad** 170:6 | **steady** 17:6 | 95:18 101:17 | 141:13 |
| **ss** 257:4 | **step** 32:7 64:2,2 | 112:2 115:5 | **sum** 71:3 |
| **staff** 56:7,8 84:2 | **stephanie** 2:4,6,7 | 116:20 117:22 | **summarize** 134:7 |
| 148:20 152:8 | 6:18 | 118:16 119:22 | 154:2 |
| 159:7 246:10 | **stipulated** 3:5,20 | **subordinates** | **summarized** |
| **staffing** 56:16,18 | **stipulation** 6:25 | 84:17 92:19,23 | 129:12 131:7 |
| 56:21 57:9,14,19 | 7:5 228:7 | 96:3 102:13,20 | **summary** 129:13 |
| 57:25 58:4,13,16 | **stop** 6:4 73:24 | 111:25 113:5 | 129:18 130:18,22 |
| **standard** 58:20 | **stopped** 46:8 | 114:4 165:5,7 | 131:8 133:9 |
| 131:10 136:3,14 | 47:19 88:18 | 170:16,17 | 137:21 138:13,17 |
| 140:13 | **storage** 26:6 44:6 | **subpoena** 1:19 | 147:21,22,24 |
| **standardized** | 67:25 71:10,19 | 26:22 27:9 255:6 | 148:6,10,16,17,22 |
| 121:20 136:20 | 78:5 224:14,21 | **subscribed** 254:18 | 152:9 153:24 |
| 225:20 235:7 | **store** 77:25 | **subsequently** | 169:9 181:12,13 |
| **standards** 39:2 | **stored** 12:4 36:12 | 134:25 | 182:18 184:3,6,21 |
| 101:10 103:4 | 39:20 44:24 45:15 | **substance** 71:3 | 238:25 |
| **standing** 11:2 | 46:16 48:12 67:24 | 238:3 | **summons** 243:15 |
| 222:5 247:14 | 68:19,19,23 70:24 | **substantial** 246:18 | **superior** 20:5,7,8 |
| **stands** 138:25 | 71:17 72:16,24 | **substantiated** | 200:20 |
| 179:18 | 73:9 77:22 78:3 | 213:6 214:11 | **superiors** 22:18 |
| **start** 55:13 76:16 | 94:11 225:3,4,10 | **sudden** 41:23 | 23:12 |
| 152:19 157:14 | 236:20 | **sufficient** 129:21 | **supervise** 92:23 |
| 206:24 | **stores** 225:8 | **sufficiently** 129:12 | 102:13 104:23 |
| **started** 7:11 14:23 | **street** 13:11 19:20 | 205:16 | **supervisee** 105:16 |
| 20:12 47:22 77:14 | **stretch** 226:8 | **suffolk** 1:8,8,9,10 | 105:17 |
| **state** 1:24 4:4,9 | **structural** 22:9 | 1:17,21 2:10,11 | **supervising** 18:16 |
| 171:19 178:16 | **structure** 55:11 | 4:13 5:2 8:8,10 | 117:2 162:5 |
| 179:16 214:19 | **stuart** 77:15 | 20:5 21:15 74:4 | 169:14 |
| 216:7 257:4,8 | **study** 29:11 | 74:10,15 84:3 | **supervisor** 84:20 |
| **stated** 113:11 | **stuff** 89:15 | 87:10 88:20 89:20 | 85:11 92:16,24 |
| **statement** 150:15 | **subject** 39:2 87:12 | 89:24 90:13 92:17 | 93:17,19 94:4,7 |
| 151:3,5 207:16 | 171:4 174:3 178:3 | 153:13 190:2,21 | 95:16 100:10,13 |
| **statements** 105:16 | 182:6 186:13 | 198:5 201:9 | 100:17 101:13 |
| 152:17 | 228:6,10 233:12 | 211:20 242:18 | 102:6 103:11,21 |
| **states** 1:2 | 240:9 | 244:10 252:4 | 104:6,18,22 114:3 |
| **statistics** 154:5 | **submission** 150:21 | 253:1 257:5 | 115:4,6,10 158:25 |
| **statute** 89:10 | **submits** 121:16 | **suffolkcountyny...** | 159:3 164:25 |
| **stay** 99:19 229:20 | **submitted** 25:21 | 2:14 252:2 | 168:24 169:10 |
| 229:24 230:5 | 89:5 127:14 132:3 | **suggested** 141:8 | 170:15 179:23 |
| | 199:9 | | 180:14 187:8 |

198:19 206:14
233:18 234:6,10
**supervisor's**
113:10
**supervisors** 92:9
96:2 99:7 101:21
111:24 113:3
120:12,14 160:24
161:16,17 162:3,6
162:11 169:19
170:11 177:18
180:9
**supervisory** 17:17
17:22 84:16
102:19 179:24
**support** 34:17
213:7
**suppose** 250:20
**supposed** 112:24
116:3 129:17
142:19 184:2
195:14 233:18
**sure** 9:25 15:8
32:12 36:5 37:24
37:25 41:9,19
47:18 51:19 53:14
62:3 65:9 66:23
70:3,18 79:12
83:10 102:12,20
104:5 105:5
106:22 111:12
113:20 115:23
118:18 120:15
132:10,21 133:8
136:11 143:2
148:13 149:11
152:15 154:24
159:16 173:24
179:2 185:7
189:15 192:22,25
209:11 243:20

**surmise** 172:8
**suspect** 245:16
**suspects** 133:14
**suspension** 156:9
**suspicion** 161:6
**swearing** 209:9
211:9
**sworn** 3:10 4:4 5:6
74:13,17,18 78:15
153:3 161:10
226:7 254:5,18
257:11
**system** 34:12
35:24 36:6,7,8,9
36:10,11,13,15,20
37:3,12,14 38:9,23
41:15 42:3,8 43:5
43:17,21 44:6,16
48:12 49:19,22
53:23 54:7 61:24
63:12,14,22 64:14
65:2 66:24 67:5
67:12 79:11 81:7
81:23,25 107:17
108:3,24 109:23
111:15 113:2,17
113:18,20 115:14
118:20 121:6
123:16 124:23
126:17 131:16
132:11 136:19,23
137:23 138:3
140:10,23 141:10
141:17,19 151:18
161:18 162:13
164:10,17 165:8
165:19,20 166:18
167:4,5 168:21
169:6,23 171:23
174:16 175:13,24
176:2,23 178:8,14

178:19,20 179:9
180:11 182:11,23
186:5,22 204:5,21
204:25 205:2
206:5 207:3,8
209:6,11 219:16
219:19 221:15,21
221:22 222:17,19
225:18,19 227:22
232:14 233:6
235:15 236:23
245:11 246:21
**systems** 26:14

## t

**t** 3:2,2 52:5 253:3
253:3 254:2 255:2
257:2,2
**tab** 166:24 227:20
227:21 228:3,17
**take** 15:25 29:10
32:6 64:2 66:25
78:6 88:10 92:17
96:2 97:20 102:15
118:8 122:25
134:9 160:17
197:12 226:22,24
229:4 245:15
**taken** 1:18 32:15
33:19 65:17 66:16
78:9 80:7,13 94:6
94:15 112:21
125:23 129:6,9
136:9,13,20
151:12 152:25
154:3 156:5,9
157:3 181:20
197:25 207:16
218:11 226:4
245:21
**takes** 93:21 103:12
127:16 167:6

179:23 218:13
**talk** 6:8 27:19
88:10 90:5,6,9,11
90:20 91:2 93:11
180:17 227:19
234:11 246:4
**talked** 25:8 138:13
182:6 228:21
239:11
**talking** 21:18
27:10 31:24 34:16
34:18 42:6 53:7
71:8,11 89:13
99:2 110:8 113:13
114:12,14 119:2
122:11 127:5
150:23 162:4
174:11 190:12,17
193:14 197:4
206:10,12 220:21
247:20
**talks** 90:4 228:18
**tangential** 28:3
**tasked** 110:25
113:4,8 160:24
161:17 162:3,7
**tavares** 1:8
**team** 55:21 56:4
132:4 138:6
148:10 168:25
**teams** 56:3
**tech** 34:16 224:10
225:5
**technical** 37:23
41:5 66:22
**techniques** 18:5
18:14
**technological**
39:19
**technology** 30:16

**tell** 5:15 8:20 9:23
18:25 20:6 23:9
25:18 28:8 31:8
43:7 48:2 49:17
54:15 67:8 72:25
80:17 86:9,12,14
87:7 90:7 107:6
116:24 128:25
131:24 132:14
133:14 137:4,13
138:2 160:15
165:10 167:13
171:7 174:25
201:24 215:24
221:13 225:12
256:14
**telling** 25:7
**tells** 7:21
**ten** 131:6,6 207:20
233:25 234:2
**tendency** 6:8
**tens** 42:12
**term** 56:12 118:4
231:6
**termination**
156:10
**terms** 112:10
228:10
**testified** 4:5 5:20
40:12 59:23 60:22
62:2 72:12 175:11
179:3 183:8 231:2
248:6
**testify** 40:7 87:21
87:24 88:4,6,7,16
88:24 89:23 254:5
**testimony** 144:14
150:22 174:5
199:16 209:8,23
210:2,14,19 211:8
252:9,18 254:6,10

257:13
**testing** 9:19
**thank** 13:24 16:14
226:20 251:12
**thing** 78:18 147:25
197:4 207:23
251:4
**things** 7:15 27:20
28:10 31:23 56:23
70:21 88:4 136:24
151:23 192:24
240:10
**think** 6:9 26:20,24
30:11 32:2 41:25
45:9 106:19
116:11 122:19
171:13 174:11
183:15 187:18
214:6 245:13
**third** 81:16 215:14
218:13 219:11
220:2 240:6
**thirty** 139:3
**thomas** 1:9 188:14
239:11
**thoroughly** 147:15
**thought** 18:15
78:18 249:8
**thoughts** 127:7
194:24 195:20
197:24
**thousands** 42:12
47:7
**three** 50:14 55:5
55:20 56:2,5
83:25 117:16
137:17,19 172:24
175:2,10,22
202:23 206:2
226:11 231:23

**threshold** 170:2
171:3,11 174:10
175:19 176:19,23
227:23 228:19,20
228:21,24,25
229:2,7,17 230:17
231:3 232:3,13,15
232:17 233:4
234:5
**thresholds** 171:2
172:24 174:24
175:17 228:23
231:13
**throw** 247:8
**throwing** 196:4
**thumb** 67:10
**time** 1:15 3:22
6:13 8:2 10:3 15:6
16:2 17:21 19:18
19:25 25:3 26:10
29:10 30:6 33:10
36:4 53:13 55:10
60:4 64:19 78:16
79:22 102:23
106:8 108:20
128:13 133:22
134:2 135:22
137:11 139:11,16
144:23 146:9,9
159:15 173:3
180:24 185:11
196:6 200:3,12,15
200:18,23 202:16
202:24 204:8
211:4 215:13,20
223:8 230:16
231:4,22 232:5,13
232:24 233:23
234:7 240:2
245:12 250:22
252:19 254:10

**timeframe** 252:8
**timely** 10:2 120:9
**times** 29:25 30:3,4
77:2 87:8 121:2
140:7 207:20
215:25
**timothy** 1:10
**title** 8:4 83:23
**titles** 55:2
**today** 5:3,7,14,20
6:21 21:18 24:18
24:24,25 25:6,15
26:23 27:16,19
29:21 30:2,8
31:24 33:24 67:23
68:21 87:12
128:13 138:25
183:16 246:2,17
**tom** 220:17,22
**tool** 151:24
**top** 49:6 53:19
162:16 235:2
247:21 248:8
**track** 15:5 57:6
80:6 128:20
168:23 186:23
235:11 243:5
**tracked** 80:2
111:24 179:10
**tracking** 113:12
114:13,17 116:24
**train** 102:16,19
104:23
**trained** 131:13
143:6 148:20
**training** 18:3,12
18:18 19:2,5,11,19
61:7,13 79:7
80:22,23 81:12,14
81:24 94:13 95:17
97:2,10,13 101:12

101:17,19,24
102:18 103:13
104:7 109:20
111:7,14 120:13
120:25 121:5
142:17 170:10
**transcript** 251:6
252:6,20 254:9,9
**transfer** 237:8
**transferred** 15:18
37:17,18 60:14
61:12
**transfers** 55:24
56:23 57:16
182:17
**transmit** 238:12
**transmitted** 122:5
**trial** 3:22 5:9
209:8 210:15
**trigger** 37:19 96:7
97:19 159:21,23
161:2 170:22
171:8 172:4,16,18
173:7 175:12,18
175:25 177:22
178:9 205:24
207:21 208:11,23
209:5,12,15
211:16 228:22
232:3 242:21
243:3,18
**triggered** 85:8
174:23 207:8
243:8
**triggers** 101:21
121:24 157:6,11
157:13,23 175:7
176:19
**trouble** 207:5,22
**true** 254:9 257:12

**trust** 152:6
**trusted** 102:10
104:22
**trustee** 23:11
**truth** 5:16,16,17
254:5
**truthful** 209:14
**try** 134:4,17 241:7
**trying** 91:6 126:2
145:6 187:11
188:12,21 191:11
191:17 192:10
193:17 237:14
**two** 7:15 10:21
29:5 30:3,4 34:20
51:2 55:23 106:11
117:16 137:17,19
172:25 173:4
175:3 188:4 212:4
228:20 231:24
234:4 250:2,9
**type** 41:8 93:9
95:22,23 96:13,14
119:4 120:25
136:19 147:25
154:17 155:2
164:2 176:10
234:15,17
**types** 164:11
234:20 237:16

**u**

**u** 3:2
**u.s.** 9:13 214:18
216:6 242:2
**ultimate** 14:4,7
**ultimately** 82:12
86:4 232:18
**unaware** 67:15
115:11
**unbecoming**
143:21,22 144:10

144:11,13 149:21
150:4 175:9
**unclassified** 53:19
**undergo** 18:3,12
133:7
**underlying** 211:17
**underneath** 51:20
117:4
**understand** 5:7,13
5:17 6:2,5,7,15,16
11:17 24:24 32:4
33:2 47:12 55:11
58:17 117:17
168:11 180:4
187:11 188:12
191:17 192:10
196:25 198:4
209:19,21 212:2
225:15 246:2
**understanding**
34:23 46:10 49:18
68:15 89:11
102:24 125:10
165:6 189:7
201:18 218:15
225:14 227:21,25
248:22
**understood** 72:7
79:14 106:24
117:5 118:21
120:3 182:15
184:10 212:13
**undertaking** 47:10
47:13
**undue** 205:6
**unethical** 241:14
**unfortunately**
109:14 149:7
151:7 186:16
205:15

**unfounded** 212:21
**uniform** 172:18
**union** 20:3,7,23
21:3,21,23 22:3,6
22:9,18,25 23:16
23:22 24:14,14,15
200:20,25
**unit** 17:15 56:5,14
249:6,13,17
**united** 1:2
**unprofessional**
173:2 175:3
**unreasonable** 90:2
**unrestricted** 54:3
54:5
**unsigned** 3:14
**unsubstantiated**
213:2
**unwheely** 109:18
**update** 11:7 36:25
37:9 39:2 62:16
62:18,20,21,23,25
63:3,6,11,13,21,23
64:3,8,20,25 65:6
65:7,8,9,11,12,16
66:3,4,7,12,14,16
79:8 117:6 118:25
121:9 146:17
247:16
**updated** 11:2,4,13
12:24 35:21 62:3
106:9,11,12
109:19 110:15
130:20 203:23
232:22,23,24
**updates** 34:16
35:22,23 36:14
37:4 38:8 62:13
106:14,23
**uploaded** 43:16,21
67:11 72:12

125:12 126:5
186:4,6
**ups** 67:9,16 70:12
71:4 72:3 196:15
246:3,8
**usage** 35:7 49:22
221:14
**use** 26:9 30:14
31:9,15 32:4 34:3
34:8,20 35:7,10
41:13 50:9 53:4
53:21 62:6 72:10
73:2 81:22,25
82:5,7,8,17,18
109:11,17 147:19
149:5,6 151:2
161:22 164:3
166:11 167:6
168:16 177:13
179:5,15 180:22
181:22,23 186:14
186:20 222:10
224:10 227:4
228:5 229:3 235:6
235:19 236:14
237:18
**useful** 109:6
249:21
**user** 33:20 34:3,7
182:22
**user's** 225:8
**uses** 48:16 49:20
**usual** 137:6 219:7
**usually** 60:18
61:23 62:17 79:17
120:25 149:18
238:4
**utmost** 106:14

**v**

**v** 252:4 253:1
**vague** 133:24
**vagueness** 130:12
**various** 9:14 10:19
11:24 13:5 17:16
82:25 160:23
**vary** 9:24
**vehicle** 96:25,25
161:22 164:6,6,18
165:14,16 166:5,6
168:18 177:12
181:22
**vendor** 64:21,23
65:20 66:6 76:3
78:4 227:2
**vendors** 76:20
**verbal** 239:4
**verdict** 243:11
**verify** 252:9
**veritext** 252:14,23
**veritext.com.**
252:15
**vernacular** 102:24
**version** 31:14,16
32:3,9 33:6,8,14
33:17,20 34:4,8
35:25 36:2,17
38:17 41:9 60:20
62:9 107:22,24
109:22 126:11
199:8 202:4
227:13,16
**versions** 46:7
141:13
**versus** 5:2
**veterans** 1:22 2:12
13:18
**video** 72:22 73:6
73:25 76:24

**violating** 205:23
**violation** 205:12
205:24
**violence** 164:19
165:12 228:13
**voice** 6:11
**vote** 171:4

**w**

**w** 4:2 52:6
**wait** 86:15
**waived** 3:9
**waiving** 7:2,6
**walk** 124:11
**want** 32:11 34:21
69:10 86:19,24
89:7,8 91:9,18
105:2 152:16
157:10 166:9
184:19 192:23
198:4 203:19
220:20 226:17
227:19 229:4
234:11 239:8
251:2
**wanted** 27:19 30:7
84:21 120:4 140:3
145:17 148:23
249:23 250:24
**wants** 170:15,16
**ward** 122:16
**warrant** 121:4
158:7,11 160:8
**warranted** 93:22
93:24
**watch** 209:15
244:13
**way** 6:20 15:2
42:18 45:21 62:5
88:3 90:6 95:11
131:17 132:8
136:5 148:22

152:13 167:6
175:20 187:17
197:3 257:17
**ways** 250:2
**we've** 68:25
130:11 141:18
**webber** 202:20,21
246:14
**website** 112:9
**week** 57:2 237:24
238:11,15
**weekly** 238:8,10
247:3,6
**weinschreider**
1:24 257:7,23
**went** 41:21 57:19
58:4 109:21 110:2
167:25 172:15
**whatnot** 18:12
37:10 101:24
**whatsoever**
218:16
**whereof** 257:19
**whichever** 224:10
**white** 1:3 2:5 5:2
6:19 252:4 253:1
**wicks** 70:4 89:8
**wide** 10:10 147:18
**widespread** 77:10
**william** 246:11,12
**wind** 89:3
**wing** 145:6
**wise** 116:13
**withheld** 207:12
**withholding** 207:6
**witness** 1:17 3:10
3:16,18 4:3 20:17
40:4,5 69:17 70:5
78:14 105:22
116:14 135:19,24
153:3 226:7,22

251:15 252:8,10
252:12,19 257:10
257:13,19
**wong** 1:11
**wood** 2:19 7:12
251:11
**word** 63:13 148:15
148:23 149:4,6
184:20,22 237:13
**words** 95:16 148:5
148:16 149:7
249:4
**work** 37:11 55:16
128:21 134:12,16
216:13
**worked** 15:2 17:6
39:14 56:20
141:17 145:24
**working** 37:5
79:18,22 104:17
135:14,22 200:10
241:10
**works** 68:25 76:7
90:6
**wrap** 245:14,17
251:3
**write** 127:11
**writing** 93:4,13
126:5
**written** 10:12,15
11:13 28:2 58:7
88:3 93:8 94:10
127:24 133:24
134:13 137:21
150:21 198:8,17
**wrongdoing**
135:20

**x**

**x** 1:3,13 4:2
105:16 107:5
255:2,17

**xo** 114:8

**y**

**y** 105:17 108:13
**yaphank** 4:14,14
12:14,15 84:11,11
**yeah** 11:4 13:16
16:16 19:3 25:23
67:13 72:8 73:20
79:2 120:23
139:25 145:3
208:3 238:4
**year** 10:25 45:19
46:5 76:5,14,15,21
140:8 172:25
207:20 231:24
**years** 14:21 23:9
28:20,21,24,25
29:2 35:15 42:24
43:23 44:21 47:22
47:24 56:19 57:4
57:6 108:19
130:14 137:18,19
139:7,10,14
140:15 186:25
187:4 205:10
231:24 234:4
**yep** 29:22 184:23
187:25 188:6
233:20
**york** 1:2,23,25 2:6
2:6,13 4:5,15
13:19 257:4,9

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.