## INSIDE INTERNAL AFFAIRS

# Secret file reveals 'cover-up of a cover-up' in unjustified police shooting, arrest of innocent man

Suffolk police brass pressed internal affairs to delete evidence that would support misconduct charges in arrest of cab driver shot by off-duty Nassau officer during Huntington Station road-rage incident.



Police respond to the Huntington Station scene where off-duty Nassau Police Officer Anthony DiLeonardo shot cabdriver Thomas Moroughan in February 2011. Photo credit: Stringer News Service

By David M. Schwartz

*Published: Feb. 10, 2022*

The shooting of a Huntington Station cabdriver by an off-duty Nassau County police officer in a fit of alcohol-fueled road rage has been dogged for more than a decade by evidence of cover-ups and the wrongful arrest of an innocent man.

Former Nassau Officer Anthony DiLeonardo opened fire on cabbie Thomas Moroughan after a night of dinner and drinking in 2011. He wounded Moroughan twice, pummeled him with a pistol, breaking his nose, and faced possible arrest on a first-degree assault charge.

Nassau Police ID photo of former officer Anthony DiLeonardo.



POLICE OFFICER ANTHONY DILEONARDO
SERIAL NUMBER 9103
SHIELD NUMBER 3632
THIRD PRECINCT
DATE OF APPOINTMENT 11/2/2007 (3 YEARS)

Instead, Suffolk County Police Department investigators initially accepted DiLeonardo's account that he had shot Moroughan in self-defense. They charged Moroughan with assault after detectives took a hospital-bed statement in which Moroughan purportedly exonerated DiLeonardo and incriminated himself. At the time, doctors had administered narcotic medications to dull Moroughan's pain.

## Behind the scenes of Newsday investigation

The shooting entangled the internal affairs bureaus of Long Island's neighboring county forces in separate investigations. After more than three years, the Nassau department dismissed DiLeonardo. Separately, it punished

fellow Officer Edward Bienz, who was at the scene of the shooting after drinking with DiLeonardo, with the loss of 20 days' pay.

Because Suffolk was the site of the shooting, Suffolk police were responsible first for determining whether a crime had been committed and, if so, by whom. After the district attorney's office dropped all charges against Moroughan, Suffolk internal affairs examined the circumstances surrounding the cabdriver's arrest.

Newsday's look into how Long Island's two county police forces have policed themselves uncovered the outcome of Suffolk's internal investigation, including how ranking members of the department brought the case to a close under the near total secrecy that was imposed by law on police discipline.

**From the editors**

Newsday found that:

- The Suffolk County Police Department ruled there was no misconduct by any member of the force and ordered no discipline.
- In finding no fault, then-Commissioner Edward Webber overruled the department's internal affairs chief, who had called for filing misconduct charges against a sergeant and a detective sergeant.
- Former Chief of Detectives William Madigan pressed internal affairs commanding officer Michael Caldarelli to delete evidence from a report that Caldarelli considered crucial to supporting the charges, including accounts that DiLeonardo smelled of alcohol and that Moroughan had been given morphine, according to notes handwritten by Madigan.

- Madigan pushed Caldarelli to change his report at a meeting also attended by police Capt. Alexander Crawford, an attorney who is the department's chief legal officer, who also had served as a trustee of the Superior Officers Association, the union representing the sergeant and detective sergeant.
- Caldarelli rebuffed Madigan and Crawford, notifying Webber in a memo that he refused to make the deletions they requested.
- The department permitted a second trustee of the Superior Officers Association, a sergeant, to play a key role in recommending whether or not to file charges against any officers involved in investigating the shooting at a time when the sergeant was both a union member and a union trustee.


Police Action filed against D/Sgt. Lamb and
ited. In recognition of the lack of definitive
is finding.

t. Distler of the NCPD IAB states
photograph placard of the incident listed the
y PO DiLeonardo was a subject as it was
n Assault 1st Degree. (See the attached

pondence was obtained from Keith Olsen,
l to the scene of the shooting as a police
photographed the scene. He reported



Image from secret internal affairs report.

Moroughan, then 26, had been shot twice and had his nose broken as DiLeonardo tried to rip him from the cab. Moroughan had spent the night at the hospital calling out repeatedly for his lawyer, he said, before Suffolk police arrested him. He faced seven years in prison on the charges that included assaulting an officer, which were later dropped.

At Newsday's request, five experts in criminal law or police misconduct reviewed a detailed account of the case. Newsday based the account on internal affairs documents obtained from court files and confidential sources,

official public statements and Caldarelli's recollections of an internal affairs tenure that he described as "Kafkaesque." The Suffolk police department denied a Newsday Freedom of Information Law request for internal affairs documents related to the case.

The experts who reviewed the case included a former 15-year Manhattan assistant district attorney who prosecuted homicides and violent street gangs; a former Manhattan and Bronx prosecutor who teaches at Pace University Law School and is author of "Prosecutorial Misconduct," a treatise on wrongful convictions; a former police officer turned criminologist who has tracked the arrests of 20,000 police officers over the past 15 years while teaching at Bowling Green State University in Ohio; a former California Superior Court judge who conducted independent audits of police misconduct investigations; and a New York Law School professor who served as a law clerk to a federal appeals court and as an appellate lawyer for the Washington, D.C., public defender's office.



Officer leads Thomas Moroughan out of the Second Precinct in Huntington in 2011. The officer was not involved in Moroughan's arrest. Photo credit: James Carbone

Unanimously, the five experts concluded that based on the evidence provided by Newsday Moroughan had not committed a crime; that Suffolk police had wrongfully arrested him; that DiLeonardo had shot Moroughan without legal justification; and that Suffolk police could have arrested DiLeonardo.

Some also concluded that Suffolk police used Moroughan's arrest to cover up DiLeonardo's crime; that former Suffolk District Attorney Thomas Spota reinforced the apparent cover-up by declining to conduct a grand jury investigation; and that Suffolk police leadership completed the cover-up by overruling its internal affairs chief and taking no action against detectives and supervisors who participated in Moroughan's arrest.

"It's a cover-up of a cover-up," said Bennett Gershman, the Pace University law professor, adding:

"They don't want the truth to come out, because if the truth comes out, it's very embarrassing. And maybe even worse, it's criminal."



## 'It's a cover-up of a cover-up.'

*Bennett Gershman, Pace University criminal law professor and former prosecutor*

In addition to potentially filing criminal charges against DiLeonardo for shooting Moroughan, Gershman said Suffolk law enforcement authorities had grounds for exploring whether other officers had committed crimes such as obstruction of justice or filing false documents.

Caldarelli led Suffolk's Internal Affairs Bureau from late 2012 to 2014, when, he believes, he was forced out because he had recommended substantiating too many misconduct charges against officers. He retired from the department with the rank of inspector in 2017.

In a Newsday interview, Caldarelli recalled telling Webber: "It's clear to me that there are people inside and outside of the department who seem to feel that internal affairs should be functioning as an organ of defense. I said it cannot be that way. By very definition that's corruption, and I won't be a party to it."

**READ AND WATCH MORE**

Understaffed, undermined: Ex-Suffolk internal affairs commander describes how he was driven out

His account of how the cabdriver's shooting played out at the department's highest levels bolstered a key conclusion of Newsday's Inside Internal Affairs investigation: That the Nassau and Suffolk police departments have allowed officers to escape all, or most, discipline even in cases involving serious injuries or deaths.

What follows is a history of how Suffolk police wrongfully moved to jail the victim of a police shooting rather than potentially subject an officer to criminal prosecution — and faced no discipline.

Moroughan had started driving the cab on a 6 p.m. to 6 a.m. shift a week before the shooting. Previously, he had worked as a tow truck operator and had driven a taxi for another company. He was single, having ended a relationship, and was helping to support three children.

Riding in the cab's front passenger seat, Moroughan's girlfriend, Kristie Mondo, witnessed the gunfire that pierced the windshield and hit Moroughan in the chest and arm. He was held overnight in a hospital. When the wounds proved not to be life-threatening, Suffolk police transported Moroughan to the Second Precinct in Huntington, then walked him in front of the media with his hands cuffed behind his back, on his way to an arraignment in Central Islip court.

Later that day, Mondo secured bail and won Moroughan's release from Riverhead jail. Charged with offenses that carried a maximum sentence of seven years, he retained a criminal lawyer and lived under the threat of conviction and imprisonment for three months before the district attorney's office dropped the case.

Moroughan declined to be interviewed by Newsday on the advice of his attorney, Anthony Grandinette.

Webber, who retired as commissioner in 2015, did not respond to interview requests.

Former detective chief Madigan disputed that he and Crawford ordered Caldarelli to delete any material or to change his findings. Instead, he said that he only informed Caldarelli his conclusions were wrong.

"Us ordering him to remove anything, that's blatantly false," Madigan said.

DiLeonardo, through his attorney, Bruce Barket, declined to comment. Barket said DiLeonardo was justified in shooting Moroughan.

More than a decade later, Suffolk and Nassau counties are contesting a lawsuit in which Moroughan is seeking $30 million in damages. Suffolk has argued that its officers "acted reasonably and in good faith" and were justified in arresting Moroughan. Nassau has blamed Moroughan for allegedly causing DiLeonardo to shoot him.



## ‘Both counties were involved in a cover-up for the purpose of protecting their officers.’

*LaDoris Cordell, former California judge and internal affairs auditor*

“This is all appalling,” said LaDoris Cordell, the retired California Superior Court judge, who reviewed internal affairs cases as San Jose’s independent police auditor from 2010 to 2015.

“I really do believe that law enforcement and prosecutors in both counties were involved in a cover-up for the purpose of protecting their officers from criminal and civil liability.”

## Drinking, driving, shooting

DiLeonardo and his girlfriend joined fellow Nassau County Police Officer Edward Bienz and his wife for a Saturday night dinner at a Farmingdale restaurant on Feb. 26, 2011. DiLeonardo drank at least two cocktails, Bienz told investigators. Bienz had three beers.

They then drove to Huntington village, where they visited three bars. DiLeonardo drank five more vodka cocktails while Bienz drank five additional beers, Bienz reported. In his own statement to Nassau internal affairs, DiLeonardo put his alcohol consumption at six drinks during the night. A Suffolk district attorney's investigator reported that DiLeonardo admitted consuming eight to 10 drinks.

The couples headed home around 1 a.m., with Bienz driving an Acura and DiLeonardo behind him in an Infiniti. On West Hills Road, the two cars came up behind Moroughan in his cab. Moroughan testified that Bienz passed, cutting him off. DiLeonardo followed, flashing his high beams and forcing Moroughan to the side of the road, Moroughan said.

## WHERE IT HAPPENED

Two off-duty Nassau police officers encountered a cab driver after a night out in February 2011. Click for more.

1 of 4




A Flourish data visualization

Continuing on their way, the off-duty officers made a wrong turn and pulled over. Moroughan, who had started driving again, encountered them. He stopped, rolled down a window and yelled at DiLeonardo about reckless driving. DiLeonardo shouted back with profanities and insulted Moroughan's girlfriend, who was riding in the cab's passenger seat, the cabdriver stated.

Moroughan got out of his car but retreated when DiLeonardo and Bienz got out of theirs.

Throwing the Prius into reverse, he backed up 30 to 45 feet. DiLeonardo followed on foot, at some point drawing a .38 caliber Smith & Wesson from an ankle holster. Moroughan put the Prius into drive and angled left to make a U-turn. He estimated that he moved a foot or two before DiLeonardo opened fire, emptying the five-shot revolver.

Two bullets hit Moroughan, one in the chest, one in an arm. DiLeonardo approached the cab, broke the driver's window with his gun butt and pummeled Moroughan with it, breaking his nose.

With Moroughan "bleeding appreciably," according to a crime scene analysis, DiLeonardo tried to drag Moroughan from the cab. During the struggle he dropped the revolver into the Prius, where it would later be recovered by Suffolk police.

Bienz ran toward DiLeonardo. Initially, he reported that he tried to help DiLeonardo make an arrest, indicating that he believed Moroughan may have committed a crime. Later, Bienz said that he only "intended to intervene between two individuals who were fighting over a loaded handgun."

Attempting to escape, Moroughan put the Prius into reverse again. The moving car knocked down DiLeonardo and Bienz. Moroughan made a U-turn and drove to Huntington Hospital. His girlfriend dialed 911, reporting that a man in an orange shirt had shot her boyfriend and telling the operator, "I think that kid said that he was a cop."

Near pooled blood on the roadway, Bienz yelled at DiLeonardo, "Dude, what the [expletive] did you just do?" he told internal affairs investigators.



POLICE OFFICER EDWARD
SERIAL NUMBER 894
SHIELD NUMBER 346
THIRD PRECINCT
DATE OF APPOINTMENT 1/3/200

Nassau Police ID photo of Officer Edward Bienz.

## No cause to fire, experts say

Under New York law, police and civilians alike may use deadly force in self-defense if they reasonably believe their lives are in danger.

DiLeonardo was acting as a civilian when he confronted Moroughan, according to legal experts. Moroughan had not committed a crime by shouting at DiLeonardo and then had tried to leave the confrontation by backing up. At that point, they said, DiLeonardo had no grounds to act against Moroughan as a police officer.

“I don’t see any cause for a private individual to take out a gun and threaten the other person with deadly force like that,” said Gershman, the Pace law professor. “I don’t see any justification for even removing his gun and displaying his weapon.”

Instead, Gershman said, DiLeonardo had a duty to retreat to safety from perceived danger rather than use deadly force.

New York Law School Professor Justin Murray said, “I see no evidence whatsoever that Moroughan engaged in any kind of criminal activity and no justification for the officer to resort to displaying a gun, much less firing at him.”



## ‘He should’ve been arrested that night.’

*Philip Stinson, former police officer and Bowling Green State University criminal justice professor*

Bowling Green Professor Philip Stinson said of DiLeonardo: “He should’ve been arrested that night.”

Stinson’s 20,000-case database breaks down arrests of police officers by location and types of offenses. When officers are implicated in crimes, investigators are often less aggressive than they are when looking into offenses committed by civilians.

“They start with a different set of assumptions,” Stinson said. “Evidence isn’t collected. Witnesses aren’t canvassed.”

## No alcohol testing

DiLeonardo called 911. He reported that he was a Nassau County police officer, thought he had been shot and issued a code for a cop in distress. More than 20 officers swarmed the scene. Accounts given to internal affairs investigators and in Moroughan's lawsuit described what then happened.

Sgt. Jack Smithers, the top responding officer, reported that DiLeonardo was teary-eyed, said that he couldn't find his gun and again said that he thought he had been shot. He was bleeding from what turned out to be a cut finger. Another officer described Bienz as "shaken up."

Initially, investigators from Suffolk's Second Precinct in Huntington viewed Moroughan as a possible victim and DiLeonardo as a possible suspect. Det. Patricia Niemir ordered the crime scene labeled as the setting for investigating a first-degree assault: a shooting.

She was introduced there both to Nassau County Police Department Deputy Chief John Hunter, who was heading up a team responsible for scrutinizing the shooting, and to Nassau County Police Department PBA President James Carver. Niemir reported to internal affairs that she did not discuss the investigation with them and didn't work on it long enough to determine who had committed a crime and who was a victim.

Two residents of nearby homes called 911 after the shooting. One of them had been an eyewitness. Still, a Suffolk County detective reported that a neighborhood canvass proved unsuccessful.

Interviewed months later by Nassau County internal affairs — rather than by one of the Suffolk officers who was at the scene of the shooting — the witness reported that he had seen "a man with a gun walking towards a white car which was stopped in the middle of the road. The man with the gun was shooting his gun at the windshield of the car."

> 'The man with the gun was shooting his gun at the windshield of the car.'

In New York City, New York Police Department regulations mandate that a police officer who discharges a firearm must take a Breathalyzer test, regardless of whether on duty or off duty. When readings are above .08, the legal limit for driving while intoxicated, supervisors must order further alcohol testing, can command officers to surrender firearms and must notify internal affairs.

The Suffolk department does not conduct mandatory alcohol or drug testing of officers after shootings. Spokeswoman Dawn Schob said the county's police contract permits testing only when fellow officers suspect that a shooter is impaired.

An officer and a detective separately detected the smell of alcohol around DiLeonardo, Bienz and their companions. They told internal affairs that they hadn't been able to tell who was emitting the odor.

Smithers, the sergeant on scene, spoke with DiLeonardo. In a deposition, he quoted DiLeonardo as asking, "Sarge, can you help me?"

He told internal affairs that he saw no evidence that DiLeonardo was intoxicated and reported that he didn't question DiLeonardo about alcohol consumption.

"It wasn't even a thought in my eyes. I didn't smell it," Smithers told internal affairs.

Suffolk police ordered no sobriety testing

Murray, the New York Law School professor, called the failure to investigate alcohol consumption by DiLeonardo and Bienz "a really inexcusable oversight."

Measuring DiLeonardo's sobriety was crucial to determining whether he reasonably believed that he faced a threat when Moroughan drove the cab forward.

"The odds he's acting reasonably plummets precipitously if it turns out he's not in his right mind because of intoxication," Murray said.

## Detectives take a contested statement

An ambulance took DiLeonardo and Bienz to Huntington Hospital.

More than 30 officers, detectives and police supervisors crowded the emergency room. They came both from Suffolk, whose department was responsible for investigating the shooting, and from Nassau, home base of DiLeonardo and Bienz. The personnel included four representatives of the two officers' union, the Nassau Police Benevolent Association, and a PBA attorney.

An emergency room physician recorded that DiLeonardo was "slurring words at times with smell of alcohol on breath."



Homicide Det. Ronald Tavares investigated the shooting. He was photographed at criminal court in Riverhead in 2010 in an unrelated case. Photo credit: Joseph D. Sullivan

Noting that he was also sweating and had bloodshot eyes, the doctor described DiLeonardo as "hostile," found his "psychiatric insight and judgment to be impaired" and wrote that DiLeonardo refused to undergo blood or urine testing aimed at pinpointing his level of intoxication.

A Suffolk detective wrote that the doctor remarked: “Great, you can get drunk, shoot someone and walk out the same day.”

Within a few hours, the department gave the case to homicide detectives, who investigate officer-involved shootings. They focused on Moroughan as a suspect rather than on a possible first-degree assault by DiLeonardo.

After Moroughan’s wounds proved not to be life-threatening, he was placed in a room under police guard. He testified in a lawsuit deposition that the officer asked what happened and he answered, “I got into an argument on the road and this [expletive] psycho jumped out of his car and started shooting at me for no reason.”

He told a doctor that he thought he was “going to die” when the “guy got out of the car with a gun,” and he testified in a preliminary lawsuit hearing that police rebuffed repeated requests for a lawyer.

Moroughan’s godmother, Risco Mention-Lewis, arrived at the hospital. She then served as a Nassau County assistant district attorney and is now a Suffolk police department deputy commissioner. Police refused her entry to Moroughan’s room.

Suffolk County Deputy Police Commissioner Risco Mention-Lewis. Photo credit: Barry Sloan

Over the course of the night, his regimen of drugs included the sedative Ativan and the narcotic painkillers morphine, Dilaudid and Percocet.

Homicide detectives Ronald Tavares and Charles Leser arrived around 4 a.m. Interviewed six hours later at the precinct, DiLeonardo and Bienz told the detectives they each had consumed only a couple of drinks.

The detectives took statements from DiLeonardo, his girlfriend, Bienz’s wife and Moroughan’s girlfriend. The detectives did not take a statement from Bienz. Their supervisor, Det. Sgt. William Lamb, told internal affairs that he never ordered the detectives to get Bienz’s account of what happened in writing.

Two former prosecutors said detectives should have taken a statement from Bienz.

Calling a written witness statement "the best evidence you have of what happened," Gershman, the Pace University law professor, said: "It's hard to believe they wouldn't take a statement from every witness at the scene of the incident. That's suspicious."

Ayanna Sorett, a fellow at Columbia University's Center for Justice who served for 15 years as an assistant Manhattan district attorney, wrote in an email that investigations of possible criminal conduct by police are among the most challenging for prosecutors.

"Obtaining detailed facts at the very beginning is imperative as it lays the groundwork for a thorough and effective investigation," she wrote, also citing a need to gather statements from witnesses "when the information is fresh in their mind" and "before these witnesses can be influenced by others."



Around 5:50 a.m., Lamb ordered Tavares and Leser to question Moroughan. An hour later, Tavares wrote out a statement that purported to be Moroughan's account of his encounter with DiLeonardo. Leser witnessed the document.

It quoted Moroughan as saying that he had been angry about traffic from the start of his shift, that he got angrier in the confrontation with DiLeonardo, and that he had aimed his car at DiLeonardo.

Implicating himself in a crime, Moroughan reportedly said: "I revved my engine. I drove forward toward the guy who was standing in the street near his white car."

He also allegedly said that he believed DiLeonardo shot in self-defense — in effect, establishing that DiLeonardo was legally justified to open fire.

"I felt he fired at me to protect himself because I drove at him," the detective quoted Moroughan as saying.

## 'I felt he fired at me to protect himself because I drove at him.'

**-Disputed statement allegedly made by Thomas Moroughan**

Gershman said Moroughan's statement was exactly what police needed to justify DiLeonardo's shooting, exonerating the officer and implicating Moroughan.

"If it was a script, it was a good script," he said.

Grandinette, the lawyer representing Moroughan in the $30 million lawsuit, said Tavares and Leser constructed the statement with the language necessary to frame Moroughan and spare DiLeonardo.

"The Suffolk County Homicide Bureau, and all the officers who were at the hospital that were involved in this case, knew that there was only one out for DiLeonardo and Bienz. And that singular out is to claim justification. And, so, they create and fabricate these statements" Grandinette said, adding:

Attorney Anthony Grandinette in his Mineola office. Photo credit: J. Conrad Williams Jr.

"The outrageous thing is that these detectives were willing to frame an innocent man, for serious criminal charges that would send him to prison, in order to shield Anthony DiLeonardo and Edward Bienz from administrative and criminal sanctions."

Leser, who retired in 2020, didn't return calls for comment. A department spokeswoman said Tavares would not comment because of litigation.

Lamb arrested Moroughan on a charge of second-degree assault. He alleged that Moroughan had injured DiLeonardo with the intent of preventing a police officer from making an arrest. Lamb also alleged that Moroughan had recklessly endangered DiLeonardo by accelerating the car toward him.



Former Nassau PBA President James Carver in 2012. Photo credit: Howard Schnapp

## Initial probe backs shooter

Less than 12 hours after the shooting, four high-ranking Nassau County officers completed a preliminary investigation that became the first to clear DiLeonardo and Bienz of wrongdoing.

After shootings, members of the county's Deadly Force Response Team render initial judgments about whether officers acted properly in discharging their weapons.

Based on the investigation conducted by Suffolk officers and its own evaluation of the scene, the team concluded that DiLeonardo had acted within guidelines when he shot Moroughan.

Their report cited as fact that Moroughan "began to drive his vehicle directly at DiLeonardo." It did not mention alcohol consumption.

The team judged DiLeonardo and Bienz to be "fit for duty." They returned to work after sick leaves — 12 days for DiLeonardo, 10 days for Bienz — related to injuries sustained in the incident.

When Moroughan's criminal defense attorney called for the release of records that would show DiLeonardo and Bienz had been drinking, the Nassau police union backed DiLeonardo.

"Any allegation of any alcohol is intended as a distraction from the defendant's actions," PBA President Carver told Newsday at the time.

## Crime lab analysis undermines charges

The Suffolk County Crime Laboratory dispatched an investigator to the site of the shooting. Working independently from police and prosecutors, the lab analyzes evidence ranging from DNA samples to the length of tire tracks left after a fatal car collision. Its responsibilities also include analyzing and reconstructing crime scenes.



After studying the events, including the kind of car Moroughan was driving, the locations of the cars and DiLeonardo's use of an ankle holster, lab analyst George Krivosta reported that DiLeonardo "follow[ed] on foot" when Moroughan climbed back into his taxi after the shouting match.

Where DiLeonardo and the Deadly Force Response Team described Moroughan as "revving" his Prius engine before driving at DiLeonardo, Krivosta wrote that the hybrid's motor system was quiet.

He also doubted that DiLeonardo had time to reach and draw the revolver from his ankle in a split-second reaction to an oncoming vehicle, as DiLeonardo had stated.

Crime lab analyst George Krivosta, whose findings contradicted DiLeonardo's account. He was photographed in 2004. Photo credit: Joel Cairo

"The difficulty of drawing a weapon from an ankle holster would have required him to have drawn the weapon prior to" the car's movement, Krivosta wrote, also stating that DiLeonardo "may have been concealing the weapon from view by holding it at his side."



More than three months after Moroughan's arrest, the Suffolk County District Attorney's Office asked a judge to dismiss the case.

In court, Assistant District Attorney Raphael Pearl said there was a "significant deficiency in the proof" against Moroughan and cited evidence both that Moroughan had withdrawn from the confrontation and that DiLeonardo had been drinking.

## Sergeant on DiLeonardo drinking:

> 'It wasn't even a thought in my eyes. I didn't smell it.'

Source: Suffolk internal affairs report

## Doctor on DiLeonardo drinking:

> 'slurring words at times with smell of alcohol on breath.'

Pearl also noted that Moroughan had suffered two gunshot wounds and a broken nose while DiLeonardo's most serious injury was a cut finger.

The judge dismissed the charges, clearing Moroughan.

## District attorney decides no grand jury investigation

With the evidence indicating that DiLeonardo had shot and wounded Moroughan without cause while under the influence of alcohol, Suffolk DA Spota had the power to pursue an assault charge before a grand jury.

Instead, Spota chose to drop the matter.

Moroughan's defense attorney, William Petrillo, told the judge that he had advised Moroughan "that there is no need to be testifying before a grand jury or participating in any criminal proceedings."

Outside court, a spokesman for the DA said the office would not seek charges against DiLeonardo because Moroughan preferred not to testify.

Former Suffolk County District Attorney Thomas Spota in 2011. Photo credit: James Carbone

"I'm glad I can move on with my life. It's just nice to know I don't have to worry," Moroughan said.

Gershman said the DA should have subpoenaed Moroughan and his girlfriend to testify before a grand jury.

"The police officer appeared to be drunk and acting recklessly. This is a case where you gotta be very, very aggressive if you're a

prosecutor in terms of finding out what these police officers did, and whether what they did was unlawful," Gershman said. "You don't want police officers on the force who violate their oath and violate the law."




Referring to Suffolk prosecutors, Murray, the New York Law School professor, said, "No doubt they could've gotten indictments without Moroughan and his girlfriend."

Grandinette said that, if necessary, Spota could have secured an indictment without Moroughan's testimony.

"Would we have supported prosecution of individuals? Sure," Grandinette said.

He said that Moroughan didn't trust Suffolk law enforcement and called Moroughan' stance against testifying a "great decision," given that Spota was later convicted of covering up crimes to protect former Chief of Department James Burke.

## Two internal affairs investigations

Following standard practice, the Nassau and Suffolk departments each opened internal affairs investigations when lawyers notified the counties that Moroughan planned to sue. As required by law, the departments conducted the investigations in secret and reached their findings in secret.

In Suffolk, Internal Affairs Bureau Sgt. Kelly Lynch had primary responsibility for investigating whether police had conducted a proper investigation before arresting Moroughan.

While she was assigned to internal affairs, Lynch won election as a Superior Officers Association trustee.

Her focus in the Moroughan investigation included the roles played by two union members: Det. Sgt. Lamb, who ordered detectives Tavares and Leser to take Moroughan's hospital-bed statement, and Sgt. Smithers, the initial supervisor at the shooting scene and who joined Lynch as a Superior Officers Association trustee while her investigation of his conduct was underway.



Former Internal Affairs Bureau Sgt. Kelly Lynch in 2019. Photo credit: J. Conrad Williams Jr.

Lynch recommended substantiating no charges against Lamb and Smithers or any other member of the department, Caldarelli said.

In contrast, a yearlong Nassau internal affairs investigation concluded that DiLeonardo had committed 11 unlawful acts when he shot Moroughan. They included first-degree attempted assault, second- and third-degree assault, criminal use of a firearm, reckless endangerment, criminal mischief, reckless driving and driving while impaired by alcohol. The investigation also found that DiLeonardo had committed eight departmental rule violations.

The Nassau IA report found that Moroughan had not committed any crime before DiLeonardo opened fire and that there was no evidence he had tried to run down DiLeonardo.

"Most troubling is the fact that PO DiLeonardo appeared to have unholstered his gun before he started to approach the cab, and possibly when he was in his own car," the report stated, adding that "there appears to be no reason for PO DiLeonardo, who unquestionably was consuming alcohol that evening, to have unholstered his weapon before he started to approach the cab."

intoxicated. Most troubling is the fact that PO DiLeonardo appeared to have unholstered his gun before he started to approach the cab and possibly when he was in his own car. There is nothing to suggest that Mr. Moroughan or Ms. Moro[illegible] might have been armed or that they posed any risk beyond the use of foul language. Thus, there appears to be no reason for PO DiLeonardo, who unquestionably was consuming alcohol that evening, to have unholstered his weapon before he started to approach the cab.

**‘DiLeonardo appeared to have unholstered his gun before he started to approach the cab.’**

Nassau internal affairs report

The report found that Bienz committed two unlawful acts — driving while impaired and reckless driving — and three counts of violating department rules, including conduct unbecoming an officer. He pleaded guilty to two departmental charges and was fined 20 days’ pay, according to a document obtained by Newsday.

Facing termination, DiLeonardo demanded a hearing. The department scheduled one and then postponed it for 14 months. Moroughan’s lawyer Grandinette told the magistrate presiding over the lawsuit that the county had given notice that the hearing “would be adjourned pending the resolution of the federal civil rights case.”

Police departments often move slowly in disciplinary cases to avoid generating evidence that can strengthen legal claims against them, Cordell said.

“Where an officer’s being terminated for conduct that’s a subject of a lawsuit, that’s a problem for a county, if it is concerned not about justice but about just their pocketbook,” she said, adding, “I don’t think there’s a plausible, credible explanation for delaying [DiLeonardo’s] termination almost two years” after the report was completed.

## Secrecy breaks by accident

To that point, because of internal affairs confidentiality, the public had the opportunity to know little more than the basic outline of events: a Nassau police officer had shot a cabdriver; Suffolk police had arrested the cabbie for trying

to run down the officer; the district attorney had dropped charges against the cabbie; and the DA had closed the investigation. DiLeonardo was still an officer with the Nassau County Police Department.

Then, a Newsday reporter discovered a copy of Nassau's IA report — filed by mistake — among public records in Moroughan's lawsuit.

Suddenly made public, evidence that DiLeonardo had committed crimes — and that Suffolk officers had wrongly arrested Moroughan — produced repercussions.

How Newsday told the story: June 23, 2013.

On one front, Spota announced that he had changed course and empaneled a grand jury to investigate DiLeonardo's conduct — only to have his office later say that the panel had been helpless to act.

On another front, defense lawyers for a teenager convicted of an unrelated gang killing zeroed in on the discredited confession taken by Tavares and Leser because the two detectives had taken a disputed confession from the teenager, Gabriel Hubbard.

The attorneys alleged that the district attorney's office had unlawfully hidden evidence of misconduct by the two detectives, denying Hubbard the opportunity to impeach their credibility before the jury that found him guilty.

Justice Martin Efman, who went on to throw out the teenager's conviction, demanded to see both Nassau and Suffolk's internal affairs report.

## Internal affairs chief calls for charges

The judge's order prompted Caldarelli to finish Suffolk's internal affairs report, including overturning Lynch's recommendation against substantiating any misconduct charges. At this point, however, the department was powerless to impose discipline.

State law sets an 18-month limit for filing disciplinary charges against police officers. When Caldarelli completed his report in June 2014, the department had missed the deadline by 21 months.

In overruling Lynch, Caldarelli recommended substantiating two misconduct charges.


Caldarelli in 2021. Photo credit: Alejandra Villa Loarca

He faulted Smithers, the crime scene supervisor, for failing to investigate whether DiLeonardo and Bienz had been drinking.

"The fact that two twenty-something-year-old men were involved in a violent incident at 0118 hours on a Sunday morning near Huntington village, an area known for its prevalence of bars, should have suggested possible alcohol involvement to the police personnel at the scene," Caldarelli wrote.

"This raises questions regarding Sgt. Smithers' claim that alcohol involvement 'was not even a thought in his eyes.' In light of the totality of the circumstances, it should have been a primary concern."

Smithers "should have also made an effort to interview" Bienz and his wife, along with DiLeonardo's girlfriend, Caldarelli wrote, adding:

"All relevant information should have been promptly brought to the attention of the investigating detectives and assessed for impact on the shooting investigation and for possible DWI enforcement action."

Caldarelli also recommended substantiating a charge of improper police action against Lamb, the detective sergeant who ordered detectives to take Moroughan's statement.

Pointing out that Moroughan had been prescribed painkillers after getting shot twice, Caldarelli wrote that "no statement should have been taken." He also questioned the legitimacy of Moroughan's purported confession, writing that "it cannot be established that he did in fact utter" the self-incriminating remarks.

He faulted Lamb for failing to order the two detectives, Tavares and Leser, to take a statement from Bienz on the night of the shooting. He wrote: "Lamb's failure to obtain a written statement from Edward Bienz on the date in question was also improper and constitutes a further basis for this finding."

Leser said that Lamb decided not to take a sworn written statement from Bienz "because a grand jury was likely," according to the internal affairs report.

"That to me is a far-fetched excuse," Gershman said. "They don't want to memorialize a story before they get the story they want. It's extremely suspicious."

Caldarelli did not call for charges against Tavares and Leser. Referring in an interview to the statement they took from Moroughan, he said, "The proof was not definitive enough that it was a complete fabrication."

"The biggest problem wasn't the content, it was that it was taken from someone who was shot and medicated," Caldarelli said.

## 'Truth was a casualty'

As commissioner, Webber had the power to overrule Caldarelli's findings. Instead, Caldarelli remembers Webber saying that he would hear from Madigan about changing the document. Madigan then summoned Caldarelli to a meeting. Crawford, the department's counsel, also attended.

Madigan brought a copy of the report to the meeting. Caldarelli said the document was covered with notes and crossed-out sections. A copy obtained by Newsday showed the handwritten instructions. Caldarelli confirmed its authenticity.

The notes called for deleting evidence that police should have investigated DiLeonardo's alcohol consumption and that detectives should not have taken Moroughan's statement.

"Out!!"" Madigan wrote next to a passage reporting that Tavares and Leser had interviewed Moroughan after he had been given morphine. "Where did this come from? IAB report of Nassau? If so, out."

He wrote "Delete" next to a section where Caldarelli wrote: "This is because the circumstances clearly indicate no statement should have been taken from Mr. Moroughan."



#4 It is unclear if the claimant's request to speak with the then Nassau County ADA Mention-Lewis constituted a clear and unequivocal request for counsel. This issue undoubtedly would have been contested in court had the charges against the claimant not been dropped. While I am not prepared to dismiss this question out of hand, I believe it to be irrelevant. This is because the #5 circumstances clearly indicate no statement should have been taken from Mr. Moroughan, any request for counsel notwithstanding. The claimant had been shot twice, once in the chest. It is unclear what medications had been administered to him at the hospital (The Nassau County PD IAB report indicates he had been given morphine and Moroughan's 50-H testimony mentions his being medicated). Although his wounds were deemed non-life threatening and he was #6 discharged from the hospital later that day, the involved detective personnel had no way of accurately assessing his condition at the time of the confession, as indicated by D/Sgt. Lamb's statements. Sgt. Lynch determined the claim of **Improper Police Action** made against D/Sgt. Lamb and Detectives Lesser and Tavares was unsubstantiated. I differ with Sergeant Lynch on this matter. While it is unclear if any right to counsel attached in this case, it is clear to me that a #7 **Substantiated finding on this claim is indicated against D/Sgt. Lamb**, not on the basis of counsel being denied, but for allowing a confession to be taken from an individual whose physical and mental condition was such that his ability to intelligently, knowingly and

Delete

Out!!

Where did this come from? IAB report of Nassau? if so, out

Image from secret internal affairs report.

Madigan crossed out a section that reported Huntington Hospital records showing that DiLeonardo slurred his words, had alcohol on his breath and refused to provide blood or urine samples.

Next to a section that listed DiLeonardo's and Bienz's accounts of their drinking that night, Madigan wrote "w/o report- Delete"

Caldarelli quoted Madigan as saying Lynch had been "spot on" when she recommended against substantiating any charges.

In a phone interview, Newsday described for Madigan the handwritten notes that Caldarelli attributed to him, including "Delete" and "Out."

Madigan declined to comment on the notations and declined offers to review the documents.

"I'm not looking to be the highlight of this show," he said.

Crawford held the rank of police captain at the time. From 2010 through 2012, he had served as Superior Officers Association trustee and went on to take the post of union sergeant-at-arms from 2015 through 2018. At the meeting with Madigan, he said that the counsel's office was available to provide legal advice, Caldarelli recalled.

Crawford, through a department spokeswoman, declined to comment.

Permitting Madigan to dictate changes was "totally inappropriate," Caldarelli said, pointing out that Tavares and Leser reported to him up through the chain of command.

"He's the chief of detectives. These are his guys," Caldarelli said. "He has an objective interest in this. It's embarrassing if people are found guilty of wrongdoing. It reflects poorly on him."



Former Suffolk Chief of Detectives William Madigan in 2014. Photo credit: John Paraskevas

Eventually, Caldarelli said, he stopped arguing and left the meeting with a copy of the changes that Madigan had requested. Proof, he believed, of an effort to whitewash the case.

"The truth was a casualty there, which totally was the point," Caldarelli said.

Caldarelli wrote in a memo Webber:

"While I am happy to make some of the minor changes Chief Madigan directed, I object to the more substantial amendments he ordered. Chief among these is his direction that I remove information which I consider essential to a full understanding of my substantiated findings in this case."

He continued: "I consider this matter to be of the utmost importance."

Without informing Caldarelli, Webber ruled out all charges.

"They had to write a report that basically contradicted his report, because he was blatantly wrong," Madigan said, referring to Caldarelli.

Caldarelli was soon transferred out of internal affairs — after "a friendly warning" by Chief of Patrol John Meehan, who retired in 2016 after more than four decades on the force.

"He mentioned to me very casually, 'Michael, a lot of people are thinking you're substantiating too many cases,'" Caldarelli said.

Meehan declined to comment on Caldarelli's account, saying he had been questioned about it in a deposition in an unrelated federal lawsuit that accuses the Suffolk County Police Department of racially profiling Hispanic drivers. The deposition and other documents in the lawsuit are under seal.

"I'm not going to comment on anything I addressed during the deposition, but any insinuation that I, in any way, in 43 years acted unethically is patently untrue," he said.

Confirming that internal affairs had deemed all charges as "unfounded," a Suffolk County attorney wrote to Newsday that Caldarelli's report "was the product of one individual, and was not the position of the SCPD."

## The aftermath of two investigations

Three years and two months after Moroughan's shooting, a hearing officer approved DiLeonardo's termination for pummeling the cabdriver with his gun, damaging the cab and losing the gun. The Nassau department had dropped the accusation that DiLeonardo had wrongfully shot Moroughan.

Asked for comment, Nassau County police spokesman Det. Lt. Richard LeBrun wrote in a statement:

"The Nassau County Police Department conducted an extensive Internal Affairs investigation into Officer Anthony DiLeonardo's conduct during an off duty incident. Officer DiLeonardo was charged with numerous violations of our

Rules and Regulations and the Police department terminated his employment."



Thomas Moroughan at his attorney's office in Mineola. Photo credit: Reece T. Williams

DiLeonardo's attorney Barket in court papers indicated that DiLeonardo's defense against Moroughan's lawsuit would be that he was justified to shoot while attempting to make a lawful arrest.

"He got fired," Barket said of DiLeonardo. "So, if people think he's at fault, he lost his career."

Bienz was promoted to sergeant in 2018 and lieutenant in 2020, according to payroll records.

Cordell said that he should have been penalized more harshly than the loss of 20 days' pay.

"The message we're getting is if you're an officer and do this, the worst you're going to get is a fine," she said.

Bienz did not respond to requests for comment through the department and Nassau Superior Officers Association.

Det. Sgt. Lamb retired in 2018. He referred questions to the county attorney's office, which did not respond to requests for comment.

Smithers is still a sergeant. Through a spokeswoman, he declined to comment.

Lynch, the former internal affairs investigator, moved on to lead the department's Domestic Violence and Elder Abuse Unit. She retired in 2021. She did not respond to requests for comment.

The Suffolk district attorney's office retried Gabriel Hubbard for murder after Efman ruled that prosecutors should have informed the teenager's lawyers about the actions of detectives Tavares and Leser in taking Moroughan's confession. As the lawyers cross-examined Tavares, the DA's office allowed Hubbard to plead guilty to manslaughter and win release after being jailed for six years.

Caldarelli, an inspector, was reassigned to a position formerly held by a lieutenant, a rank three levels below his. He retired in 2017.

Crawford has been promoted to inspector and serves as the executive officer, or second in command, of Suffolk County's Internal Affairs Bureau. His work has included determining whether the department would release disciplinary records in response to FOIL requests.

In 2021, he signed letters partially or fully denying Newsday access to records in response to 11 Freedom of Information Law requests. Records related to Suffolk IAB's investigation into the shooting and wrongful arrest of cabdriver Moroughan were among those kept confidential.

A federal magistrate has ordered the counties and Moroughan's lawyer to engage in mediation that could lead to a settlement in Moroughan's 10-year legal battle.

Suffolk County argued in a January filing that its officers "acted reasonably and in good faith" and were justified in arresting Moroughan.

Nassau County asserted that Bienz did not do anything to Moroughan that would be grounds to hold him or the county liable. The county also argued that Moroughan was injured because the "private and personal roadside incident was precipitated and exacerbated by (his) own aggressive and threatening conduct."

Today, his attorney Grandinette said, Moroughan still lives in Suffolk County and works as a delivery truck driver.

"It's awfully difficult for him to believe he's safe and will receive proper police services as a citizen of Suffolk County."

With Sandra Peddie

# MORE COVERAGE

## Understaffed, undermined: Ex-Suffolk internal affairs commander describes how he was driven out

READ MORE

**Reporter:** David M. Schwartz

**Additional reporting:** Sandra Peddie

**Editor:** Arthur Browne

**Video editors:** Valerie Robinson, Jeffrey Basinger, Greg Inserillo

**Digital producer and project manager:** Heather Doyle

**Digital design/UX:** James Stewart

**Social media editor:** Gabriella Vukelić

**Print production:** Jessica Asbury, Andrew Wong

**QA:** Daryl Becker