**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SAMUEL WHITE,**

Plaintiff

Civil Action No.:
20-CV-01501

v.

**Plaintiff's Memorandum of Law In Opposition to County Defendants' Motion for Summary Judgment**

**COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE DEPARTMENT, RONALD TAVARES, MICHAEL MILAU, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, DARRYL LEVY, LAURA NEWCOMBE, THOMAS SPOTA, JOHN DOES 1-10, TIMOTHY SINI, OFFICE OF THE MEDICAL EXAMINER CRIME LABORATORY (SUFFOLK COUNTY), HELEN WONG, ODETTE R. HALL, M.D., JOHN PETERSON, AND JAMES MCGUINNESS,**

Defendants

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Oral Argument Requested

Dated: September 5, 2025
New York, New York

Stephanie Mc Clure, Esq.
Law Office of S. Mc Clure LLC
101 Avenue of the Americas; 9th Fl
New York, New York 10013
Tel: (646) 417-8380
Email: Stephanie@nycnjlawyer.com

*Attorney for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i
TABLE OF AUTHORITIES .......... iii
PRELIMINARY STATEMENT .......... 1
SUMMARY JUDGMENT STANDARD .......... 2
LEGAL ARGUMENT .......... 3

**POINT I** .......... 3

**TIMONY SINI AND JAMES MCGUINNESS WERE PERSONALLY INVOLVED IN CONSTITUTIONAL VIOLATIONS** .......... 3

**SINI IS NOT ENTITLED TO SOVEREIGN IMMUNITY OR PROSECUTORIAL IMMUNITY** .......... 20

**POINT III** .......... 22

**PLAINTIFF'S CLAIMS DO NOT FAIL FOR GROUP PLEADING AND A LACK OF PERSONAL INVOLVEMENT BY MANY OF THE NAMED DEFENDANTS** .......... 22

**POINT IV** .......... 25

**NEITHER HALL NOR WONG ARE ENTITLED TO ABSOLUTE IMMUNITY** .......... 25

**POINT V** .......... 26

**PROBABLE CAUSE DID NOT EXIST** .......... 26

**POINT VI** .......... 38

**PLAINTIFF'S INDICTMENT BY GRAND JURY WAS SECURED BY FRAUD AND THEREFORE PROBABLE CAUSE IS REBUTTED** .......... 38

**POINT VII** .......... 40

**PLAINTIFF HAS ESTABLISHED GENUINE ISSUES OF MATERIAL FACT SURROUNDING THE ISSUE OF PROBABLE CAUSE, AND HIS CLAIMS FOR FALSE ARREST AND MALICOIUS PROSECUTION SURVIVE SUMMARY JUDGMENT AS A MATTER OF LAW** .......... 40

**POINT VIII** .......... 44

**PLAINTIFF HAS COME FORWARD WITH EVIDENCE SUFFICIENT TO ESTABLISH A GENUINE ISSUE OF FACT ON ALL ELEMENTS OF HIS MALICIOUS PROSECUTION CLAIMS** .......... 44

**POINT IX** .......... 52

**PLAINTIFF HAS RAISED A GENUINE ISSUE OF FACT AS TO WHETHER DEFENDANTS DEPRIVED PLAINTIFF OF HIS RIGHT TO A FAIR TRIAL** .......... 52

**POINT X** .......... 56

**DEFENDANTS' POINT X MUST BE DENIED *IN TOTO* AS PLAINTIFF'S COUNTS 9-18 ARE SUFFICIENT TO STATE COGNIZABLE CLAIMS FOR WHICH**

**PLAINTIFF HAS PRESENTED EVIDENCE SUFFICIENT TO RAISE A GENUINE ISSUE OF MATERIAL FACT** ........ 56

**POINT XI** ........ 58

**SUFFICIENT EVIDENCE EXISTS TO SUBMIT PLAINTIFF'S EQUAL PROTECTION CLAIM TO A JURY** ........ 58

**POINT XII** ........ 60

**THE RECORD SUPPORTS A FAILURE TO INTERVENE CLAIM** ........ 60

**POINT XIII** ........ 61

**PLAINTIFF'S §1985 CONSPIRACY CLAIM IS NOT BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE AND GENUINE ISSUES OF FACT EXIST TO SHOW CONSTITUTIONAL VIOLATIONS** ........ 61

**POINT XIV** ........ 63

**PLAINTIFF HAS DEMONSTRATED SUFFICIENT EVIDENCE TO RAISE GENUINE ISSUES OF FACT AS TO ITS *MONELL* CLAIM** ........ 63

**POINT XV** ........ 86

**COUNTY DEFENDANTS' GENERAL ASSERTION REGARDING TESTIMONIAL IMMUNITY IS IRRELEVANT AND MUST BE DENIED** ........ 86

**POINT XVI** ........ 86

**COUNTY DEFENDANTS' GENERAL ASSERTIONS REGARDING THE NOVEMBER 23, 2018 ARREST DOES NOT MEET ITS CELOTEX BURDEN AND MUST BE DENIED** ........ 86

**POINT XVII** ........ 87

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY** ........ 87

CONCLUSION ........ 91

# TABLE OF AUTHORITIES

Cases


**Page(s)**

Al-Jundi v. Estate of Rockefeller
885 F.2d 1060, 1066 (2d Cir. 1989) .................................................................. 4

Amnesty Am. v. Town of West Hartford
361 F.3d 113 (2d Cir. 2004) .................................................................. 2, 64

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986) .................................................................. 2

Baez v. Hennessy
853 F.2d 73.................................................................. 20

Bailey v. City of New York
79 F. Supp. 3d 424 (E.D.N.Y. 2015) .................................................................. 49

Barnes v. Anderson
202 F.3d 150, 158 (2d Cir. 1999) .................................................................. 48

Barrett v. Watkins
919 N.Y.S.2d 569, 572 .................................................................. 44

Blake v. Race
487 F. Supp. 2d 187 (E.D.N.Y. 2007) .................................................................. 49, 86

Brady v. Maryland
373 U.S. 83 (1963) .................................................................. 52

Brandon v. City of New York
705 F.Supp 2d 261, 276 (S.D.N.Y. 2010) .................................................................. 64

Buari v. City of New York
530 F.Supp 356, 383 (S.D.N.Y. 2021) .................................................................. 44

Buckley v. Fitzsimmons
509 U.S. 273 (1993). .................................................................. 20

Bunnenberg v. Liberty Mut. Fire Ins.
2024 WL 4278644 (N.D.N.Y. Sept. 24, 2024) .................................................................. 22

Cameron v. Church
253 F. Supp. 2d 611, 623 (S.D.N.Y. 2023) .................................................................. 59

Celotex Corp. v. Catrett
477 U.S. 317 (1986) .................................................................... 2, 25, 56, 58

Chinese Am. Citizens All. of Greater New York v. Adams
116 F.4th 161 (2d Cir. 2024) ........................................................................ 57

City of Canton v. Harris
489 U.S. 378, 109 S.Ct 1197 (1989) ....................................................... 4, 64

City of St. Louis v. Proaprotnik
485, U.S. 112, 127 (1988) ............................................................ 63

Clark v. City of N.Y.
2015 WL 5719612, (E.D.N.Y. Sept. 29, 2015) ............................................ 87

Coggins v. County of Nassau
988 F. Supp 2d 231,245 (E.D.N.Y. 2013) ................................................ 48

Coollick v. Hughes
699 F.3d 219 (2d Cir.2012) .......................................................... 86

Connell v. Sgnoracci
153 F.3d 74, 80 (2d Cir. 1998) ....................................................... 85

Connick v. Thompson
563 U.S. 51 (2011) ....................................................................................... 4

Curley v. Vill. of Suffern,
268 F.3d 65 (2d Cir. 2001) ............................................................ 26, 29, 35

Fiacco v. City of Rensselaer, N.Y.
783 F.2d 319 (2d Cir. 1986) .............................................. 4, 6, 62, 63, 65, 75

Ford v. McGinnis
352 F.3d 582, 597 (2d Cir. 2003) ........................................................ 86

Frost v. N.Y.C. Police
980 F.3d 231, 248-249 (2d Cir. 2020) ................................................ 50-55

Fuentes v. Shevin
407 U.S. 67, 87 92 S.Ct. 1983 ............................................................ 53

Garnett v. Undercover Officer
F 3d. 265, 277-28 (2d Cir. 2016) ......................................................50-51

Gentile v. Suffolk County
926 F.2d (2d. Cir. 1991)........................................................................ 4, 20

Golino v. City of New Haven
950 F.2d 864, 870 (2d Cir. 1991) ................................................................. 26, 35

Gregory v. City of Louisville
444 F.3d 725 (6th Cir. 2006) ........................................................................ 24

H.H. v. City of New York
2017 WL 3396434 (E.D.N.Y. Aug. 7, 2017) ................................................... 65

Harlow v. Fitzgerald
457 U.S. 800 (1982) ......................................................................................... 87

Harris v. Tioga County
663 F. Supp. 3d 212 N.D.N.Y. (2023) .............................................................. 48

Herlihy v. City of New York
654 F. App'x 40 (2d Cir. June 30, 2016) .............................................................9

Higazy v. Templeton
505 F.3d 161 (2007)........................................................................................ 88

Huminski v. Corsones
396 F.3d 53, 69 (2d Cir. 2005) ....................................................................... 2

Hunter v. Underwood
471 U.S. 222 (1985) ......................................................................................... 57

Jones v. City of NY
988 F.Supp 2d 305 (E.D.N.Y. 2013) ............................................... 20, 62, 63

Kanciper v. Lato,
2016 WL 11507274 (E.D.N.Y. Dec. 1, 2016) ..................................................... 9

Keko v. Hingle
318 F.3d 639, 644 (5th Cir.2003) .......................................................................24

Kern v. City of Rochester
93 F.3d 28, 44 (2d Cir. 1996) .......................................................................... 62

Lennon v. Miller
66 F. 3d 416, 423 (2d Cir. 1995) ...................................................................... 86

Lewis v. Clarke
581 U.S. 155 (2017) ………………………………………………………………….. 19

Macshane v. City of New York
2015 WL 1298423 (E.D.N.Y. Mar. 23, 2015) ........................................................................ 9

Mandell v. County of Suffolk
216 F.3d 368, 385 (2d Cir. 2003) ……………………………………………………….85

Manganiello v. City of New York,
612 F.3d 149 (2d Cir. 2010) ……………………………………………………….37, 43, 87

Maxwell v. City of New York 554
N.Y.S.2d 502, 505 (App. Div. 1990)………………………………………………… 49

Miller v. Terrillion
391 F. Supp. 3d 217 (E.D.N.Y. 2019) ................................................................................... 57

Miloslavsky v. AES Engineering Soc., Inc.
808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,*993 F.2d 1534 (2d Cir.), *cert. den*………… 26, 35

Mooney v. Holohan
294 U.S. 103 (1935) ............................................................................................................... 87

Morel v. Reed
Nos. 11-CV-1808, 12-CV-5145, 2015 WL 3755976, at (E.D.N.Y. June 16, 2015) … . …. 36, 38

Moroughan v. Cnty. of Suffolk,
514 F. Supp. 3d 479 (E.D.N.Y. 2021) ………………………………………………..26, 47, 55

Newson v. City of New York
2019 WL 3997466 ………………………………………………………………… 51-52

Newton v. City of New York
738 F.Supp.2d 397 (S.D.N.Y. 2010) ………………………………………………… 24

Ortiz v. Wagstaff,
523 F. Supp. 3d 347 (W.D.N.Y. 2021) ................................................................................... 37

Panetta v. Crowley
460 F. 3d 388, 395 (2d Cir. 2006) ……………………………………………………… 26, 35

People v. Hubbard
991 N.Y.S.2d 297 (N.Y. Sup. Ct. 2014) ................................................................................ 10

Phillips v. DeAngelis
571 F.Supp 2d 347, 353-54 (N.D.N.Y 2008) .................................................... 44

Poventud v. City of N.Y.
750 F.3d 121 (2d Cir. 2014)........................................................................ 49

Quinn v. Nassau Cnty. Police Dep't
53 F. Supp. 2d 347 (E.D.N.Y. 1999) ........................................................... 59

Ramchair v. Conway
601 F3d. 66, 73 (2d Cir. 2010) ................................................................. 50

Ricciuti v. N.Y.C. Transit Auth.
124 F.3d 123 (2d Cir. 1997) ................................................ 36, 38, 44, 49-50, 87

Richardson v. City of New York,
2006 WL 2792768 (E.D.N.Y. Sept. 27, 2006) ................................................ 2

Rivera v. Incorporated Village of Farmingdale
29 F.Supp.3d 121, 129 (2013) ......................................................................9

Rivera v. Fischer
655 F. Supp. 2d. 235 ................................................................................. 4

Rohman v. N.Y.C. Transit Auth
215 F.3d 208, 216 (2d Cir. 2000) ............................................................ 43

Rounseville v. Zahl
13 F.3d 625 (2d Cir. 1994) ......................................................................... 49

Saget v. Trump
345 F. Supp. 3d 287 (E.D.N.Y. 2018) ........................................................ 57

Savino v. City of N.Y.
331 F.3d 63, 72 (2d Cir.2004)......................................................................36

Singer v. Fulton Cnty. Sheriff
63 F.3d 110, 199 (2d Cir. 1995)........................................................... 26, 35

Smith-Hunter v. Harvey
95 N.Y.2d 191, 195, 734 N.E.2d 750, 753, 712 N.Y.S.2d 438 (2002)............................ 49

Tanvir v. Tanzin,
894 F.3d 449 (2d Cir. 2018) ...................................................................... 19

Terry v. Ashcroft
336 F.3d 128 (2d Cir. 2003) ........................................................................ 2

Torcivia v. Suffolk County
409 F. Supp. 3d 19, 50 (E.D.N.Y. March 31, 2019) .......................................... 23

United States v. Agurs
427 U.S. 97 (1976) ........................................................................................ 87

Vann v. City of New York
72 F.3d 1040, 1049 (2d Cir. 1995)........................................................ 64, 78

Washington v. Napolitano
29 F.4th 93 (2d Cir. 2022) ........................................................................... 32

Walker v. City of New York
974 F.2d 293, cert. den. 507 U.S. 961.......................................................... 4, 64, 86

Ying Li v. City of New York
246 F. Supp. 3d 578, 600-621 (E.D.N.Y. 2017)................................................ 60

Zahrey v. Coffey
221 F.3d 342 (2d Cir. 2000) ........................................................................ 54

**Statutes & Rules**

Fed. R. Civ. P. 56(a) ........................................................................ 2

Fed R. Ev. 613 ............................................................................ 8

Fed R. Ev. 803(d) ........................................................................ 8

**PRELIMINARY STATEMENT**

In March of 2020, Plaintiff Samuel White filed this action against Defendants seeking redress for violations of his constitutional rights and for unlawfully depriving him of his liberty for one year. White was falsely arrested on May 25, 2016, without probable cause, based upon fabrications of evidence and suppression of exculpatory evidence. Expert reports confirm fabrications in the autopsy, fabrications in the surveillance video, among fabrications in the statements, and identify systemic failures that perpetuated a culture where withholdings of exculpatory evidence and manufacturing false "evidence" were a norm. Thomas Spota, the former District Attorney, and Police Chief Burke led by example in creating and maintaining this culture of corruption, where fabricating evidence, withholding evidence, witness tampering, false criminal charges, and deprivations of constitutional rights were used tactically in order to maintain the police narrative and reputation of the administration at all costs. Upon taking office in 2018, Sini, who was aware of significant problems festering within the office, was intentionally indifference to serious misconduct within his homicide unit involving fabrications of evidence and suppression of exculpatory material. He was also aware of the need for changes in systems, policy, supervision, and training. Instead, he was indifferent to these needs and made administrative decisions that allowed the customs of misconduct and deprivations of rights to continue, ultimately resulting in the injuries and deprivations of this plaintiff. The named defendants all played a role in the unconstitutional acts, deprivations of rights, fabrications and withholdings as indicated below and as set forth through evidence within plaintiff's statement of additional facts to be tried, submitted herewith and incorporated herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when a moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). In deciding whether such a showing has been made, "a court is required to resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). The moving party bears the initial **burden of pointing to evidence in the record that demonstrates "the absence of a genuine issue of material fact."** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the burden then shifts to the nonmoving party to demonstrate a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The court "is **not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments**." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson*, 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Therefore, **the nonmovant "is entitled both to have his testimony believed and to have all reasonable inferences that can be drawn therefrom made in his favor**." *Richardson v. City of New York*, No. 02 CV 3651 JG, 2006 WL 2792768, at *3 (E.D.N.Y. Sept. 27, 2006) (denying summary judgment on false arrest and malicious prosecution claims because there was a genuine issue of material fact regarding whether an officer deliberately falsified evidence).

# **LEGAL ARGUMENT**

## **POINT I**

## **TIMONY SINI AND JAMES MCGUINNESS WERE PERSONALLY INVOLVED IN CONSTITUTIONAL VIOLATIONS**

County Defendants baldly assert that there is no admissible evidence to support the personal involvement of Defendants Sini and McGuinness in this case. To the contrary, plaintiff has shown admissible evidence that creates a genuine issue of fact as to each of these defendants and their personal involvement in constitutional violations.

**Timothy Sini** Pursuant to Judge Seybert's Ruling at [DE 130], three claims remain against Sini in his *individual* capacity; Counts 1, 2, and 21. [DE 130]. County Defendants' moving papers errantly advise this court that Counts 1 and 2 remain against Sini in his "official capacity only." (See County Defs. Memorandum of Law P. 5). That is incorrect. [DE 130]. The claims that remain as to Sini remain against him in his *individual capacity* (only). [DE 130]. Sini's personal involvement is briefed in detail below. However, before addressing same, plaintiff hereby moves to dismiss Count One as to Timothy Sini only, leaving Timothy Sini individually named in Counts 2 and 21 only. The evidence strongly supports his personal involvement from the date he took office through the end of the prosecution of plaintiff, but not on May 25, 2016. Therefore, the plaintiff has moved accordingly in the interest of justice with regard to Count One (only) and addresses Sini's personal involvement in Counts 2 and 21 below.

**Personal Involvement Defined in the Law**

Well-established case law defines the evidentiary threshold needed to establish "personal involvement" of a supervisor or policymaker. Courts have repeatedly affirmed that "personal involvement" need not be shown by having knowledge specific or hands-on work in any given

matter. Rather, "personal involvement" may be evidenced through showing a custom, failing to supervise or train, intentional indifference, or showing instances of prior mishandlings. Cf. *Fiacco v. City of Rensselaer* NY 783 F.2d. 319, *Rivera v. Fischer* 655 F. Supp. 2d. 235. See also Walker v. City of New York, 974 F.2d 293, cert. den. 507 U.S. 961. *City of Canton*, 489 U.S. 389, *Gentile v. Suffolk County* 926 F.2d (2d. Cir. 1991). Further, "personal involvement" of a supervisory official may be established by a plaintiff by coming forth with evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." *Id.; see also Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1066 (2d Cir.1989) (direct participation not necessary to establish personal involvement). "Personal involvement" of a municipality and/or district attorney may be shown through custom, failing to supervise or train, or discipline, including instances of prior mishandlings and a following intentional indifference thereto. *See C.F. Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331-32 (2d Cir. 1986) [Court affirmed trial judge's decision to admit evidence of seven prior unrelated cases of mishandlings in order to show the history of the claims/mishandlings and the relevant defendant individual party's notice of same and indifference thereto. The court concluded that in that case, the plaintiff's evidence of unrelated cases of misconduct was admissible and *necessary,* in fact, to establish the custom and notice of it. Id. at 329-331] Finally, the Supreme Court has held that "personal involvement" may include deliberate indifference to the constitutional violations or deliberate indifference to the need to

supervise, investigate, train, and discipline staff. *See Connick v. Thompson*, 563 U.S. 51, 59 (2011). Plaintiff's evidence demonstrates genuine issues of material fact about Sini's "personal involvement" through the following means prescribed in *Fiacco* and *Connick*. Importantly, while only a single showing need be made in one of the enumerated ways, plaintiff's evidence demonstrates six separate methods of establishing Sini's "personal involvement."

**(1)** Plaintiff's evidence follows the method approved by the court in *Fiacco*, and demonstrates instances of prior mishandlings and Sini's intentional indifference thereto;

(2) Plaintiff's evidence show that Sini, after being informed of certain Constitutional Violations by the homicide bureau prosecutors through reports delivered by Interim D.A. Emily Constant, failed to address them; and in fact perpetrated the wrongs;

(3) Sini was grossly negligent in supervising subordinates who committed the wrongful acts;

(4) Sini exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring; by:

a. Having information that ADA Newcombe was involved in serious misconduct and failed to investigate her or her files. Instead, re-interviewing her and re-hiring her; failing to give her targeted re-training or address the egregious violations in any way; failing to increase supervision; failing to institute obviously needed systems

b. Having knowledge of the prior instances of misconduct between the SCDAO and the SCPD conspiring in cases involving Det. Tavares and his office; involving fabrications of evidence by both offices and Brady violations by both offices, including the SCDAO and SCPD specifically utilizing a procedure to avoid Brady

disclosure; Sini failed to investigate or implement needed policies with regard to Brady material relating to officer misconduct

(5) Under Connick liability, showing deliberate indifference to the constitutional violations and/or his deliberate indifference to the need to supervise, investigate, train, and discipline staff.

a. Under Connick, showing that, despite all of the above; (direct knowledge of constitutional violations from Constant; reports; notice from media; prior mishandlings; Sini displayed intentional indifference to the constitutional violations by:

1. re-hiring Laura Newcombe despite having knowledge of her involvement in prior egregious misconduct (fabrications/withholdings);
2. and in a further act of indifference toward the constitutional violations involved in the prior mishandlings, decided, as administrator to forgo the investigation into her files, as part of an investigation passed to him by the interim administration
3. made the decision as administrator not to require obviously necessary training or increased supervision for this ADA or the homicide unit, despite the history of constitutional deprivations
4. made the decision as administrator to forgo needed systems in order to supervise the administration of homicide files and ensure proper disclosure; i.e. failing to require checklists or records of disclosures, or any systems between his office and the SCPD and / or the Internal Affairs Department.

(6) Sini continued a custom under which unconstitutional practices occurred.

**Six Showings of Sini's Personal Involvement**

**1. Prior Mishandlings** The first way that plaintiff demonstrates personal involvement is through a showing of prior mishandlings, following the method used and evidence approved in *Fiacco, supra.* In Fiacco, plaintiff sued for violations of excessive force. To prove the district attorney was personally involved in this via "intentional indifference," evidence of seven prior claims of excessive force was allowed into trial to establish the norm ignored. *Fiacco* at 327-328. On the issue of the admissibility of this evidence, the court reasoned that:

> ***"(T)he value of such evidence to a plaintiff in a § 1983 action is clear. Since the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, see City of Oklahoma City v. Tuttle; Turpin v. Mailet, 619 F.2d 196, 202–04 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence. Proof that other claims were met with indifference for their truth may be one way of satisfying the plaintiffs' burden. Id.***

Plaintiff submits the following instances of prior mishandlings following the *Fiacco* model.

**Rudolph Bisnauth**. (2011) Rudolph Bisnauth was convicted of homicide after a trial in 2011. Detectives Tavares and Charles Lesser interviewed the people's witnesses. The District Attorney's Office and its delegates were sanctioned by trial judge Mark Cohen for withholding evidence from the defense showing that the main witness against Bisnauth was an informant on drug cases, working with the Suffolk County Police Department. Also withheld from the Defense was evidence that Tavares and Lesser were implicated in the 2011 false statement in *Moroughan infra*. Judge Cohen wrote that he believed Brady violations occurred and in a statement to the media, the ADA didn't deny the violation, but rather said, the case could've been tried without the witness to which the Brady material pertained (suggesting that *Brady* disclosures may be avoided by not calling certain witnesses to the stand.) See Ex. 136

**<u>Thomas Moroughan</u>**. (2011) Thomas Moroughan, a cab driver, was shot by an off-duty Nassau police officer who was intoxicated. Detective Tavaras responded to the Hospital to interview Moroughan who was being treated for gunshot wounds. Tavares interviewed him bedside, and denied him an attorney. His repeated requests for an attorney, witnessed by others. Ex. 55 Deposition excerpt, Riscoe Mention Lewis. Tavares manufactured a false confession from Moroughan, one that made out a perfect case of self-defense for the police officer who shot him. The false confession stating in sum: *The officer shot me in self-defense because I was driving my car at him.* Several Nassau officers had been interviewed before this point, but Tavaras' statement was the first to even mention self-defense. See Ex. 54 and Ex. 58 – Deposition of Lesser P. 90-120. As a result of the fabricated statement, Moroughan was charged and arrested with assaulting the officer who shot him, and the officers were cleared of liability. Ex. 54 The Suffolk County District Attorney's Office prosecuted the case against Moroughan, using the false confession. Ex. 54 A simultaneously conducted *Nassau County* Internal Affairs investigation exposed Tavares' misdeeds and came to conclusions contrary to Suffolk's own Internal Affairs Investigation, which was shown, by evidence, to have purposely excluded facts against Tavares. At a hearing held pursuant to Municipal Law 50(h), Moroughan testified under oath regarding Tavares' and Lesser's deceptive practices and misconduct during their fabrication of his purported statement. See Ex. 56 Moroughan 50(h) transcript and (<u>People v. Hubbard</u> No. 01618-2010). The charges against Moroughan were dismissed after pressure from media and defense counsel and he successfully sued for his false arrest in this court by filing a complaint against the county and Tavares, among others in 2012. See [2:12-CV-00512]. See Ex. 54. This case was the subject of significant media; especially regarding the Internal Affairs Department cover-up of details that would attribute misconduct to Tavares. See Ex. 61, 65, 66.

Plaintiff's evidence of this prior mishandling will include witnesses who have long-appeared on his disclosures, including Thomas Moroughan, Michael Calderelli, Ronald Tavares, and Charles Lesser. All of these witnesses have made prior statements about this incident, which form the basis of anticipated testimony. Each will give live testimony in court, but like any other witness, the prior sworn testimony in the attached exhibits will be used at trial if needed for impeachment purposes, or if circumstances arise rendering the prior testimony admissible either under Fed R. E. 613 or 803(d) as a Prior Inconsistent Statement, excepted from the hearsay rules. Importantly, regarding all individuals identified in this brief as Plaintiff's witnesses, all have long been disclosed and are referenced herein as individuals who will be testifying at trial. **Their prior statements (including transcripts from other cases) must be considered on summary judgment.** *Kanciper v. Lato*, No. 13CV0871SJFSIL, 2016 WL 11507274, at *13 (E.D.N.Y. Dec. 1, 2016), *aff'd*, 718 Fed. Appx. 24 (2d Cir. 2017) **(stating that "although the deposition (transcript) testimony ultimately may not be admissible at trial under Rule 32(a) of the Federal Rules of Civil Procedure, <u>the witnesses who gave such testimony may, themselves, testify at trial</u>," and, therefore, the court can consider deposition testimony from a prior case). <u>Even if a deposition transcript would be inadmissible at trial, as long as the underlying deposition testimony is admissible, it is admissible at summary judgment</u>. (Emphasis added).** *See Macshane v. City of New York*, No. 06-cv-6024, 2015 WL 1298423, at * 4, n.4 (E.D.N.Y. Mar. 23, 2015), *aff'd sub nom Herlihy v. City of New York*, 654 F. App'x 40 (2d Cir. June 30, 2016) **("[A] transcript of a deposition may not be in a form that is admissible, but the underlying testimony would be admissible at trial subject to its compliance with the Federal Rules of Evidence, and therefore may be considered by the Court at the summary judgment phase.").** Additional evidence is submitted in the form of news articles, submitted for the non-hearsay

purpose of establishing "notice." (**News articles are admissible for the non-hearsay purpose of establishing knowledge or notice of the matter**. *Rivera v. Incorporated Village of Farmingdale*, 29 F.Supp.3d 121, 129 (2013)).

The County and the District Attorneys, Spota and later Sini, had notice not only through the widely publicized media on the case and internal affairs "cover up" of the Tavares' false confession, but also the lawsuit itself against the County et al was pending and actively litigated until 2022. See [2:12-CV-00512]. Knowledge of this matter is incontrovertible.

**Aston Martin Barth** **(2012)** A third example is the case of Aston Martin Barth, charged with murder in 2012. Det. Tavaras wrote a statement from the defendant that the SCDAO used against him in the prosecution. Barth's defense lawyer moved for disclosure of Tavaras' IA records. After an initial ruling by Judge Condon agreeing to review the IA records of Tavaras for disclosure, the SCDAO continued to fight against disclosure, stating on the record that the ADA would change her witness list and ***not*** call Tavaras as a witness at trial, arguing that Tavares' history for fabricated statements would not, then, need be turned over. This "end around tactic" allowed the SCDAO to use Tavaras' fabricated evidence without subjecting it to cross-examination. By allowing other officers to testify and use Tavares' "notes," the SCDAO hid Tavaras' internal affairs records from the defense and also from a jury, allowing him to continue his malfeasance unchecked. This was the same tactic employed in plaintiff's case. This was an end-around tactic known and used within the SCDAO homicide bureau to deprive defendants of exculpatory evidence. See Ex. 89, Ex. 72, PP. 143-144, L-4, P. 156, L 20 – P. 161, L 4. Kurtzrock testimony.

**Gabriel Hubbard** **(2014).** The fourth example is that of Gabriel Hubbard, who was convicted of murder based on another statement fabricated by Detective Tavaras. Despite knowing Tavaras' history of fabrications, he was never subject to any discipline, and the Suffolk County Police

Department allowed him to continue to produce witness statements. In this case, Tavares and the ADA failed to disclose Tavaras' prior misconduct in the Moroughan case to the defense counsel (again). **On July 25, 2014, the Supreme Court vacated Gabriel Hubbard's conviction, finding that the failure to disclose evidence of Tavaras' prior misconduct was a violation of the Hubbard's constitutional rights as incorporated under *Brady*. Ex. 51 People v. Hubbard, 45 Misc.3d 328 (Efman, J.), aff'd 132 A.D.3d 1013 (2d Dept 2015).** Since 2015, at a minimum, the county and its police and prosecutors were on notice that a failure to disclose Tavares' prior misconduct is a violation of a defendant's constitutional rights.

**Messiah Booker** (2013) A fifth example is that of Messiah Booker. Booker was charged in 2013 with murder. In May 2017, trial began but was stopped when it was discovered that the SCDAO failed to disclose over 100 pages of material, which included exculpatory information on other suspects whom the ADA knew defense counsel had been investigating. The ADA also intentionally manipulated police notebooks to appear as original evidence, when in fact he had removed dozens of pages intentionally. ADA Kurtzrock was admonished for this case and the case of Shawn Lawrence, infra, though evidence indicates ADA Laura Newcombe was the ADA on that case during the discovery period. See 72, P. 46, L 10-12; P. 52 L 1-25, Kurtzrock Deposition. ADA Kurtzrock was subjected to a grievance that was substantiated for his role in the Booker withholdings. Ex. 95.

**Shawn Lawrence (2015)** The fifth example is that of Shawn Lawrence. Shawn Lawrence was convicted of murder in 2015. Detective Tavares manufactured statements against Lawrence by a key witnesses, who had previously identified someone else in a statement. The gunman was described by witnesses as 5'4" tall. Shawn Lawrence is 6' 4" tall. Suffolk County ADA Newcombe had been assigned this case during pre-trial disclosures and in fact began trial herself.

The trial ended in a mistrial due to a defense conflict that arose after jury selection. Newcombe handed the case off to ADA Glen Kurtzrock for re-trial because she was leaving on maternity leave. She met with Kurtzrock and discussed the case prior to passing it off. Id. P 70, L 20-24, p. 326 L. 21-22. Lawrence was convicted and sentenced to 75 years. **Six years into his prison sentence, Lawrence's conviction was overturned when it was discovered that the SCDAO withheld over 45 pages of evidence and relied upon fabricated evidence of police notebooks, withheld exculpatory evidence regarding additional suspect identifications and a video which was tampered with.** Upon advocacy by post-conviction counsel, a court vacated and dismissed Lawrences charges in 2018, after he served six years in prison for a murder he did not commit. Evidence of this prior instance of misconduct will include the record of the dismissal Ex. 69 (Order of Dismissal) and news articles submitted to establish notice. Even though Newcombe had the case through the disclosure period and actually began trial, Kurtzrock was blamed for all the withholdings and was disbarred for a number of years due to the egregious misconduct. Newcombe's files were never investigated. Ex. See Ex. 76 P. 291 L. 16-19; See also ex 75, p. 68, 11-13.

**Dante Taylor** **(2016)** A sixth example of past constitutional violations is the case of Dante Taylor charged with murder in 2016. The case was prosecuted by Janet Albertson, the supervisor or "Chief" of the SCDAO Homicide Bureau. It came to light during trial that she had withheld at least five pieces of critical exculpatory *Brady* evidence in the case, including a series of Crime Stopper tips pointing to other suspects and evidence that Suffolk County Police destroyed a threatening voicemail message to the victim left by her ex-boyfriend from whom she had recently split. Even after sanctioning Albertson and ordering additional disclosures, on the eve of trial, Albertson reported to Collins that evidence he ordered her to disclose was "accidentally destroyed"

by Detectives. The trial was permitted to continue but not without the notice of the fact that the homicide bureau supervisor herself was sanctioned by Justice Collins for misconduct over repeated failures to disclose exculpatory evidence in the case. Taylor was eventually convicted and committed suicide in jail shortly thereafter. Notice of the prior mishandling is established through testimony of plaintiff's witness Emily Constant Ex. Ex. 76 p. 80-81 and also news media, see Ex. 94.

**Spota/Burke/McPartland** **(2012-2015)** The final and seventh example of the prior custom known to Sini, which unfolded during the time period of plaintiff's case, was perpetuated by his predecessor Thomas Spota himself along with Police Chief Jim Burke, and the SCDAO Anticorruption Chief, Christopher McPartland. In 2017, the three were Federally indicted and charged with acts from 2012-2015. Charges included a conspiracy to deprive an individual's constitutional rights; witness tampering; obstructing an official investigation and more. This related to the beating and coerced confession of a burglary suspect who had stolen items from Chief Burke's vehicle. The beating was witnessed by multiple police personnel. Together, Burke and Spota conjured the police narrative of what their "story" was and made it known to all officers, even at a PBA union meeting, that sticking to this story and not cooperating with any federal investigation was expected of them. See Ex. 111, 582-583. Plaintiff's witnesses, Hickey, Bombace, and Leto will describe the extents to which Spota and Burke worked together to ensure that officers stuck to the police narrative at all costs and knew they would suffer if they broke the narrative. They will testify that retaliation they would suffer would include the fabrication of false criminal charges against the "traitor" or his family. Fabricated criminal charges were used by the administration in the past as punishment for doing something against the police narrative, and all were aware of the case of John Olivia, used to set the example. All will testify about the customs

reinforced by the false charges and prosecution of Olivia, for a felony crime, and how Spota used personal information obtained through an illegal wiretap, as leverage to force Olivia to plead guilty. Olivia's conviction and sentence were overturned when the truth of this came to light during the 2017 Spota trial. Spota and Burke's actions set the standard of what was acceptable, fabricating witness statements, cover-ups, and false prosecutions used tactically to maintain their narrative and reputation. Burke pleaded guilty to obstruction and Spota was found guilty of (1) conspiracy to deprive a person's civil rights; (2) witness tampering; and (3) obstruction of an official investigation and (4) obstruction of justice, after a lengthy trial exposing the extreme corruption perpetrated by the SCDAO and SCPD functioning as one unit. Ex. 104.

Just as in *Fiacco*, these seven instances of prior mishandlings create a genuine issue of material fact as to whether the city and district attorney Sini knew of these instances and through their intentional indifference, acquiesced to the customs. Sini unquestionably knew about these instances; all the subject of media attention, and testimony will show that he was personally briefed by Interim DA Emily Constant as well. Sini showed deliberate indifference to the fabrications and withholdings of evidence and systemic failures in his homicide bureau, lacking in systems and accountability by failing to address these issues as they related to open homicide files during the time he took office. He not only failed to investigate, or offer obviously needed or targeted training or retraining, but he also failed as administrator, re-hiring an ADA who was known to be involved in the Lawrence withholdings; without investigating her files at all; and without any targeted training or supervision. That ADA was Laura Newcombe who was the prosecutor in plaintiff's case during the fabrications and withholdings. Sini also failed to address obvious systemic failures needed to minimally supervise the homicide bureau, and between his office and the SCPD. For example, Sini knew there was no policy or system in place for reviewing disclosures, no 'Brady

list," no way to ensure detectives were providing notes or their full files prior to homicide trials; Ex. 72 P. 199, L 17-18, P. 220 L9-25, P. 223, L 6-17, P. 36, L 7-14; ADAs were not required to use checklists and no supervisor would review the homicide files for proper disclosures at any time; See. Ex. 75, 125-126, Ex. 84, P. 34. The evidence establishes that Sini (and the County) knew of these instances and Sini's failures constitute his acquiescence to the customs, as did his own administrative acts noted above.

(2) Plaintiff also demonstrates Sini's personal involvement via the second way noted above under *Fiacco*: specifically that Sini, after being informed of Constitutional Violations **through reports** failed to remedy the wrong. Plaintiff has long had Emily Constant on Plaintiff's witness disclosure list. Constant will be called at trial to testify in person at trial. Constant will testify that she had been the interim DA during the transition period between Spota and Sini and met with Sini and not only discussed these incidents with him, but also gave him memos written regarding Glen Kurtzrock's homicide files and disclosure/fabrication issues therein. Importantly, Constant spoke specifically about the Lawrence case, arguably one of the worst instances of fabrications and withholdings above and other ADAs involved in the case besides Kurtzrock, including Laura Newcombe. Id. That report clearly implicated Newcombe in serious misconduct of fabrications and withholdings. Ex. 75, p 50-51, also 76, p 170, L 1-17. Sini failed to act on the reports. Laura Newcombe will also be called by this plaintiff testify. It is expected that she will testify that she received no additional training or supervision from Sini. Sini re-interviewed and hired her, her files were never investigated and she was never subjected to discipline. Ex. Id. P. 187, L. 4-5, Ex 76 P. 168, L. 19-25, and P. 170, L. 2-17. Sini did not require new targeted training which was obviously necessary, did not increase supervision, and did not implement obviously needed systems to mitigate against these problems. Instead, the ADAs were allowed to continue their

customs uninterrupted, injuring this plaintiff, violating his rights by withholding exculpatory evidence, Tavares' history, and prosecuted him through fabrications of evidence.

(3) The third way under *Fiacco* that this plaintiff creates a genuine issue of fact as to Sini's personal involvement is through evidence that Sini was grossly negligent in supervising subordinates who committed the wrongful acts. In order to make this showing, one need not look further than the preceding paragraphs. Timothy Sini knew that the homicide bureau and Laura Newcombe was involved in deprivations of constitutional rights from the instances of mishandlings and by virtue of the reporting by Emily Constant and ADA Opisso. He also knew that there was no system of supervision over the homicide files; no supervisor review, no checklists, no procedures. Despite this, plaintiff's witness testimony will show that after being re-hired by Sini, Newcombe was not subject to additional supervision, her files were not investigated, nor was she given any new or different training nor were any new systems put in place. The homicide bureau, and Newcombe were allowed to continue uninterrupted ways, leading directly to the same deprivations of rights in this plaintiff's case.

(4) The fourth way under *Fiacco* that this plaintiff establishes a genuine issue of material fact as to Sini's personal involvement is: Sini exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring. Spota had information that the homicide bureau of the SCDAO repeatedly denied defendants' rights. He knew about the instances listed above. He specifically knew that the homicide bureau and ADA Newcombe were involved in deprivations of rights and made administrative decisions that allowed them to continue the customs of deprivations uninterrupted. He displayed deliberate indifference by deciding to terminate the administrative review of homicide files that was started during the transition which Emily Constant testified about. Sini knew the investigation had focused

exclusively on Kurtzrocks' files and the administration "ran out of time" before getting to Newcombe's. Sini knew Newcombe was the ADA on the Lawrence case, which involved serious egregious misconduct during the time she had the file. See Ex. 75, p. 50-51. Sini made the administrative decision to stop or forgo that investigation into her files and instead re-hired her. She was not given any new or different training or supervision. Sini also failed to act by failing to implement obviously needed systems that would have facilitated tracking and making Brady disclosure by requiring standard operating procedures such as a checklist and recording of disclosures or documents; the systemic failures noted above (no supervisor review of open files; no checklists; no Brady list; no system of ensuring receipt of a full file from the SCPD; no system of communication with I.A. re disclosures) and failed to act. These failures allowed the custom (and the ADA) to continue uninhibited to injure this plaintiff by depriving him of liberty based on fabricated evidence and depriving him of exculpatory evidence. As per *Fiacco*, by showing that Sini had this knowledge of unconstitutional acts occurring and failed nevertheless to act, plaintiff establishes his deliberate indifference and personal involvement.

5. Next, Plaintiff establishes a genuine issue of material fact as to Sini's "personal involvement" under *Connick* liability, by showing his "deliberate indifference to the constitutional violations and/or his deliberate indifference to the need to supervise, investigate, train, and discipline staff." Under *Connick*, showing that, despite all of the above, the prior mishandlings, the reports, the debriefings with Constant, the news reports about various and ongoing constitutional violations of fabrications and withholding of Brady material; Sini displayed intentional indifference to the constitutional violations and deliberate indifference to the need to supervise, investigate, train, and discipline staff in the ways noted above, which need not be repeated to establish the genuine issue of material fact under *Connick*.

(6) Finally, the last and sixth way this plaintiff establishes Sini's personal liability is again under *Fiacco*, by creating a genuine issue of material fact as to whether "Sini continued a custom under which unconstitutional practices occurred." In the light of the above, reargument is not needed. Sini's actions and intentional inactions listed above show his acquiescence to the known customs thereby continuing it.

Sini's personal involvement in this plaintiff's case is therefore well-established, pursuant to the standards set forth in *Fiacco and Connick* supra and with the type of evidence of prior mishandlings recognized as appropriate and admissible in *Fiacco.* Viewing the evidence in the light most favorable to Plaintiff, and giving the plaintiff the benefit of all favorable inferences that could be drawn therefrom, and resolving any ambiguities in his favor; it must be determined that plaintiff has established a genuine issue of material fact with regard to DA Sini's "personal involvement" sufficient to deny summary judgment as to Count 2 (false arrest) and Count 21 (failure to supervise, train, intervene, discipline).

**Detective Sergeant James McGuinness.** Detective Sergeant James McGuiness was personally involved in the deprivation of White's constitutional rights. McGuinness was a Detective Sergeant who was the supervisor over the SCPD Homicide investigation into White. He was responsible for the supervision, intervention, and discipline of his team which included Detective Tavares, Milau, and Petersen in this case. McGuinnes knew of Tavares' history of fabrications as it was public knowledge. The fabrication involving Thomas Moroughan in particular, was highly publicized and was the subject of a 2015 judicial order rendering the disclosure of his fabrications necessary under Brady. Ex. 51. Nevertheless, McGuinness allowed the investigation to proceed without additional supervision of Tavares. Instead, McGuinnes continued the custom of deprivations showing his deliberate indifference and assigned Tavares as Detective who

interviewed the People's one and only witness in the case against this plaintiff, directly leading to a statement containing confirmed fabrications. A question of fact exists as to whether the Sergeant's failure to supervise, train, intervene, or discipline Tavares constitutes his personal involvement in accordance with the standards set forth above under *Fiacco and Connick.*

Importantly, McGuinnes was also directly involved in the deprivation of White's rights by his own actions. McGuinness violated White's constitutional rights to due process and to be free of unreasonable seizure, by putting out a WANTED notice to all Suffolk County Police, calling for the unlawful detention of White, at a time when he was not the subject of an arrest warrant, probable cause, or any lawful reason to detain him. The WANTED notice instructed SCPD to unlawfully detain White despite advising that there was "no probable cause to arrest" him. See Ex. 100. Rather, the instructions on the notice were to (unlawfully) seize White and while surreptitiously calling Detective Milau on his cell phone, making note not to tell White what was going on or why he was stopped. This notice unlawfully encouraged the detention of White and violated his constitutional rights noted above. This type of unlawful seizure is part and parcel of the unconstitutional norms perpetuated by the defendants to unlawfully seize persons without probable cause or justification and McGuinnes' WANTED notice is proof of his participation in the ongoing unconstitutional norm which led to his direct violation of this plaintiff's rights.

Viewing all evidence in the light most favorable to this plaintiff, incorporating all facts and evidence referenced in plaintiff's statement of additional facts submitted herewith, and drawing all favorable inferences therefrom, and resolving any ambiguities in plaintiff's favor, it must be held that plaintiff sufficiently created a genuine issue of material fact as to the personal involvement of Sini and McGuinness in this case and Point One of the County Defendant's Motion must be denied.

**POINT TWO**

**SINI IS NOT ENTITLED TO SOVEREIGN IMMUNITY OR PROSECUTORIAL IMMUNITY**

Sini next claims that he is entitled to sovereign immunity or absolute prosecutorial immunity as to the second count in the complaint**.** Counsel for Sini errantly argues that this individual capacity claim is covered by sovereign immunity. This argument is wrong in the light of this Circuit's holding in *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (citing *Lewis v. Clarke*, 581 U.S. 155, 163 (2017)), *aff'd*, 592 U.S. 43 (2020), specifically holding that **sovereign immunity does not apply to the claims against officers in their "individual capacity."** Therefore, sovereign immunity simply does not apply. The inquiry may end here.

Noteworthy, however, this argument was previously advanced by Defendant Sini in prior motion practice and rejected by both Judges Seybert and Wicks, as a matter of law, based upon the functional role of the District Attorney in question and as alleged in the complaint against him, now only in Counts 2 and Count 21. Importantly, *Jones v. City of NY,* 988 F.Supp 2d 305 (E.D.N.Y. 2013), is directly on point as to how to apply the functional analysis here. The *Jones* court contemplated the District Attorney in different roles: as both municipal and state representative and as administrator/manager. In doing so, it specifically considered application of sovereign immunity to the two distinct functional roles. *Jones* plainly held that sovereign immunity protection does **not** apply to the function in question in this case as manager and administrator. It is true that a prosecutor is considered a "state" actor when he or she is acting *in the course of advocating on behalf of the state during a judicial process*. Id. However, when not acting as advocate, it has been clearly established that the District Attorney, **when acting in his role as manager/administrator/policymaker, hiring, training, and managing his office, is a county or municipal policymaker and specifically not a state actor**. Id. See also *Baez v. Hennessy*, 853

F.2d 73. Sovereign immunity does not apply to the actions alleged against Sini in his administrative capacities as manager and head of his office.

Prosecutorial immunity likewise does not apply to the role as head of office (manager/administrator). *Buckley v. Fitzsimmons*, 509 U.S. 273 (1993). Issues regarding prosecutorial immunity and a District Attorney's liability for administrative actions as a Policymaker and functional manager were resolved as in *Gentile v. Suffolk County, supra*. Sini's policymaking and administrative duties do not fall within "advocacy" roles for the state, but rather his County role for which he was elected, to manage the District Attorney's office and its policies, its employees, including hiring, firing, training, etc. and roles of an administrator; roles not akin to an advocate during a judicial process. Id. See also *Buckley v. Fitzsimmons*, 509 U.S. 273 (1993). Judge Seybert ruled on the issue in [DE 130] taking into consideration the functional role of Sini charged in Counts 2 and 21.

> *The County Defendants' Sini-related objection is OVERRULED. In support of his 21st Cause of Action, Plaintiff has plausibly alleged a claim that (a) Spota, and then Sini, failed to supervise and;*
>
> *(b) were personally involved in that failure based upon the District Attorney's pre-existing policy or custom of permitting unconstitutional pre-charge investigations to be undertaken, using a fabrication-of-evidence scheme. Thus, as Magistrate Judge Wicks stated, notwithstanding that Van de Kamp "specifically extended prosecutorial immunity to certain administrative tasks including supervision and training" because in this instance Plaintiff adequately alleged Spota's and Sini's personal involvement with detailed allegations of policies/customs that Spota created and/or let continue, and that Sini let continue upon succeeding Spota," which preceded and did not rely upon alleged underlying misconduct by Newcombe and Levy, those allegations plausibly state an unconstitutional violation supporting Plaintiff's 21st, failure-to-supervise and failure-to-train cause of action against Spota and Sini to which Spota and Sini are not immune by extension of Newcombe's and Levy's absolute prosecutorial immunity.*

Viewing plaintiff's evidence in a light most favorable to him, , incorporating all facts and evidence referenced in plaintiff's statement of additional facts submitted herewith, and drawing all favorable inferences therefrom, and resolving any ambiguities in his favor, it must be held that

plaintiff established genuine issues of fact to be submitted to a jury as to Sini on Count 2 and 21, for which neither sovereign immunity nor absolute prosecutorial immunity apply.

## POINT III

## PLAINTIFF'S CLAIMS DO NOT FAIL FOR GROUP PLEADING AND A LACK OF PERSONAL INVOLVEMENT BY MANY OF THE NAMED DEFENDANTS

Defendants next claim the pleading contains "group pleading." The concept and discouragement of "group pleading" arose out of mass securities litigation and class action cases and relates to complaints that fail to distinguish between acts of those charged. This is based in the concept that defendants have a right to know what is claimed against them. By contrast, this plaintiff pleaded 85 pages of specific factual contentions against each and every defendant individually. These factual contentions were then specifically incorporated by reference in each and every count of the complaint. Point III must be denied because group pleading is not present, and each defendant is on notice of what is claimed against him or her. Strangely, defendants cite to Judge Seybert's opinion for the proposition that factual contentions must be brought as to each defendant, as if to suggest she was in agreement with their claims of deficiency. However, the opposite is true. Judge Seybert rendered an opinion that allowed all 21 counts of plaintiff's complaint to survive the attack on the pleading.

Thereafter, within the same point, Defendants contend that Plaintiff failed to plead specific conduct of Wong, Hall, and Peterson to sustain claims for: false arrest, malicious prosecution, denial of fair trial, due process violations, equal protection and conspiracy. Again, this is inaccurate. The 85 pages of pleaded factual contentions speak for themselves. Similarly, the complaint pleaded with specificity the plaintiff's equal protection claim, also challenged by

defendants. The pleading incorporates facts sufficient to plead differential treatment toward plaintiff, of mixed race and a medium skin tone, as directly compared to the white person similarly situated and involved in the case, (Valerie Holloway), consistent with the county's custom of bias as reflected in their then-ongoing DOJ supervision for biased policing against Hispanics. Ex 108 Facts are pleaded contending that White, *who went into the police department to report a crime against him*, was immediately arrested and framed as a killer, despite evidence of his innocence immediately available to the defendants. Evidence shows they knew White was of mixed race and initially believed he was Spanish. See Ex. 1, (Tavares questioning White as to whether he is Spanish two times.) By contrast, the Caucasian woman, despite being implicated in tips, and whose guilt was immediately known to police via her text messages, was protected by the chosen police narrative. Police determined they would not treat her as a suspect despite the evidence against her and her overt lack of veracity with them. Despite the fact that her guilt is proven in text messages and the photo posted to public media of her with the robbery proceeds (White's diamond ring), she remains uncharged to date. Therefore, given the disparate treatment of persons similarly situated, and in the light of the county's custom of proven bias policing, plaintiff has created a genuine issue of material fact for a jury to consider as to the equal protection violation.

Viewing plaintiff's evidence in a light most favorable to him, incorporating all facts and evidence referenced in plaintiff's statement of additional facts submitted herewith, and resolving any ambiguities in his favor, it must be determined that the evidence of disparate treatment in this case, under all circumstances present, creates a question of fact for a jury to decide.

Importantly, beyond the defendants' failed objections, plaintiff has conducted an evidentiary audit of its own evidence and wishes the following claims to be dismissed as to the following persons, as the evidence excludes a genuine issue of material fact as to certain

defendant's involvement in certain violations. In the interests of justice, plaintiff moves to have the following defendant's excluded from the following claims, and the individual claims be dismissed accordingly.

Count One – False Arrest of May 25, 2016. Plaintiff previously moved herein to dismiss this count as to Timothy Sini. Also, the evidence shows Helen Wong began her involvement **two days *after*** the May 25, 2016 arrest, (but prior to the Grand Jury proceeding). Therefore, Plaintiff moves to dismiss Count One as to Helen Wong as well.

Count Nine. Count nine charges a violation of White's Fourth Amendment right to be free of unreasonable seizure as it relates to the May 25, 2016 arrest. For the same reasons as stated with respect to Count One, the Plaintiff moves to exclude Helen Wong from this count.

Count Eleven. Count Eleven charges a violation of White's Fourteenth Amendment Right to Due Process as it specifically relates to his arrest of May 25, 2016 without a valid warrant based on lawful probable cause. For the same reasons stated above, Plaintiff moves to exclude Helen Wong from this count.

Count Thirteen Count Thirteen pleads a violation of White's Right to Counsel during interrogation on May 25, 2016, as protected by the Sixth Amendment of the Constitution. Plaintiff moves to exclude Wong, Hall, and Petersen from this count, as the evidence shows they were not involved in the denial of White's right to counsel on May 25, 2016 during his interrogation.

Count 21 Failure to Supervise, Investigate, Train and Discipline. Plaintiff's review of the evidence indicates that Wong, Tavares, Milau, and Peterson did not have supervisory duties sufficient to hold them accountable for the failures set forth in this paragraph. While they remain liable for failing to intervene and the other separately enumerated claims notwithstanding, Plaintiff

moves to exclude these defendants from Count 21 of the complaint, which should remain as to the County, both District Attorneys, Odette Hall, and James McGuinness.

The balance of the counts in the complaint must remain unchanged as plaintiff has established sufficient evidence to create a genuine issue of material fact as to each claim and each defendant as further discussed herein.

**POINT IV**

**NEITHER HALL NOR WONG ARE ENTITLED TO ABSOLUTE IMMUNITY**

Hall and Wong are not entitled to absolute immunity. In attempt to support its contention otherwise, Defendants cite to *Torcivia v. Suffolk County,* 409 F. Supp. 3d 19, 50 (E.D.N.Y. March 31, 2019) and claim to quote from it. **However, a reading of that opinion makes clear that "absolute immunity" was not even a consideration in that case**. That case, in small part, contained an analysis of only "qualified immunity." It granted qualified immunity to medical defendants, not because of their role as medical personnel, (as the defense would have this court believe), but the analysis of the court in *Torcivia* for qualified immunity purposes concerned whether the medical defendants' actions "violated a known right" of the plaintiff's. The *Torcivia* court held that, because the acts of medical defendants did **not** violate a well-established or known right, qualified immunity applied, (not absolute immunity.) **In fact, the term "absolute immunity" does not even appear in that opinion one time**. Defendant's attempt to quote otherwise on p. 15 "… doctors can qualify for this type of immunity" is nothing more than an attempt to mislead this court into an incorrect conclusion of the law. **(Emphasis added.)**

Likewise, the County Defendants mis-cite to the case of *Newton v. City of New York* which considered a post-conviction application of a defendant related to his post-conviction exoneration from a rape after 22 years in jail. *Newton v. City of New York*, 738 F.Supp.2d 397 (S.D.N.Y.

2010). The plaintiff in that case filed claims against a number of parties, including a city laboratory analyst for failures in conjunction with his post-conviction application for which was opposed by the People. The entire analysis of the court rested upon a functional analysis of the allegations and actions against the medical employee in that post-conviction scenario and found that under those circumstances and in that post-conviction proceeding, the analyst was serving as an advocate supporting the People, and not in her ordinary, pre-trial medical-investigatory role. It took care to note that the distinguishing factor is the role played in the attendant circumstances and made sure to distinguish between ordinary investigatory roles not appropriate for absolute immunity. Newton 418. The *Newton* court used the case of *Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir.2006) to clarify its point: (“**Under the Supreme Court's functional test, the *pre-trial investigatory* acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions**.”) (emphasis added); and also used *Keko v. Hingle,* 318 F.3d 639, 644 (5th Cir.2003) (“[T]o the extent Dr. West's *pre-testimonial* activities were investigative, his immunity ought to correlate with the merely qualified immunity granted to the police for comparable activities.”) (emphasis added).

In this case, the claims against Hall are all related to her investigative function during the autopsy investigation and reporting and against Wong during the laboratory investigation and reporting. Neither role or function can even arguably compare to that of an “advocate.” Absolute immunity does not apply.

## POINT V

## PROBABLE CAUSE DID NOT EXIST

Probable cause did not exist to arrest plaintiff and the indictment was secured by frauds. It is well-established that the moving party bears the initial burden of pointing to evidence in the

record that demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). County Defendants' Point Five offers their own argument as "fact" and ask this court to adopt their version of facts without more. This approach cannot be said to meet the *Celotex* burden to "point to evidence in the record that demonstrates the absence of a genuine issue of material fact." The court's treatment of the point could end here for that reason. Nevertheless, plaintiff has demonstrated through evidence that probable cause did not exist and surely has created a genuine issue of material fact as such.

Defendants argue that no genuine issue of fact exists as to whether there was probable cause to arrest White due to: (1) the results of the autopsy report; (2) the statement of Valerie Holloway; (3) the video evidence; and (4) purported "confessions" of the plaintiff himself. To the contrary, Plaintiff's evidence, including Expert Reports, establish the following: (1) the **autopsy contained fabrications and withholdings of exculpatory evidence**; 2) **surveillance video contained fabrications and withholdings**; and (3) **the witness statement contained fabrications**. Lastly, to call the statement of Samuel White a "confession" is misleading and entirely disingenuous. Plaintiff's statement makes no "confession" at all. White went to the police to report the violent assault and robbery perpetrated upon him as victim. The statement is an hours-long tearful recitation of facts and circumstances that describe White being victimized and forced to defend himself while in fear for his life. The expert evidence and evidence in the record will speak for itself and unquestionably establishes genuine issues of fact regarding fabrications in the autopsy, the video, the witness statement and serious withholdings for a jury to consider. Ex. 7-12.

First, what is probable cause? Judge Bianco's opinion in the matter of **Thomas Moroughan v. County of Suffolk, 2:12-cv-00512-JFB-ARL**, at [DE 301] provides the circuit's definition:

*"(i)n general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id.*

With respect to an officer's **basis** for probable cause, it is well-established that:

"(w)hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists **unless the circumstances raise doubt as to the person's veracity." (Emphasis added).** Id. Citing to *Curley v. Village of Suffern*, 268 F. 3d 65, 70 (2nd Cir. 2001), (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 199 (2d Cir. 1995)

The reliability or veracity of a person is an important factor to consider when evaluating whether probable cause exists. *Panetta v. Crowley,* 460 F. 3d 388, 395 (2d Cir. 2006) Probable cause can be established by information given by an eyewitness "**unless circumstances [exist] that raise doubt as to the [eyewitness statement's] veracity." (Emphasis added).** *Miloslavsky v. AES Engineering Soc., Inc.,*808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,*993 F.2d 1534 (2d Cir.), *cert. denied,*510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993). **Importantly, where probable cause does not exist, it cannot be manufactured by an officer**. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)

**A. Veracity**

On May 25, 2016, plaintiff, a man with no criminal record, went to the police department to report a crime that was perpetrated against him. White's report of the assault and robbery perpetrated upon him was immediately corroborated by the viewable video evidence and text message evidence available in his phone and Hollway's phone.

Evidence from the record demonstrates that Detectives obtained and watched this video prior to White's arrival at the Third Precinct. The video clearly showed Rivera coming into the parking lot and parking in the first parking space next to the exit of Mary Caroll's bar where White and "Janelle" were located. The video shows Rivera's car back out of the space and begin to drive around the parking lot, shutting off his headlights as he drove to be surreptitious. Rivera drove around the lot and back toward the door where they would exit; slowing down at some point to let another car fully pass before turning the wrong way up the street to go back toward the door. The video shows Rivera stop his car in the middle of the street, a one way, facing the wrong way, get out of the driver's seat, leaving the door open, and aggressively charge at White while holding something in his sweatpants. Ex. 3. The video also is reflective of Rivera's size; 6'4 and 260 lbs as compared to the 5'10' 180 pound White. Id.

While the **video immediately corroborated White's statement – it also <u>proved Valerie Holloway's statement to police to be false</u>. (Emphasis added.)** Holloway's statement indicates that she did not know how Rivera knew where she was and specifically denied telling Rivera their location at Mary Carroll's. Her immediately available text messages as compared to the video proved <u>this critical lie to police</u>. The time stamps on the video match perfectly with Holloway's text messages with Rivera, coordinating their meeting there. Holloway lied to police to cover up the fact that she set up this incident and viewing the texts and video makes that indisputable.

**The text messages instantly confirmed that Holloway lied to police and lacked veracity**. The texts clearly show she set up this encounter, calling and texting Rivera through the evening, including when he was outside waiting. In fact, the time stamps on the text messages align perfectly with the video so that that there can be absolutely no question that Holloway knew Rivera was outside waiting. The texts also immediately proved Holloway's motive for setting this

up and harming Rivera. Texts indicate Holloway had just broken up with Rivera, after she found out that Rivera had been cheating on her with multiple women prior to going back to live with the mother of his children. The texts also show Holloway had tried to set him up in similar fashion in the past. The texts also show Rivera suspected Holloways retribution, asking if he "needed to be worried." **Most importantly, the text message evidence immediately available to police, clearly and unequivocally proved that Holloway's statement to police contained major lies.**

Importantly, **in addition** to the above**, police had received multiple tips implicating Holloway as a suspect, including tips from Rivera's friends and family.** See Ex. 43-45.

Any reasonable detective under these circumstances where: (1) The Police Department received multiple tips from different parties pointing to Holloway as a suspect; and (2) the decedent's own family asking that police look into (Holloway) because they suspected she was involved and (3) having received her direct lie to police, to cover up her own conduct; and (4) having seen the video showing that Rivera had been lying in wait outside Mary Carroll's; and (5) being in possession of text messages unambiguously showing Holloway lied and that she set up the incident and her motives therefore; **would have recognized her lack of veracity**. Surely, any reasonable detective observing 1-4 above would have looked in her phone for the texts of that evening which were immediately available to them at that time, and for which they had her consent to search**.** The texts immediately confirmed her lies, motive to lie, and motive to harm Rivera. Her lack of veracity was apparent. Ex. 3, 6, 43-45.

Instead, Detective Tavares, known for fabricating statements to suit the police narrative, ignored her lack of veracity which was blatantly obvious, and manufactured a statement for Holloway, by writing out, in his handwriting, a statement that made out a case of homicide against White. Ex. 134. Tavares manufactured a statement to "make the case" out in order to sustain the

police narrative of "homicide" – in the exact way he did in *Moroughan* and the cases outlined in Point One *supra*.

Holloway's lack of veracity was immediately apparent under all the circumstances. "When information is received [regarding an alleged crime].. from an eyewitness… probable cause exists **unless circumstances raise doubt as to the person's veracity.** *Curley v. Village of Suffern*, supra at 70. (Emphasis added.) Here, circumstances unquestionably raised doubt as to Holloway's veracity (in fact, circumstances and evidence immediately exposed her lies.)

**Fabricated Video Evidence**

Expert evidence confirms that the video in this case contains frauds and withholdings. Ex. 7-12. Police records and testimony establish that a surveillance video was downloaded by Detective Petersen at Huntington Town Hall. Ex. 36-38, and Ex. 41, P 630. Entries in police records establish that *prior to preserving the original downloaded video in evidence*, Petersen took the video to "Distinctive Technologies," a non-law enforcement entity. Ex. 38 There is no report about this and Petersen lied to the grand jury to cover up his stop there. Ex. 41, P 630. Forensic expert Jennifer Own inspected the data present in the video. Ex. 11, 12. Her analysis reveals the video was subjected to editing software which left trace evidence in metadata. Also, jpg images showing Toshiba editing software were located and confirmed to be editing software capable of removing and syncing video frames. The video itself appears to "freeze" during certain scenes that would be exculpatory to plaintiff. Petersen acknowledged this to the grand jury but falsely testified that missing footage was dropped due to "wifi" issues. See Ex. 12 Expert Jennifer Owen confirmed this lie as well. Owen examined the data and found that the cameras did not fail to record frames due to "wifi" issues at all- rather all of the footage was captured and is accounted

for in the data. However, certain frames were rendered "unviewable" to the viewer. Ex. 12. Over five minutes of data was recorded but rendered unviewable. Ex. 3, 12. The missing footage coincides with the time that certain exculpatory scenes would have been captured; e.g. Rivera sitting up talking with Holloway after White retreated; Holloway's interactions with Rivera after White walked away, including her opportunity to take his cell phone (which she later falsely blamed on White), and her opportunity to cause injury to Rivera. (Her statement written by Tavares indicates that White took the phone and threw it out of his car window while driving away from the scene, however, the phone was later found lying in a dumpster outside White's home, after his incarceration, in a dumpster that was not present prior to White's arrest. The SIM card was also retrieved from a friend of Rivera who lived down the block from Holloway. Ex. 15 Holloway clearly took Rivera's cell phone from the scene and falsely blamed White. This necessarily would have occurred during the portion of footage rendered unviewable.)

Police created their narrative that this was a "homicide" within minutes of the initial response as shown in the police records and, consistent with the norms in place, began to immediately to manufacture evidence to fit their established narrative; while withholding evidence contrary to their narrative. Ex. 116, 117

Viewing plaintiff's evidence in a light most favorable to him, and drawing all favorable inferences, and resolving any ambiguities in plaintiff's favor a genuine issue of fact exists regarding fraud in the video due to: the expert forensic video analysis confirming fabrications and withholdings in the video, combined with the stop to Distinctive Technologies, the police hiding that information from reports, and confirmed lies in the grand jury.

**Fabrications in the autopsy**

Expert Evidence from arguably the world's most foremost forensic pathologist, Dr. Michael Baden, confirm that the cause of death was not as reported in the autopsy in this case. Ex. 9, 10. Hall, informed of the police narrative, manufactured her findings to fit the police narrative and did so while intentionally ignoring exculpatory medical evidence. Hall intentionally ignored the true cause of death in this case, which was strangulation by compression, despite having obvious proof of compression injuries to the neck. Photographic evidence from the autopsy confirm that compression injury was present to the neck of Rivera caused clearly by an errantly placed neck collar which left visible compression injuries, bruises and cuts, outlining perfectly and unambiguously with the curvature of the structure of the neck collar. Ex. 22-24. This evidence was in Hall's possession, but instead of acknowledging the injuries, she intentionally left them out of all drawings, reports, and the narrative regarding the cause of death. Instead, Hall manufactured her report to comport with the police version of "assault." Evidence even shows her amending her draft reports by hand to include the word "assault," a legal term not medical term. See Ex. 32, 33.

Dr. Michael Baden opined that Rivera's cause of death was not as reported by Hall. Rivera did not die due to "blunt force injuries to the head and neck" as reported by Hall. In fact, there were no blunt force injuries to the neck at all, nor were there any fatal head injuries. Rivera's death was due to neck compression that cut off oxygen to his brain; death by strangulation. See Ex. 10 - Report of Dr. Michael Baden; Ex. 9 - Declaration of Dr. Michael Baden; Ex. 22-24 ; Medical/hospital records; Ex. 27, 28 showing no injury to neck other than that caused by the neck collar. Further, Hall had initially described how the injury occurred as "Struck by other person," but crossed out "Struck" and wrote in "Assaulted." Ex. 32 Medical Record Autopsy Worksheet.

Viewing this evidence in the light most favorable to Plaintiff, and drawing all favorable inferences therefrom, and resolving any ambiguities in Whtie's favor, it must be determined that a triable issue exists regarding frauds in the autopsy.

"**Review for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence . . . .**" *Washington v. Napolitano*, 29 F.4th 93, 111 (2d Cir. 2022).

Not only did the defendants intentionally ignore available evidence that proved their star witness lied in her statement, and was in fact guilty of setting up this encounter, but they also tailored the other evidence to fit their narrative of "assault," and "homicide" by creating frauds in the autopsy investigation and in the surveillance video, intentionally withholding exculpatory evidence and any evidence contrary to their narrative.

Noteworthy is that, the evidence the county attempts to rely upon, the surveillance video itself, is not even admissible in this court to establish probable cause. ***The video itself has been edited and is not what it purports to be and cannot be authenticated***. See Ex. 12 Report of Jennifer Owen, Forensic Video Expert, See Ex. 11, Declaration of Jennifer Owen, See Ex. 38 Dispatch Report, See Ex. 130 Police (Bottari) Notebook entry.

Viewing all of the evidence in a light most favorable to plaintiff, , incorporating all facts and evidence referenced in plaintiff's statement of additional facts submitted herewith, and drawing all inferences therefrom in his favor, and resolving any ambiguities in his favor; it must be determined that a triable issue exists with regard to the frauds in the witness statement, frauds in the autopsy, and frauds in the video.

**Conclusion as to the May 25, 2016 arrest**

Plaintiff has pointed to and come forward with evidence, including Expert Evidence, which, considered in the light most favorable to plaintiff, drawing all favorable inferences

therefrom, and resolving any ambiguities in his favor, establish a genuine issue of material fact for trial.

**Probable Cause Did Not Exist for Plaintiff's Second Arrest in 2018**

After Justice Condon dismissed the indictment due to the people's failure to instruct the grand jury on self-defense, the defendants filed a fraudulent affirmation and appeal, setting forth all of the fraudulent evidence presented to the Grand Jury, to an Appellate Court. Egregiously, the submission and resultant order highlighted the theory that plaintiff "used his shoes or boots to stomp decedent" which had already been disproven by forensic lab results that the defendants had in their possession. The defendants knew their own lab excluded White from bloody shoe prints on the scene, and on Rivera's cheek, and swabs of his shoes and gas/break pedal tested negative for the presence of blood. Nevertheless, the defendants put all the frauds from Grand Jury before the Appellate Division, who relied on them, and reinstated the indictment. Ex. 13, 14.

Prior to that time, exculpatory evidence abounded, as well as further evidence regarding frauds and Holloways lack of veracity. As mentioned above, long prior to the appeal, conclusive laboratory evidence disproved the police narrative and showed that White never "stomped" Rivera, as White's shoes and gas and break pedals tested negative for trace evidence of blood. White's shoes were also deemed not a match to the bloody shoeprints left on the scene and on Rivera's cheek. Id. The forensic evidence directly disproved the police narrative, facilitated through the fraudulent Tavares statement signed by Holloway, that White "stomped" Rivera.

Importantly, prior to this 2018 second arrest, police and prosecutors unquestionably reviewed Holloway's cell phone, including her text message records with Rivera in the days and weeks leading up to the incident. The text messages conclusively showed, beyond doubt, that (1) Holloway lied to police about not telling Rivera of her whereabouts, and in fact had called him

directly to Mary Carroll's that night; (2) that Rivera and Holloway were in constant communication in the minutes leading up to the incident and that Holloway knew he was waiting outside Mary Carroll's and lied about it; (3) that Holloway was infuriated with Rivera, who had recently left her for the mother of his children, not only because of that but also because of her discovery that he was also seeing other women "on the side;" and (4) the messages established Holloway's prior attempts to set Rivera up for violence and Rivera's expressing concern about same in the day leading up to the incident; Ex.6 This evidence of Holloway's lack of veracity with police is clearly confirmed by a simple reading of her text messages.

Holloway's lack of veracity was also corroborated by the fact that the time stamps on her texts lined up perfectly with the surveillance video to leave absolutely no doubt at all as to her lies to police and the fact that she called Rivera to the scene, and knew he was in the parking lot lying in wait. Compare Ex. 3 to Ex. 6 (Ex. 3:08 *Text from Rivera says "I'm leaving" at the moment surveillance video shows him back out of his parking space.)* It was abundantly clear from the face of the messages that she set up the incident by calling Rivera to the scene and coordinated his getting here. Ex 6. **Furthermore, in the weeks after the initial indictment, prior to the second arrest, <u>Holloway posed in a photo on public social media with the proceeds of the robbery of White. Specifically, she posed with White's diamond ring she stole, along with "Mike" the man who introduced her to White in the first instance</u>**. See Ex. 5

In addition, the SIM card to Rivera's phone, that Holloway alleged White took and threw out the car window, was retrieved from a friend of Rivera who lived down the block from Holloway, proving yet another lie. Further, the phone "magically" turned up outside White's home in a dumpster that was only placed there after White had been incarcerated. See Ex. 15, Ex. 4, P 131, 3-6. It was abundantly clear that Holloway took Rivera's phone and lied and blamed White.

Recall the standard that applies here is "(w)hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists **unless the circumstances raise doubt as to the person's veracity." (Emphasis added).** Id. Citing to *Curley v. Village of Suffern*, 268 F. 3d 65, 70 (2nd Cir. 2001), (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 199 (2d Cir. 1995) The reliability or veracity of a person is an important factor to consider when evaluating whether probable cause exists. *Panetta v. Crowley,* 460 F. 3d 388, 395 (2d Cir. 2006) Probable cause can be established by information given by an eyewitness "**unless circumstances [exist] that raise doubt** **as to the [eyewitness statement's] veracity." (Emphasis added).** *Miloslavsky v. AES Engineering Soc., Inc.,*808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,*993 F.2d 1534 (2d Cir.), *cert. denied,*510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993). **Importantly, where probable cause does not exist, it cannot be manufactured**. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)

Plaintiff's evidence, including expert reports, establishes frauds in the autopsy report, frauds in the video, and pointing to frauds/untrustworthiness of the Tavares/Holloway statement, the additional exclusionary evidence developed after the initial indictment and prior to the second arrest, further establishes genuine issues of fact relating to the lack of probable cause for the re-arrest in November 2018. Additional exculpatory facts became known, including (1) conclusive forensic evidence excluding White from the bloody shoeprints on the scene, (2) proving there was no blood on his gas or break pedal, and (3) exclusion of his shoes from those which could have caused the marks on decedent's cheek; and (4) clear text message evidence proving Holloway's direct lies and lack of veracity with police; (5) revealing Holloway's role in setting up the entire violent encounter; (6) revealing Holloways motive to harm Rivera; and (7) photographs publicly posted on social media showing Holloway posing with the proceeds of the robbery of White.

Viewing all facts and evidence in a light most favorable to plaintiff, , incorporating all facts and evidence referenced in plaintiff's statement of additional facts submitted herewith, and resolving any ambiguities in his favor, this court must hold that plaintiff has, at minimum, raised genuine issues of fact regarding probable cause to be determined by a jury.

**POINT VI**

**PLAINTIFF'S INDICTMENT BY GRAND JURY WAS SECURED BY FRAUD AND THEREFORE PROBABLE CAUSE IS REBUTTED**

While it is true that an indictment by a grand jury creates a presumption of probable cause, it may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir.2004). When law enforcement officers fabricate evidence the presumption of probable cause created by the indictment is overcome. (Emphasis added) *Morel v. Reed*, Nos. 11-CV-1808, 12-CV-5145, 2015 WL 3755976, at *4 (E.D.N.Y. June 16, 2015) **An indictment secured by fraud is not entitled to the presumption of probable cause**. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997). **Emphasis added.**

By way of example, in *Riccuiti*, the Second Circuit reversed summary judgment on a malicious prosecution claim where the officer fabricated a false confession and forwarded it to prosecutors. In another example, *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 364 (W.D.N.Y. 2021), the court denied summary judgment due to the fabrication of a false confession. "'[A] police officer's fabrication and forwarding to prosecutors of known false evidence' is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment." *Id.* (citing *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010)).

Plaintiff has provided the Grand Jury transcript in which the (1) autopsy report; (2) the surveillance video; and testimony of John Petersen and Valerie Holloway were submitted to the Grand Jury. **Plaintiff has provided Expert Evidence, showing frauds in the autopsy, frauds in the surveillance video, and has shown frauds in the statement of Holloway, and frauds in the testimony**. See Ex. 41, (transcript) and Ex. 7 – 12. (Expert Reports.)

Importantly, the grand jury questioned Holloway's veracity during deliberations. A juror specifically asked a question about whether or not she knew Rivera was outside of the bar. ADA Newcombe, knowing full well the truth from the text messages, that not only did Holloway know, but she called Rivera there, intercepted the question and rephrased it, specifically in order to facilitate the lie to the grand jury, in effort to mask Holloway's lies and role in setting up the robbery of White. The transcript speaks for itself in this regard. Also interesting is that ADA Newcombe redacted this information from the Grand Jury transcript that was originally disclosed to the defense. While it is acknowledged that ADA Newcombe received absolute immunity for her actions in Grand Jury, this redaction nevertheless goes to show the ongoing cover-up custom and culture that pervaded the office. Ex. 78

That said, notwithstanding the direct lies from John Petersen regarding the video, the lies from Valerie Holloway, and ADA Newcombe's role in facilitating the lies, <u>the actual proffered evidence</u>; i.e., the video played for the grand jury and the autopsy report given to the grand jury, were both subjected to frauds and fabrications, and therefore the evidence of such frauds rebuts any contention that probable cause is established here because of the indictment.

**When law enforcement officers fabricate evidence the presumption of probable cause created by the indictment is overcome.** *Morel v. Reed*, Nos. 11-CV-1808, 12-CV-5145, 2015 WL 3755976, at *4 (E.D.N.Y. June 16, 2015) **An indictment secured by fraud is not entitled**

**to the presumption of probable cause**. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997).

Plaintiff's evidence, viewed in a light most favorable to him, and giving Plaintiff the benefit of all favorable inferences and the benefit of any ambiguities, this court must hold that Plaintiff has established genuine issues of fact as to fabricated evidence used at the Grand Jury. This genuine issue of material fact is for a jury and negates/rebuts any presumption of probable cause per *Morel* and *Riccuti* as briefed above. For that reason, the County Defendant's Point VI must be denied.

## POINT VII

## PLAINTIFF HAS ESTABLISHED GENUINE ISSUES OF MATERIAL FACT SURROUNDING THE ISSUE OF PROBABLE CAUSE, AND HIS CLAIMS FOR FALSE ARREST AND MALICOIUS PROSECUTION SURVIVE SUMMARY JUDGMENT AS A MATTER OF LAW

Plaintiff has established above that no probable cause existed for his arrest. At minimum, plaintiff established a genuine question for a jury to decide.

Shockingly, in this next point, Defendants allege that "it is **undisputed** from both the documentary evidence and the video evidence in this case that Plaintiff assaulted Edwin Rivera." They go on to contend "It is further **undisputed** based on the video evidence that Rivera retreated from Plaintiff during the incident and Plaintiff went after him regardless, continuing to further assault him." The County Defendant's finally in this particularly **disingenuous** argument on page 25, lastly make reference to the Appellate decision from September 26, 2018, which concluded that Plaintiff punched and "stomped" on him (Rivera) before driving off. The defendants note the appellate division's reliance on the autopsy report which indicates the cause of death falsely, as

blunt force injury to the face and neck, knowing full well that their "stomping" theory was directly disproven by forensic evidence. This paragraph contains nothing more than misstatements of the evidence and disingenuously refers to it "undisputed."

To clarify, there is absolutely no "**undisputed** documentary evidence or video evidence that shows Plaintiff "assaulted" Rivera." It does not exist and most certainly, the disingenuous allegation that White "assaulted" Rivera is **vehemently DENIED**. Furthermore, the video evidence in question, was not only subjected to frauds, fabrications, and editing but also, the video evidence itself shows exactly the opposite of what the County Defendants contend.

First, the defendants will not be able to offer the video in evidence for their proposition, because it has been proven to have been subject to editing and unquestionably does not represent what it purports to represent. See Expert Report, Ex. 12. Irrespective of the fact that it cannot be authenticated for the defense purpose, it matches up exactly with the credible statement White gave to police prior to ever even knowing a video existed. The video shows Rivera lying in wait outside Mary Carroll's bar. Medical evidence demonstrates he was high on cocaine and alcohol at the time. Ex. 26. Text message evidence shows Rivera was called there by his ex-girlfriend, Holloway, who intentionally brought him to the scene to set up this violent encounter and robbery of White. Ex. 6 The video further shows Rivera surreptitiously driving around the parking lot, having turned off his lights, stopping in the middle of the one-way street facing the wrong way, getting out and leaving his car door open, and charging aggressively toward White, holding what appeared to White to be a weapon in his sweatpants pocket. White advised police Rivera was screaming at him, specifically and repeatedly screaming he was going to kill White, and also steal his watch after he knocked him out. The video corroborates White's statements to police that he tried to retreat from Rivera numerous times, and shows White, smoking a cigarette and physically

withdrawing multiple times from Rivera, who kept coming more aggressively toward him, just like White told police. Ultimately, the video shows Rivera attack White. White described to police how Rivera pulled him down to the ground and ripped his gold chain off his neck, all while repeatedly screaming that he was going to kill him. White told police multiple times he was in fear for his life and was forced to defend himself to save his life. The video shows the actual physical interaction between them lasting mere seconds. County defendants falsely contend the video shows Rivera "retreat" and White "go after him to further assault him." Again this is completely disingenuous. Rivera never retreated and extinguished the threat to White. Rivera tripped at some point moving into the street, but that absolutely was not a retreat; it was Rivera regaining his footing after tripping over a curb. Absolutely nothing shows White "assaulting" Rivera at all, but the other way around. It shows Rivera lying in wait for White outside the bar and then physically attacking White, despite White's several attempts to get away and avoid him. White reasonably was in fear for his life, and a jury has agreed. White's response to defend himself cannot, by any means, be determined to be an "assault" of any kind. **The obvious self-defense, confirmed by the evidence, <u>would have extended to any charge of assault</u>, just like it applied to the fabricated "homicide." (Emphasis added.)**

The County Defendants argue in Point VII that plaintiff's false arrest and malicious prosecution claims must be denied because probable cause existed for *some* charge – as if they would have had probable cause to charge White with "assault." This argument is belied by law, facts, and logic. The circumstances leading up to the attack on White are confirmed in text message evidence between Rivera and Holloway, and the much larger Rivera was seen clearly perpetrating the attack on White after lying in wait surreptitiously outside of Mary Carroll's, and after White's recorded attempts to retreat from him. Rivera attacked and threatened to kill and

rob White, and White had a right to defend himself and did. As he explained to detectives that day, as soon as he felt it was safe to go to his car, he did. **A jury agreed and the self-defense would have negated any allegation of assault as well. The jury saw the video in full, containing what the County disingenuously describes as a "retreat" by Rivera. The jury knew better. Rivera never retreated extinguishing the threat against White. White was well within his rights to defend himself and was found not guilty of any crime that day. Whether he would have been charged with "assault" rather than "homicide" is immaterial, as the obvious self-defense and lack of probable cause to believe White committed any crime, would have been equally as applicable to any lesser charge; including assault**. No matter what alternate charge the County wants to claim could have been charged, questions of fact regarding probable cause remain unavoidable, when viewing plaintiff's evidence, including evidence of frauds and fabrications, in a light most favorable to him, and resolving any ambiguities in his favor, and drawing all favorable inferences from the evidence in his favor. *See* also *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) **("Under the circumstances of this case, a reasonable jury could have concluded that Tavernier should have known that Jocks was acting in self-defense.")** Incorporating all facts from Plaintiff's Statement of Additional Facts for Trial, it is abundantly clear that a triable issue has been established, as the same arguments and the same obvious self-defense situation would have negated any probable cause for the charge of assault.

Defendants next argue that there were no intervening facts that could have eliminated probable cause for malicious prosecution if there was probable cause for arrest. Again, there was no probable cause for arrest. *See supra*. However, even after the arrest, additional evidence was shown to further negate probable cause, see supra., including (1) the wholly exculpatory laboratory results excluding White through blood analysis, excluding him from bloody footprints on the

scene, showing no blood on his gas/brake pedal, and excluding his shoes from causing the cheveron print on Rivera's cheek; (2) the text message evidence showing beyond doubt, that Holloway's statement contains lies and that she was in constant communication with Rivera that night and in fact called him to come to Mary Carroll's, and knew he was outside the bar; (3) text message evidence showing Holloways mal-intent toward Rivera and showing that she set up the entire encounter and then lied to police about it to cover her own misdeeds; (4) the text message evidence showing Holloway's motive to harm Rivera and anger toward him in the preceding days over his and his leaving her for another woman; (5) evidence proving Holloway lied about Rivera's cell phone, and in fact, took it herself from the scene; and (6) photographic evidence of Hollway, several weeks after the incident, posing for social media with the proceeds of the robbery of White. Ex. 3, 5, 6, 14, 15,

Viewed in a light most favorable to this plaintiff, incorporating all facts and evidence from Plaintiff's Statement of Facts, and drawing all inferences therefrom in his favor; and resolving any ambiguities in his favor, this evidence must be determined at minimum to create a question of fact for a jury to determine.

## POINT VIII

## PLAINTIFF HAS COME FORWARD WITH EVIDENCE SUFFICIENT TO ESTABLISH A GENUINE ISSUE OF FACT ON ALL ELEMENTS OF HIS MALICIOUS PROSECUTION CLAIMS

In its Point VIII, county defendants baldly contend that plaintiff cannot sustain the elements of his malicious prosecution claims. Again, defendants fail to point to any evidence to support their contention at all, and fail in their initial Celotex burden. Nevertheless, an examination of plaintiff's claims and evidence requires their argument be denied.

The elements of a claim of malicious prosecution are well established: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 160-61. Probable cause (the third element) was addressed above. Defendants concede Plaintiff's establishment of element (2) that this case meets the "termination of the criminal proceeding in White's favor" requirement (also quelling inquiry about *Heck,* which no longer applies in the light of more recent and conceded law in plaintiff's favor). Defendants also appear to concede the post-arraignment restraint of liberty requirement as per Rohman v. N.Y.C. Transit Auth, 215 F.3d 208, 216 (2d Cir. 2000), as it is not disputed that Plaintiff spent one year in jail on these charges.

Therefore, defendants challenge plaintiff's ability to present a triable issue of fact as to only two of the required elements: (1) the initiation or continuation of a criminal proceeding against plaintiff and (4) actual malice as a motivation for defendant's actions.

(1) <u>The Initiation or Continuation of a Criminal Proceeding Against Plaintiff.</u>

**The initiation or continuation of a criminal proceeding can be satisfied, inter alia, showing that the defendant filed formal charges and caused the plaintiff to be arraigned**. *Phillips v. DeAngelis,* 571 F.Supp 2d 347, 353-54 (N.D.N.Y 2008). It is also well settled that even a "civilian" or non-law enforcement officer can be liable; "(I)n order for a *civilian complainant* to be considered to have initiated a criminal proceeding, 'it must be shown that [the complainant] played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act. *Barrett v. Watkins*, 919 N.Y.S.2d 569, 572 (App.Div. 2011). Police and civilians alike, however, are held liable for malicious prosecution where there is evidence he/she

**"creat[ed] false information likely to influence a jury's decision and forward[ed] that information to prosecutors**," *Ricciuti,* 124 F.3d at 130.

Where a defendant is a law enforcement officer or civilian he/she may be liable if he/she played an active role in the prosecution, such as by giving advice and encouragement or importuning the authorities to act, **failing to make a complete and full statement of the facts to the prosecutor, misrepresenting, falsifying or withholding evidence or otherwise acting in bad faith.** *Buari v. City of New York,* 530 F.Supp 356, 383 (S.D.N.Y. 2021).

Here, Plaintiff has pointed to evidence in the police records, medical record, and Expert Reports, that create genuine issues of fact as to the false information and withholding of exculpatory evidence by all named defendants for use in or during the prosecution of plaintiff as in *Buari.* But by way of brief summary, the case was initiated by the complaint signed by Detective Milau, which made false statements of probable cause and false statements about the cause of death of Rivera. Under *Phillips*, supra this suffices to establish element as to Milau. Milau also played an active role in the continuing prosecution, attending post-indictment meetings with the ADA and lab personnel, and was directly involved in the withholding of exculpatory laboratory testing as reflected in lab notes. Ex. 79, 81 Milau also falsely reported information, writing in a report (and later testifying at trial) that White did not provide his passcode to his cell phone, which resulted in exculpatory text messages with Holloway being "undiscovered" during the course of the prosecution. Ex. 50. The truth, however, is that plaintiff is on video giving the passcode and asking detectives to please search his phone for the exculpatory texts with her. The passcode is also recorded in Milau's notebook Ex. 49 Milau is also responsible, as the lead detective on the case, for intentionally ignoring Holloway's text messages which were immediately available to him prior to charging White, under circumstances in which her veracity was already suspect and

the texts were readily available, with her consent to search them. Ex. 6, 16 These text messages prove, beyond doubt, that she lied to police in her statement and that she, in fact, was the one who set-up this entire incident by calling Rivera to Mary Carroll's. Also, as the Lead Detective who stayed involved through the course of the prosecution, he failed to consider or disclose publicly posted photographs of Holloway, posing with the proceeds of the robbery of White, his diamond ring she stole during the incident. Ex. 5

With regard to John Petersen, a genuine issue of fact has been raised through police records and expert reports detailed above as to whether he fabricated video evidence and withheld recorded exculpatory evidence. See. Ex 11, 12, 38. He then passed that fabricated video to the D.A., knowing it would be likely to influence a jury. He then testified and lied to the grand jury about his process for securing the video, leaving out the trip to Distinctive Technologies from his testimony, and directly lying about the cause of "missing video," blaming bad "wifi" which was not true. Ex. Ex. 41, P. 630-631.

With regard to Detective Tavares, plaintiff has come forth with evidence to create a genuine issue of fact as to whether he fabricated the statement of Holloway, in the same way he did in the Thomas Moroughan case; to manufacture a case of "manslaughter" with this witness whose veracity was already in question, and whose texts conclusively proved that statement was fabricated and that she, in fact, set up this violent encounter to occur. The statement has been proven to contain falsehoods, contravened by Holloway's own text and call records.

Tavares intentionally ignored the issues surrounding her veracity and intentionally ignored the available evidence text messages and call records, when any reasonable person would have done so, and instead used her to manufacture a statement to fit the police narrative of homicide. He then passed that statement to prosecutors knowing that a jury would rely upon it. He, and

prosecutors, also failed to disclose Brady material of his tarnished history for taking false statements for disclosure to the defense. ( Such was a required disclosure since 2015 when it was held by a court to violate a defendant's constitutional rights and rights under Brady to fail to disclose this exact evidence; withheld here. See ex. 51)

Odette Hall was the Medical Examiner. Her role in the fabrication of information in the autopsy report is discussed above and incorporated here. Expert evidence proves that the cause of death was compression strangulation, something that did not fit the police narrative, or what appeared to be on video, so it was intentionally ignored. Instead, Hall fabricated an autopsy report to conform to the police narrative of "assault" – amending her worksheet notes, excluding references to neck injuries present from a neck collar, and then falsely reported the cause of death as "blunt force injuries to head and neck." She then passed this onto prosecutors knowing a jury would be likely to rely on it. Ex. 9, 10, 22, 23, 24, 32, 33

With regard to Helen Wong, plaintiff has established that she was the lab analyst and technician assigned to this case. She was in possession of exculpatory information after the initial arrest, that conclusively negated the police narrative of events that White "stomped" on Rivera. Presumptive lab evidence showed "negative" tests for blood on plaintiff's brake and gas pedal, as well as negative tests from blood swabs from his shoes, and that his shoes were excluded from those that made the bloody footprints on the scene. This evidence was available prior to the initial grand jury presentation. Ex. 13, 14, 81. Knowing this information to be fully exculpatory and critical, Wong intentionally withheld reports at the behest of the ADA which is memorialized in her telephone notes.

Supervising Detective Sgt. James McGuinness is equally liable for malicious prosecution. As indicated above, McGuinnes knew of Tavares' history of taking false witness statements,

however he caused Tavares to take the statement of Holloway, whose veracity was already in question, resulting in the fabricated statement. McGuiness also participated and encouraged the prosecution by sending all SCPD a notice indicating that White was WANTED BY HOMICIDE, directing them to unlawfully detain white, (noting they did not have probable cause to arrest), at least for as long to notify Detective Milau by cell phone, directing police further not to let White know that he was wanted or being reported to Milau. Ex.100

Each is also liable due to their failures to intervene. In the matter of *Moroughan v. Suffolk*, supra, Judge Bianco, citing to Branen, 17 F.3d at 557, held that an officer may be held liable for the malicious prosecution of plaintiff based upon an alleged failure to intervene in connection with the charges being filed against plaintiff. In that case, the judge reasoned that there was evidence sufficient to allow a jury to rationally find that Det. Tavares and Det. Lesser initiated the criminal proceeding against plaintiff, given that, among other things, they determined which charges should be filed against him, prepared the charging documents, fabricated documents to support the charges, misrepresented the true facts to the prosecutor and otherwise acted in bad faith. Bianco reasoned that Detective Bienz could be liable for malicious prosecution, by failing to intercede. ***"An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know … that a citizen has been unjustifiably arrested; or that any constitutional violation has been committed by a law enforcement official.***" Bianco opinion [DE 130] p. 35, citing to Coggins v. County of Nassau, 988 F. Supp 2d 231,245 (E.D.N.Y. 2013) ( It is well settled that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."

The Second Circuit has also held that **where officers are jointly involved in a scheme to ensure that a plaintiff was detained on false charges, the officer may be held liable for malicious prosecution even though he did not personally prepare the documents to initiate the prosecution.** *Ricciutti,* supra at 129. (Finding that summary judgment was improper where a reasonable jury could find that officers violated the plaintiff's rights by fabricating a statement and forwarding it on to prosecutors, and prosecuting plaintiff without probable cause.)

Viewing all facts in a light most favorable to this plaintiff, incorporating all plaintiff's facts and evidence from his Statement of Additional Facts for Trial, and giving plaintiff the benefit of all inferences, and resolution of any ambiguities in his favor, it must be held that plaintiff has created a genuine issue as to each of the named defendants on this element.

**Termination in Plaintiff's Favor.** Defendants concede this issue. Plaintiff was fully acquitted on July 12, 2019 after a jury trial due to self-defense justification. This type of termination in plaintiff's favor is an acceptable basis upon which to ground a malicious prosecution claim. *Harris v. Tioga County*, 663 F. Supp. 3d 212 N.D.N.Y. (2023), citing *Barnes v. Anderson*, 202 F.3d 150, 158 (2d Cir. 1999).The Second Circuit clarified the application of Heck to malicious prosecution and other Section 1983 claims in *Poventud v. City of N.Y.*, 750 F.3d 121 (2d Cir. 2014) (en banc). The Court explained that "[i]n the context of § 1983 malicious prosecution cases, Heck's bar is coextensive with the favorable termination requirement," and "any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination . . . ." Poventud, 750 F.3d at 131 (quoting Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195, 734 N.E.2d 750, 753, 712 N.Y.S.2d 438 (2002)). As such, the acquittal in this instance, unquestionably satisfies this element and Defendants concede as such.

**Actual malice as a motivation for defendant's actions**.

Lastly, defendants challenge the element of actual malice. **It is well-settled that a jury may infer actual malice from the absence of probable cause.** *Maxwell v. City of New York* 554, N.Y.S.2d 502, 505 (App. Div. 1990). Actual malice need not be shown with direct evidence. *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994). Malice can be shown through circumstantial evidence. *Id.* Moreover, the lack of probable cause and the presence of malice are closely related. *Id.* at 631; *see also Blake v. Race*, 487 F. Supp. 2d 187, 211-12 (E.D.N.Y. 2007). In fact, the absence of probable cause "raises an inference of malice sufficient for a claim of malicious prosecution to withstand summary judgment." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015) (quoting *Ricciuti*, 124 F.3d at 131).

Given the plaintiff's evidence supporting the fabrication and withholding of evidence, it must be held that the same genuine issues extend to the malice requirement here in order to withstand summary judgment. Viewing the evidence in a light most favorable to plaintiff, incorporating all facts and evidence from Plaintiff's Statement of Additional Facts, and giving plaintiff the benefit of all favorable inferences therefrom, and resolving any ambiguities in his favor, it must be determined that there is a genuine question for a jury to resolve regarding the malicious prosecution counts of the complaint.

## POINT IX

## PLAINTIFF HAS RAISED A GENUINE ISSUE OF FACT AS TO WHETHER DEFENDANTS DEPRIVED PLAINTIFF OF HIS RIGHT TO A FAIR TRIAL

County Defendants ignore the evidence, including expert evidence, and argue that there is "no evidence of fabrication" in this case. They also argue that because Plaintiff was acquitted, Plaintiff is barred from asserting claims to denial of a fair trial caused by any fabrication of evidence and withholding of Brady material. Neither statement is correct.

The Due Process Clause guarantees a criminal defendant's "right to a fair trial." *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010). This right is violated "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Such violations are "redressable in an action for damages under 42 U.S.C. § 1983." *Id.* Tellingly, the right to a fair trial and the integrity of the process is so protected by this right, such that, unlike a malicious prosecution claim, a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand – regardless of whether or not probable cause to arrest existed. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016). **This right to a fair trial and due process does is not contingent upon whether one is convicted at trial, rather, even the deprivation of liberty during pre-trial detention is a cognizable denial of liberty for purposes of 1983 Fair Trial claims.** *Frost v. N.Y.C. Police,* 980 F.3d 231, 248-249 (2d Cir. 2020).

In Frost, the Second Circuit specifically examined the causation issue raised by defendants here, and concluded they "missed the mark." Id. The Frost court explained that ***a "prosecutor's decision to pursue charges rather than to dismiss [a] complaint without further action may***

***depend on the prosecutor's ... assessment of the strength of the case, which in turn may be critically influenced by fabricated evidence."*** Id. citing its holding in *Garnett*, 838 F.3d at 277. The Frost court reasoned that a reasonable jury could find that fabricated evidence "critically influenced" the decision to prosecute Frost, (**which led to his pre-trial deprivation of liberty**.) *Id.* **The court determined that the potential impact of the fabricated evidence on the decision to prosecute itself was "all that is necessary to sustain Frost's due process claim (Denial of Fair Trial)." Id.**

Defendants cite to cases in different, Post Conviction procedural postures to try to support their position which is directly contrary to this Circuit's holdings. In 2019, after all cases cited by the defense, Judge Glasser of this District addressed this precise argument in *Newson v. City of New York*, 2019 WL 3997466. Judge Glasser looked to the same line of cases cited by the defense here for the proposition that the acquittal bars relief. Judge Glasser distinguished these cases and passages cited (the same passages cited by county defendants p. 31) and recognized the compensable prejudice of pre-trial detention by reasoning that:

> *"(A)ll [the passages] are taken from cases outlining the State's Brady obligations in the context of post-conviction proceedings. The importance of this point cannot be overstated. The Supreme Court has only had the opportunity to define what it means for the State to violate "Brady" in cases where a conviction was presupposed, and where the only relief being sought was vacatur of the actual conviction or sentence. In these cases, the only relevant consideration, as far as "prejudice" was concerned, was the effect of the nondisclosure on the trial itself. Placed in their proper context, these cases merely establish that* ***post-conviction relief*** *is not warranted unless "there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281. In none of these cases was the Supreme Court called upon to consider whether a* ***civil § 1983*** *action for damages can be maintained where, as here, the State's suppression of exculpatory evidence has injured the plaintiff in another way, that is, by prolonging his pretrial incarceration."*

Glasser ultimately held that, "in any event, the question of whether a "*Brady*" claim may be brought by an acquitted plaintiff is academic. In cases where a plaintiff has been deprived of

his liberty prior to trial due to the State's suppression of exculpatory evidence, courts have recognized that he may bring a § 1983 claim." *Newson* at 4.

As the Court stated in *Brady itself ,* "our system of the administration of justice suffers when any accused is treated unfairly.... A prosecutor that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." Brady, 373 U.S. at 87–88, 83 S.Ct. 1194. *Brady* and its progeny impose a duty on prosecutors and police officers to produce evidence favorable to the accused where the evidence is material either to guilt or punishment. Brady, 373 U.S. at 87, 83 S.Ct. 1194. **As the court stated in *Frost,* "(I)f courts prohibit a criminal defendant from making a civil claim for concealment of material exculpatory evidence simply because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because the defendant was able to overcome it by other means. In this Court's view, such an approach undermines the important interests protected by *Brady* and its progeny**. (Emphasis Added) *Frost* at 249. The Frost Court continued to explain that: **" (N)otwithstanding the nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself. Indeed, a criminal defendant can bring a fair trial claim even when no trial occurs at all.**" Id. In other words, the existence of a due process violation giving rise to a Denial of a Fair Trial claim did not depend on whether the due process violation made a substantive difference in the ultimate decision. The Court noted that " **'[i]t is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, *whatever the outcome of the hearing....*' "** *Id.* at 266, 98 S.Ct. 1042 (quoting *Fuentes v. Shevin,* 407 U.S. 67, 87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972))

First, defendants, deliberately ignoring expert evidence, disingenuously argue that "not one scintilla of evidence of fabrication" exists in this case. To the contrary, plaintiff has submitted: (1) an expert report showing fabrications in the autopsy; (2) an expert report showing fabrications in the video; (3) an expert report from a police practices expert discussing the fabricated evidence and lack of probable cause, among other failures of these defendants; and (4) has pointed to evidence in the grand jury, the medical records, and police reports that corroborate plaintiff's evidence.

Second, Defendants knowingly withheld exculpatory evidence including: evidence of the true cause of death; data from the surveillance video, delayed exculpatory laboratory results, and required disclosures regarding Detective Tavares' marred history for falsifying witness statements in various homicide cases.

The Tavares withholding was especially critical because in this case, Tavares testified at pre-trial hearings in plaintiff's case. Had counsel learned about Tavares' negative history prior to the hearings, he would have been able to effectively impeach Tavares with the information and suppress the Holloway statement, which already contained statements disproven by the available text message evidence and circumstances questioning her veracity.

Viewing all evidence in a light most favorable to the plaintiff, and giving him all benefits of all favorable inferences, and resolving any ambiguities in his favor, this court must find that plaintiff's evidence sufficiently creates genuine issues to be tried on the **fabrication-based claims and the Brady/Withholding claim** and it is irrelevant that plaintiff was acquitted. Despite the County Defendant's argument otherwise, the law in this circuit clearly states that plaintiff has a right to relief for these misdeeds even though a jury fully acquitted him.

## POINT X

## DEFENDANTS' POINT X MUST BE DENIED *IN TOTO* AS PLAINTIFF'S COUNTS 9-18 ARE SUFFICIENT TO STATE COGNIZABLE CLAIMS FOR WHICH PLAINTIFF HAS PRESENTED EVIDENCE SUFFICIENT TO RAISE A GENUINE ISSUE OF MATERIAL FACT

Plaintiff's Counts 9-18 raise claims for violations of individual constitutional rights, set forth in each Count, along with the specific facts upon which each claim rests. While the counts are broadly titled, a reading of the pleaded elements thereunder distinguishes the basis for the individual claims. The County argues that there is no "due process" right to certain constitutional violations in attempt to place semantics over substance. For example, it is axiomatic that a suspect has a right to an attorney present during interrogation. That right is protected by the 6th and 14th Amendments; in the same way a False Arrest may be cognizable under the 4th Amendment or the 14th where fabrications of evidence or a faulty search warrant underly the arrest. There is no authority to suggest that a Plaintiff must "pick one" theory of redress. Rather, a plaintiff is free to plead all his claims.

The County Defendants next argue that "[t]here has been no evidence gleaned during discovery to support a substantive or procedural due process claim against any of the defendants." **However, it is "firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer"** *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000); or withheld exculpatory evidence as discussed herein *supra*. County Defendants ask this court to ignore the evidence in the record, the police record, the court record, the medical records, and the three Expert Reports plaintiff has proffered, showing more than sufficient evidence to raise a genuine issue of fact on the various fabrications and withholdings of exculpatory evidence discussed above.

Finally, Defendants assert that the *Ambrose* case, a case decided in the trial court of the S.D.N.Y., is dispositive, and created a blanket rule that an acquittal after criminal trial invalidates all Due Process claims. That is absolutely not the case and the Second Circuit held as such in Frost supra, considering the exact issue. **The right to a fair trial and due process is not contingent upon whether one is convicted at trial, rather even the deprivation of liberty during pre-trial detention is a cognizable denial of liberty for purposes of 1983 Fair Trial claims.** *Frost*, 248-249 (2d Cir. 2020). Brady, 373 U.S. at 87, 83 S.Ct. 1194. **As the court stated in *Frost,* "(I)f courts prohibit a criminal defendant from making a civil claim for concealment of material exculpatory evidence simply because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because the defendant was able to overcome it by other means. In this Court's view, such an approach undermines the important interests protected by *Brady* and its progeny**. (Emphasis Added) *Frost* at 249. The Frost Court continued to explain that: " **(N)otwithstanding the nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself. Indeed, a criminal defendant can bring a fair trial claim even when no trial occurs at all.**" Id. Further, "the fair trial right [a Due Process Right], protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Frost* at 250. This opinion was cited by Judge Bianco in his opinion at [DE 130] in the *Moroughan* case as well, under like circumstances and like parties. See Ex. 54 at p 46. It is contrary to justice to think that a defendant, who loses his liberty, at any time, due to fabrications and withholdings contrary to the requisites of sound judicial process, may not seek redress because he was nevertheless able to overcome the schemes of his accusers and achieve an acquittal at trial.

On a motion for summary judgment, the moving party bears an initial burden of pointing to evidence in the record that demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As Defendants point to no evidence, nor even advance any specific pleading failure other than their blanket assertions that seek to place semantics over the substance of the counts in the complaint, it cannot be said that Defendants have even met their initial *Celotex* burden on this point. Nevertheless, Plaintiff has brought forth evidence sufficient to create genuine issues of material fact as to his deprivation of liberty and violations of his constitutional rights, confirmed by Expert Reports, including a Police Practices Expert, a Forensic Video Expert, and the nation's foremost Forensic Pathologist, revealing various fabrications of evidence, withholdings, and deprivations. Plaintiff's expert opinions are based upon and also corroborated by evidence in the medical record and police reports and together create genuine issues of fact as to the constitutional violations pleaded in counts 9-18, and the deprivation of White's liberty it caused.

Viewing the evidence in a light most favorable to plaintiff, incorporating all facts and evidence from Plaintiff's Statement of Additional Facts for Trial, and drawing all favorable inferences therefrom and resolving any ambiguities in his favor, it must be determined that a genuine issue exists with regard to White's due process claims, notwithstanding his complete acquittal after trial.

## POINT XI

## SUFFICIENT EVIDENCE EXISTS TO SUBMIT PLAINTIFF'S EQUAL PROTECTION CLAIM TO A JURY

"'Proving the motivation behind official action is often a problematic undertaking,' as officials rarely make outright pronouncements of their discriminatory motives." *Chinese Am. Citizens All. of Greater New York v. Adams*, 116 F.4th 161, 172 (2d Cir. 2024) (quoting *Hunter v.*

*Underwood*, 471 U.S. 222, 228 (1985)). Therefore, because direct evidence of discriminatory intent is almost never available, circumstantial evidence is used to prove that a government policy or decision was motivated by a discriminatory purpose. *Id.*; *Saget v. Trump*, 345 F. Supp. 3d 287, 301 (E.D.N.Y. 2018); *Miller v. Terrillion*, 391 F. Supp. 3d 217, 225 (E.D.N.Y. 2019).

In paragraphs 303 – 313 of his Complaint, plaintiff pleads disparate treatment he received at the hands of the defendants in this case. Plaintiff has come forward with evidence to show that, at the time of Plaintiff's arrests, Suffolk County was under federal overwatch for biased policing based on race/ethnicity. See Ex. 108. During the police interactions with Plaintiff, the police can be heard asking White if he was Spanish and then reiterating the question in disbelief. See Ex. 1 Second Interview/Interrogation of White. Plaintiff's appearance is evidenced in discovery. See Id. His skin tone was dark versus that of the other person similarly situated with him in the underlying matter; Valerie Holloway, a white woman. See Ex. 5 (*Photo of Holloway with proceeds of robbing White*.)

Plaintiff has come forward with evidence to show that, while he went to the police to report a crime against him, and gave a statement corroborated by surveillance video, detailing a violent incident perpetrated against him; he was immediately handcuffed and investigated as a suspect; ultimately, being the victim of fabricated evidence and serious exculpatory withholdings in order to falsely convict him for a homicide.

By contrast, Valerie Holloway, the white woman, whose text messages, and social media posts, prove, beyond doubt, that she set-up and robbed White that evening, and intentionally set up the violent encounter with mal-intent toward Rivera, was immediately declared "not a suspect" in Riveras death, despite numerous tips being initially received by police from Riveras friends and family that implicated her as a suspect. To date, after incontrovertible evidence exists to prove her

role, including the photo of her with the robbery proceeds, she was never charged for any crime or even considered a suspect.

County Defendants fail in their initial *Celotex* burden to come forth pointing to any evidence in the record or even making any argument other than a general denial of this point. Regardless, the facts and evidence viewed in the light most favorable to White, incorporating all facts and evidence from Plaintiff's Statement of Additional Facts for Trial and giving White all favorable inferences, and resolving any ambiguity in his favor, are sufficient to create a genuine question of fact as to disparate treatment and the denial of equal protection of the law for a jury to decide.

## POINT XII

## THE RECORD SUPPORTS A FAILURE TO INTERVENE CLAIM

In Point XII, County Defendants' assert a general denial of the claim. Defendants' fail again in their initial burden to point to evidence in the record that demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Defendants allege that Plaintiff "cannot prove any underlying constitutional violation." This is not the summary judgment standard. The standard is whether plaintiff has come forward with evidence sufficient to create a genuine issue for a jury to decide, not whether plaintiff has "proven" anything here. His claims will be "proven" at trial. Here, plaintiff's burden is to come forth with evidence to create a genuine issue for a jury to decide.

Defendants continue to ignore the evidence and contend that the "admissible evidence in the record is wholly insufficient to support Plaintiff's failure to intervene claim." The bald assertions of the Defendants in their point XII may not be deemed to satisfy their initial *Celotex*

burden. Nevertheless, plaintiff has come forward with evidence herein described *supra*, that creates a genuine issue of material fact for multiple underlying constitutional violations (fabrications, withholdings, and depriving him of liberty based upon same) that underpin this Failure to Intervene Claim. Defendants are charged here as they all witnessed constitutional violations occur, had a duty to intervene and did not. As no other element of the Failure to Intervene claim is challenged, the court's review should be limited as such, and the motion as to this count must be denied.

## POINT XIII

## PLAINTIFF'S §1985 CONSPIRACY CLAIM IS NOT BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE AND GENUINE ISSUES OF FACT EXIST TO SHOW CONSTITUTIONAL VIOLATIONS

Defendants challenge the Conspiracy count in the complaint, making two arguments, first that it is barred procedurally and second, defendants again baldly assert that Plaintiff cannot establish an underlying constitutional violation. Both arguments are without merit.

Defendants first claim that the conspiracy charge is procedurally barred by the Intracorporate Conspiracy Doctrine. However, **the Intracorporate Conspiracy Doctrine <u>does not apply in instances in which persons are charged in their "individual" capacity as here or are acting outside the scope of their employment</u>.** *Cameron v. Church* 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2023) and *Quinn v. Nassau Cnty. Polic Dep't*, 53 F. Supp. 2d 347, 359-360 (E.D.N.Y. 1999). In this case, just as in <u>*Moroughan*</u> before Judge Bianco, this plaintiff has brought forth evidence to show that defendants violated plaintiff's rights in a myriad of ways including specifically fabricating evidence, withholding exculpatory material regarding Tavares, and intentionally withholding significant exculpatory evidence. **The County Defendants remain**

**charged in their individual capacities only. Further, while a norm and culture of corruption existed that led to these deprivations, surely it cannot be said that fabricating evidence is within the scope of [defendants'] actual employment.** Additionally, the defendants here unquestionably worked as a team across agencies to fabricate evidence and then use it in the course of the malicious prosecution. For example, reports exist showing representatives from the SCDAO, SCPD, and the crime laboratory met to discuss the case and spoke on the phone throughout the prosecution in re withholding of certain trace evidence reports that were favorable to White. Additionally, the surveillance video was fabricated by SCPD and a non-law-enforcement-entity, and then passed to Newcombe who facilitated the false grand jury testimony and the use of the actual footage. In the same way, the evidence here actually shows that detectives were constantly involved in the medical assessment and autopsy of Rivera, which was fabricated specifically with law enforcement input. In fact, a detective was present through the entire autopsy. See *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 600-621 (E.D.N.Y. 2017), where the court found a plausible conspiracy claim where detectives and doctors acted jointly to fabricate medical evidence where detectives were in communication with hospital staff and a detective was present at the autopsy. Here, an officer accompanied Rivera in the ambulance, stayed at the hospital, met with Detectives Milau and Tavares who responded to the hospital for the "homicide / manslaughter investigation" even prior to the autopsy being conducted; and then had a detective present for the autopsy. Id. Additionally, Hall's worksheets confirm she obtained law enforcement, which is clear from her edits (using the word "assault") and also the falsely reported cause of death, contrary to all the obvious exculpatory medical evidence. Ex. 19, 21-28, 31-33.

Next, defendants argue again, baldly and without merit, that plaintiff cannot show any conduct that would amount to a constitutional violation and therefore cannot sustain this claim.

Plaintiff has briefed this issue above and will rely on those showings to establish the proposition rather than repeating here.

Viewing the evidence in a light most favorable to the plaintiff, incorporating all facts and evidence from Plaintiff's Statement of Additional Facts for Trial, and giving him the benefit of all favorable inferences, and resolving any ambiguities in his favor, it must be determined that evidence exists to create a genuine issue of fact for a jury as to whether constitutional violations upon plaintiff occurred, including fabrications of evidence and withholding of evidence and Brady material. Further, it must be held as a matter of law that this matter is not barred by the Intracorporate Conspiracy Doctrine which does not apply to individuals as charged here. Defendant's arguments must be denied.

## POINT XIV

## PLAINTIFF HAS DEMONSTRATED SUFFICIENT EVIDENCE TO RAISE GENUINE ISSUES OF FACT AS TO HIS *MONELL* CLAIM

Defendants Point XIV is two-fold and attempts to attack plaintiff's *Monell* claim. First defendant allege, yet again, that plaintiff has not shown any evidence to support the fact that his constitutional rights were violated. Second, defendants allege that plaintiff has not shown any evidence of a custom that led to a violation. Both arguments are bald assertions that turn a blind eye to expert evidence, corroborated by case documents, and ask this court to do the same. To do so would be error. Plaintiff has indeed come forth with evidence not only establishing the fact that his constitutional rights were violated, but also that defendants' customs caused deprivations and harm to this plaintiff resulting in injuries, including monetary injuries. Ex. 131.

With regard to the deprivation of plaintiff's rights via fabrications and withholdings, plaintiff will again rely on its prior showings briefed above to establish the violation of rights.

With regarding the *Monell* showings, plaintiff does so in several ways (although only one is necessary to sustain the claim). The following will review plaintiff's "custom" evidence, as well as the evidence supporting plaintiff's failure to supervise, failure to train, and failure to investigate and discipline claims as well, showing the municipality's "deliberate indifference" sufficient to create a genuine issue of fact for a jury to decide.

***Monell* Standards**

A municipality is subject to section 1983 liability under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury....Monell at 694. "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 28, 44 (2d Cir. 1996). A policy, custom, or practice of the municipal entity may be inferred where the municipality so failed to train, supervise, or discipline its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. In fact, 1983 liability attaches when a municipality's policy of intentional indifference to constitutional violations by its police officers causes a violation. *Fiacco at 325.* In order "to hold the **city** .. liable, a plaintiff must show that the constitutional deprivation was the result of a municipal policy or custom." *Jones v. City of NY,* 988 F.Supp 2d 305, 312 (E.D.N.Y. 2013). Upon such a showing, *Jones* held that a plaintiff establishes that policymaking officials and the District Attorney constructively acquiesced in their continuation and personal involvement is thus established. *Jones* at 313, *citing City of St. Louis v. Proaprotnik*, 485, U.S. 112, 127 (1988). **"*Personal* involvement" of a municipality .. may be shown through custom,**

**failing to supervise or train, or discipline, including instances of prior mishandlings and a following intentional indifference thereto.** *See C.F. Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331-32 (2d Cir. 1986) **[Court affirmed trial judge's decision to admit evidence of seven prior unrelated cases of mishandlings in order to show the history of the claims/mishandlings and the relevant defendant individual party's notice of same. The court concluded that in that case, the plaintiff's evidence of other cases of misconduct was admissible and logically *necessary,* in fact, to establish the custom and relevant individual's notice of it. Id. at 329-331] Admissible evidence, therefore, in the context of *Monell* claims, and the need to show a "custom" necessarily and properly includes evidence of third-party claims and prior mishandlings. Id. (Emphasis added)** In *Fiacco*, *supra.* the Second Circuit explained its evaluation of the evidence of prior mishandlings and its analysis is instructive for this court:

> *"(I)n the context of a theory that the City negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force. The City's knowledge of these allegations and the nature and extent of its efforts to investigate and record the claims were pertinent to Fiacco's contention that the City had a policy of nonsupervision of its policemen that reflected a deliberate indifference to their use of excessive force. The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims."*

A plaintiff may demonstrate a custom by introducing evidence of " (1) **actions taken by government officials** responsible for establishing the municipal policies that caused the deprivation; (2) a practice so consistent and widespread that, although not expressly authorized, constitutes a **custom or usage of which a supervising policymaker must have been aware**; or (3) a **failure** by policymakers **to provide adequate training or supervision** to subordinates to

such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York,* 705 F.Supp 2d 261, 276 (S.D.N.Y. 2010) Noteworthy, in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court addressed the dimensions of municipal liability for failure to train or supervise. The Supreme Court ruled that a claim of inadequate training will trigger municipal liability where "the failure to train amounts to deliberate indifference to the rights" of those with whom municipal employees will come into contact. *Id.* at 388, 109 S.Ct. at 1204. The Court explained that "deliberate indifference" required that city policymakers made a "deliberate choice ... from among various alternatives" not to fully train employees. *Id.* at 389, 109 S.Ct. at 1205. Such a deliberate choice could be shown where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." ***Id.*** **(Emphasis added.)**

A deliberate indifference claim may be raised under a theory of failure to train or failure to supervise. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d at 127. A failure-to-train theory requires a "specific deficiency in the city's training program" that is closely related to the injury such that it "actually caused" the constitutional violation. *Id.* at 129 (citing *City of Canton*, 489 U.S. at 391); see also *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992). A failure-to-supervise claim may be established by showing "**that the need for more or better supervision to protect against constitutional violations was obvious**." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). **"An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further**

**incidents."** ***Id.*** **"Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."** *H.H. v. City of New York*, No. 11-CV-4905 (NG)(ST), 2017 WL 3396434, at *8 (E.D.N.Y. Aug. 7, 2017) (citing *Cf. Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("**Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility** that its police officers had used excessive force.")).

Plaintiff incorporates his argument from Point One *supra,* as the evidence therein also demonstrates the municipality's acquiescence and personal involvement, just as it established' Defendant Sini's. Summarizing plaintiff's evidence as it pertains to the municipality, plaintiff has demonstrated evidence sufficient to create a genuine issue of material fact for a jury through evidence of not just one, but three of the ways noted above.

First, plaintiff has shown evidence that "actions taken by government officials responsible for establishing the municipal policies that caused the deprivation." Plaintiff has done so by showing that Thomas Spota, the former District Attorney himself and James Burke, former Chief of Police, created and perpetuated a custom wherein fabrications of evidence, witness tampering, denials of individuals' constitutional rights, and false criminal charges were acceptable, and used to maintain the police narrative or reputation of the administration. Spota was convicted of four federal felony-level crimes in 2017 for his behavior during the relevant time frame (2012-2015). Spota was convicted of: Witness Tampering, Obstruction of an Official Proceeding; Obstruction of Justice and being an Accessory to the Deprivation of Civil Rights of "John Doe." See JOC Ex. Ex. 105 The Police Chief, James Burke pleaded guilty for his role in the same malfeasance and scheme from 2012-2017. Burke pleaded guilty to Deprivation of Civil Rights and Conspiracy to commit obstruction of Justice. See JOC, Ex. 104.

Plaintiff previously identified witnesses in disclosures who will testify in Plaintiff's Case-In-Chief regarding the malfeasance of these policymakers that led to the violation of his rights. Plaintiff's witnesses will testify as to the actions of Spota and Burke that created and reinforced this custom and unwritten policy wherein fabricating evidence and fabricating false witness statements are acceptable; where false criminal charges are acceptable, and where lying under oath is **expected** in order to keep the police narrative of events.

Plaintiff herein incorporates his Statement of Additional Facts and all evidentiary items listed on the undersigned's declaration. The following is a summary of testimony expected regarding Burke and Spota's actions as policymakers, and their actions that created and perpetuated the customs that ultimately caused the violations against this plaintiff. All of the below is from plaintiff's witnesses who he will call to testify at trial. Their prior statements must be considered on summary judgment as briefed above, for the anticipated trial proofs. See page 9 *supra*.

Officer Draiss will testify consistent with his prior testimony, that he responded to the home of one, Christopher Loeb, pursuant to a probation warrant to search his home in 2012. Ex. 110, P. 412, L. 17-18. As he was on scene, Chief James Burke came, took his duffel bag and its contents, (containing condoms, dildos, and more), out of Loeb's bedroom and left the scene without entering it into evidence or writing a voucher for it. Id. P. 412-430. Draiss testified that during interviews about the investigation, he lied in order to cover for Burke because he believed that if he embarrassed Burke he would be demoted and Burke would hurt his career. Id., P. 461. Draiss will testify that in the Suffolk County Police Department, if you went against the administration, (Burke and Spota) there would be "retribution." Id., P. 461.

Michael Kelly will also testify. He was a lieutenant in Internal Affairs beginning in March of 2019. Prior to that he served as a police officer in the 4th and 6th Precincts. Ex. 111, P. 552-553.

Kelly served under Chief James Burke from 2012-2015. Ex. Id. P. 554. Kelly explained that police and detectives get promoted within the police department, so it was odd that Burke, when he became Chief, worked directly for Spota. Ex. Id. 555-556. Kelly was involved in the Loeb search and arrest and testified that among public rumors of Burke's assault upon Loeb, the PBA vice president, Lou Toutone called him to notify him of a PBA meeting. Ex. Id. 581. At the PBA meeting, there were numerous officers and some lawyers, and he and others were asked to tell their observations of the Burke/Loeb situation. Ex. Id., P. 190-191. Kelly described that at the meeting, the PBA vice president made him aware that Burke had a certain factual narrative about the Loeb situation that he (and everyone) was to stick to. Ex. Id. 582, 583. He feared crossing Burke because he had a reputation for being vindictive. Ex. Id. 582, 583. Kelly testified about a hearing in the Loeb criminal trial, in which he was called to testify. He lied during the hearing and did not reveal the truth about the door to the interrogation room being open and hearing slapping sounds, as was the truth of his observations of officers attempting to fabricate a confession. He was scared it would get back to Burke. Ex. Id. 587-591.

Kelly testified in sum and substance that he had previously read the arrest report of Detective John Olivia, who was charged in 2014 with a felony crime for leaking information to the press. He testified that he believed the charge was retaliatory and it confirmed his anxiety over sticking to the police narrative regarding the Loeb/Burke situation. Ex. Id. 591-593. (In 2021 Olivia's conviction was overturned and in 2022 the County paid Olivia 1.5 million dollars for the false criminal charges brought after the Spota trial confirmed it was fabricated, and that Spota used an illegal wiretap of his phone to gain personal information he used against him in order to coerce a plea.) See Ex. 111 Kelly testified in sum and substance that he believed he could be the subject of similar fabricated crimes if he did not stick by the approved narrative. Ex. Id. 591-593.

Det. Kenneth Bombace will testify consistent with his prior testimony that he, Burke, and a few others assaulted one Christopher Loeb (the burglary suspect who stole Burke's duffel bag), and then took part in the cover up of it. Bombace testified that his involvement lasted from the initial assault through his testimony at a Federal Grand Jury in 2015. Ex. 103 P. 620-621. Bombace testified that Chief Burke orchestrated the cover up. Id. Bombace testified that he, Det. Leto and Det. Malone, all screamed, swore at, and slapped Loeb in the face, while Loeb was chained, as they tried to get him to confess to breaking into Chief Burke's car and taking his possessions. Bombace will testify that the detectives and Burke all assaulted Loeb in effort to get him to confess. Ex. Id. 648, 649. Bombace testified that after the assault on Loeb, and a special prosecutor was assigned to investigate the situation, Burke called everyone into his office and "fed" them the narrative they needed to maintain. Ex. Id. P. 657-659. Bombace will testify they all feared retaliation that would include ruining their lives, careers, and testified that he feared "targeted criminal prosecution" if they didn't keep the narrative. Ex. Id. P. 658-659. When called upon, he did in fact lie, because he knew the special prosecutor was "handpicked" and that whatever was said would get right back to McPartland and Burke. Ex. Id. 660-662. In 2013, he was served with a federal grand jury subpoena. In response, he called Lt. Hickey and the other detectives involved in the cover up. Ex. Id. 665-668. Bombace testified that at the time the state court case against Loeb required testimony, Spota and McPartland handpicked Officer Anthony Leto because they trusted him not to crack and to stick to the narrative. Ex. Id. P. 678. Bombace testified that from his observations there was no separation between the police department and the District Attorney's Office during this time period. He testified that, whereas he used to feel some separation or "pushback" on cases or resources, things of that nature, that was non-existent during this time, and that the District Attorney's Office and the Suffolk Police Department were operating "seamlessly."

Ex. Id. P. 722 He feared retaliation if he challenged the administration and knew that Detective John Olivia was prosecuted on false charges, as retaliation for doing something against the administration (Spota/Burke). Ex. Id. P. 740-741. Bombace testified he feared a "fraudulent criminal prosecution" akin to Olivia's. Ex. Id. P. 741. Bombace testified that when the federal investigation continued and he was subpoenaed for the federal grand jury, he was so afraid at some point he left town with his family and stayed in a hotel in Nassau County. Ex. Id. P. 764. Bombace testified in sum and substance that he was afraid that if he went against the police narrative, he would be subject to a fraudulent prosecution against him or against one of his family members, by the administration "making up a crime." Ex. Id. P. 832-833. Bombace also testified regarding illegal investigatory activity he witnessed having nothing to do with the Loeb cover up. He testified that Hickey had him meet with "Sammy" a friend of Burke's, in order to serve as Sammy's "lookout" while he removed an illegal GPS from the vehicle of Police Commissioner Riscoe Mention Lewis they used to watch her. Ex. Id. P. 748 – 751.

Anthony Leto also will testify at trial consistently with the testimony he gave in trial against Spota and McPartland. Leto was part of the conspiracy and was convicted of Conspiracy to Commit Obstruction of Justice after a plea of guilt. See Ex. 126 and 102.

Leto testified about investigations he was asked to perform, unrelated to the Loeb case, and not based upon suspicion of a crime, but at the direction of Chief Burke. These things included pretending to be "security" for County Executive Bellone but really serving as a spy and reporting back to Burke and also following Burke's girlfriend's stepson who had been giving her a hard time. See Ex. 102, P. 1174-1176. Leto testified in detail about how he feared Burke due to his history of demoting people in the department who went against the police narrative and the retaliations that were taken. See Ex. Id. P. 1174-1183. Leto was asked about whether he hit

Christopher Loeb during the attempt to draw a confession from him and he said yes. Ex. Id. P. 1190 Leto was asked whether that was the first time he ever struck a prisoner in custody and he answered "no," he had done that before. Ex. Id. P. 1191. Leto described how one of the officers who participated in the beating of Loeb, Officer Malone, was publicly bragging at their Department Christmas Pary about urinating in Loeb's coffee during the ordeal. Ex. Id. P. 1203. Leto described how they were confident the Suffolk County District Attorney's Office would protect them from criminal charges, and wouldn't care about the allegations, so they were nervous when an outside prosecutor was assigned to investigate the Loeb situation. Ex. Id. p. 1214. Leto corroborated Bombace's testimony about the meeting where they were called to fabricate their cover-up story. Ex. Id. P. 1218. Leto testified that he was terrified of false prosecutions being brought against him or his sons, with fabricated evidence such as planted evidence or drugs, if he went against the police narrative. Ex. Id. P. 1231. Leto testified that Lt. Hickey advised him that Thomas Spota wanted him to shield Burke, by testifying in his place at the criminal court suppression hearing in the Loeb criminal prosecution. Ex. Id. P. 1243

Leto testified that he voiced concerns to Hickey about testifying and lying under oath. Lt. Hickey responded **"that is what they signed up for."** Ex. Id. P. 1244. Leto testified that he lied in the Loeb criminal suppression hearing out of fear and that Detective Madigan (from the District Attorney's Office) called him and told him he did a good job (afterward). Ex. Id. P. 1249. Leto testified that he admitted to federal investigators that the Loeb situation was not the first time he hit prisoners in custody and that he never had an Internal Affairs investigation for it. Ex. Id. P. 1290.

Lt. James Hickey will also testify as part of Plaintiff's case. Hickey also testified in the Spota/McPartland trial after pleading guilty to Conspiracy to Obstruct Justice. Hickey has long

been on plaintiff's disclosed witness list and is expected to testify consistently with his testimony at the Spota trial. Ex. 101, P. 1531; and 127, Judgment of Conviction of James Hickey. Hickey testified that he worked for the Suffolk County Police Department for 30 years and was part of what they called an "inner circle" for over 10 years along with Spota, Burke, and McPartland. Ex. 101. P. 1530 – 1536. He knew that he could not cross Spota or not only would he suffer but also his family would suffer; again, referring to fraudulent prosecutions. Ex. Id. P. 1536. Hickey testified that he saw Spota and the "inner circle" use fraudulent prosecutions against other people. Ex. Id. P. 1538. ***Hickey testified that conversations regarding fabricated criminal prosecutions targeting persons and their family members, would happen with Spota all the time***. Ex. Id. P. 1539, 1540. Hickey was part of the discussion between Spota and Burke regarding Burke's leaving the DA's office to become Chief of the Suffolk County Police Department because "it would benefit Spota by having control over both entities." Ex. Id. p. 1553. Hickey testified that Burke praised the guys who beat Loeb specifically telling them they **"did the unit proud"** by beating him and peeing in his coffee. Ex. Id. P. 1569. After the Loeb beating went public, every time Hickey saw Spota, Spota would ask him questions to ensure that Hickey was making sure the officers/detectives under his control were still lying and keeping the police narrative. Ex. Id. P. 1599. Hickey testified that he had a discussion with Burke about Leto's lying on the stand during the Loeb criminal court suppression hearing, and that Burke said **"this is what they signed up for."** Ex Id. P. 1649.

Hickey also testified about other instances of fabricated criminal charges outside of the Loeb scenario. He gave the example when a Newsday article regarding "escalating crime" prompted meetings by the administration because it looked bad for "the County," Spota, and Burke. Ex. Id. p. 1579. Burke and Spota identified Detective John Olivia as the leak and they all met to come up

with a lie in order to get a wiretap warrant for Olivia's phone. Ex. Id. P. 1662. He said the purpose of the illegal wiretap was to "fuck him and get information." Ex. Id. p. 1661.Hickey said that Spota signed the fake affidavit for the search warrant for the wiretap that they discussed. Ex. Id. P. 1665. After bringing false criminal charges against Olivia and using personal information gleaned from an illegal wiretap to coerce a guilty plea, Hickey said the administration would later use the Olivia case as an example to keep the fear of going against the police narrative. Spota told Hickey to "remind your guys what happens when guys go against the administration, ask Olivia." Ex. Id. P. 1697.

Hickey testified that Spota and Burke called him into Spota's office to talk about the fact that they had found out that Bombace met with his lawyer and the federal investigation was ensuing. Spota said "Bombace is dead, he will never work again, he will see to it." Ex. Id. P. 1696. Hickey went to the Suffolk County Superior Officer's Union when he received his federal grand jury subpoena. He went before telling Burke. Ex. Id. P. 1739. The Union Representative immediately called Burke and Burke came there with a copy of his "handout" of the false narrative of events that he carried around. Ex. Id. P. 1739. Burke told him that he didn't mind "playing cards with mobsters for three years but he needed to be strong and not flip as to Spota and McPartland." Ex. Id. 1741. Hickey was scared that Burke would have him killed. Ex. Id. P. 1765. Hickey testified that the ***Suffolk County Police Unions, the Suffolk County Police Department, and the Suffolk County District Attorney's Officer were all operating as one***. Ex. Id. p. 1769. Hickey testified two Detectives from the Homicide Unit were told to work with them to spy on people in furtherance of their cover up efforts. Ex. Id. p. 1800.

**Hickey also testified about Chief Burke's "broken wing" theory of supervision. He explained that he (Hickey) had a "broken wing" because he testified in a case where a judge**

**found that he fabricated probable cause in a case and dismissed the complaint. Ex. Id. P. 1850-1853.Hickey testified that Burke told him, when supervisors give guys with a "broken wing" another chance, in turn, they give you undying loyalty. Ex. Id. Hickey testified that Spota and McPartland both knew that Hickey had been found discredited for fabricating probable cause in a case. Ex. Id. P. 1855. Hickey testified that McPartland told him that the finding was "a badge of honor." Ex. Id. P. 1855, 1861.**

Next, Hickey testified about Internal Affairs. "I.A. Rat" is what they called Inspector Cuff, the Internal Affairs investigator who substantiated Burke's I.A. findings, a person who suffered retaliation. Ex. Id. P. 1884. Hickey testified that Cuff was his boss at the Third Precinct at a time that Cuff's son got arrested with a gun and was charged with a misdemeanor. Hickey told Spota, McPartland, and Burke. Spota's office upgraded Cuff's son's charge, fabricating a felony as retaliation. Hickey was promoted for his efforts. Ex. Id. P. 1888.

Former ADA Spiros Moutsakas also testified about constitutional violations that corroborated the others' testimony. Moutsakas is likewise on this plaintiff's witness list and will testify at trial. Moutsakas testified previously about a particular instance in which the 4th Squad Detectives asked him to write a search warrant for Christopher Leob's home **after** the search had already been conducted and items were already recovered. Ex.113 P. 901-904. Moutsakas also testified regarding the illegal wiretap of John Olivia and that he observed that it was Spota himself who approved the false wiretap warrant affidavit, the extension paperwork, and was often in the wiretap room listening to the wire. He saw Spota in the wiretap room at least a dozen times. Ex. Id. P. 940-955.

The above represents a brief glimpse into the plaintiff's evidence of acts by the policymakers Spota and Burke that validated a custom where fabrication of evidence, withholding of exculpatory

evidence, fabrication of charges, and deprivation of constitutional rights were not only acceptable but expected in order to stick to the chosen police narrative and what was best for the administration. These customs were taught to police at the PBA and union meetings and pervaded the office which was functioning as one between the union, the SCPD, and the SCDAO.

**Chief Burke's "broken wing theory," supported by the administration, in particular, is proof positive, that the policymakers of the SCPD and SCDAO created and maintained a custom where fabrications of probable cause were an acceptable means of policing that made the administration proud; a "badge of Honor" as McPartland put it, *supra.***

It was during this same time period that the prior instances of misconduct briefed in Point One supra unfolded; fabrications of evidence, withholding of evidence, and fabrication of charges to fit a chosen police narrative of the case in question. Spota knew and was personally involved in each one of these cases; as Emily Constant confirmed, he had weekly debriefings with the homicide prosecutors and was the "ultimate arbiter of the prosecution." Ex. 76 P. 37, L 6-15, P. 56, L 7-8. Spota and Burke set the customs by their own actions during this time, that was then reflected in the prior mishandlings, right up through plaintiff's case. Allowing this culture and customs to pervade the office, allowed the same to occur in this plaintiff's case. Plaintiff has shown evidence that the police decided this was a "homicide" within minutes of the initial dispatch and immediately began fabrications necessary to comport with that narrative and manufacture probable cause. Plaintiff was subjected to: fabrications in the autopsy; fabrications in the witness statement; and fabrications in the surveillance video; and withholdings, by police and ADA personnel who had been involved in the prior mishandlings.

Plaintiff has submitted evidence in the form of admissible witness testimony and judgments of conviction, which create, at a minimum, a genuine issue of fact for a jury to consider as to

whether Spota and Burke, as policymakers, set this policy or custom of fabrications of probable cause in place by their own actions, leading to the custom and moving force behind the deprivation of the rights of this plaintiff.

That showing is sufficient to end the inquiry here, as only one method of liability is needed for the Monell claim to survive summary judgment. However, plaintiff submits even more proof than is necessary, under the other ways approved by the Second Circuit in *Fiacco*.

Plaintiff has provided **proofs of practices widespread within the homicide bureau of fabrications and withholdings such that <u>a policymaker must have been aware</u>**; (the *Fiacco* method.) Just as in Fiacco, this plaintiff came forward with seven instances, briefed in Point One *supra*, which all describe fabrications of evidence and withholding of exculpatory evidence. Not only was the problem widespread within the homicide bureau but also the matters and sanctions against the ADAs were repeatedly published in news media making it public knowledge. The policymakers knew; and were intentionally indifferent as briefed herein supra. Point One lists instances of dozens of pieces of evidence withheld, evidence fabricated, Tavares' history withheld, exculpatory evidence withheld, court sanctions, conspiracies to avoid disclosure of Tavares' history, convictions overturned, and innocent persons let out of prison after malfeasance discovered. These were all highly publicized in the local media and were well within the public knowledge. Plaintiff's evidence at a minimum, creates a genuine issue as to whether the municipality was aware of these issues and acquiesced to the administration and its ways due to deliberate indifference; a complete failure to act on them as briefed. These customs of fabrications and withholdings were perpetuated and led to the same deprivations upon this plaintiff.

In addition, plaintiff has proved inadequate responsive training or supervision as well as a failure to address systemic failures, amounting to deliberate indifference triggering municipal liability.

First, plaintiff has provided evidence in the form of admissible anticipated witness testimony that, within the homicide department, during the relevant time period leading up to plaintiff's trial, **despite the prior instances of misconduct,** : there was still no policy or procedure in place that required an ADA do any sort of check or inventory as to whether Brady/disclosure of exculpatory evidence was done. See Ex. 76, Pp. 90-92, 125-126, See also 72 P. 107 There was no "Brady list" within the office to keep track of officers whose history required disclosure. Ex. 72, p. 223, L. 6-7. There was no policy or procedure by which an ADA could ensure they got the entire homicide file from a homicide detective; *Id*. at 44, also P. 199, L. 17-23. There was not even a simple "checklist" system required for the homicide prosecutors to use and keep track of disclosures. *Id*. at 125-126, Newcombe dep p. 34. There was no recordkeeping system or requirement to inventory documents/evidence within a homicide file. Id. 33-34. Also, despite the obvious need for it, there was no training for how to disclose I.A. or impeachment information from officers' whose backgrounds require Brady disclosure (like Tavares). Ex. 72, P. 220, L 9-15. There was no training or memo that went out or was required in regards to Tavares after the Efman decision. Id. L. 16-25. There was also not training for homicide prosecutors as to how to ensure they received the entire file and notes from detectives after a plethora of issues were raised as to this issue in the Booker and Lawrence cases supra. Id. P. 199, L 17-23.

Plaintiff also brought forward evidence that, despite the prior mishandlings, a complete lack of supervision was perpetuated. Although Janet Albertson was the homicide ADA supervisor in title, Spota knew that Albertson did not supervise the homicide bureau assistants. Ex. Id. at

207-208 and 279-280. Plaintiff's witness Emily Constant and Thomas Spota had discussions where Constant raised the issue of Janet Albertson's possible transfer and how her misconduct during homicide cases was not setting a good example for ADAs nor was she actually supervising them. Constant will testify that Spota did not want to transfer her due to her work on the Gilgo beach cases, despite her prior misconduct. P. 207, 208, 223. Further, the homicide ADAs and files were completely without oversight. Constant will testify that she did not go into homicide files to check for compliance with *Brady*, nor did any supervisor ever check the files for required *Brady* disclosure. *Id*. 91-92. Further Constant will testify that she and Spota knew that ADA Newcombe was involved in the Shawn Lawrence prosecution detailed above. Id. 187. Newcombe, in fact, had been the ADA during the years leading up to a trial she began that ended in a mistrial. See Ex. 72 Kurtzrock deposition p. 48, 52, 71. After the Lawrence conviction was overturned, and fabrication of evidence found, and serious withholding of evidence and Brady material uncovered, Kurtzrock was investigated for it as the prosecutor who handled the re-trial after Newcombe left on maternity leave. However, according to Constant, no one ever reviewed Newcombe's files because they "just ran out of time." Ex. 76 P. 291 L. 16-19. Constant testified that Timothy Sini got all of the memos, including memos pertaining to Lawrence indicating that other prosecutors (including Newcombe) were involved in that case and that he was "certainly" aware of them. See Id 291-292. However, Sini decided to forego any investigation into Newcombe's cases. See ---p. 20, 67-68. Instead, he re-interviewed and re-hired Newcombe. <u>Id</u>. Despite the publicly known and egregious misconduct, Sini did not make any systemic changes, or offer any targeted or new training regarding discovery until the year 2020 when discovery rules changed. Ex. 84 Newcombe deposition p 28. A failure-to-train claim is made here because it was blatantly obvious that additional training in the homicide department was necessary; but none

was given for several years, until 2020, and were not targeted to address the ongoing misconduct and withholdings and fabrications; nothing at all was required to curtail those customs. No targeted training was issued that would have prevented or mitigated misconduct in the then-open homicide cases; including this plaintiff's. Absolutely no new or targeted training in regards to *Brady* material or discovery obligations was given or required, even through it was obviously needed. *Id*. 28-30. Furthermore, no system was in place at all to know when Brady impeachment material was needed due to prior malfeasance, e.g. like Ronald Tavares. After the 2015 Judge Efman decision overturned the Gabriel Hubbard conviction for failure to turn over the history of Tavares' fabrications in *Moroughan*, the homicide bureau especially needed to be advised of disclosure obligations and supervised to ensure the disclosures. No memo went out, no "list" was kept, no oversight or supervision effort was made by the administration at all to ensure disclosure of this material, or material of like kind with other officers. This directly led to the withholdings in plaintiff's case as the customs were allowed to continue unchecked, and uninterrupted due to the complete and deliberate indifference to the deprivations and likelihood that it they would be repeated. *Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).* ( "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.") Detectives and prosecutors were allowed to continue their ways "empowered by perceived impunity." See *Vann*, 72 F.3d at 1051 (whether indifference to civilian complaints empowered the officer to use unlawful force with perceived impunity is a question to be decided by the jury).

Plaintiff has also demonstrated evidence of <u>systemic failures built into the Suffolk County Internal Affairs Bureau</u>. Among plaintiff's disclosed witnesses is Michael Calderelli, the former

Chief Inspector (head) of the Internal Affairs Bureau. Calderelli has spoken out about how during the time period in question, the I.A.B. office was set up to defend the police against allegations, rather than to perform investigations and discipline; in other words, set up to turn a blind eye to malfeasance and misconduct. See Ex. 63 Calderelli was the inspector during the office's purported investigation into the *Moroughan* case, where it was revealed that the administration required Calderelli to remove information from his report that would've been detrimental to Tavares, who fabricated the false confession while Moroughan was being treated with Morphine. Ex. 61, photo inlay of report. Copies of the notes to Calderelli, telling him to remove information were made public and published in Newsday. Calderelli was transferred out of Internal Affairs and chose to retire prior to vesting in his pension fully because he "was disgusted" at the Internal Affairs Bureau. Ex. 63 P. 207, L. 4-10. See Also 64, 65, news reports serving as notice to the county and all supervisors/policymakers. Calderelli will testify about the system designed to fail and about the pressure he received to protect police. He will give an example of supervising Chief of Detectives Meehan coming to visit him in his office and making a comment about his rate of recommending substantiations in investigations being too much. Ex.63, 268 L. 19-25, 269, 274, L. 10-22 Calderelli will explain that the message was received as a threat under the circumstances; or what he called a "Sicilian message" – which he explained was something like "sleeping with the fishes…" Id. at 274 L. 10-22. He will also explain he received multiple messages that the administration did not like the way he was handling investigations and that he was inclined to substantiate too much. Calderelli will testify that he would not know the results of the final investigations because he would send his recommendations to the administration or "the bosses" who would make the final decisions and who would not be under any obligation to tell him whether

he was overruled or whatnot. Ex. 273. Ultimately, he was replaced by someone who was "in alignment" with Chief Burke in 2014. Ex. 266-267.

Additionally, Plaintiff deposed Alexander Crawford, the current Chief Inspector of the Suffolk County Internal Affairs Office (the head of office), and what was discovered through that deposition was ongoing systemic failures, a complete lack of meaningful intake procedures, categorization procedures, searchable databases, training, or equipment. See. Ex. 62.

Police Practices Expert, Daniel Busken has opined as to these systemic failures and how they are set up to fail consistent with the Spota/Burke culture of corruption. See Ex. 8 P. 2, 40-42. Buskin, citing the lack of any meaningful intake procedure, cross-referencing or communication with personnel / police files, or the ability to track and follow up on misconduct represents a system designed to fail. *Id*. The **"Internal Affairs structure in Suffolk County lacks personnel, policies, and organization. The result is systemic failures. These are failures which are consistent with the customs of corruption revealed by the criminal prosecution of Thomas Spota and other high ranking police personnel – that favor cover ups of police misconduct."** Busken report P. 2.

First, it was discovered through the Crawford deposition that acts of officer admonishments and discipline were allowed to be recorded in secret police "personnel" files, which are not shared or even accessible to the Internal Affairs Department, making it impossible to track individual officer behavior or misconduct. Ex.62, P. 84-94. Interestingly, Crawford, as the head, was appointed to this lead investigatory position, with admittedly zero training or experience in conducting investigations at all. Ex. 62, P.15-20. Plaintiff can also demonstrate indifference by the lack of disciplinary records within the Internal Affairs Department covering the time period leading up to plaintiff's arrest. Despite the known seven instances of misconduct leading to

overturned convictions, dismissals, and judicial admonishments, Internal Affairs Records were silent on the issue of discipline through any of the named cases; and have no recorded category for such things as "fabrication of evidence" or "false witness statements." Not a single file exists for "fabricating evidence" or "fabricating probable cause" or "withholding exculpatory evidence." In fact, Crawford testified that since there was not established "categories" for such claims within the software they used, in order to investigate whether any such claims were made, one would have to search through each category or possibly could use key words which were input into the system at the discretion of secretary staff who receive absolutely no training in this regard. **The standard operating procedure for the intake of claims based on "fabrication of evidence" was to just "put it somewhere" since that type of claim category is not even available in the IAB system. Ex. 63, Pp. 146, L. 5-14, See also 143-146.**

Therefore, there is absolutely no meaningful way to track misconduct within the I.A. records. Suffolk's Internal Affairs systems are not only set up to be purposely superficial, but also are only reactionary, opening files only when a third party files a complaint. Critically, Crawford testified that it is not the policy of his office to ever investigate an officer after mishandlings (like the seven in point one supra) come to light. They only investigate when a third party files a complaint. Internally, they take referrals from supervisors who monitor their sworn staff with a "tickler" system that notifies them if their subordinate was in a motor vehicle accident, had a domestic violence incident, a vehicle pursuit or formal complaint filed. If a problem fell outside of those four categories, it would not be included in the "tickler" system. Ex. 165, 166. This alone evidences the municipality's indifference to ongoing mishandlings. Crawford testified they relied on this "tickler" system that would notify him if an officer violated a "category" of conduct more than once so it could be addressed. But the decision of how to categorize a complaint in the

system, is chosen by untrained secretary staff. Further, the categories are short sighted and specifically do not have a category for "fabricated evidence" or "false witness statement" or anything of the sort. Also the categories have changed over the years and no effort was made to rebuild or recategorize the notification system. Ultimately, Crawford testified that the "SOP" for categorizing a fabrication of evidence complaint would be to just "put it somewhere" as indicated above. Importantly, as confirmed during the deposition, there is no category for fabrication of evidence or withholding exculpatory evidence at all. All evidence points toward the deliberate indifference of the municipality and the set up of the I.A. bureau designed to be superficial at best, or as Expert Busken put it, favored the cover-up of police misconduct as was the custom set by Spota and Burke themselves. See, Ex. 7, 8 and 72.

As an example of the indifference, plaintiff listed seven prior instances of misconduct, involving Detective Tavares and the homicide bureau of the SCDAO, in which fabrications and withholdings of evidence were evident, and caused judicial admonishments, sanctions, and overturned convictions. Despite the overturned convictions, and obvious fabrications by Detective Tavares in the *Moroughan* case, Tavares received no discipline, there was no scrutiny, retraining, increased supervision, or flags from Internal Affairs. See. Ex. 52 Since that time, Tavares works with prosecutors in a tactical way, keeping notes during the pre-investigation stage, that are then used by other officers who take the stand in his stead; in an overt end-around scheme designed to ensure a cover-up of his mishandlings. The county was on notice of this scheme as several news publications made reference to it; and it unfolded in public court sessions, trials, and hearings. Plaintiff will testify this same scheme was used in his case as well.

Lack of systems or accountability were built into the Suffolk County IA office intentionally, with deliberate indifference to known and ongoing violations of individual's constitutional rights as part of their cover-up culture.

Plaintiff's evidence, submitted not just in one, but in three separate showings under *Fiacco:* The acts of Spota, Burke, and Sini themselves as policymakers establish the municipality's personal involvement or acquiescence to the ongoing constitutional violations; the prior mishandlings and the intentional indifference thereto; and the failures to supervise, train, and discipline all being established; and an Internal Affairs system designed to fail; resulted in those misdeeds of fabrications of evidence; fabrications of probable cause; withholdings of exculpatory evidence, and withholding of Tavares' *Brady* material to be perpetrated upon this plaintiff; (in fact by persons known to have committed prior mishandlings to boot.)

Recall, this was a culture where fabrication of probable cause was favored; **see Hickey testimony *supra* regarding his "badge of honor" for being discredited at a hearing where he fabricated probable cause. See 101, 1855, 1861 *supra*. Recall this was a culture where false charges were discussed with Spota "all the time" and where Spota himself openly fabricated probable cause for the Olivia charges and illegal wiretap.** Ex. 101, P. 1539, 1540; 1661-1662. These methods and the expectation of keeping the police narrative was literally taught at police union meetings; as the union, the SCDAO, and the SCPD were all working "as one." See also Ex. 103, p. 722 *supra*. This cover-up culture was built right into the internal affairs systems designed to defend police officers and cover-up misconduct; which allowed officers such as Tavares and ADAs such as Newcombe, to continue with a sense of impunity; and they did, ultimately subjecting this plaintiff to fabrications and withholdings.

At a minimum, when viewing this evidence in a light most favorable to the plaintiff, incorporating all facts and evidence from Plaintiff's Statement of Additional Facts for Trial, and giving him the benefit of all favorable inferences therefrom and resolving any ambiguities in his favor; a question exists for a jury as to *Monell* liability.

## POINT XV

## COUNTY DEFENDANTS' GENERAL ASSERTION REGARDING TESTIMONIAL IMMUNITY IS IRRELEVANT AND MUST BE DENIED

In Point XV, as part of their kitchen sink arguments, County Defendants make sweeping generalizations and fail under their *Celotex* to **point(ing) to evidence in the record that demonstrates "the absence of a genuine issue of material fact."** General assertions of testimonial privilege do not suffice. Nevertheless, none of plaintiff's claims rely upon testimonial misdeeds causing damages. Further treatment is not warranted.

## POINT XVI

## COUNTY DEFENDANTS' GENERAL ASSERTIONS REGARDING THE NOVEMBER 23, 2018 ARREST DOES NOT MEET ITS CELOTEX BURDEN AND MUST BE DENIED

In Point XVI, County Defendants reargue generalized issues surrounding plaintiff's November 2018 arrest, without pointing to any specific claim or fact in issue. Rather, County Defendants re-argue issues regarding probable cause and the indictment in this matter, continuing to fail to acknowledge plaintiff's expert evidence of frauds previously discussed *supra.*

Defendants attempt to argue that *because there was no new charging document or arrest warrant*, plaintiff cannot assert his right to be free of unreasonable search and seizure (false arrest) or malicious prosecution for the November 2018 arrest. There is no authority to support that proposition, nor is it even logical. Plaintiff was arrested in 2018 after the original indictment was

reinstated, despite the availability of a plethora of exculpatory evidence that became available since the initial arrest of May 25, 2016. This re-arrest was based upon the same original indictment that was secured by frauds as briefed above and as proven by several expert reports by experts who will testify at trial. **Unequivocally, the arrest of a defendant whose indictment had been secured by fraud is a violation of that defendant's constitutional rights. It is "firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."** ***Coffey*****, 221 F.3d at 355.** The 2018 arrest was a second deprivation of White's liberty and second violation of his constitutional rights.

County Defendants also spiral into re-argument relating to plaintiff's "malicious prosecution claim for his November 23, 2018 arrest." Plaintiff asserted three Malicious Prosecution Claims in Counts 3, 4, and 5 of the Third Amended Complaint, each differing in underlying misconduct and none of which relate solely to the re-arrest as defendants suggest. Defendants fail to point to any claim or count in issue in the complaint and fail to satisfy their initial *Celotex* burden. This count must be denied without further treatment.

## POINT XVII

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Lastly, County Defendants argue in the alternative an entitlement to qualified immunity over every count in the complaint. Their argument is fatally flawed for the following reasons.

The Second Circuit has held that qualified immunity will shield a government official from liability for civil damages if the official's conduct "did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 216 F.3d 368, 385 (2d Cir. 2003).

A right is "clearly established" when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right… the unlawfulness must be apparent." *Connell v. Sgnoracci*, 153 F.3d 74, 80 (2d Cir. 1998).

As it relates to this motion, the Second Circuit has said that a court should cover a defendant with qualified immunity on summary judgment only "when a court finds that an official has met his or her burden to demonstrate that no rational jury could conclude**:** (1) that the defendant violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. *Coollick v. Hughes*, 699 F.3d 219 (2d Cir.2012). The Second Circuit will also extend qualified immunity at summary judgment in the instance "if the evidence is such that, even when it is viewed in a light most favorable to the plaintiff.. and with all permissible inferences drawn in the plaintiff's favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003).

As an initial matter, all the rights and deprivations plaintiff asserts herein and in his complaint are well-established rights; the right to be free from unlawful arrest, malicious prosecution, withholding of exculpatory evidence or information – all well established in law. See e.g. *Lennon v. Miller*, 66 F. 3d 416, 423 (2d Cir. 1995) [There is no question that the rights at issue in this case – to be free from false arrest, malicious prosecution… were clearly established at the time of the incident]; See also *Brady, supra.* regarding the withholding of exculpatory or impeaching evidence or information.

It has also been long and firmly established that constitutional rights exist **not to be deprived of liberty on the basis of false evidence fabricated by a government officer.** *Walker v. City of New York*, 974 F2d 293, 299 (2d Cir. 1992).

**It is axiomatic that acts such as misrepresenting, manufacturing, withholding or destroying evidence are not protected by qualified immunity.** *See Blake*, 487 F. Supp. 2d at 214, 216 n.21 (genuine issues of material fact regarding fabrication of evidence and Brady violations prevented summary judgment on qualified immunity). **There can be no "arguable probable cause," in such a situation because it would not have been objectively reasonable for any officer to believe that misrepresenting, manufacturing, withholding or destroying evidence did not violate a plaintiff's "clearly established constitutional rights.** Put another way, there could be no disagreement among officers of reasonable competence that [such] conduct was unlawful." *Manganiello*, 612 F.3d at 160 (internal citations omitted).

Qualified immunity only extends to official conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ricciuti*, 124 F.3d at 127 (quoting *Harlow v. Fitzgerald*, 457 U.S 800, 818 (1982)). There can be no disagreement among officers of reasonable competence that coercing witnesses is unlawful. *Manganiello*, 612 F.3d at 160. Indeed, courts have long held that "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Ricciuti*, 124 F.3d at 130 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also Ortiz*, 523 F. Supp. 3d at 368 ("Defendants' qualified immunity argument necessarily depends on the factual conclusion that Stambach did not knowingly procure a false statement of confession from Plaintiff and then pass that false statement on to the prosecution, but the facts as to Stambach's conduct are disputed and must be determined by a jury.").

Finally, **when there are issues of fact that bear on the issue of qualified immunity, summary judgment on qualified immunity grounds must be denied.** See *Clark v. City of N.Y.*, No. 09-CV-2533, 2015 WL 5719612, at *7 (E.D.N.Y. Sept. 29, 2015).

As established herein supra, plaintiff has come forward with admissible evidence, including expert reports, that raise issues of fabrications in the autopsy, fabrications in surveillance video, fabrications of witness statements, and withholding of critical exculpatory evidence as well as impeaching information about Tavares. These factual contentions raise genuine issues of material fact as argued above in each and every count of the complaint; including the conspiracy count and *Monell* counts for the reasons stated above.

Though defendants may dispute the evidence, there is no doubt that genuine issues have been raised, and pursuant to *Higazy v. Templeton,* 505 F.3d 161 at 174 **"where there is a dispute about the material facts, the question of whether the officer's conduct was objectively reasonable must be resolved by the factfinder.** Id.

Viewing the evidence in a light most favorable to plaintiff, including all the evidence referenced within Plaintiff's Statement of Additional Facts for Trial, and giving plaintiff the benefit of all favorable inferences and resolving any ambiguities in Plaintiff's favor; it must be determined that qualified immunity is denied, all well as all other aspects of defendants' motion. Plaintiff has established genuine issues to be determined by a jury.

**CONCLUSION**

For the reasons stated above, County Defendant's motion for summary judgment must be denied.

Dated: September 5, 2025
New York, New York

Stephanie Mc Clure, Esq.
Law Office of S. Mc Clure
101 Avenue of the Americas; 9th Fl
New York, New York 10013
Tel: (646) 417-8380
Email: Stephanie@nycnjlawyer.com

*Attorney for Plaintiff*