**U.S. Department of Justice**

Civil Rights Division

JMS:LC:SJD:TJM:tr:jk:dj
207-52-4

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

September 13, 2011

**Via Electronic Mail and First Class Mail**

Mr. Steve Levy
Suffolk County Executive
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788-0099

Re: Suffolk County Police Department Technical Assistance Letter

Dear Mr. Levy:

On September 1, 2009, the U.S. Department of Justice Civil Rights Division and the U.S. Attorney's Office for the Eastern District of New York initiated a joint investigation of the Suffolk County Police Department ("SCPD"), pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). In accordance with our pledge to conduct a transparent investigation and to provide technical assistance to SCPD as appropriate, this letter provides preliminary observations, advice and recommendations to address concerns regarding SCPD's policies and procedures as well as certain policing methods. We addressed these concerns and gave you oral recommendations during our meetings with Commissioner Dormer and SCPD command staff in February and March 2010 and on May 20, 2011. We have not yet made formal findings, which will be contained in a separate letter.

The technical assistance provided below is intended to assist SCPD in its efforts to provide constitutional police services, and are not mandates. Constitutional policing is a critical element to ensuring public confidence in the police force and in promoting public safety. These recommendations were developed in close consultation with our police practices consultants and closely follow the productive dialogues we have had with SCPD command staff and officers. Because important aspects of our review process have yet to be completed, this technical assistance letter is not meant to be exhaustive. Rather, it focuses on recommendations we can provide at this stage of our investigation. We recognize that SCPD has already taken some steps to address our concerns, as set forth in the May 11, 2011 letter from County Attorney Malafi. We look forward to continued collaboration to address concerns about SCPD's policing services.

## I. PATROLLING AND POLICING

Among the issues that we are investigating is the claim that SCPD engages in discriminatory policing, that its approach to the Latino community discourages Latino victims from filing complaints and cooperating with the police, and that the Department fails to investigate crimes and hate-crime incidents involving Latinos. While we have not yet made findings, we believe that several SCPD policies may contribute to these concerns: (1) Chapter 16, Section 4, "Arrest and Prisoners: Arrest or Detention of Non-U.S. Citizens or Persons with Dual Citizenship;" (2) Chapter 24, Section 6, "Investigations: Hate Crimes;" and (3) Chapter 13, Section 8, "Reporting Police Activities." Our recommendations for revisions are provided below.

### SCPD Should Modify Certain Policies and Procedures that Affect Latinos

We have a few global recommendations about revising policies and procedures. First, we noted that SCPD policy and procedure updates are circulated through "packets," which may not be the most effective manner to update officers about changes to officers. For example, as part of our June 2011 document request we sought a list of all SCPD policies that have been updated since 2008. We received five packets (numbered 52-56) of the updated policies and procedures. Each packet had a cover sheet which provided a very brief summary of changes, but no explanation of the rationale or the consequences of the changes. We suggest that the summary cover sheet provide a more substantive explanation of changes and the reasoning for them.

Second, the revised versions of the policies that followed in the packet did not indicate where the changes made were found. For this reason, we again recommend that when providing revised policies and procedures, SCPD publish the revisions in a manner that highlights the changes in the document itself. Otherwise, officers are required to compare the prior version and the new version side-by-side in hopes of gleaning the changes.

Lastly, SCPD does not have a system that ensures that policies are reviewed on a regular basis. To ensure that policies are up-to-date and reflect the practices of the Department, they should be reviewed every 6 to 12 months. It is difficult to determine whether a policy is due for review because the date of the last revision is not noted. The form of each policy has a place to indicate its effective date, but it is frequently marked "N/A." Below, we provide comments and technical assistance for three current SCPD policies that should be revised. These three policies either are too vague or provide insufficient guidance to officers to render them effective. Consequently, these policies are a disservice to SCPD officers and the Suffolk County community as a whole.

### (1) <u>Chapter 16, Section 4:</u> Arrest and Prisoners: Arrest or Detention of Non-U.S. Citizens or Persons with Dual Citizenship

**<u>SCPD policy that governs the collection and use of information regarding the immigration status of witnesses, victims and suspects is too vague to provide officers with necessary guidance and is subject to abuse.</u>**

SCPD policy and procedure prohibits officers from questioning witnesses and victims about their immigration status but requires SCPD officers to question a person arrested for a crime regarding his or her immigration status, regardless of the charge, "when there is reason to believe" that the arrestee is an "undocumented person." Chapter 16, section 4. Specifically, the policy section of Chapter 16, Section 4 states the following:

> *When there is reason to believe that an individual arrested for a criminal offense may be an undocumented person,* the Police Department is responsible for alerting federal immigration officials, the prosecuting attorney, and the judiciary. While enforcement of immigration laws is primarily a federal responsibility, State, County and local law enforcement agencies necessarily and appropriately should inquire about a person's immigration status under certain circumstances (emphasis added).

This policy is too vague and offers little or no guidance on how to determine whether there is reason to believe that an individual is an "undocumented person." Without more clarification, this policy is vulnerable to abuse and exposes SCPD to allegations of racial profiling and potential legal action for discrimination on the basis of national origin.

The weakness of SCPD policy is further highlighted by Paragraph VI.(A), "Procedure," of Chapter 16, Section 4 which provides for SCPD officers to determine if an arrestee "was born outside the country." It states:

> Arrests of Non-U.S. Citizens -- When processing an arrest for a felony or misdemeanor and the processing officer knows or reasonably suspects the defendant *was born outside the country,* the following procedure will be followed…. (emphasis added).

The standard for determining whether a person was "born outside the country" also is ambiguous. For example, an officer may inappropriately rely on a person's apparent ethnicity, race, or even language or manner of speech as the basis for making this determination. There is no standard for determining whether an individual has been born outside the United States. Moreover, implementing this procedure would compel officers to question all individuals, including those who may have been born in a foreign country but who are presently U.S. Citizens, Permanent Residents, or those authorized to work, study or reside in the United States (for example, individuals who are naturalized U.S. citizens.) SCPD should revise the policy and procedure language of Chapter 16 and the training provided to officers related to these provisions.

As we noted during our conversation with you on May 20, 2011, it is our understanding that as of February 2011, Suffolk County has become an activated jurisdiction as part of "Secure Communities," a state and federal partnership administered by the Department of Homeland Security.[1] Due to the possibility that this may raise fears in the Latino community, we recommend that SCPD, through outreach to the community, explain what joining "Secure

---

[1] United States Immigration and Customs Enforcement, "activated jurisdictions," *available at* www.ice.gov/secure_communities/ (last accessed 07/25/2011).

Communities" means and what SCPD would be doing, if anything, differently. We made this recommendation during our May 20, 2011, meeting and you stated that you believed that there was no concern within the Latino community about SCPD's joining "Secure Communities." However, there appears to be a lack of communication between the Latino community and SCPD and that concerns do exist regarding SCPD's participation in this program.

Lastly, we encourage SCPD to expand its list of embassies attached to Chapter 16, Section 4. SCPD uses this list to meet its obligation to notify the appropriate embassy if a foreign citizen is arrested. The list at present includes only one Spanish speaking country, Costa Rica. As Suffolk County has a large population of individuals from South and Central America, we recommend reaching out to consular offices for Spanish speaking countries, including Mexico, El Salvador, Ecuador, Peru, Nicaragua, Guatemala, Honduras, and Colombia.

**(2) <u>Chapter 24, Section 6</u>: "Investigative Operations of Hate Crimes"**

**<u>SCPD policy that governs the investigative procedure of the Hate Crimes Unit is inconsistent with SCPD's duty to provide Limited English Proficiency ("LEP") individuals with adequate services</u>.**

As currently written, this departmental order requires that "[i]n every case where a hate crimes unit investigator is consulted and determines that an incident is not a hate crime, an investigator from the hate crimes unit will conduct an *in person follow-up interview* with the complainant." (emphasis added). During our investigation it appeared that, despite the order, hate crimes detectives rarely conduct an *in-person follow-up interview* with complainants. Indeed, during the course of our interviews, we spoke with victims and individuals who complained that they did not receive any form of follow-up interview by SCPD for incidents that they perceived to be bias-related and potential hate crimes.

To address this issue, we recommend SCPD revise or modify this policy to require its Hate Crimes Unit ("HCU") to contact all hate crimes victims and possible victims, but to allow these contacts to be either in person or via telephone. SCPD should also mandate that these contacts be made within a specific time frame and be documented to demonstrate that procedure was followed. Further, we strongly recommend that SCPD develop a quality assurance mechanism to prompt detectives to contact victims or possible victims with status updates at periodic, reasonable intervals. This will ensure that victims are kept abreast of the status of investigations and build trust with residents. To ensure effective communication with victims who are LEP, detectives must use language assistance services, such as competent bilingual staff or telephonic interpreter services. We commend SCPD for implementing measures to this end, such as the installation of interpreter cell phones in some police patrol units and the installation of interpreter telephones in public police facilities, as mentioned in County Attorney Malafi's May 11, 2011 letter. However, we have received reports that these services are not always available, or that individuals with LEP needs have not been given access to such services. This will be discussed further in our formal findings letter.

We also recommend that the supervisor(s) of the HCU routinely conduct random audits of hate crime investigations each month. The routine audit should, focus on among other things, the quality of the investigation and whether officers make contact with victims or alleged victims

or at least attempt to make contact and are accurately documenting their efforts. This additional level of scrutiny also will help ensure that victims are kept informed.

**(3) Chapter 13, Section 8: Reporting Police Activities**

**SCPD policy that governs when an officer is required to make a report of an incident is too vague with regard to the term "Youth Disturbances," and it likely will result in underreporting and inadequate tracking of hate or bias incidents by youths against immigrant individuals.**

Departmental policies permit officers to fail to report incidents even though the information gathered may be useful for investigative purposes. This raises a particular concern with respect to hate crimes. Currently, officers may "dispose of a call" and not prepare a field report with respect to:

(3) Calls which are non-criminal (no offense committed), and
(a) Have either an anonymous complainant or a complainant that declines/refuses an interview or is not physically present, or
(b) Have a complainant, and the information provided by the complainant does not necessitate the preparation of a Field Report, such as:
(1) Youth Disturbances. . . .

See Paragraph VI(7)(a)(1)-(3) of Chapter 13, Section 8.

We strongly recommend that SCPD modify Chapter 13, Section 8 to eliminate the use of the term "non-criminal." The current "non-criminal" label may diminish the level of investigation given to a matter. Merely because a complainant is reticent, anonymous or no longer available does not properly obviate the need for accurate reporting. Indeed, there are many victims in the immigrant community who may be reluctant to cooperate, terming a matter "non-criminal" may also be unintentionally affecting the County's ability to assess how many hate crimes or incidents may be occurring at any given time.

Further, we also recommend that SCPD delete (a)(3)(b)(1) which lists "Youth Disturbances" as one of the instances in which officers are not required to prepare a field report even though they receive a complaint. The term "Youth Disturbances" is vague and undefined and could result in SCPD missing critical patterns of crime. For example, if an officer were called to a scene of a man being shot at by youths carrying BB guns and the youths then ran away, that officer might describe the incident as a "Youth Disturbance." In fact, the offense itself could be a precursor to a more severe string of violence by those youths. Our example is not hypothetical, but rather taken from the facts prior to the death of Marcelo Lucero in November 2008. As you will recall, after the death of Mr. Lucero, other Latino men came forward and claimed that they had been attacked (glass bottles thrown at them, being harassed, or having BB guns shot at them) by the same teenagers. One Latino man in particular claimed that he had been shot at by youths with a BB gun on the same evening and alleged that SCPD had called the incident a "disturbance."

In making this recommendation, we highlight that individuals have informed us that the response time of SCPD can be long and, because of prior experience waiting for police services, victims often leave the scenes even if injured. One victim told us that he called the police after being attacked by a group of youths, but he left the scene after waiting thirty minutes for the police to arrive. He was bleeding and needed to return home to care for the injury to his face.

In such an instance, even if the individual left the scene, SCPD should capture as much information and/or documentation as possible and prepare a field report or an abbreviated police report. The abbreviated police report would include the reason for the service call (i.e. robbery) with the notation of "victim declined to be interviewed," or "victim gone," and could then be tracked electronically to determine any pattern of crimes, types of crimes, or if certain areas are being sought out by criminals despite not having testimonials from victims. Additionally, we recommend SCPD seek ways to minimize response time for victim calls.[2]

## II. HATE CRIMES UNIT

Hate crimes can have a debilitating effect on a community. When these types of crimes go unaddressed, community members quickly develop a perception of police apathy that undermines the ability of the force to protect the community. During our interviews with members of the immigrant community, we found that many felt that "immigrant bashing" was abetted by SCPD through inaction. Our review of SCPD policies has revealed at least three factors that contribute to inadequate hate crime response: (1) Erroneous reporting of hate crimes from SCPD to New York State, (2) Vague and conflicting instruction and policies to officers regarding hate crimes, and (3) Insufficient mechanisms and processes for tracking hate crimes/incidents and following up on hate crime/incident complaints. Although we commend SCPD for establishing a dedicated county-wide Hate Crimes Unit, we recommend that SCPD continue to develop a more effective response to hate crimes and bias incidents.

### A) SCPD's Hate Crimes Unit Has Long Misunderstood How to Report Hate Crimes, and there is No Indication that the Problems Have Been Fully Rectified

A June 2004 letter from Mr. James Seymour, New York State Hate Crimes Reporting Coordinator, to SCPD illustrates that SCPD, in the fairly recent past, has not been correctly reporting hate crimes to the NYS Department of Criminal Justice Systems ("DCJS"). Mr. Seymour's memorandum stated that:

> "[s]ome of your reported Making Graffiti incidents comments noted Anti-Jewish or Anti-Black symbols were drawn. If the officer had charged PL 145.00 Criminal Mischief 4th instead of or in addition to Making Graffiti, the incident would be considered a hate crime. Charge PL 145.60 [(Making Graffiti)] only and it is not recognized as a hate crime."[3]

---

[2] Although we cannot confirm how long the victims we interviewed waited for police assistance, we believe, based on victims' statements and SCPD officers' representations, that there are not enough officers patrolling the streets and that extended delays in service do occur.

[3] The New York State Hate Crimes Statute, New York Penal Law § 485, provides, generally, for the enhancement of the penalties for certain "specified offenses" when the

Therefore, because the officers who initially responded to these incidents did not charge the incidents correctly as specified offenses defined by the statute, the incidents were "not counted" as hate crimes. New York State Division of Criminal Justice Services, Memorandum to Detective/Sargent [sic] Robert Reecks, Suffolk County PD, June 14, 2004**.**

It appears from this letter that SCPD was sensitive to hate crimes in 2003, but lacked a procedural or legal understanding of what type of charged offense could be recognized as a hate crime. Because this is a matter which could possibly be addressed by training, DOJ requests that SCPD submit documentation illustrating the concrete steps it has taken to improve training regarding charging hate crimes. DOJ recognizes that SCPD may have improved its ability to correctly report hate crimes to NYS DCJS in the seven years since this letter was written.

**B) Definitions and Examples of Hate Crimes Provided in Various Policy and Instructional Documents are Vague and Inconsistent**

In addition to the mistakes that have been discovered in SCPD's external reporting mechanisms, SCPD's internal guidance with respect to hate crimes is vague and inconsistent. SCPD presents its descriptions of hate crimes law in ways that may be confusing to officers because the definitions are frequently inconsistent and inadequately explained. For example, in the sheet titled "Hate Crimes Q&A," the following question and answer dialogue appears:

Q: "Is painting/drawing of a swastika on a public place an example of a hate crime?"
A: "Only if it's specifically directed at an individual or individuals."

But the packet "No More Hate: Hate Crimes 2010," described below, explicitly states that aggravated harassment in the first degree includes a provision that

> "A person is guilty of aggravated harassment in the first degree when…he… etches, paints draws upon or otherwise places a swastika commonly exhibited as the emblem of Nazi Germany on any building or other real property, public or private, owned by any person, firm or corporation or any public agency or instrumentality, without express permission of the owner or operator, or whoever paints, draws upon or otherwise places or displays a "noose," commonly exhibited as a symbol of racism and intimidation, on any building or other real property, public or private owned by any person, firm or corporation or any public agency…without express permission…."

---

perpetrator of the offense selects his or her victim or commits the act or acts constituting the offense because of what the perpetrator believes is the victim's race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation of a person**.** See N.Y. Penal Law § 485.05 (McKinney 2003) for a list of cognizable offenses that can be considered hate crimes. The statute refers to these as "specified offenses." As the letter from Mr. Seymour notes, "Making graffiti" does not appear on the list of specified offenses; "Criminal Mischief in the 4th degree" does.

The above description of the law does not require that there be evidence that the subject "specifically directed [the symbol] at an individual or individuals;" rather, according to this description of the law, the law presumes that one who paints a noose or swastika is, by that very act, directing the symbol to an individual or individuals. SCPD should clarify these two descriptions of the law so that they are presented in a way that is consistent—and correct—to officers. If officers are given conflicting or inaccurate statements of what the law requires regarding the painting of nooses and swastikas, the county and the state lose the ability to accurately track these forms of hate crimes.

Another example of how the SPCD's materials provide inadequate instructions to officers regarding the charging of hate crimes is that, although the packet "No More Hate" describes several charges, including "aggravated harassment in the second degree" (prohibiting various forms of assault and battery against another that is motivated by race, color, national origin, ancestry, gender, religion, religious practice, age, disability, or sexual orientation), "aggravated harassment in the first degree" (prohibiting damaging religious premises and painting swastikas and nooses," and "aggravated disorderly conduct" (prohibiting disrupting a religious service), it does not list the full panoply of charges that officers can use when a crime is motivated by animus towards one of the protected groups. For example, in its 2004 letter, DCJS notes that charging the perpetrator of a graffiti drawing that contains, for example, anti-Jewish slogans with "criminal mischief" would allow the charge to come under the definition of a hate crime. (See New York State Division of Criminal Justice Services, Memorandum to Detective/Sargent [sic] Robert Reecks, Suffolk County PD, June 14, 2004). The packet "No More Hate" describes the law in general that prohibits graffiti, but inexplicably lacks a description of the charge that would allow the crime to be upgraded to a hate crime.

Additionally, there is no mention in this packet or in any of the other documents provided by Suffolk County that attempts or conspiracies to commit hate crimes are also chargeable offenses. Further, there is no instruction for officers on how to determine whether a suspect has a hate-based motive. These details are critical because pursuant to NY Penal Law § 485.05 (McKinney 2003) in order to charge a hate crime, there must be a specific motive—one that is directed toward an individual based on one of the prohibited categories. Accordingly, if officers are to correctly identify and charge hate crimes as hate crimes, they have to be able to accurately detect such motives.

Finally, there is no mention in any of these materials that youths can be charged with hate crimes. Officers need to be informed clearly that youths are capable of committing hate crimes. The tendency to brush off attacks as "just kids being kids" fails to recognize the severity of criminal conduct in which minors may engage, as seen from the murder of Marcelo Lucero, whose attackers were high school-aged youths. Greater detail and consistency are required throughout these documents in order for officers to have the direction they need to correctly charge hate crimes and prevent hate crimes from occurring.

While we understand the HCU is charged with investigating hate crimes, as well as "hateful incidents," there does not seem to be a clear definition of what constitutes a hateful incident. Bias driven behavior, even if it does not rise to the level of a hate crime, can be significant, and it should be addressed. Unchecked, it can develop into serious hate crimes, as evidenced by the events preceding the death of Marcelo Lucero.

To better anticipate and address bias incidents, SCPD should develop clearer definitions of what constitutes a "bias incident" or "hate incident." During our on-site visits, we saw multiple references in documents, including arrest reports and incident reports, to bias incidents and hate incidents. However, while examples of "hateful incidents" have been offered, such as painting a swastika on a stop sign, none of the SCPD officials we met with were able to provide a clear definition of a hateful incident. This lack of clarity may be the result of guidance materials that officers receive regarding hate incidents. For instance, the packet "No More Hate: Hate Crimes 2010" attempts to lay out the definition of a "hate incident" by contrasting it with the definition of a hate crime. The discussion begins with the following definition of a hate crime:

> 1. "'Criminal Offense' means offenses that are criminal in nature, including juvenile offenses, disorderly persons offenses, misdemeanors, motor vehicle, offenses, felonies and crimes + 'Bias motive' means that the perpetrator and [sic] a motive to commit the criminal offense because of the victim's (actual or perceived) race, color, religion [sic] Ethnicity, sexual orientation, gender [sic] N[sic]ational origin, or disability = If either element—criminal offense or bias motive—is absent, then there is no hate crime. A bias motive coupled with some action that does not constitute a criminal offense is often referred to as a 'Bias incident.'"

There is no further elaboration on what "some action" could be—but such elaboration is critical. As we mention above, incidents that might not rise to the level of a crime could nevertheless be predictors for future hate crimes; officers therefore need to have a clear understanding of the sort of hate incidents that they should take note of but this packet does not provide such guidance. Where applicable, specific examples of hate incidents should be provided; while DOJ understands that SCPD cannot anticipate every possible scenario an officer will encounter, several illustrative hypothetical or actual examples could at least provide some guidance to a topic that otherwise might be vague. Taking these steps would help ensure that officers take note of those incidents that might not rise to the level of a chargeable offense, but that could serve as predictors for future crimes, and ensures that officers have the confidence of knowing that the county has defined these terms consistently.

**C) SCPD Should Develop Better Methods to Track Hate Crimes/Incidents and Follow Up on Hate Crime/Incident Complaints**

In addition to providing clear definitions of "hate incidents" and "hate crimes," SCPD should develop a better system for tracking these types of incidents and crimes. For example, in "SCPD Internal Correspondence" between February 5, 2008, and May 4, 2011, there are monthly reports regarding the hate crimes cases reported from the same month the previous year, broken down by race, religion, ethnicity, sexual orientation, disability, and "non bias." However, it does not appear from these reports that SCPD accurately tracks or trends this data. Such tracking and trending will assist in observing patterns of behavior and areas which require further attention.

We also suggest that SCPD also conduct a crime victim survey, which would enhance its ability to identify and understand trends. Such a survey could provide SCPD with a basis to compare its internally generated data and assess the accuracy of its reporting mechanisms. For example, if the number of hate crimes reported has decreased from one year to the next, but a crime survey illustrates an increase or stagnation in hate crimes, that could serve as evidence that the HCU is unsuccessful in decreasing hate crimes and does not have sufficient reporting mechanisms in place. If, however, the number of hate crimes reported has increased, and has kept pace with any increase in hate crimes that were reported in the victimization survey, that would illustrate to the HCU that its reporting mechanism is working, even though it has not been successful in decreasing hate crimes. Finally, if the victimization survey showed a decrease in hate crimes that could illustrate that the HCU is succeeding in reducing hate crimes. The National Crime Victimization Survey distributed by the Bureau of Justice Statistics could serve as a model. SCPD may be able to partner with local universities and non-profit organizations to develop a plan to distribute such surveys.[4]

We also understand that SCPD police officers and investigators now receive a full day of Hate Crimes training. We recommend that SCPD ensure that all members of the department receive this training and regular refresher training. Training in hate crimes and bias incidents will enhance SCPD patrol officers' abilities to take citizen complaints in the normal course of business and collect relevant information about hate crimes. Reporting officers should be trained to elicit information about racial epithets or other hate crime indicia or other conduct which may be offensive to an identifiable group. This practice will demonstrate to the community a continued awareness and sensitivity to hate crime violations and improve the ability of SCPD to identify and track them.

According to County Attorney Malafi's May 11, 2011 letter, SCPD policy was changed to require reception and investigation of third party complaints. SCPD should always allow community members who may be reluctant to contact the police to make reports about harassment or crime through third party community organizations. Community organizations may be less intimidating than the police precincts. By working with these organizations the Department will restore confidence in the Latino community in the investigative process and minimize community reticence to report crimes. Community members should be advised of the option to report through a community group or the Department's web pageGreater involvement of patrol officers in the initial handling of hate crimes will also enhance SCPD's ability to address hate crimes and incidents. We understand that, at present, it is the practice of patrol officers and their supervisors to defer entirely to the HCU when a hate crime or bias incident occurs. While clearly the HCU, should take the lead in these investigations, training patrol personnel in this area will result in greater and more accurate identification of hate crimes and bias incidents.

SCPD also needs to improve its follow-up after receiving a complaint of a hate crime or incident. We recommend that SCPD provide a status update, within a reasonably prompt timeframe, to a person who has reported an incident of hate-related conduct to an officer (such a person might be a witness, victim, or potential victim of the incident). If SCPD contacts LEP

---

[4] See Bureau of Justice Statistics Crime Victimization Survey, *available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=dcdetail&iid=245 (last visited July 12, 2011).

individuals, it must use appropriate language assistance services including competent bilingual staff who speak the non-English language or telephonic interpreter services. We recognize that police officers are already obligated to provide updates to civilians who file complaints against officers, but we believe that the follow-up should be extended to situations in which a person has reported a bias incident or any incident that does not rise to the level of a crime. We also recommend that SCPD memorialize these incidents and send them to an electronic database to help map and track possible crime hotspots. Such affirmative actions convey the notion to the community that police officers are actively seeking to address bias incidents and are keeping individuals aware of what happened even when the incident may not rise to the level of a hate crime.

Public confidence in the police department will increase and the public will assist the Department to ensure public safety once the public witnesses that hate crimes are being properly documented and investigated. In the wake of past violent attacks against immigrants in Suffolk County, the SCPD should take proactive and deliberate steps to ensure that the HCU remains committed to investigating all hate crimes in an effective and independent manner.

## III. <u>MISCONDUCT INVESTIGATIONS</u>

We recommend that SCPD revise its procedures for receiving and investigating reports of police misconduct, including modifying its report form to preserve the integrity of each investigation and to enhance complainant confidentiality. SCPD should modify its current process for investigations of allegations of misconduct by officers to ensure that: (1) all allegations are consistently investigated; (2) complainants remain engaged in the complaint process until resolution; (3) formal or official tracking numbers are established for each allegation, and (4) supervisors receive proper training in how to review and address the findings of internal misconduct investigations. By addressing these issues SCPD will improve its reputation in the Latino community.

### A) Citizen Complaint Forms and Processes

An open, fair, and impartial process for receiving and investigating citizen complaints serves several important purposes. An appropriate citizen complaint procedure ensures officer accountability and supervision, deters misconduct, and helps maintain good community relations, increasing public confidence in and respect for law enforcement. Improving SCPD's current procedures for handling citizen complaints would maximize these goals.

Under the SCPD's current practices, complaints may be made at SCPD Headquarters or any of the precincts located throughout Suffolk County. When a complaint is made, a copy of the printed online Civilian Complaint Report or the manually completed Form PDCS-1300 is given to the complainant. This form includes the complainant's name, address, and phone number, as well as details of the complaint. If this form is lost by the complainant, or is viewed by the subject of the complaint, it may compromise investigation of a complaint. We recommend that SCPD develop a privacy-oriented tracking system that does not include personal identifiers to protect the identity of the complainant, any witnesses and the officer. This will further serve to preserve the integrity of the investigation.

According to SCPD policy (Order Number 10-25), Compliment/Complaint Information Reports (PDCS-1300-1) are to be "conspicuously displayed in each precinct lobby, Headquarters lobby, and at other appropriate public facilities, in such a manner that members of the public can obtain one without asking." See Paragraph V(A)(1)(a) of Chapter 5, Section 2. We recommend that blank complaint forms be available in publicly accessible locations such as libraries, post offices, and community recreation centers and that forms continue to be available without the need for a specific request. Accessibility to complaint forms makes it easier for a resident who may be reluctant to go to a local precinct or other SCPD facility, because, for example, he or she has already had a negative interaction with SCPD officers. Civilian complaint forms and informational materials should be also carried by all SCPD patrol officers and be available on the SCPD website.

According to County Attorney Malafi's May 11, 2011 letter, SCPD has developed a self-submit complaint form available in both English and Spanish. The letter states that this form is available, without asking, in all precincts as well as at police headquarters, the Suffolk County Human Rights Commission, and at public libraries. We recommend that the form be available in additional locations and that it be made available in English, Spanish and any other commonly used language in Suffolk County. We also recommend that complaint forms be available online, both for completion and for electronic submission. As discussed above, as recipients of federal financial assistance, and given the growing Spanish-speaking population in Suffolk County, SCPD must ensure that it has language assistance services in place and that it provides them at no cost to LEP individuals.[5] This means that complaint forms and other vital information must be translated into Spanish and other non-English languages and competent bilingual officers and other interpreter services must be provided to assist LEP complainants in filling out the necessary form. Our formal discussion regarding Suffolk County's provision of LEP assistance will be in our Findings Letter.

SCPD Order Number 10-25 states that the civilian complaint procedure is intended to ensure that all department members will refer complaints regarding official misconduct to their respective officers in charge. The policy should define "official misconduct" to include criminal and serious administrative misconduct that could result in dismissal. SCPD should also consider using the word "allegation" throughout the text of Order 10-25 instead of "complaint" and should define "allegation" in Section III. SCPD should consider incorporating a definition similar to the following:

---

[5] Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., VI requires recipients of federal financial assistance to provide meaningful access to LEP individuals by providing translated vital documents like complaint forms. We have three memoranda of agreement between the Department of Justice and law enforcement agencies as a result of Title VI investigations to provide examples of policies and procedures that should be in place to ensure SCPD is complying with the requirements of Title VI and its implementing regulations. We also attached a copy of the U.S. Department of Justice *Language Access Assessment and Planning Tool for Federally Conducted and Federally Assisted Programs*, which is *available at* http://www.lep.gov/resources/2011_Language_Access_Assessment_and_Planning_Tool.pdf. (last visited July 12, 2011).

> An allegation is the reporting of any employee misconduct classified as: (1) Criminal – an act or omission of a duty that, if substantiated, would result in a criminal conviction; or (2) Administrative – an act that, if substantiated, could result in disciplinary action up to and including dismissal. Allegations do not include routine supervisory matters or other performance issues (e.g., losing credentials, failure to engage video camera).

The definition of allegation should include actions or performance and non-performance that violate policy, rules and regulations, procedures, criminal or civil law, written directives, operational instructions, interoffice communications, personnel orders, and training regulations. It should also include the requirement of all officers to report such conduct. Using the term "allegation" is preferable to "complaint" because "complaint" implies more formality, an element of proof, and usually suggests the complainant identifies himself. Conversely, allegations imply less of a requirement for substantial knowledge; they are merely a transfer of information to an authority to investigate.

Although we commend you for signing an executive order in 2010 which provides for the Human Rights Commission to accept and process complaints against SCPD that allege undue force or discriminatory conduct,[6] the HRC's efficacy seems limited. According to interviews we conducted, when the HRC receives complaints against the police, it does not independently investigate them. Instead, it refers them to IAB or other internal police investigatory units. This is not an effective method of ensuring independent monitoring of police conduct, and it gives the public a false impression.

**B) Intake and Tracking of Complaints Against Law Enforcement**

1) Intake of Complaint

SCPD should accept all complaints or allegations of police misconduct, including anonymous or third party complaints that, if true, would constitute a violation of applicable laws or SCPD's rules and regulations. The form of the complaint or allegation should not be an impediment to its receipt, tracking, and processing; allegations should be accepted by individuals making them in person or by telephone, complaint form, personal letter, website, email, fax, or TDD. SCPD policy should make clear that all allegations, regardless of the source, will be reviewed and a determination made as to the nature and extent of the investigation required. SCPD policy should make clear that complaints and allegations do not have to be submitted in writing. Thus, SCPD Order Number 10-25 Paragraph VI.B(1-3), regarding third-party complaints, could be eliminated and replaced with language indicating that all complaints will be accepted and subjected to review by IAB, which will determine if an investigation is warranted and the nature and extent of the investigation to be conducted. If an incident is determined to be a performance issue, it can be returned to the precinct through the chain-of-command for disposition, with a copy of the final resolution to IAB. SCPD policy may also choose to incorporate language indicating that it will seek a criminal prosecution against any person who intentionally files a false complaint. IAB should be responsible for classifying, processing, and

---

6 The Suffolk County Human Rights Commission 2010 Annual Report.

disseminating all complaints against SCPD members. In addition, even if the complainant wishes to withdraw the complaint, the investigation should continue to resolution.

SCPD Order Number 10-25, titled "Civilian Complaint Procedure," effective August 2, 2010, requires that when a member of the public prepares a complaint via the Compliment/Complaint Information Report, that report "can" be forwarded directly to the Internal Affairs Bureau ("IAB") by the command accepting the report. We recommend that SCPD send all potential complaints and allegation, not just Compliment/Complaint Reports, to IAB. Further, we recommend the policy be rewritten to read that such complaints "must" be forwarded to IAB within the next 48 hours.

All IAB complaints should be maintained on a strictly need-to-know basis and access to such complaints should be restricted to IAB personnel whenever possible. Order Number 10-25 states that supervisors must, when possible, record complaints where a person is physically located. See Paragraph V(C) of Chapter 5, Section 2. We recommend instead that all potential complaints against SCPD officials be transferred or referred directly to IAB, via telephone or in person. For example, when an individual calls a local precinct, rather than the central SCPD switchboard, the Precinct Duty Officer should connect the caller directly to IAB and then drop the line, to preserve the integrity of the allegation and protect the caller from inadvertent or improper disclosure. Complaints against other agencies could be taken by the Duty Officer and also referred to IAB. .

In addition, all SCPD members have the responsibility to report allegations as soon as they become aware of them, including self-reporting. SCPD policy should provide a penalty for the failure to report allegations as well as a penalty against those who retaliate against members who initiate such reports. IAB also should have protocols in place to ensure that it receives a direct report if any member of the department suspects that an officer any may have engaged in certain types of conduct such as bribery, drug use, excessive force resulting in egregious bodily injury, and other allegations of a serious or sensitive nature. Further, IAB should ensure that protocols exist so that it is notified of the disposition of all prosecutions of SCPD officers in cases involving charges of obstruction of official business, resisting arrest, officer assault, or disorderly conduct. Similarly, IAB should be notified by the Suffolk County District Attorney's office or local courts when SCPD officers are accused or have been found guilty of having intentionally violated individuals' constitutional rights.

2) Tracking Complaints

SCPD Order Number 10-25[7] states that a copy of the online complaint report or PDCS-1300 should be given to the complainant. However, this document could be misplaced or shown to someone without a need to know, thus exposing to third parties the identities of potential witnesses, police officers, etc. Instead, to ensure the proper and timely resolution of civilian complaints, we recommend that SCPD assign complaints a complaint number to be used to track the investigation. Copies of the complaint should be made available upon request and every

---

[7] In addition to the recommendations regarding SCPD Order Number 10-25 we make in the main text of this letter, we also attach a red lined version of the Order with additional recommendations.

complainant should be made aware of this opportunity. Complainants may use the complaint number to follow up on the status of the investigation. All complainants should also receive a letter acknowledging receipt of the complaint and thanking them for providing the information. When the complaint is written in a non-English language, SCPD should promptly translate the contents of the complaint and send an acknowledgement written in that non-English language. A copy of this letter should be maintained in the investigative folder. At the conclusion of an investigation, SCPD should notify all relevant parties, including complainants, of the final disposition. If one or several of the relevant parties are LEP, this notification should be provided in the appropriate non-English language(s). Through our early document review, we have found variance in the quality of notification letters to complainants. We suggest a standardized letter that allows for providing important information to the complainant such as the IAB reference number. In this way, citizens can, if they choose, contact IAB and easily reference their complaints.

### C) Citizen Complaints of Criminal or Illegal Conduct

We encourage SCPD to adopt a policy that explicitly prohibits officers from engaging in conduct that tends to discourage a citizen from making a complaint regarding criminal or illegal conduct. During our tour, we heard complaints that some officers have declined to take formal complaints if the alleged perpetrator is a juvenile or where the officer perceives the alleged offense as not serious. Some individuals also claimed that officers declined to assist them where language was a barrier to communication. The intake process should facilitate the public's ability to make complaints and reduce the perception that SCPD discourages complaints. Further, any new policy or procedure should provide that if an officer violates the policy he or she may be subject to discipline.

### D) Early Warning System

We recommend that SCPD use its current computer database early warning system, IAPRO, to track data on use of force, citizen complaints, internal investigations, service calls, discipline, and other items relevant to each officer's conduct. SCPD should use this data regularly and proactively to: (1) promote best professional police practices; (2) improve accountability and management; (3) manage the risk of police misconduct and potential liability; (4) evaluate and audit the performance of officers and units; (5) evaluate and assess the effectiveness of training and policy; and (6) recognize and commend positive officer performance.

In keeping with best practices, we recommend that, to the extent that it does not already, SCPD use IAPRO as follows:

1. The early warning system should capture information on all investigations and complaints, including non-sustained complaints and complaints prior to final disposition, discipline and other supervisory corrective measures, uses of force, arrests and charges, searches and seizures, service calls, training, awards and commendations, sick leave, civil lawsuits, and other items relevant to an officer's conduct.

2. SCPD should use IAPRO to gather and track data for each officer's arrests by race or ethnicity of the subject.

3. We also recommend that SCPD require supervisors, including command staff, to review these data for every officer they supervise on a quarterly basis.

4. We recommend that SCPD compare their subordinates' IAPRO data to that of the subordinates' peers, focusing upon complaints against officers and use-of-force reports.

5. Command staff should review the unit-wide IAPRO data and compare these data with peer units. In addition, a policy should be established providing explicit guidance to supervisory officers reviewing reports to ensure that patterns of possible misconduct are identified, analyzed, and addressed properly by command staff. The aim of this process is to give supervisors valuable information that, if received early, could identify potential problem officers before misconduct occurs.

6. To use IAPRO effectively as a predictive model tool, SCPD must ensure that the system has defined triggers for management intervention. SCPD should revise as appropriate its IAPRO policy to establish guidelines regarding what specific events will trigger an additional supervisory review, what type of a review will be conducted, and what type of remedial services or action is needed, if any.

## E) Timeline and Protocols for Misconduct Investigations

SCPD General Order 10-01 states that IAB's standard for completing investigations is 90 days. We recommend that SCPD adopt a policy that, absent exigent circumstances, all investigations of officer misconduct be completed within 45 calendar days**.** The investigation should include a review by the Commissioner or his command staff designee. Internal adjudication, if any, of the results of the investigation should be timely completed within deadlines specified under SCPD's labor agreements. Imposition of any discipline should occur within 30 days of the end of the Commissioner's review or the end of internal adjudication. Extensions beyond these time periods should require the Commissioner's written approval (rather than the deputy chief's approval), based upon criteria set out in SCPD policy, and be communicated in writing to the complainant. Misconduct investigations should be completed within 45 days from receipt of the allegation to disposition, unless extenuating circumstances warrant keeping the investigation open beyond that period. Exigent circumstances include those involving witnesses who are unavailable and criminal cases that are pending.

### 1) General Order Number 11, Section 3

General Order Number 11, Section 3 requires that all pre-civil suit administrative notices of claim seeking monetary damages for police conduct routinely be forwarded to IAB for appropriate investigation. We agree that this is an appropriate notification. This order should emphasize that it is every officer's responsibility to immediately notify his or her supervisor if he or she is named as a party in a civil suit for on-duty conduct and for off-duty conduct alleging racial bias or physical violence.

### F) Complaint Quality Assurance

We recommend that SCPD's IAB conduct periodic random follow-up surveys to assess completed misconduct investigations. IAB should contact complainants to ensure that the investigation was handled professionally and thoroughly. Specific questions about the conduct of the investigation should be asked: whether the complainant understood the investigative process; whether the complainant felt that the investigator was thorough in his or her questioning; and whether the complainant received both written acknowledgement of the complaint and notification of the results of the investigation. A dedicated auditing component of SCPD should examine the receipt, investigation, and adjudication of all misconduct investigations.

Further, when possible, interviews of victims, complainants, witnesses and subjects conducted during misconduct investigations should be tape recorded. There should be randomized periodic audits by supervisors of the taped interviews to ensure that IAB investigators asked probative questions.

We also recommend that IAB perform an annual check of officers' New York State driving records for violations or suspended licenses and check local court dockets for civil suits that may have bearing on an officer's behavior on duty. IAB should act proactively and use both integrity tests and record reviews to identify potential internal affairs issues. Lastly, if, during the course of an IAB investigation, collateral misconduct is discovered, IAB should institute an investigation of the misconduct. IAB policy should be clear that if a policy violation is uncovered during such an investigation, IAB will identify the violation and investigate or refer it as appropriate. Likewise, the policy should state that any criminal conduct uncovered will also lead to a referral for a criminal investigation.

## IV. SUPERVISION AND ACCOUNTABILITY

### A) The Internal Affairs Bureau: Structure and Organization

The internal affairs component of a law enforcement agency should seek to maintain the integrity of the department through a system of internal discipline or corrective action after it conducts objective and impartial investigations. SCPD should continue to support the core mission of IAB: to monitor the behavior of police officers for misconduct while maintaining its objectivity and autonomy.

SCPD should consider altering the chain-of-command for the IAB. Similar entities in other departments and most other departments within SCPD report directly to Chiefs or Commissioners. IAB currently reports to a Deputy Commissioner.

### B) Incentivizing positions at IAB

SCPD should consider creating incentives for officers to take positions in IAB. This will allow the Department to select the best officer(s) for the position and make the position a more attractive career path. SCPD should promote the work done by IAB investigators and reach out to ensure diversity and excellence. We recommend that IAB positions start at the rank of

detective. The head commander of IAB should have first choice of applicants for detective positions. Special consideration should be given to individuals who can demonstrate competency in Spanish and other frequently encountered non-English languages and/or officers who can commit to taking language instruction and interpreter training courses to attain competency. Service in IAB should be a minimum of three years during which time applicants could avail themselves of advanced training in investigative techniques. Upon completion of the assignment, IAB members should be given extra preference in their next assignment. Officers would be permitted to remain in IAB longer if they desired.

**C) Toll free Bilingual Civilian Complaint Hotline**

According to County Attorney Malafi's May 11, 2011 letter, SCPD has established a toll-free hotline. SCPD should ensure that a toll-free 24-hour Civilian Complaint Hotline is available in English, Spanish, and other languages prevalent in Suffolk County to accept complaints of misconduct and positive comments about officer conduct. The toll free Hotline should be recorded and should be periodically audited to ensure that: the calls are being taped; the intake officer provided his or her name, rank, and affiliation; the intake officer arranged for an interpreter, if needed; the intake officer did not attempt to discourage the caller from making the complaint; and the intake officer made it clear that the complaint did not have to be in writing. The toll free hotline number should be listed on informational material, complaint forms, and consent to search forms. All forms should be printed in English, Spanish, and other non-English languages depending on the linguistic composition of the services area. There should be sufficient advertising to inform the community of the Hotline number and encouraging community members to report all incidents.

**D) Random Integrity Tests**

We recommend that SCPD consider randomized integrity tests of the complaint reporting system. Testers should call precincts or approach officers in the street indicating they wish to file a complaint of misconduct. IAB can then ensure that the receiving officer provided the complainant with the proper reporting procedure and that the officer reported the information as required by standard operating procedures (SOPs). The SOPs must specifically note that if, during the course of an IAB investigation, a complainant wishes not to proceed further, or wishes to withdraw the complaint, that the complainant understands the investigation will go to conclusion regardless of whether the complainant cooperates.

SCPD should be proactive in offering assistance to officers who have reported misconduct or other acts of prohibited discrimination to ensure that their careers do not suffer adverse consequences for their cooperative actions.

## V. <u>TRAINING</u>

During our site visit, we found that SCPD needs to provide its officers additional training beyond the basic training they receive when they first join the department. We recognize that SCPD has upgraded its ongoing training programs and will continue to develop new programs

for officers and supervisors.[8] Adequate training is a critical element in the creation and sustainment of effective and appropriate policing. For training to be successful, the department should set priorities and evaluate the success of training. The recommendations below outline a strategy for SCPD to adopt best policing practices.

Policies and procedures are the primary means by which police departments communicate their standards and expectations to their officers. Accordingly, it is essential that SCPD's policies be comprehensive, up-to-date, comprehensible, and consistent with relevant legal standards and contemporary police practices.[9] Several of SCPD's policies and procedures are inconsistent with generally accepted police practices and are insufficiently detailed to provide the appropriate guidance for officer conduct.

SCPD should improve the means by which police personnel are informed of new policies. Currently, SCPD primarily uses roll-calls to inform officers of policy changes. From our review of this practice, by itself, it is not the most effective way to ensure that personnel are fully informed of the new policies. Accordingly, we recommend that SCPD distribute written copies of all new policies to each officer. For policies discussing major changes, including the procedure to inquire about immigration status, the handling of citizen complaints, or the process for complaint reporting, all incoming and current SCPD officers should receive a substantive training session. Upon completing this training, each officer should provide a written acknowledgment of their receipt, review, and understanding of the policy. This written acknowledgment should be maintained as part of SCPD officer's personnel file.

In addition, we suggest that SCPD designate an individual who will be responsible for reviewing any revisions to new policies and, where necessary, promptly notifying command staff regarding changes in substantive law and ensuring that SCPD policies are consistent (e.g., the citizen complaint process should treat immigration status in a manner consistent with other policies of the department).[10] This official would also be responsible for ensuring that all officers receive complete copies of policy manuals and policy revisions, and for maintaining copies of officers' signed acknowledgments. We also recommend that when SCPD revises policies or procedures it provides officers copies that highlight in some fashion[11] the changes that have been made. This will assist officers, who already have busy schedules, to quickly and

---

[8] We recommend that SCPD make its training materials available to all officers and supervisors through the Internet.

[9] We understand that SCPD has been revising its policies and practices based on the technical assistance we provided during our tours. This letter reflects our recommendations based on the policies and practices we received prior to, during and following our tour. We have endeavored to review the most recent version of the policies and procedures discussed in this letter. Please note that Suffolk County should not interpret our discussion of certain policies and procedures as an approval of all or any other SCPD policies or procedures not reviewed.

[10] Any substantive legal updates or changes should be made in consultation with the County Attorney or her designee.

[11] For example, a "redline" copy of a document created in Microsoft Word displays new language with an underscore and language that was deleted with a strikethrough. The Department does not endorse any one particular word processing program over another and only uses Microsoft Word as an example.

accurately see what provisions have been changed, added, or deleted. First-line supervisors should conduct periodic assessments of officers' policy manuals to ensure that those manuals are up-to-date and complete.

We recommend that SCPD post policies, procedures and general orders of public importance (e.g. those regarding citizen complaints, hate crimes, use of force) on the official SCPD website, rather than distributing them to members of the department only in paper form. An electronic version should be searchable (manual-wide, not just within each policy) and include both a comprehensive index and a table of contents. This will make them more accessible to SCPD personnel. Additionally, having the SCPD policy and procedure manual online will make this vital information available to the community.

SCPD can identify training needs by seeking recommendations from internal SCPD committees, IAB, focus groups, or from command staff. Externally, the need to train or re-train officers can be generated by changes in the law, court interpretations of police procedures, world events, and best practices as defined by similarly situated police agencies or police organizations.

General Order 18, Section 2.C.2 (Training) discusses the procedures of the training committee. That subsection requires members to conduct research, review reports and field observations, and make recommendations or modifications in training, with the understanding that the Police Training Academy Bureau can adopt final modifications. SCPD should revise this policy to include clear requirements. At a minimum, it should mandate: (a) assessment of training needs; (b) development, delivery, and evaluation of training; (c) evaluating the field implementation of the training; (d) creating a document archival system for all training provided and (e) a training record for each officer to track in-service training.

By creating these specific outcome measures, SCPD will be better able to measure whether training has been successful. SCPD must ensure an evaluative component both in the training and its implementation. The content of the instruction, the instructors, and the delivery should be evaluated by students. Similarly, training without successful field implementation may be inadequate. Feedback from officers, IAB, and commanders can determine if SCPD's ever-changing needs are met.

## VI. COMMUNITY OUTREACH

Effective policies and practices regarding community relations enhance and reinforce police/community relationships and play a significant role in ensuring that a police department maintains the trust of its residents. Trust begins, but does not end, with responding to residents' needs. Effective policing requires that police departments provide other services, such as community policing. The benefits of outreach programs include greater willingness by residents to cooperate with police investigations, increased reporting of issues within the community, increased community trust in the police department, and enhanced public safety. We encourage SCPD to enhance its community relations and outreach programs, particularly to cultivate relationships with Latino communities in Suffolk County. SCPD has increased its initiatives, but they are nevertheless still limited.

### A) SCPD Should Enhance the COPE Program

One of the most important techniques to cultivate better community relations is community policing.[12] SCPD's community oriented policing program is called Community Oriented Police Enforcement ("COPE"). SCPD officials have stated that COPE officers proactively address problems and issues before they become the subject of traditional policing (e.g. criminal apprehension), and that COPE officers are assigned to specific beats to develop relationships with residents and business owners in the area and for community members to interact with SCPD outside of emergent circumstances such as arrests.

Although there are a substantial number of COPE officers in SCPD, our investigation revealed that COPE officers do not, with only a few exceptions, engage in genuine community policing. COPE officers function in traditional patrol units, interacting with community members largely only in response to calls, complaints, and arrests. In discussing the day-to-day operations of COPE officers with SCPD staff, we were routinely informed that COPE is viewed by officers primarily as a promotional stepping stone to becoming a detective, and that community outreach is not the primary thrust of the program.

There were notable exceptions to this general rule. A small group of COPE officers we encountered had worked to become familiar with the community they patrolled. They regularly interacted with shop owners, and one of these officers made regular visits to schools in the area to speak to students and develop relationships with school officials. This conduct is laudable and should be the norm for COPE officers, rather than the exception.

The COPE program can be enhanced by collecting data from field reports and memo books maintained by officers. We understand that field reports and notes made in officers' memo books are not entered into a database or recorded in any organized fashion. These records can help track trends in conduct which, while not rising to the level of an arrestable offense, could identify patterns of behavior which if unaddressed could escalate to criminal activity. Therefore, we recommend that officers memorialize all such incidents (i.e. those incidents that do not rise to the level of an arrestable offense), and then require that the reports of these incidents be sent to a centralized database that is capable of processing and possibly mapping trends. In this way, SCPD can pursue additional surveillance and other preemptive crime-control measures in areas that may be likely to experience a hate crime. We are pleased that the SCPD has established a position of Community Liaison Officer within each precinct's COPE unit. Accordingly, we suggest that Section 1 of Chapter 28 of the policy manual be expanded to include reference to this new position in the COPE unit and the unit's re-invigorated mission. With effective deployment, community liaison officers will link the community with the various precincts. Over time, Latino residents may consider SCPD officers as more approachable, thereby bridging the distrust that currently exists.

---

[12] Community policing is a philosophy that promotes organizational strategies, which support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. See www.cops.usdoj.gov/Default.asp?Item=36 (Last visited May 9, 2011).

**B) SCPD Should Expand Its Community Outreach and Liaison Programs**

In addition to an effective COPE program, a well-developed community outreach program is essential to better community relations. Though there are few efforts made to reach out to the Latino community, a notable exception is the laudable work of the Special Advisor to the Commissioner for Minority Affairs. She is assigned as a full-time community relations officer to the Latino community. The officer is well-regarded and trusted in the Latino community. Her presence at community meetings and the direct assistance that she has offered to individuals has had an invaluable impact on the perception of the department within the Latino communities. She is but one individual, however. Community residents told us that SCPD's assignment of only one person to be a liaison with the Latino community highlighted the lack of effort by SCPD rather than remedied the perception that SCPD is uninvolved in the Latino community. We recommend that the outreach program be expanded and that additional Spanish speaking outreach officers be assigned to work as special advisors with the Latino communities. Although County Attorney Malafi's May 11, 2011 letter states that SCPD has appointed police officials of Latino descent to key positions within the police department, such appointments, while symbolic, do not necessarily improves the department's relationship with the Latino community because these officials may not interact with individuals within the Latino community on a regular basis.

Since December 2008, SCPD appears to have worked towards creating a better relationship with the Latino community. County Attorney Malafi's May 11, 2011 letter mentioned outreach efforts such as the PoliceSmart Educational Program and ESL classes. We encourage SCPD to continue to consider other cultural and language programs or activities. Outreach methods include providing information to the public and to LEP communities regarding the language assistance services available free of charge, or including this information on signage, websites, translated documents, telephone tree options, kiosks, and non-English or ethnic media.[13] Additionally, we encourage SCPD to increase the number of "outreach" activities that occur outside of the precinct. Requiring community members to visit the precincts may deter some individuals from participating in such activities. SCPD also has pointed to its Police Athletic League (PAL) as a significant example of its community outreach. However, that program has not made an effort to recruit officers from the Latino community, and the level of participation by Latino youth is unclear. While Police Athletic League programs have value, they are not a substitute for community relations and outreach programs. The department should ensure that Latinos have full access to the PAL program, including providing forms in both English and Spanish, and should ensure that bilingual officers who speak Spanish are involved in the program.

SCPD should also continue working with community advocates to develop Spanish language training and training on cultural norms in various Latino communities. These programs should be designed so that they are useful to officers when they interact with residents. Additionally, as mentioned in County Attorney Malafi's May 22, 2011 letter, SCPD is providing

---

13 See U.S. Department of Justice, *Language Access Assessment and Planning Tool for Federally Conducted and Federally Assisted Programs*, at 6. http://www.lep.gov/resources/2011_Language_Access_Assessment_and_Planning_Tool.pdf.

some Spanish language learning opportunities for officers as well as sensitivity and diversity training, including seminars administered by organizations such as the Anti-Defamation League. SCPD should expand such opportunities. When working with community based organizations, SCPD should provide information, translated into appropriate non-English languages, describing how it provides language assistance services at no cost for LEP individuals. SCPD will derive two mutually-reinforcing benefits from establishing such programs: First, SCPD engages and cooperates with community advocates who will then convey the message to the community that SCPD is actively seeking to employ the most effective ways to communicate with and protect Latino residents. Second, SCPD benefits through receiving language and cultural assistance, which in turn will help SCPD fight crime and protect residents more effectively.

During our interviews, community members and advocacy groups told us that they did not know of or understand many SCPD policies and expressed a desire to be able to obtain access through means other than filing a freedom of information request. Though the SCPD website currently provides access to some policies, the department should include updates of all policies and procedures and post some form of notice on the website that a change, revision or addition has been made. Because SCPD receives federal financial assistance, Title VI of the Civil Rights Act of 1964 (Title VI) also requires SCPD to translate any vital[14] written documents and ensure that limited English proficient (LEP) individuals in the community have meaningful access to important written information.[15] While SCPD's website is available in Spanish, it seems that some online documents are translated using Google Translate, which is of limited value and accuracy. An expert speaker of that language should review all translations for accuracy. Further, when DOJ visited the SCPD website in late May 2011, the policy and procedure translations in Spanish had formatting issues. To be clear, "meaningful access" should be interpreted to mean that LEP individuals should be provided versions of the same documents that are as legible and easy to decipher as those provided for English speaking individuals.

We believe greater access to the community and appropriate translations of SCPD policies and procedures will assist in removing the appearance that SCPD's actions are unclear or being concealed. We understand that SCPD is in the process of publishing more information on its website, and we commend that effort.

SCPD's dissemination of General Order 09-54 is a good, concrete example of how accessible policies assist SCPD in its community relations and outreach efforts. General Order

---

14 Whether or not a document is considered "vital" depends upon: "the importance of the program, information, encounter, or service involved, and the consequence to the LEP person if the information in question is not provided accurately or in a timely manner." 67 Fed. Reg. 41,455, 41,463 (June 18, 2002). Examples of such written materials could include: "Consent and complaint forms; intake forms with the potential for important consequences; written notices of rights, denial, loss, or decreases in benefits or services, parole, and other hearings; notices advising LEP persons of free language assistance; prison rule books; written tests that do not assess English language competency, but test competency for a particular license, job, or skill for which knowing English is not required; and applications to participate in a recipient's program or activity or to receive recipient benefits or services." Id. at 41463

15 <u>See</u> 28 C.F.R.§ 42.405(d).

09-54 provides that SCPD officers shall not ask victims of crime about their immigration status. SCPD maintains that this has been its policy since 2005. However, it was not until October 15, 2009, almost one year following the death of Marcelo Lucero,[16] that this policy was disseminated to the public. It also appears that even in 2005, the policy was not formally placed into SCPD's policies and procedures manual. Thus, the Latino community in Suffolk County understandably perceived that this policy was issued only after, and in response to, the Lucero killing and that SCPD had been authorized to request victims' immigration status previously. It is possible that had General Order 09-54 been available to the public when first issued, this perception could have been substantially mitigated and would have encouraged greater reporting of hate crimes.

### C) SCPD Should Enhance Its Community Contacts to Address Gang Activity

Data suggests that gang activity is a serious problem in Suffolk County and that it particularly adversely affects the Latino community. SCPD is engaged in vigorous efforts to reduce and eliminate this serious concern. However, to be most effective, gang prevention units should have substantial community contacts to develop sources of information and, where possible, learn of potential gang activity before it occurs. It is our understanding that SCPD has eliminated local precinct gang units and replaced them with a department-wide Gang Team Section. Having a centralized gang unit can severely limit SCPD's ability to develop relationships with the community or to create preventative interventions. The lack of a regular anti-gang presence in the community alienates adults when gang prevention activity is conducted and exposes children, who are the primary targets of gang recruitment efforts, to gang influences. We recommend that SCPD focus its anti-gang activities on the local level, using re-established local precinct anti-gang units and street crime sections. These units will be perceived by the Latino community as more interested in serving the community and addressing real community concerns. In addition, the community policing discussed above may assist in the anti-gang initiatives of the SCPD.

### D) SCPD Should Revise the Use of Roadblocks in Latino Communities

We understand that SCPD has used a vigorous program of roadblocks and police sobriety checkpoints. As law enforcement tools, these are established methods of addressing drunk driving and other potential criminal activity. We have received reports, however, that SCPD's checkpoints have been used primarily to request documentation of citizenship. While we

---

16 In November 2008, Mr. Lucero, an Ecuadorean man living in Patchogue, was fatally stabbed by a group of teenagers. The same teenagers later admitted that, in the weeks before the Lucero killing, they had regularly sought out and attacked Latino men in the community. Following Mr. Lucero's death numerous Latino men came forward and described incidents of harassment and/or attacks and their belief that they were attacked because of their heritage. The attacks described were reported to have occurred over a period of years. SCPD and the County government stated that they were unaware that Latino men were targeted due to their ethnicity or national origin. Some Latinos who came forward in the aftermath of the Lucero killing explained they had not reported hate crime incidents to SCPD because they had been previously discouraged by SCPD from reporting crimes, were afraid that they would be asked about their immigration status, or because prior complaints of harassment went unheard.

continue to investigate these claims, if true, this is not an acceptable practice. We recommend that SCPD ensure that officers at checkpoints inspect only for sobriety or other specific illegal conduct and do not conduct identity checks or otherwise ask for documentation without a basis for believing that a crime or violation has been committed.

**E) SCPD Should Develop Additional Mechanisms to Promote Cultural Competence In Its Police Training, Policies and Procedures**

Vital for good community relations are policies and procedures that are culturally aware and take into consideration the cultural differences between different ethnic groups. Officers who are trained and guided by policies and procedures that recognize the cultural differences in the various communities will be more effective in serving all communities.

One of the policies that SCPD should revise is Chapter 10, Section 1 of the Department Manual, which states that a police officer should:

> Give particular attention to peddlers and solicitors to determine that they are properly licensed and are not using that occupation as a cloak for some illegal purpose.

Street vendors are common in many immigrant communities, including immigrant communities with high Latino populations. Training, policies and practices that question the validity of legitimate activity, such as peddling or soliciting, could be viewed as culturally insensitive and thus exacerbate police-community tensions. This kind of language can also create a bias in the mind of officers against Latinos in general. We recommend that this policy be reconsidered and/or revised, and we further suggest re-wording or revising the language in this section from "peddlers and solicitors" to language that simply states that individuals who appear to be engaged in illegitimate activity on the street may warrant particular attention. Such a focus would serve to spotlight attention on suspicious conduct, rather than individuals engaged in legitimate activity.

Police officer training programs should explicitly teach officers about cultural differences. For example, in some communities a married woman's religious practice dictates that she not speak directly or make eye contact with a police officer. That conduct could be interpreted by an officer to be evasive and reflective of a refusal to cooperate. With proper training, an officer would be aware of the cultural basis and respond appropriately. Overall, given the diversity in Suffolk County, and the growing population of recent immigrants, training in cultural diversity will improve community relations. We understand that SCPD has begun cultural awareness and language training as part of its Hate Crimes curriculum; and according to County Attorney Malafi's May 11, 2011 letter, recruits now receive 45 hours of cultural awareness, sensitivity, diversity, and foreign language training. Your letter also stated that SCPD members receive supplemental cultural awareness and similar training that includes seminars administered by the Anti Defamation League and other organizations. We commend SCPD for these efforts and encourage SCPD to continue to expand sensitivity training. This training should be mandatory for all officers. This will improve communication and reduce tensions that can arise from cultural misunderstandings.

One way to identify the need for greater cultural sensitivity is to obtain assistance in the development of policies, procedures and training programs from members of the various communities in Suffolk County. Section 18.2 of the Department Manual establishes a Training Committee made up of representatives from various sections of the department. We recommend establishing a community advisory committee, reflecting the diversity of cultures in the County, to work with that committee, to advise the Police Commissioner regarding cultural sensitivity training, and to ensure that policies and procedures reflect an understanding of the differences that exist in different communities.

Similarly, regular interaction between community members and precinct commanders would increase officer sensitivity and positive interactions. In certain precincts, SCPD holds "First Tuesday" meetings, which all residents of the precinct can attend and voice their concerns. These meetings are commendable, and SCPD should consider expanding this program or appropriate offshoots to all precincts.

We also recommend that SCPD consider creating Community Precinct Councils, a program which has achieved great success in other jurisdictions, including the City of New York. Typically, councils consist of members of various constituencies and communities in each precinct. The councils meet regularly, help inform the precinct command structure of issues affecting each community, and act as a forum for discussion between various groups, identifying common interests and breaking down cultural barriers.

**F) SCPD Should Engage the Latino Community On An Informal Basis**

SCPD should endeavor to "take the pulse of the community" on a routine and informal basis. Interviewing community members in a nontraditional police environment, in a capacity that does not involve law enforcement action or procedure, may lessen trepidation in the community and increase the likelihood of open dialogue. The topic of hate crimes and community sentiment toward the police on the issue may therefore become an ongoing dialogue, not merely one that arises due to unfortunate circumstances.

As we recommended during our tours, SCPD should consider conducting its own research to determine citizen satisfaction with the police. We understand that the SCPD has begun surveying residents by Internet, U.S. mail, and telephone and compiling the results. Surveys have been made available in both English and Spanish. We encourage SCPD to continue to make surveys available, in both English and non-English languages relevant to the community, in places of worship, supermarkets, schools, and other areas where people congregate.

According to SCPD's online citizen satisfaction survey, which tallied responses from 2007 through 2011, residents' views of SCPD seemed to improve overall, with the percentage of respondents rating SCPD as "excellent" increasing in five categories measured ("helpfulness," "knew how to handle my problem," "treated me fairly," "professional conduct," and "response time"). The percentage of respondents rating SCPD as "improvement needed" also fell in the five categories. However, the numbers were not divided by ethnicity, so it is unclear whether Latinos, for instance, collectively experienced an improvement in SCPD services.

And in a series of IAB quality service audits that involves surveys of citizens who telephoned SCPD for assistance, IAB only managed to survey one LEP individual between April and May in 2011. The previous year, IAB surveyed 15 LEP individuals during the same time period. Another survey compiled on May 18, 2011, which asked respondents a variety of questions about SCPD service and broke the results down by precinct, seems to indicate positive results – at least according to the limited survey results with which we were provided. Between 74 and 92 percent of respondents said they were "overall … satisfied with my entire interaction" with SCPD. However, the survey results SCPD provided to DOJ only included responses to question numbers 4, 13, 18, and 19. Answers to other questions, such as number 5 ("The 911 Operator/Desk Officer who received my initial call communicated with me in the language I spoke, or connected me with someone who did") were not provided. SCPD did not provide us with the survey results to 16 of the 20 questions. In addition, it is again unclear how many respondents are Latino and non-Latino, so it is unclear how much progress, if any, is being made building a relationship with the Latino community.

SCPD should take steps to ensure that surveys correctly reflect its relationship with the Latino community in particular and not just its relationship with the county as a whole. In addition to knowing the race or ethnicity of respondents, it would also be helpful to know the total number of surveys provided (i.e., how many surveys were not returned).

In addition, SCPD may wish to review research conducted by the Rand Corporation as part of a collaborative agreement with the City of Cincinnati, Ohio.[17] Such research can assist the department in learning the cause, nature, and extent of community disengagement. Another consideration would be to transform the new "research section" of SCPD as part of a dedicated audit function and inspection section. Specifically, all data that are currently entered into all databases (all enforcement actions and procedures, investigation, complaints, incident reports, etc.) should have dedicated software to articulate trend analysis by each individual variable. This form of predictive policing enables departments to anticipate trends and better serve the community.[18]

* * * * *

[17] See Ridgeway, et al., "Police-Community Relations in Cincinnati," prepared by the Rand Corporation, *available at* http://www.rand.org/pubs/monographs/MG853 (last visited July 12, 2011).

[18] SCPD may wish to work with local universities to examine police empirical data and outside independent analysis.

## CONCLUSION

Although the SCPD has made some advances in revising its practices to enhance its policing techniques and relationship with the Latino community, we strongly urge the SCPD to adopt these technical assistance recommendations. We look forward to working with you and the department as our investigation proceeds. If you have any questions, please do not hesitate to contact Special Counsel Laura L. Coon at (202) 514-1089, Silvia J. Dominguez at (202) 616-8547, Jack Morse at (202) 305-4039, or Michael J. Goldberger of the U.S. Attorney's Office for the Eastern District of New York at (718) 254-6052.

Sincerely,

Michael J. Goldberger
United States Attorney's Office
for the Eastern District of New York
Chief of Civil Rights, Civil Division

Jonathan M. Smith
United States Department of Justice
Civil Rights Division
Special Litigation Section
Section Chief

Laura L. Coon
Special Counsel

Silvia J. Dominguez
Jack Morse
Trial Attorneys

# FOURTH REPORT ASSESSING SETTLEMENT AGREEMENT COMPLIANCE BY SUFFOLK COUNTY POLICE DEPARTMENT

**January 19, 2017**

# I. INTRODUCTION

In January 2014, the United States Department of Justice ("DOJ") and the Suffolk County Police Department ("SCPD" or the "Department") entered into a Settlement Agreement ("Settlement Agreement" or "Agreement") to ensure that police services are provided to all members of the Suffolk County community, including the Latino community, in a manner that complies with the Constitution and laws of the United States.[1] DOJ, as part of its responsibilities for oversight of SCPD's implementation of the Settlement Agreement, periodically reports on its assessment of SCPD's compliance with the Agreement. This is the fourth Assessment Report.

Since we issued our last Assessment Report in April 2016 (the "Third Assessment Report"), DOJ representatives from both the Civil Rights Division and the United States Attorney's Office for the Eastern District of New York reviewed documents and materials provided by SCPD, including revised policies and procedures, copies of internal affairs investigations, a sample of entries in SCPD's community relations daily activity reporting system, and other reports completed during the time period covered by this report. We also met with SCPD officials, including Commissioner Timothy Sini, SCPD command staff and other supervisors, and SCPD officers, toured precincts and participated in ride-alongs with on-duty officers, attended training courses, and met with members of specialized units, including the Hate Crimes Unit, the Internal Affairs Bureau, and the Community Response Bureau. In addition, we solicited the views of the Suffolk County community, including the Latino community, both by interviewing community members about their specific experiences with SCPD and by meeting with community advocates. We also attended SCPD's quarterly meeting with advocates and members of the Latino community. In conducting these activities, we consulted with police practice experts with expertise in the areas of policing covered by the Settlement Agreement.

We thank the SCPD officials with whom we met during this assessment period, and we appreciate the cooperation and effort that SCPD and Suffolk County leadership continue to show in addressing the requirements of the Agreement. We also thank the many members of the Suffolk County community who have met with us and provide us with invaluable feedback.

This Assessment Report is divided into two sections. First, we provide a compliance rating for each provision of the Settlement Agreement. Second, we provide a more detailed analysis of SCPD's successes and challenges to date in each main area of the Agreement: 1) bias-free policing; 2) hate crimes and hate incidents; 3) language assistance; 4) allegations of police misconduct; and 5) community engagement.

As set forth in detail below, SCPD has made substantial progress in implementing the requirements of the Settlement Agreement during the previous rating period, particularly with respect to its Hate Crimes and Language Access training programs. In other areas, considerable work remains.

---

[1] This Agreement is available in both English and Spanish at https://www.justice.gov/crt/special-litigation-section-cases-and-matters0#police.

Over the coming year, we will focus our attention on the Department's efforts in the substantive areas of the Agreement with which the Department remains in partial compliance. We will, however, continue to assess the Department's work in the areas where it already has achieved substantial compliance, in order to ensure that the Department maintains its progress in those areas. In conducting our assessment work, we will continue to communicate with SCPD officers and command staff, both during regular phone calls and site visits. We also will continue to meet with community members, both during larger-scale community outreach meetings during our site visits and through ongoing meetings and communications with individual community members and representatives. We will publicly report on our observations of SCPD's implementation of the Agreement in the Spring and Fall of 2017.

## II. CURRENT COMPLIANCE RATINGS

Section IX of the Settlement Agreement provides that, every six months, the United States will assess and report on SCPD's compliance with the Agreement. *See* Agreement at 20. The compliance ratings below represent the United States' current assessment of SCPD's compliance with each area of the Agreement. While Section III of this Report provides more detailed analysis of SCPD's compliance with the Agreement, these ratings are included to provide SCPD and the Suffolk County community with a clear and accurate summary of progress to date, as well as areas that remain most in need of attention.

The definition of each rating type is as follows:

- "Substantial Compliance" indicates that the County has achieved compliance with most or all components of the relevant provisions of the Agreement.
- "Partial Compliance" indicates that the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains.
- "Non-Compliance" indicates that the County has not met most or all of the components of the Agreement.
- "Compliance Rating Pending" indicates that there is insufficient information to make an assessment or the provision is not yet ripe for evaluation.

| **Settlement Agreement Area** | **Status of Compliance** |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Substantial Compliance |
| c. Traffic Stop Data | Partial Compliance |

| | |
|---|---|
| d. Training | Compliance Rating Pending |
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Substantial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Partial Compliance |
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Noncompliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Partial Compliance |
| h. Community Survey | Partial Compliance |
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Partial Compliance |
| b. Investigation of Misconduct | Partial Compliance |
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement ("COPE") | Substantial Compliance |

| | |
|---|---|
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social media and notification systems | Substantial Compliance |
| VIII. POLICIES AND TRAINING GENERALLY | Partial Compliance |
| IX. MONITORING OF THE AGREEMENT | Partial Compliance |

## III. ANALYSIS OF SCPD'S COMPLIANCE TO DATE

### A. <u>BIAS-FREE POLICING</u>

| | |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Substantial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Compliance Rating Pending |

The Settlement Agreement contains specific provisions designed to ensure that SCPD delivers police services that are "equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Department." Agreement at 4. The Agreement requires that "members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, or sexual orientation, and in accordance with the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States." *Id.* Successful implementation of these provisions requires that the Department make bias-free policing a top priority and adopt training, supervision, data collection, and accountability mechanisms that ensure law enforcement duties are being performed free of impermissible bias. While the Department has made some advances in this area, we expect significant progress to be made in the coming months, particularly with respect to traffic stop data collection and bias-free training.

1. <u>Policies and Procedures</u>

SCPD has made considerable progress in adopting appropriate policies and procedures in this area but must continue to take steps to ensure that these policies and procedures are properly implemented.

A number of SCPD's policies set forth appropriate guidance for officers. For example, Rules & Procedures Chapter 1, Section 11 prohibits officers from "us[ing] race, ethnicity, national origin, age, gender, religion, sexual orientation, or gender identity when engaging in routine or spontaneous law enforcement activities, except when engaging in appropriate suspect-specific activity to identify a particular person or persons." The policy also emphasizes the importance of building community trust, and requires SCPD members who become aware of biased-based policing to immediately report the matter to a supervisor, who in turn must convey the information to Internal Affairs. SCPD policy also requires immediate referral of any complaint alleging discriminatory policing to the Internal Affairs Bureau. *See* Rules & Procedures Chapter 5, Section 2. Other policies and directives are well crafted to ensure that SCPD's hiring, promotion, and performance assessment practices promote bias-free policing. *See* Rules & Procedures Chapter 26, Section 1; Applicant Investigations Command General Order 15-01 (prohibiting the hiring of any candidate who "has committed any discriminatory act or . . . evinces a biased perspective based upon race, color, ethnicity, national origin, religion, or sexual orientation that indicates such candidate is not be able [sic] to perform the duties of police officer in a non-discriminatory manner."). The promulgation of these policies marks an important step towards ensuring bias-free policing.

In light of this significant progress, we have rated SCPD in "substantial compliance" with this requirement. Nonetheless, additional work is needed to ensure that these policies are adhered to in practice. Specifically, the implementation of these policies requires appropriate training, which has not yet been developed, and appropriate data collection measures to assess whether SCPD members are policing in a manner that complies with these policies, which also do not yet exist. As set forth below, these issues are specific areas of focus for SCPD in the next rating period.

Additionally, as we noted in our last report, we note here that it is likely that SCPD or the United States will identify needed modifications to policies that have already been adopted. We appreciate the Department's continued willingness to consider and adopt policy recommendations.

2. <u>Traffic Stop Data</u>

A key requirement of the Settlement Agreement is the collection of meaningful and accurate traffic stop data to be able to identify any potential bias in conducting those stops. *See* Agreement at 6. Meeting this requirement is critical, as ensuring that policing services are delivered in a manner free from bias requires the collection and analysis of accurate information regarding SCPD's practices.

As set forth in detail in our last Report, the data collected by SCPD omits critical variables that are necessary for meaningful analysis of bias-free policing. For example, SCPD does not collect any meaningful data regarding why a traffic stop was initiated. By enhancing SCPD's current data collection practices to include detailed information regarding why a stop was initiated, SCPD will be able to evaluate whether similar offenses result in similar outcomes independent of the race, ethnicity, or other protected characteristic of the driver or passenger, or are instead influenced by unlawful bias. As another example, while SCPD collects data regarding whether an officer conducts a search during a traffic stop, critical data regarding

conducted searches is omitted, including whether a particular search revealed contraband, or not. Without this data, SCPD is unable to assess whether there are disparities in search practices that suggest those practices are influenced by unlawful bias.

During this rating period, we met with representatives from SCPD's patrol division and information technology department to determine how these enhanced data points can be collected. The substantive recommendations that we made regarding data collection are consistent with the recommendations we made in a June 2015 letter to SCPD's counsel and within our last assessment report. During this meeting, SCPD also committed to a plan and timeline for developing appropriate data collection methods consistent with our recommendations. That plan involves transitioning from a computerized data terminal system developed by an outside vendor to a system developed within SCPD, which all allow SCPD to control the substantive fields included. Next, SCPD will ensure that those substantive fields capture data agreed upon by the parties, and will solicit input from officers regarding ways to make the data collection process more efficient and usable for officers. This plan will allow SCPD to begin collecting appropriate data early in 2017. We will continue to provide any assistance we can as the Department undertakes these efforts.

Expanding the range of data to be collected during traffic stops only has utility if officers consistently complete traffic stop data collection forms, and if supervisors regularly review the data that gets collected. SCPD has been successful in ensuring that officers record information in their mobile data terminals. Precinct supervisors have increased the attention placed on ensuring these reports are filled out completely. As a result, there has been a reduction in the proportion of traffic stop data that is left incomplete. As the new traffic stop data collection system gets implemented, these efforts to maintain the consistent collection of data must continue. Current efforts should be supplemented with quality assurance audits to confirm that officers are completing traffic stop data forms appropriately.

Once SCPD successfully implements enhanced data collection practices, SCPD must take meaningful steps to ensure that collected data is analyzed and that appropriate measures are taken when this analysis reveals problematic conduct. The Settlement Agreement requires that, at least annually, SCPD provide the United States with a report containing this analysis and a summary of the remedial measures taken, if any. Agreement at 6. Going forward, the United States will work with SCPD to ensure this provision is implemented appropriately.

Finally, we renew our recommendation that SCPD supervisors incorporate a substantive review of traffic stop data into their regular supervisory activities. In our last report, we recommended that SCPD provide updated training for supervisors, many of whom have not received supervisor-specific training since attaining the rank of sergeant. We will continue to work with SCPD to ensure that these or other measures are implemented to provide supervisors with the training needed for how to incorporate traffic stop analysis into their regular supervisory duties.

3. <u>Training</u>

Ensuring bias-free policing requires that officers receive effective training in how to conduct law enforcement activities in an equitable manner. The Settlement Agreement requires

that all sworn officers receive training on bias-free policing at least annually. *See* Agreement at 6-7. The Agreement provides that SCPD's training on bias-free policing "will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, is prohibited by policy and will subject officers to disciplinary action." *Id.* The Agreement also sets forth specific elements that must be incorporated into bias-free training. *Id.*

As explained in detail in our last Assessment Report, SCPD's revised bias-free policing training was both pedagogically and substantively deficient, and as a result, SCPD elected to suspend the delivery of its bias-free policing training until appropriate training—consistent with the requirements of the Agreement and best practices—could be developed. *See* Third Assessment Report at 9.

To assist SCPD, the Office of Justice Programs of the United States Department of Justice has agreed to provide SCPD with technical assistance in the form of training modules. Specifically, the Office of Justice Programs will provide SCPD with training programs on both procedural justice and bias-free policing. Further, SCPD has agreed on a training schedule that will allow all SCPD officers to complete *both* procedural justice and bias-free policing within an initial two-year period, with bias-free policing training recurring annually thereafter for all officers. This plan marks a significant commitment from SCPD to ensure that all SCPD officers police in a manner that is consistent with constitutional requirements and provides equal treatment to all community members.

We are hopeful that this training can begin within the next several months. The Office of Justice Programs is finalizing the training modules. Once those modules are finalized, SCPD will need to work with the Office of Justice Programs to ensure that the training modules are appropriately tailored to the specific rules and procedures of SCPD. Once that process is complete, SCPD can begin delivery of this critical training. Notably, since these modules are "train the trainer" models, SCPD will in the process be developing a capacity inside the Department to continue this training in the years to come.

We have been impressed by SCPD's commitment to bringing about this enhanced procedural justice and bias-free policing training, and we will continue to work with SCPD, including command staff and the training academy, to provide any assistance that we can. Going forward, we will assess whether SCPD is appropriately tailoring and delivering these training modules in a manner that is consistent with the terms of the Agreement. We will review training curricula, observe training sessions, and meet with SCPD trainers and officers completing the training to assess effectiveness. We will also continue to facilitate communication between SCPD and the Office of Justice Programs to help ensure this program is implemented in a timely fashion. With respect to data collection, in the immediate months we will review SCPD's proposed traffic stop data collection system to ensure that appropriate fields are included. We will also assess whether that revised system, once approved, is appropriately deployed, including whether officers are appropriately trained in how to use that system and whether supervisors are ensuring data is being collected consistently and accurately. To accomplish these objectives, we will continue to meet with officers, command staff, and others within the Department, including during on-site visits. And once accurate data is being collected, we will begin working with SCPD to ensure it is appropriately analyzed.

## B. HATE CRIMES AND HATE INCIDENTS

| | |
|---|---|
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Substantial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Partial Compliance |

SCPD has continued to make significant strides in the area of hate crimes and hate incidents. The Department successfully implemented many of the recommendations in our last Assessment Report, especially in the area of hate crimes training. *See* Third Assessment Report at 10-12. Thus, we find the Department in substantial compliance with the hate crimes training provision of the Agreement. While the Department has made marked improvements in the areas of hate crime tracking and quality assurance, it remains in partial compliance with those provisions of the Agreement for the reasons discussed below.

### 1. Training

SCPD has incorporated many of the recommendations that we had suggested in our last Assessment Report and has developed a training that uses an effective format and is substantively complete. The instructors have achieved the proper tone and adequately convey the purpose of hate crimes reporting and investigations: to protect community members who may be victims of crime on the basis of their membership in a protected class, to increase police legitimacy, and to send a message that hate crimes and hate incidents will not be tolerated.

The format for the hate crimes training that we observed in October 2016 was similar to the format for the previous training that we had observed in March 2016, which we had found to be very effective. Again, the course opened with a road-map, listed the objectives, and clearly detailed the topics to be covered. The introduction laid out the community policing philosophy behind the hate crimes training and the instructor incorporated a prepared lecture with slide and video presentations, small group discussions, and interactive role playing exercises. Overall, the format and delivery of content was very successful and students appeared genuinely engaged.

In our last Assessment Report, we raised concerns that that the hate crimes training lacked clarity regarding 1) the substance of the New York State Hate Crimes Statute, and 2) the process for determining whether an incident is a potential hate offense and its referral to Hate Crimes Unit (HCU). *See* Third Assessment Report at 10-12. SCPD has successfully addressed both of these issues. The instructor provided a clear and accurate explanation of the legal standard under New York State Hate Crimes Law, NYSPL § 485.05(1a), and also distributed an informational handout setting forth the law to the students. Most importantly, the instructor did a very good job of explaining the process by which an incident should be flagged as a potential

hate crime or hate incident and then referred to HCU for investigation. While the previous training presented conflicting messages about the level of discretion that officers have in referring incidents to HCU, the October 2016 training clearly laid out the requirement to notify a supervisor whenever there is an incident may have been motivated by hate.

2. <u>Tracking, Reporting, and Pattern Analyses</u>

The tracking and mapping of crime allows police departments to examine crime trends and identify crime patterns, and thus to reduce or prevent crime. To this end, it is paramount that the graphic representations of crime patterns be shared department-wide with command staff *and* line officers, as well as the community. During our visit, we learned that the monthly maps that HCU produces are sent to SCPD management but are not shared with line officers or published online. We suggest publishing or sharing the hate crimes maps department-wide so that officers can engage and contribute to the process of identifying and addressing hate crimes and hate incidents.

Currently, HCU produces the hate crimes map on a monthly basis, beginning in January of each calendar year and aggregating data as the year progresses. This results in a dearth of data at the beginning of the year and creates the potential for missing hate crime patterns when the slate is wiped clean each January. We suggest that the monthly maps incorporate data from the previous twelve-month period at a minimum so that potential patterns of hate crimes will be more apparent. Additionally, the current representation of hate crimes and hate incidents that have occurred at the same geolocation are layered, resulting in a visual under-representation of hate crimes. We recommend jittering the dots for hate crimes that have occurred at the same geolocation to provide users with more accurate visual depiction of the quantity of hate crimes or hate incidents.

In our last Assessment Report, we raised concerns about the information sharing, or lack thereof, between the Criminal Intelligence Unit (CIU) and the HCU. *See* Third Assessment Report at 13. In its July 2016 Compliance Report and during our October 2016 visit, the Department clarified that HCU is solely responsible for all hate crime tracking and mapping. *See* Fourth Compliance Report at 10-11. While we understand that HCU is the entity solely responsible for the hate crimes mapping, we continue to encourage the HCU and the CIU to work together and develop a regular system of information sharing. HCU should be comparing the hate crime and hate incident patterns against other crime patterns in Suffolk County as part of its analysis to determine if connections to other crime exist or if there are leads it can pursue.

Under the Agreement, the Department currently produces an annual report mapping and analyzing potential patterns and trends for all hate crimes and hate incidents. *See* Agreement at IV(b)(ii). In our meeting with HCU, we suggested producing the report on a bi-annual basis so that the information available is more recent. This would also allow potential patterns of hate crimes to be addressed in a more timely fashion. The HCU was receptive to this recommendation.

3. Quality Assurance[2]

SCPD's hate crime investigations policy aims to ensure the effective identification and investigation of hate crimes, and for SCPD members to provide assistance to victims of hate crimes. *See* SCPD Hate Crimes GO 16-43. This involves improving outreach and communication with community members. *See id*. Indeed, the HCU has reported that "[m]embers of the Hate Crimes Unit also continually educate Department personnel and community members on the mechanics of Hate Crimes laws and the importance of reporting and properly classifying incidents in order to ensure effective investigation and provision of counseling services to victims." SCPD, Hate Crimes Unit: 2015 Patterns and Trends Analysis.

At the same time, we encourage SCPD to enhance its efforts to educate and inform the community about hate crimes and the hate crimes investigation process. Doing so may help the HCU stay informed about potentially criminal activity. Additionally, while SCPD is limited in what it can do when acts do not rise to the level of a hate crime or hate incident, we recommend that SCPD encourage people who have been subject to such threats to continue to register them with the Department. HCU detectives told us about a recent assault on an African-American woman that had been charged as a hate crime. The victim had called SCPD a year-and-a-half earlier, when the same perpetrator had threatened her and used racial slurs against her. At the time, HCU could not investigate the incident as a potential hate crime because it did not meet the legal standard for a hate crime or hate incident. In this instance, detectives learned that the victim had experienced several encounters in which the perpetrator had threatened her or her family members in the time between her first call to SCPD in April 2015 and the stabbing in October 2016. However, the victim did not report these incidents to SCPD and detectives were not able to monitor the interactions.

The Department has met the requirement of conducting random audits of its hate crimes investigations every six months. We agree with the Department that it continues to be in partial compliance with this provision of the Agreement. *See* Fourth Compliance Report at 11. While the report provides summaries of the investigations audited, it does not provide any analysis of the quality of the investigations or "any corrective actions planned or taken as a result of the audits" as required under the Agreement. *See* Agreement at 11.

In our last Assessment Report, we had recommended that SCPD revise its outreach signs that solicit tips about hate crimes to specifically inform the public about hate crimes and hate crime reporting. *See* Third Assessment Report at 13-14. The HCU provided us with the proposed language for the sign during our October 2016 visit, which we will review and provide feedback on.

We look forward to working with SCPD as it makes progress toward substantial compliance in the hate crimes areas that remain in partial compliance—tracking and reporting

---

[2] In its July 2016 Compliance Report, SCPD states that our Second Assessment Report found the Department to be in substantial compliance with the quality assurance provision of the hate crimes section of the Agreement. *See* SCPD Fourth Compliance Report 11. However, the Department was found to be in partial compliance, not substantial compliance, with this provision in our June 26, 2015 Assessment. *See* Second Assessment Report 7, *available at* https://www.justice.gov/crt/file/706761/download.

and quality assurance. To help the Department meet the requirements of the Agreement we will review HCU's monthly maps and provide feedback. We expect by incorporating the recommendations we have made regarding these maps, SCPD will be able to better analyze patterns of potential hate crimes or hate incidents in Suffolk County. Likewise, we will collaborate with HCU to improve its random audits so that they can better capture the scope of the investigations, and identify gaps and corrective action to address those gaps. DOJ will follow-up with SCPD to schedule bi-monthly strategy meetings to achieve these goals. We will also continue to meet with HCU representatives on-site to continue to monitor implementation of the Agreement.

## C. LANGUAGE ASSISTANCE

| | |
|---|---|
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Noncompliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Partial Compliance |
| h. Community Survey | Partial Compliance |

One of the cornerstone elements of the Agreement is the requirement that SCPD develop a robust Language Assistance program, to ensure that police officers and others in the Department are able to communicate effectively with individuals in the community who have Limited English Proficiency ("LEP"). *See* Agreement at 8-11. Such communication is vital for ensuring that SCPD provides LEP crime victims appropriate police services, effectively investigates crimes occurring in the county, and protects the civil and constitutional rights of LEP individuals who are arrested or otherwise charged with criminal conduct. More broadly, this communication is vital for ensuring that the Department is held accountable for serving all members of the community, including LEP individuals and others who are particularly vulnerable to victimization or marginalization in the criminal justice system.

As noted below, although SCPD has written a comprehensive policy on language access, that policy is not yet being properly implemented. While there is a greater awareness of the Department's commitment to language access, there is not yet an agency-wide commitment to providing language assistance whenever it is needed. We hope and expect that this will improve

with enhancements to the Language Access training program and as more Department personnel receive the training, along with improved review and enforcement of language assistance in the field.

1. <u>Language Access Policy</u>

SCPD has made developed and formalized appropriate policies and practices with respect to LEP individuals over the last two and a half years. It now has in place a strong, integrated Language Access Plan ("LAP"). Rules & Procedures Chapter 26, Section 5. However, one important policy change was identified during this visit. The LAP Section VI.C.4. a-c currently authorizes only Department Authorized Interpreters (DAI)--and not qualified bilingual employees who have demonstrated through testing sufficient proficiency in a non-English language--to take LEP suspect, victim, witness, and complainant statements. This reduces significantly the pool of approved individuals who can take such statements. Concededly, there is an important distinction between the skills required for interpretation and bilingualism. It is preferable to use DAIs wherever possible. However, bilingual fluency can be sufficient in certain circumstances, such as taking witness statements in non-custodial settings, which should be clearly delineated and set forth in policy.

Further, as noted in the last memo, while the LAP is helpful in its detail, we recommended that SCPD prepare at least one distilled version of the policy, one to two pages long, to assist members of service, particularly line officers, to understand and effectively implement the policy. During this tour, we reviewed a few draft versions of the policy. However, they were not accurately targeted at the officer. With some revisions, the current draft could be useful for the public, as it summarizes the main points of the requirements of the Agreement with respect to Language Access. What officers need is different; they need a summary of the LAP that hones in on the key operational aspects of language access, as it relates to their roles in the field, at precinct desks, during interviews, etc. A summary that fits inside officers' memo books will ensure that the LAP is as accessible as other written resources. The summary document for the community could come in a number of different forms, including one for the community. Every member of Suffolk County's LEP community should know that s/he could communicate with the police department in their primary (best) language. And they should be able to request this during any interaction without pushback.

The LAP has been appropriately translated into Spanish and the other priority languages. SCPD has consistently distributed the Spanish version of the LAP at SCPD facilities and maintains a copy on its website in five of the priority languages. However, it appears that there may be different versions of the LAP depending on the language, on the website. The current English version is dated 5/13/16, while the Spanish, Chinese, Italian and Portuguese, versions are dated 4/12/2015. The Haitian Creole version is dated 12/4/2015, and the Polish version was dated Kwietnia 12 (April 12), 2015. During our tour, it did appear that desk officers were aware of the LAP and it was available in English and Spanish for visitors to the precinct to review and take.

It is unclear if community stakeholders have reviewed policies translated into languages other than Spanish to ensure that the translations are appropriate for local linguistic communities. We see that the LAP was translated into Simplified Chinese, to match the linguistic

demographics of the local Chinese population, but the Complaint/Compliment form (PDCS 1300-1a) is in Traditional Chinese online. We recommend that the SCPD develop its own network of multi-lingual advisors to ensure that everything that is translated is written in plain language and matches the predominant languages in the county. As noted in the last memo, we continue to encourage the Department to widen its distribution of the LAP.

2. <u>Training</u>

We had the opportunity to sit in on the four-hour language access training, including a segment on cultural competency. We also shared substantive feedback with the trainers immediately following the training. Below, we highlight elements of that feedback, along with a few additional points.

The language access training we observed was clearly the strongest we have seen to date; there were some excellent components. Specifically, the content and presentation of the first third of the training was the strongest. There was excellent use of small groups and large group discussion and the officers attending the training appeared to be engaged and interested in the content. The remaining two-thirds of the training effectively covered the most important aspects of language access. However, it lacked the group engagement and optimal application of adult learning best practices. It was predominantly a mix of lecture and videos. While the use of videos was mostly effective, there were many opportunities for further engaging the group, through large group discussions and small group exercises, role plays, scenario-based discussions, and case reviews. These techniques can help leverage the participants' relevant prior experiences and the real-world applications of language access in the SCPD.

The training on how and when to employ bilingual officers and Department Authorized Interpreters (DAIs) can be further strengthened. The flow chart on "Engaging an LEP Individual" should be revised so that officers can get a clear understanding of the options and decisions to make in such situations. Pedagogically, instructors should engage students in discussion and brainstorming about the importance of and adjustments in thinking required by encountering LEP individuals, the reasons for the new procedures, and understanding why, for example, the Department should no longer use children as interpreters.

Further, we have concerns about SCPD relying on limited Spanish-language training for SCPD officers as a means of providing meaningful language access for the Spanish-speaking LEP community. This training is inadequate as a means of equipping officers to effectively communicate with Spanish-speaking LEP individuals, even for emergency situations. To the extent that SCPD wishes to assist officers who would like to learn Spanish, we recommend that such Spanish-language training be separate from any language access training and that SCPD view it as distinct from its implementation of the language access provisions of the Agreement. Further, in order to maximize the potential impact of language training on SCPD's ability to effectively serve the Spanish-speaking LEP community, we recommend that any Spanish-language training for SCPD officers be tailored to help officers who already have a strong foundation improve to the point where they can pass the bilingual exam.

Trainers discussed the Language Assistance Tracking forms appropriately and in sufficient detail during the training. Trainers also explained the purpose and process of these

forms in detail. This aspect of the training could have been strengthened further if participants were given copies of all of the relevant screen shots of the CAD shown on the PowerPoint. Likewise, it was quite effective to ask participants to complete the tracking forms for the two situations they analyzed in the training; instead of the teacher reading off the answers, the students should be called on to share their answers for each of the fields. Once it is finalized the instructors should review a distilled version of the LAP at the end of the program as a final takeaway, rather than just referencing the LAP.

Finally, we note the language access instruction preceded the hate crimes training. This pairing works well, particularly if one of the scenarios in the language access training is about a hate crime case and the hate crime training discusses how to overcome language barriers in hate crimes identification and investigations.

3. Implementation of LAP in the Field

As more officers and supervisors are trained in Language Assistance, we expect the use of Language Assistance tools, including DAIs and Language Line, to become more widespread. At present, however, officers appear to continue to lack recognition of the need for use of language access services. Supervisors need to act as agents of these changes and take ownership of this much-needed culture change in the Department.

Officers still appear to be improperly relying upon bystanders and children for language assistance. During this visit, we heard first-hand that some officers continue to use bystanders and children and do not understand why they should not continue to do so. This attitude is elucidated by the analysis performed by the SCPD of Lima calls (any call that a 911 dispatcher receives for which language assistance is indicated is assigned a "Lima" code) where officers ultimately determined that no language assistance was required. SCPD reviewed 144 Lima calls where officers determined no language assistance was required on site. Only four of those calls were properly closed without language assistance, however, indicating that officers require considerably more understanding of the requirements regarding use of language assistance services.

One other way of increasing use of language assistance services is for the Communications Section to inform LEP individuals who call 911 that they are entitled to an interpreter at no cost if they cannot communicate with the police officer due to a language barrier. Educating LEP individuals of their rights can help ensure that Suffolk residents get the police services they deserve.

We also heard complaints from officers who experienced problems with Language Line. Specifically, officers told us that they had not always received appropriate assistance. One officer recounted a situation where he requested a Mandarin Chinese speaking interpreter and was repeatedly connected to interpreters who spoke Spanish. Language Line audits by IAB also revealed that three out of 19 calls reviewed were disconnected. While the information currently gathered during these audits is useful, the overall monitoring and quality assurance of Language Line that IAB conducts requires significant improvement. These audits should include a broader range of information, such as the duration of each call before connection to Language Line, and whether or not an effort was made to explain that the caller would be put on hold. IAB also

contacts members of the public and other reviews of Lima calls. However, this work is performed by just one Captain and one Sergeant in IAB. Because of their other extensive duties, their ability to conduct the reviews and audits is limited. Supervisory Detectives are not needed to conduct much of this work; we recommend utilizing civilian staff or a dedicated line officer for much of this work.

4. Implementation of Language Assistance in the 911 Call Center

As noted above, the Communications Section has developed excellent systems to identify and respond to calls it receives from LEP individuals. In addition to employing bilingual operators, all operators have instant access to Language Line, and reported using it frequently. To date, a total of 10 dispatchers have been tested and certified as bilingual employees.

As noted above, SCPD's analysis of Language Access Tracking data revealed that the dispatchers' assessment of language assistance needs was highly accurate. The Department should consider if it would be prudent to make a policy decision that all calls with a Lima designation automatically receive a bilingual, DAI, or Language Line assignment. Another recommendation is that all dispatchers end their communication with an LEP caller with a statement that the caller can at any time request an interpreter during their interaction with the responding police officers, and an interpreter will be provided, free of charge.

5. Tracking Use of Language Access Assistance

It has now been more than six months since SCPD implemented a Language Assistance dispatch and tracking program using the CAD system in patrol cars. Any call that a 911 dispatcher receives for which language assistance is indicated is assigned a "Lima" code. Before an officer is able to close out a call with a Lima designation, the officer must complete a Language Assistance Tracking form in the CAD system that indicates, among other things, what language assistance, if any, was provided on the call. As noted in our last memo, the forms provide valuable information to the Department on compliance with the policy, gaps in service, and other emerging needs.

However, as noted above, implementation of the Lima program is poor. In a September 2016 audit, SCPD reviewed 144 incoming Lima 911 calls received in a thirty-day period between June and July for which officers indicated no language assistance was needed in the field because "the victim/complainant spoke sufficient English to communicate." The audit showed that of the 144 instances, individuals in the field requested an interpreter 94 times, while 36 were unable to communicate with officers.[3] This is of significant concern; officers must become more aware of the need to use language access services. Further, more robust analysis is needed to understand why officers decline to use language access services so frequently.

[3] The status of the other 10 calls is unclear.

6. Qualification of DAIs and Bilingual Officers

We understand that a total of 34 staff members have been deemed qualified bilingual employees, that three staff have been deemed DAIs, and that there is a long list of staff who are waiting testing and qualification. There was a hold placed on subsequent training in the summer due to budget and contractual issues; we were told that very recently, a total of $25,000 has been identified and allocated for future training and a sole source contract was signed with Language Line Services in early October.

We received considerable feedback from personnel who had both passed the bilingual exam and not passed the DAI exam. Both tests need to be better tailored to fit the unique realities of law enforcement. From our conversations with test takers, the bilingual test lacks sufficient policing or criminal justice-related content. Multiple test takers reported having to answer questions about politics (e.g., the election, climate change), anthropology, and other topics that appeared to be completely irrelevant and needlessly difficult to speak about. Instead, for example, test takers could be asked to give descriptions of people – skin color, clothing, height, weight or explain the direction of flight of a suspect.

Similarly, the DAI test needs to be adapted to the types of interactions that police officers engage in. We have been told that the DAI appears to be oriented towards court interpreters, who are required to memorize and repeat large chunks of information without being able to stop speakers or ask them to repeat themselves or slow down. It does not account for the level of control and flow of police-community conversations.

Finally, we recommend that SCPD hold preparatory sessions for individuals taking the bilingual or DAI test. Test takers should be briefed on the process of the testing (which requires quick responses and interaction with the phone and can benefit from ready access to a pen and paper) and the purpose and process of each type of test. All test takers should be accommodated in a quiet room for taking the test. The SCPD could also request that the Language Line testers allow all test takers to do a practice question before commencing the graded portion of the test.

7. Incentives for Officers to Become DAIs and Bilingual Officers

The Department has yet to determine what incentives it will offer to officers to become DAIs and bilingual officers. This must be addressed as soon as possible. Further, we were told that a bilingual officer who assists a non-bilingual officer becomes the primary officer on the case and becomes responsible for the call and all of the associated paperwork. This acts as a disincentive to officers to become qualified as bilingual. As we recommended during the visit, elimination of this disincentive is relatively straightforward; the bilingual officer should be required only to complete a supplemental report just as any secondary responding officer would.

8. Translation of Critical Documents

SCPD has translated many critical documents, including, importantly, the complaint/compliment form, into Spanish, Haitian Creole, Italian, Polish, and Portuguese. The critical documents translated into Chinese are divided between those that are available in Traditional Chinese and those available in Simplified Chinese. The documents on the website

available in Simplified Chinese include the following: How to obtain a police report, PDCS-8100j; Crime Victim Information Report, PDCS-8105b; and What to Do when Stopped by Police PDCS-7148b. The documents online in Traditional Chinese include the Missing Persons Guidelines, the Special Needs/Silver Alert PDCS-8060d, Family Offense Assistance and Court Procedures PDCS-7109p, and Mental Health Assistance, PDCS-7146c, Compliment Complaint form, PDCS-1300-1a; these have not yet been posted on the website with Simplified Chinese translations.

The Department is still in the process of developing online submission capability for complaints/compliments, as well as the translation of the complaint/compliment form into other non-English languages, as appropriate. However, review of SCPD's website provides no evidence of the complaint/compliment phone line on the "contact us" page, and the line is not mentioned on the "Información en Español" page (the number for the community response bureau is provided). This could be one reason that SCPD reports that it has received so few pieces of correspondence in a language other than English.

It does not appear that the SCPD has assessed any possible barriers to receiving correspondence in languages other than English, and/or developed strategies to effectively overcome them. There may be a need to publicize that the Department will accept correspondence in languages other than English and that it will translate the written communications. Indeed, community advocates reiterated to us their view that the broader public is not aware of this complaint line. Likewise, the Spanish version of the complaint/compliment form does not have a note that the phone operators speak Spanish or any other language.

We repeat our recommendation that SCPD add a header or footer to all translated documents identifying (in English) the foreign language in which the document has been translated and the date of the last update to the translation. The "Missing Persons Guidelines" document on the website does have a header listing the language, but it does not include a date. The best practice of including a date makes it easy for officers to access appropriate translations of forms and documents and ensure up-to-date information is available to the public. In addition to identifying potential different versions of the LAP by language (as noted above), we identified two different versions of the English version of the community survey available in one of the precincts. Going forward, our expectation is that use of Language Access Services, including Language Line, will increase. This will occur so long as training continues to strengthen and officers develop a better understanding of the need to use appropriate language access services, rather than bystanders or family members. SCPD needs to immediately develop firm incentives for officers to become DAIs and/or qualified bilingual members so that the number of such staff available to provide interpretation services grows. Enhanced auditing and review of Lima calls will also be required, to ensure that language access services are in fact provided properly.

Over the coming year, we expect to continue to observe and offer support and recommendations for enhancing the language access training program. We also anticipate conducting additional interviews with officers in the field, during ride-alongs and in meetings, regarding their understanding of language access protocols and their experiences in using language access services. We will also review data regarding the use of language access

services. Finally, we will continue to meet with community representatives to learn of their experiences in receiving language access services in interactions with SCPD members.

D. <u>ALLEGATIONS OF POLICE MISCONDUCT</u>

| | |
|---|---|
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Partial Compliance |
| b. Investigation of Misconduct | Partial Compliance |

As we discussed in our April 2016 report, SCPD has made significant reforms to the organizational structure of its Internal Affairs Bureau ("IAB") over the past year, and the Police Commissioner, other SCPD leadership, and the new command staff at IAB have made it a priority to enhance the stature of the IAB and to tackle the backlog of unresolved IAB investigations. We welcome these changes and already have observed the positive impact they are having on the timeliness and effectiveness of SCPD's internal investigations; we also recognize that the Department has achieved a substantial reduction in the backlog of unresolved investigations. In addition, we were encouraged to learn that the IAB has adopted practices to improve and increase its communication with individuals submitting complaints. These measures remain relatively new, informal, and largely unknown to the public, however; thus we will continue to monitor the Department's progress in implementing these procedures and, as discussed further below, recommend that the Department take steps to clarify and formalize these procedures both within the IAB and to the public. Going forward, we also will consider the impact of the changes to the IAB's organizational structure and the extent to which the IAB is able to continue reducing the backlog of unresolved IAB investigations while still improving the timeliness and effectiveness of its handling of new investigations. We describe SCPD's areas of improvement and our outstanding concerns in more detail below.

1. <u>Reporting Misconduct</u>

In our April 2016 report, we urged SCPD to increase and improve its communication with complainants outside the Department, in particular, by increasing and improving the information provided to complainants about the progress and resolution of the investigations of their complaints. We are encouraged that the Department appears to have considered and acted upon that recommendation. Since the time of our last report, the IAB command staff has proposed time frames for when to contact complainants in writing to confirm receipt of their complaint, when to interview complainants following the receipt of their complaint, and at what points throughout the life cycle of an investigation to provide complainants with written updates about the status of the investigation. These are important and welcome changes, and we expect that they will both increase the community's confidence in SCPD and the effectiveness of the IAB's investigations.

Based on our review of recently closed internal affairs investigations, interviews with IAB personnel, and input from members of the community, however, it is our impression that these procedures are not yet being consistently understood or applied by the IAB, and also that

the public is not yet aware of these procedures. For example, of the three most recently closed internal affairs investigations, all of which were opened within the first half of 2016 and completed in October 2016, only one of the case files included a copy of the "acknowledgement of complaint" letter that is supposed to be sent to complainants within 24 hours of the receipt of a complaint. (In that case, the acknowledgment letter was in fact sent to the complainant on June 24, 2016, the very same day the complaint was received by the IAB.) In the other two cases, the file did not include a copy of the "acknowledgment of complaint" letter or any other indication of correspondence or communication with the complainant, whether about the receipt of the complaint, updates about the status of the investigation, or even about the final outcome of the investigation. Thus, either it is not yet a standard part of IAB's practice to send a letter to complainants within 24 hours of receiving a complaint or to correspond with them at regular intervals throughout the investigation, or such communication is not currently reflected in SCPD's internal affairs investigative case files and is therefore unable to be tracked and verified by IAB supervisors. Similarly, in our interviews with IAB personnel, we heard considerable variation in their descriptions of when and how they would contact complainants, and also about how they knew about the newly instituted procedures and timelines for communication with complainants. We heard, for example, that guidance about the new procedures had been provided to them by e-mail and by verbal instructions from their supervisors. In addition, it appeared to depend somewhat on individual investigator's practice as to how and when they would communicate with complainants. Whereas some personnel reported relying on an automated system to alert them that it was time to send out a letter to complainants, one investigator described to us his personal practice of communicating with complainants well before the deadlines described in the new IAB procedures. In addition, our feedback from community advocates and individuals indicates that the public either has no information, or has misinformation, about when to expect to hear from SCPD about investigations of their complaints. Based upon this information, we find that there is inconsistency, both internally and in the public's understanding, regarding SCPD's practices and procedures for communicating with complainants about internal affairs investigations.

With that in mind, we strongly recommend that SCPD formalize its new procedures and timelines for communication with complainants about internal affairs investigations. We specifically recommend memorializing these procedures in SCPD policy or standard operating procedures. We also recommend clearly assigning responsibility to appropriate personnel, for example to case managers and to supervisors, for ensuring that notifications are sent out to complainants in accordance with these procedures and timelines. In so doing, we also recommend that SCPD continue to assess whether the interim timelines for communication with complainants are the correct ones. We have some concern, for example, that the current proposal may focus too intensely on making contact with the complainant in the short term after initial receipt of a complaint, but then allow too much time to pass between the required periodic updates to complainants about the status of the investigation. Allowing too much time to lapse between investigators' contacts with complainants may compromise the complainant's, and the public's, confidence in the investigative process, and also risk having the investigator lose contact with the complainant altogether. Finally, especially if the IAB continues to rely on its current proposed timelines, we would urge investigators to consider these timelines as the outside limit for when to contact complainants, as opposed to waiting until the end of the required time period, or until investigators receive an alert from an automated system, to prompt them to contact a complainant.

In addition, we strongly recommend that SCPD take steps to inform the public about its procedures and timelines for communication with complainants. For instance, this information could be easily, but effectively, included in the "acknowledgment of complaint" letter sent to complainants and on the SCPD website, as well as in the various brief handouts and pamphlets that the SCPD has been distributing at its community outreach events. We believe this could go a long way toward better informing the public and thus increasing the public's confidence in the integrity of SCPD's internal affairs investigations and of the department overall.

Along these same lines, SCPD still has not made clear to the community the specifics regarding SCPD's policies and procedures for taking complaints submitted by third parties. In our April 2016 report, we noted that individuals and advocates had reported encountering problems with submitting third party complaints. Since that time, we were encouraged to hear, consistently, from SCPD officers and command staff that SCPD and the IAB are committed to treating complaints from third parties in the same manner as a complaint submitted directly by the affected individual. We remain concerned, however, that this message is not being transmitted effectively to the public. Moreover, we heard a related concern from the community that advocates are not being permitted to accompany complainants in their interviews by IAB investigators; and, in our meetings with SCPD leadership, they confirmed that the IAB practice has been not to permit complainants to be accompanied by advocates in their interviews. In light of these concerns, we recommend that SCPD make plain to the public that complaints submitted to the IAB by third parties will be received and treated in the same manner as any other complaint. We also recommend that the IAB seriously consider altering its practice to allow complainants to be accompanied by advocates in their interviews and other meetings with IAB, to the extent that complainants wish to have such advocate participation.

In addition, we renew our recommendation, discussed in more detail in our April 2016 report, that SCPD and IAB continue to develop and expand upon their work measuring and assessing trends in their internal affairs investigations. Although we acknowledge that SCPD has started to identify and assess trends in its internal investigations, SCPD needs to continue to develop and expand upon this assessment, for example by looking at trends over a longer time period than it has done to date and, importantly, by measuring and analyzing the time periods between different stages in the life cycle of an internal affairs investigation. In our meetings with IAB personnel and leadership, for example, it appeared that IAB could not easily give us information about the average period of time for resolving current investigations, or about how the length of time needed to resolve an investigation compared across recent years. Similarly, it does not appear that IAB personnel or leadership gleans any useful information, or develops any recommendations for changes in practice, from the analysis it does perform of trends in their internal affairs investigations. We would stress that, rather than viewing this type of analysis as a requirement that the Department must undertake in order to meet its obligations under the Agreement, it should use this analysis to support the Department's consideration of the effectiveness of their investigations and law enforcement procedures, overall.

2. Investigating Misconduct

SCPD has made significant reforms to the organizational structure of its IAB within the past year, with the expressed aim of enhancing the stature and credibility of the IAB within

SCPD and in the community, as well as improving the efficacy and timeliness of its investigations. For example, as discussed in our April 2016 report, the IAB has added more and higher-ranking officers to its command structure, and reconstituted the IAB so that it is now composed of three teams of six investigators, each of which is led by a captain. In addition to these changes, the IAB has instituted critical incident review teams so that the IAB is involved in the first response to critical incidents such as officer-involved shootings. Although it remains too early to determine the long-term effects of this restructuring, it appears that these changes are having an extremely positive impact on the IAB. It is clear that the IAB has brought in some very experienced and accomplished investigators; for example, we met and interviewed investigators who were recently recruited for the IAB from other departments in SCPD and who had extensive experience with both investigating and supervising criminal investigations. In addition, the new command staff in the IAB has expressed to us a serious commitment to reducing the backlog of unresolved cases and to improving the timeliness of ongoing investigations, and it appears that they already are having success in achieving those goals. We note, for example, that the three most recently closed internal affairs investigations all were closed between five and nine months after receipt of the initial complaint; this is a time line which can be improved upon but which nonetheless is shorter than that of similar cases handled by the Department in the past. In addition, SCPD command staff reported that, at the time of our most recent site visit in October 2016, they had completed 211 internal affairs investigations for the year to date; this compares to a total of 130 internal affairs investigations completed in 2015, and 65 internal affairs investigations completed in 2014. Moreover, of the 211 internal affairs investigations SCPD had completed by October 2016, only 26 were investigations that were opened in 2016; thus it is apparent that SCPD has been devoting substantial resources to completing older investigations. We also heard from both IAB command staff and investigators that they are having more frequent and more substantive communication with one another about supervisory review of investigations. Moreover, the development of the critical incident review team gives legitimacy to the IAB and better integrates the IAB with the operations of the rest of the department. Finally, based on our review of recently completed internal affairs investigations, it does appear that current investigations involve a more thorough review than those in the past. Overall, we believe that the recent changes in the IAB structure and personnel are ones that were needed in IAB and that will continue to improve both the quality and the timeliness of the IAB's investigations.

Nonetheless, SCPD continues to face a significant backlog of unresolved cases, and continuing to reduce this backlog while keeping up with open investigations and newly received complaints will remain a significant challenge. To that end, we would renew our recommendation that IAB develop concrete plans for how to prevent a backlog from developing in the future. As we have in our past Assessment Reports, we recommend, for example, that IAB develop interim timelines for the progress of an investigation and institute a way of measuring their adherence to those timelines. Similarly, we recommend that the new IAB command staff develop and implement case management guidelines, for example, to guide investigating officers in determining how to allocate their time between the investigations they are handling. In addition, as discussed above, we recommend that the IAB develop and implement a method for tracking the progress of their investigations. Without the development and implementation of measures to compile and track such information, we are concerned that IAB will not be able to complete and sustain the considerable work it has undertaken in reducing the backlog of its unresolved investigations.

In the next year, we will continue to assess SCPD's implementation of the Agreement's requirements relating to the Department's handling of allegations of police misconduct by, for example, reviewing the case files of internal affairs investigations as these investigations are closed, meeting with IAB command staff and investigators, both during our periodic site visits and during conference calls with IAB command staff and SCPD legal counsel, and seeking input from community representatives, both through community forums held during our site visits and through more individualized meetings and communications with community representatives and organizations throughout the year. Consistent with our practice during the investigation and our oversight of the Agreement, we will be joined by and will consult with subject matter experts in police accountability in conducting our site visits and in developing our assessments and recommendations.

E. COMMUNITY ENGAGEMENT

| | |
|---|---|
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement ("COPE") | Substantial Compliance |
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social media and notification systems | Substantial Compliance |

Over this past reporting period, SCPD, and in particular, its Community Liaison Officers ("CLO"), Community Oriented Policing Enforcement ("COPE") officers, and the command staff in its Community Response Bureau ("CRB"), continued to devote substantial time and energy into its community engagement programs. In particular, we were impressed with the extent to which Police Commissioner Timothy Sini, Lieutenant Matthew O'Malley, and Sergeant Kathleen Kenneally participated in community meetings, and we believe that their personal involvement communicates to the Department and to the community the importance that SCPD is assigning to engaging with the community. We also were impressed with the array of activities that the CLO and COPE officers planned and executed over the summer months, including expanding its popular soccer and team sports programs for youth, and with the clear energy and personal commitment that these officers bring to their work. Substantial compliance was maintained in the areas of the Agreement directly relating to these officers' work. Finally, we were encouraged to learn that SCPD had organized community forums in response to recent

officer-involved shootings of African-Americans in cities like Baton Rouge, Louisiana and St. Paul, Minnesota, specifically to address questions and concerns from the public about biased policing.

These efforts notwithstanding, we continue to have concerns about the effectiveness of SCPD's implementation of the community engagement provisions of the Agreement. In particular, we recommend that SCPD continue making efforts to better integrate its COPE officers with its CRB and COPE officers, and also to involve *all* of its officers, and not only those formally involved in community engagement, in community policing. In addition, we recommend that SCPD make efforts to be more proactive and thoughtful in seeking to engage less traditional partners and the more underserved parts of the Suffolk County community in its community engagement programs, and also in seeking to address the current informational needs and concerns of the community in its outreach efforts. We describe SCPD's areas of improvement and our outstanding concerns in more detail below.

1. <u>Maintaining Community Relationships and Community Outreach</u>

As we noted above, we recognize Police Commissioner Sini and the leadership of SCPD's CRB, including Lieutenant O'Malley and Sergeant Kenneally, for their stated commitment to making community engagement a priority for SCPD. We also commend SCPD for making that commitment clear through regularly meeting in person with representatives of the community, including leaders of advocacy groups and service providers working with the Latino community in Suffolk County. It does appear that these meetings are helping to make SCPD leadership and the Department, in general, more accessible to the community.

SCPD still needs to think beyond its established community engagement events when conceiving of how to adopt a community policing model throughout its Department. The Department needs to be more proactive and thoughtful in planning its outreach, both in order to reach segments of the community with which it still has not made sufficient inroads and, importantly, to assuage the community's concerns and provide needed information about current criminal justice issues affecting Suffolk County. As an example, we were impressed with the manner in which SCPD handled a political campaign rally some months ago; it reflected significant coordination between different parts of the Department, advance outreach to community organizations that SCPD anticipated would be affected by the rally and potential protests, and advance plans to have a heightened officer presence in the area. By contrast, we heard from Latino advocates and individuals in the community that they are extremely fearful about a string of recent abductions and murders of Latina girls, and that this anxiety is exacerbated by a lack of clarity or information about SCPD's policies and practices for taking and responding to reports of missing persons. We would urge SCPD to respond to these concerns by taking proactive steps to reach out to potentially affected communities, and by dedicating officer resources to making people feel informed and protected in the wake of these crimes. Similarly, we would urge SCPD to continue to hold community forums like the ones that it organized in response to the national concerns about officer-involved shootings and racial profiling, either about these issues or about other criminal justice issues that arise and seem pressing to the communities served by the Department.

In addition, SCPD appears to be facing some challenges implementing some of the more innovative ideas that it had proposed to improve its community engagement efforts. For example, SCPD's plans for revising and implementing a survey of the community appear to have not yet been implemented. We urge SCPD to either resolve the financial and logistical disputes that appear to have caused this impasse, or to seek out a reasonable alternative for conducting and analyzing such a community survey. As we have expressed in our past reports, the community survey, and analysis of the survey results, should serve as a key data point for SCPD in determining how to improve its community engagement programs.

Moreover, we found that SCPD is still not using its community relations daily activity reporting system in a consistent or effective way. It seemed to us that the officers who are intended to use this system to report on their activities did not have the same understanding of what the current capabilities of the system are as was described to us by CRB leadership; for example, we heard both that a feature for recording community contacts had been developed as a mock-up simply for the purpose of showing it to DOJ during our site visit, and then, in a separate meeting with SCPD leadership, that the program was operational and should be being used by all COPE and CLO officers. Having a consistent and accurate means of tracking officers' community engagement work, and of keeping information on community contacts developed at the precinct and CRB levels, is an essential, but still lacking, component of developing an effective community engagement program.

2. Community Liaison Officers, Community Oriented Policing Enforcement, and the Community Response Bureau

Although we recognize that CLO and COPE officers are working well together at the precinct level, we continue to think that SCPD would benefit from improving communication between CLO and COPE officers across different precincts and from having better and more regular communication not just between CLO and leadership in CRB, but also COPE and CRB. To begin with, as we have expressed in past reports, improving communication across precincts should allow them to share with one another useful information about the successes and challenges of their own community engagement programs. Moreover, based on our interviews with CLO and COPE officers, we have the impression that these officers largely perceive of their roles as distinct: the CLO officers are responsible for implementing the community engagement and public relations strategies set by SCPD leadership, while the COPE officers are responsible for attending and participating in the day-to-day activities in their precinct – the list of which is largely unchanging and determined by invitations from local organizations or individuals. This perception is not consistent either with the expressed intention of leadership in the CRB or, we believe, with effective implementation of a coordinated community engagement program. We recommend that SCPD, and in particular, the CRB take steps to improve the communication and collaboration of the COPE officers with their leadership in CRB. For example, COPE officers might be invited to and participate once a month in the weekly meetings between the CLO officers and the CRB. Similarly, it may be useful to hold quarterly meetings including the CLO and COPE officers, the CRB, and the Deputy Police Commissioner, either at SCPD headquarters or at locations rotating among the various precincts.

In addition, we renew our recommendation, expressed in our April 2016 report, that SCPD take affirmative steps to involve the entire Department – and not only its COPE and CLO

officers – in community policing. It is essential that community engagement be perceived as relevant to, and part of the responsibility of, *all* police officers and command staff in SCPD—and it is the responsibility of SCPD leadership and command staff to take concrete, affirmative steps to get patrol and investigative units involved in community engagement programs. For example, SCPD should encourage patrol officers to attend community events and make it clear that such activities are an integral part of their law enforcement responsibilities. While we did hear examples of patrol attending community events along with their CLO and COPE colleagues – most notably, at one precinct where the precinct commander assigned a rotating list of patrol to attend such events – this remains the exception rather than the norm. Moreover, even having patrol officers occasionally attend community events, while welcome, would not reflect the kind of culture change that is needed in order for the Department to truly operate with a community policing model. Instead, community policing should infuse the context of everything that officers do, regardless of whether their job description focuses on patrol, detective work, or community engagement. We were encouraged by Commissioner Sini's commitment to this principle during our meetings with him on this site visit, and are hopeful that progress in this area will be made during the next several months.

To be clear, we recognize that such culture change can be difficult and slow, and that the steps needed to achieve it may be harder to recognize or to measure than, for example, increasing the number of events that COPE and CLO officers attend or the number of new community contacts that they develop. We have appreciated the open spirit with which SCPD has taken to our suggestions about how to improve its compliance with the Agreement's community engagement provisions, including by participating in periodic conference calls between DOJ and representatives of the CRB, and we remain very willing to working cooperatively with the Department to discuss and strategize about how to continue and improve this work going forward. In addition, we note that the procedural justice training that the Department will be receiving and implementing over the course of the next year (discussed in more detail in the section on Bias-Free Policing) should provide the Department with useful guidance about how to incorporate community policing into all of its law enforcement work.

Going forward, we will continue to meet with representatives of the CRB command staff, both during our site visits to SCPD and during our periodic conference calls with CRB command staff and SCPD legal counsel, to discuss SCPD's implementation efforts and, to the extent appropriate, to give our recommendations and feedback on these efforts. We also will meet with COPE and CLO officers during our site visits and review documents and information about their community meetings and outreach events, both to assess the quantity and quality of the COPE and CLO officers' outreach efforts, to gauge SCPD's progress in developing a system for recording and tracking such outreach, and to assess the extent to which SCPD is improving the communication and cooperation between the different officers and command staff involved in community outreach. As has been our practice in the past, we will be joined by and will consult with subject matter experts in community engagement by law enforcement in conducting these meetings and our assessment. In addition, we will continue to monitor SCPD's progress in developing and implementing a community survey, and expect that this work will include reviewing drafts of the survey instrument itself as well as plans for the survey's implementation, and meetings with the individuals involved in the survey's development and implementation.

# <u>FIFTH REPORT ASSESSING SETTLEMENT AGREEMENT COMPLIANCE BY SUFFOLK COUNTY POLICE DEPARTMENT</u>

**June 23, 2017**

# I. INTRODUCTION

In January 2014, the United States Department of Justice ("DOJ") and the Suffolk County Police Department ("SCPD" or the "Department") entered into a Settlement Agreement ("Settlement Agreement" or "Agreement") to ensure that police services are provided to all members of the Suffolk County community, including the Latino community, in a manner that complies with the Constitution and laws of the United States.[1] DOJ, as part of its responsibilities for oversight of SCPD's implementation of the Settlement Agreement, periodically reports on its assessment of SCPD's compliance with the Agreement. This is the fifth Assessment Report.

Since we issued our last assessment report in January 2017 (the "Fourth Assessment Report"), DOJ representatives from both the Civil Rights Division and the United States Attorney's Office for the Eastern District of New York reviewed documents and materials provided by SCPD, including revised policies and procedures, copies of internal affairs investigations, a sample of entries in SCPD's community relations daily activity reporting system, and other reports completed since our last site visit in the fall of 2016. We also met with SCPD officials, SCPD command staff and other supervisors, and SCPD officers, toured precincts and participated in ride-alongs with on-duty officers, attended training courses, and met with members of specialized units, including the Hate Crimes Unit ("HCU"), the Internal Affairs Bureau ("IAB"), and the Community Response Bureau ("CRB"). We also held a conference call with SCPD command staff, including Commissioner Timothy Sini. In addition, we solicited the views of the Suffolk County community, including the Latino community, by meeting with community advocates. In conducting these activities, we consulted with police practice experts with expertise in the areas of policing covered by the Settlement Agreement.

We thank the SCPD officials with whom we met during this assessment period, and we appreciate the cooperation and effort that SCPD and Suffolk County leadership continue to show in addressing the requirements of the Agreement. We also thank the many members of the Suffolk County community who have met with us and provided us with invaluable feedback.

This Assessment Report is divided into two sections. First, we provide a compliance rating for each provision of the Settlement Agreement. Second, we provide a more detailed analysis of SCPD's successes and challenges to date in each main area of the Agreement: 1) bias-free policing; 2) hate crimes and hate incidents; 3) language assistance; 4) allegations of police misconduct; and 5) community engagement.

As set forth in detail below, SCPD has made substantial progress in implementing the requirements of the Settlement Agreement during the previous rating period, particularly with respect to its hate crimes quality assurance and police misconduct investigations. In other areas, considerable work remains.

Over the coming year, we will focus our attention on the Department's efforts in the substantive areas of the Agreement with which the Department remains in partial compliance.

---

[1] This Agreement is available in both English and Spanish at https://www.justice.gov/crt/special-litigation-section-cases-and-matters0#police.

We will, however, continue to assess the Department's work in the areas where it already has achieved substantial compliance to ensure that the Department maintains its progress in those areas. In conducting our assessment work, we will continue to communicate with SCPD officers and command staff, both during regular phone calls and site visits. We also will continue to meet with community members, both during larger-scale community outreach meetings during our site visits and through ongoing meetings and communications with individual community members and representatives. We will publicly report on our observations of SCPD's implementation of the Agreement in the fall of 2017 and spring of 2018.

## II. CURRENT COMPLIANCE RATINGS

Section IX of the Settlement Agreement provides that the United States will assess and report on SCPD's compliance with the Agreement. *See* Agreement at 19-20. The compliance ratings below represent the United States' current assessment of SCPD's compliance with each area of the Agreement. While Section III of this Report provides a more detailed analysis of SCPD's compliance with the Agreement, these ratings are included to provide SCPD and the Suffolk County community with a clear and accurate summary of progress to date, as well as areas that remain most in need of attention.

The definition of each rating type is as follows:

- "Substantial Compliance" indicates that the County has achieved compliance with most or all components of the relevant provisions of the Agreement.
- "Partial Compliance" indicates that the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains.
- "Non-Compliance" indicates that the County has not met most or all of the components of the Agreement.
- "Compliance Rating Pending" indicates that there is insufficient information to make an assessment or the provision is not yet ripe for evaluation.

| **Settlement Agreement Area** | **Status of Compliance** |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Substantial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Compliance Rating Pending |

| | |
|---|---|
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Substantial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Substantial Compliance |
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Partial Compliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Substantial Compliance |
| h. Community Survey | Partial Compliance |
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Substantial Compliance |
| b. Investigation of Misconduct | Partial Compliance |
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement (“COPE”) | Substantial Compliance |

| | |
|---|---|
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social Media and Notification Systems | Substantial Compliance |
| VIII. POLICIES AND TRAINING GENERALLY | Partial Compliance |

## III. ANALYSIS OF SCPD'S COMPLIANCE TO DATE

### A. BIAS-FREE POLICING

| | |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Substantial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Compliance Rating Pending |

Under the Agreement, the SCPD has committed to ensuring that its police services are "equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Department" and that all "members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, or sexual orientation, and in accordance with the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States." Agreement ¶ III(a) at 4. To bring these provisions to fruition, the Department must develop and implement a robust system of training, supervision, data collection, and accountability mechanisms that ensure its law enforcement duties are being performed free of impermissible bias. The SCPD has codified the principles of bias-free policing through its policies and procedures. This is a necessary first step, but as detailed below, the principles of bias-free policing must take root through the Department's data collection and analyses, and its training program. Because SCPD continues to develop the requirements of these provisions, the Department remains in partial compliance with the bias-free policing section of the Agreement.

#### 1. Policies and Procedures

We previously rated SCPD in substantial compliance with the policies and procedures provisions of the Agreement. *See* Fourth Assessment Report at 6; *see also*, Agreement ¶¶ III(a) - (b) at 4-5. As we noted then, ensuring that these policies are adhered to in practice will require

additional work, specifically, through the appropriate data collection and training practices required under the Agreement, discussed below. *See* Fourth Assessment Report at 6.

2. Traffic Stop Data

To ensure bias-free policing, SCPD must collect accurate traffic stop data and analyze it for indications of bias. *See* Agreement ¶ III(c) at 6. Our last two assessment reports detailed the various shortcomings with SCPD's data collection practices. *See* Third Assessment Report at 7-8; Fourth Assessment Report at 6-7. During our site visit in September of 2016, SCPD had committed to a plan and timeline for developing appropriate data collection methods consistent with the substantive recommendations we had made about enhancing the data collected. *See* Fourth Assessment Report at 7. This plan involved transitioning from a computerized data terminal system designed by an outside company to one that is developed and maintained by SCPD's information technology department. We supported this approach since it would give SCPD greater control over the data collection and improve the Department's ability to analyze up-to-date data. At the time, the Department projected that the new system would be up and running and begin collecting data in early 2017. Unfortunately, SCPD was unable to meet this estimation, and the system was not operational at the time of our April 2017 visit. For this reason, the Department continues to be in partial compliance with the traffic stop provisions of the Agreement.

While the new system was not operational, the Department provided DOJ a mock-up of the re-designed interface. The current interface captures much of the pertinent data involved in a traffic stop, and we made suggestions for additional data fields that would allow SCPD to conduct more meaningful analyses of the data and the legality of the traffic stops. Several weeks after our visit, the Department provided further information regarding the new interface, in particular the drop-down values that officers will see as they input information into this system. Once the parties have agreed to the data fields and their drop-down values, the Department will finalize the interface design and implement the system. The Department estimated that it would be able to rollout the system within a month of finalizing the substantive fields.

As part of our comments to the traffic stop interface mock-up, we recommended linking the traffic-stop reports to use-of-force reports where a traffic stop led to a force incident. This is an important function that the Department should develop; by linking the two data sources, supervisors and command staff will be able to conduct thorough analyses of traffic stop and use of force incidents, and to determine whether any force incidents unnecessarily resulted from an illegal stop. There are technical difficulties to linking the two databases, however, since each uses its own unique identifier to track incidents. The Department suggested that it could issue a directive requiring that officers provide the traffic stop identifier ("CC number") in the "details" field of use of force reports when a traffic stop results in a force incident. This requirement will facilitate a more thorough and efficient review process for supervisors and command staff. By easily accessing related traffic stop reports, reviewers will be able to analyze the entire encounter to make determinations of the propriety of the traffic stop and force incident.

The Department will also code the traffic stop data so that any stop report with a related use of force incident will automatically require supervisor review and approval of the traffic stop. Relatedly, we renew our recommendation that SCPD supervisors develop specific protocols for the substantive review of traffic stop data as part of supervisors' regular

supervisory activities and that SCPD provide updated training for supervisors, many of whom have not received supervisor-specific training since attaining the rank of sergeant. *See id.* at 7.

We look forward to the next steps of this process and to the new implementation of the traffic stop data system. It is our hope that SCPD will be able to rollout the system soon so it can begin collecting and analyzing data, which would permit DOJ to review SCPD's analysis of several months' worth of data before our fall 2017 site visit to provide feedback and to ensure that the Department is properly analyzing the data.

3. <u>Training</u>

The Agreement requires that all sworn officers receive training on bias-free policing at least annually. *See* Agreement ¶ III(d) at 6-7. This training is to "emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, is prohibited by policy and will subject officers to disciplinary action." *Id.* The Agreement also sets forth specific elements that the Department must incorporate into bias-free training. *Id.*

As detailed in our last assessment report, SCPD suspended its bias-free policing training after we determined that it was deficient. *See* Fourth Assessment Report at 8. To aid the Department in the development of a sound and effective training, the Office of Justice Programs (OJP) of the United States Department of Justice had agreed to provide SCPD with technical assistance in the form of training modules, specifically, with training programs on both procedural justice and bias-free policing. *See id.* Further, SCPD has agreed on a training schedule that will allow all SCPD officers to complete both procedural justice and bias-free policing within an initial two-year period, with bias-free policing training recurring annually thereafter for all officers.

The Department recently had a planning call with OJP to develop a work plan and timeline for the training. On the call, OJP explained that it uses a "train-the-trainer" model that involves having its personnel show SCPD trainers how to deliver bias-free policing and procedural justice trainings. Under this model, OJP will deliver a four-day training; debrief the Department after; work with SCPD to develop an implementation guide; provide support to SCPD during the rollout of the training; and develop data metrics for measuring whether the Department achieves the program's goals. SCPD enthusiastically opted for an in-depth partnership with OJP that includes customized technical assistance, subject matter expertise, and site-visits by OJP beyond the basic delivery, rollout, and implementation of the program.

The SCPD and OJP agreed to conduct the train-the-trainer training in November 2017. While the trainings has taken longer than anticipated to coordinate, we are encouraged by SCPD's desire to take full advantage of the resources OJP is able to provide. Once SCPD trainers begin to deliver the training, we will assess whether SCPD is appropriately tailoring and delivering the training modules in a manner that is consistent with the terms of the Agreement. We will review training curricula, observe training sessions, and meet with SCPD trainers and officers completing the training to assess effectiveness. We are hopeful that partnership with OJP is the Department's first step in the process toward substantial compliance with the bias-free policing training provisions of the Agreement.

B. HATE CRIMES AND HATE INCIDENTS

| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| --- | --- |
| a. Training | Substantial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Substantial Compliance |

SCPD has made significant strides in the area of hate crimes and hate incidents since entering into the Agreement. In our last Assessment Report, we found the Department's hate crimes training markedly improved and in substantial compliance with the requirements of the Agreement. *See* Fourth Assessment Report at 9-10. The Department has likewise now come into substantial compliance with the quality assurance provisions of the Agreement. Because SCPD is currently developing a new mapping system to track and analyze potential hate crimes and hate incidents, however, it continues to be in partial compliance with those provisions of the Agreement.

1. Training

Under the Agreement, SCPD must ensure that all officers receive annual hate crimes and hate incident training. Agreement ¶ IV(a) at 7. DOJ previously found SCPD to be in substantial compliance with these provisions Agreement. *See* Fourth Assessment Report at 9-10. While we will continue to monitor hate crimes trainings to ensure that SCPD maintains substantial compliance with this provision, we did not observe SCPD's training in this area during this visit. We will note, however, that the Hate Crimes Unit ("HCU") reported receiving more calls from officers for incidents that might be a hate crime or hate incident, which is reflected in the increase of incidents that were examined as potential hate crimes in 2016 (195) compared with 2015 (125). *See* SCPD Hate Crimes Report 2016 at 4; SCPD Hate Crimes Report 2015 at 13. The HCU reasonably attributes this increase, at least in part, to the training's effectiveness insofar as line officers are more familiar with this crime category and understand the importance of involving the HCU in investigations.

2. Tracking, Reporting, and Pattern Analyses

A critical factor for SCPD to adequately and effectively combat hate crimes and hate incidents is the Department's tracking and mapping of crime trends and crime patterns. Accordingly, the Agreement requires SCPD to "implement a policy to track, analyze and report patterns and trends regarding hate crimes and hate incidents," and to "produce a report mapping and analyzing for potential patterns and trends [of] of all hate crimes and hate incidents[.]" Agreement ¶ IV(b) at 7. A robust, up-to-date, tracking and reporting system that is widely shared within the Department will allow officers to engage in pattern analysis and potentially

identify hate crime patterns in their own precincts. Until SCPD develops and implements such a tracking system, the Department cannot ensure that it is tracking and analyzing crimes to identify patterns or trends of potential hate crimes or hate incidents.

The Department currently is developing a new mapping system, and it was not operational at the time of our visit in April 2017. Previously, the County had been administering SCPD's hate crime mapping. The SCPD's IT Department will now oversee and administer the new system, allowing SCPD greater control over the updating and analysis of data. The new mapping system will present crime data at the countywide level as well as the precinct-level. We commend this effort, especially because the precinct-level data will provide officers relevant information about crimes occurring in the areas they police. Indeed, COPE officers that we spoke with expressed that the precinct-level maps will be useful in helping them with targeted outreach to communities that are experiencing potential hate crimes or hate incidents.

In our Fourth Assessment Report, we raised the issue that SCPD's mapping system at the time did not provide an adequate visual representation of the volume of potential hate crimes and hate incidents because each dot represented a crime at the geolocation where the crime had occurred. *See* Fourth Assessment Report at 10. Where there had been several incidents, the map layered the dots, underrepresenting the number of incidents. SCPD informed us that they are integrating a "heat map" type feature into the maps to indicate the frequency of incidents at a given geolocation represented as colors. The maps will also have more underlying data that will be accessible by clicking on a particular dot. Additionally, the Department has implemented our recommendation to provide 12-month aggregate crime data on its maps, rather than data based on a 12-month calendar year beginning each January, and will continue this approach with the new mapping system. *See id*. at 10. These features will be useful in providing officers more accurate, meaningful data about crime patterns and potential hate crimes. We look forward to the launch of the new mapping system, and we are hopeful that it will aid the Department in its commitment to analyzing crime patterns to identify and prevent future hate crimes and hate incidents.

We renew our recommendation that the Department produce the annual report mapping and analyzing potential patterns and trends for all hate crimes and hate incidents on a bi-annual basis to maximize the utility of the crime data in identifying hate crime patterns. *See id*. at 10. Additionally, while we are mindful of the Department's desire not to overload officers with information, *see* SCPD Compliance Report (March 2017) at 5, we emphasize the importance of ensuring that officers have ready access to information about potential hate crimes and hate incidents. We appreciate SCPD's efforts to think strategically about the best means by which to disseminate the mapping data information efficiently and effectively within the Department. *See id*.

3. <u>Quality Assurance</u>

The Agreement requires SCPD to "implement a policy describing its HCU quality assurance process that ensures that HCU investigations follow proper techniques and procedures," and that SCPD will conduct random audits of HCU investigations and any corrective actions taken because of the audits. Agreement at 7-8. As we stated in our last report, SCPD's hate crime investigations policy aims to ensure the effective identification and

investigation of hate crimes, and this involves improving outreach and communication with community members. *See* Fourth Compliance Report at 11 (citing SCPD Hate Crimes GO 16-43). Previously, we had raised concerns that hate crimes might go unreported due to a lack of public awareness about what qualifies as a hate crime or hate incident. *See id*. SCPD is making significant efforts to improve its outreach to communities that have been targets of hate crimes or hate incidents. For example, representatives from the HCU spoke about the difference between hate crimes and hate incidents at the Islamic Association of Long Island in March 2017. The Unit attended another community engagement at a mosque that same month.

The HCU has also created public outreach materials including a poster providing information about how to report a hate crime and a flyer detailing the elements to a hate crime. The HCU will continue to disseminate these materials at businesses and other high-traffic areas where community members are likely to see them. It is important that the Department continue these outreach and public education efforts, particularly in light of community members' impression that the Department is not proactively investigating incidents against Latinos. Specifically, we heard from members of the Latino community who expressed concerns that the Department had not received any tips or investigated any crimes against Latinos in 2016. This raises concerns of an under- or non-reporting problem due to police mistrust or lack of cooperation. We conveyed these concerns to the HCU, and it promptly offered to hold informational meetings with interested community groups to discuss the legal standards for hate crimes and hate incidents, and the Unit's investigations of such incidents. We also recommended that the HCU develop a public service announcement for broadcast on Spanish-language radio. Vigorous outreach measures to inform and educate the public about hate crimes and the HCU's investigative process will allow community members to understand the scope of SCPD's efforts in this area. These efforts will also increase the likelihood of cooperation and collaboration in combatting hate crimes and hate incidents.

The Department has greatly improved its bi-annual hate crime audit and reporting. *See* Agreement ¶ IV(c)(ii) at 6-7. Our last assessment found that HCU's report provided summaries of the investigations audited but did not provide any analysis of the quality of the investigations or "any corrective actions planned or taken as a result of the audits" as required under the Agreement. *See* Fourth Assessment Report at 11. The HCU's most recent report, however, included information about the status of the cases, and what charges, if any, the Unit pursued. *See* SCPD Annual Report 2016. The report also provided thorough case and investigation narratives, facilitating a better and more accurate audit review process. The audit sample was a random 10% sample drawn from the Department's 2016 hate crimes investigations, which is a valid representative sample. The HCU, however, had also included a few other cases it deemed of interest in the audit report but had not noted this in the report. We suggested clarifying this methodology for the report. We find SCPD in substantial compliance with Section IV(c) of the Agreement. In the coming months, it remains imperative that the Department maintain substantial compliance with this provision and continue to strengthen its quality assurance methods. In subsequent site visits, we will continue to monitor this aspect of the Agreement. We commend the Department's progress in this area and we will continue to provide support in advancing its goal of ensuring that the Department follows proper techniques and procedures in investigating hate crimes.

C. LANGUAGE ASSISTANCE

| | |
|---|---|
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Partial Compliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Substantial Compliance |
| h. Community Survey | Partial Compliance |

As we have noted in our previous reports, Language Assistance is a cornerstone of the Agreement. *See* Agreement V at 8-11. Limited English Proficiency ("LEP") individuals are particularly vulnerable to victimization and marginalization. Police officers and other SCPD staff must be able to communicate effectively with them in order to provide appropriate police services, effectively investigate crimes, and protect arrestee's civil and constitutional rights. Since our last report, SCPD has improved aspects of its language access program. It has revised its already solid, comprehensive written language access policy; we offer a few suggestions below to strengthen it even more. SCPD also has developed an excellent training program. As a result, our compliance rating has improved for several components of the language assistance section of the Agreement. However, at this juncture, SCPD still falls far short of fully implementing the Language Access Plan ("LAP") and does not sufficiently track or monitor provision of language access services.

1. Language Access Policy and Language Line Order

SCPD has a strong LAP rules and procedures manual, which includes all materials and directives that were previously separately set forth in its LAP and Language Line Order. *See* SCPD LAP, Rules & Procedures, Ch. 26, Sec. 5. The Department has recently improved its LAP even further, revising the role and responsibilities of certified bilingual staff, tweaking its tests for bilingual proficiency and Department Authorized Interpreters ("DAI") and strengthening requirements for documenting "Lima calls" (i.e., calls which may involve LEP individuals) on the Online Reporting System. However, SCPD needs to take additional steps to ensure that its

language assistance policies are adequate and provide the needed services to non-English speaking community members. Thus, while the Department continues to be in substantial compliance with the language line order provision of the Agreement, see Agreement ¶ V(b) at 9, it remains in partial compliance with the language assistance policy provisions for the reasons discussed below. *See id.* ¶ V(a).

In our last report, we recommended that SCPD authorize bilingual employees, not just DAI, to take LEP suspect, victim, witness, and complainant statements. SCPD has adopted this recommendation. We also suggested that SCPD develop a network of multi-lingual advisors to ensure that it translates documents accurately. SCPD has tried to establish such relationships, but has not yet fully executed this effort.

We recommend three additional changes to the LAP. First, it should include a strong message that officers should not use children as interpreters except in exigent circumstances when there is no other option. At present, the LAP is silent on this topic. Second, SCPD should revise the policy to clarify the order of preference of language assistance services that may be used. The LAP does not currently prioritize the available language assistance options. It should require that, unless an interaction with an LEP person is by telephone, SCPD personnel can use either a DAI or bilingual officer, and should use Language Line only if no in-person assistance is available. Third, the LAP needs to specify that written statements by LEP individuals should be transcribed in the person's language and subsequently translated into English. The LAP should further indicate who is authorized to translate a written statement.

Finally, we recommended previously that SCPD prepare a summary version of the LAP as a reference for officers. The SCPD has prepared a document summarizing the LAP, but it primarily informs community members of their rights. SCPD still needs to develop a simplified resource for officers that hones in on the key operational aspects of language access as it relates to their roles in the field, at precinct desks, during interviews, and in other settings.

2. <u>Policy on Persons with LEP</u>

Even though policies and training have improved, implementation of the LAP is still lacking. Officers still do not appear to understand when they are supposed to use language assistance services and too often fail to provide them at all. Supervisors and commanders do not know which officers under their command are qualified to provide language assistance. Contrastingly, the 911 Call Center provides language access services well.

Although the use of Language Line has increased every month and every year since 2013, there are still substantial barriers to using this telephone translation service. Officers report that using Language Line is too time consuming. Further, the cell phones SCPD provides officers to access Language Line are old, poor quality flip phones. We have received complaints from community members that it is difficult to understand interpreters because of poor audio quality. Officers often resort to using their personal phones instead. We recommend that SCPD invest in updated phones that ensure effective communication with interpreters when using Language Line.

We also commend the SCPD for modifying the Online Reporting System so that before officers can close out all calls, not just Lima calls, they must indicate in a designated computer field what, if any, language assistance services they provided. However, we note that the system automatically completes the field in non-Lima designated calls with "no language assistance required." We urge SCPD to eliminate this default. A need for language assistance can surface at the scene *after* the initial call, and it is important that officers do not fail to provide proper language assistance.

We repeat a tip from one of the supervisors we met during our visit. The supervisor suggested that every precinct desk operator be taught to say the simple phrase, "un momento," meaning "one moment," (and we would add "por español," meaning "for Spanish") before transferring a Spanish-speaking caller to Language Line. Apparently, it can take around a minute to connect a call with a Language Line interpreter, and callers are likely to hang up during that silence unless they are advised to wait.

Additionally, for the most part, the data SCPD is collecting regarding language access services are unhelpful and incomplete and its analysis is inadequate. The limited data collected shows that SCPD is frequently not providing language access services when needed. Far too many officers (upwards of 80%) report that they did not need to use language services on Lima calls. The Department has acknowledged that it is highly unlikely that only 20% of designated Lima calls require language access. Officers either are not using language access services when required, or at a minimum, are not adequately documenting their use. Limited internal affairs audits show that officers are not providing the mandated services.

Beyond the raw data which documents the use, or non-use, of language access services, there is little analysis identifying the root cause of the problem. IAB's review process, while useful, is limited. SPCD would be better served through use of a full data analysis that flags potentially problematic officers through an early warning system model and regular supervisory review of language access data. We recommend that SCPD hire or assign an analyst who can collect, review, and analyze data regarding Lima calls. Further, precinct supervisors need instruction on how to review the documentation of language assistance, to flag problems and ensure that officers provide language access services and accurately document their use.

SCPD seems to have overcome the difficulties it encountered identifying and implementing appropriate tests for DAIs and certified bilingual officers. The Department has begun using a telephonic Language Line test to certify bilingual officers, and has developed an appropriate law-enforcement based exam for DAI. During our visit, seven officers had scheduled times to take the new DAI test, and the number of certified bilingual officers has grown. We applaud these determined efforts and anticipate seeing a more robust bilingual and DAI corps during our next tour.

SCPD also can capitalize on the Spanish language test that is administered as part of the Police Academy entrance process. This test appears to be effective and more thorough than Language Line's test. Assuming that SCPD can confirm that the Academy test is consistent with

the results of Language Line testing,[2] and provides as robust an assessment of Spanish language ability, we recommend that SCPD automatically certify as bilingual new officers who have passed the Academy entrance language proficiency test.

In our past report, we recommended that SCPD conduct preparatory classes for individuals taking the bilingual certification or DAI tests. SCPD has not yet created such a program, and we reiterate this suggestion.

Finally, we note that SCPD still has not adequately addressed barriers to receiving correspondence, particularly complaints and compliments, in languages other than English. As we recommended in our last report, SCPD needs to better publicize its complaint/compliment system and inform the public, particularly LEP community members, that comments need not only be in English.

3. Spanish Language Access to the SCPD Website

SCPD has done an admirable job of providing access to its website to LEP individuals, particularly Spanish speakers. Important information is a click or two away from the homepage. The Department is in the process of overhauling its website, and we expect that this will make language assistance even more accessible.

SCPD also has done an excellent job of translating critical documents and providing access to them on the website. However, the Department needs to maintain better quality control over forms provided to the public in the precincts. During this visit, we found that the version of the LAP at the headquarters' front desk was outdated. In one of the precincts, we found complaint/compliment forms were missing in some languages. In more than one precinct, there are still two different versions of the community survey available at the desks. These issues need to be resolved.

4. Incentives for Interpreters

SCPD has recently circulated a memorandum that gives certified DAIs and bilingual members of the Department priority when seeking transfers. This is a positive step, although SCPD had previously contemplated employing monetary or promotional incentives to encourage officers to become DAIs and bilingual officers. We look forward to seeing data-based results that show that the transfer priority is an effective incentive or whether other incentives may be necessary

We also commend the SCPD for eliminating a potential disincentive for officers to take the DAI or bilingual certification tests. In the past, an officer who provided language access assistance was automatically designated the primary officer on the call and became responsible for preparing all associated paperwork. As we recommended, SCPD now requires responding officers to submit all reports.

---

[2] We understand that in all but one case, officers who had passed the Academy test also met Language Line certification standards. The one outlier is re-taking the Language Line test. We look forward to hearing the results.

5. Consultation with the Latino Community & Community Survey

The Agreement requires that SCPD survey community representatives regarding SCPD's LEP efforts. *See* Agreement ¶ V(h) at 10-11. From our conversations, it appears that the Department, as a general matter, is doing a better job of consulting with community advocates. As noted in the community engagement section below, SCPD has substantially improved its communications with members of the Latino community through regular meetings at both the precinct and department-wide level and through community outreach events. However, in its most recent Community Relations Bureau Report, the SCPD indicated that the community survey must be "overhauled" this year. *See* SCPD Community Relations Bureau Report at 41. We support that effort. The current survey is too long and the topics it covers need to be revised. In addition, the dissemination of the survey is not structured in any way to enable randomization and confidence in the representativeness of the findings. Indeed, we found different versions of the survey in different precincts during our tour.

6. Language Assistance Training

We were very impressed with the significantly improved language assistance training. Training personnel have applied the feedback they received from our language access experts; the syllabus is now comprehensive and concisely teaches cultural competency. Pedagogically, the class now provides a mix of lecture, videos, and active exercises in small groups. As a result, students—SCPD officers and personnel—are engaged and demonstrate significantly better appreciation of the material and the importance of providing language assistance services.

We will continue to observe trainings during future monitoring visits to ensure sustained substantial compliance with the Agreement. Going forward, the training should continue to evolve and be modified as necessary to align with modifications in the LAP (e.g., the Department's policy regarding the preference of language assistance options, discussed above). We also recommend that SCPD consider and clarify what, if any, Spanish-language training it intends to provide officers. As we noted in our last report, SCPD had been relying on limited Spanish-language training during the one-day training program pursuant to the requirements of the Settlement Agreement. *See* Fourth Assessment Report at 14. It was too limited to be useful, and SCPD has appropriately abandoned it. We have also learned that the Department is no longer offering the 20 hours of Spanish language and culture training in the training academy. Officers have expressed interest in learning or improving their command of Spanish, however, and SCPD should consider offering a stand-alone course in Spanish for law enforcement.

D. ALLEGATIONS OF POLICE MISCONDUCT

| | |
|---|---|
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Substantial Compliance |
| b. Investigation of Misconduct | Partial Compliance |

SCPD has made substantial strides in improving its response to allegations of police misconduct. For example, the Department has significantly reduced its backlog of unresolved internal affairs investigations; it has put into place changes to its organizational structure and promotional practices aimed at increasing the timeliness and effectiveness of its internal affairs investigations and enhancing the stature of the Internal Affairs Bureau (IAB); and it has adopted, and most recently, institutionalized through official policy, practices for improving and increasing its communication with individuals submitting complaints. Based upon our review of these efforts, we have determined that SCPD has achieved substantial compliance with the Agreement's requirements relating to reporting misconduct. SCPD has made significant progress but remains in partial compliance with the Agreement's requirements relating to the investigation of misconduct.

We offer below a discussion of some of the most noteworthy recent developments SCPD has achieved in this area, as well as our recommendations for SCPD to continue to improve its handling of allegations of police misconduct and to derive the greatest impact from the reforms it has put into place. We will continue to monitor the Department's efforts in this area to evaluate whether SCPD sustains its substantial compliance with the requirements relating to reporting misconduct, and to offer our input as to how the Department can advance in its implementation of the requirements relating to investigating misconduct and continue to build upon its progress in this area, overall.

1. <u>Reporting Misconduct</u>

As discussed in our last Assessment Report, SCPD has devoted significant attention in the last year to ensuring that allegations of misconduct are reported and investigated. *See* Fourth Compliance Report at 19-23. Since our last report, SCPD has taken further action, most significantly by implementing an official policy requiring consistent communication with complainants to ensure that SCPD keeps them apprised of the investigation process. With SCPD's recent efforts, detailed below, we have determined that SCPD is now in substantial compliance with Section VI(a) of the Agreement. Although the Agreement's provisions on reporting misconduct do not include express requirements that the Department communicate with the public about its internal affairs investigations, we believe that increasing the public's awareness of the IAB policies and procedures and the status of pending investigations as appropriate is an effective way of encouraging the public to submit complaints of officer misconduct. This also is crucial to promoting the public's trust in the integrity and effectiveness of its internal affairs investigations. Accordingly, we have evaluated and will continue to evaluate the Department's policies and procedures for communicating with the public as part of our assessment of SCPD's compliance with this area of the Agreement.

In March 2017, the Department issued a directive memorializing its procedures and timelines for communication with individuals who have filed administrative complaints about SCPD officer misconduct.[3] The issuance of this directive reflects the Department's consideration of our previous recommendations to put these procedures—which were initially adopted last year—into formal policy in order to ensure that they are clearly communicated both to the IAB and to the community. The directive requires that the IAB member recording the

[3] SCPD Directive, Order No. 17-01 (March 17, 2017) (copy provided to DOJ).

complaint in the SCPD's database complete an "acknowledgment of complaint form."[4] The directive further requires that the IAB administrative staff mail a copy of this form to the complainant. We believe that this will help to ensure that individuals consistently receive timely notice when IAB opens investigations of their complaints. The directive also includes detailed requirements for IAB's communication with complainants. First, IAB is to make contact with a complainant as soon as possible, and under ordinary circumstances, no later than within three days. Second, IAB will send a letter to complainants when it commences an investigation, which will include the case number, the name of the assigned investigator, and contact information for the assigned investigator. Third, investigators will contact complainants when cases remain open for more than 180 days. Including these requirements in SCPD policy sets clear expectations within the Department and in the community regarding communication with complainants about internal affairs investigations.

We will continue to monitor this section of the Agreement to ensure that SCPD remains in substantial compliance, and to suggest additional ways that SCPD can bolster its effectiveness in this area. SCPD can build upon its significant efforts to date by creating additional materials to communicate within the Department and to the public about other relevant IAB policies and procedures, including, for example, its policies allowing involvement of advocates in IAB meetings with complainants and witnesses. SCPD's public statements indicate that the Department has plans to create such materials, and we urge SCPD to follow through with those plans. For example, SCPD noted in its March 2017 compliance report that it "anticipates coalescing" the revised IAB Command General Orders "into a unit operations manual by the end of the next reporting period." SCPD Compliance Report (March 2017) at 8. SCPD further noted that this manual would include case management guidelines, consistent with the recommendations in our previous assessment report about the utility of establishing such guidelines and making sure that all members of the IAB are aware of them and adhere to them. To be clear, SCPD has already adopted appropriate guidelines for conducting internal investigations, which is central to our determination that the Department has reached substantial compliance with these provisions. We agree, however, that there would be a benefit to coalescing these materials into a unit manual. Furthermore, we continue to believe that it would be useful for the Department to establish case management guidelines to ensure that investigators and supervisors have an appropriate caseload, and we recommend that the Department develop such guidelines and include them in the future IAB operations manual.

Similarly, we were encouraged that SCPD noted in its March 2017 compliance report that it is planning to "provide a brochure for public consumption which outlines the process for making a complaint and describes what to expect with reasonable certainty. This effort will also address the availability of language assistance and the involvement of third party advocates." *Id.* At a meeting in February 2017, Commissioner Sini also told the Latino Community Outreach Committee that SCPD would create a public document with a bullet point summary of IAB's policies on the use of advocates and timelines for reporting incidents to IAB, and that the Department would post this document on the SCPD website in both English and Spanish. At present, although there is a one-page document on the "Civilian Complaint Procedure" posted on

[4] SCPD has identified this form as PDCS-1300-3.

the SCPD website,[5] the Department has not posted a Spanish-language version of the summary document. We encourage SCPD to follow through with its plans to develop and circulate these materials, perhaps in partnership between its IAB and CRB. We believe that such informational materials would be extremely useful in better informing the public about the Department's internal affairs processes. Explanation of these process, combined with promoting public awareness of the positive reforms that SCPD has undertaken in this area, also will serve to increase public confidence in the integrity of SCPD's internal affairs investigations and of the department overall.

2. Investigating Misconduct

Over the past 18 months, SCPD has made it a priority to reduce the backlog of unresolved internal affairs investigations. The Department also has made significant reforms to the IAB, such as restructuring the organization of the IAB and naming experienced detectives to positions of leadership in the IAB, aimed at increasing the efficiency and effectiveness of its internal affairs investigations and giving the IAB a position of prominence within the Department. In addition, the Department has put in place procedures for gathering, tracking, and analyzing data related to complaints and investigations of officer misconduct, and has been regularly reporting the results of this analysis both to DOJ and to the public.

Nonetheless, work remains in order for SCPD to achieve substantial compliance with this section of the Agreement. Below, we highlight and explain the types of continued progress we would hope and expect to see for the Department to achieve substantial compliance with the Agreement's requirements relating to the investigation of police misconduct. *See* Agreement ¶ VI(b) at 11-12.

The Agreement's provisions on investigating misconduct include requirements that the Department collect, track, and analyze information about misconduct allegations relating to discriminatory policing, and that the Police Commissioner and the Department conduct additional review of misconduct investigations relating to discriminatory policing. As reflected in the Department's own compliance reporting, including its publicly available annual report on its biased policing complaints, and information provided to us in response to our information requests, the Department is not only doing a fair amount of tracking and analysis of information of its internal affairs investigations, but also using the information gleaned from this analysis to inform positive changes and improvements to its procedures. For example, as SCPD noted in its 2016 report on biased policing complaints, SCPD decided to expand the Department's definition of "biased policing" to include discrimination on the basis of non-physical disabilities and limited English proficiency. SCPD Annual Report on Biased Policing Complaints (2016) at 17. The Department updated the definition after reviewing cases involving allegations of biased policing and determining that its previous "biased policing" definition did not allow for the accurate classification of some of the misconduct complaints it had received. *Id.* Similarly, in conducting its periodic review of a randomly chosen set of discriminatory policing investigations, SCPD noted that "[c]omplainants frequently voice displeasure in the degree of

---

[5] SCPD, Civilian Complaint Procedure, available at http://apps.suffolkcountyny.gov/police/documents/IAB%20Procedure.pdf (last visited May 5, 2017).

detail contained in the disposition letter[,]" as well as with the time periods between the presentation of a complaint and the initial interview with an investigator. *Id.* In response, the Department "is researching ways to increase" the amount of information it shares with complainants, while complying with applicable privacy laws, and also has instituted into policy "concrete timeframes" for interviewing and communicating with complainants. *Id.* at 17-18. SCPD has thus already implemented reforms in response to its analysis of certain internal affairs investigations.

The Department must continue to improve and refine its analysis of information regarding its misconduct investigations, and continue to implement reforms in response to that analysis. For example, SCPD has reported the average length of time for completion of an investigation of a complaint received in 2016 was 176 days, with a range of 56 days to 293 days.[6] The Department should continue to collect and analyze this type of data and expand its application. SCPD should compare the investigation timelines in different years, measure the extent to which the Department is making progress in accelerating those timelines, and assess how to conduct investigations more efficiently going forward. Similarly, the Department should collect and track data that would allow it to compare the periods for investigations of different types of allegations, as a means of assessing whether certain allegations are unnecessarily taking longer to resolve than others.

Furthermore, now that SCPD has protocols in place regarding the timelines for communication with complainants, it would be useful for the Department to collect, track, and analyze information about communication with complainants to ensure consistency. In addition, we would encourage SCPD to take a deeper look at trends in the types of allegations they are receiving and the dispositions of those cases. For example, the Department may consider whether they are appropriately classifying allegations and reaching appropriate conclusions in investigations. In our own analysis of internal affairs investigations closed between October 1, 2016 and March 13, 2017, we noted that the Department did not find any of the allegations of biased policing substantiated, and overall charges were substantiated in roughly 9% of the allegations. Of the same set of investigations, nearly half of the allegations of biased policing were determined to be "unfounded," or to have no basis in fact. We have not determined that these outcome rates are inappropriate, but we note that SCPD should be able to identify trends in the outcomes and handling of complaints, and to make observations about whether those trends are problematic, in using its information tracking systems. Identifying information such as this is critical to identifying trends that may require further inquiry and response.

Finally, we note that the Agreement requires that the Police Commissioner or his designee review each IAB investigation of officer misconduct relating to discriminatory policing. *See* Agreement ¶ VI(b)(iii) at 11. In order for these reviews to be meaningful, and for the Department to achieve substantial compliance with this section of the Agreement, the review should involve not only reviewing investigations to determine whether to approve the final disposition of the investigation, but also to assess thoroughness and timeliness of the underlying investigation and any concerning material, such as improperly discrediting of the complainant.

---

[6] SCPD Annual Report on Biased Policing Complaints (2016), at 5, available at http://apps.suffolkcountyny.gov/police/documents/DoJ/IABFeb2017.pdf (last visited May 5, 2017).

We identified one 2016 discriminatory policing investigation in which the investigative report suggested that the investigator might have drawn unjustified assumptions regarding the credibility of the complainant. In that same case, it appeared that the investigator had not considered or followed up on information that the complainant had provided identifying a person who was allegedly both a witness to the underlying incident and a target of other discriminatory conduct by the officer. The SCPD ultimately exonerated the officer. We would urge SCPD and IAB leadership to ensure that both that investigators are meticulous in their work, and that the review of investigations is substantive and identifies gaps in investigative processes. Such review would allow SCPD to remediate those gaps through further investigation or additional training for investigators.

## E. COMMUNITY ENGAGEMENT

| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
|---|---|
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement ("COPE") | Substantial Compliance |
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social Media and Notification Systems | Substantial Compliance |

Over this past reporting period, SCPD, and in particular, its Community Liaison Officers (CLO), Community Oriented Policing Enforcement (COPE) officers, and the command staff in its Community Response Bureau (CRB), continued to devote substantial time and energy toward its community engagement. We continue to be impressed with the extent to which Police Commissioner Sini, Sergeant Kathleen Kenneally, and Lieutenant Matthew O'Malley participate in community meetings. We believe that Commissioner Sini's personal involvement communicates to the Department and to the community that community policing is a Department priority and that SCPD is accessible and responsive to its community. We also continue to be impressed with the array of activities that the CLO and COPE officers planned and executed, including rolling out the "coffee with a cop" program into additional precincts and expanding its youth sports programs to offer ice skating. SCPD has maintained the compliance ratings it had achieved in the past reporting period, including substantial compliance in the areas of the Agreement directly relating to the responsibilities of the CLO and COPE officers.

As we have expressed in past reports, we believe that it is critical that SCPD continue making efforts to involve *all* of its officers and command staff in community policing—not only those formally assigned to community engagement work. In addition, we repeat our recommendation that SCPD make efforts to be more proactive, analytical, and strategic in seeking to engage with less traditional partners and the more underserved parts of the Suffolk County community. SCPD also should enhance its efforts to address current questions and concerns of the community through outreach and distribution of informational materials. In support of SCPD achieving compliance in this area of the Agreement, and to maximize the impact and effectiveness of SCPD's ongoing community engagement efforts, we focus our discussion below on the most noteworthy areas of progress and recommendations for addressing our most pressing concerns.

1. Maintaining Community Relationships and Community Outreach

Based primarily on our visits to individual precincts, we have the impression that patrol officers are becoming more involved in community outreach events organized by the CLO and COPE officers in their precincts, including attending the precinct monthly community meetings. We also learned that new recruits have an expectation that engaging with the community is a central part of their duties, largely due to the training on community-oriented policing they are receiving at the Police Academy. These are important and encouraging developments. For the Department to adopt a community-oriented policing approach in a meaningful way, it is important for all officers, not only those specifically assigned to community outreach work, to be involved in their precincts' community outreach events. Training new officers that community engagement is an essential part of their work as law enforcement officers is an important means of incorporating community policing into the culture of the Department.

The Department and its individual precincts are maintaining a busy schedule of community outreach events, including quarterly meetings with the Latino Community Outreach Committee, monthly community meetings at the precincts, and popular programs such as sports programs for local youth and trainings targeted at educating about the risks of opioid addiction. In addition, SCPD is continuing to meet its obligation of producing and publishing annual reports with its own analysis of the CRB's successes, areas in need of improvement, and strategies for making improvements, including posting these reports on its own website.

To come into substantial compliance with the community engagement requirements of the Agreement, we recommend that SCPD focus on the following: 1) effective implementation and use, at the Department level, the CRB level, and the precinct level, of the computer systems for tracking and analysis of community outreach events, and 2) creation and dissemination of written informational materials for the public. With respect to the first, we recognize that SCPD and its CRB have been working to refine the computer systems they use for keeping track of community outreach events attended by officers and SCPD leadership. As a next step, we would expect to see SCPD demonstrate that its officers are using these systems to accurately and regularly record their community outreach work and community contacts. We also would expect that supervisors at all levels would use this information to measure and analyze the effectiveness of community outreach, to appropriately share information across precincts, to identify potential gaps in their community outreach, and to strategize about how to improve the effectiveness and breadth of community outreach. Relatedly, we recommend that the CRB and the precincts work

together to identify and develop an effective means of consistently maintaining and sharing their calendars of community outreach events. At present, it appears that each precinct is handling this differently, and that this may be impeding SCPD's ability to communicate with patrol officers about events, and to encourage attendance at those events.

With respect to the second recommendation, we note that the Agreement requires that SCPD "engage the public through the dissemination of public information on a regular basis." Agreement VII(a) at 12-13. Although this requirement falls under the Agreement's community engagement provisions, it need not be the exclusive responsibility of the CRB, or the CLO and COPE officers, to bring the Department into compliance with this requirement and the community engagement provisions generally. The public information to be disseminated could include information about SCPD policies and procedures that relate to functions of the SCPD other than the CRB—for example, the policies and processes relating to how members of the public may submit complaints about officer misconduct. In meetings with the Latino Community Outreach Committee, for example, Commissioner Sini has committed to creating informational materials "regarding the use of advocates as well as a timeline for reporting incidents to Internal Affairs that would be posted on our website in both English and Spanish."[7] In this way, the IAB and other components must play a central role in helping the CRB ensure the provision of informational materials. Moreover, creating and disseminating informational materials to the public will not only help to bring SCPD into compliance with the Agreement, but also should foster greater trust and transparency between the community and SCPD. Throughout this report, we have identified several specific areas in which more transparency and information to the public would be beneficial. More broadly, we also recommend that SCPD assign responsibility within the Department for identifying other types of informational materials that would be useful to the public, for facilitating the creation of those materials in coordination with the relevant SCPD component, and for determining how SCPD will disseminate these materials to the public. In light of the significant impact this will have on community engagement, the CRB may be the most appropriate component for this responsibility.

2. <u>Community Liaison Officers, Community Oriented Policing Enforcement, and the Community Response Bureau</u>

As we noted above, SCPD has maintained a rating of substantial compliance with the provisions of the Agreement relating to the responsibilities of the CLO and COPE officers. During this rating period, we continued to be impressed with the individual officers in these roles, and we were encouraged to find that there are two bilingual Spanish-speaking officers in these roles and that the Department is making further efforts to fill vacancies with bilingual Spanish-speaking officers. SCPD has made improvements in response to our recommendations to increase the communication and coordination between the CRB and the CLO and COPE officers. SCPD has increased the frequency of meetings bringing together the CRB, CLOs, and COPE officers, which is improving the communication between the CLO and COPE officers working in different precincts.

[7] Minutes of February 2016 Quarterly Meeting of SCPD and Latino Community Outreach Committee (on file with DOJ).

To achieve substantial compliance with the provisions of the Agreement relating to the CRB, and to maximize the impact of SCPD's community engagement efforts, we recommend: 1) that SCPD develop and implement a community survey, as required by the Agreement, and 2) that SCPD and CRB continue to make strategic efforts to infuse community-oriented policing principles throughout the Department. SCPD's progress with the development of a community survey appears to have stalled to a halt. We recommend that SCPD make this a priority as it is necessary to achieve substantial compliance with the Agreement and is an important means of measuring the effectiveness and impact of its community outreach and engagement. We stand ready to provide SCPD with technical assistance with the development and rollout of a community survey.

Bringing a community-oriented policing philosophy to the Department as a whole will require the involvement of *all* officers and command staff, and not only the CLO and COPE officers assigned to conduct community outreach. We encourage SCPD to think creatively and strategically about how to achieve these goals and demonstrate the adoption of such a philosophy. This may involve strategies and actions outside of the traditional community outreach events organized by the CLO and COPE officers. We encourage SCPD leadership to think about community policing more broadly than community outreach events; for example, the Department's community policing could include building relationships between the Department and other local governmental agencies, service providers, and community advocacy organizations. These community partners also can assist in developing training curricula, Department policies, and informational materials for the public.

Commissioner Sini has consistently recognized that building strong community partnerships throughout the entire Suffolk County community is critical to the Department's ability to effectively fight crime. We commend SCPD for its efforts to date on building those partnerships, and stand ready to provide SCPD with technical assistance, including guidance from our subject matter experts, examples from other law enforcement agencies, and written resources, which may be useful to SCPD as it builds upon the significant progress already achieved.

## F. POLICIES AND TRAINING GENERALLY

| VII. POLICIES AND TRAINING GENERALLY | Partial Compliance |
|---|---|

The SCPD must "maintain policies and procedures that are consistent with [the] Agreement and that provide clear direction to ensure that officers and civilian employees enforce the law effectively, ethically, and constitutionally." Agreement ¶ VIII(a) at 17. While the Department is in substantial compliance with the bias-free policing policy and hate crimes policy requirements of Agreements, its language assistance policy and policy on persons with limited English proficiency continue to need work and thus remain in partial compliance. As discussed above in the Language Assistance section, we are encouraged by the steps the Department has taken.

The Agreement also requires that SCPD ensures that "all officers who take [required] trainings will be required to pass a test demonstrating a basic comprehension of the training material after it is presented." *Id.* ¶ VIII(b). The Department has met this requirement with its hate crimes training. However, the Department has not met this requirement for its language assistance training. And, as discussed in the Bias-Free Policing section above, the Department begins the train-the-trainer training for bias-free policing next fall. Thus, we cannot assess its compliance with this provision until then.

**U.S. Department of Justice**

Civil Rights Division

JCP:LLC:MJG:CWH:BDB
DJ 207-52-4

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

June 26, 2015

**Via Electronic Mail**

Gail M. Lolis, Esq.
Deputy County Attorney
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788-0099

**Re: Assessment of SCPD's Compliance with the Settlement Agreement**

Dear Ms. Lolis:

This letter is to provide you with the Department of Justice's current assessment of the Suffolk County Police Department's compliance with the Settlement Agreement between Suffolk County and the United States, effective January 2014. Since the beginning, SCPD has maintained a collaborative and professional approach to the compliance process. We appreciate the cooperation and effort that SCPD and Suffolk County leadership have thus far put into addressing the requirements of the agreement. The SCPD of today is different from the department that we initially investigated, but there is still work to be done. We and the community look forward to seeing the improvements that are to come.

In the months since reaching agreement, the Civil Rights Division and United States Attorney's Office for the Eastern District of New York have conducted multiple compliance visits, participated in numerous conference calls with SCPD, and provided technical assistance to SCPD, including direct access to DOJ consultants, on a broad range of compliance topics. Technical assistance has helped SCPD to increase capacities in a variety of areas, and although we expect that the collaborative process will continue as we move forward, the provision of technical assistance will lessen as we shift to the next level of compliance review. DOJ's role will now shift more substantially to assessment of compliance with agreement requirements.

In the attached table, we provide a compliance rating and comments for each provision of the agreement. The definition of each rating type is as follows:

- "Substantial Compliance" indicates that the County has achieved compliance with most or all components of the relevant provisions of the Agreement. (15 provisions)
- "Partial Compliance" indicates that the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains. (50 provisions)

- "Non-Compliance" indicates that the County has not met most or all of the components of the Agreement. (5 provisions)
- "Compliance Rating Pending" indicates that there is insufficient information to make an assessment or the provision is not yet ripe for evaluation. (7 provisions)

Please feel free to reach out to us if you have any questions. We look forward to returning to Suffolk County soon to continue the process.

Sincerely,

JUDITH PRESTON
Acting Section Chief
Special Litigation Section
Civil Rights Division

By: /s/Laura Coon
Laura Coon
Special Counsel
Special Litigation Section
Civil Rights Division

KELLY T. CURRIE
Acting United States Attorney
Eastern District of New York

By: /s/Michael Goldberger
Michael Goldberger
Chief of Civil Rights
Civil Division

cc: Commissioner Edward Webber
Suffolk County Police Department

Sgt. Christopher Love
Suffolk County Police Department

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| **III. BIAS FREE POLICING** | | |
| a. SCPD will continue to deliver police services that are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Department. In conducting its activities, SCPD will ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, or sexual orientation, and in accordance with the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States. | Partial Compliance | SCPD has taken good-faith steps towards drafting new policy language and developing training curricula that will reinforce equitable policing within the Department. SCPD should finalize some of these elements shortly. SCPD has developed policies that promise to increase access to services for limited English proficiency individuals; some of those policy changes have yet to be implemented. SCPD's efforts in community policing and outreach promise to pay dividends in fostering community trust. More time is required to determine whether those changes will result in the necessary outcomes. |
| b. Policies and Procedures | | |
| i. SCPD will maintain implementation of a comprehensive policy prohibiting discrimination, including the denial of services, on the basis of race, color, ethnicity, national origin, religion, or sexual orientation in SCPD police practices. | Partial Compliance | SCPD has proposed language that would expand its policy commitment to bias-free policing. The United States has suggested refinements to the proposed language to ensure compliance with Paragraph III(b)(i) of the Agreement. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
| --- | --- | --- |
| ii. SCPD's policy on bias-free policing will prohibit officers from using race, color, ethnicity, national origin, religion, or sexual orientation in conducting stops or detentions, or activities following stops or detentions, except when engaging in appropriate suspect-specific activity to identify a particular person or persons. | Substantial Compliance | SCPD has proposed language regarding the use of the enumerated characteristics that would improve upon previous SCPD policies. The United States has suggested refinements to the proposed language to ensure compliance with Paragraph III(b)(ii) of the Agreement. SCPD will need to train officers on improved policies, implement practices that will guard against biased policing, and monitor to ensure that they are being carried out properly. |
| iii. SCPD policy will require that, within five days of receipt, SCPD will refer any complaint of discriminatory policing to IAB for a full investigation. Throughout the pendency of this Agreement, SCPD will also send a copy of any such complaint and material documenting the resulting investigation to the United States within five business days upon completion of the investigation. | Substantial Compliance | SCPD has revised its policies and practices consistent with the requirements of this section. We urge the Department to continue to vigilantly ensure that they are being implemented. |
| iv. SCPD officers who are found to have engaged in discriminatory policing will be subjected to disciplinary action and, where appropriate, will be referred for possible criminal prosecution. | Compliance Rating Pending | SCPD referred for prosecution the only case for which the Department independently identified the need for discipline or criminal referral. We continue to monitor this situation and any other complaints. SCPD informs us that it has not had any other instances where an officer has been found to have engaged in discriminatory policing; accordingly, no compliance rating can be assessed at this time. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| v. SCPD will maintain and implement a policy that promotes bias-free policing and equal protection within its hiring, promotion, and performance assessment processes. Officers who have a history of engaging in biased policing practices will not be entitled to promotional opportunities, except as required by collective bargaining laws and Civil Service Laws, rules and regulations. | Partial Compliance | SCPD reports that it is emphasizing bias-free policing in its recruitment, hiring, performance review, and promotions practices, although several of these measures have not been memorialized in policy. Specifically, SCPD informed us in its January 2015 Compliance Report that it has yet to implement the required policies fully. Accordingly, we have yet to review this policy, but will do so once SCPD provides us with the finalized version. |
| vi. SCPD will implement a revised Chapter 16, Section 4, "Arrest of Non-US Citizens and Persons with Dual Citizenship," as approved by the United States. | Partial Compliance | SCPD has issued a revised policy regarding arrest of non-US citizens and persons with dual citizenship, which has been approved by the United States. SCPD will next need to provide evidence of successful implementation of this requirement. |
| vii. Six months after the Effective Date and every six months thereafter throughout the pendency of this Agreement, SCPD will provide to the United States a report showing civilian complaints regarding police services related to allegations of discrimination and biased policing, noting the disposition of each complaint, if any, the geographic area in which the alleged discrimination occurred, the demographic category involved, and what measures, if any, SCPD will take as a result of the analysis. | Substantial Compliance | SCPD has, to date, provided the required reports. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| c. Traffic Stop Data | | |
| i. SCPD will implement a revised Chapter 13, Section 9, "Traffic Stop Data Collection," as approved by the United States. | Partial Compliance | SCPD has developed a revised policy for traffic stop data collection. Actual collection of the traffic stop data began in October 2014 and SCPD has not analyzed the data set yet. As the United States commented in June 2015, SCPD will need to make modifications to the data collection process. Accordingly, implementation of the program cannot be assessed as of yet. |
| ii. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will provide to the United States a report analyzing the collected traffic stop data and explaining what measures, if any, SCPD will take as a result of the analysis. | Non-Compliance | SCPD has yet to provide the report required under this section. |
| d. Training on bias-free policing | | |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| i. SCPD will ensure that all sworn officers receive training on bias-free policing at least annually. SCPD's training on bias-free policing will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, is prohibited by policy and will subject officers to disciplinary action. The training curriculum will address:<br>1. Methods and strategies for more effective policing that relies upon non-discriminatory factors;<br>2. Police and community perspectives related to discriminatory policing;<br>3. Constitutional and other legal requirements related to equal protection and unlawful discrimination;<br>4. The protection of civil rights as a central part of the police mission and as essential to effective policing;<br>5. The existence and impact of arbitrary classifications, stereotyping, and implicit bias;<br>6. Identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and<br>7. Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies. | Compliance Rating Pending | SCPD is still developing the necessary course curriculum in this area. The United States will continue to offer SCPD the assistance of our subject matter experts so that SCPD can develop an appropriate training curriculum. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| ii. SCPD will conduct cultural sensitivity training for all SCPD officers at least annually. | Compliance Rating Pending | See note regarding Section III.d.(i. above. |
| **IV. HATE CRIMES AND HATE INCIDENTS** | | |
| a. Training | | |
| i. SCPD will ensure that all officers receive hate crime and hate incident training at least annually. The training curriculum will address:<br>1. The elements of relevant crimes, including hate crimes and bias crimes; and<br>2. How to properly charge offenses and avoid the downgrading of crimes, including hate crimes and hate incidents. | Compliance Rating Pending | As SCPD has reported, it is currently developing the necessary training curricula, and has not yet provided this training. The United States is committed to continuing to work with the SCPD to help it develop the appropriate training. |
| b. Tracking and reporting | | |
| i. SCPD will implement a policy to track, analyze and report patterns and trends regarding hate crimes and hate incidents. | Partial Compliance | In January 2015, SCPD produced an updated draft of the policy corresponding to this Paragraph of the Agreement. The draft policy strengthened areas about which the United States previously raised concerns. The United States raised a few additional questions about the revised version. Upon addressing these concerns and approving the revised policy, SCPD can be in Substantial Compliance. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| ii. Within one year of the Effective Date and annually thereafter, SCPD will produce a report mapping and analyzing for potential patterns and trends all hate crimes and hate incidents which have occurred over the previous six months. The report will detail SCPD's planned response to any identified pattern or trend. Throughout the pendency of this Agreement, the report will be provided to the United States at least five business days before the report is made public. | Partial Compliance | In January 2015, SCPD presented a review of the hate crimes and hate incidents in Suffolk County in 2014. We requested important additional information about how the data is collected and maintained, and how SCPD analyzes for trends and patterns. |
| c. Quality assurance<br>i. SCPD will implement a policy describing its HCU quality assurance process that ensures that HCU investigations follow proper techniques and procedures. | Partial Compliance | In January 2015, SCPD produced a revised draft of its policy defining the parameters of hate crimes audits. The audit process and the detail with which it is described in the policy both appear thorough. The United States requested only two clarifications. Upon addressing these concerns and approving the policy, SCPD can be in Substantial Compliance. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| ii. Six months after the Effective Date, and every six months thereafter throughout the pendency of this agreement, SCPD will forward to the United States a report describing all random audits of HCU investigations completed within the current six-month time period and any corrective actions planned or taken as a result of the audits. | Partial Compliance | SCPD has twice timely submitted reports corresponding to this Paragraph of the Agreement. In both reports, the Commanding Officer of the SCPD Hate Crimes Unit affirmed his review of a selection of hate crimes investigations, and summarized the cases reviewed. In the latter report, the Commanding Officer concurred with the result of each of the investigations reviewed. Both reports were helpful, and the second report responded to a request by the United States to provide more detail about the investigations and the casefile.<br><br>Notwithstanding the value of the reports provided in the first two compliance periods, we believe additional information is critical to the report. In particular, the reports should include the criteria used by the Commanding Officer to evaluate each case for accuracy and completeness. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| **V. LANGUAGE ASSISTANCE** | | |
| a. SCPD policy will require the following: | | |
| i. A current Language Access Plan that explains how SCPD will implement its policies and procedures to provide meaningful access to police services. This plan will be updated at least annually. | Partial Compliance | SCPD approved the current version of its Language Access Plan (Rules & Procedures Chapter 26, Section 6) in August 2014. The policy has a number of strengths, and SCPD appears to be approaching its annual review in good faith, as it recently forwarded the United States a proposed updated draft which we have commented on in a separate letter dated June 22, 2015. |
| ii. Translations of the Language Access Plan and Policy into Spanish and other non-English languages as appropriate and posting in a public area of the police department building, on its website, and in any other locations throughout the County where individuals go to seek police assistance. | Partial Compliance | SCPD policy provides for the posting of the Language Access Plan in relevant locations; policy should also require updated translations of the Plan (i.e., it should be listed under the vital documents requiring translation). SCPD has appropriately translated and posted the LAP in Spanish. SCPD needs to translate the Policy into Spanish, and provide an appropriate plan for translating the LAP into any other languages. |
| iii. Distribution of the Language Access Plan and Policy to all SCPD staff and to community organizations serving LEP communities encountered by SCPD. | Substantial Compliance | SCPD policy provides for this and to date SCPD has conducted fairly widespread distribution of the LAP and Policy. We encourage SCPD to continue to identify additional distribution points. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| iv. Availability of Citizen Complaint/ Compliment forms in Spanish and other common non-English languages in all precincts and on SCPD's website for both completion and submission. | Partial Compliance | SCPD policy contains the relevant language. SCPD has translated this form into Spanish, and has made hard copies available in its precincts. SCPD is undertaking the steps to fulfill compliance with this Paragraph, including online submission of complaints/compliments and translation of the form into other non-English languages, as appropriate. |
| v. Translation of all vital written documents and materials, shall be consistent with DOJ Guidance, in order to ensure that LEP individuals in the community have meaningful access to such documents and materials. | Partial Compliance | SCPD has made major strides towards substantial compliance, but additional documents remain to be translated into Spanish and all documents need to be translated into additional languages. |
| vi. Translation of any citizen correspondence received that is in a non-English language. If that correspondence when translated would be considered a citizen complaint, then the information as translated will be processed in the same manner as are citizen complaints originally received in English. | Substantial Compliance | The Language Access Plan has incorporated this Paragraph into policy. The policy provides that authorized interpreters shall translate the correspondence; this should be changed to "authorized translators." SCPD also reports that all non-English correspondence has been translated, and none of the correspondence would be considered a complaint. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| vii. Availability of bilingual operators for complaint phone lines or a dedicated Spanish complaint phone number. SCPD will indicate on its Spanish-language Compliment/Complaint form that the phone operator speaks Spanish. | Compliance Rating Pending | During the March site visit, we had an opportunity to learn more about the dedicated phone line that can receive telephone complaints in Spanish. We learned that very few calls have been received and thus, it is premature to assess compliance at this point in time. Going forward, there should be an increase in Spanish language complaints. If not, the SCPD will need to determine what else needs to be done (in terms of outreach) to draw in unreported complaints or compliments from the Spanish-speaking community. |
| viii. Objective oral language proficiency standards and annual proficiency testing for all IAB members who are designated as "Spanish-speaking" or as speaking a non-English language. | Compliance Rating Pending | As part of the finalization of the DAI authorization and certification process, we understand that the SCPD will implement annual proficiency testing of Spanish-speaking Internal Affairs personnel. It is critical that bilingual skills are not conflated (or confused) with interpretation skills. Likewise, in terms of bilingualism, recognizing that these personnel will likely encounter both written and spoken Spanish communications, the assessment should cover both oral and written Spanish proficiency. |
| ix. Recording and periodic auditing of phone calls through the multi-language toll-free complaint hotline. | Partial Compliance | SCPD indicated in its January 2015 report that it is recording phone calls. However, auditing has yet to occur. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| x. Documentation of the use of any interpreter used when conducting a field interview or interrogation of an LEP individual, including the following:<br>1. the date;<br>2. the location;<br>3. the full name of the interpreter;<br>4. the non-English language spoken by the interpreter;<br>5. the relationship (if any) of the interpreter to the LEP individual;<br>6. contact information for the interpreter, including telephone numbers, email and postal address;<br>7. the name of the witness, victim, and subject person requiring an interpreter to the extent not prohibited by privacy laws; and<br>8. a summary of any action taken. | Partial Compliance | SCPD has implemented a policy which requires officers to document the use of interpreters. However, the completion of these forms is inconsistent and some additional training may be warranted. |
| b. SCPD will revise "Language Line Translating and Interpreting Service," Order Number 09-117, as follows:<br>i. The order will use the term "interpretation" to refer to oral communication, and "translation" to refer to written communication. As written, the order uses both terms interchangeably. | Substantial Compliance | |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| c. SCPD will modify its practices and implement the revised Chapter 26, Section 5, "Persons with Limited English Proficiency," as approved by the United States. | Partial Compliance | SCPD has drafted a new R&P 26.5, and we are working with SCPD to finalize that policy so that it can implement it going forward. |
| d. SCPD will ensure that the home page of its website states, in at least Spanish, how to access language assistance services and Spanish translations of SCPD policies and other relevant information. | Partial Compliance | The Forms & Reports page should include Spanish forms, even though there is a separate Spanish language site. Also, as noted above, we question the selection of Traditional Chinese. It may be important to also have them in Simplified Chinese. In addition, every form in every language should include a document footer with the last update date, document title, and language.<br><br>In the next compliance report, we look forward to hearing what the Police Technologies Bureau has learned regarding to the necessary measures to update and reorganize the SCPD website to make it more user friendly and to facilitate multi-language functionality. |
| e. SCPD will maintain effective incentives for bilingual employees to become SCPDAIs, including assignments, promotions, and other means available to the County. | Non-Compliance | SCPD has yet to propose any particular incentives. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| f. Within 90 days of the Effective Date, SCPD will implement a process of consultation with representatives of the Latino community to develop and annually review: implementation of the Language Access Policy, including areas of possible collaboration to ensure its effectiveness; accuracy and quality of SCPD language assistance services; and concerns, ideas, and strategies for ensuring language access. This process will be reviewed and approved by the United States prior to its implementation. | Partial Compliance | SCPD has conducted some meetings with community representatives. However, the plan for engaging the community is not fully developed and SCPD has not been fulfilling its own goals of meeting regularly. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| g. Within 180 days of the Effective Date, and annually thereafter, SCPD will provide at least four hours of training to all personnel on providing language assistance services to LEP individuals. This training will include:<br>i. SCPD's LEP plan, policies, and procedures and the requirements of Title VI and this Agreement;<br>ii. How to identify the non-English language and language assistance needs of an LEP individual during an in-person or telephone interaction;<br>iii. How to access SCPD-authorized, telephonic and in-person interpreters;<br>iv. How to work with interpreters in the field and assess interpreter quality;<br>v. How to account for cultural diversity and language barriers in policing; and<br>vi. Basic command terms and phrases in Spanish for officers assigned to patrol in areas with significant Spanish-speaking populations. | Non-Compliance | SCPD has yet to begin this training. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| h. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will conduct a satisfaction survey of representatives from the Latino community regarding SCPD's LEP efforts. SCPD will partner with local Latino advocacy groups in order to conduct the survey. SCPD will produce a report analyzing the results of each survey and detailing what measures, if any, SCPD will take as a result of the analysis. Each report will be provided to the United States throughout the pendency of this Agreement at least five business days before it is made public. | Partial Compliance | SCPD reports that it has distributed surveys and has received more than 1,000 completed forms. However, as noted above, engagement with community groups is not at the level it should be. Further, SCPD has yet to analyze the results or report on measures it intends to take in response to the survey results (they say that the CRB report satisfies this requirement—we should discuss; I don't think it really does). |
| **VI. ALLEGATIONS OF POLICE MISCONDUCT** | | |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| a. Reporting misconduct | | |
| i. SCPD policy will require that all members have the duty to report allegations of discriminatory policing to a supervisor or to the IAB. Failure to report or document allegations of misconduct will be grounds for disciplinary action. | Partial Compliance | In its January 2015 Compliance Report, SCPD cites a draft of R&P Chapter 5, Section 2, which requires that suspected violations be referred to an officer in charge, and that allegations of discriminatory policing be referred to IAB within 48 hours. However, this policy should also specifically reference discriminatory policing in the purpose section.<br><br>The draft of R&P 5.2 also does not state that failure to report or document allegations of misconduct will be grounds for discipline. Requiring SCPD members to reference and interpret the R&P section on "Police Mission" is too indirect a means of addressing this issue to constitute compliance. |
| ii. SCPD policy will ensure that all complaints are investigated even if the complainant does not submit the complaint on an actual SCPD complaint form. | Partial Compliance | SCPD has created the required policy. The United States will continue to monitor how this policy is being implemented. |
| iii. SCPD policy will explicitly permit parties other than victims to file complaints with the HCU, with the IAB, with any officer, or at any SCPD precinct. Complaints regarding hate crimes or hate incidents will be forwarded to an HCU investigator for review and investigation. | Partial Compliance | The language of R&Ps 5.2 and 24.6 that SCPD cites complies with the spirit of this requirement.<br>We further recommend that SCPD conduct outreach, particularly to minority communities, to ensure that members of the community know that this option is possible. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| b. Investigation of Misconduct | | |
| i. SCPD policy will ensure that all allegations of officer misconduct relating to discriminatory policing, regardless of the manner in which reported, will be forwarded to IAB no later than 48 hours from receipt. | Partial Compliance | SCPD has created the required policy. The United States will continue to monitor how this policy is being implemented. |
| ii. Within 180 days of the Effective Date, SCPD will review the staffing of IAB and ensure that individuals currently serving as or who are selected for IAB possess excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective. Supervisors with a sustained complaint of, or who have been disciplined for, excessive use of force, sexual harassment, discrimination, or dishonesty will be presumptively ineligible from assignment to IAB. | Partial Compliance | SCPD conducted a staffing review. During an on-site visit, SCPD disclosed to the United States that it had conducted a more detailed review, but the review was never produced. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| iii. SCPD policy will require that each IAB investigation of officer misconduct relating to discriminatory policing be reviewed by the Police Commissioner or his designee. | Substantial Compliance | SCPD has created the required policy, and the Commissioner acknowledges his concurrence with completed discriminatory policing investigations by signing them.<br><br>SCPD's documentation of chain-of-command review of completed investigations could better capture the substance of that review. SCPD personnel explained during the United States' visit that the Commissioner and Chief of Department conduct a substantive review and provide direction on certain investigations. This should be documented. We recommend that SCPD use a log to capture the supervisors' comments, and that this procedure be embodied in policy. |
| iv. Per SCPD policy, the Department will maintain a tracking system for all misconduct allegations relating to discriminatory policing that does not rely on personal identifiers. Upon receipt of such an allegation, SCPD will assign a unique numerical identifier to the complaint, which will be provided to the complainant at the time the allegation is made. SCPD will use the centralized numbering and tracking system to track data regarding the number, nature, and status of such misconduct allegations, from initial intake to final disposition, including investigation timeliness and the complainant's notification of the interim status and final disposition of the investigation. | Partial Compliance | SCPD has created a tracking system for misconduct allegations regarding discriminatory policing that does not require personal identifiers. The United States will conduct an on-site review to assess how SCPD is gathering the data generated by this system and how it is analyzing that data and using it to identify and address problems. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| v. SCPD will maintain protocols to analyze and address trends in complaints relating to discriminatory policing, including demographic data, lodged against SCPD officers. | Partial Compliance | SCPD has attempted to analyze and trend the data. However, no protocol upon which the analysis was based was provided. The protocol that is developed should be useful to SCPD for planning and problem solving and not just for data analysis. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| vi. Six months after the Effective Date, and every six months thereafter during the pendency of this Agreement, and thereafter every year, SCPD will conduct reviews of randomly-chosen, completed misconduct investigations relating to discriminatory policing. SCPD must review at least 20 percent of all completed misconduct investigations since the last review. The reviews will be conducted by the Police Commissioner or his/her designee, but not an involved individual, and will require contacting the complainant to ensure the investigation was handled in a professional and thorough manner. Dissatisfaction with the results of the investigation will be documented and the case may be reopened if the complainant discloses credible new facts which would support allegations not addressed in the original complaint. Throughout the pendency of this Agreement, the results of each review will be forwarded to the United States within five business days of its completion. | Partial Compliance | SCPD has conducted three such reviews. We will assess additional reviews during the course of the pendency of the Agreement. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| **VII. COMMUNITY ENGAGEMENT** | | |
| a. In all of its policing operations, SCPD will maintain robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and community confidence in the Department. SCPD will maintain community and problem-oriented policing principles in its policing operations. SCPD will also engage the public through the dissemination of public information on a regular basis. SCPD and the County will maintain systems to ensure comprehensive, effective, and transparent oversight of SCPD. | Partial Compliance | SCPD has taken significant strides toward better community engagement, but more work needs to be done. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| b. Community Liaison Officers | | |
| i. SCPD policy will ensure that a Community Liaison Officer is assigned to each of the Department's seven precincts. A preference for selection and assignment of each Community Liaison Officer shall be given to a sworn officer fluent in both English and a second language commonly spoken in the relevant community, if any. Each Community Liaison Officer will have training in the nature and scope of federal and state civil rights laws as applied to law enforcement activity. | Partial Compliance | The United States is pleased that SCPD has created CLO positions throughout the precincts and within the Community Relations Bureau. We look forward to seeing these officers continue to address community concerns throughout Suffolk County, and for SCPD to finalize its policies and training with respect to these important positions. SCPD should assess whether it requires additional bilingual CLOs; it reports that at present, only two out of eight are fluent in Spanish. |
| ii. SCPD will ensure that the contact information and duty hours of the Community Liaison Officers are publicly available on its website. Community Liaison Officer hours of availability for contact with the public will be during normal business hours. | Partial Compliance | SCPD has posted contact information and duty hours for the CLOs on its website. However, the website indicates inaccurately that officers are available from 9 A.M. to 10 P.M. daily. The website should be revised accordingly. Further, we recommend that the SCPD develop a separate link on the SCPD website which indicates monthly availability, which should include nights and weekends to attend events and meetings. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| iii. Each Community Liaison Officer's duties will include the following:<br><br>1. Arranging monthly meeting of community residents to discuss issues and ask questions regarding the police department. The meeting will be attended by the Community Liaison Officer, at least one senior SCPD command staff member, and at least one officer responsible for patrolling in that particular precinct.<br>2. Each Community Liaison Officer will review, on a monthly basis, all concerns submitted to SCPD by members of his or her precinct to assess community issues. For those concerns that do not rise to the level of requiring formal action under SCPD policy, the Community Liaison Officer will notify the complainant that the Community Liaison Officer is available to answer the complainant's questions and respond to any further community concerns. The Community Liaison Officer will refer complaints of police misconduct relating to discriminatory policing to IAB.<br>3. Each Community Liaison Officer will meet at least once every six months with the respective bureau commander. During these meetings, the Community Liaison Officer will communicate any concerns or issues that he or she has received during the previous six months, along with any other relevant information pertaining to SCPD's | Partial Compliance | SCPD is holding monthly community meetings as per this requirement. However, SCPD has not provided information documenting biannual meetings between CLOs and bureau commanders. If such documentation exists, please produce it. We further recommend that CLOs try to ensure appropriate interpretative services are available at the monthly community meetings. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| c. Community Oriented Policing Enforcement ("COPE") | | |
| i. SCPD policy will define COPE officers as those who will be assigned to a specific area as a liaison between the community and the police department to assist the community in solving neighborhood problems. | Substantial Compliance | Each precinct has two COPE officers who act as liaisons to the community and assist in addressing community problems. They are no longer assigned sector car or patrol duties. |
| ii. SCPD policy will ensure that all COPE officers engage in routine community policing and community outreach, which may include: attending neighborhood association meetings to provide input or answers, attending school functions to educate children about safety and crime prevention, assisting the community in solving non-emergency problems, addressing community decay issues (abandoned and junk vehicles, graffiti, abandoned residences and buildings, code enforcement violations, illegal dumping), meeting with business owners to provide input or answers, and helping the community to become self-reliant. While COPE officers may be called upon to enhance patrol efforts, this duty should be in relation to a particular community-generated request, need or identified problem and not as routine duty. | Partial Compliance | Although we observed some activities of COPE officers consistent with this requirement, there is insufficient documentation of COPE officer activities. COPE officers should be able to demonstrate on a weekly, if not daily, basis, their interactions with the public and the results thereof. We also recommend that COPE officers be given sufficient flexibility to allow them to attend meetings on weekends and evenings, as needed. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| iii. SCPD policy will ensure that all COPE officers engage with individuals in their respective patrol areas; *e.g.*, COPE officers assigned to patrol units in business districts should interact with business owners, and COPE officers assigned to patrol school and residential areas should interact with school personnel and residents, respectively. | Partial Compliance | See comments to Section VII.c.ii. above. |
| iv. SCPD policy will require COPE officers to submit to their supervisors a monthly activity report documenting the amount of time they dedicated to community-oriented policing activities, the type of community-oriented activities in which the officers have engaged, and listing the organizations and individuals the officers have contacted. | Non-Compliance | SCPD needs to develop and implement a form that is useful for planning and problem solving, not just documentation of meetings attended. |
| d. Community Response Bureau | | |
| i. Within 90 days of the Effective Date, SCPD will develop and provide to the United States for review a policy that details the CRB's plan for engaging with the Latino community. | Partial Compliance | SCPD produced a policy in April 2014 and the United States provided comments. |
| ii. SCPD policy will ensure that each precinct has an officer representing it in the CRB. | Substantial Compliance | |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| iii. Within 90 days of the Effective Date, SCPD will develop a survey instrument in order to solicit assessments of the CRB's success in engaging the Latino community. Additionally, each quarter SCPD will ask community and political leaders within the Latino community to critique CRB programs and initiatives. SCPD officers involved in administering CRB programs will also quarterly analyze participation and results. | Partial Compliance | *See* notes in Section V.h. |
| iv. Using and analyzing feedback from the above sources, SCPD will produce reports annually that identify CRB successes as well as areas in need of improvement and a strategy for making such improvements. SCPD will provide to the United States copies of these reports throughout the pendency of this agreement within five business days of their completion. Within ten business days of their completion, the reports will be made available to the public, unless SCPD demonstrates a good faith reason for non-disclosure. | Partial Compliance | SCPD produced the first CRB report with its January 2015 report. That report was largely consistent with this requirement. |
| v. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will provide to the United States reports summarizing issues addressed at community meetings and SCPD responses. | Partial Compliance | *See* notes regarding Section VII.d.iv above. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| e. Community Outreach | | |
| i. SCPD policy will continue to ensure that the Police Commissioner or designated high ranking officer(s) meet with key leaders in Latino and other minority groups on a regular basis both at SCPD-sponsored meetings and at meetings held by minority groups. | Partial Compliance | Although the Commissioner and his First Deputy have met with Latino community members, these meetings have not been regular or sufficiently numerous. We encourage the Commissioner and Deputy Commissioner to attend more meetings at which issues relating specifically to minorities and policing issues are discussed. In particular, we urge that the Commissioner ensure that he attend quarterly meetings with his advisory group at least four times per year. |
| ii. SCPD will continue its outreach programs to all members of the community (*e.g.* Police Athletic League, English as Second Language classes, etc.) with the assistance of bilingual SCPD officers. | Partial Compliance | SCPD's outreach program continues to engage organizations such as the Police Athletic League, but the program needs to be augmented in order to reach all members of the community. |
| iii. SCPD will engage the Latino community on an informal basis through community events in an effort to maintain a good relationship with the Latino community. | Partial Compliance | SCPD is engaging in these activities; we encourage it to continue to grow the established programs and create new ones. |
| iv. SCPD will solicit and receive input from the Community Advisory Board regarding the development of Spanish language training. | Partial Compliance | SCPD reports that it has met with its advisory board regarding Spanish language training. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| v. SCPD will provide Spanish language learning opportunities for officers as well as sensitivity and diversity training, including presentations administered by Suffolk-based or local Latino organizations. | Partial Compliance | Although SCPD has taken some steps in this regard, sensitivity and diversity training is still in development, and it is unclear to what extent Suffolk based or local Latino organizations have been included in this process. |
| vi. All non-confidential audits and reports related to the implementation of this Agreement will be made publicly available via the SCPD website and at the Police Department, County headquarters, and other public locations, to the fullest extent permissible by law. | Substantial Compliance | SCPD has posted reports on its website related to implementation of this agreement. |
| vii. SCPD will collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to SCPD decision making and activities, as permitted by law. | Partial Compliance | SCPD has begun to collect and analyze data in many areas. Hoever, as noted above and in SCPD's own reports, identification of pertinent data to be collected, collection of that data and analysis of that data is ongoing in many areas. |
| f. Social media and notification systems | | |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| i. Within 180 days of the Effective Date, to the extent SCPD uses social media and related publishing systems, such as Nixle, to provide community members with information that includes emergency alerts, safety tips, and other public safety information, SCPD will ensure that messages that are broadcast in English are also provided in Spanish or, to the extent practicable, any other non-English language commonly spoken by community members, consistent with the requirements of Title VI. | Substantial Compliance | |
| ii. SCPD will advertise the availability of such publishing systems to the community using local and social media. | Substantial Compliance | |
| **VIII. POLICIES AND TRAINING GENERALLY** | | |
| a. SCPD will maintain policies and procedures that are consistent with this Agreement and that provide clear direction to ensure that officers and civilian employees enforce the law effectively, ethically, and constitutionally. SCPD will ensure that all SCPD officers and employees are trained and able to fulfill their duties and responsibilities pursuant to SCPD policies and procedures. | Partial Compliance | As set forth above, SCPD has revised some of its policies consistent with this Agreement, but others remain in need of revision, and training needs to be conducted to ensure appropriate implementation. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| b. After undergoing any training required by this Agreement, SCPD will ensure that all officers who take such training will be required to pass a test demonstrating a basic comprehension of the training material after it is presented. | Compliance Rating Pending | The SCPD training curricula the United States has reviewed do not yet meet the requirements of the Settlement Agreement. Accordingly, at the United States' request, SCPD has not delivered the trainings. Testing on the trainings will be required upon their delivery.<br><br>SCPD should take steps to ensure that each training curriculum is accompanied by a test that will assess comprehension. |
| c. SCPD policies and procedures will define terms clearly, comply with applicable law, and comport with best practices. | Partial Compliance | SCPD continues to work to achieve this standard. |
| d. SCPD will apply policies uniformly and hold all officers accountable for implementing and complying with SCPD policies and procedures. | Partial Compliance | SCPD continues to work to achieve this standard. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| e. Upon request, SCPD will make available to the United States any policy the United States wishes to review. All policies and training curricula required by this Agreement will be provided to the United States for review within five business days of completion or modification. Within 60 days of receipt of any policy or training curricula for review, the United States will notify SCPD of any concerns it has regarding compliance with this Agreement, the Constitution, or federal law. SCPD will revise, modify, or delete any policy or training curricula required by this Agreement that the United States finds to be deficient unless SCPD shows, to the satisfaction of the United States, that it need not do so. If the parties disagree, the parties will attempt to resolve their differences in good faith. | Substantial Compliance | SCPD has responded timely and appropriately to document requests. Training curricula and policies have largely been provided to the United States timely upon completion or modification. In certain cases, the United States has provided substantial commentary on training curricula, and SCPD did not respond with related modifications. |
| f. SCPD will implement a mechanism to ascertain whether policies required by this Agreement are being followed and to measure the success of the revised, modified, or newly created policies and procedures. The mechanism will incorporate measuring officer accountability and seeking community input as part of its metrics. | Partial Compliance | SCPD has developed mechanisms to test discreet aspects of the implementation of the Settlement Agreement, such as spot-checking precincts to ensure that citizen complaint forms are displayed in Spanish. SCPD has not produced the comprehensive mechanism described in this section. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| g. SCPD will ensure that all policies and procedures are available to SCPD members in an electronic format. | Substantial Compliance | SCPD has made these documents available to members through an electronic platform. |
| h. SCPD will ensure that all revised or modified policies, procedures, directives, or orders are provided to SCPD members in a manner that clearly highlights or distinguishes any modification or change within the text of the policy itself. | Substantial Compliance | |
| i. After issuing a Rule and Procedure pursuant to this Agreement, SCPD will ensure that all SCPD personnel have received, read, and understand their responsibilities pursuant to the revised policy or procedure, including the requirement that each officer or employee report violations of policy. SCPD officers will be required to demonstrate that they understand the revised Rule and Procedure. SCPD will also ensure that all officers know that, if they need clarification of a Rule and Procedure, they should consult with their supervisor. | Partial Compliance | SCPD continues to work to achieve this standard. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| j. SCPD will review each Rule and Procedure required by this Agreement within one year after it is implemented, and at least annually thereafter to ensure that the policy or procedure provides effective direction to SCPD personnel and remains consistent with the Constitution, current law, and best practices. Each policy will be marked with the next date for review. | Non-Compliance | This rating may change pending information to be provided by SCPD with the next self report. |
| k. SCPD will ensure that Rules and Procedures made pursuant to this Agreement, including policy updates and revisions, are made available on its website in both English and Spanish and any other language commonly spoken within the community within 180 days of the Effective Date. Subsequently, Rules and Procedures made pursuant to this Agreement will be made available on SCPD's website in both English and Spanish within 60 days of each policy's Effective Date. SCPD may seek the United States' permission not to post particular Rules and Procedures on the website if SCPD provides a reasonable basis for its request. | Partial Compliance | SCPD continues to work to achieve this standard. |

| SETTLEMENT AGREEMENT REQUIREMENT | COMPLIANCE RATING | COMMENTS |
|---|---|---|
| l. SCPD will check its website for accuracy, formatting, and ease of comprehension within 90 days of the Effective Date and then at least annually. SCPD will ensure that all applicable Rules and Procedures on the SCPD website are translated by a competent translator. | Partial Compliance | SCPD is dedicating energy to reviewing and updating its website's information and presentation thereof. SCPD has placed links to the Language Access Plan, including a Spanish version, and the Complaint/Compliment form on the website's homepage. The website also features links to a Spanish-language information page that includes a number of translated documents.<br><br>SCPD can still improve the website's navigability and more rigorously update posted documents to reflect current policies and forms. |
| m. SCPD should ensure that policies are not duplicative or redundant and that when policies are updated, the policies they replace are no longer used and no longer referenced in other policies, practices, training materials and other department documentation. | Partial Compliance | Duplicative or outdated policies have not presented a concern in SCPD's compliance activities to date. However, SCPD is still working to bring its policies into compliance with the terms of the Settlement Agreement. SCPD should take care to avoid duplication in particular instances – for example, where SCPD is moving content from an existing policy into a new, stand-alone policy dedicated to a narrower topic. |

# THIRD REPORT ASSESSING SETTLEMENT AGREEMENT COMPLIANCE BY SUFFOLK COUNTY POLICE DEPARTMENT

**April 18, 2016**

# I. INTRODUCTION

In January 2014, the United States Department of Justice ("DOJ") and the Suffolk County Police Department ("SCPD" or the "Department") entered into a Settlement Agreement ("Settlement Agreement" or "Agreement") to ensure that police services are provided to all members of the Suffolk County community, including the Latino community, in a manner that complies with the Constitution and laws of the United States.[1] DOJ, as part of its responsibilities for oversight of SCPD's implementation of the Settlement Agreement, periodically reports on its assessment of SCPD's compliance with the Agreement. This is the third such Assessment Report.

Since we issued our last Assessment Report in December 2015 (the "Second Assessment Report"), DOJ representatives from both the Civil Rights Division and the United States Attorney's Office for the Eastern District of New York reviewed documents and materials provided by SCPD, including revised policies and procedures, copies of internal affairs investigations, a sample of entries in SCPD's community relations daily activity reporting system, and other reports completed during the time period covered by this report. We also met with SCPD officials, including Commissioner Timothy Sini, SCPD command staff and other supervisors, and SCPD officers, toured six precincts and met with officers at each of those precincts, participated in ride-alongs with on-duty officers, attended three different training courses, and met with members of specialized units, including the Hate Crimes Unit, the Internal Affairs Bureau, and the Community Response Bureau. In addition, we directly engaged the Suffolk County community, including the Latino community, both by interviewing community members about their specific experiences with SCPD and by meeting with community advocates. In conducting these activities, we consulted with police practice experts with significant expertise in the areas of policing covered by the Settlement Agreement.

We thank the SCPD officials with whom we met during this assessment period, and we appreciate the cooperation and effort that SCPD and Suffolk County leadership continue to show in addressing the requirements of the Agreement. We also thank the many members of the Suffolk County community who have met with us and provide us with invaluable feedback.

This Assessment Report is divided into two sections. First, we provide a compliance rating for each provision of the Settlement Agreement: substantial compliance, partial compliance, or non-compliance. Second, we provide a more detailed analysis of SCPD's successes and challenges to date in each main area of the Agreement: 1) bias-free policing; 2) hate crimes and hate incidents; 3) language assistance; 4) allegations of police misconduct; and 5) community engagement. As set forth in detail below, while SCPD has made real progress in implementing the requirements of the Settlement Agreement, there remains considerable work to be done in each of these areas.

---

[1] This Agreement is available in both English and Spanish at https://www.justice.gov/crt/special-litigation-section-cases-and-matters0#police.

## II. CURRENT COMPLIANCE RATINGS

Section IX of the Settlement Agreement provides that, every six months, the United States will assess and report on SCPD's compliance with the Agreement. *See* Agreement at 20. The compliance ratings below represent the United States' current assessment of SCPD's compliance with each area of the Agreement. While Section III of this Report provides more detailed analysis of SCPD's compliance with the Agreement, these ratings are included to provide SCPD and the Suffolk County community with a clear and accurate summary of progress to date, as well as areas that remain most in need of attention.

The definition of each rating type is as follows:

- "Substantial Compliance" indicates that the County has achieved compliance with most or all components of the relevant provisions of the Agreement.
- "Partial Compliance" indicates that the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains.
- "Non-Compliance" indicates that the County has not met most or all of the components of the Agreement.
- "Compliance Rating Pending" indicates that there is insufficient information to make an assessment or the provision is not yet ripe for evaluation.

| **Settlement Agreement Area** | **Status of Compliance** |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Partial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Noncompliance |
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Partial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Partial Compliance |
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |

| | |
|---|---|
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Noncompliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Partial Compliance |
| h. Community Survey | Partial Compliance |
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Partial Compliance |
| b. Investigation of Misconduct | Partial Compliance |
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement (“COPE”) | Substantial Compliance |
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social media and notification systems | Substantial Compliance |
| VIII. POLICIES AND TRAINING GENERALLY | Partial Compliance |
| IX. MONITORING OF THE AGREEMENT | Partial Compliance |

# III. ANALYSIS OF SCPD'S COMPLIANCE TO DATE

## A. BIAS-FREE POLICING

| | |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Partial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Noncompliance |

The Settlement Agreement contains specific provisions designed to ensure that SCPD delivers police services that are "equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Department." Agreement at 4. The Agreement requires that "members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, or sexual orientation, and in accordance with the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States." *Id.*

SCPD continues to take steps towards compliance with this section of the Agreement. As set forth below, SCPD has made considerable progress in drafting appropriate policies and procedures in this area. However, continued progress is needed to ensure those policies and procedures are actually implemented. Further, in light of significant shortcomings in the bias-free training highlighted in the last Assessment Report, SCPD has put a temporary hold on conducting any additional bias-free training until the curriculum can be revised. While we believe this action was appropriate given the deficiencies in that training, it is critical that appropriate curricula are developed in order to allow training to recommence. To that end, the Office of Justice Programs of the United States Department of Justice has agreed to provide SCPD with a newly developed bias-free training module, which SCPD should tailor to its particular needs over the next few months. Finally, with respect to data collection, SCPD has made significant progress in remedying the inaccuracies within collected traffic stop data that were highlighted in our last Assessment Report. Nonetheless, the data collected by SCPD continues to be insufficient to allow for a meaningful statistical analysis of SCPD's enforcement practices.

Ultimately, although SCPD has worked to develop policies that are largely consistent with the bias-free policing requirements of the Agreement, these measures alone are insufficient to address the depth and breadth of the deficiencies that persist in this area. The Department must make bias-free policing one of SCPD's highest priorities, and must communicate to all SCPD officers—through training, supervision, and accountability mechanisms—that law enforcement duties must be performed free of impermissible bias in order for the Department to function lawfully and effectively.

1. Policies and Procedures

SCPD has made considerable progress in adopting appropriate policies and procedures in this area. Nonetheless, SCPD must continue to take steps to ensure that these policies and procedures are properly implemented.

For example, Rules & Procedures Chapter 1, Section 11 unequivocally prohibits officers from "us[ing] race, ethnicity, national origin, age, gender, religion, sexual orientation, or gender identity when engaging in routine or spontaneous law enforcement activities, except when engaging in appropriate suspect-specific activity to identify a particular person or persons." The policy also emphasizes the importance of building community trust, and requires SCPD members who become aware of biased-based policing to immediately report the matter to a supervisor, who in turn must convey the information to Internal Affairs. In this way, the policy provides a strong foundation for SCPD to ensure policing free from unlawful bias. Nonetheless, as discussed throughout this section, implementation of this policy will require training, supervision, and accountability beyond what is currently in place.

SCPD has also made clear in policy that, within five days of receipt, SCPD will refer any complaint of discriminatory policing to the Internal Affairs Bureau for a full investigation. *See* Rules & Procedures Chapter 5, Section 2. While the adoption of this policy represents significant progress, we continue to have concerns regarding the processes actually used for investigating allegations of discriminatory policing. As set forth in detail in Part III, Section D of this report, a large number of misconduct investigations do not proceed in a timely manner, which results in delays that leave the complainant, accused officer, and SCPD without a resolution for far longer than necessary. This delay can undermine both officer and public confidence in the complaint process. There have been some positive developments in the area of investigating allegations of discriminatory policing. SCPD continues to consistently forward such investigations to the United States as required by the Agreement. Agreement at 5. Further, enhanced implementation of the Department's computerized notification system has the potential to improve the complaint investigation process. Nonetheless, the recommendations set forth in Part III, Section D below must be implemented in order for SCPD to achieve substantial compliance.

Similarly, SCPD has made significant progress in the area of ensuring adherence to the principles of bias-free policing and equal protection within SCPD's hiring, promotion, and performance assessment processes through the revisions made to Chapter 26, Section 1 of the Rules and Procedures. The policy appropriately provides that "[a]ll recruitment efforts will focus on providing equal opportunity for all applicants," irrespective of membership in a protected class "or any other factor not directly related to job performance." The policy also directs officers to, *inter alia*, "maintain positive and productive relationships with community leaders, educational institutions and religious organizations" and make continuous efforts to "recruit eligible applicants at high schools and colleges." *Id.* Further, on August 24, 2015, SCPD issued Applicant Investigations Command General Order 15-01, prohibiting the hiring of any candidate who "has committed any discriminatory act or . . . evinces a biased perspective based upon race, color, ethnicity, national origin, religion, or sexual orientation that indicates such candidate is not be able [sic] to perform the duties of police officer in a non-discriminatory

manner." But while the adoption of these directives is significant progress, as SCPD acknowledges in its Self Assessment Report, additional work is needed to ensure that these policies are adhered to in practice. *See* Compliance Report Assessing Implementation of the 2014 Settlement Agreement between the United States and the Suffolk County Police Dep't (Feb. 15, 2016) ("SCPD Self Assessment Report") at 8. SCPD must demonstrate that it is conducting the investigations, reviews, and screenings targeting a history of bias and/or biased policing, and that equal protection measures are being enforced.

It is important to note that, in the course of SCPD's ongoing efforts to ensure that bias-free related policies and procedures are fully implemented, it is likely that SCPD or the United States will identify needed modifications to policies that have already been adopted. In our last Assessment Report, for example, we recommended minor modifications to Chapter 1, Section 11 of the Rules and Procedures, as well as to Chapter 26, Section 1. We appreciate the Department's willingness to adopt those recommendations. The United States is committed to continuing to work with SCPD to evaluate and provide feedback regarding policies and procedures as they are implemented.

2. Traffic Stop Data

A key requirement of the Settlement Agreement is the collection of meaningful and accurate traffic stop data. *See* Agreement at 6. Meeting this requirement is critical, as ensuring that policing services are delivered in a manner free from bias requires the collection and analysis of accurate information regarding SCPD's practices. Significant steps remain necessary to ensure the collection and analysis of this data.

SCPD has made strides in improving its collection of traffic stop data. Officers now record critical information in their mobile data terminals. Officers report that the data collection interface on the mobile data terminals functions well, and that they are able to input necessary data in a timely and efficient manner. Precinct supervisors have also increased the attention placed on ensuring these reports are filled out completely. During this rating period, there has been a notable reduction in the proportion of traffic stop data that is left incomplete.

Nonetheless, the data collected by SCPD continues to be inadequate to allow for the needed assessments of SCPD's enforcement practices. Most significantly, the data collected by SCPD omits critical variables that are necessary for meaningful analysis. For example, SCPD does not collect any meaningful data regarding why a traffic stop was initiated. Without detailed data regarding the reason for a stop—e.g., speeding violation, equipment violation, etc.—it is impossible to determine whether the outcomes of traffic stops are based upon the severity of the violation, or are instead impermissibly influenced by bias. By enhancing SCPD's current data collection practices to include detailed information regarding why a stop was initiated, SCPD will be able to evaluate whether similar offenses result in similar outcomes independent of the race, ethnicity, or other protected characteristic of the driver or passenger, or are instead influenced by unlawful bias. As another example, while SCPD collects data regarding whether an officer conducts a search during a traffic stop, critical data regarding conducted searches is omitted. As an example, SCPD does not track whether a search was conducted of the driver alone or instead the passenger or the entire vehicle; SCPD does not track the duration of the search; and, most significantly, SCPD does not consistently track whether a search yielded a

finding of contraband such as weapons or controlled substances. Without this data, SCPD is unable to meaningfully assess whether there are disparities in search practices that suggest those practices are influenced by unlawful bias. Further, collection of such data is not only necessary to ensure bias-free policing; such data also serves as an effective management tool and has the potential to promote efficiency by showing which law enforcement strategies are most effective.

In a June 22, 2015 letter to SCPD's counsel regarding language access, bias-free policing, and accountability policies and practices, we noted these and other shortcomings in the range of data collected by SCPD, and made specific recommendations regarding additional data that should be collected and analyzed. Additionally, during our on-site meetings with SCPD officials between March 10 and March 15, 2016, we discussed in detail the need for enhanced data collection. Implementing these recommendations and expanding SCPD's data collection practices should be of the highest priority for the Department over the next several months. We will continue to provide any assistance we can as the Department undertakes those efforts.

Furthermore, as noted in our last Assessment Report, SCPD identified flaws in its procedures that made the collection of traffic stop data unreliable prior to July 2015. SCPD notes in its Self Assessment Report that these flaws resulted in approximately 7,000 incomplete records. *See* SCPD Self Assessment Report at 10. While the Department has taken measures to correct the systemic errors that lead to these problems, including by improving the retrieval software used by the Department, it is critical for SCPD to continue to monitor collected data in order to quickly identify and correct any future errors that may arise.

SCPD must take meaningful steps to ensure that collected data is analyzed and that appropriate measures are taken when this analysis reveals problematic conduct. The Settlement Agreement requires that, at least annually, SCPD provide the United States with a report containing this analysis and a summary of the remedial measures taken, if any. Agreement at 6. Given the shortcomings within the data collected by SCPD, including the technical errors that resulted in unreliable data prior to July 2015, SCPD has not yet been able to comply with this provision of the Agreement. SCPD's immediate priority must be to ensure that appropriate data is collected and accurately recorded during each traffic stop. To that end, SCPD must work to develop appropriate benchmarks that are required for certain types of analysis. The United States will work with SCPD to assist in the development of these benchmarks.

Finally, SCPD supervisors must incorporate a substantive review of traffic stop data into their regular supervisory activities. While it is clear that SCPD supervisors are making a concerted effort to ensure traffic stop data is consistently and completely entered, supervisors' use of this data is entirely inconsistent. Many supervisors do not regularly review traffic stop data collected by their officers likely stems, at least in part, from the fact that supervisors have not received appropriate training regarding how to best make use of this data. Indeed, SCPD fails to provide any specific, recurring supervisory training; instead, supervisors are trained regarding how to perform supervisory functions only when they are promoted to the rank of sergeant. SCPD should strongly consider developing and implementing specific, recurring training for supervisors that includes instruction on how to use collected data to ensure officers are performing effectively and lawfully.

3. <u>Training</u>

Ensuring bias-free policing requires that officers receive effective training in how to conduct law enforcement activities in an equitable manner. The Settlement Agreement requires that all sworn officers receive training on bias-free policing at least annually. *See* Agreement at 6-7. The Agreement provides that SCPD's training on bias-free policing "will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, is prohibited by policy and will subject officers to disciplinary action." *Id.* The Agreement also sets forth specific elements that must be incorporated into bias-free training. *Id.*

As explained in detail in our last Assessment Report, SCPD's revised bias-free policing training was both pedagogically and substantively deficient. *See* Second Assessment Report at 16-19. Acknowledging these deficiencies, SCPD has elected to suspend delivery of its bias-free policing training until the curriculum can be comprehensively revised to comport with the requirements of the Settlement Agreement and best practices in the field. SCPD's efforts will be assisted by the Office of Justice Programs of the United States Department of Justice, which has agreed to provide SCPD with technical assistance in the form of a train-the-trainer bias-free policing training module. To be clear, SCPD will need to shape this module to be consistent with its specific rules and procedures and to fit its particular needs. Nonetheless, this assistance promises to aid SCPD in fulfilling its obligation to provide effective training on bias-free policing.

SCPD has also developed and begun the delivery of cultural sensitivity training. As set forth in Part III, Section C, this training also has significant pedagogical and substantive shortcomings. As SCPD works to adopt and implement bias-free policing training, the Department should also ensure that cultural sensitivity training is expanded and fully incorporated.

B. <u>HATE CRIMES AND HATE INCIDENTS</u>

| | |
|---|---|
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Partial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Partial Compliance |

SCPD has made significant strides in the area of hate crimes and hate incidents since entering into the Agreement, most notably in its hate crimes training and investigations, and we commend the progress. The Department successfully implemented many of the recommendations in our last Assessment Report, including restructuring the format of the hate

crimes training and implementing more rigorous data analyses for quality assurance purposes. *See* Second Assessment Report at 20-24. However, substantial improvements are still required, particularly in how officers identify potential hate crime offenses and refer them to the Hate Crimes Unit ("HCU"), and in the hate crime mapping process. Accordingly, SCPD continues to be in partial compliance with the hate crime provisions of the Agreement.

1. <u>Training</u>

a. *Format*

The Department has made several changes to address the problems with SCPD's hate crimes training that we had identified in the last Assessment Report. A primary concern was that the training presentation needed better structure and organization. SCPD adopted our recommendations and has made the necessary changes. The training we observed in March 2016 opened with a road-map for the course, listed the objectives, and clearly detailed the topics to be covered. The introduction laid out the community policing philosophy behind the hate crimes training: to provide fair policing to all members of the community, foster positive community relations, and increase police legitimacy by properly dealing with and investigating potential hate crime offenses. *See* Rules & Procedures Chapter 1, Section 11. Nonetheless, while the training was effective overall, several concerning statements were made during the training that communicated mixed messages regarding the purpose and importance of ensuring appropriate hate crimes enforcement. We will communicate these specific concerns directly with SCPD's training coordinators, but overall, this training was markedly improved.

In our last Assessment Report, we had recommended pedagogical changes to the hate crimes training. *See* Second Assessment Report at 20-21. At the time, the training had been almost entirely lecture-based. Such an approach does not sufficiently engage students. Instead, the training should have elements of participatory and scenario-based learning. SCPD has embraced this approach. The training we saw in March incorporated a prepared lecture with slide and video presentations, small group discussions, and interactive role playing exercises in which participants reasoned through scenarios that raised points of law and proper police procedure. These changes are a significant improvement to the previous versions of the training and should increase its effectiveness in educating officers about the concepts underlying hate crimes laws. Indeed, the majority of those in attendance actively participated and seemed genuinely engaged with the material. The three-hour course was an appropriate length to cover the subject and provided sufficient time to incorporate group discussions and exercises in combination with the lecture.

b. *Curriculum Substance*

The training curriculum should teach officers how to identify hate crimes by providing instruction on the elements and proper charging of these offenses. Although the training was, overall, very good, we have concerns that the training lacked clarity regarding 1) the substance of the New York State Hate Crimes Statute, and 2) the process for determining whether an incident is a potential hate offense and its referral to HCU. The discussion of hate-based graffiti as aggravated harassment in the first degree also needs to be refined, especially given that it is the most common hate offense occurring in Suffolk County.

The instructor did not provide an accurate explanation of the legal standard under New York State Hate Crimes Law, NYSPL § 485.05(1a). The law requires that the perpetrator intentionally commit the offense against a person "in whole or substantial part" because of beliefs or perceptions about the victim's identity. *See id.* Rather, the instructor incorrectly stated that "in whole or substantial part" means fifty-one percent or more. The standard does not require this showing, but rather that a considerable part of the perpetrator's motivation in committing the offense is based on his or her belief or perception that the victim is a member of a protected class. *See, e.g.*, *People v. Fox*, 844 N.Y.S.2d 627, 638 (N.Y. Sup. Ct. 2007) (noting that "any person of ordinary intelligence would understand that the words 'in whole' mean completely or entirely and the words . . . 'substantial part' mean a considerable portion or amount") (citation omitted). This portion of the presentation must be changed as it misstates the law and will result in the under-identification of potential hate crimes.

The instructor also needs to revise his description of the process by which an incident is flagged as a potential hate crime or hate incident and then referred to HCU for investigation. The instructor stated that when officers suspect that an incident could be a hate crime, they should conduct the legal analysis and notify their supervisors or HCU if they conclude the incident may have been hate motivated. The instructor explained that the supervisors then should conduct the same analysis and decide whether to refer the case to HCU. It was unclear who has the discretion to decide whether an incident warrants notifying HCU. The instructor seemed to suggest that both the officer and the supervisor have discretion to decide whether to refer the incident to HCU. However, the instructor also stated that when there is any indication of racial bias, such as the uttering of a racial epithet during a road rage incident, HCU should automatically be notified, thus implying the officer and supervisor do not have any discretion. The training must be revised so that officers have a clear understanding of this process.

Our interviews with officers and supervisors confirm the lack of clarity about this process. Officers at different ranks do not seem to have a consistent understanding of when HCU should be notified. The training instructor, supervisors, and officers seemed to believe to some extent that "when in doubt, notify the supervisor or the Hate Crimes Unit." However, the supervising officers do not seem to agree on the appropriate criteria to use when deciding whether to notify HCU. For example, when given a hypothetical of an event that, at first glance, did not appear to be racially motivated, but in which the victim said "I feel like this was done to me because I am black," one supervisor remarked that he would not call HCU if he felt that the act was not racially motivated. Another supervisor said that given the victim's allegation, he would refer the case to HCU for investigation and a final determination. Our recommendation is that officers should notify HCU anytime there has been a racial slur during the commission of a crime to allow HCU detectives to investigate and track such incidents as they may, in the aggregate, show a pattern of animus that police can then monitor. In sum, the process for analyzing potential hate offenses and the levels of discretion are unclear, and the training set forth contradictory standards. SCPD should revise the hate crimes training to establish clear guidelines for identifying and referring potential hate offenses to HCU, which has the expertise to properly evaluate potential hate crimes.

Lastly, the training's instruction on swastika graffiti should be refined to avoid confusion about New York's hate crimes statutes. Swastikas, burning crosses, and nooses are images that

epitomize religion- and race-based hate. However, these incidents are not prosecuted under Section 485.05 of the penal law. Instead, they fall under Section 240.31of the penal law—aggravated harassment in the first degree. *See* NYPL § 240.31(3*); see also id.*, § (4) (cross burning), § (5) (noose displays or images). The instructor first covered Section 485.05, and properly noted that swastika drawing is not a chargeable offense under the statute, without discussing that it is, however, aggravated harassment in the first degree, and Section 240.31 was covered later in the course. We recommend that the two statutes be presented together to emphasize that while these offenses might intuitively appear to be hate crimes under New York Penal Law Section 485.05, they are actually prosecuted as aggravated harassment in the first degree. It is critically important that officers understand this because SCPD has identified hate-based graffiti as the number one hate-based offense in Suffolk County.

c. *Course Examples and Scenarios*

It is important that the hate crimes training use examples and scenarios to reinforce the concepts being taught. There were several examples that were effective in illustrating successful investigations of potential hate offenses; for example, the trainers described a case in which a pig head was thrown at a Jewish family's home and the subsequent investigation finding that the incident was not hate-motivated, but rather the result of a teenage break-up. The presentation also included an example of a minority-perpetrated hate crime to illustrate that hate crimes can be committed by members of protected classes. However, certain examples included elements that could mislead officers when trying to evaluate potential hate offenses. For example, in one hypothetical, the perpetrator of a potential hate offense was described as "from Tennessee," and the instructor implied that this might be evidence of a propensity toward racial discrimination. But the perpetrator's home state is immaterial and presenting this fact as relevant to a hate crimes analysis undercuts the message that officers should not generalize about individuals based upon individual traits. The training should not encourage officers to rely on stereotypes of any kind, including geographic stereotypes, in evaluating hate offenses.

At certain points there was a lack of cultural sensitivity in remarks that appeared to be intended as light humor. For example, when discussing a case about a woman who was supposedly promiscuous, the instructor stated that he did not think "slut" is a protected class. When discussing the various protected classes the instructor stated that "transgender is a protected class, believe it or not." These statements send the wrong message in a hate crimes training where the purpose of the course is animated by the belief that people should not be victimized on the basis of an individual trait.

2. Tracking, Reporting, and Pattern Analyses

Preventing hate crimes requires police to track, analyze, and identify patterns and trends of hate crimes and incidents. SCPD's tracking of hate crimes has improved significantly since entering into the Settlement Agreement. HCU is responsible for investigating, tracking, reporting, and analyzing hate crimes and their patterns. It relies primarily on 911 notifications that an incident might be a hate crime, and upon officers or supervisors to notify HCU about potential hate-based offenses. These are obvious and necessary methods for tracking hate crimes. HCU also conducts a daily audit of SCPD's crime log to identify potential hate offenses that might have been missed by 911 dispatchers or officers. While manual searches of the crime

log provide a check on the system for flagging potential hate offenses, HCU would benefit from a more systematic method of trend analysis to ensure none are slipping through the cracks.

We have a significant concern with the methodology that SCPD employees use for data reporting and analysis—in particular, the manner of sharing of information between HCU and the Criminal Intelligence Unit ("CIU"), and the pattern mapping process. Both units map hate offenses and there is not a clear protocol regarding who has primary responsibility for this task. Indeed, in talking with members of these units, it is apparent that a clearer understanding of each unit's respective role should be developed. Without a clear delineation of responsibilities between HCU and CIU, critical data is likely to be omitted. More coordination is needed among the precinct analysts, HCU, and CIU. Further, establishing clear procedures will ensure that these units are not duplicating efforts. Finally, regardless of who is conducting the analysis, analysts do not consistently track trends over time, nor do they employ quantitative methods to understand correlations between particular types of crimes and other variables such as the demographic characteristics of victims and suspects and the locations of incidents.

3. <u>Quality Assurance</u>

In our Second Assessment Report, we recommended that SCPD expand the Hate Crimes Reports required under the Agreement by including, for example, the legal analysis for determining whether a particular incident was a hate crime, and providing the case progress. *See* Second Assessment Report at 25-26. HCU has done an impressive job of auditing and analyzing those hate crimes that it has identified. SCPD's most recent Hate Crimes Report included detailed descriptions of nine hate crime investigations. Each case description included the fact pattern, analysis of the fact pattern, the steps undertaken in the investigation, and the status of the case. The Hate Crimes Report then provided an overall conclusion, finding that: 1) the majority of hate crimes in Suffolk County are religion-motivated; and 2) crimes involving the deception of elderly persons are a trend. It also provided information about the efforts SCPD is taking to address hate-based crime through community outreach. We also had recommended analyzing data to identify the prevalence and breakdown of hate crimes. SCPD has included a table indicating the number of HCU investigations with the number that were found to be hate offenses, a pie chart showing the break-down of hate offenses by protected class, and maps of crime patterns. In sum, the Hate Crimes Report evidences HCU's thorough review and analysis of its investigations and hate crime tracking.

The Hate Crimes Report also details how HCU detectives proactively canvass communities that may be targets of hate offenses to create open lines of communication, encourage the reporting of hate crimes, and collect hate crime information. Community Oriented Policing Enforcement (COPE) officers conduct community outreach for the same purposes, and we commend these outreach and investigative efforts.

We have a minor recommendation for the signs that HCU posts in the community to solicit leads about hate crimes. HCU posts a general crime reporting sign to encourage reporting potential hate offenses. *See* Hate Crimes Report, Attachment 5. The Department should consider also posting a hate crimes specific sign, explaining what a hate crime is, because it might have better results in getting information about hate crimes. Lastly, the Spanish version of

the sign should not use script, as it is harder to read, especially when it is publicly posted and thus meant to be read quickly. *See id.*, Attachment 6.

C. LANGUAGE ASSISTANCE

| | |
|---|---|
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Noncompliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Partial Compliance |
| h. Community Survey | Partial Compliance |

One of the cornerstone elements of the Settlement Agreement is the requirement that SCPD develop a robust Language Assistance program, to ensure that police officers and others in the Department are able to communicate effectively with individuals in the community who have Limited English Proficiency ("LEP"). *See* Agreement at 8-11. Such communication is vital for ensuring that LEP crime victims are able to receive appropriate police services, protecting the civil and constitutional rights of LEP individuals who are arrested or otherwise charged with criminal conduct, and, more broadly, developing a closer relationship with LEP communities and thereby strengthening SCPD's ability to address and prevent crime in those communities.

As noted below, although SCPD has written an appropriate policy on language access, that policy is not yet being properly implemented. Language assistance is provided unevenly at best. We hope and expect that this will improve with enhancements to the Language Access training program and as more Department personnel receive the training, along with improved review and enforcement of language assistance in the field.

1. Language Access Policy

SCPD has made strides towards developing and implementing appropriate policies and practices with respect to LEP individuals over the last two years. It now has in place a strong, integrated Language Access Plan ("LAP"). Rules & Procedures Chapter 26, Section 5. The

LAP is helpful in its detail, but we recommend that SCPD prepare a distilled version of the policy, one to two pages long, to assist officers to understand and effectively implement the policy. During our tour, several Department members expressed support for this idea. Such a document would also help the community understand the policy. In fact, a postcard sized information card on the rights of an individual to request translation services could be developed and translated into the five primary languages.

The LAP has been appropriately translated into Spanish and the other priority languages. SCPD has consistently distributed the Spanish version of the LAP at SCPD facilities and maintains a copy on its website in five of the priority languages. However, the LAP was not always available in precincts during our review, and if it was available, not all desk officers were aware of this. One desk officer at a precinct did not know where the LAP was kept or whether it was available to the public.

Moreover, now that the policies have been translated into languages other than Spanish, these should be reviewed by community stakeholders to ensure that the translations are appropriate for local linguistic communities. For example, the Chinese translations are not consistent—the policy is written in Simplified Chinese and the complaint/compliment form is written in traditional Chinese. We also encourage the Department to continue to widen its distribution of the LAP, and ensure that LEP communities have the opportunity not only to access the policy but to review and comment on it to ensure accuracy. The Department also must ensure that precincts have appropriate posted signs translated into the priority non-English languages.

2. Training

Unlike in the past, SCPD is now providing four hours of language access training, including an hour of cultural competency training. Pedagogically, the language access training program has some excellent features, but requires additional revisions. There was mixed use of videos in this training. Some were effective; the use of video that was most effective included pausing the video to have a larger group discussion about the issues the video raised. The discussion itself needed further development, however. There was some resistance from students to the lesson that language assistance could lead to better outcomes, because the example video included policing mistakes unrelated to language access—one student said "the example was a stupid cop." The instructors did not effectively address the importance of language access policy in response to this critique.

Additionally, more could be done to create opportunities for interactive discussion in small groups after the video presentations. There was a short video training on basic Spanish phrases, but instructors left the room for the video and, without further dialogue, this video alone was not effective. Many officers appeared to stop paying attention and were checking their phones during this part of the training. Overall, the training should include more scenarios and role play, focusing on common encounters with LEP individuals. For example, the demonstration for using the Language Line was good, but the same should be done with teaching the four stated "How Tos" in the LAP. Incorporation of the LAP into scenarios in other training would serve to reinforce that LEP individuals may be encountered in any situation; i.e., domestic violence training in a scenario where the only one present who speaks English is a young child.

With regard to substance, the program started with an hour of Cultural Competency training. This part of the training did not meet the minimum standards for teaching this subject. The stated objectives for the program were unclear and, as a result, the program lacked focus. For the most part, culture and the need to be aware of cultural differences were discussed only in a general sense. Little of what was discussed was integrated into a discussion of how culture can affect how officers should do their jobs. The program did not define culture, nor did it explain how cultural orientation can affect the interpretation of events. It also did not present any information regarding how people of different cultures respond differently to external stimuli. Nor did the program lay out any strategies to help officers navigate challenges of dealing with people with different cultural practices. This critical portion of the training needs to be completely revamped.

The Language Assistance Tracking forms were covered in detail, and people were trained regarding how to complete them. The purpose and process of these forms were also explained in detail. However, there was no discussion of the role of third parties in reporting and complaint situations, and how even in cases where an advocate or other third party is capable of interpreting, a neutral interpreter is still required (Language Line or Department Authorized Interpreters ("DAIs")). SCPD needs to better instruct officers about when and why they are required to use department-authorized language assistance services, including Language Line. Officers have expressed concern about the time and effort it takes to access those services; they need to understand why it is in their best interests to do so. More detailed discussion of different scenarios on the use of interpretation at the precinct, in the field, and in exigent circumstances, would serve to enhance officers' understanding. For example, the training should contain more discussion of the exigency exception so that officers can understand when and for how long they can stray from using DAIs, qualified bilingual officers, or Language Line. Greater discussion of the use of either children or an unauthorized interpreter is important because these have been the most relied upon sources of language assistance for years, and they are no longer permitted, except during an exigency. Some attendees also had concerns about the use of Language Line in taking statements and other testimony for court. Instructors did not have an adequate answer to alleviate this concern.

Students should be given a copy of the LAP, and it should be discussed, section by section, to learn what the policy requires. A distilled version of the LAP, which must be developed, should be reviewed at the end of the program as final takeaways. Merely referencing the LAP is insufficient. SCPD instructors also should receive procedural justice training and incorporate the principles of procedural justice into the Effective Communication lesson. (See here for some police training podcasts on the topic: http://www.cops.usdoj.gov/default.asp?Item=2656).

3. Implementation of LAP in the Field

As more officers are trained in Language Assistance, we expect the use of Language Assistance tools, including DAIs and Language Line, to become more widespread. At present, however, officers appear to continue to lack recognition of the need for use of language access services. Some officers appear to believe that Language Line interpretation services should be used only in connection with calls for service, but not used for non-crime calls. Many calls for

service that are not crimes are also serious (e.g., traffic accident with serious injuries), and may require the use of an interpreter. Moreover, this is not an accurate reflection of the policy. (Rules and Procedures, Chapter 26, Section 5, II.B notes "Department personnel shall provide free language assistance services to LEP individuals, and shall inform members of the community that language assistance services are available to them free of charge.") Training and supervision should directly address this issue.

Likewise, officers still appear to be improperly relying upon bystanders and children for language assistance. Some officers have been in the practice of using bystanders and children and see no reason not to continue to do so because they have never had a problem doing so in the past. Others see no need to use language assistance tools because they believe that people who would require them do not call the police due to language barriers. Yet others appear to believe that children can be helpful in giving officers a good idea of what is happening. These misapprehensions must be addressed, in training sessions, roll call, and during direct supervision of officers.

4. <u>Tracking Use of Language Access Assistance</u>

SCPD has now implemented a language assistance tracking program using CAD computers in patrol cars. Any call that a 911 dispatcher receives for which language assistance is indicated is assigned a "Lima" code. Before an officer is able to close out a call with a Lima designation, the officer must complete a Language Assistance Tracking form in the CAD system that indicates, among other things, what language assistance, if any, was provided on the call. This requirement serves two purposes: first, to prompt officers to use language assistance services, and second, to ensure that they record the services provided. This has led to increased numbers of completed forms than in the past. The forms provide valuable information to the Department on compliance with the policy, gaps in service, and other emerging needs. In precincts, the front desk officer and civilian staff also provide language assistance to people, but complete the language assistance forms by hand, and administrative personnel input the information into the CAD system. This raises a concern that these kinds of services are less likely to be fully documented in SCPD's data. Precinct personnel should be able to input their use of language access services directly into the CAD system.

The development of Lima codes and use of the CAD system to document interactions with LEPs is a very positive development. However, supervisory review of Lima data is inconsistent. SCPD must develop procedures to ensure: 1) the accuracy of Lima data; and 2) that officers are appropriately assessing language needs and appropriately using language services. This would include comprehensive review of the language assistance tracking forms, 911 calls, and Language Line data, and developing an analytical plan to ensure proper adherence to the policy and emerging language needs.

5. <u>Language Assistance in the 911 Call Center</u>

The Communications Section has developed excellent systems to identify and respond to calls it receives from LEP individuals. In addition to employing bilingual operators, all operators have instant access to Language Line, and reported using it frequently. The Department also employs a number of Spanish-speaking operators who should, consistent with developing

department policy, become certified as bilingual employees. However, SCPD does not employ enough Spanish-speaking operators to ensure coverage on every shift, and this should be remedied.

The Communications Section has also developed a variety of information about the community to better identify and respond to LEP calls for service. In addition to these efforts, we recommend that SCPD develop and use the detailed demographic information available on Suffolk County's LEP population to assist it in identifying language assistance needs in the field as calls come in. Review of the 911 interface in the Communications Section appeared to show that Lima codes were incorporated into the system by changing the values in an existing field, rather than adding a new field for tracking LEP callers to the database. This creates a dropdown list twice as long as before, with code options that are nearly identical, differing only in the L designation. This may be resulting in some data entry error, in both directions—over-identification and under-identification of LEP calls. We recommend that SCPD seek a programming solution that reduces this error and improves the usability of the 911 interface.

Finally, one additional concern, shared by SCPD, is that a large number of forms were closed as "THE VICTIM/COMPLAINANT SPOKE SUFFICIENT ENGLISH TO COMMUNICATE" (65 percent of no language assistance given cases) and "NON-LIMA CALL" (7 percent of no language assistance given cases). This percentage has increased over the last few months. Further inquiry into this data is required to ensure that it is accurate, and to better understand if LEP individuals are receiving necessary police services.

6. <u>Qualification of DAIs and Bilingual Officers</u>

A cornerstone of a successful language access plan is to ensure that personnel who provide language access services have the necessary skills to effectively communicate with LEP individuals. The Settlement Agreement requires that before bilingual personnel engage in monolingual conversation in a language other than English or provide interpretation services through DAIs, they must pass an appropriate test and be deemed qualified. *See* Agreement at 10. SCPD has only begun to implement these requirements. Only a few individuals have been tested and certified as DAIs or bilingual officers. This process must be accelerated. Further, no one within the Department has yet been certified as to translate documents.

Further, officers need to better understand the appropriate role of bilingual personnel and DAIs. As noted, officers remain unclear about when they are permitted to use bystanders and family members, and when and how to employ the services of DAIs, Language Line, and bilingual personnel. Training, both at the Academy and at roll call, needs to clearly articulate these matters.

7. <u>Translation of Critical Documents</u>

SCPD has translated many critical documents, including, importantly, the complaint/compliment form, into Spanish, Traditional Chinese, Haitian Creole, Italian, Polish, and Portuguese. The Department is still in the process of developing online submission capability for compliments and complaints, as well as the translation of the form into other non-English languages, as appropriate. However, review of SCPD's website provides no evidence of the

compliment and complaint phone line on the "contact us" page, and the line is not mentioned on the "Información en Español" page (the number for the community response bureau is provided). This could be one reason that SCPD reports that it has received only one piece of correspondence in a language other than English.

SCPD should reassess barriers to receiving correspondence in languages other than English. There may be a need to publicize that the Department will accept correspondence in languages other than English and that it will translate the written communications. Indeed, community advocates noted that the public is not aware of this complaint line. Likewise, the Spanish version of the compliment/complaint form does not have a note that the phone operators speak Spanish or any other language.

Finally, we recommend that SCPD add a footer to each translated document identifying (in English) the foreign language in which the document has been translated and the date of the last update to the translation. This best practice makes it easy for officers to access appropriate translations of forms and documents and ensure up-to-date information is available to the public.

## D. ALLEGATIONS OF POLICE MISCONDUCT

| | |
|---|---|
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Partial Compliance |
| b. Investigation of Misconduct | Partial Compliance |

SCPD has made significant structural reforms to its Internal Affairs Bureau ("IAB") within the past year, and the Police Commissioner, other SCPD leadership, and the new command staff at IAB have expressed a serious commitment to enhancing the stature of IAB and reducing the backlog of cases under investigation by IAB. We are encouraged by these changes and hope that they will lead to significant improvements in the timeliness and effectiveness of SCPD's internal investigations—and that this, in turn, will help to bolster the community's confidence in the Department. These structural changes are still relatively new and untested, however, and we continue to have concerns with SCPD's accountability procedures, as well as the Department's ability and willingness to support members of the community filing complaints about officer misconduct. We describe SCPD's areas of improvement and our outstanding concerns in more detail below.

### 1. Reporting Misconduct

Although we recognize that SCPD has made significant efforts to increase the community's awareness of and accessibility to means of submitting complaints of officer misconduct, we continue to believe that SCPD needs to do more work with the community and with its precincts in order to fully enable community members to file complaints. We continue to hear troubling stories about members of the community encountering problems with submitting complaints, both in person at their local precincts and directly to IAB, and about

community advocates facing significant resistance to the submission of third-party complaints. We note that, although SCPD has established a variety of means by which individuals outside of the Department may file complaints, there continue to be significant gaps in the community's awareness of how to submit complaints and in the community's level of confidence that external complaints will be accepted and handled in a fair and timely manner.

We recommend that SCPD assess how, when, and from where external complaints are submitted to the Department, to identify where there continue to be gaps in the community's access to complaint procedures and to develop strategies for closing those gaps. For example, SCPD appears to be planning to rely heavily on online procedures for receiving complaints; while useful, we are concerned that over relying on online methods may result in the process not being accessible to segments of the community that either do not have easy access to computers or that tend to access the Internet through their phones, which may not be conducive to submitting a complaint. An assessment of when the Department learns of complaints against its officers also may help IAB identify problem areas in its outreach to and relations with the community. If, for example, IAB learns of an individual's complaint only when the individual files a lawsuit against SCPD, then there has been a delay in the information reaching SCPD that is likely to seriously compromise the Department's ability to work cooperatively with the complainant or to conduct an effective investigation of the allegations. If SCPD were to identify a trend of IAB learning of allegations of officer misconduct well after the occurrence of the underlying incidents, it should suggest to SCPD that IAB would benefit from doing more to encourage and enable complaints being filed soon after the occurrence of an incident – and, at least indirectly, this would help SCPD avoid more complicated and more contentious responses from the community, such as litigation against SCPD. Although we heard and recognize that members of SCPD and IAB in particular feel as if they have adequately engaged the community in order to facilitate complaints, it is critical—as much for SCPD's compliance with these provisions as for the integrity of its IAB and the restoration of the community's trust in IAB and SCPD—that persistent deficiencies are identified and addressed. SCPD should continue to assess and improve the methods available for submitting a complaint, including by assessing trends in the methods actually used by complainants, and the timing of those complaints, in order to identify processes that may not be accessible or well known.

Related to the above concern, we urge SCPD to increase and improve its communication with complainants outside the Department. We are concerned that external complainants continue to receive little to no information about the progress of the investigations of their complaints, and in particular, little to no notice of and information about the resolution of those investigations. Indeed, this concern was highlighted by SCPD's own audit of IAB cases completed between July 1, 2015, and January 1, 2016, which identified a case in which the complainant did not recall ever speaking to an IAB investigator and had never been informed about the resolution of the investigation of his complaint. SCPD needs to develop and implement a regular process for informing the complainant, and ideally, the community, about the outcomes of its internal affairs investigations. Furthermore, we renew our recommendation that supervisors include appropriate complainant contact as one of the bases for their review of investigations—both for IAB's review and for the chain of command above IAB. *See* Second Assessment Report at 45.

Finally, we recommend that SCPD and IAB continue to develop and expand upon their work measuring and assessing trends in their internal affairs investigations. We were pleased to see, as evidenced by SCPD's "IAB Patterns and Trends of Biased Policing 2015" Report, that SCPD has started to identify and assess trends in their internal investigations. However, SCPD needs to continue to develop and expand upon this assessment. For example, we recommend that SCPD and IAB look at trends over a longer time period than they have done to date and that they measure and analyze the time periods between different stages in the life cycle of an internal affairs investigation. SCPD and IAB should use this analysis to support the Department's consideration of the effectiveness of their investigations and law enforcement procedures, overall; for example, SCPD and IAB should consider looking at their internal affairs cases to consider whether the use of body-worn cameras or dashboard cameras would have allowed for an easier or more effective resolution of the investigation. We further note that this type of data analysis may be complemented by the implementation of the traffic stop data analysis measures discussed in connection with the bias-free policing provisions of the Settlement Agreement, and recommend that SCPD look for and consider ways in which these procedures may support one another. *See* Settlement Agreement at 6-7.

2. Investigating Misconduct

SCPD has made significant structural reforms to its IAB within the past year, including adding more and higher-ranking officers to its command structure, and modifying IAB's organizational structure so that it is now composed of three teams of six investigators, each of which is led by a captain. To the extent that these organizational changes speak to SCPD's commitment to enhancing the stature and credibility of IAB within SCPD and in the community, as we believe they do, we are encouraged by these changes. Moreover, it is our expectation that these structural changes will encourage earlier, more frequent, and more substantive supervisory review of investigations, as well as more consultation and collaboration between investigators and their supervisors. These are changes that were needed in IAB and that we expect will improve both the quality and the timeliness of SCPD's internal investigations.

Similarly, we were encouraged by the expressed commitments of the Police Commissioner, SCPD leadership, and the new command staff at IAB to reducing the backlog of cases handled by IAB. It is our hope and expectation that their prioritization of enhancing IAB's resources will send a message to the Department and to the community that officer accountability is a core value of SCPD. Furthermore, we expect that the new IAB command staff's focus on reducing the clearing the backlog of cases will mean that many long-standing investigations will be resolved, and we hope that it will prompt IAB to develop measures for improving the timeliness of future investigations.

In addition, we were encouraged to find that IAB investigative officers are receiving specialized training relating to conducting internal affairs investigations. It is important not only to identify training opportunities for investigative officers, but also to create an environment in which officers feel that their supervisors actually support them receiving such training. We were encouraged to find that both are happening with greater regularity than in the past. At the same time, we are concerned that sergeants, lieutenants, and other supervisors at the precinct level do not receive specific training for how to conduct a misconduct investigation given the significant number of complaints that are assigned to the precinct for a chain of command investigation. As

noted above, SCPD does not provide any specific, recurring training regarding supervisory duties. While supervisory functions are a component of training delivered upon an officer's promotion to sergeant, SCPD should strongly consider developing recurring training for supervisors, with a component specifically dedicated to investigating allegations of misconduct.

We continue to have serious concerns about the long time periods between the opening of an internal investigation and the final resolution of the investigation. Although we are encouraged by SCPD's and IAB's stated commitment to reducing the backlog of cases, we did not find that IAB had developed concrete plans for how to prevent such a backlog from developing in the future. As we have in our past Assessment Reports, we recommend, for example, that IAB develop interim timelines for the progress of an investigation and institute a way of measuring their adherence to those timelines. Similarly, we recommend that the new IAB command staff develop and implement case management guidelines, for example, to guide investigating officers in determining how to allocate their time between the investigations they are handling. We are concerned, for example, that investigating officers may allow cases perceived as "easier" or less important to linger if and when they are assigned to investigate a higher priority case. IAB command staff needs to develop and implement procedures for dealing with this situation if they hope to improve the timeliness of their investigations and prevent backlogs from amassing in the future.

Related to this concern, we renew our earlier recommendation that the IAB develop and implement a method for tracking the progress of their investigations. *See* Second Assessment Report at 44-46. We are concerned that neither IAB command staff nor its investigating officers were able to describe the time periods for IAB's current investigations. We believe that IAB should have a process to determine how long each stage of an investigation takes, for example, between the assignment of an investigation to an investigating officer and the first supervisory review of the investigation. Moreover, IAB should have a means of identifying and assessing these time periods for individual cases, for individual investigative officers, and for IAB as a whole. Without the development and implementation of such measures, we are concerned that IAB's expressed commitment to reducing the backlog of its cases will not translate into improvements to the timeliness of its investigations in the future.

## E. COMMUNITY ENGAGEMENT

| | |
|---|---|
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Substantial Compliance |
| c. Community Oriented Policing Enforcement ("COPE") | Substantial Compliance |

| | |
|---|---|
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social media and notification systems | Substantial Compliance |

It is clear that SCPD, and in particular, its Community Liaison Officers ("CLO"), Community Oriented Policing Enforcement ("COPE") officers, and the command staff in its Community Response Bureau ("CRB"), has committed substantial time and energy into further developing its community engagement programs over the past year. These efforts have resulted in the expansion and improvement of the programs and services offered by SCPD to the community, as well as improvements to the communication and collaboration between CLOs and COPE officers in different precincts and between CLOs and COPE officers and CRB. Notwithstanding SCPD's commendable efforts and improvements, we continue to have concerns about the effectiveness of SCPD's implementation of the community engagement provisions of the Agreement, and we urge SCPD to heed our recommendations for expanding its community engagement efforts to reach throughout the Department and to access the more underserved parts of the Suffolk County community.

1. <u>Maintaining Community Relationships and Community Outreach</u>

We recognize the new Suffolk County Police Commissioner, and the leadership of SCPD's CRB, for their stated commitment to making community engagement a priority for SCPD, and for their efforts to meet with representatives of the community, including leaders of advocacy groups and service providers working with the Latino community in Suffolk County. It is clear that the Police Commissioner and CRB have made it a priority to schedule regular meetings with these community groups, and to have these meetings attended by high-ranking members of SCPD.

In addition, we note with approval that SCPD has implemented a survey of the community, has conducted some analysis of the survey results, and, based on that analysis, has made plans for revising the survey instrument and the method of distributing the survey. The community survey is an important means of soliciting feedback from the community, and analysis of the survey results should serve as a key data point for SCPD in determining how to improve its community engagement programs.

However, SCPD needs to think beyond its more traditional community engagement events when mapping out its future plans for community engagement, in order to continue to deepen the relationships and trust it is building with the community groups with which it is already involved and to forge new relationships with parts of the community with which it has yet to connect. For example, SCPD should meet with leaders of community groups to get their input about what types of community events SCPD should be involved with, about geographic areas, organizations, or parts of the community that SCPD should develop relationships with, and about how to staff and structure community events to encourage more robust and more

meaningful participation from the community. Toward the same ends, SCPD should consider conducting more outreach to the faith community and taking advantage of its existing School Resource Officers to get new ideas about community engagement. Although the development of the community relations daily activity reporting system is a positive step, the Department needs to use this system in a more effective and accurate way. As it stands, we have concerns that the system does not present an accurate or useful picture of how COPE officers and CLOs spend their time. Rather than having officers account for a particular community engagement event as a discrete event involving many different actions, for example, officers appear to be separately accounting for each action that they take relating to a particular community event. This may lead to an artificially inflated description of the extent of a particular officer's work, or even of SCPD's community engagement work at the precinct or department level. Having a more consistent and accurate means of tracking officers' community engagement work is an essential, and still missing, component of developing an effective community engagement program.

Finally, we note that SCPD should continue with its plans to revise the community survey, and should further refine and improve its analysis and use of the survey results. As SCPD acknowledged in its 2015 Community Relations Report, the survey instrument itself needs to be reformulated. For example, because many of the questions in the current version of the survey yielded few or no substantive responses, SCPD should consider rewriting those questions, and revisiting how and where the survey is distributed. In the same vein, as SCPD has acknowledged, the survey results strongly suggest that the survey is not reaching a significant proportion of the Latino or LEP populations in Suffolk County, and thus that SCPD is not yet getting useful information from the survey about how it is working with these segments of the population. SCPD thus needs to do more to get the survey to Latinos in the community, particularly LEP individuals. Indeed, our own assessment supports this finding from the survey: it remains evident to us, for example, that additional outreach with Latino and LEP community advocates is needed to ensure that they know about the compliment/complaint line and that they are informing their constituents to use it to provide feedback to SCPD. SCPD has stated that it will be reformulating and redistributing the report in 2016. We look forward to seeing the revised survey instrument and to hearing about the Department's efforts to improve distribution of the survey instrument.

2. <u>Community Liaison Officers, Community Oriented Policing Enforcement, and the Community Response Bureau</u>

We recognize both that CLO and COPE officers in different precincts are now working more closely with one another and that CLO and COPE officers are having more regular communication with their leadership in CRB. This enhanced communication and collaboration represents a notable improvement from the past, when it seemed that CLO and COPE officers had little to no familiarity with the community engagement programs in precincts outside of their own. Ensuring effective communication promises to better enable precincts to share with one another what they have learned about opportunities and challenges for developing and improving their own community engagement programs. We note, for example, that the soccer program organized through the Police Athletic League in the Fifth Precinct—which has, fairly, been held up to us as one of SCPD's most successful community engagement programs—will be replicated in the First Precinct, with the support of CLO and COPE officers who organized the soccer program in the Fifth Precinct. This is a clear example of the benefit of having more

regular and more meaningful information sharing between CLO and COPE officers in different precincts. While we are encouraged by the progress in this area, we urge SCPD to continue to foster this intradepartmental communication.

Beyond encouraging continued activities by and dialogue between its CLO and COPE officers, SCPD needs to take affirmative steps to involve the entire Department in community engagement. It is essential that community engagement be perceived as relevant to, and part of the responsibility of, *all* police officers and command staff in SCPD—and it is the responsibility of the Police Commissioner, of SCPD leadership, and the CRB, to make sure that this culture change takes place. As it stands, SCPD continues to have its community engagement efforts handled almost exclusively by its COPE officers and CLOs, and to have decisions about what community engagement means for the Department determined by CRB. Although command staff and line officers attend community engagement programs, their involvement seems to be fairly minimal and to depend mostly on their individual availability and interest. SCPD leadership and command staff need to take concrete, affirmative steps to get patrol and investigative units involved in community engagement programs. For example, SCPD should encourage patrol officers to attend community events and make it clear that such activities are an integral part of their law enforcement responsibilities.

**U.S. Department of Justice**

Civil Rights Division

---

JCP:LLC:MJG:CWH:BDB
DJ 207-52-4

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

December 14, 2015

**Via Electronic Mail**

Gail M. Lolis, Esq.
Deputy County Attorney
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788-0099

**Re: Assessment of SCPD's Compliance with the Settlement Agreement**

Dear Ms. Lolis:

This letter is to provide you with the United States' current assessment of the Suffolk County Police Department's (SCPD) compliance with the Settlement Agreement between the Suffolk County Police Department and the United States Department of Justice, effective January 13, 2014 (Agreement). Since the last Compliance Status Assessment Report, the Civil Rights Division and United States Attorney's Office for the Eastern District of New York have reviewed documentation of police operations, met with community stakeholders, held conference calls with SCPD, and conducted a compliance tour with subject matter experts during the week of September 21, 2015. We appreciate the cooperation and effort that SCPD and Suffolk County leadership continue to show in addressing the requirements of the Agreement.

In the attached Compliance Status Assessment Report, we provide a compliance rating and comments for each provision of the Agreement. The definition of each rating type is as follows:

- "Substantial Compliance" indicates that the County has achieved compliance with most or all components of the relevant provisions of the Agreement. (14 provisions)
- "Partial Compliance" indicates that the County has achieved compliance on some of the components of the relevant provisions of the Agreement, but significant work remains. (55 provisions)
- "Non-Compliance" indicates that the County has not met most or all of the components of the Agreement. (4 provisions)
- "Compliance Rating Pending" indicates that there is insufficient information to make an assessment or the provision is not yet ripe for evaluation. (4 provisions)

SCPD continues to make progress in meeting many of the requirements of the Agreement. By all accounts, SCPD has given new life to the Community Liaison Officer (CLO) and Community Oriented Policing Enforcement (COPE) programs in its precincts. At the same

time, SCPD must take significant and immediate steps to address other aspects of implementation. Please see our comments in the Compliance Status Assessment Report for further details about these areas.

Please feel free to reach out to us if you have any questions. We look forward to returning to Suffolk County soon to continue the process.

Sincerely,

JUDITH PRESTON
Acting Section Chief
Special Litigation Section
Civil Rights Division

By: /s/Laura Coon
Laura Coon
Special Counsel
Special Litigation Section
Civil Rights Division

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

By: /s/Michael J. Goldberger
Michael J. Goldberger
Chief of Civil Rights
Civil Division

cc: Commissioner Edward Webber
Suffolk County Police Department

Sgt. Christopher Love
Suffolk County Police Department

**Compliance Status Assessment Report – December 14, 2015**

**Agreement between the United States Department of Justice and the Suffolk County Police Department**

| **Settlement Agreement Heading** | **Status of Compliance** |
|---|---|
| III. BIAS-FREE POLICING | Partial Compliance |
| a. Continued Delivery of Bias-Free Policing | Partial Compliance |
| b. Policies and Procedures | Partial Compliance |
| c. Traffic Stop Data | Partial Compliance |
| d. Training | Noncompliance |
| IV. HATE CRIMES AND HATE INCIDENTS | Partial Compliance |
| a. Training | Partial Compliance |
| b. Tracking and Reporting | Partial Compliance |
| c. Quality Assurance | Partial Compliance |
| V. LANGUAGE ASSISTANCE | Partial Compliance |
| a. Policy | Partial Compliance |
| b. Language Line Order | Substantial Compliance |
| c. Policy on Persons with Limited English Proficiency | Partial Compliance |
| d. Spanish-language access to SCPD website | Substantial Compliance |
| e. Incentives for Interpreters | Noncompliance |
| f. Consultation with the Latino Community | Partial Compliance |
| g. Language Assistance Training | Noncompliance |
| h. Community Survey | Partial Compliance |
| VI. ALLEGATIONS OF POLICE MISCONDUCT | Partial Compliance |
| a. Reporting Misconduct | Partial Compliance |

| | |
|---|---|
| b. Investigation of Misconduct | Partial Compliance |
| VII. COMMUNITY ENGAGEMENT | Partial Compliance |
| a. Maintaining Community Relationships | Partial Compliance |
| b. Community Liaison Officers | Partial Compliance |
| c. Community Oriented Policing Enforcement ("COPE") | Partial Compliance |
| d. Community Response Bureau | Partial Compliance |
| e. Community Outreach | Partial Compliance |
| f. Social media and notification systems | Substantial Compliance |
| VIII. POLICIES AND TRAINING GENERALLY | Partial Compliance |
| IX. MONITORING OF THE AGREEMENT | Partial Compliance |

## III. BIAS FREE POLICING

**a. SCPD will continue to deliver police services that are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in the Department. In conducting its activities, SCPD will ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, or sexual orientation, and in accordance with the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD continues to take steps towards compliance with this provision and is finalizing a strong set of policies governing bias-free policing. SCPD has designed and begun delivering training in this area, but the training requires immediate and significant revision, described below. SCPD has started to lay a foundation for accountability in this area by adopting a data collection policy for traffic stops and devoting heightened attention to review of biased-policing complaints. However, improvements are necessary in the processing of internal misconduct investigations, and the collection and analysis of traffic stop data need to be conducted in a manner that ensures reliability. |

**b. Policies and Procedures**

**i. SCPD will maintain implementation of a comprehensive policy prohibiting discrimination, including the denial of services, on the basis of race, color, ethnicity, national origin, religion, or sexual orientation in SCPD police practices.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD submitted a proposed policy for this provision, designated as Chapter 1, Section 11 of its Rules & Procedures (R&P 1.11). *See* Suffolk County Police Department Compliance Report, Aug. 1, 2015 (hereinafter "SCPD Self-Report"), Attachment 1. We recommend that SCPD implement Chapter 1, Section 11 as presented to the United States in August 2015.<br><br>The proposed policy improves upon previous proposals, particularly in the following areas:<br>• Dedication of a stand-alone policy that unequivocally prohibits biased policing in all forms;<br>• R&P 1.11 retains strengths of previous SCPD directives on bias-free policing, including the focus on equitable treatment for all individuals and emphasis on the importance of building community trust;<br>• R&P 1.11 prohibits the use of relevant characteristics in policing except when identifying a particular suspect;<br>• Members who become aware of biased policing are required to |

| | |
|---|---|
| | immediately report the matter to a supervisor, who must convey the information to Internal Affairs; and<br>• R&P 1.11 sets forth directives for members to follow at each stage of a law-enforcement encounter.<br><br>Although R&P 1.11 is better than previous directives, there is room for improvement. For example, in R&P 1.11.VI.A., the word "shall" is preferable to "should," and more consistent with the requirements that precede that paragraph in the section. The importance of this policy to the organization and community favors the more prescriptive wording in this paragraph. The actions detailed in this section impact the perception of the individual contacted by the SCPD. As such, the organization should not leave it to the patrol officer to decide if they will follow the procedure as outlined in the policy document.<br><br>*Training on the Policy*<br>SCPD arrived at an acceptable policy in August 2015 and must now train all SCPD members on the policy's requirements. SCPD's current training on bias-free policing does not appropriately teach members how to apply the policy and must be modified to do so. A more detailed assessment follows in our analysis corresponding to Paragraph III(d)(i).<br><br>*Implementation of Bias-Free Policing Policy*<br>Our analysis of the implementation of the bias-free policing policy is tied to our analyses regarding implementation of the other requirements in this section and our review of SCPD's compliance under Paragraph VI(b)(vi) of the Agreement, *infra*.<br><br>SCPD has identified flaws in its procedures for collecting traffic stop data that rendered the collected data unreliable since at least January 2015. As explained in our Analysis related to Paragraph III(c), several factors apparently contributed to this outcome: 1) a glitch in SCPD's data collection software, and 2) failures in SCPD's measures for reviewing data entries for accuracy and completeness. Historically, incomplete stop data entries were tracked and referred to supervisors for follow-up. However, the problems noted above caused incomplete entries to go unnoticed by patrol officers and supervisors for nine months.[1] As a result, SCPD lacks data that would enable the agency to reliably measure its performance in this area.<br><br>*Recommendations*<br>SCPD must take steps to ensure accurate data collection. Additionally, SCPD should identify and apply a suitable benchmark for analyzing the traffic stop data, which we understand SCPD is currently attempting to do. Finally, |

[1] A Sergeant in the Chief of Patrol's office was taking steps to correct the issues and review the backlog of incomplete data entries when the United States met with SCPD in September 2015.

| | |
|---|---|
| | implementation of its bias-free policing policies will require SCPD to integrate analysis of the traffic stop data into SCPD's accountability mechanisms. |

**ii. SCPD's policy on bias-free policing will prohibit officers from using race, color, ethnicity, national origin, religion, or sexual orientation in conducting stops or detentions, or activities following stops or detentions, except when engaging in appropriate suspect-specific activity to identify a particular person or persons.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | The draft R&P 1.11 prohibits officers from "us[ing] race, ethnicity, national origin, age, gender, religion, sexual orientation, or gender identity when engaging in routine or spontaneous law enforcement activities, except when engaging in appropriate suspect-specific activity to identify a particular person or persons." "Routine or spontaneous law enforcement activities" includes a range of enforcement activities: vehicle and pedestrian stops, searches, frisks, detentions, arrests, and issuance of summonses.<br><br>This policy should be finalized and implemented immediately to ensure compliance. |

**iii. SCPD policy will require that, within five days of receipt, SCPD will refer any complaint of discriminatory policing to IAB for a full investigation. Throughout the pendency of this Agreement, SCPD will also send a copy of any such complaint and material documenting the resulting investigation to the United States within five business days upon completion of the investigation.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | Although SCPD issued a Department Memorandum consistent with this paragraph on April 4, 2014, the agency must still establish the contents of the Memorandum as policy. In order to do this, SCPD has drafted R&P 5.2 to codify the requirements of this paragraph. We reviewed SCPD's complaint investigation files to determine whether the requirements have been implemented in practice.<br><br>*Forwarding Complaints to IAB Within Five Days.* For most cases forwarded to the United States during this reporting period, IAB received notice within five days of SCPD's receipt of the complaint, or shortly thereafter. In one investigative file, however, it appears that more than a month passed between the time that SCPD received notice of the complaint and the time that IAB received the referral. *See* Case #14-582i. In another case where SCPD apparently received correspondence on four separate occasions regarding the |

same allegation, only the fourth correspondence – which came more than five days after the first correspondence – actually triggered the opening of an SCPD internal investigation. *See* Case #15-0002i.

*Forwarding Completed Investigations to the United States within Five Days.* SCPD consistently forwards investigations into allegations of biased policing to the United States within five days of the Commissioner's review, or within a reasonable time thereafter.

Notwithstanding, several disturbing patterns in the conduct of internal affairs cases have come to light during this reporting period. First, there are troubling delays in the completion of supervisory review of IAB investigations. In one recent case, more than a calendar year elapsed after the investigator submitted her findings before the Commissioner acknowledged concurrence with these findings. *See infra* Case #13-227i. While some cases have proceeded in a timely manner, delays that leave the complainant, accused officer, and the Department without a resolution for an extended period can affect the actual and perceived integrity of the investigative process.

The delay in completing supervisory review is compounded by a second problem: IAB investigations themselves take an extraordinarily long time. It is common for SCPD's peer agencies to complete investigations in less than 180 days, from the lodging of a complaint to issuance of the department's final findings. However, for example, 869 days elapsed between the filing of complaint #13-227i and SCPD's determination, with 184 days of that period elapsing after IAB presented its findings to the Commissioner. IAB had the complaint for nearly two calendar years before finalizing its determination. This is inconsistent with industry practice and SCPD policy and, if left to continue, could negatively affect efforts to build community trust.

SCPD has started to address these concerns by implementing a tracking practice that will require IAB investigators to record the dates and times at which they complete steps in the investigative process, including interviewing the complainant, interviewing witness officers, etc. *See* Analysis re Paragraph VI(b)(iv), *infra* (discussing 'Case Notes Overview' sheet). IAB supervisors will periodically review these tracking sheets with the intention of ensuring that the necessary investigative steps are taken. To its credit, SCPD allocated a net of two additional investigators to IAB during this reporting period.

Below is a table describing implementation of this Paragraph of the Agreement for cases completed since January 14, 2015. For each complaint, the table provides two chronologies: first, the time elapsed between the moment that SCPD received the complaint until the moment the complaint was forwarded to IAB; second, the amount of time required to complete review of the investigative findings once IAB completed its investigation.

| | Complaint: | Timing of Referrals |
|---|---|---|
| | #14-565i | From initial SCPD notice to IAB referral:<br>• 8/16/14: Complaint lodged with SCPD<br>• 8/21/14: Investigation opened by IAB<br>From completion of investigation to delivery to DOJ:<br>• 4/23/15: IAB investigator submitted findings<br>• 5/6/15: IAB Captain concurred with findings<br>• 9/4/15: Commissioner concurred with findings<br>• 9/10/15: Investigation forwarded to the DOJ |
| | #13-227i | From initial SCPD notice to IAB referral:<br>• 4/18/13: Complaint lodged with SCPD<br>• 4/19/13: SCPD referred complaint to IAB<br>From completion of investigation to delivery to DOJ:<br>• 7/14/14: IAB investigator submitted findings<br>• 3/4/15: IAB commanding officer concurred<br>• 9/4/15: Commissioner concurred with findings<br>• 9/9/15: Investigation forwarded to the DOJ |
| | #14-309i | From initial SCPD notice to IAB referral:<br>• 4/30/14: Complainant contacted IAB directly<br>From conclusion of investigation to delivery to DOJ:<br>• 12/8/14: IAB investigator submitted findings<br>• 12/15/14: IAB commanding officer concurred<br>• 3/31/15: Commissioner concurred with findings<br>• 4/1/15: Investigation forwarded to DOJ |
| | #14-128i | From initial SCPD notice to IAB referral:<br>• 2/25/14: Complainant contacted IAB directly<br>From conclusion of investigation to delivery to DOJ:<br>• 2/17/15: IAB investigator submitted findings<br>• 2/23/15: IAB commanding officer concurred<br>• 3/30/15 (approx.): Commissioner concurred<br>• 4/1/15: Investigation forwarded to DOJ |
| | #14-582i | From initial SCPD notice to IAB referral:<br>• 7/10/14: Complainant sent complaint to SCPD by certified mail<br>• 8/22/14: IAB opens investigation<br>From conclusion of investigation to delivery to DOJ:<br>• 2/25/15: IAB investigator submitted findings<br>• 3/3/15: IAB commanding officer concurred<br>• 3/30/15: Commissioner concurred with findings<br>• 4/1/15: Investigation forwarded to DOJ |
| | #12-499i | From initial SCPD notice to IAB referral:<br>• 6/26/12: Complaint lodged with SCPD (does not allege discrimination)<br>• 7/2/12: IAB receives complaint |

| | | |
|---|---|---|
| | | • 10/21/13: Civil complaint filed against SCPD alleging profiling<br>• 10/21/13: Civil complaint forwarded to IAB[2]<br>From conclusion of investigation to delivery to DOJ:<br>• 12/4/14: IAB investigator submitted findings<br>• 12/8/14: IAB commanding officer concurred<br>• 2/20/15 (approx.): Commissioner concurred<br>• 3/4/15: Investigation forwarded to DOJ |
| | #14-155i | From initial SCPD notice to IAB referral:<br>• 2/27/14: Letter from Suffolk County Human Rights Commission<br>• 3/4/14: Date IAB marks letter received<br>From conclusion of investigation to delivery to DOJ:<br>• 11/22/14: IAB investigator submitted findings<br>• 12/9/14: IAB commanding officer concurred<br>• 2/20/15 (approx.): Commissioner concurred<br>• 2/20/15: Investigation forwarded to DOJ |
| | *Recommendations*<br>During our past two compliance visits, the United States' consultant recommended that SCPD's Internal Affairs Bureau implement a log system for recording dates and times of steps in the investigative process, including when the complaint is assigned for investigation, when the investigation is completed, when each supervisor receives the investigative findings for review, and when each supervisor subsequently forwards the case for additional review (or sends the case back for further investigation). We again make this recommendation and reiterate the importance of having an effective tracking mechanism to ensure the timely resolution of investigations. | |

**iv. SCPD officers who are found to have engaged in discriminatory policing will be subjected to disciplinary action and, where appropriate, will be referred for possible criminal prosecution.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | The United States did not identify any investigations during this reporting period in which an officer engaged in discriminatory policing but was not disciplined or referred for possible criminal prosecution.<br><br>SCPD is still in the early stages of implementing processes to assess officer |

[2] Case files often do not clearly document when a notice of claim or civil summons and complaint are served on the agency, as in this case. Here, one document in the file contains a handwritten note that the summons and complaint were served on SCPD on October 21, 2013; however, the file also contains an interoffice memorandum circulating the summons and complaint on October 16, 2013.

| | |
|---|---|
| | activity for possible bias. As noted above, SCPD still needs to implement a reliable traffic stop data collection program. This program, when operational and integrated into SCPD's accountability systems, will provide one backstop against unlawful profiling. It is critical that SCPD take immediate steps to bring this program into compliance.<br><br>Additionally, SCPD has only recently taken steps to ensure that IAB investigators adequately document and follow routine investigative procedures. SCPD is in the process of implementing a field training program to help IAB investigators hone their skills. *See* Analysis re Paragraph VI(b)(ii), *infra*. |

**v. SCPD will maintain and implement a policy that promotes bias-free policing and equal protection within its hiring, promotion, and performance assessment processes. Officers who have a history of engaging in biased policing practices will not be entitled to promotional opportunities, except as required by collective bargaining laws and Civil Service Laws, rules and regulations.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Recruitment and Hiring*<br>SCPD draft policy R&P 26.1 states that, "All recruitment efforts will focus on providing equal opportunity for all applicants," irrespective of membership in a protected class "or any other factor not directly related to job performance." *See* SCPD Self-Report, Aug. 2015, Att. 4. "Officers are assigned to the Recruitment Section at the discretion of the Commanding Officer of the Community Relations Bureau." *Id.* The policy also directs officers to, *inter alia*, "maintain positive and productive relationships with community leaders, educational institutions and religious organizations" and make continuous efforts to "recruit eligible applicants at high schools and colleges." *Id.*<br><br>On August 24, 2015, SCPD issued Applicant Investigations Command General Order 15-01 prohibiting the hiring of any candidate who "has committed any discriminatory act or … evinces a biased perspective based upon race, color, ethnicity, national origin, religion, or sexual orientation that indicates such candidate is not be able [sic] to perform the duties of police officer in a non-discriminatory manner." The Order also directs members of the Applicant Investigation Section "who obtain any information concerning a possible discriminatory act committed by a candidate, and/or discover a biased perspective … to notify the [Section's] Commanding Officer," who will ensure a thorough investigation of the issues to assess the candidate's fitness.<br><br>Although R&P 26.1 and Command General Order 15-01 appear strong in many respects, we recommend the following modifications. First, R&P 26.1 |

and its overall recruitment yields may be improved by memorializing SCPD's commitment to increasing awareness in all communities about its application process (not only increased access). Second, the Recruitment Section should reflect the diversity of SCPD's force more broadly, and the policy should commit to such diversity (notwithstanding the CRB Director's discretion). Third, while the policy's directive to maintain good relationships with community institutions and to recruit through educational institutions is important, this would be strengthened by directing officers to undertake these efforts in diverse communities. Finally, the policy should require the CRB Director to maintain a list of institutions (community-based organizations, clergy, etc.) that have been helpful in fostering equal awareness about SCPD's entrance process, and to consult these groups to ensure awareness of the recruitment process.

The Applicant Investigations Command General Order on investigating bias against employment candidates should, at the next possible review, be amended as follows:

- SCPD should add "gender" and other classes protected under State and local law to the list of prohibited biases; and,
- SCPD should direct the Applicant Investigation Section to make specific, affirmative inquiries to assess each candidate's history of biased acts and biased views (as it stands, the draft Command General Order only requires that investigators report biases that come up in the process by happenstance).

We encourage SCPD to provide evidence of implementation of the Applicant Investigations Command General Order when SCPD provides its next Self-Report in January 2016. This can be provided under separate cover, to preserve any confidential or personal identifying information.

*Performance Assessments*

SCPD policy provides for two routine measures that SCPD proposes will identify biased policing practices. First, patrol supervisors in precincts, the Marine Bureau, and the Highway Patrol Bureau are directed to hold monthly individual meetings with patrol officers to review the officers' respective Monthly Activity Reports. *See* R&P 10.3.VI.B.7. Second, supervisory personnel from sergeants to precinct Commanding Officers, and the Chief of Patrol's office, review traffic stop entries and data for erratic trends and potential biased policing. *See* R&P 10.3.VI.B.13; R&P 13.9.VI.C.

The first measure may improve the quality of SCPD's traffic patrol generally, but additional information is needed to determine specifically how this process is being used to identify possible biased policing. Now that SCPD has a means for identifying incomplete traffic stop entries, SCPD should be conducting this review. The second measure appears, on its face, to be a helpful backstop against biased policing. Supervisors at all levels should review traffic stop data to identify concerning enforcement patterns. This

| | |
|---|---|
| | process also depends upon reliable traffic stop data. Random audits could also provide SCPD with helpful information. We look forward to conducting on-site observations of these reviews during the next reporting period.<br><br>*Promotions*<br>Regardless of how SCPD identifies biased policing, the Agreement requires that evidence of such conduct disqualify officers from promotional opportunities, except as required by collective bargaining and civil service laws. SCPD has incorporated this language into policy. *See* R&P 17.2.III.C.<br><br>*Implementation*<br>SCPD needs to provide evidence that it is conducting the investigations, reviews, and screenings targeting a history of bias and/or biased policing, and that equal protection measures are being enforced. |

**vi. SCPD will implement a revised Chapter 16, Section 4, "Arrest of Non-US Citizens and Persons with Dual Citizenship," as approved by the United States.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Text of the Policy*<br>SCPD has issued a revised policy regarding arrest of non-US citizens and persons with dual citizenship.[3] The United States does not object to the revised language of the policy.<br><br>*Implementation of the Policy*<br>Implementation of this policy requires assessments of members' compliance. SCPD proposes to amend R&P 16.4 to require officers to use the Arrest Worksheet to describe any consular notifications that occur. *See* SCPD Self-Report, Aug. 2015, at 8. Provided that SCPD unequivocally directs its members not to interpret the additions to the Arrest Worksheet as a reason or excuse to inquire into immigration status, this proposal may be appropriate. We look forward to reviewing the draft policy.<br><br>SCPD needs to develop mechanisms for assessing whether members have inquired into immigration status in violation of policy. |

**vii. Six months after the Effective Date and every six months thereafter throughout the pendency of this Agreement, SCPD will provide to the United States a report showing civilian complaints regarding police services related to allegations of discrimination and biased policing, noting the disposition of each complaint, if any, the geographic area in which the alleged**

[3] *See* http://apps.suffolkcountyny.gov/police/documents/16-4.pdf.

**discrimination occurred, the demographic category involved, and what measures, if any, SCPD will take as a result of the analysis.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD has provided the reports related to Paragraph III(b)(vii). Each report noted few citizen complaints, which were dispersed among a number of SCPD precincts and involved complainants from diverse demographic backgrounds. SCPD reported no trends or pattern. *See* SCPD Self-Report, Jan. 2015, Att. 11; SCPD Self-Report, Jul. 2014, at 7-8. In its most recent report, SCPD stated that the complaint information "revealed no pattern and no two complaints involved the same officer." SCPD Self-Report, Jul. 2015, Att. 6. Although this was consistent with the records that we reviewed, SCPD's reports need to provide more detailed information about the complaints. At the United States' request, the August 2015 civilian complaint report described the nature of each of the complaints in more detail than the report in January 2015. However, the level of detail in the report was still inconsistent with the requirements of this provision.<br><br>*Recommendations*<br>Future reports should contain, in addition to the information supplied during this reporting period:<br>• The IAPro summary of the complaint; and<br>• Appropriate historical information about allegations/sustained complaints of biased policing relevant to the officer, the locality, the alleged victim, and/or the victim's demographic. |

**c. Traffic Stop Data**

**i. SCPD will implement a revised Chapter 13, Section 9, "Traffic Stop Data Collection," as approved by the United States.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD implemented the "Traffic Stop Data Collection" policy approved by the United States. Subsequently, SCPD revised this policy to supplement existing supervisory reviews of traffic stop data with the following requirement:<br>The Office of the Chief of Patrol will conduct monthly audits of T-Stop data. Incomplete or atypical traffic stops and/or enforcement activity identified will be referred to a precinct or bureau commanding officer for investigation. Evidence of racial profiling or bias based policing will be referred directly to the Internal Affairs Bureau for investigation.<br>The United States approves of this additional language.<br><br>*Implementation*<br>SCPD has not satisfactorily implemented the "Traffic Stop Data Collection" |

policy as required. As noted above, a computer glitch prevented users of the traffic stop data software program from identifying incomplete entries. The patrol officers who entered the incomplete data, the Patrol Sergeants and Lieutenants charged with monitoring traffic stop data for incomplete entries, and the Chief of Patrol charged with auditing traffic stop data failed to identify and remedy this problem in a timely manner. As a result, SCPD had approximately 7,748 incomplete traffic stop data entries during the months of January – August 2015. The traffic stop data SCPD has collected since at least the outset of 2015 – and possibly before then – is likely unreliable in identifying problematic trends in traffic stops.

At the time of the United States' on-site visit in late September, SCPD was taking steps to ensure that incomplete traffic stop data entries would be identified and addressed in the manner required by policy. Specifically, the Chief of Patrol's office was drafting a memorandum to distribute Department-wide outlining the specific software function(s) that patrol supervisors could reliably use to identify patrol officers' incomplete entries. This seems like an appropriate first step.

Personnel accustomed to searching for incomplete traffic stop entries via one method may require brief trainings and/or supervision to ensure that a new method is adopted wholesale. SCPD should monitor the situation carefully and deploy any necessary resources to ensure that the entries are being completed going forward. Many of the supervisory reviews required by R&P 13.9 would benefit from this type of monitoring.

R&P 13.9 requires that SCPD apply appropriate benchmarks to the data. The United States will work with SCPD to identify appropriate benchmarks and begin to integrate them into SCPD's traffic stop data collection program going forward.

*Recommendations*
Given the scale of SCPD's problems implementing the traffic stop data collection program under the Agreement, semiannual updates are insufficient to ensure compliance. We recommend that SCPD's Chief of Patrol Office regularly send the United States brief summaries of each precinct's (a) complete traffic stop entries, (b) incomplete traffic stop entries, (c) remedial measures required to implement the policy, and (d) any anticipated remedial measures. We request monthly summaries for December 2015 through March 2016, and quarterly thereafter.

**ii. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will provide to the United States a report analyzing the collected traffic stop data and explaining what measures, if any, SCPD will take as a result of the analysis.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD submitted a report pursuant to this requirement in its August 2015 Self-Report. However, the report was based upon the aforementioned unreliable data set. Accordingly, the report does not reliably reflect SCPD's traffic stop activity. SCPD also needs to modify its benchmarking methods to accurately assess its enforcement patterns.<br><br>The traffic stop report, albeit based on flawed data, reached troubling conclusions about SCPD traffic stop practices. Should future reports indicate the same trends, we will expect SCPD to produce an exacting plan about how to correct these problems. SCPD should immediately begin to address this issue, should it be substantiated in the next report. |

**d. Training on bias-free policing**

**i. SCPD will ensure that all sworn officers receive training on bias-free policing at least annually. SCPD's training on bias-free policing will emphasize that discriminatory policing, in the form of either selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, is prohibited by policy and will subject officers to disciplinary action. The training curriculum will address:**

**1. Methods and strategies for more effective policing that relies upon non-discriminatory factors;**

**2. Police and community perspectives related to discriminatory policing;**

**3. Constitutional and other legal requirements related to equal protection and unlawful discrimination;**

**4. The protection of civil rights as a central part of the police mission and as essential to effective policing;**

**5. The existence and impact of arbitrary classifications, stereotyping, and implicit bias;**

**6. Identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and**

**7. Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.**

| | |
|---|---|
| **Status** | **Noncompliance** |
| **Analysis** | SCPD has developed a curriculum to instruct officers on bias-free policing, and began classroom instruction in September 2015. SCPD's current bias-free policing curriculum represents a substantial upgrade over previous versions shared with the United States. Notwithstanding those improvements, |

both the pedagogical approach to teaching this subject and the substantive information provided require additional substantial revisions.

Pedagogically, the curriculum superficially includes most of the necessary structural elements for a satisfactory adult learning course that the previous drafts lacked. The curriculum now (1) identifies learning objectives; (2) conveys notes to the instructor (critical for any hope that future presenters may be able to teach this subject); (3) features visual aids, including power point slides and video clips; and (4) requires a post-test. Discreet elements of the current training hold promise, including the use of videos to illustrate policing techniques.

However, critical aspects of an effective training are lacking. The course is primarily lecture-based and lacks true interactive features. This is not an effective means to communicate the essential elements of the topic, and leads to a lack of student engagement. The training should combine lecture with interactive features in small groups. For example, participants could be broken into small groups, given a scenario and a copy of the policy and then asked, after discussion within the group (with structure provided by a few framing questions), to report out about how they would handle the situation described in the scenario. Further, the scenarios describing discriminatory policing conduct that are used during the course require additional detail to encourage students to engage in robust discussion. The discussion would also be enhanced by asking questions of participants before the fact patterns are described, to focus participants on key issues.

Even more than the pedagogy, however, the substantive treatment of the subject tended to obscure, avoid and even undermine the intent of the training. For example, the class commenced by discussing, generally, the legal prohibitions on biased policing. However, rather than directly stating that discrimination based upon impermissible characteristics violates an individual’s constitutional rights, the instructor framed the discussion of discriminatory policing as an issue under Title VI of the Civil Rights Act, which prohibits entities that receive federal funds from discriminating. This mischaracterizes officers’ obligations and reduces the importance of bias-free policing. A subsequent discussion of constitutional requirements and law enforcement, including “equal protection” under the Fourteenth Amendment, failed to demonstrate any intersection with police officers’ responsibilities, or what is at risk for them as police officers or for their agency if they fail to respect the law while performing their duties.

The first 15-20 minutes of a training program must focus on the most critical concepts the participants will need to take away. Much of this time during the training witnessed by the United States was spent discussing historical issues which did not contribute to a proper understanding of the issues surrounding bias-free policing. The instructors cited to Germany after WWI and the response to conditions and questioning of law enforcement and the rise of

Hitler. The import of the example was lost on our observers; this is cause for serious concern. Similarly, the training discussed slavery and Lincoln. The relevance of this point to bias-free policing was not clear.

If the intent of this portion of the training is to provide the participants some historical context from the perspective of members of the community, especially those that tend to have a negative or skeptical view of law enforcement, a more effective and helpful approach would be to modify the lesson plan to explain that the role of law enforcement is as the enforcer/guardian of societal rules. That is an important role, because it can be argued that our adherence to societal rules is the foundation of a civilized society. This role is also unique in American culture. The training could provide examples of how law enforcement, in the name of enforcing “societal rules” or the law, has been used as the tool to violate the rights of people in this country, from the era post-Emancipation through the Civil Rights Movement. The lesson plan can also drive home the importance of this topic by explaining that law enforcement is the only profession in this country that is authorized (mandated) to make decisions and take actions that can take away what we as Americans value the most—our freedom, even our lives in some circumstances. Therefore, people in this country must have confidence that their law enforcement professionals make bias-free decisions.

A great deal of the training on bias-free policing focuses incorrectly on officers’ feelings about being accused of bias, rather than why members of the public view police as biased. For example, during a discussion regarding videotaping of police activities, the focus was on the officers’ dislike of being videotaped. The training also discussed an officer in Alabama who was attacked but hesitated because of his fear of being in the media. This approach perpetuates the negative beliefs of the participants regarding this topic and does nothing to address their role and responsibilities relative to bias-free policing.

Further to the point, the instructor made several statements throughout the training that undermined the intent of the training:

- “I know that this frustrates you, but this is what we have to do”
- “Stop and frisk is absolutely an effective method when used properly….”
- “Act appropriately and you won't be accused of bias”
- “Our job is to stand around and look for crime, to be nosey”
- Using the term “racially-biased policing,” but then stating “I don't like this phrase either.”
- “A simple explanation [to an individual] removes the potential for bias”

These statements suggest that bias in policing is not a significant issue and reports of police bias are a matter only of community members’ perceptions that officers can do little to prevent.

| | |
|---|---|
| | The training raises the crucial issue of implicit bias only at the end of the training. While it touches on issues such as Implicit Social Cognition and mentioned the Harvard Implicit Bias test and Dr. Kenneth Clark's "doll test," the discussion tended to be superficial and conclusory at best. Participants became easily defensive during this discussion, which can be understandable. However, the instructors needed to emphasize that implicit bias is real, albeit not intentional, and show how it affects policing.<br><br>Indeed, the training concluded with a brief discussion of "Recognizing Perspectives." Rather than training officers to recognize that their conduct, while intended one way, could legitimately be perceived by the community as something altogether different, the instructor emphasized a mentality of "us against them." This does not just undermine the message that police need to be sensitive to other perspectives, but only hardens an attitude that others' perceptions are incorrect and anti-police. This last point was driven home, probably unintentionally, by the instructor's final message: that, if you do your job and do it in accordance to the law, you can avoid claims of bias and you are adhering to Procedural Justice. This is an incorrect statement of what Procedural Justice is, and, as noted above, serves to undermine the purpose of the training.<br><br>*Recommendations*<br>As discussed above, pedagogically, the training needs to become more interactive and ensure focused and free discussion on the key issues around bias-free policing. Substantively, the training should be completely revamped. It is questionable whether trainers unfamiliar with the subject matter, creating a course from scratch, can train on this subject in a fulsome and comprehensive fashion. Serious consideration should be given to retaining instructors from outside the SCPD to train officers in this critical area.<br><br>Continued training with the existing course material, in the current fashion, will not lead to compliance with this provision. |

**ii. SCPD will conduct cultural sensitivity training for all SCPD officers at least annually.**

| | |
|---|---|
| **Status** | **Noncompliance** |
| **Analysis** | SCPD has developed a curriculum to instruct officers on cultural sensitivity, and began classroom instruction in September 2015. This training reflects effort and commitment. However, like the training in Bias-Free Policing, this training requires substantial revision. In particular, the curriculum needs to discuss in a nonjudgmental way how people formulate stereotypes and why we come to rely upon them; why they are nevertheless harmful to effective policing; help |

| | |
|---|---|
| | participants identify and interrogate their own prejudgments about Suffolk County's diverse cultures; and apply this in the context of policing and public safety. Many of the pedagogical concerns identified in the Bias-Free Policing section immediately above also apply here.<br><br>The program starts by focusing on morals and values. This is positive, as is the fact that the instructor also introduces the training module by sharing the new SCPD mission statement, and connecting it to constitutional requirements. The instructor also demonstrated the importance of cultural understanding by highlighting the need to know the nuances of the different cultures. However, she did so by referencing and comparing the cultures of Latino gangs. This was inappropriate, without additional context, and could foster inaccurate negative stereotypes about the local Latino community.<br><br>Moreover, the instructor also commenced the module by apologizing to the officers for having to teach these subjects. This serves only to reinforce any negative feelings students may have about having to sit through the class, and undermines the message being transmitted.<br><br>Further, as with the Bias-Free Policing training, there is too much lecture throughout the class. For example, the instructor made good use of the concept of social distance to create motivation for the participants to engage the community. Rather than lecture about this, the lesson plan should be modified to include table group or large group discussion to identify ways that they can close social distance, and then create a list of the benefits of closing social distance and enhancing the relationship with the people they have sworn to serve and protect.<br><br>When discussing core values of large groups, the instructors must be careful to avoid stereotyping. The use of "all" in reference to a particular group serves to reinforce stereotypes rather than break them down.<br><br>Tying into the issues described above regarding Bias-Free Policing, this training also does not adequately train students on how their misunderstanding of cultures can impact their policing activities. The stated "Motivation" of the lesson indicates that the goal is to remove stereotypes; this is impossible. The appropriate approach to stereotyping is to delve into why people create and use stereotypes and how reliance on stereotypes can negatively impact policing. Discussion should focus on common stereotypes of ethnic and racial groups that reside in Suffolk County, and how stereotyping may lead to improper treatment by law enforcement.<br><br>The use of the BRIDGES formulation, while well-intentioned, does not function as effectively as SCPD would like it to. It is too vague and is not sufficiently policing-oriented. The course objectives should clearly state what change will result from this training. The training should focus on the cultural and ethnic composition of Suffolk County's diverse population and highlight these groups' |

public safety vulnerabilities and/or barriers to effective police-community relations and communication. This is more relevant to police personnel.

In sum, while the curriculum superficially addresses the requirements of the Agreement, it does so without ensuring that the participants fully understand that the Department's new policies change the expectations that the organization has regarding their performance as patrol staff. It is unlikely, given the manner that the information is communicated, that officers' judgment and decision-making will change after they leave the training environment and return to the street.

Continued training with the existing course material, in the current fashion, will not lead to compliance with this provision.

*Recommendations*
We recommend that the training be revamped, consistent with our recommendations regarding Bias-Free Policing, and that SCPD consider bringing in outside consultants to provide the necessary training.

Finally, we have three specific recommendations regarding the Power Point presentation used during this training:

- First, the slide on Children of Immigration should instead focus on (a) how such children are often over-relied upon for interpretation and/or overcoming cultural barriers and (b) that this can be detrimental to the child and/or yield inaccurate information for police officers.
- Second, the slide on Non-U.S. Citizens and Immigration Status should more directly reference the agency policy R&P 16.4 and explain the "criminal arrest and charge" exception thoroughly. The manner of the presentation failed to capture the spirit behind the policy. Also, the exception was misstated: R&P 16.4 states that the person must have been arrested *and* charged with a crime. Similar to the Non-U.S. Citizens slide, the slide about the U-Visa misses the spirit behind the policy. Both of these policies were developed to break down trust barriers with undocumented immigrants, who can have a greater vulnerability of victimization and are fearful of police. The slides (and training), as currently formulated, do not accomplish this.
- Finally, the Waking in Oak Creek video is good, but it is not sufficiently related to the purpose of this training. Indeed, the point of the video appeared to get lost—students somewhat understandably reacted most strongly to a segment relating to an officer who was severely injured while trying to subdue the shooter at the Sikh temple that was under attack. Another "Not in Our Town" documentary—Light in the Darkness, about the killing of Marcelo Lucero and the aftermath in Patchogue—would be much more effective. Excerpts from this could be shown, and would be far more relevant to the students in the room.

## IV. HATE CRIMES AND HATE INCIDENTS

### a. Training

**i. SCPD will ensure that all officers receive hate crime and hate incident training at least annually. The training curriculum will address:**

1. **The elements of relevant crimes, including hate crimes and bias crimes; and**
2. **How to properly charge offenses and avoid the downgrading of crimes, including hate crimes and hate incidents.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD has developed a curriculum to instruct officers on hate crimes and hate incidents, and began classroom instruction in September 2015. The curriculum has a number of strengths, and addresses both topics above. The presentation will need to be more tightly structured and organized in order to achieve substantial compliance. Pedagogically, as with the other trainings, the hate crimes training needs to be more interactive and participatory. SCPD will need to train all officers on a revised training.<br><br>We provide below comments on aspects of two training sessions the United States observed.<br>• The Hate Crimes Detective leading the training began by providing the contact information of the Hate Crimes Unit (HCU). The written instructor's notes do not contain this information; it is critical that they do, so that non-HCU instructors will have it at hand. The information may be best presented at the end of the training; trainers should make every effort to present examples or role plays touching on core concepts at the outset of the training, when the trainees' attention is focused most sharply.<br>• The training next discussed an example of an incident that was investigated as a hate crime. Engaging the audience through an interactive device at the outset is good. The incident discussed required an explanation of fine distinctions[4] that needs to be reserved for later in the training, though. At this stage, the training needs to provide straightforward illustrations of core concepts and drive home the seriousness of the problem of hate crimes.<br>• The training next discussed the hate crimes statute. The training placed special emphasis on key phrases in the statute. These are critical elements. As we have shared in the past, the training may benefit by quickly transitioning from lecture (citing the critical decision points in an officer's assessment) to illustrative exercises (requiring the trainees to |

[4] For example, the investigation was complicated by the involved parties' false testimony. This presents problems in criminal investigations that apply more generally than the specific hate crimes material that the training is designed to address.

| | |
|---|---|
| | make these same decisions as applied to simple examples).<br>• The training lists demographic categories that may form the motivation for a hate crime (the training refers to them as "protected classes"). The training needs to explain that a hate crime may occur even when the perpetrator is not targeting a minority demographic, *e.g.*, the perpetrator may target someone because they are a non-Hispanic white individual. This should also be featured in an interactive exercise, and on the post-test.<br>• The training included discussion of a high-profile hate crime that took place in Suffolk County. Any discussion of this incident must emphasize one critical lesson (among many) that the training participants may take away: patrol must stay vigilant in assessing incidents of criminal conduct for potential hate crimes and hate incidents. Discussing this incident without emphasizing this point is problematic.<br>• The training used several real cases as examples. We encourage the trainers to continue to emphasize scenario-based training. It is also good to use different media – descriptions of the events by the instructor, video, etc. – to engage the audience. Several of the cases chosen involved collateral issues that detracted from the illustration of key points, though. SCPD would be better served modifying the facts of the scenario slightly to fit the point the instructor wants to illustrate, and explaining that the instructor has taken these creative licenses.<br>• Some examples at the end of the training (about two hours after the training started, in one session we observed) illustrated targeted concepts. These were very helpful.<br>• The Hate Crimes Detective leading the training emphasized the need to influence public perception as the reason for the training. Trainees would benefit more from hearing that the training is building *credibility* with the public – credibility that will require that officers are actually learning and applying the critical skills they are developing in the training. Another reason for the training might be that it supports SCPD's mission.<br>• The instructors did not reference the handout, and few participants followed the instruction using the handout. If the handout is meant as a reference for the officers to use in their work outside the training, participants should be so advised, and the handout can be distributed at the conclusion of the training (so as not to divert participants' attention from the visual aids).<br>• In each of the first two numbered bullet points on page 3 (entitled the "Handout"),[5] SCPD should replace "and" with "or" in the list of protected categories.<br>• The time allotted for the training seems appropriate (although existing content will need to be tightened and additional elements incorporated, |

[5] All references to pages are to the training curriculum sent on September 9, 2015.

| | |
|---|---|
| | as set forth herein).<br><br>Several necessary elements are missing from the current training:<br>• The training does not discuss SCPD policy.<br>• The written training curriculum does not currently address the duties that officers have in responding to the scene of a potential hate crime. It should. Some of these steps may refer to general crime scene processing procedures, such as securing the scene; requesting medical aid if needed; collecting physical evidence; conducting a preliminary investigation; documenting information from victims and witnesses on suspected perpetrators; and recording statements made by suspects. To the extent these constitute review of common practices, the instructors may be able to note these duties without devoting substantial time to discussing them. However, responding to the scene of a potential hate crime may give rise to specific duties: identifying and collecting certain types of physical evidence, such as hate literature, spray paint cans, and symbolic objects used by hate groups, such as swastikas and crosses; the importance of precision in recording the statements (to capture, for example, expressions of bias); identifying prior bias-motivated occurrences in the immediate area or against the same victim; requesting the presence of a supervisor and/or the Hate Crimes Unit, and briefing these personnel on the investigation; and assisting investigators in complying with any federal or state hate crime data collection reporting requirements. If these duties are not currently part of SCPD policy regarding hate crimes, SCPD should probably consider incorporating them.<br>• Hate crimes may also more frequently give rise to the need for interpreters; officers should be advised that part of their duties in responding effectively to hate crimes is understanding SCPD's Language Access Plan (discussed below) and using interpretation services effectively when necessary. (Although any more detailed discussion of language access should be reserved for the relevant training.)<br><br>Although not required, the training may also benefit from small group discussions in which participants are invited to think about their respective individual experiences with enforcement situation(s) that had the elements of a hate crime. The groups may discuss common experiences and identify solutions.<br><br>Finally, while a Hate Crimes Unit detective delivered the trainings that the United States observed, SCPD has shared that it expects to call upon SCPD Academy instructors with no specialized expertise in hate crimes to deliver the training eventually. SCPD will need to implement measures to ensure that Academy instructors have the resources they need to address the material and questions that arise during the training, and to ensure that instructors deliver a high-quality presentation. |

**b. Tracking and Reporting**

**i.SCPD will implement a policy to track, analyze and report patterns and trends regarding hate crimes and hate incidents.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | In January 2015, SCPD produced a revised draft of its policy defining the parameters of hate crimes audits, R&P 24.6. SCPD Self-Report, Jan. 2015, Att. 14. Our review of the policy showed that it contained many of the necessary elements.<br><br>In August 2015, SCPD produced a further proposed revision to R&P 24.6. SCPD Self-Report, Aug. 2015, Att. 10. SCPD revised the policy to specify that it will analyze the information on hate crimes for "possible trends and patterns regarding the type of hate act, frequency of occurrence, geographic area of occurrence and type of victim." *See id.* ¶ VI(I)(3). This general description of the trend analysis is a helpful addition. More detail can be provided, as described in the Recommendations, below.<br><br>In addition to providing real-time access to mapping of hate crimes to the command staff at SCPD headquarters and the command staff of each precinct, *see* SCPD Self-Report, Jan. 2015, Att. 14 ¶ VI(I)(2), the proposed updated policy also provides for the annual dissemination and publication of a report analyzing the trends mentioned above, *see id.* ¶ VI(I)(4).<br><br>In practice, SCPD's mapping system appears to be programmed properly and offers reasonably good functionality. We did not see any obvious problems.<br><br>A further discussion of implementation of the policy appears in our Analysis re Paragraph IV(b)(ii), *infra*.<br><br>*Recommendations*<br>The policy should provide more detail regarding the trend analyses conducted. Insofar as this information is sensitive, the policy can alternatively provide that SCPD will memorialize a list of more specific analyses to conduct, and maintain such list confidentially.<br><br>It may add value to the database and hate crimes/incidents map by mapping the hate crimes/incidents overlaid onto data regarding other ambient incidents such as traffic incidents, so that the rate at which hate incidents occur may be interpreted in relation to other incidents. This may require substantial expertise with GIS software. SCPD may want to consult its Research and Development Division or other County resources to see if this is feasible. |

**ii. Within one year of the Effective Date and annually thereafter, SCPD will produce a report mapping and analyzing for potential patterns and trends all hate crimes and hate incidents which have occurred over the previous six**

**months. The report will detail SCPD's planned response to any identified pattern or trend. Throughout the pendency of this Agreement, the report will be provided to the United States at least five business days before the report is made public.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | In January 2015, SCPD presented a review of the hate crimes and hate incidents in Suffolk County in 2014. *See* SCPD Self-Report, Jan. 2015, App'x A. The report provided detail about each incident, the steps the investigators took, and the efforts to identify perpetrators of the incident in question and/or links to other incidents.<br><br>In March 2015, the United States requested: (1) the process of collecting data and inputting it into the database; (2) steps taken to maintain quality control; and (3) the analysis that SCPD conducts once the data is gathered. As to the third category, we asked that SCPD provide a detailed description of the criteria that it considers in identifying patterns or trends, including, if applicable:<br>• Geographic patterns;<br>• Demographic characteristics of victims;<br>• Demographic characteristics of offenders (when known);<br>• The type and timing of events; and<br>• Alternative explanations for desultory patterns.<br>SCPD has agreed to provide this information in its next annual report. *See* SCPD Self-Report, Aug. 2015, at 13. The trends reviewed should be set forth in SCPD policy, as mentioned above. *See* Analysis re Paragraph IV(b)(i), *supra*.<br><br>In August 2015, we requested that SCPD identify trends in hate crimes identified since January 2014. SCPD did not list new trends identified beyond what was listed in its January 2015 report.<br><br>On-site observations in September 2015 provided some detail about SCPD's analyses of hate crimes and hate incidents. SCPD's mapping system permits the user to view hate crimes and hate incidents on a map of the police district. The marker representing each crime/incident reveals additional data.<br><br>The low volume of incidents may present difficulties in analyzing for some trends. At a minimum, however, SCPD should be analyzing data over time, as described in the recommendation below.<br><br>*Recommendations*<br>It may be helpful to map hate crimes alongside other incidents of crime to interpret the occurrence of hate incidents in relation to other types of incidents, as mentioned above. *See* Analysis re Paragraph IV(b)(i), *supra*. SCPD should also look for trends over time, focusing especially on the type |

| | |
|---|---|
| | and timing of events, and victim and offender demographic characteristics.<br><br>SCPD should present the criteria it will use for all trend analyses. |

**c. Quality assurance**

**i. SCPD will implement a policy describing its HCU quality assurance process that ensures that HCU investigations follow proper techniques and procedures.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>In January 2015, SCPD produced a revised draft of its policy defining the parameters of hate crimes audits, R&P 24.6. SCPD Self-Report, Jan. 2015, Att. 14. The United States posed questions about the proposed revisions. In August 2015, SCPD produced a further proposed revision to R&P Chapter 24, Section 6. SCPD Self-Report, Aug. 2015, Att. 10. The new draft includes, as applicable here, an additional clause specifying that the criteria for a complete investigation are the Hate Crimes Investigators' Responsibilities in the policy's subdivision VI(D). *See id.* ¶ VI(F)(2). These include, for example, ensuring that the scene is protected, preserved and processed; interviewing all victims and witnesses; canvassing the neighborhood for additional sources of evidence; determining if a pattern of such incidents exists; removing offensive physical evidence, once it has been properly documented; maintaining contact with the victim; and other steps. *See id.* ¶ VI(D). These are sound criteria for assessing the quality of hate crimes investigations.<br><br>*Implementation of the Policy*<br>During our on-site assessment in September 2015, the HCU demonstrated a software program used to sample cases for the audit. SCPD reports that it selects the cases in its report randomly using this software (and does not single out particular cases for review).<br><br>The hate crimes auditing process is increasingly detailed, although the report, as discussed below, should adhere more closely to the criteria in R&P 24.6. This is explained further below.<br><br>Our review of a selection of the hate crimes investigations themselves showed them to be, in general, comprehensive and thorough. The detectives at the Hate Crimes Unit appear committed to the enforcement of hate crime laws and knowledgeable about their area of focus. As discussed below, however, sometimes casefiles left more questions than answers. Our review of investigations remains ongoing.<br><br>*Recommendations*<br>SCPD should expand on the reports delivered to date, as described |

| | |
|---|---|
| | immediately below.<br><br>SCPD only recently implemented its form for recording the status of communication with the victims of hate crimes/incidents, but it will need to monitor this process going forward. |

**ii. Six months after the Effective Date, and every six months thereafter throughout the pendency of this agreement, SCPD will forward to the United States a report describing all random audits of HCU investigations completed within the current six-month time period and any corrective actions planned or taken as a result of the audits.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD has timely submitted reports corresponding to this Paragraph of the Agreement. In the reports, the Commanding Officer of the SCPD Hate Crimes Unit affirmed his review of a selection of hate crimes investigations, and summarized the cases reviewed. The reports provided some helpful information, but until the August 2015 report, SCPD did not provide the criteria used by the Commanding Officer to evaluate each case for accuracy and completeness. SCPD provides that information in the form of draft policy language. *See* Analysis re Paragraph IV(c)(i), *supra*.<br><br>As mentioned above, the criteria for quality assessment that SCPD provided in August 2015 are sound. These criteria should form the structure for evaluation of each investigation. The report should also apply the elements of the hate crime statute to the facts known about the incident at the time of the report, and make an independent assessment of whether the known facts meet the elements of a hate crime; the report should subsequently compare the investigator's determination to that of Det. Lt. Hernandez. Finally, the report should make assessments concerning case progress; in some cases, several months had transpired since the last interview or other event in the investigation, and the report summarily concurred that the case should be classified as "pending," without further discussion.<br><br>Compliance with this provision is linked to compliance with Paragraph IV(c)(i). |

## V. LANGUAGE ASSISTANCE

**a. SCPD policy will require the following:**

**i. A current Language Access Plan that explains how SCPD will implement its policies and procedures to provide meaningful access to police services. This plan will be updated at least annually.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD has accepted the recommendation of the United States' experts and intends to finalize a single Language Access Policy (LAP) to replace its Language Access Plan (R&P 26.6) and R&P 26.5, Persons with Limited English Proficiency. The combined policy appears to comply with the requirements of this section. However, SCPD should develop a more extensive plan, which will serve as an "administrative road map" for implementation. To ensure proper implementation, SCPD will also need to train officers fully on how to engage with individuals who are LEP, the resources available to them and how to employ those resources. For example, the LAP discusses use of bilingual officers who are not Department Authorized Interpreters ("DAIs") in certain situations, except in taking statements with criminal suspects, victims, and witnesses and obtaining complaints about SCPD personnel. The distinction should be clearly communicated during training (*i.e.*, qualified bilingual personnel will only be using their language skills when the interaction originates with them, or in the case of Spanish-speaking bilingual 9-1-1 operators, when calls are also routed to them).<br><br>Further, the proposed LAP states that the IAB will "periodically" request a list of 9-1-1 calls to monitor services. This should be more routine and scheduled, similar to other monitoring efforts. Broadly speaking, all monitoring activities (whether they be ordered by the Chief of Patrol, the Language Access Coordinator, or IAB) should be well documented and coordinated. We recommend that the policy provide that the Language Access Coordinator maintain a list of bilingual personnel, in addition to DAIs.<br><br>Finally, the LAP also contains references to using American Sign Language interpretation with individuals who are deaf and hard of hearing. While there are similarities with engaging individuals who are LEP, the SCPD should develop a separate policy for addressing the needs of individuals who are deaf or hard of hearing.<br><br>In addition to these general comments, SCPD should also take note of the following specific recommended revisions:<br>• Provision II.C (page 2) should refer to Policy 16.4.<br>• SCPD needs to clarify what the purpose is of "collecting LEP contacts", as noted under VI.A.2.b. |

- SCPD should add “inappropriate” after “excessive” in VI.A.2.d(4).
- Provision VI.A.3.c (page 5) should distinguish between community-based organizations and local school districts and hospitals—they are not the same.
- To enable proper quality assurance, as noted under VI.A.2.d, the PDCS 7042 Language Assistance Tracking forms should collect documentation of the use of any and all forms of language assistance, including temporary interpreters.

We make further recommendations regarding the revised Plan/Policy in our Analyses regarding other Paragraphs of the Language Access Section.

*Implementation*
The current R&Ps 26.5 and 26.6 as well as the proposed Plan/Policy require the practices below. We note the following regarding implementation of these practices:

- *Language access and immigration status*: The policies prohibit officers from relying on an individual’s use of SCPD language services as a basis for inquiring into immigration status. SCPD should develop a mechanism for ensuring that officers do not make such unauthorized inquiries and for determining that the policy is observed.

- SCPD reports that officers have notified consular officers only twice in 2015, signaling that no more than two non-citizens have been arrested. Even if this is accurate, SCPD needs to develop more rigorous data collection in this area and improve its training.

- *Signage Declaring the Availability of Interpreters*: Policies require signage at entrances to SCPD facilities notifying LEP individuals of the availability of an interpreter free of charge. SCPD maintains such signage at the facilities we have observed.

- *Availability of Vital Documents: See* Analysis re Paragraph V(a)(v), *infra*.

- *Language Identification Charts* must be posted at all public police facilities and maintained in all sector cars. The United States found Language Identification Charts in the facilities and sector cars we observed.

- *Translation of all non-English Correspondence:* SCPD reported in March 2015 that its only correspondence in a language other than English were completed community surveys. SCPD reports that, in the reporting period ending August 1, 2015, no correspondence was submitted in non-English languages.

| | |
|---|---|
| | • *Use of Language Line:* Overall, the use of Language Line telephonic interpretation services has increased. However, our observations indicate that there are substantial deficiencies in this program. Officers still appear reluctant to use the service, and still appear to be using bystanders and family members to interpret (see below). During one ride along, an officer noted that the Language Line cell phone charger was "wobbly," and therefore not able to effectively charge the phone. In another case, an officer indicated that his regular vehicle was out of service, so he had no Language Line cell phone. SCPD needs to do more to ensure that officers understand how and when to use Language Line and the importance of proper interpretation.<br><br>• *Use of interpreters, Use of temporary interpreters:* During our site visit, we observed that there is still significant reluctance to move away from using bystanders and children for language assistance, because of a perception that this has never been a problem.<br><br>In addition to the comments provided above, it is evident that the training must be updated to accurately and comprehensively reflect each component of the finalized policy.<br><br>Ensuring that Suffolk County's diverse LEP populations have meaningful access to police services will require a substantial cultural change at SCPD. Personnel will have to dispatch with methods that may seem intuitively prudent (relying upon bystanders to interpret), while adopting new methods with rigor (ensuring that appropriate sector cars have functioning Language Line access, and routinely using it). We commend SCPD for its steps down this path, but there is considerable work left to do. |

**ii. Translations of the Language Access Plan and Policy into Spanish and other non-English languages as appropriate and posting in a public area of the police department building, on its website, and in any other locations throughout the County where individuals go to seek police assistance.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | *Policy*<br>The current policy does not incorporate all of the elements of this section. The proposed consolidated Plan/Policy should require that it be translated and that a Spanish version be distributed.<br><br>However, in practice, SCPD has consistently distributed the Spanish version of the Language Access Plan at department facilities and has maintained a copy on its website. Translations of the LAP into the five priority languages have not yet been undertaken. |

| | |
|---|---|
| | *Recommendations*<br>SCPD should list the Language Access Plan and Policy as a "vital document," requiring that a Spanish translation be maintained at all times. In addition, SCPD should amend the Plan/Policy to require that Spanish versions of the Plan/Policy be distributed in all public areas and on the website. Additionally, SCPD should ensure that all translations of the LAP are conducted by Language Line Services (or another qualified entity) to maximize accuracy, and are widely available to all intended users or recipients of the documents. When the translations are completed, they should be reviewed by community stakeholders to ensure that the translations are appropriate for local linguistic communities. |

**iii. Distribution of the Language Access Plan and Policy to all SCPD staff and to community organizations serving LEP communities encountered by SCPD.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>Current policy provides for this distribution. The proposed Plan/Policy requires distribution to community groups.<br><br>SCPD has distributed its language access policies to many community organizations. We encourage SCPD to continue to identify additional distribution points.<br><br>*Recommendation*<br>The proposed Plan/Policy should be amended to require distribution to all SCPD members. |

**iv. Availability of Citizen Complaint/ Compliment forms in Spanish and other common non-English languages in all precincts and on SCPD's website for both completion and submission.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD policy contains the relevant language, has translated this form into Spanish, and has made hard copies available in its precincts. Copies of the form appear in several other common languages on the SCPD website.<br><br>SCPD is undertaking the steps to fulfill compliance with this Paragraph, including online submission of complaints/compliments and posting of the form in other non-English languages, as appropriate. |

| | |
|---|---|
| | *Recommendation*<br>SCPD should amend the proposed Plan/Policy so that it requires that the website link to versions of the Complaint/Compliment form in common non-English languages. |

**v. Translation of all vital written documents and materials shall be consistent with DOJ Guidance, in order to ensure that LEP individuals in the community have meaningful access to such documents and materials.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD's policies continue to appropriately require (a) translation of the following documents into the six most commonly spoken non-English languages in the Suffolk County police district, and (b) that they be available in public police facilities and on SCPD's website:<br>a. How to Obtain a Police Report, (PDCS-8100)<br>b. Family Offense Assistance and Court Procedures, (PDCS-7109)<br>c. What to do When Stopped by the Police, (PDCS-7148 )<br>d. Missing Person Guidelines<br>e. Special Needs/Silver Alert Program, (PDCS-8060)<br>f. Crime Victim Information Report, (PDCS-8105)<br>g. Compliment/Complaint Information Report, (POCS-1300-1)<br>h. Mental Health Assistance Notification, (PDCS-7146)<br>Under the proposed Plan/Policy, these documents are required to be translated only into Spanish and "other relevant languages as determined by the Language Access Coordinator." *See* Plan/Policy subdivision VI(B)(2)(b)-(c). The policy should be revised to ensure compliance with this section and to ensure that local LEP populations can have meaningful access. Many of the above documents can be found in hard copy at SCPD precincts and other facilities.<br><br>*Recommendations*<br>Although SCPD has described its translation of vital documents as an "ongoing process," SCPD is nearing the point where it may want to undertake an audit of all facilities to ensure that hard copies of the necessary vital documents are posted. SCPD should begin to consider relevant languages other than English or Spanish spoken in the communities covered by each precinct. Such a review should also take into account the location of the posted documents within the reception areas of SCPD facilities, to ensure meaningful access.<br><br>SCPD shared during our September visit to SCPD facilities that it has recently finalized the content for the "What do to When Stopped By Police" brochure and has identified additional "vital" documents to translate (*i.e.*, CVIR, general receipt for property, medical release form, and domestic violence |

| | |
|---|---|
| | assessment form). Copies of these should be provided to DOJ and listed on the SCPD website. |

**vi. Translation of any citizen correspondence received that is in a non-English language. If that correspondence when translated would be considered a citizen complaint, then the information as translated will be processed in the same manner as are citizen complaints originally received in English.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>The Language Access Plan has incorporated this Paragraph into policy. The policy provides that authorized interpreters shall translate the correspondence; this should be changed to "authorized translators." SCPD also reports it has not received any citizen correspondence in a non-English language since the effective date.<br><br>*Recommendations*<br>SCPD has conducted substantial outreach to the LEP community concerning other initiatives, such as the universal entrance exam for cadets. We suggest that SCPD review what lessons, if any, can be drawn from the successes of its other outreach efforts to ensure that members of Suffolk County's LEP population recognize that SCPD has processes in place to accept and appropriately route correspondence in languages other than English, including citizen compliment/complaint forms. |

**vii. Availability of bilingual operators for complaint phone lines or a dedicated Spanish complaint phone number. SCPD will indicate on its Spanish-language Compliment/Complaint form that the phone operator speaks Spanish.**

| **Status** | **Compliance Rating Pending—Insufficient Documentation** |
|---|---|
| **Analysis** | Very few calls have been received to date and thus, it is premature to assess compliance at this point in time.<br><br>Additional outreach needs to be undertaken with Latino and LEP community advocates to ensure that they know about the compliment/complaint line and are informing their constituents to use it communicate feedback. *See* Recommendations re paragraph V(a)(vi), *supra*. |

**viii. Objective oral language proficiency standards and annual proficiency testing for all IAB members who are designated as "Spanish-speaking" or as speaking a non-English language.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD's plan for testing Department Authorized Interpreters and bilingual personnel, as relayed to the United States, now seems appropriate. The SCPD will be paying Language Line Services to test/qualify prospective DAIs for interpreting skills. For those who do not pass interpreter certification, a second level of language proficiency testing will be conducted to determine if prospects are qualified to serve as department bilingual personnel. As of September 2015, SCPD was conducting a trial with Language Line with staff of varying Spanish-language proficiencies. We understand that SCPD will implement annual proficiency testing of Spanish-speaking Internal Affairs personnel as part of this process. We understand that SCPD will initially certify just 50 staff as bilingual interpreters. This will present a challenge, to ensure that an appropriate number of staff members/ officers are scheduled to work to ensure appropriate language access coverage.<br><br>There is currently no plan for testing/qualifying personnel for translation skills; SCPD indicated that they would work on this after the interpreting and verbal language proficiency testing processes were finalized.<br><br>*Recommendations*<br>As discussed above, we recommend that the Language Access Coordinator maintain a list of bilingual SCPD personnel, in addition to interpreters.<br><br>SCPD will need to document testing and certification of interpreters and bilingual personnel. We look forward to reviewing the results. |

**ix. Recording and periodic auditing of phone calls through the multi-language toll-free complaint hotline.**

| | |
|---|---|
| **Status** | **Compliance Rating Pending—Insufficient Documentation** |
| **Analysis** | SCPD policy requires such recording. However, few phone calls have been received, so we are unable to analyze the effectiveness of this policy. |

**x. Documentation of the use of any interpreter used when conducting a field interview or interrogation of an LEP individual, including the following:**

**1. the date;**

**2. the location;**

**3. the full name of the interpreter;**

**4. the non-English language spoken by the interpreter;**

**5. the relationship (if any) of the interpreter to the LEP individual;**

**6. contact information for the interpreter, including telephone numbers, email and postal address;**

**7. the name of the witness, victim, and subject person requiring an interpreter to the extent not prohibited by privacy laws; and**

**8. a summary of any action taken.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD has implemented a policy that requires officers to document the use of interpreters. During the site visit, we learned that the SCPD has changed the name of the Interpreter Tracking form to a Language Assistance Tracking form. Completion of the form has been integrated into the CAD system for all incidents that get assigned a central complaint number (with an L designation) and are assigned to officers on patrol. Officers cannot close out the call until they complete the form. This is a very positive development and is working well. For those calls that do not get a central complaint number (*i.e.*, traffic stops or individual inquiries made at the precinct), paper tracking forms are being used. The forms comply with the requirements of this section. The final version of this form should enable documentation of each type of language assistance service that was used, including temporary interpreters. We note, however, that the documents we reviewed indicate that use of the forms is uneven. Further training and emphasis on accuracy and completion of the forms is necessary.<br><br>*Recommendation*<br><br>SCPD needs to emphasize the importance of preparing these documents fully and accurately and ensure that this occurs. |

**b. SCPD will revise "Language Line Translating and Interpreting Service," Order Number 09-117, as follows:**

**i. The order will use the term "interpretation" to refer to oral communication, and "translation" to refer to written communication. As written, the order uses both terms interchangeably.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | SCPD has made the required revision. SCPD should apply this distinction consistently throughout its language access policies. |

**c. SCPD will modify its practices and implement the revised Chapter 26, Section 5, "Persons with Limited English Proficiency," as approved by the United States.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | As discussed above, SCPD proposes a single policy, *see* SCPD Self-Report, Aug. 2015, Att. 12, that will replace its Language Access Plan (Rules & Procedures Chapter 26, Section 6) from August 2014 and R&P 26.5, Persons with Limited English Proficiency. *See* our analysis contained Paragraph V(a)(i) above. |

**d. SCPD will ensure that the home page of its website states, in at least Spanish, how to access language assistance services and Spanish translations of SCPD policies and other relevant information.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | SCPD has two separate buttons on its website homepage labeled, "*Información en Español*." *See* http://apps.suffolkcountyny.gov/police/index.htm. Each button directs the user to a page dedicated to Spanish-language forms, policies, and other literature. *See* http://apps.suffolkcountyny.gov/police/information_sp.htm.<br><br>In the recently concluded reporting period, SCPD added a link under the table of forms in non-English languages that provides an additional route to access the Spanish-language forms page. *See* http://apps.suffolkcountyny.gov/police/onlineforms.htm.<br><br>SCPD reports that it has submitted its Chinese forms to be re-translated in Simplified Chinese, rather than Traditional Chinese, as we recommended previously.<br><br>Despite improvements, SCPD's website would substantially benefit from a more functional platform. SCPD reports that it is seeking funding in order to make the necessary improvements.<br><br>*Recommendation*<br>As we recommended in June 2015, SCPD should add a footer that states the target language and the date of the last update/translation to all translated documents. |

**e. SCPD will maintain effective incentives for bilingual employees to become SCPDDAIs, including assignments, promotions, and other means available to the County.**

| | |
|---|---|
| **Status** | **Noncompliance** |
| **Analysis** | SCPD has not identified incentives corresponding to this provision. As SCPD notes in its Self-Report dated August 1, 2015, it is in a better position to implement such incentives now that the certification process for Department Authorized Interpreters has been finalized and expects to do so and is considering the best method for offering such incentives.<br><br>*Recommendations*<br>As we reported during the last reporting period, qualifying incentives under this Paragraph must offer a real and tangible benefit to employees who certify as SCPDAIs. This should extend to bilingual officers as well. We look forward to reviewing SCPD's proposed incentive program when it ready. |

**f. Within 90 days of the Effective Date, SCPD will implement a process of consultation with representatives of the Latino community to develop and annually review: implementation of the Language Access Policy, including areas of possible collaboration to ensure its effectiveness; accuracy and quality of SCPD language assistance services; and concerns, ideas, and strategies for ensuring language access. This process will be reviewed and approved by the United States prior to its implementation.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | We understand from both SCPD and Latino community advocates that meetings have been held. |

**g. Within 180 days of the Effective Date, and annually thereafter, SCPD will provide at least four hours of training to all personnel on providing language assistance services to LEP individuals. This training will include:**

**i. SCPD's LEP plan, policies, and procedures and the requirements of Title VI and this Agreement;**

**ii. How to identify the non-English language and language assistance needs of an LEP individual during an in-person or telephone interaction;**

**iii. How to access SCPD-authorized, telephonic and in-person interpreters;**

**iv. How to work with interpreters in the field and assess interpreter quality;**

**v. How to account for cultural diversity and language barriers in policing; and**

**vi. Basic command terms and phrases in Spanish for officers assigned to patrol in areas with significant Spanish-speaking populations.**

| Status | Noncompliance |
|---|---|
| **Analysis** | SCPD has begun to provide some training to officers regarding Language Access. Further, we recognize that the training we viewed was conducted while the new Language Access Policy was being finalized. There was good use of videos in this training. However, the training provided does not meet the requirements of this section. It lacks clarity and is sometimes inaccurate. The training did not effectively communicate that a change is being implemented in the agency's service to LEP individuals and why this is change is necessary. SCPD must also fully integrate into the training the mandated use of DAIs, Language Line or, in some circumstances, bilingual personnel. There was no training on basic Spanish phrases, as required by the LAP. Additionally, only one hour of true language access training is currently being provided. That hour is sandwiched between two other hours of training, which address Cultural Proficiency and Effective Communication. These purport to relate to language access issues, but in fact do not sufficiently relate to this topic. Even if they did, this would amount to only three hours of Language Access training, and this Paragraph of the Agreement requires four hours.<br><br>*Recommendations*<br>As with the other training sessions we witnessed, the training on Language Access should include more scenario/role play, focusing on common encounters with limited English proficient individuals. Demonstrating the use of the Language Line was good, but the same should be done with teaching the four stated "How Tos" in the LAP.<br><br>Everyone should be given a copy of the Language Access policy, and it should be interactively discussed, section by section, informing personnel about what is required. Merely referencing sections of the LAP is insufficient.<br><br>The benefits of using Department-authorized language assistance services, including DAIs and Language Line, need to be better communicated. Accessing these services will undoubtedly take time and effort, so officers need to understand why it is in their best interests to do so. Discussing some problem scenarios where either children or an unauthorized interpreter are used is important because these have been SCPD's default sources of language assistance for years, and they are no longer permitted, except during an exigency.<br><br>The purpose, process, and benefits of using the new Language Assistance Tracking form needs to be better communicated.<br><br>The training must discuss in depth the exigency exception to use of authorized interpreters.<br><br>If the Effective Communication segment remains in training, the SCPD |

| | |
|---|---|
| | trainers should learn more about procedural justice and incorporate this concrete training content into their lesson. (See here for some police training podcasts on the topic: http://www.cops.usdoj.gov/default.asp?Item=2656). |

**h. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will conduct a satisfaction survey of representatives from the Latino community regarding SCPD's LEP efforts. SCPD will partner with local Latino advocacy groups in order to conduct the survey. SCPD will produce a report analyzing the results of each survey and detailing what measures, if any, SCPD will take as a result of the analysis. Each report will be provided to the United States throughout the pendency of this Agreement at least five business days before it is made public.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD is conducting the required survey and has collected a significant number of responses. We look forward to reviewing SCPD's complete assessment of how these will inform their operations.<br>However, as SCPD acknowledged, there is substantial room for improvement in the current survey form, both in substance and form.<br><br>*Recommendation*<br>SCPD should continue to explore other survey tools, particularly those that have been evaluated by researchers. For example, the national "Police-Citizen Interaction Survey," developed by National Police Research Platform is one that is being used by a growing number of municipalities. More information is available here: http://nationalpoliceresearch.org/. |

# VI. ALLEGATIONS OF POLICE MISCONDUCT

## a. Reporting misconduct

### i. SCPD policy will require that all members have the duty to report allegations of discriminatory policing to a supervisor or to the IAB. Failure to report or document allegations of misconduct will be grounds for disciplinary action.

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>The proposed draft of R&P 1.11 requires "[m]embers who have observed or are aware of other members who have engaged in bias-based policing [to] report such conduct to a supervisor immediately."[6] SCPD Self-Report, Aug. 2015, Att. 1. R&P 1.11's definition of bias-based policing is consonant with the Settlement Agreement's definition. *Compare id. with* Agreement ¶ II(i).<br><br>The August 2015 SCPD Self-Report also cites to R&P Chapter 5, Section 2(V)(E). This appears to reference the draft of this policy submitted with the January 2015 SCPD Self-Report. That draft requires that suspected violations be referred to an officer in charge. The policy likewise requires that allegations of discriminatory policing be referred to IAB within 48 hours.<br><br>The proposed R&P 1.11 also dictates that "[m]embers who have engaged in, ignored or condoned biased-based policing shall be subject to discipline." *See* SCPD Self-Report, Aug. 2015, Att. 1, §V(B).<br><br>These draft policy changes collectively capture the spirit of Paragraph VI(a)(i). The relevant changes to the policies referenced above should be finalized and implemented at SCPD's earliest availability.<br><br>*Policy Recommendation*<br>Members who "ignore[] or condone[] biased-based policing" should certainly be subject to discipline. At the next annual review, SCPD must also add the precise language of Agreement ¶ VI(a)(i), subjecting to discipline those members who know of misconduct but fail to report or document it.[7]<br><br>*Implementation*<br>SCPD has submitted satisfactory policies for the United States' review with the August 2015 SCPD Self-Report, but much of SCPD's work in implementing this provision is ahead of it. |

[6] Thereafter, "[s]upervisors receiving notification that a member has engaged in a bias-based policing shall report such conduct to the Internal Affairs Bureau in accordance with the procedures" in R&P Chapter 5.

[7] R&P Chapter 5, Section 2(V)(A)(14) appears to direct members to report and, where necessary, record misconduct, but does not specify that it is subject to discipline.

| | |
|---|---|
| | SCPD has seen problematic situations to which this Paragraph would apply in recent months. *See, e.g.*, Analysis re Paragraph VI(a)(ii), *infra* (February 2014 complainant ultimately reports allegations of racial profiling directly to IAB *after* having first made same allegations to precinct desk officer and patrol supervisor) (no evidence that precinct officers reported allegations to IAB themselves).<br><br>A document request related to this Paragraph was pending at the time of this Compliance Assessment. |

**ii. SCPD policy will ensure that all complaints are investigated even if the complainant does not submit the complaint on an actual SCPD complaint form.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>The draft of R&P Chapter 5, Section 2 submitted in January 2015 incorporates language that reflects this Paragraph's requirement. *See, e.g.*, SCPD Self-Report, Aug. 2015, Att. 4 §§II(A)-(C). However, the policy contains additional language that could be viewed as internally contradictory. *See id.* § (VI)(C)(2) ("The Internal Affairs Bureau shall accept and review all allegations to determine *if an investigation is warranted* and the nature and extent of the investigation to be conducted." (emphasis added)). This should be addressed, as set forth below.<br><br>Note: SCPD's Compliment/Complaint Incident Report invites the reader to call IAB (or the Human Rights Commission) directly to report officer conduct.<br><br>*Implementation*<br>SCPD has not provided comprehensive evidence of compliance with this provision.<br><br>Complainants' experiences in attempting to file complaints orally or otherwise appear to be mixed. One particular case may be emblematic of this problem. An individual stopped and given a traffic citation in February 2014 said he believed he was the subject of racial profiling. The individual reported to a precinct to complain. The complainant reports that he waited almost an hour at the precinct. The desk officer arranged for the complainant to speak with the patrol officer's supervisor, but apparently failed to communicate this fact to the complainant; upon the supervisor's arrival, the complainant was reluctant to speak with another officer in the chain of command. Ultimately, it appears that the complainant left the precinct without any record of his misconduct complaint being taken. This is highly problematic.<br><br>The complainant later contacted IAB directly, and an IAB investigator took the |

| | |
|---|---|
| | complaint over the phone and entered it into a common database. The complaint was investigated. Notwithstanding, the complainant appears to have navigated a series of steps before complaint intake was completed.<br><br>See Analysis re Paragraph VI(b)(vi) for a review of investigation quality assurance.<br><br>A document request related to this Paragraph was pending at the time of this Compliance Assessment.<br><br>*Recommendations*<br>SCPD should eliminate the phrase "if an investigation is warranted and" in the draft R&P Chapter 5, Section 2(VI)(C)(2), such that the Subsection would read, "The Internal Affairs Bureau shall accept and review all allegations to determine … the nature and extent of the investigation to be conducted." Some assessment of the facts alleged is required. Determining that an investigation is unwarranted could be read to violate Paragraph VI(a)(ii).<br><br>Although all parties acknowledge that the complaint process can be a difficult one for the officer and the agency, SCPD as an agency must welcome the opportunity to address possible officer misconduct. If SCPD has reason for concern that patrol, desk officers, or other personnel may be discouraging complaints, remedial action is required. |

**iii. SCPD policy will explicitly permit parties other than victims to file complaints with the HCU, with the IAB, with any officer, or at any SCPD precinct. Complaints regarding hate crimes or hate incidents will be forwarded to an HCU investigator for review and investigation.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policies*<br>The language of the drafts of R&P Chapter 5, Section 2 and Chapter 24, Section 6 capture most aspects of this Paragraph. SCPD accepts misconduct complaints from third parties, *see* SCPD Self-Report, Aug. 2015, Att. 4, §VI(B), and the Internal Affairs Bureau is notified, *see id.* §VI(C). Chapter 24, Section 6 directs SPCD members to investigate complaints of hate crimes regardless of how they are submitted. *See* SCPD Self-Report, Jan. 2015, Att. 14. Notwithstanding, the internal investigations policy should also include the explicit language of the first sentence this Paragraph of the Agreement, as it applies to internal investigations.<br><br>The draft R&P Chapter 24, Section 6 directs the responding SCPD member to notify the HCU of a hate crime, hate incident, and/or non-designated hate offense. *See* SCPD Self-Report, Jan. 2015, Att. 14, §VI(B)(2). The HCU takes primary investigative responsibility for such investigations, with few exceptions. |

Document 237-9 Filed 11/04/25
PageID #: 17604

| | |
|---|---|
| | *See id.* §V(A). Notwithstanding, this policy should also include the explicit language of the first sentence of this Paragraph of the Agreement, as it applies to hate crimes.<br><br>It is unclear whether SCPD has adopted the draft of R&P Chapter 24, Section 6 provided in January 2015; in any event, a new policy has not been posted to SCPD's website. *See* http://apps.suffolkcountyny.gov/police/documents/24-6.pdf.<br><br>*Implementation*<br>SCPD has not provided comprehensive evidence of how it is treating third-party complaints.<br><br>We have reviewed anecdotal evidence bearing on compliance with this paragraph. In one recent instance, a third party called to report an apparent domestic dispute. SCPD responded to the criminal complaint. The third party also complained about the delay in response time and that the responding officer did not take the call seriously. We have reviewed some documentation that the alleged improper conduct was investigated; additional follow-up may be required.<br><br>In another recent case, the crime victim had a third-party advocate during the initial interview. It bears specifying that the victim reported the crime, not a third party. Notwithstanding, this shows that SCPD is taking some steps to encourage victims who may be reluctant to come forward.<br><br>*Recommendations*<br>SCPD should approve the version of R&P 24.6 attached to the January 2015 SCPD Self-Report, and post it publicly.<br><br>SCPD should consult with community-based organizations that may be aware of crimes or officer misconduct affecting Suffolk County's diverse communities. We encourage SCPD to work with these organizations to develop a system to forward SCPD complaints and to troubleshoot the complaint process.<br><br>We further recommend that SCPD conduct outreach, particularly to minority communities, to ensure that members of the community know that this option is possible.<br><br>Further solicitation of third-party complaints will present new issues to SCPD. For example: interested parties, such as advocates for witnesses or victims, may want to act as interpreters. SCPD will need to enforce its policies on third-party complaints, victim advocates, and language access equally. This may require supplemental training, for example. We encourage SCPD to present these issues as they come up. |

b. **Investigation of Misconduct**

**i. SCPD policy will ensure that all allegations of officer misconduct relating to discriminatory policing, regardless of the manner in which reported, will be forwarded to IAB no later than 48 hours from receipt.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | *See* Analysis re Paragraph III(b)(iii), *supra*. |

**ii. Within 180 days of the Effective Date, SCPD will review the staffing of IAB and ensure that individuals currently serving as or who are selected for IAB possess excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective. Supervisors with a sustained complaint of, or who have been disciplined for, excessive use of force, sexual harassment, discrimination, or dishonesty will be presumptively ineligible from assignment to IAB.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | *Policy*<br>The second sentence of this Paragraph of the Agreement should be incorporated into policy.<br><br>*Implementation*<br>SCPD shared information about the work histories, training, and disciplinary records of 17 current IAB staff, including the Commanding Officer and Executive Officer, in August 2015. *See* SCPD Self-Report, Aug. 2015, Att. 14. This information helps supplement the staffing studies conducted and resolve concerns about the discrepancies between the two previous studies.<br><br>SCPD's IAB investigators possess considerable experience on the force. SCPD's corps of IAB investigators has a collective track record for good conduct. Some investigators have a background in investigations at IAB or in other roles, including as detectives or crime scene officers. Some have attended training related to investigations through New York state or the FBI. Overall, we appreciate SCPD's efforts to recruit an experienced group of officers to IAB. Notwithstanding, IAB concedes that the outside courses on internal misconduct investigation skills that it has tried in the past have not been a good fit for the agency, and at least in recent years, SCPD has not maintained such a training program within the agency. Investigators appear to have had differing access to |

| | |
|---|---|
| | training on the investigative skills they need.<br><br>Investigators may be getting more uniform access to skills development through a field training course that IAB is now implementing. We have reviewed documentation certifying that investigators who started with IAB since June have received direction on many of the skills they will need to execute on a regular basis. Still, the certifications are only a one-page checklist, and do not reflect with any depth the instruction taking place. We have not had the opportunity to observe the instruction or explore the program with the new investigators or instructors. In addition, this field training program only applies to new investigators.<br><br>*Recommendations*<br>As we have previously informed SCPD, all IAB investigators should take training specific to their craft. SCPD is in the process of implementing a field training course for new officers at its Internal Affairs Bureau. At SCPD's request, we have recommended several off-site training courses that the agency may want to employ. We recommend that SCPD create a written training plan for IAB investigators of all experience levels, and implement the same forthwith. That training plan should include the Agreement-mandated training courses on cultural sensitivity and language access. |

**iii. SCPD policy will require that each IAB investigation of officer misconduct relating to discriminatory policing be reviewed by the Police Commissioner or his designee.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | SCPD has created the required policy, and the Commissioner has acknowledged his concurrence with completed discriminatory policing investigations by signing them.<br><br>SCPD has not adopted our recommendation to supplement its documentation of existing chain-of-command review of completed investigations, such as through a log that dates each supervisor's review and summarizes their comments and directives. We renew that recommendation here. Understanding what directives the Commissioner and Chief of Department provide IAB may help reveal the sources of some of the delays identified in our Analysis re Paragraph III(b)(iii), *supra*. Such a procedure should be captured in policy. |

**iv. Per SCPD policy, the Department will maintain a tracking system for all misconduct allegations relating to discriminatory policing that does not rely on personal identifiers. Upon receipt of such an allegation, SCPD will assign a unique numerical identifier to the complaint, which will be provided to the**

**complainant at the time the allegation is made. SCPD will use the centralized numbering and tracking system to track data regarding the number, nature, and status of such misconduct allegations, from initial intake to final disposition, including investigation timeliness and the complainant's notification of the interim status and final disposition of the investigation.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD has created a numbering system for misconduct allegations regarding discriminatory policing that does not require personal identifiers.<br><br>The IAB is using IAPro to vet incoming complaints, and IAB retains investigations of discriminatory policing and other investigations of sufficient complexity or troubling allegations. Notwithstanding, SCPD has not provided evidence, either pursuant to its semiannual reports or on-site, that the complainant correspondence, data tracking, or timeliness complies with this Paragraph.<br><br>SCPD may be taking one critical step in the right direction by implementing the Case Notes Overview investigation tracking sheet. This form serves as a one-stop resource for investigators and supervisors alike to review a summary of the allegations and the steps that have been taken in the investigation. SCPD has provided such forms for twelve open cases to-date.<br><br>Data from the Case Notes Overview may allow SCPD to perform some of the analysis required by this Paragraph. For example, dates regarding complainant contact, the completion of witness interviews, completed officer interviews, and completion of the investigator's findings will give at least a thumbnail sketch of case progress. The Research and Development or Information Technology Sections may be able to assist in compiling this data in useful ways.<br><br>Our review of actual outcomes suggests that investigations are proceeding very slowly. *See* Analysis re Paragraph III(b)(iii), *supra*.<br><br>*Recommendations*<br>We recommend that SCPD review how the data from the Case Notes Overview sheet can be captured, analyzed, and produced to help achieve compliance with this section, as described above.<br><br>The log of supervisory reviews and comments we recommended above, *see* Analysis re Paragraph VI(b)(iii), *supra*, may also serve as a tool to improve investigation timeliness. Supervisors need to include appropriate complainant contact as one of the bases for their review of investigations; although IAB intends to include complainant contact as one point in the Bureau's checklist going forward, the chain of command above IAB also needs to review this aspect. Likewise, supervisors should discuss with investigators the timeliness of |

| | |
|---|---|
| | the steps they are taking in the investigation.<br><br>SCPD should create a Complainant Contact Form that records the complainant's essential information if a complaint is made verbally. This form would be forwarded to IAB to make contact with complainant at appropriate junctures. |

**v. SCPD will maintain protocols to analyze and address trends in complaints relating to discriminatory policing, including demographic data, lodged against SCPD officers.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD reports that the number of discriminatory policing allegations against the agency is small enough that analyzing the complaints for trends has proven difficult.<br><br>SCPD may need to look at longer-term trends in order to achieve compliance. Also, SCPD's personnel working on trends related to discriminatory policing complaints may want to draw from the experience of the Hate Crimes Unit, which has been mapping hate crimes, hate incidents, and related data for several years.<br><br>Compliance with this provision requires implementation of the traffic stop data analysis measures, and implementation of the two measures may complement one another. *See* Analysis re Paragraph III(c), *supra*. The traffic stop data may identify precincts where drivers of one demographic category are being stopped in disproportionate numbers. SCPD would be in a position to focus its attention on these precincts, to identify reasons for these outcomes. |

**vi. Six months after the Effective Date, and every six months thereafter during the pendency of this Agreement, and thereafter every year, SCPD will conduct reviews of randomly-chosen, completed misconduct investigations relating to discriminatory policing. SCPD must review at least 20 percent of all completed misconduct investigations since the last review. The reviews will be conducted by the Police Commissioner or his/her designee, but not an involved individual, and will require contacting the complainant to ensure the investigation was handled in a professional and thorough manner. Dissatisfaction with the results of the investigation will be documented and the case may be reopened if the complainant discloses credible new facts which would support allegations not addressed in the original complaint. Throughout the pendency of this Agreement, the results of each review will be forwarded to the United States within five business days of its completion.**

| **Status** | **Compliance Rating Pending—Data Unavailable** |
|---|---|
| **Analysis** | SCPD did not submit a report on completed cases during this reporting period, as the few complainants declined to speak with the auditor.<br><br>In May and September 2015, the United States visited SCPD and met with Internal Affairs personnel charged with investigating allegations of biased policing and conducted a review of the discriminatory policing allegations that had been filed. Our review disclosed several concerns regarding the manner in which discriminatory policing allegations were investigated. In several cases, investigators did not make inquiries that the facts at hand seemed to warrant. For example, one recent complaint alleged undue enforcement of noise ordinances against a local business. In order to make a thorough assessment of whether the involved officers had targeted the business on the basis of the owner's race or national origin, the investigator might naturally have visited the establishment at a peak hour of operation, to assess the noise level first hand. It surprised us to learn that the investigator concluded the investigation without visiting the business. In another case, the involved officers reported using electronic control devices in a manner inconsistent with the actual usage as reported by Taser. Nevertheless, this was not a focus of the investigator's inquiries. While not necessarily reflecting a lack of objectivity, the IAB needs to instill a culture that all appropriate investigative avenues be explored before an investigation is concluded, particularly when it comes to assessing allegations of discriminatory policing.<br><br>*Recommendations*<br>We recommend that, whenever possible, SCPD advise complainants immediately after intake concludes that an auditor may contact the complainant at the conclusion of the investigation to get their feedback. SCPD should make clear that the purpose of contacting the complainant is to seek feedback on SCPD internal investigations. (Of course, the investigator should be contacting the complainant with periodic updates on the progress of the investigation as well.) Properly executed, this advisory just after intake may set the complainant's expectations appropriately.<br><br>For complainants who are still reluctant to provide feedback, SCPD may also consider utilizing an anonymous online survey tool. The complainant could be advised by email of the survey opportunity. |

## VII. COMMUNITY ENGAGEMENT

**a. In all of its policing operations, SCPD will maintain robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and community confidence in the Department. SCPD will maintain community and problem-oriented policing principles in its policing operations. SCPD will also engage the public through the dissemination of public information on a regular basis. SCPD and the County will maintain systems to ensure comprehensive, effective, and transparent oversight of SCPD.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | The quality and quantity of individual SCPD community engagement programs have grown and improved. *See, e.g.*, Analysis re Paragraph VII(b). However, community relationships have been built principally through the Community Liaison Officers (CLO) and Community Oriented Policing Enforcement Officers (COPE), and by members of Department leadership. SCPD has demonstrated little to no involvement by the patrol and investigative units in community and problem-oriented policing. Although there are great benefits to having designated units to lead the effort, all SCPD officers must appropriately incorporate community policing and problem-oriented policing into their operations. To achieve compliance with this provision, SCPD must parlay its successes in outreach programs and the new COPE into building trust between the community and all individual members of the Department.<br><br>*Recommendations*<br>SCPD should involve patrol officers in CLO and COPE events on a weekly basis. Whenever there is a community event or meeting, a patrol officer or officers should be assigned to attend at least a portion of the event or meeting. This will require relief to be provided to the patrol officer. If it is left to chance, it is likely that the patrol officer's time will be preempted by call load.<br><br>When CLO/COPE is aware that a particular issue or concern has been raised by a constituent or group, they should involve the appropriate patrol or investigative unit in meetings to discuss resolutions.<br><br>SCPD should document efforts by non-CLO/COPE segments of SCPD in community and problem-oriented policing. For instance, several of the precinct commanders mentioned participation in various community groups, but no documentation was produced. |

**b. Community Liaison Officers**

**i. SCPD policy will ensure that a Community Liaison Officer is assigned to each of the Department's seven precincts. A preference for selection and assignment of each Community Liaison Officer shall be given to a sworn officer fluent in both English and a second language commonly spoken in the relevant community, if any. Each Community Liaison Officer will have training in the nature and scope of federal and state civil rights laws as applied to law enforcement activity.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | CLOs are detailed to each precinct. During recent tours, we have met the CLOs and/or COPE in the 1st, 2nd, 3rd, 4th, 5th, and 6th precincts. As a group, the CLOs and COPE officers are highly motivated and foster creative community-policing strategies.<br><br>The precincts with the highest concentration of Spanish language speakers are the 1st, 2nd, 3rd, and 5th. CLOs with proficiency in Spanish are assigned to the 2nd, 3rd, and 5th precincts. While the CLO in the 1st precinct is not proficient in Spanish, one of the COPE officers in the 1st precinct is Spanish speaking. SCPD has analyzed its language needs using census data and English Second Language statistics from school districts, and assigned Spanish-speaking CLOs to what appear to be appropriate precincts. A review of statistics on languages other than Spanish indicates that other language access tools (such as Language Line and training) may certainly be appropriate, but proficiency by the CLO in a language other than Spanish is not required. One of the challenges facing SCPD is to balance the need for a CLO to be effective at community engagement with the need for language competency. Based on the CLOs that we met during the recent tours, SCPD is doing a good job at striking that balance.<br><br>SCPD has submitted the curriculum on police legitimacy that was used to train CLOs. Assessment of the training is ongoing.<br><br>*Recommendations*<br>A draft of R&P 26.1 provided by SCPD on September 3, 2015, captures the requirements of this provision, in addition to the other aspects of the Agreement governing CLOs. We suggest that SCPD approve these changes forthwith.<br><br>SCPD should continue to have Spanish speaking CLOs/COPE assigned to the four precincts with the largest concentration of Spanish language speakers. SCPD should also recruit COPE officers who are Spanish speaking to work in these precincts when possible.<br><br>Recognizing that the language needs of the population of a precinct may change over time, SCPD should incorporate into policy an annual analysis of requests for language assistance in all precincts to determine whether a CLO's |

| | |
|---|---|
| | fluency in a second language is appropriate. SCPD will also want to bear in mind that the precinct where LEP constituents work may not be the same precinct in which they live.<br><br>Further recommendations on training may be forthcoming once the assessment of current training is complete. |

**ii. SCPD will ensure that the contact information and duty hours of the Community Liaison Officers are publicly available on its website. Community Liaison Officer hours of availability for contact with the public will be during normal business hours.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | SCPD has posted contact information and duty hours for the CLOs on its website. The website states that the CLO is available two weeks during daytime hours and the third week during a 2-10pm "swing" shift. *See* http://apps.suffolkcountyny.gov/police/documents/CLOContacts.pdf. The website also provides the CLOs' contact information, including email and cell phone numbers.<br><br>While this information is helpful, the public is left to determine when a CLO is on daytime or swing shift hours. For engaged members of the public, this has not always presented a problem: for example, a 2nd Precinct COPE officer distributed her mobile phone contact to members of concerned parents organizations and neighborhood watch groups, and members did not hesitate to contact the officer. More reluctant members of the public may want to have the confidence that a CLO (or COPE) officer will be available when they call.<br><br>*Recommendations*<br>SCPD should post a link that advises the community which shifts each CLO and COPE officers are working a particular week. It could be posted in conjunction with the events that CLO/COPE will be attending a particular week. Google calendar or another software platform could be used to do this efficiently. (Note: while this provision applies solely to CLOs, COPE officers are just as often contacted by the community.)<br><br>SCPD should record a weekly message for the telephone number that is listed on the website that informs the public which shift the CLOs/COPE are working a particular week. |

**iii. Each Community Liaison Officer's duties will include the following:**

**1. Arranging monthly meeting of community residents to discuss issues and ask questions regarding the police department. The meeting will be attended**

**by the Community Liaison Officer, at least one senior SCPD command staff member, and at least one officer responsible for patrolling in that particular precinct.**

**2. Each Community Liaison Officer will review, on a monthly basis, all concerns submitted to SCPD by members of his or her precinct to assess community issues. For those concerns that do not rise to the level of requiring formal action under SCPD policy, the Community Liaison Officer will notify the complainant that the Community Liaison Officer is available to answer the complainant's questions and respond to any further community concerns. The Community Liaison Officer will refer complaints of police misconduct relating to discriminatory policing to IAB.**

**3. Each Community Liaison Officer will meet at least once every six months with the respective bureau commander. During these meetings, the Community Liaison Officer will communicate any concerns or issues that he or she has received during the previous six months, along with any other relevant information pertaining to SCPD's relationship with Suffolk County residents.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | *Policy*<br>SCPD has provided a draft of R&P 26.1 that incorporates the requirements of this Paragraph of the Agreement. See Draft of R&P 26.1 provided on September 3, 2015. We encourage SCPD to approve the relevant changes at its earliest convenience.<br><br>*Arranging Monthly Meetings*<br>Monthly meetings are being held. Often the monthly precinct meeting is being counted as the monthly meeting; this is appropriate. The Commanding Officer from the precinct is normally at the meetings and SCPD reports that the Executive Officer is present if the Commanding Officer is unable to attend. Attendance by patrol personnel was reported by SCPD as being spotty due to call load.<br><br>*Review Community Concerns*<br>CLOs, on a sporadic basis, have reported the concerns they have received, but seldom is there a notation as to if and how they have been handled. While it may seem that a concern does not rise to the level of requiring formal action, keeping records of all concerns will assist in determining trends that need to be addressed.<br><br>*Semiannual Bureau Commander Meetings*<br>Chapter 26 of the Rules and Procedures has been amended to require a semi- |

| | |
|---|---|
| | annual report to be submitted by the CLO to the Commander of the precinct to which they are assigned. Deputy Commissioner Mention-Lewis indicated during one of the United States' previous on-site visits that she was meeting with the CLOs on a monthly basis. The issues and potential solutions emerging from these regular meetings should be captured in a periodic, priority Department Memorandum, for ease of reference. (This memo may largely inform the annual CRB report under the Agreement.)<br><br>*Recommendations*<br>As part of Tour Report system, CLOs should memorialize meetings they have held. Further documentation of what they do when not attending meetings also would be appropriate.<br><br>Documentation of the monthly meeting is fairly consistent. The completed forms should reflect whether a command staff member and/or patrol officer attended the meeting.<br><br>Documentation of concerns raised by community members and how they are addressed should be part of a monthly report which can be used as the basis for the semi-annual report now required under Chapter 26.<br><br>If the semiannual meetings are occurring, they should be documented. Documentation should include the concerns and issues presented at the meeting, and the outcomes.<br><br>When concerns are noted that require formal action, action plans should be utilized to facilitate a timely resolution and documentation. |

**c. Community Oriented Policing Enforcement ("COPE")**

**i. SCPD policy will define COPE officers as those who will be assigned to a specific area as a liaison between the community and the police department to assist the community in solving neighborhood problems.**

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | The draft of R&P 26.1 supplied on September 3, 2015 incorporates the requirements of this Paragraph of the Agreement.<br><br>Each precinct has a minimum of two COPE officers who act as liaisons to the community and assist in addressing community problems. They are no longer assigned sector car or patrol duties. COPE officers report that this change makes it much easier for them to solve neighborhood problems, as they are not diverted to enforcement. To the extent that COPE officers are still being used to backfill patrol shifts, work traffic, and perform patrol checks in some of the precincts, this kind of backsliding should not take place. |

COPE officers reported that they are conducting community engagement. Several examples were noted during the tours and information provided. These included:

- Summer soccer program in the 5th Precinct;
- Organizing efforts for a school year indoor soccer program in Patchogue
- Bicycle rodeos in several precincts
- Presentation of a heroin awareness program in several precincts
- A summer camp in the 1st Precinct
- Distribution of notices to shop owners about a recent rash of robberies in the 1st Precinct, and similar outreach in the 4th Precinct
- Outreach events through school districts in several precincts

COPE officers also reported receiving community complaints and solving neighborhood problems. For example, in one precinct with a persistent problem in drug crime, COPE officers succeeded in working with local authorities to evict dealers from an abandoned house and condemn the property. In another precinct, COPE officers coordinated with a shopping mall to ensure that SCPD devoted resources to monitoring crowds expected to gather for the release of a coveted electronic device.

*Recommendations*
COPE officers should not be used to backfill patrol, work traffic or do patrol checks. If a COPE officer is used for such a purpose, a memorandum should be generated which explains the reason why the COPE officer was diverted from regular COPE duties.

COPE officers should submit a monthly report detailing a summary of how their time was spent.

CLOs meet on a frequent basis and share ideas. COPE officers are not provided the same opportunity. We recommend that a meeting of all CLO/COPE officers be held on at least a semiannual basis.

**ii. SCPD policy will ensure that all COPE officers engage in routine community policing and community outreach, which may include: attending neighborhood association meetings to provide input or answers, attending school functions to educate children about safety and crime prevention, assisting the community in solving non-emergency problems, addressing community decay issues (abandoned and junk vehicles, graffiti, abandoned residences and buildings, code enforcement violations, illegal dumping), meeting with business owners to provide input or answers, and helping the community to become self-reliant. While COPE officers may be called upon**

**to enhance patrol efforts, this duty should be in relation to a particular community-generated request, need or identified problem and not as routine duty.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | The draft of R&P 26.1 supplied on September 3, 2015 incorporates the requirements of this Paragraph of the Agreement.<br><br>COPE officers appear in many cases to be addressing the problems specific to their communities. COPE officers in one precinct suffering from comparatively low levels of violent crime dedicate themselves to initiatives like disrupting the heroin epidemic in the schools and tracking down missing persons. COPE officers in a different precinct with more street crime spend most of their day responding to community complaints about potential drug hotspots. *See also* Analysis re Paragraph VII(c)(i), *supra*. This is very encouraging.<br><br>As noted above, it appears that some COPE officers are being used to backfill patrol shifts, work traffic, and perform patrol checks. While in some limited circumstances the traffic patrol or patrol check appear to be related to community-generated requests, it usually appears that it is supplementing routine patrol duties.<br><br>COPE officers presented calendars that indicated partial compliance with this section. What is not clear from the calendar entries is what concerns and issues were raised by community members and how they were addressed. COPE officers should be able to demonstrate on a weekly, if not daily, basis, their interactions with the public and the results thereof. We also recommend that COPE officers be given sufficient flexibility to allow them to attend meetings on weekends and evenings, as needed.<br><br>*Recommendations*<br>Currently, activities are reflected solely on a calendar entry. Most, if not all, meetings should be recorded in a manner so as to reflect the issues and concerns raised and the action plan for resolving the issue. If other units are employed in resolving the issue, they should be noted. |

**iii. SCPD policy will ensure that all COPE officers engage with individuals in their respective patrol areas; e.g., COPE officers assigned to patrol units in business districts should interact with business owners, and COPE officers assigned to patrol school and residential areas should interact with school personnel and residents, respectively.**

| Status | Partial Compliance |
| --- | --- |
| Analysis | The draft of R&P 26.1 supplied on September 3, 2015 incorporates the requirements of this Paragraph of the Agreement.<br><br>This appears to largely take place. During the tours, we were able to observe interaction between COPE officers and the business community, neighborhood governments, community-based organizations, charities, and school districts. School Resource Officers focus primarily on school-related concerns, and are developing relationships there. Other COPE officers rotate between different locales throughout the geographic areas covered by each precinct, but have also been given the freedom to focus on repeated, successful interventions; examples include one COPE officer's interactions with the business community in the 2nd Precinct, and another's relationships with the Latino community in the 1st Precinct. *See also* Analysis re Paragraphs VII(c)(i)-(ii), *supra*.<br><br>COPE officers in several of the precincts were using bicycle patrols. The COPE officers reported positive reaction from business owners and community members.<br><br>*Recommendations*<br>As noted in the recommendations in Paragraph VII(c)(ii), better documentation would be helpful in ensuring meetings take place and that concerns and issues are addressed. |

**iv. SCPD policy will require COPE officers to submit to their supervisors a monthly activity report documenting the amount of time they dedicated to community-oriented policing activities, the type of community-oriented activities in which the officers have engaged, and listing the organizations and individuals the officers have contacted.**

| Status | Partial Compliance |
| --- | --- |
| Analysis | The draft of R&P 26.1 supplied on September 3, 2015 incorporates the requirements of this Paragraph of the Agreement.<br><br>Currently, COPE officers have calendars of their various meetings, but it is not presented in the manner required by this section nor does it facilitate the addressing of concerns and issues. Nor do their calendars reflect activities outside of scheduled meetings. These should be reported as well.<br><br>*Recommendations*<br>SCPD needs to develop and implement a form that is useful for planning and problem solving, not just documentation of meetings attended. |

| | |
|---|---|
| | The weekly activity forms can then be used as the basis for preparing a monthly activity report which would comply with this section. |

**d. Community Response Bureau**

**i. Within 90 days of the Effective Date, SCPD will develop and provide to the United States for review a policy that details the CRB's plan for engaging with the Latino community.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD has formulated a plan for engagement. The plan requires additional discussion between the parties. |

**ii. SCPD policy will ensure that each precinct has an officer representing it in the CRB.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | The draft of R&P 26.1 supplied on September 3, 2015 provides that CLOs are part of the CRB, but are detailed to the precincts. The policy must also require that a CLO be assigned to each precinct.<br><br>In fact, CLOs are assigned to each precinct. |

**iii. Within 90 days of the Effective Date, SCPD will develop a survey instrument in order to solicit assessments of the CRB's success in engaging the Latino community. Additionally, each quarter SCPD will ask community and political leaders within the Latino community to critique CRB programs and initiatives. SCPD officers involved in administering CRB programs will also quarterly analyze participation and results.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | *See* Analysis re Paragraph V(h), *infra*. Surveys have been distributed, but no assessment has been completed and submitted. |

**iv. Using and analyzing feedback from the above sources, SCPD will produce reports annually that identify CRB successes as well as areas in need of improvement and a strategy for making such improvements. SCPD will provide to the United States copies of these reports throughout the pendency of this agreement within five business days of their completion. Within ten business days of their completion, the reports will be made available to the public, unless SCPD demonstrates a good faith reason for non-disclosure.**

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD produced the first CRB report with its January 2015 report. That report was largely consistent with this requirement. |

**v. One year after the Effective Date and annually thereafter throughout the pendency of this Agreement, SCPD will provide to the United States reports summarizing issues addressed at community meetings and SCPD responses.**

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | *See* Analysis re Paragraph VII(d)(iv), *infra*. |

**e. Community Outreach**

**i. SCPD policy will continue to ensure that the Police Commissioner or designated high ranking officer(s) meet with key leaders in Latino and other minority groups on a regular basis both at SCPD-sponsored meetings and at meetings held by minority groups.**

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD reports that the Deputy Police Commissioner attended many dozens of community engagement events during the recently concluded reporting period. These include meetings with nominal leaders of minority communities and advisory boards to SCPD. The Deputy Commissioner's outreach activities extend much further. The Deputy Commissioner met with ex-offenders, youth, parents, and other individuals and organizations, frequently in communities of color. We have observed the Deputy Commissioner participate in some of these events. The Deputy Commissioner's work will be a critical component in strengthening community trust in SCPD.<br><br>SCPD reports that the Commissioner and Chief of Department, by comparison, attended one community meeting collectively during the recent reporting period. We are acutely aware of the demands SCPD leadership face in running a law enforcement agency of SCPD's size and scope of mission. Nonetheless, the Commissioner and other SCPD leadership must personally attend community meetings with Suffolk County's diverse communities—particularly those who have suffered strained relationships in recent years with the agency. We have previously emphasized the importance of the Commissioner and Chief of Department taking up this mantle, and we renew that recommendation here.<br><br>SCPD has prioritized meeting regularly with Latino community leaders, including a quarterly meeting at the Empire Justice Center at Touro Law |

| | |
|---|---|
| | School. We appreciate that this meeting has become routine.<br><br>One feature of monthly community meetings in those SCPD precincts where the tradition is strongest: each monthly meeting commences by addressing the issues of the previous month in detail. SCPD commands in these precincts know that they must "stand and deliver" every month. By contrast, this has not been a strong feature of SCPD's quarterly meetings with representatives of the Latino community. Although SCPD may address issues discussed at previous meetings, it has not always been on the terms that the community expected. SCPD leadership must continue to seek areas of common interest with community groups, and follow through from one meeting to the next. |

**ii. SCPD will continue its outreach programs to all members of the community (e.g. Police Athletic League, English as Second Language classes, etc.) with the assistance of bilingual SCPD officers.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD continues a number of outreach programs, and has expanded programs in ways that target the needs of a diversity of County residents. The 1st Precinct CLO and COPE officers have continued a long-standing, successful summer camp. Meanwhile, the 5th Precinct partnered with a local Latino community organization to launch a soccer league that is continuing into its second season. We have also observed some of the other successful innovations that SCPD mentions in its report, such as the *Vamos a Hablar* outreach events.<br><br>*Recommendations*<br>CLO and COPE officers should share program ideas and collaborate. For example, 1st Precinct COPE officers were considering starting a soccer league during one of our recent site visits. But these officers were unaware that 5th Precinct officers had recently implemented a successful soccer league in one of their neighborhoods. CLOs regularly meet together as a group with the head of the CRB; this forum should be a platform for further collaborative programming.<br><br>Examples of CLO/COPE's outreach work abound, including events featuring bilingual officers. At this stage, SCPD needs to look to facilitate the participation of other officers in community outreach. SCPD's community policing efforts will continue to grow among these officers. |

**iii. SCPD will engage the Latino community on an informal basis through community events in an effort to maintain a good relationship with the Latino community.**

| Status | Partial Compliance |
|---|---|
| Analysis | *See* Analysis re Paragraph VII(e)(ii), *supra*. |

**iv. SCPD will solicit and receive input from the Community Advisory Board regarding the development of Spanish language training.**

| Status | Partial Compliance |
|---|---|
| Analysis | SCPD reports that it has met with its advisory board regarding Spanish language training. |

**v. SCPD will provide Spanish language learning opportunities for officers as well as sensitivity and diversity training, including presentations administered by Suffolk-based or local Latino organizations.**

| Status | Partial Compliance |
|---|---|
| Analysis | SCPD shared during this reporting period that Spanish-language learning efforts have proven cost-prohibitive, logistically difficult, or both. *See also* SCPD Self-Report, Jan. 2015, at 62. This is unfortunate, as Spanish proficiency benefits both SCPD and its individual officers, both in ensuring public order, addressing community concerns, and fostering officer safety. SCPD has apparently willingly provided these opportunities in the past, but given the limited returns on investment, is understandably searching for better options.<br><br>While SCPD must continue to find ways to offer valuable Spanish language learning opportunities to the entire force, SCPD may receive significant returns on investment by focusing on providing intensive language training to those officers whose language skills approach, but do not quite meet, the requirements for certification as bilingual/authorized interpreter. We will look for SCPD to provide an update on opportunities for this target group in the next semiannual report.<br><br>Cultural sensitivity training still requires additional development. *See* Analysis re Paragraph III(d)(ii), *supra*. |

**vi. All non-confidential audits and reports related to the implementation of this Agreement will be made publicly available via the SCPD website and at the Police Department, County headquarters, and other public locations, to the fullest extent permissible by law.**

| Status | Substantial Compliance |
|---|---|
| **Analysis** | SCPD has posted reports on its website related to implementation of this agreement. *See* http://apps.suffolkcountyny.gov/police/information.htm. |

**vii. SCPD will collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to SCPD decision making and activities, as permitted by law.**

| Status | Partial Compliance |
|---|---|
| **Analysis** | SCPD has begun to collect and analyze data in many areas. However, as noted above and in SCPD's own reports, identification of pertinent data to be collected, collection of that data and analysis of that data is ongoing in many areas. |

**f. Social media and notification systems**

**i. Within 180 days of the Effective Date, to the extent SCPD uses social media and related publishing systems, such as Nixle, to provide community members with information that includes emergency alerts, safety tips, and other public safety information, SCPD will ensure that messages that are broadcast in English are also provided in Spanish or, to the extent practicable, any other non-English language commonly spoken by community members, consistent with the requirements of Title VI.**

**ii. SCPD will advertise the availability of such publishing systems to the community using local and social media.**

| Status | Substantial Compliance |
|---|---|
| **Analysis** | SCPD has broadcast messages and advertised their publishing systems consistent with these provisions. *See, e.g.*, https://local.nixle.com/suffolk-county-police---headquarters/; http://apps.suffolkcountyny.gov/police/documents/NixleSP.pdf. |

## VIII. POLICIES AND TRAINING GENERALLY

**a. SCPD will maintain policies and procedures that are consistent with this Agreement and that provide clear direction to ensure that officers and civilian employees enforce the law effectively, ethically, and constitutionally. SCPD will ensure that all SCPD officers and employees are trained and able to fulfill their duties and responsibilities pursuant to SCPD policies and procedures.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | As set forth throughout this document, SCPD has revised some of its policies consistent with this Agreement, but others remain in need of revision, and training in many areas required by the Agreement requires significant attention. |

**b. After undergoing any training required by this Agreement, SCPD will ensure that all officers who take such training will be required to pass a test demonstrating a basic comprehension of the training material after it is presented.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD conducts testing at the conclusion of the training the United States observed. The testing was generally appropriate to the subject matter presented, but at times did not test for real comprehension of the subject matter addressed during the training. Rather, the testing sometimes sought mechanical answers or sought information more for the purposes of improving the training. The latter is a worthy effort, but not the same as ensuring that students comprehended the training. Given the need for substantial revision of the trainings we observed, SCPD should review its testing to ensure that it gauges students' comprehension.<br><br>*Recommendation*<br>SCPD should take steps to ensure that each training curriculum is accompanied by a test that will assess comprehension.<br><br>The United States will submit under separate cover sample post-test questions for the hate crimes training. |

**c. SCPD policies and procedures will define terms clearly, comply with applicable law, and comport with best practices.**

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | SCPD continues to work to achieve this standard. |

**d. SCPD will apply policies uniformly and hold all officers accountable for implementing and complying with SCPD policies and procedures.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD continues to work to achieve this standard. |

**e. Upon request, SCPD will make available to the United States any policy the United States wishes to review. All policies and training curricula required by this Agreement will be provided to the United States for review within five business days of completion or modification. Within 60 days of receipt of any policy or training curricula for review, the United States will notify SCPD of any concerns it has regarding compliance with this Agreement, the Constitution, or federal law. SCPD will revise, modify, or delete any policy or training curricula required by this Agreement that the United States finds to be deficient unless SCPD shows, to the satisfaction of the United States, that it need not do so. If the parties disagree, the parties will attempt to resolve their differences in good faith.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | SCPD has responded timely and appropriately to document requests. Training curricula and policies have largely been provided to the United States timely upon completion or modification. In certain cases, the United States has provided substantial commentary on training curricula, and SCPD did not respond with related modifications. As noted above, training in the areas of Hate Crimes, Bias Free Policing and Cultural Proficiency and Language Access require substantial revisions. |

**f. SCPD will implement a mechanism to ascertain whether policies required by this Agreement are being followed and to measure the success of the revised, modified, or newly created policies and procedures. The mechanism will incorporate measuring officer accountability and seeking community input as part of its metrics.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD has developed mechanisms to test discreet aspects of the implementation of the Settlement Agreement, such as spot-checking precincts to ensure that citizen complaint forms are displayed in Spanish. SCPD has not produced the comprehensive mechanism described in this section. |

**g. SCPD will ensure that all policies and procedures are available to SCPD members in an electronic format.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | SCPD has made these documents available to members through an electronic platform. |

**h. SCPD will ensure that all revised or modified policies, procedures, directives, or orders are provided to SCPD members in a manner that clearly highlights or distinguishes any modification or change within the text of the policy itself.**

| | |
|---|---|
| **Status** | **Substantial Compliance** |
| **Analysis** | SCPD is carrying out its obligation in this regard. |

**i. After issuing a Rule and Procedure pursuant to this Agreement, SCPD will ensure that all SCPD personnel have received, read, and understand their responsibilities pursuant to the revised policy or procedure, including the requirement that each officer or employee report violations of policy. SCPD officers will be required to demonstrate that they understand the revised Rule and Procedure. SCPD will also ensure that all officers know that, if they need clarification of a Rule and Procedure, they should consult with their supervisor.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD continues to work to achieve this standard. SCPD should develop clear mechanisms to ensure that officers read and understand their responsibilities pursuant to revised R&Ps. |

**j. SCPD will review each Rule and Procedure required by this Agreement within one year after it is implemented, and at least annually thereafter to ensure that the policy or procedure provides effective direction to SCPD personnel and remains consistent with the Constitution, current law, and best practices. Each policy will be marked with the next date for review.**

| | |
|---|---|
| **Status** | **Compliance Rating Pending** |
| **Analysis** | Many policies required by the Agreement have required several revisions to approach or achieve compliance.<br><br>SCPD reports that the annual review is forthcoming. |

**k. SCPD will ensure that Rules and Procedures made pursuant to this Agreement, including policy updates and revisions, are made available on its website in both English and Spanish and any other language commonly spoken within the**

**community within 180 days of the Effective Date. Subsequently, Rules and Procedures made pursuant to this Agreement will be made available on SCPD's website in both English and Spanish within 60 days of each policy's Effective Date. SCPD may seek the United States' permission not to post particular Rules and Procedures on the website if SCPD provides a reasonable basis for its request.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | Many of the policies required by the Agreement continue to undergo revisions or have recently been finalized. SCPD has reported that these policies will be translated once finalized. |

**l. SCPD will check its website for accuracy, formatting, and ease of comprehension within 90 days of the Effective Date and then at least annually. SCPD will ensure that all applicable Rules and Procedures on the SCPD website are translated by a competent translator.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | SCPD is dedicating energy to reviewing and updating its website's information and presentation thereof. SCPD's homepage and main policies/documents page each feature a link to a Spanish-language information page that includes a number of translated documents.<br><br>While the homepage does still have the conspicuous button linking to the dedicated Spanish-language page, it no longer contains a direct link to the LAP or the Complaint form. This appears to have been part of a larger effort to give the homepage a cleaner look, and may increase the website's navigability. SCPD should note such information its semiannual reports.<br><br>SCPD should continue to improve the website's navigability. SCPD should post translated documents as soon as possible after the translations are completed. |

**m. SCPD should ensure that policies are not duplicative or redundant and that when policies are updated, the policies they replace are no longer used and no longer referenced in other policies, practices, training materials and other department documentation.**

| | |
|---|---|
| **Status** | **Partial Compliance** |
| **Analysis** | Duplicative or outdated policies have not presented a concern in SCPD's compliance activities to date. However, SCPD is still working to bring its policies into compliance with the terms of the Settlement Agreement. |