UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA
CR-17-587

-against- :
United States Courthouse
Central Islip, New York

CHRISTOPHER McPARTLAND and
THOMAS J. SPOTA,

Defendants. :
November 18, 2019
- - - - - - - - - - - - - - - - - - - - X 9:30 a.m.

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government: RICHARD P. DONOGHUE
United States Attorney
100 Federal Plaza
Central Islip, New York 11722
BY: NICOLE BOECKMANN, ESQ.
LARA TREINIS GATZ, ESQ.
JUSTINA L. GERACI, ESQ.
MICHAEL MAFFEI, ESQ.
Assistant U.S. Attorneys

For the Defendants: KRANTZ & BERMAN LLP
747 Third Avenue
New York, NY 10017
BY: LARRY KRANTZ, ESQ.
BRADLEY GERSHEL, ESQ.
LISA CAHILL, ESQ.

For Mr. McPartland

Mary Ann Steiger, CSR

For the Defendants: COVINGTON & BURLING
620 Eighth Avenue
New York, NY 10018
BY: ALAN VINEGRAD, ESQ.
ERIN MONJU, ESQ.
SARAH LeMASTER, ESQ.
For Mr. Spota

Court Reporters: MARY ANN STEIGER
PAUL LOMBARDI
OWEN WICKER
100 Federal Plaza
Central Islip, New York 11722
(631) 712-6101

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

Mary Ann Steiger, CSR

THE COURT: Good morning.

If counsel could approach.

(The following takes place at sidebar.)

THE COURT: Okay, so I reviewed your submissions, made my ruling with respect to the redaction and I propose a limiting instruction.

MS. GATZ: We have no objection to anything.

MR. VINEGRAD: Obviously, we reserve our position and objections to your Honor's ruling.

THE COURT: Yes.

MR. VINEGRAD: With respect to the anonymous letter, the only thing I would suggest is in the second highlighted area --

THE CLERK: Of the anonymous letter?

MS. BOECKMANN: Which is Government's Exhibit 906.

MR. VINEGRAD: I would propose it say the following, or a few specific incidents, and not have the language that Burke was involved. In light of everything we said, the anonymity of it, and suggest that in fact he was involved when that's not the case. The incident is described, the response is coming in. It's not necessary to sort of embellish by having that in there.

THE COURT: Fine. Okay.

The only thing I would ask is when do you want

me to give this limiting instruction?

MS. GATZ: I'll leave that up to Mr. Vinegrad. He may not want it at all.

MR. VINEGRAD: May I have a moment?

THE COURT: Yes.

(Pause in proceedings.)

MR. VINEGRAD: I would ask that you give the limiting instruction after the evidence has been introduced and whatever questions are asked and when that is done with Exhibits 902 and 906, give it at that point.

THE COURT: They'll be moved in. They'll be on the screen. I want to give it when they see it so they have a frame of reference.

MR. VINEGRAD: When it's up there.

MS. BOECKMANN: Once it's moved in and she puts it on the screen.

MR. VINEGRAD: The only issue is there's going to be only one on the screen at the time and she'll give the instruction as to both.

THE COURT: Once you move it in I'll give the instruction. It will be moments later. They'll understand what it's about.

MR. VINEGRAD: Judge. On the topic of limiting instructions. We also have a proposal. For which the Government has no objection to, to the testimony of

Vincent Posillico who is the second witness today with respect to Mr. Spota's representation and Mr. Burke and one of the IAB matters and your Honor's opinion we wanted such an instruction.

THE COURT: Fine. When do you want me to give it?

MR. VINEGRAD: I would ask you to give that after Mr. Posillico is finished describing the events relating to the 1995 IAB case.

THE COURT: Why don't you cue me.

Are we ready to go? Your witness understands that the document has been redacted?

MS. BOECKMANN: Yes.

THE COURT: So the witness isn't going to sit there and say I don't recognize it because I don't recognize it in its current form.

MS. BOECKMANN: He understands it's been redacted and he shouldn't comment on anything that he can't visibly see which I would think is going to be difficult being that he can't actually see it. But, yes, he is aware and I'll reiterate it before we start.

MR. VINEGRAD: No stray comments.

MS. BOECKMANN: Right.

THE COURT: We're ready to go. Let's go.

(Continued on next page.)

(The following takes place in open court.)

THE CLERK: Jury entering.

(The jury is present.)

THE COURT: Good morning. Please be seated. I hope everyone had a good weekend.

Please call your next witness, Ms. Gatz.

MS. GATZ: Thank you, your Honor. Good morning.

The Government calls Richard Schaffer.

THE CLERK: Sir, remain standing and raise you right hand.

RICHARD SCHAFFER,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated please, speak into the microphone, state and spell your name for the record.

THE WITNESS: Richard Schaffer, S-C-H-A-F-F-E-R.

DIRECT EXAMINATION

BY MS. GATZ:

Q. Good morning, Mr. Schaffer.
A. Good morning.
Q. Can you tell the jury by whom you're employed?

A. The Town of Babylon and the Suffolk County Democratic Committee.
Q. Where is the Town of Babylon located?
A. 200 East Sunrise Highway in Lindenhurst.
Q. Suffolk County?
A. Suffolk County, yes.
Q. And you are the Town Supervisor of that town?
A. Correct.
Q. Can you tell the jury what a Town Supervisor does?
A. Sure.
It's the chief executive officer of the town, chief financial officer, the person who is in charge of running all the town board meetings and making sure that the day-to-day operations of the town are running well.
Q. Would you describe it as being the mayor, so to speak, of that town?
A. Yes.
Q. Now, you testified that you hold a position in the Democratic Party.
Can you explain to the jury what position you hold and what you do in that position?
A. Sure.
I'm the Chairman of the Suffolk County Democratic Committee.
That person is responsible for the day-to-day

activities of the County Democratic Committee, choosing candidates to run for office, raising money for campaigns, and then running the actual campaigns through staff people.

Q. Do you know the defendant Chris McPartland?

A. Yes.

Q. How do you know him?

A. Through his position with the Suffolk County District Attorney's office.

Q. Do you know the defendant Tom Spota?

A. Yes.

Q. How do you know the defendant Tom Spota?

A. He served as a candidate for District Attorney and he was the District Attorney.

Q. Now, directing your attention to the year 2001, is that when Mr. Spota ran for District Attorney?

A. Yes.

Q. The first time?

A. In 1997 he was interested in running and he screened to run for District Attorney, but he was not the candidate.

In 2001 he screened and was the designated candidate of the Democratic Party for District Attorney.

Q. When you use the term screened, is that like interviewing for the job?

A. Interviewing for the job, yes.
Q. And the defendant Tom Spota interviewed for the job in 2001 and was the chosen candidate for the Democratic Party?
A. Yes.
Q. For Suffolk County District Attorney?
A. Yes.
Q. Do you remember who the defendant Tom Spota ran against that year in 2001?
A. The incumbent James Catterson.
Q. Now, prior to the 2001 election, did the defendant Tom Spota have any professional relationship with the Suffolk County Detectives Association or the SDA?
A. Yes, I believe he was counsel to the organization.
Q. He was their lawyer?
A. Their lawyer, yes.
Q. Or one of their lawyers?
A. Yes.
Q. Could you tell the jury how many police unions there are in Suffolk County?
A. There's the Suffolk County PBA, the Suffolk County Detectives Association, and the Suffolk County Superior Officers Association.
Q. PBA, SDA and SOA are the acronyms for those organizations?

A. Yes.
Q. So, prior to the election, the defendant Tom Spota was an attorney for the police detectives union called the SDA?
A. Yes.
Q. Did the three police unions back a candidate in the 2001 District Attorney race?
A. Yes.
Q. Who did they back?
A. Tom Spota.
Q. In your experience as the chairperson of the Suffolk County Democratic Committee, how important is the endorsement of the Suffolk County police unions in the race for District Attorney?
A. It's important and it's helpful.
Q. Could you explain to the jury why.
A. Because the District Attorney's position is a law enforcement position that has to work closely with the police department and members of law enforcement.
And so when law enforcement speaks, it resonates with voters as to which candidate has their endorsement.
Q. Are there a lot of police officers living in Suffolk County?
A. Yes, both Suffolk County as well as members of other police departments from around the tri-state area.

Q. So, in your experience, if the union backs somebody, how do the police officers generally vote?
A. They generally support the position of the union.
Q. And tell me how much money, or if any money in your experience does the police unions commit to a candidate that they back?
A. It all depends on the office, but for a county-wide race, which Suffolk County District Attorney would be, they would make a contribution to that.
Q. Would you describe it as a significant contribution?
A. I would say it would be a significant contribution amongst all of the contributions that are received.
There are limits set by the State Board of Elections, so you can't go beyond a certain limit of money donated to a particular race based on the law.
Q. Fair to say, the police unions usually donate the amount they're allowed to by law?
A. Yes.
Q. And they did that for Tom Spota in his election in 2001?
A. I don't recall specifically, but I would say they were supportive.
Q. Did the defendant Tom Spota win the 2001 election for Suffolk County DA?
A. Yes.

Q. Was the defendant Chris McPartland employed by the defendant Tom Spota's predecessor Mr. Catterson?
A. Yes.
Q. After the election, did the defendant Tom Spota make staff changes at the DA's office?
A. Yes.
Q. Is that unusual in your experience?
A. No.
Q. Why not?
A. A new person coming in would want to have staff that would be working as part of his or her administration.
Q. Did the defendant Tom Spota fire the defendant Chris McPartland when he won the election?
A. No.
Q. Did you have a conversation with the defendant Tom Spota as to why he kept the defendant Chris McPartland?
A. Yes.
Q. What did he say?
A. He said he needed his expertise in wiretaps, something that the District Attorney's office did.
Q. Now, during the defendant Tom Spota's campaign for District Attorney, did you meet any Suffolk County police officers that were helping out in that campaign?
A. Yes.
Q. Did you meet James Burke?

A. Yes.
Q. I'm going to show you Government's Exhibit 101 for identification. I think it might be in evidence.
Do you recognize the person depicted in Government's Exhibit 101?
A. Yes.
Q. Who is that?
A. That's James Burke.
MS. GATZ: Your Honor, I offer Government's Exhibit 101 in evidence.
THE COURT: Received.
(Government Exhibit 101 in evidence.)
BY MS. GATZ:
Q. What if any role did Jim Burke have in Tom Spota's election campaign in 2001?
A. He was the main person I was speaking with in the campaign. He was very involved in the campaign.
Q. Did you become aware of any relationship between James Burke and the defendant Tom Spota during that time period where Tom Spota was running for District Attorney for the first time?
A. Yes.
Q. How would you describe their relationship?
A. Very friendly, like a father and son relationship.
Q. When was the defendant Tom Spota first sworn into

office?
A. January of 2002.
Q. Did Jim Burke's position at the police department change once the defendant Tom Spota was elected and assumed office?
A. Yes.
Q. How?
A. He was assigned to the District Attorney's office.
Q. Meaning James Burke was assigned to work for the defendant Tom Spota?
A. Right.
The police department assigns people to work for the District Attorney.
Q. And was the defendant Chris McPartland also working for the defendant Tom Spota at that time in 2002?
A. Yes.
Q. Between the years 2002 and 2011, did you have occasion to observe the defendant Tom Spota and the defendant Chris McPartland together?
A. Together? Not that I recall.
Q. Were you in a position to observe their relationship?
A. They worked together.
Q. And were you aware of whether they had a personal relationship?
A. No.

Q. During that same time period, 2002 to 2011, did you have occasion to observe the defendant Chris McPartland interact with Jim Burke?
A. Yes.
Q. How would you describe Jim Burke's relationship with the defendant Chris McPartland?
A. Professional colleagues and friends.
Q. Now, after being elected in 2001, when was defendant Tom Spota's first reelection campaign?
A. That would be 2005.
Q. Did anyone run against the defendant Tom Spota that year in 2005?
A. No.
Q. Is that considered something called a cross-endorsement, when there's no other candidate to vote for?
A. If the one candidate is running on a number of political party lines, yes.
Q. So the defendant Tom Spota ran unopposed in 2005?
A. Correct.
Q. Directing your attention to the year 2009, 4 years later, did the defendant Tom Spota run for reelection again?
A. Yes.
Q. Did anyone run against Tom Spota in the year 2009?

A. No.
Q. Was he cross-endorsed by several political parties again?
A. Yes.
Q. So, in 2009, fair to say, the defendant Tom Spota was reelected for a third time?
A. Yes.
Q. That meant a total of 12 years as the District Attorney at that point?
A. Yes.
Q. In your position as the Suffolk County Democratic Chairman, did you view the defendant Tom Spota as a powerful figure in Suffolk County?
A. Powerful figure?
Q. Yes.
A. Yes, he was one of the top officials in the county, yes.
Q. Why did you view him as powerful or one of the most powerful figures?
A. Because he was elected county-wide, he was a county-wide elected official.
The office itself had the power to arrest, had the power to indict, had the power to prosecute, so it's a powerful position in Suffolk or any other county where there's a District Attorney.

Q. In anticipation of the 2013 election, so this is cycle 4 of the defendant Tom Spota's involvement; is that right?
A. Yes, correct.
Q. In anticipation of the 2013 election, was there a lawsuit filed by the defendant Tom Spota and others against the County Legislature in 2012?
A. Yes.
Q. What did you understand the basis of the lawsuit was?
A. It was to declare unconstitutional the Suffolk County law which enacted term limits for the District Attorney, the County Clerk and the County Sheriff.
Q. If that law was in place in 2012, could Tom Spota run for a fourth time?
A. No.
Q. Was the lawsuit decided before the 2012 election or 2013 election?
A. Yes.
Q. And what happened with that lawsuit?
A. The New York State Court of Appeals declared the law unconstitutional and that it violated the New York State Constitution, and so the law was removed as to the three positions I mentioned.
Q. What are those three positions?
A. District Attorney, Sheriff and Clerk.

Q. So there was no longer term limits for those three positions?
A. Correct.
Q. How did that decision impact the defendant Tom Spota's fourth election?
A. Well, it allowed him to run for reelection.
Q. Did the defendant Tom Spota run for reelection in 2013?
A. Yes.
Q. Did anyone run against the defendant Tom Spota in 2013?
A. Yes.
Q. Who won the 2013 election?
A. Tom Spota.
Q. Do you know the former Nassau County District Attorney Kathleen Rice?
A. Yes.
Q. Do you recall when she was elected Nassau County DA?
A. I believe 2006 or '7, somewhere in the mid-2000s.
Q. For those of us that don't know, where is Nassau County in relation to Suffolk County?
A. Just adjacent to.
Q. To get off Long Island by car from Suffolk County, do you have to drive through Nassau County?
A. Yes.

Q. Between the years 2005 and 2015, did you have occasion to observe the relationship between the defendant Tom Spota and Nassau County District Attorney Kathleen Rice?
A. Yes.
Q. How did the defendant Tom Spota treat Kathleen Rice?
A. My one occasion of viewing that was in the Attorney General's race when she ran for Attorney General, and he did not think she would be a good candidate. I had supported her and the party had supported her.
Q. How did the defendant Tom Spota react when you endorsed Kathleen Rice for that position?
A. He was against it because he didn't think that she could be the Attorney General.
Q. Did he stop speaking to you?
A. It's like we had a father and son relationship; so, yes, he was angry with me for the decision I made.
Q. Now, I direct your attention to the year 2011.
Was there a change in the position of leader of the Suffolk County Government?
A. Yes.
Q. What's that position called?
A. Suffolk County Executive.
Q. Is that akin to like the governor of the county?
A. Yes.

Q. Who became the County Executive of Suffolk County or the governor of Suffolk County in the year 2011?
A. Steve Bellone.
Q. When the County Executive's leadership changes, does that affect the police department in your experience?
A. Yes.
Q. How?
A. The County Executive would change people in the positions of leadership.
Q. And who was the leader of the police department?
A. The commissioner is the leader of the department. The chief of the department is the highest uniformed position.
Q. Now, after the change in County Executive in 2011, did James Burke approach you about something?
A. Yes.
Q. What?
A. He wanted to be the chief of the department.
Q. Did he ask you to do something?
A. Yes.
He asked me to introduce him to the new County Executive-elect, Steve Bellone.
Q. Did you understand why the introduction was being requested?
A. Because he wanted to be the chief.

Q. Burke wanted to be the chief of the Suffolk County Police Department?
A. Yes, correct.
Q. At that time when James Burke approached you in 2011, where was he working?
A. He was in the Suffolk County District Attorney's office.
Q. Working for the defendant Tom Spota?
A. Yes.
Q. And with the defendant Chris McPartland?
A. Yes.
Q. Approximately how long had James Burke worked for the defendant Tom Spota in 2011?
A. Probably about 10 years.
Q. After James Burke asked for that introduction to County Executive Bellone, what did you do?
A. I gave Steve a call and introduced him.
Q. Now, did there come a time, in December of 2011, when you received an anonymous letter concerning James Burke?
A. Yes.
Q. In sum and substance was, the letter complaining about Jimmy Burke?
A. Yes.
Q. I would like to show you Government's Exhibit 906 for identification and ask you to look at that.

Do you recognize that?
A. Yes.
THE COURT: Can I see you quickly at the sidebar.
(Continued on next page.)

(The following takes place at sidebar.)

THE COURT: I don't have the exhibit on my screen when it's for identification, but Bob does, and he just told me one of the lines --

MS. GATZ: She's fixing it now. It's not like it's the wrong version, there's been 17 versions.

THE CLERK: The second line in this paragraph is out, but it's on the document.

MS. GATZ: I got it.

THE COURT: I'll wait until both go in and then I'll give the instruction.

MS. GATZ: Thank you.

(Continued on next page.)

(The following takes place in open court.)
BY MS. GATZ:
Q. Showing you Government's Exhibit 906 for identification, Mr. Schaffer, do you recognize Government's Exhibit 906?
A. Yes.
Q. What is that?
A. This is a redacted version of the anonymous letter.
MS. GATZ: Your Honor, I offer Government's Exhibit 906 in evidence.
THE COURT: Received.
(Government Exhibit 906 in evidence.)
BY MS. GATZ:
Q. I'll ask you to read only the highlighted portion of this letter into the record, and please read slowly?
A. Sure.
This is an anonymous letter regarding a member of the Suffolk County Police Department, Inspector James Burke.
It is composed by several longtime members of the department for the purpose of advising the incoming County Executive and his transition team.
Q. I'll take you to the next portion of the record and ask you to read it slowly, please.
A. The following are a few specific incidents.

When Burke was a sergeant in the 1st Precinct, he was known to frequent prostitutes. And on one of these occasions the prostitute stole his service firearm.

In an effort to retrieve the weapon, he committed at least one armed home invasion.

He was subsequently transferred out of the 1st Precinct as a result of that case.

Q. I'm going to the second page of the letter, and I will ask you to read that.

A. Thank you. CC: Newsday, Long Island Press, if necessary.

Q. Now, after receiving this anonymous letter -- withdrawn.

Were you aware if anyone else received this anonymous letter?

A. Of who I recall, maybe some members of the County Legislature.

Q. Did the head of the search committee for the chief of department -- withdrawn.

Did the head of the search committee for the police commissioner get a copy of this letter, as far as you know?

A. Yes.

Q. And his name is what?

A. Kevin Law.

Q. Would you tell the jury what the search committee for the police commissioner in 2011 is, what their role was?
A. They're goal and role was to interview those who submit resumes of interest for police commissioner.
Q. Who was on the committee to select a new commissioner for the Suffolk County Police Department in 2011?
A. Kevin Law was the chair and I believe Errol Toulon was now the sheriff at that time.
He was going to be serving County Executive Bellone as his public safety deputy.
Q. Who else served on the committee to select the police commissioner?
A. And I believe Emily Constant who was an Assistant District Attorney.
Q. And worked for whom?
A. Tom Spota.
Q. Now, did there come a time, in December of 2011, that you received a copy of a letter from Tom Spota responding to this anonymous letter, Government's Exhibit 906?
A. Yes.
Q. I'm going to show you what's been marked for identification as Government's Exhibit 902.
Do you recognize this?
A. Yes.
Q. What do you recognize it to be?

A. This is the letter from Tom Spota to Kevin Law responding to the anonymous letter.

MS. GATZ: I would like to move it into evidence, your Honor, with the Court's redactions.

THE COURT: It's received.

(Government Exhibit 902 in evidence.)

THE COURT: I'll give the instruction now before it goes up because I believe you have a line of questions about it.

MS. GATZ: Yes.

THE COURT: Ladies and gentlemen, from time to time, the parties may offer into evidence documents that have been partially redacted, which means that certain portions of the document have been whited out.

Redactions may be necessary for a wide variety of reasons, including that the redacted information is unrelated to the issues in this case, and is not admissible, or is redacted to protect the personal information of individuals. These are just some examples.

You should not concern yourself with why any portions of the document have been redacted, and you are not to speculate about the contents of any of the redacted information.

As I instructed you at the outset of the case, you can only consider testimony and exhibits that are

admitted into evidence during the trial. You may consider the un-redacted portion of a document as you would any other exhibit that has been admitted into evidence.

So with that, go ahead, Ms. Gatz.

MS. GATZ: Thank you.

May I approach the witness?

THE COURT: Yes.

BY MS. GATZ:

Q. Mr. Schaffer, before we put the exhibit up, could you tell me the date of the letter?

A. December 12, 2011.

Q. And to whom is the letter addressed?

A. Kevin Law.

Q. And --

A. Do you want his title?

Q. Yes.

A. President and Chief Executive Officer Long Island Association Incorporated.

Q. What is the Long Island Association Incorporated?

A. It's a business organization, almost like a giant chamber of commerce for Long Island.

Q. On whose stationery is this letter?

A. The District Attorney's stationery.

Q. I'm going to ask you to look on your screen now.

On the top of this letter is the stationery of

whom?
A. Thomas J. Spota, District Attorney, County of Suffolk.
Q. You already testified about the date and to whom the letter was addressed.
I'll ask you to read the highlighted portion slowly, please?
A. Sure.
Dear Mr. Law:
I write in response to an undated anonymous letter received by various entities.
The letter is entirely replete with false allegations regarding the conduct of several members of my staff.
Inspector James Burke has been a member of my staff since my taking office on January 1, 2002.
He has served as the commanding officer of the District Attorney's Squad first as a detective/lieutenant.
In October of 2003, Mr. Burke was promoted to captain after scoring number one on a promotional test and assigned to the office of the police commissioner.
He was subsequently promoted to deputy inspector and reassigned to the District Attorney's office.
These assignments and promotions were made by the Police Commissioner John Gallagher.

In 2004, Mr. Burke was designated as the commanding officer of the Suffolk County Police Department Organized Crime Bureau, consisting of the detectives assigned to the District Attorney Squad and the Suffolk County Police Department Criminal Intelligence Section.

In February 2005, Mr. Burke was promoted to Inspector. These assignments and promotions were made by Police Commissioner Richard Dormer.

In April 2006, I designated Mr. Burke the chief investigator of the Suffolk County District Attorney's office as a result of a vacancy created when the then chief investigator, former Police Commissioner Robert Creighton, retired.

My reason in designating him was because of his outstanding leadership abilities which he had displayed over the prior 4 years of my administration. I have never once regretted this decision.

Inspector Burke's off-duty firearm was stolen, among other things, during the commission of a burglary at his residence in Ronkonkoma in the early 1990s.

The burglary was one amongst a series of burglaries involving forcible entry into residences.

The firearm was subsequently recovered after a 911 call involving a bar fight at a licensed establishment. The serial number had been obliterated.

This is entirely consistent with the likelihood that the burglary was committed by a person or persons who resided in the Ronkonkoma vicinity and not the 1st Precinct, Town of Babylon, when Mr. Burke was then assigned.

There is no evidence of an armed home invasion reported incident/credible witnesses being committed by Mr. Burke whatsoever. Any such allegation is entirely false.

I have known Mr. Burke for many years and have entrusted him with overseeing law enforcement operations in my office for 10 years.

He is highly regarded in the law enforcement community by his subordinates and peers alike.

Please feel free to disseminate the contents of this correspondence as you see fit.

Very truly yours, Thomas J. Spota, Suffolk County District Attorney.

Q. Now, did the search committee headed by Kevin Law hire a police commissioner first or was James Burke made chief of department first?
A. I don't recall.
Q. Who was made police commissioner?
A. That was Stu Cameron.
Q. In 2002 -- 2012, do you recall? If you don't, that's

okay.
A. Senior moment.
Q. Does Richard Webber ring a bell?
A. Oh, yes. I'm sorry. Monday morning too.
Q. There you go. I got it wrong too.
Eddie Weber?
A. Ed Webber, and then he retired.
Q. Did Ed Webber hire Jimmy Burke?
A. I don't know how it works Civil Service-wise, but I believe the commissioner probably has to hire the various chiefs.
Q. Because it would make sense that the police commissioner would want to have his chief his own selection?
A. Yes. I'm sorry. Your question is the commissioner would want to have his or her own leadership team in the various chiefs. These are the uniform positions.
Q. In the usual course the police commissioner gets to select first and he or she picks their chief of department?
A. Correct.
MS. GATZ: I have no further questions.
Thank you very much.
THE WITNESS: Thank you.

CROSS-EXAMINATION
BY MR. KRANTZ:
Q. Good morning, Mr. Schaffer.
Can you hear me?
A. Yes. Good morning.
Q. My name is Larry Krantz. I represent Christopher McPartland here. I just have a few questions for you.
A. Sure.
Q. I would just like to direct your attention to the time period 2014, 2015.
You were the Town of Babylon Supervisor during that time period, correct?
A. Yes.
Q. And am I correct that during that time period the Town of Babylon had put out bids for contracts with carting or garbage companies?
A. Yes, for residential collection.
Q. And you were involved in that process, correct?
A. Yes.
Q. And am I correct that during that time period you received some threatening communications in connection with the rebidding process?
A. Yes.
Q. And you brought that information to the attention of the District Attorney's office, correct?

A. Yes.
Q. The Suffolk County District Attorney's office, correct?
A. Correct.
Q. And as part of the response from the District Attorney's office, did you receive a response from Mr. McPartland?
A. Yes.
Q. And did he participate in the investigation of the threatening information you had been receiving?
A. Yes.
MS. GATZ: Objection.
THE COURT: Overruled.
BY MR. KRANTZ:
Q. And, in fact, he equipped you with some recording equipment to try to gather evidence in connection with those threats, correct?
MS. GATZ: Objection.
THE COURT: Okay, how far are you going with this?
MR. KRANTZ: Two more questions.
A. Correct.
Q. And that he worked on that until the matter was resolved, correct?
A. Correct.

Q. And, at that time, he was the head of the Government Corruption Bureau in the District Attorney's office; is that right?
A. Correct.
Q. And that case involved you as a victim of -- potential victim of a crime?
MS. GATZ: Objection, your Honor. I think we're past two questions.
THE COURT: Overruled. I'll give him one more.
MR. KRANTZ: That's my last one.
A. Correct.
MR. KRANTZ: No further questions.
Thank you.

CROSS-EXAMINATION
BY MR. VINEGRAD:
Q. Good morning, Mr. Schaffer.
A. Good morning.
Q. I'm Alan Vinegrad. I represent Mr. Spota.
You've known Tom a long time, correct?
A. Correct.
Q. And did you also assist in his campaign for District Attorney in 2001?
A. Yes.
Q. There were many people who assisted in Tom Spota's

campaign for District Attorney in 2001, correct?
A. Correct.
Q. Members from the law enforcement community, correct?
A. Correct.
Q. Members of the Suffolk County community, correct?
A. Correct.
Q. And you described this process by which Mr. Spota in various years when he was running for reelection of being crossed-endorsed, right?
A. Correct.
Q. Which basically meant that in those years he had the support of the Suffolk County Democratic Party, right?
A. Correct.
Q. Of which you were the Chair?
A. Yes.
Q. He had the support of the Republican Party, correct?
A. Correct.
Q. And at various times the support of the Conservative Party, correct?
A. Correct.
Q. And the Independence Party, correct?
A. Correct.
Q. He had widespread support from various political parties within the county, correct?
A. Correct.

Q. Each of whom made their own independent decision whether or not to support him for reelection, right?
A. Correct.
Q. And they did, correct?
A. Yes.
Q. Now, you described Mr. Spota as one of the powerful people in Suffolk County Government, correct?
A. Yeah, through his position.
Q. And there are others as well, correct?
A. Correct.
Q. For example, the County Executive of Suffolk County, that would be another powerful person within Suffolk County Government?
A. Correct.
Q. You're the mayor of the Town of Babylon, the County Executive is sort of the major of all Suffolk County?
A. Of all 10 towns, yes.
Q. The police commissioner, that's one of the powerful people in Suffolk County Government, right?
A. Correct.
Q. The sheriff, that's one of the powerful people in Suffolk County Government?
A. Correct.
Q. The comptroller, that's a powerful person in Suffolk County Government, correct?

A. He's got the money. Sure.
Q. There you go.
And apart from people who work for the county, there are other public officials with their jurisdictions, including Suffolk County, who are also powerful. For example, U.S. Congresspersons?
A. Correct.
Q. They're powerful, right?
And in the political world you're a pretty powerful guy, aren't you?
A. Only in my own mind.
Q. Head of the committee that's kept you its head for many years, right?
A. Since September of 2000.
Q. So, all kidding aside, you are a powerful figure in the political scene in this county?
A. I guess so. Ego is the enemy. I try to keep it balanced.
Q. I'll stop embarrassing you. I'll move on to something else.
Now, you were asked about the time that Mr. Burke came to you in 2011 and asked for your help, correct?
A. Yes.
Q. And the help he wanted was to get the job as the

Chief of Department of the Suffolk County Police Department, right?
A. Correct.
Q. And, again, he came to you because you are influential in the county, right?
A. He knew I knew Steve Bellone since we were young, so he wanted an introduction to Steve.
Q. And it was going to be Mr. Bellone's pick, correct?
A. Correct.
Q. And you agreed to help Mr. Burke, correct?
A. Correct.
Q. You agreed to contact the County Executive to help Mr. Burke in his effort to get that job, correct?
A. Correct.
Q. You felt well enough about Mr. Burke to do that, right?
A. Yes.
Q. If you felt Mr. Burke was not qualified and competent for that position, you would not have contacted the County Executive to help him, correct?
A. Correct.
Q. Now, Mr. Burke was working for the Suffolk County District Attorney's office at that time, correct?
A. Correct.
Q. And Tom Spota was the District Attorney at that time,

correct?
A. Correct.
Q. And Mr. Burke asked for your help in getting that position of chief of department, the introduction to Mr. Bellone, Mr. Burke asked you not to tell Tom Spota about it; am I right?
A. Correct.
Q. And you honored that request; am I right?
A. Correct.
Q. And you spoke to Mr. Bellone about Mr. Burke, correct?
A. Correct.
Q. You actually had a conversation yourself with Mr. Bellone, right?
A. Correct.
Q. In addition to the introduction of Mr. Burke to Mr. Bellone directly, right?
A. Correct.
Q. And you told Mr. Bellone you supported Mr. Burke for the position, right?
A. Correct.
Q. Which is how you felt about him at the time, right?
A. Correct.
Q. And you knew Jimmy Burke at that point in time, right?

A. Sure.
Q. You had interactions with him over the years?
A. Absolutely.
Q. Smart man?
A. Yes.
Q. Charismatic?
A. Very.
Q. Innovative?
A. Very.
Q. In terms of his work in the police department, innovative leader?
A. Very.
Q. You communicated this to Mr. Bellone, correct?
A. Correct.
Q. And Mr. Bellone told you he loved Jimmy Burke, right?
MS. GATZ: Objection to hearsay, move to strike.
MR. VINEGRAD: State of mind.
A. Yes.
THE COURT: Overruled.
A. Yes, after they had met.
Q. After they had met Mr. Bellone told you he loved Jimmy Burke, right?
MS. GATZ: Objection.
THE COURT: Overruled.

BY MR. VINEGRAD:
Q. Right?
A. Yes.
Q. And Mr. Bellone appointed Jimmy Burke as the chief of the department, correct?
A. Correct.
Q. Now, you were asked questions about this anonymous letter and the response to it, right?
Do you recall ever speaking to Tom Spota about those documents?
A. I don't recall. Maybe after he sent his letter.
Q. Do you recall any such conversation, as you sit here now?
A. No.
Q. Do you know for a fact who actually drafted Mr. Spota's letter?
A. No.
Q. Do you know for a fact who gathered the information necessary to prepare Mr. Spota's letter?
A. No.
Q. Do you know who, in fact, reviewed that letter before it was signed?
A. No.
Q. You were asked some questions about Kathleen Rice; do you recall that?

A. Yes.

Q. And you're aware, are you not, that from time to time when the Suffolk County District Attorney's office cannot handle a particular case for some reason that it can seek the appointment of a special prosecutor from some other county to handle that case for it?

A. Yes.

Q. Okay.

Are you also familiar with the fact that it could happen in reverse, say if Nassau County has a case that for whatever reason they cannot handle, they can ask another county, such as the Suffolk County District Attorney's office, to handle that case for them?

A. Yes.

(Continued on next page.)

BY MR. VINEGRAD:
Q. Are you aware that the Suffolk County District Attorney's Office agreed to act as a special prosecutor in certain cases over the years for the Nassau County District Attorney's Office?
Are you aware of that?
A. No.
Q. Are you aware of whether the Nassau County District Attorney's Office ever agreed to handle cases on behalf of then Suffolk County DA's office that the Suffolk County DA's office couldn't handle, do you know one way or the other?
A. No.
Q. You spoke to Jimmy Burke, did you not, about the investigation into the alleged assault of Christopher Loeb, am I right?
A. Spoke to him.
Q. To Jimmy Burke --
A. Right.
Q. -- a number of times about the investigation into the alleged assault of Christopher Loeb.
A. Yes.
Q. Sort of what this trial's about, right?
Right? What this trial is about?
A. Yes.

Q. And Mr. Burke repeatedly told you he had done nothing wrong.
Am I right?
A. Correct.
Q. In early 2013, after the allegations first became public he said he did not do it. He denied it.
Correct?
A. Correct.
Q. Later in 2013 when the FBI commenced the investigation and started serving subpoenas he again denied it to you, correct?
A. Correct.
Q. He told you, in fact, that the allegations were, forgive me, bullshit, right?
A. Correct.
Q. And in 2015, after it was learned that the federal investigation into the alleged assault had become active again, he denied it to you then as well, correct?
A. At the beginning, yes.
Q. Yes.
And he denied it but he gave you an explanation for why it was, according to him, that the federal government was investigating him.
Correct?
A. Yes.

Q. He told you that he was under investigation because the federal law enforcement authorities were mad at him for removing police officers from a Long Island gang task force.
Right?
A. From all the task forces he described it as.
Q. He told you that?
A. Yes.
Q. Then in September of 2015, you had a different kind of conversation with Jimmy Burke, right?
A. Correct.
Q. And in September of 2015 you met with Jimmy Burke again, right?
A. Correct.
Q. And when you met with him he was upset, right?
A. Distraught.
Q. Crying?
A. Crying, yes.
Q. Rambling?
A. Yes.
Q. Basically told you at that point, you know, they are coming to get me, right?
A. Correct.
Q. And this, in terms of the words he used, was very different than what he had told you in the past about this

episode.
Right?
A. Correct.
Q. And the demeanor that he had at that time was very different than the demeanor that he had on those past occasions when he had denied assaulting Christopher Loeb.
Right?
A. Correct.
Q. Thank you, Mr. Schaffer.
MR. VINEGRAD: I have no further questions.
A. Thank you.

REDIRECT EXAMINATION

BY MS. GATZ:

Q. Mr. Schaffer, did you meet with Mr. Vinegrad prior to testifying at some point?
A. Yes.
Q. He asked you to meet with him and you agreed to meet with him?
A. Yes.
Q. Mr. Vinegrad asked you some questions about why you felt so confident about Burke that you actually went out and introduced him to County Executive Bellone.
Do you remember those questions?
A. What he just asked me?
Q. Yes.

A. Yes.
Q. Why did you feel that James Burke would be so great that you would introduce him to County Executive Bellone?
A. Because he had been performing his responsibilities in the office. He gave me no reason not to.
Q. According to whom?
According to the defendant Tom Spota?
A. According to just my view of him.
You know, I had interacted with him on a couple of occasions.
Q. Did Tom Spota seem supportive of James Burke?
A. Well, he was annoyed that I did not tell him that Burke had come to me.
Q. That's not my question.
A. Okay.
Q. Let me ask it again.
Did Tom Spota over the years, between 2001 and 2011 -- how did he describe James Burke?
A. He was supportive, yeah, of Burke and his work in the DA's office, yes.
Q. How supportive?
A. Supportive, I guess we read -- I read of the different promotions that he had made based on his scoring.
He kept him in the office working.

Q. Very supportive?
A. Yeah, very supportive.
Q. Close relationship?
A. Yes, I said that.
Q. So in terms of your relationship with James Burke and the defendant Tom Spota's relationship with James Burke, in your experience, who's closer?
A. Of me to Burke or Tom to Burke?
Q. Yes.
A. I would say Tom.
Q. A lot closer?
A. I would say they worked together every day, yeah.
Q. A lot closer, right?
A. Yeah.
Q. Now, was the defendant Tom Spota's support of Burke over all these years significant to you?
Did that factor into your introduction to County Executive Bellone?
A. One of the factors, yeah.
Q. You are also an attorney, are you not?
A. Yes.
Q. Did you represent James Burke in 1993 in an IAB investigation in which he was found to have done various acts of wrongdoing?
A. No.

Q. Do you know who did?
A. No.
Q. Did you look at Jimmy Burke's IAB file before you introduced him to County Executive Bellone?
A. No.
Q. Now, this letter that we just talked about from Tom Spota, December of 2011 --
A. Yes.
Q. -- Government Exhibit 906 in evidence --
MS. GATZ: Can I show it on the screen, please.
BY MS. GATZ:
Q. -- who signed that letter?
A. That's Thomas Spota.
Q. And he's the Suffolk County district attorney, right?
A. At the time, yes.
Q. In your experience does he sign letters that he doesn't read?
MR. VINEGRAD: Objection.
THE COURT: Overruled.
A. I don't know.
Q. Do you sign letters that you don't read?
A. I read everything I sign, yeah.
Q. Because you are a lawyer, right?
A. Yes.
Q. It's important for lawyers to read things before they

sign them, right?
A. Correct.
Q. Tom Spota's a lawyer?
A. Yes.
Q. Mr. Vinegrad just asked you some questions about 2015 in September when James Burke broke down and basically, in sum and substance, admitted to you the crimes that he was charged with were accurate, correct?
MR. KRANTZ: Objection.
A. Correct.
THE COURT: Overruled.
BY MS. GATZ:
Q. Yes?
A. Yes.
Q. And he told you that in September of 2015, right?
A. Labor Day of '15, yes.
MS. GATZ: One moment, your Honor.
(There was a pause in the proceedings.)
BY MS. GATZ:
Q. You also testified earlier that when the government was questioning you that Tom Spota did not like Kathleen Rice, is that right?
A. That he didn't support her.
Q. Do you know why?
A. No.

Q. Now, of all the powerful figures Mr. Vinegrad asked you questions about, how many of them had the power to indict people in Suffolk County?
A. Just the district attorney.
Q. How many of them had the power to authorize the arrest of people in Suffolk County, besides the police department?
A. I believe the sheriff does and the district attorney.
Q. How many people in Suffolk County have the power to wiretap people?
A. I believe just the district attorney, and the US Attorney's Office.
Q. So in terms of powerful people in Suffolk County government, who has the highest power as it relates to arrest, indictment and prosecution?
A. It would be the district attorney.
MS. GATZ: I have no further questions. Thank you.
MR. VINEGRAD: Brief recross.
THE COURT: Sure.
RECROSS-EXAMINATION
BY MR. VINEGRAD:
Q. Just one area I want to ask you a couple of questions about.
A. Sure.

Q. We have met once, right?
A. Yes.
Q. Back in or about April?
A. Sometime earlier this year.
Q. For maybe an hour or two?
A. Not even.
It was probably about 40 minutes, maybe.
Q. So by my count, as of a month ago, tell me if this sounds right, you met with representatives of the US Attorney's Office six times.
Am I right?
A. Sounds right.
Q. And in the last month did you meet with them again in order to prepare your testimony?
A. Yes.
Q. How many times?
A. I believe once in person and once on the phone.
Q. So that would make a total of eight sessions that you had with the members of their office where you were interviewed in connection with this case.
Am I right?
A. Yes, correct.
MR. VINEGRAD: No further questions.
MS. GATZ: I have no further questions. Thank you.

MR. KRANTZ: May I have one minute to check my notes on something?

Thank you.

(There was a pause in the proceedings.)

MR. KRANTZ: No questions, your Honor. Thank you.

THE COURT: Mr. Schaffer, you are excused. Thank you for coming.

THE WITNESS: Thank you, Judge.

(Witness steps down.)

THE COURT: Call your next witness, please.

MS. GATZ: The government calls Vincent Posillico, P-O-S-I-L-L-I-C-O.

THE CLERK: Please remain standing and raise your right hand.

VINCENT POSILLICO,

having been duly sworn, was examined

and testified as follows:

THE CLERK: You can be seated.

Please speak into the microphone and state and spell your name for the record.

THE WITNESS: Vincent Posillico, P-O-S-I-L-L-I-C-O.